BENJAMIN BRAFMAN
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-750-7800
Facsimile: 212-750-3906
Bbrafman@braflaw.com

Admitted Pro Hac Vice as Attorneys for
Defendant MELVYN I. WEISS

THOMAS M. BROWN (Cal. Bar No. 117449)
BROWN & WHITE LLP
333 South Hope Street, 36th Floor
Los Angeles, CA 90071
Telephone: 213-613-0500
Facsimile: 213-613-0550
Tbrown@brownwhitelaw.com

Attorneys for Defendant
MELVYN I. WEISS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 05-587(E) -JFW |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT MELVYN I. WEISS'S SENTENCING MEMORANDUM** |
| MELVYN I. WEISS, | |
| Defendant. | **(VOLUME 1 OF 4)** |
| | Date:       June 2, 2008<br>Time:       10:00 a.m. |

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

I. INTRODUCTION ...................................................................................1

II. PRELIMINARY STATEMENT .............................................................2

    A. The Rule 11(c)(1)(C) Plea Agreement Entered Into Between Defendant Melvyn I. Weiss And The Government ............................3

    B. The Court May Impose A Non-Guideline Sentence...........................5

III. THE HISTORY OF MELVYN I. WEISS ...............................................8

    A. Melvyn Weiss:  From Humble Origins To Leading Attorney, Philanthropist And Devoted Family Man...........................8

        (1) The Melvyn Weiss Story is One of Hard Work, Determination and the Pursuit of a Dream .................................8

        (2) Formal Education.........................................................................9

        (3) His Legal Career – The Early Years.........................................9

    B. The Law Firm Created By Lawrence Milberg & Melvyn Weiss Provided First Rate Legal Service to All of Its Many Clients...........................................................................9

        (1) Melvyn Weiss – A Lawyer With Great Vision And Leadership.........................................................................10

        (2) Lawrence Milberg & Melvyn Weiss Struggled Through Many Lean Years.......................................................11

    C. As The Firm Grew So Did The Determination Of Mr. Weiss To Use The Legal Talent He Harnessed To Address A Wide Range Of Corporate Wrongdoing And Also To Undertake An Important Array Of Pro Bono Litigation .....................................12

        (1) Mr. Weiss Recruited Some of the City's Finest Legal Minds, Professionals with Impeccable Legal Credentials To Help Do The Important Work at Milberg Weiss ...............13

# **TABLE OF CONTENTS**

**Page**

IV.   MR. WEISS UTILIZED THE LAW TO MAKE A DIFFERENCE IN
SOCIETY .................................................................................. 14

A.   Melvyn Weiss's Substantial Contributions To The
Public Good.................................................................... 14

B.   Melvyn Weiss Was A Visionary And A True Believer In
The Importance Of His Life's Work.................................. 16

C.   Holding Corporate America Accountable ......................... 20

D.   For So Many Years, Milberg Weiss Partnered With The
Government In Exposing Corporate And Consumer Fraud .............. 25

E.   The Legacy Of Melvyn Weiss Will Always Include His
Amazing Fight For a Group Of Ordinary Citizens of Glen
Avon, California, Victims of Corporate Pollution, The Victims
Of The Exxon Valdez Oil Spill, Helping Save The Southern
California Marine Environment And Children Victimized
In Nigeria .................................................................. 28

   (1)   The Stringfellow Acid Pits Case ............................. 28

   (2)   An Extraordinary Litigation – A Stunning Result
And Then a Wonderful Act of Generosity ................ 29

   (3)   The *Exxon Valdez* Litigation ................................. 31

   (4)   Saving the Southern California Marine Environment ............. 34

   (5)   Caring About the Children of Nigeria – The "Quality
Of Mercy is Never Strained" ................................ 35

F.   The Pro Bono Work Undertaken By Melvyn Weiss And
The Firm Is Unprecedented And The Good They Accomplished
Is Nothing Short Of Spectacular ...................................... 36

   (1)   The Holocaust Litigation ..................................... 36

1
2

### TABLE OF CONTENTS (Cont'd)

Page

3
4

(2)    A Survivor's Book of Poetry Gets Published by
Melvyn Weiss – A Lost Relative and Friend ...........................44

5
6

(3)    With The Guidance of Melvyn Weiss, The Milberg
Firm Steps In to Help Victims of Terrorism ...........................48

7
8

(4)    The Definition of a "Wise Man" Who Continuously
Gives of Himself to Help Others ...............................................48

9

(5)    Representing Garment Workers in Asia..................................49

10
11

(6)    Volunteering to Serve His Own Community, Giving
Of His Time and Energy........................................................49

12
13
14

(7)    Melvyn Weiss and Milberg Weiss Rescue the Legal
Aid Society and Contribute to Continuing Legal
Education Programs ................................................................50

15
16

V.    THE SCOPE OF THE CHARITY AND GENEROSITY OF
MELVYN WEISS IS BREATHTAKING.....................................51

17

A.    A "Compulsion" To Make The World A Better Place ......................52

18
19

B.    Endowing The Loan Repayment Assistance Program
At New York University School Of Law ...........................................53

20
21

C.    Inspiring Generosity In Others...........................................................56

22

(1)    The Child Life Program........................................................56

23
24
25

(2)    Like the Holocaust Litigation the Devotion of Mr. Weiss
To the Victims of a Terrorist Bombing in Argentina
Is Yet Another Moving Example of His Important
Humanitarian Work ................................................................57

26
27

(3)    Picasso For Everyone – Including the Blind and the
Disabled ..................................................................................59

28

## TABLE OF CONTENTS (Cont'd)

**Page**

(4)    Devoted to Finding Peace in the Middle East ......................... 60

(5)    Promoting Educational Opportunities ..................................... 60

(6)    The Alzheimer's Association .................................................. 61

(7)    Parkinson's Disease Research ................................................. 62

(8)    Teenagers Fighting Addiction ................................................ 62

(9)    The Hanley Center Foundation ............................................... 63

(10)   Supporting Peace, Fighting Gun Violence and
Supporting Art – The "Peace Angels Project" in
Los Angeles, California ......................................................... 63

(11)   Neighborhood Defender Services of Harlem .......................... 63

(12)   Discrimination and Civil Rights ............................................. 64

D.    The Extraordinary Charity Of Melvyn Weiss
Is Not Limited To Providing Support To A Large
Well-Funded Organization ................................................................ 65

(1)    Everyone Can Count On Mr. Weiss in Hard Times ................ 65

(2)    A Rare Day When Someone is Not at His Door ..................... 66

(3)    Recognition and Respect for Every Child ............................... 68

(4)    Spontaneously Kind ............................................................... 69

(5)    Saving a Family Business from Ruin ...................................... 69

(6)    Saving A Company – Saving A Life ....................................... 71

E.    The Emerging Legacy Of Melvyn Weiss – His Kindness,
Mentoring And Philanthropy ............................................................. 72

## **TABLE OF CONTENTS (Cont'd)**

**Page**

(1)   One of the Greatest Humanitarians of Our Time ..................... 72

(2)   A Spirit of Faith and Kindness for People of All
       Races and Creeds ........................................................ 74

(3)   "You are Nothing Until You Improve the
       Lives of Others" ......................................................... 75

(4)   We All Lose if Mr. Weiss Is Gone ........................................ 77

       a.    Helping a Family Adopt Orphaned Children ................. 78

       b.    Bonuses for Employees in Good Times and Bad .......... 79

       c,    A Father to Many ........................................... 79

       d.    My Home is Your Home .................................... 81

F.     Even If The Sentencing Guidelines Were Mandatory, This
       Court Would Be Authorized To Depart Downward From
       The Guideline Range Because Of The "Extraordinary"
       Charitable And Civic Work Mr. Weiss Undertook
       Throughout His Life ..................................................... 82

VI.    SO MANY PLEAD FOR GREAT LENIENCY AND A
       SENTENCE THAT CONSIDERS THE "TOTAL" LIFE
       OF THIS GREAT MAN ................................................ 87

A.     Colleagues and Adversaries Ask the Court For Justice
       With Mercy ............................................................... 87

B.     To Judge Melvyn Weiss on the Totality of His Career and Life ........ 87

C.     A Force for Good in the Corporate Universe ..................................... 88

D.     Our Planet is a Better Place Because of Men Like
       Melvyn Weiss ............................................................. 92

**<u>TABLE OF CONTENTS (Cont'd)</u>**

<u>Page</u>

VII.   MR. WEISS HAS ALREADY SUFFERED VERY SEVERE
PUNISHMENT THAT WILL CONTINUE FOR THE
BALANCE OF HIS LIFE AND HIS REMORSE IS MOST
GENUINE ................................................................................93

VIII.  MR. WEISS HAS BEEN DEVOTED TO HIS FAMILY
THROUGHOUT HIS LIFE ........................................................96

IX.    IN DETERMINING THE APPROPRIATE SENTENCE FOR
MR. WEISS, WE RESPECTFULLY REMIND THE COURT OF
THE POSITION THE GOVERNMENT TOOK AT WILLIAM
LERACH'S SENTENCE; THAT 24 MONTHS IMPRISONMENT
WAS CLEARLY ADEQUATE PUNISHMENT TO SATISFY
THE REQUIREMENTS OF 18 U.S.C. § 3553(A)..................... 101

X.     ON THE DATE OF HIS SENTENCING, MR. WEISS WILL BE
ALMOST 73 YEARS OLD, ELEVEN YEARS OLDER THAN
WILLIAM LERACH ON THE DATE OF HIS OWN
SENTENCING ....................................................................... 102

XI.    CONCLUSION ..................................................................... 105

Exhibit 1 – Plea Agreement ................................................................ 106

Exhibit 2 – Miller, Arthur (April 28, 2008 Letter) ................................ 136

Exhibit 3 – Barrack, Leonard (May 1, 2008 Letter).............................. 139

Exhibit 4 – Buchanan, David (April 30, 2008 Letter)........................... 141

Exhibit 5 – Restaino, John (April 21, 2008 Letter) .............................. 143

Exhibit 6 – Boies, David (May 5, 2008 Letter).................................... 145

Exhibit 7 – Zagrans, Eric (May 5, 2008 Letter) .................................. 147

Exhibit 8 – Kempf, Donald (May 7, 2008 Letter)................................. 149

Exhibit 9 – Grano, Joseph (April 14, 2008 Letter)............................... 152

Exhibit 10 – Gordon, Lilli (April 8, 2008 Letter).................................. 154

Exhibit 11 – Berman, Ira (April 15, 2008 Letter).................................. 156

1

**TABLE OF CONTENTS (Cont'd)**

2

**Page**

3    Exhibit 12 – Isquith, Fred (April 17, 2008 Letter) ...............................158

4    Exhibit 13 – Biederman, Robert (April 22, 2008 Letter) ......................160

5    Exhibit 14 – Spring, Richard (April 11, 2008 Letter) ..........................163

6    Exhibit 15 – Bernstein, Stanley (May 13, 2008 Letter) ........................165

7    Exhibit 16 – Stewart, Victor (May 1, 2008 Letter) ..............................167

8    Exhibit 17 – Jacob, Marvin (Undated Letter) ......................................169

9    Exhibit 18 – Gilreath, James (April 30, 2008 Letter) ...........................171

10   Exhibit 19 – Sporkin, Stanley (May 5, 2008 Letter) ............................173

11   Exhibit 20 – Newman, Penny (April 28, 2008 Letter) ..........................175

12   Exhibit 21 – Spinney, Linda (April 28, 2008 Letter) ...........................178

13   Exhibit 22 – Stinson, Betty (April 28, 2008 Letter) .............................180

14   Exhibit 23 – Merha, Sally (April 30, 2008 Letter) ...............................182

15   Exhibit 24 – Cowles, Macon (April 30, 2008 Letter) ...........................184

16   Exhibit 25 – Adams, Kenneth (May 13, 2008 Letter) ..........................186

17   Exhibit 26 – O'Neill, Brian (April 24, 2008 Letter) .............................189

18   Exhibit 27 – Knox, John (April 24, 2008 Letter) .................................191

19   Exhibit 28 – Altschuler, Richard (April 29, 2008 Letter) .....................193

20   Exhibit 29 – Bazyler, Michael (April 29, 2008 Letter) .........................195

21   Exhibit 30 – Neuborne, Burt (April 25, 2008 Letter) ...........................199

22   Exhibit 31 – Gaffney, Edwin McGlynn (May 2, 2008 Letter) ...............205

23   Exhibit 32 – Geoppinger, Jean (May 8, 2008 Letter) ...........................207

24   Exhibit 33 – Levin, Irwin (April 29, 2008 Letter) ...............................209

25   Exhibit 34 – Boloix, Frederic (May 1, 2008 Letter) .............................211

26   Exhibit 35 – Melvyn Weiss's Prologue to The Poems of Elly Gross ..................214

27   Exhibit 36 – Gross, Elly (April 7, 2008 Letter) ...................................217

28   Exhibit 37 – Prager, Bruce (April 18, 2008 Letter) .............................219

1

## **TABLE OF CONTENTS (Cont'd)**

2

**Page**

3    Exhibit 38 – Adelman, Sheldon (April 22, 2008 Letter).......................220

4    Exhibit 39 – Michel, Ernest (April 30, 2008 Letter) .............................222

5    Exhibit 40 – Feinberg, Kenneth (April 17, 2008 Letter)......................224

6    Exhibit 41 – Lewis, Neal (April 29, 2008 Letter) ................................225

7    Exhibit 42 – Suozzi, Thomas (May 9, 2008 Letter)..............................227

8    Exhibit 43 – Harvey, Norman (Undated Letter)....................................229

9    Exhibit 44 – Matschke, William (May 5, 2008 Letter) .........................230

10   Exhibit 45 – Revesz, Richard (April 15, 2008 Letter) ..........................232

11   Exhibit 46 – Sexton, John (May 5, 2008 Letter) ...................................234

12   Exhibit 47 – Abady, Jonathan (April 14, 2008 Letter)..........................236

13   Exhibit 48 – Maidenbaum, Jeffrey (April 24, 2008 Letter) ..................238

14   Exhibit 49 – Goldberg, Mark (April 30, 2008 Letter)...........................240

15   Exhibit 50 – Rotsztain, Saul (May 7, 2008 Letter)...............................242

16   Exhibit 51 – Attar, Dibo (May 1, 2008 Letter)......................................245

17   Exhibit 52 – Maurette, Fernando (Undated Letter) ...............................248

18   Exhibit 53 – Dr. Carlos Federico Ruckauf and
     Dra. Maria Isabel Zapatero De Ruckauf
19   (April 24, 2001 Letter to Melvyn Weiss) ..............................................250

20   Exhibit 54 – Bunzl, Nick (May 5, 2008 Letter) ....................................251

21   Exhibit 55 – Wasserman, Debra (April 29, 2008 Letter) ......................252

22   Exhibit 56 – Lancry, Yehuda (April 30, 2008 Letter)...........................254

23   Exhibit 57 – Goldfein, Laurence (April 9, 2008 Letter)........................257

24   Exhibit 58 – Levy, Edwin (April 21, 2008 Letter) ...............................259

25   Exhibit 59 – Webster, Curt (May 1, 2008 Letter) .................................261

26   Exhibit 60 – Baum, William (April 2, 2008 Letter) ..............................262

27   Exhibit 61 – Beshara, Ronald (April 8, 2008 Letter) ............................264

28

1

## **TABLE OF CONTENTS (Cont'd)**

2
**Page**

3    Exhibit 62 – Evola-Smidt, Linda (Undated Letter)...................................266

4    Exhibit 63 – Dietl, Richard "Bo" (May 6, 2008 Letter)...................................268

5    Exhibit 64 – Reich, Seymour (April 30, 2008 Letter)...........................271

6    Exhibit 65 – Sheehy, Jim (Undated Letter)...........................273

7    Exhibit 66 – Cohen, Arline (April 28, 2008 Letter)...........................275

8    Exhibit 67 – Pirie, Robert (April 17, 2008 Letter)................................277

9    Exhibit 68 – Markowitz, Danny (April 12, 2008 Letter)....................279

10    Exhibit 69 – Jacoby, Jonathan (April 29, 2008 Letter)...........................281

11    Exhibit 70 – Tomasello, James and Debra (April 21, 2008 Letter)....................283

12    Exhibit 71 – Rosenfeld, Robert (April 15, 2008 Letter)...........................285

13    Exhibit 72 – Benoit, Daniel (Undated Letter)...........................286

14    Exhibit 73 – Capazzi, Robert (Undated Letter)...........................287

15    Exhibit 74 – Goldberg, Gail (May 13, 2008 Letter)...........................289

16    Exhibit 75 – Silverman, Jonathan (May 12, 2008 Letter)....................292

17    Exhibit 76 – Buzga, Kara (April 2008 Letter)...........................294

18    Exhibit 77 – Levitt, Adam (April 23, 2008 Letter)...........................296

19    Exhibit 78 – Henry, Clarence (April 28, 2008 Letter)...........................299

20    Exhibit 79 – Bergman, David (April 5, 2008 Letter)...........................301

21    Exhibit 80 – Carmody, William (May 5, 2008 Letter)...........................304

22    Exhibit 81 – Geller, Marilyn (May 7, 2008 Letter)...........................306

23    Exhibit 82 – Alvarado, Ismael (April 8, 2008 Letter)...........................307

24    Exhibit 83 – Silverman, Lois (April 18, 2008 Letter)...........................309

25    Exhibit 84 – Schultz, Kenneth (April 24, 2008 Letter)...........................313

26    Exhibit 85 – Wong, Mandy (April 28, 2008 Letter)...........................315

27    Exhibit 86 – Morris, Carl (April 24, 2008 Letter)...........................316

28    Exhibit 87 – White, Elizabeth (April 18, 2008 Letter)...........................317

## TABLE OF CONTENTS (Cont'd)

**Page**

Exhibit 88 – Taylor, Belinda (Undated Letter) ...................................................318

Exhibit 89 – Griffith, Vernesha (April 23, 2008 Letter) .......................................320

Exhibit 90 – Karam, Francis (May 14, 2008 Letter) ............................................322

Exhibit 91 – Cespedes, Larissa (April 24, 2008 Letter) .......................................324

Exhibit 92 – Susman, Stephen (April 10, 2008 Letter) .........................................326

Exhibit 93 – Weinstein, Daniel (April 16, 2008 Letter)........................................327

Exhibit 94 – Morelli, Benedict (May 5, 2008 Letter)...........................................329

Exhibit 95 – Nussbaum, Bernard (April 22, 2008 Letter).....................................331

Exhibit 96 – Middleton Jr., Richard (April 14, 2008 Letter) ................................333

Exhibit 97 – Green, James (May 1, 2008 Letter) .................................................336

Exhibit 98 – Bell, Martin (April 23, 2008 Letter) ...............................................338

Exhibit 99 – Bursey, Steve (May 1, 2008 Letter).................................................340

Exhibit 100 – Kushner, Gary (April 29, 2008 Letter) ..........................................342

Exhibit 101 – Shapiro, Philip (May 7, 2008 Letter).............................................345

Exhibit 102 – Klein, Peter (April 7, 2008 Letter).................................................347

Exhibit 103 – Ruskin, Melvyn (April 11, 2008 Letter).........................................349

Exhibit 104 – Weiss, Jennifer (Undated Letter) ..................................................351

Exhibit 105 – Weiss, Melvyn (May 7, 2008 Letter)..............................................353

Exhibit 106 – Fox, Rita (April 27, 2008 Letter)...................................................355

Exhibit 107 – Kessler, Alberta (April 28, 2008 Letter).........................................357

Exhibit 108 – Bystock, Isidore (April 29, 2008 Letter) ........................................359

Exhibit 109 – Weiss, Nancy (Undated Letter) .....................................................360

Exhibit 110 – Weiss, Gary (April 28, 2008 Letter)...............................................362

Exhibit 111 – Weiss, Stephen (April 27, 2008 Letter) ..........................................364

Exhibit 112 – Weiss, Barbara (April 15, 2008 Letter) ..........................................370

Exhibit 113 – Politan, Nicholas (April 22, 2008 Letter).......................................372

1

## **TABLE OF CONTENTS (Cont'd)**

2
**Page**

3  Exhibit 114

4        Adams, Arlin (May 8, 2008 Letter).............................................................374

5        Adler, Robert (April 8, 2008 Letter) ........................................................376

6        Appel, Brian (April 10, 2008 Letter).......................................................377

7        Artsis, Michael (April 29, 2008 Letter).....................................................378

8        Asher, Itzhak (April 26, 2008 Letter)........................................................380

9        Asher, Karen (April 22, 2008 Letter) .......................................................382

10        Barsel, Ely (April 23, 2008 Letter) ..........................................................384

11        Bell, John (April 30, 2008 Letter) ............................................................385

12        Bell, Marc (April 28, 2008 Letter) ...........................................................387

13        Bendheim, Jack (April 10, 2008 Letter).....................................................389

14        Berkowitz, Bebe (Undated Letter) ............................................................391

15        Bernard, Martin (April 8, 2008 Letter) .....................................................393

16        Bernstein, Jacob (April 22, 2008 Letter)....................................................394

17        Bernstein, Jerry (April 10, 2008 Letter).....................................................396

18        Beyer, Timothy (April 23, 2008 Letter).....................................................399

19        Binns, James (April 16, 2008 Letter) ........................................................401

20        Blumenfeld, Edward (April 23, 2008 Letter)............................................402

21        Bowman, Jason (April 23, 2008 Letter) ....................................................403

22        Brenner, Dean (April 10, 2008 Letter).......................................................404

23        Brody, Sheldon (April 9, 2008 Letter) ......................................................406

24        Chesley, Stanley (May 5, 2008 Letter) ......................................................408

25        Chusid, Sydelle (April 12, 2008 Letter).....................................................410

26        Cohen, Daniel (April 28, 2008 Letter) ......................................................411

27        Cole, Sidney (April 16, 2008 Letter).........................................................412

28        Criscione, Joseph and Joan (April 8, 2008 Letter).....................................413

1

## **TABLE OF CONTENTS (Cont'd)**

**Page**

2

3    Cubero, Bernabe (April 30, 2008 Letter) ...................................................414

4    Davimos, Richard (April 10, 2008 Letter) ................................................415

5    Davis, J. Morton (April 23, 2008 Letter) .................................................416

6    Deegan, Daniel (April 23, 2008 Letter) ...................................................418

7    Demant, Rabbi Marvin (April 27, 2008 Letter) .......................................419

8    Faltischek, Michael (April 28, 2008 Letter)............................................421

9    Feinstein, Leonard (April 24, 2008 Letter) .............................................423

10   Figueroa, George (April 23, 2008 Letter) ................................................424

11   Finkelstein, Marilyn (April 25, 2008 Letter) ..........................................426

12   Finkelstein, Ronald (May 2, 2008 Letter) ...............................................427

13   Foxman, Abraham (April 25, 2008 Letter) ..............................................428

14   Fraidin, Stephen (April 15, 2008 Letter)..................................................430

15   Friedman, Phil (April 17, 2008 Letter) ....................................................432

16   Furman, Gail (April 9, 2008 Letter)..........................................................434

17   Garfinkel, Barry (April 22, 2008 Letter)..................................................436

18   Ginstling, Phyllis (April 28, 2008 Letter) ...............................................428

19   Goldbaum, Arnold (April 21, 2008 Letter)..............................................440

20   Goldberg, Alan (May 10, 2008 Letter) ....................................................441

21   Goldberg, Sidney (April 24, 2008 Letter) ...............................................442

22   Gordon, Joel (April 10, 2008 Letter)........................................................443

23   Gordon, Robert (April 23, 2008 Letter) ...................................................445

24   Gould, Fredric (April 15, 2008 Letter).....................................................447

25   Greenberg, Robert (May 16, 2008 Letter) ...............................................449

26   Grumet, Karin (April 16, 2008 Letter)......................................................450

27   Hamburger, Bradley (April 11, 2008 Letter) ...........................................452

28   Handelman, Martin (April 28, 2008 Letter)..............................................454

# **TABLE OF CONTENTS (Cont'd)**

**Page**

Heideman, Richard (May 16, 2008 Letter) ................................................. 455

Hirsh, Jennifer (April 29, 2008 Letter) ..................................................... 457

Horowitz, Sidney (Undated Letter) ........................................................... 459

Howard, Morton (April 25, 2008 Letter) ................................................... 461

Hubbard, Stephen (April 22, 2008 Letter) ................................................ 463

Huber, Beverly (April 29, 2008 Letter) ..................................................... 465

James, Jim (May 15, 2008 Letter) ............................................................. 466

Johnson, Eric (April 7, 2008 Letter) ......................................................... 467

Kaplan, Brian (April 15, 2008 Letter) ....................................................... 469

Kaplan, Phyllis (April 21, 2008 Letter) ..................................................... 471

Kaplan, Richard (April 21, 2008 Letter) .................................................... 472

Katz, Robert (May 6, 2008 Letter) ............................................................ 473

Kayne, Steven (April 25, 2008 Letter) ...................................................... 475

Kimelman, Martin (April 16, 2008 Letter) ................................................ 477

Kliger, Sam (Undated Letter) .................................................................... 479

Kreitman, Stanley (April 8, 2008 Letter) ................................................... 481

Labaton, Edward (April 23, 2008 Letter) ................................................... 482

LaBoy, Zulma (April 24, 2008 Letter) ....................................................... 484

Lapatine, Kenneth (April 23, 2008 Letter) ................................................. 485

LeBow, Bennet (April 29, 2008 Letter) ..................................................... 487

Leibowitz, Gail (April 28, 2008 Letter) ..................................................... 488

Levin, Arnold (April 14, 2008 Letter) ....................................................... 490

Levitt, Arthur (April 17, 2008 Letter) ....................................................... 492

Levy, Jack (April 14, 2008 Letter) ............................................................ 493

Lifton, Martin (April 17, 2008 Letter) ...................................................... 494

Lilling, Frances (April 24, 2008 Letter) ..................................................... 496

1

**TABLE OF CONTENTS (Cont'd)**

2

<u>**Page**</u>

3    Lopez, Cynthia (April 29, 2008 Letter)......................................497

4    March, Ronald (April 21, 2008 Letter) ....................................499

5    Markel, Gregory (April 30, 2008 Letter) ..................................500

6    May, John (April 6, 2008 Letter) ...........................................501

7    McLaughlin, David (May 7, 2008 Letter)..................................503

8    Meadow, Richard (April 25, 2008 Letter)..................................504

9    Medalie, Richard (April 29, 2008 Letter) .................................505

10   Meehan, Samantha (Undated Letter) .......................................507

11   Merson, Robert (April 11, 2008 Letter) ...................................508

12   Meyers, Bruce (April 29, 2008 Letter)......................................509

13   Miles, Karen (April 26, 2008 Letter) ......................................511

14   Miller, Gloria (April 17, 2008 Letter) .....................................513

15   Miller, Henry (April 16, 2008 Letter) ......................................514

16   Miller, Michael (Undated Letter) ...........................................517

17   Mininberg, Harvey (April 15, 2008 Letter)................................518

18   Moritt, Neil (May 16, 2008 Letter) .........................................519

19   Morris, Irving (May 18, 2008 Letter).......................................522

20   Morris, Stanley (April 8, 2008 Letter) .....................................526

21   Naschitz, P.G. (April 15, 2008 Letter) .....................................527

22   Nappi, Ralph (April 14, 2008 Letter) ......................................529

23   Neiman, Robert and Gerilyn (April 14, 2008 Letter)....................530

24   Nemshin, Sanford (April 22, 2008 Letter) ................................532

25   O'Connor, Brian (May 6, 2008 Letter) .....................................534

26   Osinoff, Clinton (April 20, 2008 Letter)....................................536

27   Paganelli, John (April 22, 2008 Letter).....................................537

28   Parker, Morina (April 12, 2008 Letter)......................................538

SENTENCING MEMORANDUM
ON BEHALF OF MELVIN I WEIS

# **TABLE OF CONTENTS (Cont'd)**

**Page**

Pearl, Bruce (April 22, 2008 Letter) ................................................541

Perelmuter, Rabbi (April 25, 2008 Letter) ................................................542

Perez, Carmen (April 22, 2008 Letter)................................................543

Pliskin, Kurt (April 29, 2008 Letter) ................................................545

Ponieman, Alejandro (April 24, 2008 Letter) ................................................546

Posner, Samuel (April 21, 2008 Letter) ................................................548

Pozner, Murray (Undated Letter) ................................................550

Putman, Frank (April 22, 2008 Letter)................................................551

Reissman, Maurice (April 21, 2008 Letter) ................................................553

Richheimer, Michael (Undated Letter) ................................................555

Ricken, Norman (April 19, 2008 Letter)................................................556

Roberts, Fred (April 30, 2008 Letter) ................................................557

RoccoGrande, Frank (April 18, 2008 Letter)................................................559

Rock, Allan and Strosberg, Harvey (April 30, 2008 Letter)................................561

Rosen, Jack (May 12, 2008 Letter) ................................................563

Rosen, Sam (April 8, 2008 Letter) ................................................564

Rosenfeld, Frederick (April 7, 2008 Letter)................................................565

Rosenfeld, Michael (April 15, 2008 Letter)................................................567

Rosenfeld, Steven (April 6, 2008 Letter) ................................................569

Rosental, Leo (April 2008 Letter) ................................................571

Rosenthal, Paula (Undated Letter) ................................................575

Rothman, Robert (Undated Letter)................................................576

Sagat, Kenneth (May 12, 2008 Letter)................................................578

Satsky, Monroe and Alyce (April 14, 2008 Letter) ................................................580

Schiff, Paul (April 27, 2008 Letter) ................................................581

Schwartz, Bernard (April 22, 2008 Letter) ................................................582

## TABLE OF CONTENTS (Cont'd)

**Page**

Seeger, Christopher (May 19, 2008 Letter)...................................................584

Seltzer, Robert (April 2, 2008 Letter) ........................................................588

Shalam, John (April 14, 2008 Letter)..........................................................589

Sher, Barry (April 24, 2008 Letter)............................................................590

Shifter, Jerome (April 28, 2008 Letter).......................................................592

Shub, Jonathan (April 28, 2008 Letter)........................................................593

Simon, Leonard (April 29, 2008 Letter) .......................................................595

Simon, Melvin (April 11, 2008 Letter) ........................................................597

Sklar, Lori (May 1, 2008 Letter) ..............................................................598

Smith, Ira (April 17, 2008 Letter) ............................................................600

Smith, Jeffrey (April 19, 2008 Letter)........................................................602

Snyder, Donald (April 13, 2008 Letter) .......................................................604

Sobel, Jack (April 21, 2008 Letter) ..........................................................605

Sollinger, Edward (April 23, 2008 Letter) ....................................................606

Sonnenblick, Arthur (Undated Letter) .........................................................608

Speer, Charles (April 9, 2008 Letter).........................................................609

Steiner, Dina Marie (Undated Letter) .........................................................611

Stoll, N. Robert (April 14, 2008 Letter)......................................................613

Stone, Joel (April 24, 2008 Letter)...........................................................615

Tamir, Baruch (May 9, 2008 Letter)............................................................616

Tantleff, Irwin (Undated Letter)..............................................................618

Taub, Melvin (April 14, 2008 Letter) .........................................................619

Wansa, Paula (April 29, 2008 Letter) .........................................................621

Weinstein, Charles (April 16, 2008 Letter)....................................................622

Weiss, Debra (May 19, 2008 Letter)............................................................623

1

**TABLE OF CONTENTS (Cont'd)**

2

<u>**Page**</u>

3

Weiss, Norman (April 7, 2008 Letter) ........................................................625

4

Weitman, Jeffrey (Undated Letter) ...........................................................626

5

Weitz, Perry (April 10, 2008 Letter) .........................................................627

6

Wexler, Alan (Undated Letter)..................................................................629

7

Whitcomb, Jon (May 5, 2008 Letter).........................................................630

8

Whitfield, Janis (April 20, 2008 Letter).....................................................632

9

Woods, William (April 15, 2008 Letter).....................................................634

10

Zavis, Michael (Undated Letter) ...............................................................635

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SENTENCING MEMORANDUM
ON BEHALF OF MELVIN I WEIS

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
### <u>Cases</u>

4
*Gall v. United States*,

5
    128 S.Ct. 586 (2007) ...................................................................5

6
*Koon v. United States*,

7
    518, U.S. 81, 96 (1996) .............................................................83

8
*Rita v. United States*,

9
    127 S.Ct. 2456 (2007) ...............................................................5

10
*United States v. Adelson*,

11
    441 F.Supp.2d 506 (S.D.N.Y. 2006) .....................................84, 85

12
*United States v. Booker*,

13
    543 U.S. 220 (2005) ...............................................................5, 6

14
*United States v. Canova*,

15
    412 F.3d 331 (2d Cir. 2005).......................................................83

16
*United States v. Cooper*,

17
    394 F.3d 172 (3d Cir. 2005) ......................................................84

18
*United States v. Fitch*,

19
    282 F.3d 364 (6th Cir. 2002).......................................................5

20
*United States v. Jones*,

21
    158 F.3d 492 (10th Cir. 1998) ...................................................84

22
*United States v. Lucania*,

23
    379 F. Supp.2d 288 (E.D.N.Y. 2005)...........................................7

24
*United States v. Matheny*,

25
    450 F.3d 633 (6th Cir. 2006)......................................................5

26
*United States v. Moncivais*,

27
    492 F.3d 652 (6th Cir. 2007).......................................................5

28

1

## **TABLE OF AUTHORITIES (Cont'd)**

2
**Page(s)**

3 **Cases**

4 *United States v. Randolph*,
5     230 F.3d 243 (6th Cir. 2000).......................................................................... 5

6 *United States v. Serafini*,
7     233 F. 3d 758 (3d Cir. 2000) ................................................................... 83, 84

8 *United States v. Sprei*,
9     145 F.3d 528 (2d Cir. 1998) ........................................................................ 83

10 *United States v. Vonner*,
11     _ F.3d__, 2008 WL 320773 (6th Cir. Feb 07, 2008)................................... 6

12 *United States v. Woods*,
13     159 F.3d 1132 (8th Cir. 1998) .................................................................... 84

14 **Statutes**

15 18 U.S.C. § 3553(a) ............................................................................................ 3

16
17 18 U.S.C. § 3553(a)(2)(A) .................................................................................. 7

18 18 U.S.C. § 3553(a)(2)(B) .................................................................................. 7

19 18 U.S.C. § 3553(a)(2)(C) .................................................................................. 7

20
21 18 U.S.C. § 3553(a)(2)(D) .................................................................................. 7

22 18 U.S.C. § 3661.................................................................................................. 7

23

24 **Other Authorities**

25 Fed.R.Crim.P. 11(c)(1)(C).................................................................................. 3

26 U.S.S.G. §1B1.4 .................................................................................................. 7

27
28 U.S.S.G. § 5H1.11 ............................................................................................... 7

SENTENCING MEMORANDUM
ON BEHALF OF MELVIN I WEIS

## I.  __INTRODUCTION__

On June 2, 2008, this Court will have the difficult responsibility of imposing sentence on Melvyn I. Weiss, who, despite the criminal conduct he has acknowledged, is nevertheless considered by so many to be one of the most extraordinary men of this generation.  With great respect for the independence and integrity of this Court, counsel for Mr. Weiss submits that in fashioning an appropriate sentence in this case, your Honor should weigh not only the seriousness of the offense conduct to which Mr. Weiss entered his guilty plea.  Counsel respectfully submits that your Honor should also consider the undisputed fact that throughout his adult life, Mr. Weiss has devoted his talent, his energy, much of his resources and so much of his time to a breathtaking array of charitable and public service activities that over the past 50 years has helped improve the quality of life for millions of citizens throughout the world.

From the public record made by this Court at the sentencing proceedings of the defendant William Lerach on February 11, 2008, it is clear to Mr. Weiss and his counsel that your Honor views the criminal conduct engaged in by Mr. Weiss and his colleagues to be very serious.  Neither Mr. Weiss nor his counsel quarrel with that characterization.  Indeed, perhaps better than anyone else, Mr. Weiss will bear the very heavy burden for his criminal conduct and he will live with regret, shame, contrition and genuine remorse for the rest of his life regardless of the sentence this Court imposes.

Mr. Weiss does not ask to be forgiven by your Honor.  Nor does Mr. Weiss even ask for understanding, as the conduct he participated in is something that he himself will never fully understand.  What Mr. Weiss does understand is that the criminal conduct he engaged in destroyed his personal legacy and the legacy of the wonderful law firm he helped build, and by his actions caused damage to a legal system to which he devoted so much of his life, talent, and scholarship.

- 1 -

1   Mr. Weiss and his counsel ask for compassion.  Compassion we submit that

2   Mr. Weiss has earned through a lifetime of honest service to others, a lifetime and

3   career during which he has made a very positive difference in the lives of so many.

4   Counsel for Mr. Weiss ask only for a measure of the great compassion that for the

5   last 50 years Mr. Weiss extended to others in both his professional and personal life.

6   Compassion, we submit, that might almost defy belief, if not for the fact that his

7   kindness and good work is so well-documented as to be beyond dispute.

8   More than 250 people from virtually every walk of life have written to your

9   Honor about their own interaction with Mr. Weiss.  Each letter referenced in this

10   Memorandum is attached hereto and is made part of this sentencing submission.  For

11   your Honor's convenience, many of the letters are also excerpted in the body of this

12   Memorandum so that they can be more easily referenced as they confirm the

13   exceptional qualities of Mr. Weiss that each of the writers respectfully brings to the

14   Court's attention.

15   Each of the letters, those from the leaders of industry to those from ordinary

16   citizens; from those who know Mr. Weiss as a great advocate and champion of

17   victims' rights to those who know him simply as a kind considerate man; all who

18   write speak of his compassion for others and plead in their own distinct voice with

19   powerful eloquence for your Honor to show leniency.  As your Honor reads about

20   the life, vision and true greatness of Melvyn Weiss, we respectfully ask that the

21   Court recognize not only the tragedy inherent in these proceedings but to also note

22   the true spirit of a very great man.

23   **II.   PRELIMINARY STATEMENT**

24   Despite more than 30 years as an active responsible criminal defense lawyer,

25   counsel has rarely if ever submitted to any Sentencing Court, in any jurisdiction, a

26   more compelling set of materials than those submitted to this Court on behalf of

27   Melvyn Weiss.

28

- 2 -

Together with this Memorandum we submit more than **250** letters.  What sets apart many of the letters in this case is the fact that so many of the people who write speak of how Mr. Weiss "changed" a life, or the lives of thousands.  Each letter tells a personal and often remarkable story of how Mel Weiss helped someone live a better life, choose a more productive career, recover assets wrongfully taken, or simply restored a measure of pride and dignity to a cause, a charity, a community, or a troubled life.  Each of these stories explains why Melvyn Weiss is an extraordinary man.  A man who has earned the honest compassion that we seek from this Court.

**A.      The Rule 11(c)(1)(C) Plea Agreement Entered Into Between Defendant Melvyn I. Weiss And The Government**

As your Honor knows, Mr. Weiss entered his plea pursuant to 11(c)(1)(C) of the Federal Rules of Criminal Procedure, with the understanding that if this Court does not accept the Agreement, Mr. Weiss would then be free to withdraw his Plea and proceed to trial.  In the Plea Agreement, Mr. Weiss and the Government have agreed that an appropriate disposition in this case would allow the Court to impose a sentence with a range of **18 to 33 months imprisonment**, with the Court retaining discretion to substitute community confinement or home detention for no more than one-half of the term of imprisonment imposed; a fine of **$250,000**; a three year period of Supervised Release; and a special assessment of $100.  The Agreement also provides that Mr. Weiss is to forfeit the amount of **$9,750,000** as proceeds of the Racketeering Conspiracy (Weiss Plea Agreement, Exhibit 1).

Counsel for Mr. Weiss respectfully submits that the Agreement entered into by experienced lawyers on both sides, after extensive negotiations, clearly provides for an adequate scope of punishment that will permit this Court in its discretion to impose a sentence that properly considers all of the sentencing factors provided in 18 U.S.C. § 3553(a), a sentence that is adequate but <u>not</u> greater than necessary when

considering the character of the defendant, the nature of the offense and the need to promote respect for the law.

As the Probation Office has confirmed, an 18-33 month sentencing range allows for a sentence within the advisory Guideline range calculated to be 33-41 months, with the Probation Office recommending a sentence of **33** months, the low end of the range, due to the age and the impressive charitable work of Mr. Weiss. We note that Probation Office did not have the letters submitted herewith when its report was prepared and accordingly, did not consider whether a departure was appropriate under Section 5H1.11 of the Sentencing Guidelines. *See* Section III(F), *infra*, at page 82.

Counsel for Mr. Weiss respectfully suggests that when all of the materials we now submit on behalf of Mr. Weiss are carefully studied, your Honor will conclude that the "maximum" sentence of 33 months imprisonment allowed under the Agreement is more severe than justice requires in this case because of the many compelling reasons set out below and in the hundreds of letters written to this Court by those who know Mr. Weiss best.

On the date of his sentencing, Mr. Weiss will be almost **73 years old**.  His conviction will result in his disbarment and his inability to ever again practice a profession that he has devoted his entire life to.  Mr. Weiss has also agreed to financial penalties of **$10 million dollars,** substantially more than the financial penalty imposed on any of his colleagues who have already entered their pleas in this case.  Counsel notes that the financial penalties that Mr. Weiss will suffer involve after tax funds, making the penalty almost twice the dollar amount listed.  In short when all of the financial penalties and other collateral losses that Mr. Weiss will personally suffer are totaled, he will have lost more than his share of the criminal proceeds he earned from the charged criminal conduct.

1    Counsel respectfully asks your Honor to accept the Rule 11 Agreement
2  entered into by the parties and impose the lowest sentence this Court in its discretion
3  feels is appropriate.

4        **B.        The Court May Impose A Non-Guideline Sentence**

5    Counsel submits that the appropriateness of a <u>non</u>-Guidelines sentence is
6  contemplated by the Plea Agreement in this case.  If that were not true, the onus
7  would have been on the Government to eliminate any ambiguity.  "The Court will
8  thus construe [a]mbiguities in a plea agreement ... against the government."  *United*
9  *States v. Moncivais*, 492 F.3d 652 (6th Cir. 2007), citing *United States v. Fitch*, 282
10  F.3d 364, 367 (6th Cir. 2002), citing *United States v. Randolph*, 230 F.3d 243, 248
11  (6th Cir. 2000) (internal quotes omitted).

12    In this case, it was recognized by all, that the Guidelines are advisory and not
13  mandatory.  Indeed, implicit in the Agreement is the understanding that the Court
14  may impose a sentence of imprisonment as low as **18** months, with the further
15  understanding that that the Court could substitute a period of home confinement or
16  community service for up to half the sentence imposed.

17    Counsel respectfully submits that, after considering the Guidelines, as it is
18  required to do, *Rita v. United States*, 127 S.Ct. 2456 (2007); *United States v.*
19  *Booker*, 543 U.S. 220 (2005), the Court should impose a "<u>non</u>-Guidelines" sentence,
20  as is within the reasonable exercise of its discretion.  *Gall v. United States*, 128 S.Ct.
21  586 (2007).

22    In this regard, we further note that the United States Supreme Court has
23  rejected any rule that hinges the "reasonableness" of any deviation from the
24  Guidelines on a finding of "extraordinary" circumstances.  *Gall,* 128 S.Ct. at 595.
25  Furthermore, as noted in *Gall*, any sentence outside the guideline range will not be
26  "presumptively unreasonable."  *United States v. Matheny*, 450 F.3d 633, 642 (6th
27  Cir. 2006).  As one court recently observed:

28        *Booker* empowered district courts, not appellate courts and not the

Sentencing Commission.  Talk of presumptions, plain error and procedural and substantive rules of review means nothing if it does not account for the central reality that *Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them.

*United States v. Vonner*, __ F.3d__, 2008 WL 320773 (6th Cir. Feb 07, 2008).

Based on this regimen, for purposes of imposing the appropriate sentence in the case of Melvyn Weiss,

[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. **The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party . . . .**

*Gall*, 128 S. Ct. at 596 (emphasis added).

In the final analysis, post *Booker*, a sentencing court is required to "impose a sentence sufficient, but <u>not</u> greater than necessary," to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a). According to the statute, in making this determination, the court must consider

a)   the nature and circumstances of the offense and the history and characteristics of the defendant;

b)   the need for the sentence imposed to achieve each of the enumerated purposes of sentencing;

c)   the kinds of sentences available;

d)   the applicable statute, guideline range and policy statements; and

e)   the need to avoid unwarranted sentence disparities among similarly situated defendants.  *Id.*

In evaluating these factors, the sentencing Court is not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence.  18 U.S.C. § 3661; Guidelines § 1B1.4.  Rather, **all that a person has accomplished, separate and apart from the charged conduct, must be considered.**

As we demonstrate below, the acts which serve as the predicate for Melvyn Weiss's conviction by his plea stand in stark contrast to his background.  Certainly, he has never before been convicted of any crime.  *Cf. United States v. Lucania*, 379 F. Supp.2d 288, 298 (E.D.N.Y. 2005) (Sifton, J.) (Post-*Booker* case where court noted that "Guidelines also do not take into account the inverse relationship between age and recidivism").  Moreover, throughout his life, Mr. Weiss has been a devoted family man and a trusted, committed, loyal friend to many, offering his assistance whenever needed.

Melvyn Weiss's  lifetime of giving his time for the good of the community; his selfless, dedication to his wife, family and friends; his advanced age, his remorse and the fact of his disbarment, are a rare combination of sentencing circumstances that we submit, merit this Court's consideration.

Certainly, a sentence substantially below that which a raw Guideline calculation produces would still reflect the seriousness of the offense, to promote respect for the law, and provide just punishment, § 3553(a)(2)(A), and afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  We note of course that in the case of Mr. Weiss, the Court need not consider the need "to protect the public from further crimes of the defendant," § 3553(a)(2)(c), nor is there any need to provide Mr. Weiss with "any particular educational or vocational training."  18 U.S.C. § 3553(a)(2)(D).

1    In sum, a balancing of the statutory factors demonstrates that the applicable

2    Guidelines in this case need not be followed, since the imposition of a sentence

3    below a Guideline sentence would not sacrifice allegiance to the dispositive

4    sentencing factors. Accordingly, a non-guidelines sentence, significantly below that

5    prescribed in the guidelines, is appropriate.

6    **III.   THE HISTORY OF MELVYN I. WEISS**

7          **A.   Melvyn Weiss:  From Humble Origins To Leading Attorney,**
             **Philanthropist And Devoted Family Man**
8

9             **(1)   The Melvyn Weiss Story is One of Hard Work,**
                   **Determination and the Pursuit of a Dream**
10

11   Mr. Weiss, who will celebrate his 73rd birthday on August 1, 2008, was born

12   in the Bronx, New York and grew up in Queens, New York, the son of hardworking

13   middleclass parents.  From his father, an accountant, and his mother, a homemaker,

14   Mr. Weiss learned the value of hard work, even as a teenager working with his

15   father to prepare delivery and provision bills for meat markets and bakeries, clients

16   of his father's small accounting practice.  As a young boy Mr. Weiss would rise at 3

17   a.m. to begin his work day, often crawling into dusty attics to find client invoices

18   and bills.  Hard, tedious work for which he was paid $25 a week.  The money he

19   earned, however, was not as important as the work ethic he developed, a work ethic

20   he continued throughout his legal career.

21   Whatever faults about Mr. Weiss this investigation and his subsequent plea

22   have revealed, one thing remains unchallenged; Mr. Weiss is considered by all who

23   came to know him professionally as one of the "hardest" working lawyers in

24   America.  What is beyond dispute is that his extraordinary work ethic was not

25   limited to his professional obligations.  As so many who have written to this Court

26   verify, he applied the same vigor, the same tenacity and the same energy to every

27   charitable, philanthropic and humanitarian cause he undertook.

28   Simply put, this is a story of an amazing man who grew from a young man of

humble origins into one of the most giving men of this generation.

### (2)    Formal Education

Mr. Weiss received his B.B.A. in accounting from Baruch College of the City University of New York in 1957. Soon after graduating from college, Mr. Weiss enrolled in New York University School of Law, from where he received his J.D. Degree in 1959. Following his graduation from law school, Mr. Weiss joined the United States Army and completed an initial six-month tour of duty, the first of two military assignments he completed.

### (3)    His Legal Career – The Early Years

Mr. Weiss started his legal career with the Wall Street law firm then known as Strasser Spiegelberg Fried and Frank (now Fried Frank Harris Schriver & Jacobson LLP – one of New York's Finest Law Firms). After only a year and a half, however, Mr. Weiss was recalled for another year of active military service during the Berlin crisis. His wife Barbara (who he met while in college, graduated from New York University and became a school teacher) joined him in Fort Bragg, North Carolina, where their first child, Gary, was born.

After completing his second term of military service, Mr. Weiss joined the law firm of Galef & Jacobs, a small diversified law firm, where he worked as a young litigation associate. Then, in 1965, after three years at Galef & Jacobs, Mr. Weiss was invited to join Lawrence Milberg, a well respected Harvard-educated litigator who was 22 years older than Mr. Weiss. Together, they formed Milberg Weiss. Motivated by their mutual desire to tackle the abuses of corporate America, Messrs. Milberg and Weiss struggled to develop a class-action litigation practice, a new legal arena in 1966.

### B.    The Law Firm Created By Lawrence Milberg & Melvyn Weiss Provided First Rate Legal Service To All Of Its Many Clients

There is no evidence, nor will there ever be, that in any case handled by Mr. Weiss (including those that involved paid plaintiffs) the interests of the class were

1  ever subordinated.  Whatever agreements may have existed to pay certain Plaintiffs,

2  those agreements did not affect the conduct of the cases and in <u>every</u> case

3  undertaken by Milberg Weiss, the case was handled by attorneys of high skill who

4  provided superb legal representation.

5  The firm Mr. Weiss and his colleagues built included attorneys of high

6  competence, with varied backgrounds and extraordinary levels of expertise.  The

7  firm, under the guidance of Mr. Weiss and others, spent countless hours training

8  attorneys to litigate their cases with great care.

9  In order for this Court to fully grasp and appreciate the level and degree of

10  punishment Mr. Weiss and the law firm he worked so hard to build already suffered,

11  a brief history of the firm must be discussed so that the full dimensions of this

12  terrible personal and professional tragedy can be understood.

### (1)  Melvyn Weiss – A Lawyer With Great Vision and Leadership

15  From the outset, Messrs. Milberg and Weiss set out to build their firm to

16  provide expert legal protection for victims of corporate wrongdoing.  From his own

17  early experience at Fried Frank, Mr. Weiss understood that victims of corporate

18  wrongdoing needed their own powerful, resourceful and dedicated attorneys to serve

19  as a counterforce against big corporations and the prominent law firms protecting

20  them.

21  When, in 1966, the Federal Rules of Civil Procedure were amended to

22  facilitate the bringing of class action lawsuits in the areas of securities, anti-trust,

23  civil rights, discrimination and consumer law, among others, Mr. Weiss was among

24  the very first lawyers in this country to appreciate the potential consequences of this

25  rule change and to recognize the protection to the citizens this area of litigation

26  afforded.  Over time, the firm built its reputation by using class action lawsuits to

27  vindicate the rights of countless shareholders, consumers, and victims of

28  environmental harm, discrimination, and human rights abuses.  Much has been said

in this case about all of the "fees" the work of Milberg Weiss generated.  What often gets lost in the discussion, however, is mention of the enormous good that their work accomplished and the important reforms their work created.  So too, do many forget the tens of millions of dollars in out-of-pocket expenses and more than hundreds of millions of dollars in time invested in cases where <u>no</u> recoveries were made.

### (2)   Lawrence Milberg & Melvyn Weiss Struggled Through Many Lean Years

At its start, the new firm, Milberg Weiss, struggled to make ends meet. Lawrence Milberg had some experience in stockholder derivative litigation and thus the firm initially sought to build a practice in that area, taking on risky and expensive derivative lawsuits against public corporations on a strictly contingency basis.  Early on, however, even when the firm obtained some financial recovery, the firm often barely covered its expenses, and it was not unusual during those early years for partners in the firm to contribute their own funds to keep the firm's bills current.  In these early cases, much of the firm's after-tax profits were then reinvested to finance the firm's growing inventory of cases, leaving little for the partners to live on.

So much has been said and written about the financial success of Melvyn Weiss and that is true.  His hard work and sheer talent as a lawyer eventually turned a struggling law firm and a struggling lawyer into an outstanding legal and financial success.  It is important however, when passing judgment on a man like Mr. Weiss for your Honor to understand that, early on, there were many very lean years where virtually all of the firm's earnings were used to underwrite new cases that often required years of litigation with millions of dollars being invested by Mr. Weiss and his colleagues who believed in the merit of their cases and who also believed in the fundamental integrity of the legal positions they advanced on behalf of classes of victims who had nowhere else to turn.

Throughout this Memorandum, we cite to some of the many letters written to this Court by clients, colleagues and even adversaries of Mr. Weiss who all verify how hard Mr. Weiss and the firm he built worked on behalf of their clients, how they respected the integrity of their clients whose causes they advanced and, as to Mr. Weiss in particular, how his drive, determination and all-consuming passion often made the difference between abject failure and overwhelming success.

We respectfully remind this Court that the man to be sentenced on June 2, 2008, was a true visionary who changed the legal landscape of America for the better.

### C. As The Firm Grew So Did The Determination Of Mr. Weiss To Use The Legal Talent He Harnessed To Address A Wide Range Of Corporate Wrongdoing And Also To Undertake An Important Array Of Pro Bono Litigation

In the 1980s and 1990s, under the strong leadership of Mr. Weiss, the firm achieved a string of successes that redefined class action litigation.  Many cases were in the securities field, but others involved recoveries for victims of wrongdoing in many other areas, including for example, residents of local communities injured by environmental torts (*e.g.*, the *Stringfellow* toxic waste and *Exxon Valdez* litigation); consumers harmed by deceptive sales practices (*e.g.,* cases against *Hertz* and the life insurance companies who misled customers); sweatshop workers exploited by the garment industry in Saipan; and even members of the medical profession who were treated unfairly by HMOs.

As your Honor reads about the extraordinary success of Milberg Weiss as a firm and Mr. Weiss as an individual, it is an important constant to remember that Mr. Weiss and the firm he built were not just about money.  As so many who have written to your Honor independently verify, Mr. Weiss honestly cared about the clients he represented, cases he initiated, the reforms he brought about and the courageous pro bono work he undertook.

### (1) Mr. Weiss Recruited Some of the City's Finest Legal Minds, Professionals with Impeccable Legal Credentials to Help Do the Important Work at Milberg Weiss

Mr. Weiss, more than anyone else, was responsible for recruiting to the firm and thus mentoring some of the best legal minds who then helped him develop Milberg Weiss into one of the finest law firms in the nation.  Included among the firm's lawyers at various times were Former Assistant United States Attorneys, attorneys who served in the Tax and Antitrust Divisions of the Justice Department and staff lawyers for the Enforcement Division of the SEC, the Federal Trade Commission and the Commodities Futures Trading Commission.  So too did Mr. Weiss recruit lawyers from many of the top law schools in the country as well as lawyers who at various times, worked for some of the leading law firms in the nation.

It is important for your Honor to accept as fact that despite the criminal conduct that Mr. Weiss and a handful of his colleagues engaged in, it was nevertheless always the intention of Mr. Weiss to build a first class law firm staffed with some of the brightest legal minds in the country.  It is also important for your Honor to recognize that it was Mr. Weiss's stature and the esteem in which he was held by the Bar and the opportunity of working with him that drew so many talented attorneys to the firm.

Despite his fall from grace and despite the serious criminal conduct that he has now acknowledged, this Court must nevertheless accept as true, that the overwhelming portion of the life of this great man was not immersed in criminal conduct.  His life has been devoted to building a law firm capable of taking on corporate giants who were represented by some of the biggest and best staffed law firms in the country.  To that end, at Mr. Weiss's direction, Milberg Weiss employed its own forensic accountants, in-house investigators, and paralegals.

Indeed, the quality of the law firm that Mr. Weiss built allowed Mr. Weiss to believe that his firm was capable of providing access to the Courts for so many who would never have been able to withstand the cost, the out of pocket expense and the difficulties inherent in mounting a litigation against corporate giants.  In years prior to facing Milberg Weiss, these corporate giants were able to simply bury lawyers who worked at firms much smaller than Milberg Weiss, and these smaller firms simply could not compete with the legal scholarship of the army of attorneys retained by the corporations.  The smaller plaintiffs firms also could not fund the litigation through to its conclusion.  Milberg Weiss took on the corporate giants and their powerful law firms and in doing so leveled the playing field for millions of people who had previously been denied access to the courts.

The criminal conduct that Mr. Weiss is guilty of should not be allowed to overshadow all of the good and just outcomes that he and the firm he built accomplished.

## IV.   MR. WEISS UTILIZED THE LAW TO MAKE A DIFFERENCE IN SOCIETY

### A.   Melvyn Weiss's Substantial Contributions To The Public Good

Melvyn Weiss and the firm he built played central roles in obtaining billions of dollars in compensation for millions of aggrieved investors, consumers, and other victims of corporate wrongdoing.  We list only a handful of important examples to clearly demonstrate the "good" accomplished by Mr. Weiss and the firm he built. These examples are not intended to minimize or excuse the criminal conduct that Mr. Weiss has acknowledged participating in.  It is very important, however, to Mr. Weiss and the firm he built that this Court not have the impression that the only thing they were interested in was the recovery of huge legal fees and that the only way they managed to accomplish that objective was through the payment of certain plaintiffs, who in truth, represented only a handful of the thousands of people Mr. Weiss and his firm represented during the past 40 years.

As the record and facts make absolutely clear, many of the most important litigations undertaken by Mr. Weiss resulted in important reforms, uncovered massive corporate fraud and in many of its more celebrated pro bono undertakings achieved compensation for victims of terrible wrongdoing.  Several of the firm's most important cases are outlined below.

- The Holocaust cases, in which $6.25 billion was recovered for World War II victims of bank fraud, property theft, and slave labor;

- The WPPSS case, in which $775 million was recovered for bondholders of the Washington Public Power Supply System;

- The Drexel-Milken litigation, in which the firm worked together with the FDIC and RTC to recover over $2 billion for investors and the government;

- The Enron case, in which $7.3 billion has been recovered so far;

- The Prudential Life Insurance case, in which $4.5 billion was recovered for defrauded consumers;

- The Met Life Insurance case, in which $1.7 billion was recovered for victims of deceptive practices in the life insurance industry;

- The Stringfellow Acid Pits case, in which $109 million was recovered for residents of Riverside County, California, who lived downstream from the Stringfellow toxic waste site;

- The *Exxon Valdez* oil spill litigation in which Milberg Weiss served as co-chair of the Plaintiffs' Law Committee and helped achieve a $5 billion jury verdict;

- *In re Raytheon Securities Litigation*, 99 CV 12142 (E.D. Mass.), in which Raytheon and its auditor PricewaterhouseCoopers LLP paid $460 million to settle claims that Raytheon failed to write down assets adequately on long term construction contracts.  The lead plaintiff was the New York State Common Retirement Fund.

Many of these fascinating litigations are referenced in the letters submitted to your Honor.  Several of these cases are so significant as to merit further discussion in the pages that follow as they point up not only the high legal skills of Mr. Weiss but also verify his devotion throughout his career to the pursuit of justice for victims throughout the world.

### B.   Melvyn Weiss Was A Visionary And A True Believer In The Importance Of His Life's Work

The letters from retired Judges, law professors, colleagues in the plaintiffs bar, and even adversaries who represented defendants in cases Mr. Weiss brought all confirm that despite his criminal conduct, Mr. Weiss was a highly respected attorney who was considered a brilliant and dedicated advocate for every client or cause he ever represented or advanced.  His diligence was fueled by a passion for his cause and compassion for the voiceless.

**Professor Arthur Miller**, a prominent legal scholar who for many years taught at the Harvard Law School and is now a University Professor at New York University, first met Melvyn Weiss 25 years ago when he was moderating an "all star" panel of lawyers and judges at the National Center for State Courts.  Over the next 25 years, Professor Miller interacted with Mr. Weiss on a weekly and often daily basis, working with him on many important legal matters.  Professor Miller watched Mr. Weiss fighting hard, day after day, for people in need of help who otherwise would have had no voice in the legal system.  His respect and admiration for Mr. Weiss is clear.

> **In each of the many contexts in which I have observed his work, the beneficiaries of Mel's efforts have been people – countless in numbers – who have been unable, either economically, intellectually, or by virtue of age or infirmity to pursue their grievances on their own and for whom alternative legal representation was unavailable.  Simply put, these people would have been unable to secure access to our justice system, let alone any legal redress they might be entitled to, without his assistance. He has a deep and genuine concern about people; his are not "lawyers"**

- 16 -

**cases; he doesn't just represent classes; he represents people and I have watched him – on innumerable occasions – care about them as individuals in need of help.**  (Exhibit 2) (emphasis added).

Professor Miller then goes on to explain how Mr. Weiss also took on significant pro bono litigations that required many years of difficult work and the assumption of significant financial risk, cases that no on else was willing to undertake:

> In many, many instances Mel has been willing to assume significant financial risks and invest enormous amounts of personal time when others would not step forward.  A perfect exemplar is the Slave Labor Cases.  I was present when an intricate legal theory was presented to him for pursuing quantum meruit and international law claims for the slave laborers who were taken from the concentration camps and forced to work (usually to death) for German industry during World War II – sixty years earlier.  No one else was willing to undertake such a venture**.  Mel had the vision – and the humanity – to see the possibilities and he devoted enormous energy and resources to that effort for years before it bore fruit for the Survivors.**  He also understood that what was important for most of the Survivors was public recognition of what they had suffered.  That is why he funded a structure of paralegals who were available to empathize and confer with Survivors, not simply in connection with the Slave Labor cases but about their experiences as well as German so-called exacerbation claims and pensions.  He did that knowing the costs would not be reimbursed.  The Slave Labor Cases were only secondarily about monetary compensation.  **Indeed much of what Mel has done in the years I have been with him has not been about money but about accountability**….
>
> **Melvyn I. Weiss is a man who has had a meaningful career and has had a significant and positive affect on the lives of many, many people.**  (Exhibit 2) (emphasis added).

The passion that Professor Miller so eloquently describes was part of who Mel Weiss was even 40 years ago.

**Leonard Barrack**, an attorney in Philadelphia, practiced in the field of securities litigation for most of his career.  He first met Melvyn Weiss almost 40

years ago, when Mr. Weiss was involved in a lawsuit with Mr. Barrack's former firm:

> Even at that time, Mr. Weiss, while still a young lawyer himself, already exhibited incredible tenacity and brilliance and **an overarching desire to help people who have been wronged, no matter how large or powerful the wrongdoer was.**
>
> Over the years, I have worked with, and at times, against Mr. Weiss, and I have seen his tenacity and desire to help innocent victims only grow stronger. Mr. Weiss is personally responsible for a good part of the development of the law relating to securities litigation, and particularly class action aspects. He is universally recognized as one of the pre-eminent figures in class action securities litigation and is truly a titan in the field. (Exhibit 3) (emphasis added).

His "overarching desire to help people who have been wronged" has prompted Mr. Weiss to accept cases knowing that there was little prospect of compensation. His friend and colleague **David R. Buchanan** explains what drives Mr. Weiss to take on the "hopeless" cases:

> Mel has often been the lawyer to represent those who others would not represent. He has been the lawyer to take on the case or client that others thought was too fraught with challenge that the wrong could not be righted. I have seen him assume representations with little prospect of compensation (though at great cost to him and his firm) because it was simply the right thing to do and something needed to be done. **Those are often the cases that don't make headlines or yield fees. But they do make a difference. They provide recourse to someone wronged in a manner personal to them. Mel understands that fact fundamentally and assumes that responsibility proudly.** (Exhibit 4) (emphasis added).

Mr. Weiss's compassion for his clients also inspired and invigorated his colleagues.

**John Restaino**, a lawyer, first practiced foot surgery for 10 years prior to practicing law. Mr. Weiss taught Mr. Restaino to maintain absolute focus on his clients, the clients' plight and the obligation to achieve a just outcome:

- 18 -

> I had the great fortune of working with Mel Weiss and learning from him.  Foremost amongst all of my memories in that regard was Mel constantly reminding the attorneys involved, and me specifically, **to never lose sight of the plight of the clients for whom we labored;** that our 'goal' in each litigation was *not* a large settlement from which one could derive a large fee and Common Benefit allotment but, instead, our goal was a fair and equitable resolution of the case in order to effectuate as much a recovery for our clients as possible.  Mel would share with me the circumstances under which he would *reduce* his fees and/or costs to assure that the clients received a fair amount of the money to be distributed.  (Exhibit 5) (emphasis added).

Because he was driven by a true belief in fighting against corporate wrongdoing, Mr. Weiss would often <u>reduce</u> fees and costs to benefit clients, and would often reject frivolous litigation.

Even his fierce adversaries respect his legal brilliance, believe him to be honorable and are awed by the enormity of his contributions to justice.  **David Boies** has practiced law for 42 years and has often faced Melvyn as an adversary.  Mr. Boies considers Mr. Weiss to be **"a man of extraordinary warmth, integrity, and accomplishment who has made many important contributions to our justice system and our country."**  (Exhibit 6)  (emphasis added).  He writes that Mr. Weiss catalyzed corporate change:

> Professionally, Mr. Weiss was, of course, a tough and fearsome adversary…Many of the cases that he brought compensated real victims and stimulated important changes in corporate behavior.  (Exhibit 6).

**Eric Zagrans** represented plaintiffs and defendants, and when he was Associate General Counsel at Ernst & Young, was one of Mr. Wiess's opponents.  For more than 20 years, he has argued cases with, and against, Mr. Weiss, and he agrees with Mr. Boies's view of Mr. Weiss's impact on the legal system:

> I know Mel as a pillar of the legal community and as a giant of the class action bar . . . but also one who never hesitates to show mercy to his adversaries who deserve mercy.  (Exhibit 7).

**Donald G. Kempf, Jr.** confirms Mel's unwavering commitment to his clients. Prior to retirement, Mr. Kempf spent 35 years as a defense trial lawyer at Kirkland & Ellis, and then six years as executive vice President, chief legal officer and secretary of Morgan Stanley. In his letter he explains to the Court why he holds Mel Weiss in "high regard" as a talented professional and as a fine person:

> [Mr. Weiss] is, I sincerely believe, a very good person. What he did that is at issue in this case against him is wrong- as he recognizes and has acknowledged. **But he is a fundamentally good and kind person and a skilled professional who has dedicated his life to the effective representation of class members in securities litigation. He has made their lot better and, along the way, has helped corporations improve their ways of doing business.** (Exhibit 8) (emphasis added).

**Joseph Grano Jr.**, the Chairman and Chief Executive Officer of UBS PaineWebber, a global securities firm, and until July of 2005 Chairman of the Homeland Security Council for President George W. Bush, maintains high respect for Melvyn Weiss's work despite the fact that his own firm, was on occasion, named as a defendant in class action suits filed by Milberg Weiss:

> I know [Mr. Weiss] to be an **insightful guardian of corporate responsibilities**. We have had long discussions relative to our respective positions as to adequate and appropriate disclosures to a company's clients and shareholders. In each and every discussion, Mel would be the advocate for better and forthright communication. I always understood as a CEO of a public firm that his firm was in the business of representing clients for a contingency fee; however, I never once walked away with anything but a sense that **his priority was to right a wrong.** (Exhibit 9) (emphasis added).

## C.     Holding Corporate America Accountable

**Lilli Gordon** has spent the last 15 years working on behalf of some of the largest shareholders in corporate America, charged with protecting shareholders' rights. She explains the courage required to take on corporate wrongdoers and her great respect for Mr. Weiss.

> I have an MBA from the University of Chicago and founded one of the first corporate governance and proxy voting services in the country –

Institutional Voting Research Services … In ensuring the rights of shareholders, Mr. Weiss at times has staked out positions that have made him unpopular in certain circles.  It takes courage to challenge America's leading executives and their paid advisers.  Mr. Weiss has met these challenges with an abundance of courage.  He is a fierce individual with a fierce devotion to shareholders of public companies.  (Exhibit 10).

**Ira Berman**, who has practiced law for more than 50 years, believes that Melvyn Weiss undertook monitoring big corporations on behalf of shareholders, as if it was his "**duty**:"

Melvin Weiss spent his entire life and career protecting public shareholders…Mel believes it was his **duty**, as if he were the attorney general, to regulate the markets for the protection of the public shareholders.  The loss of Mel Weiss as a practicing attorney means the industry will lose one of its stalwart watchmen.  (Exhibit 11) (emphasis added).

**Fred Taylor Isquith**, a senior partner in the law firm of Wolf, Haldenstein, Adler, Freeman & Herz LLP, a competitor law firm, first met Melvyn Weiss in 1980.  He explains that Mel and Milberg Weiss were the "**most formidable**" of class action firms describing how hard they worked:

The Milberg Weiss firm did so with imagination, tenaciousness, care and, particularly, the willingness to risk the resources necessary to maximize the value of the case for the classes that its lawyers represented.  Mr. Weiss' approach was then unusual and set his firm apart.  The results he achieved are a reflection of Mr. Weiss, a determined and brilliant attorney and strategist.  (Exhibit 12).

**Robert Biederman** describes how Mr. Weiss obtained a "**fair and equitable resolution**" in so many cases.  Mr. Biederman, who was then representing the Insurance Commissioner of California, first met Melvyn Weiss when they worked together pursuing claims against those who contributed to the insolvency of the Executive Life Insurance Co., including Michael Milken.  Their joint efforts resulted in enormous success.

- 21 -

Furthermore, as a direct result of their work in the life insurance marketing cases, the life insurance industry was <u>forced</u> to substantially improve disclosures made to consumers.  Mr. Biederman describes his experiences working with Mr. Weiss and the positive impact of Mr. Weiss's fight against the marketing practices of the life insurance industry:

> The outcome of the life insurance marketing cases was remarkable. These settlements that were endorsed by government regulators and leading academicians broke new ground for resolving complex consumer issues that resulted in recoveries in the billions of dollars to those consumers.  Mel conceptualized the use of a creative ADR program and other novel remedies for this class of consumers.  **Equally significant was that these cases resulted in a change in how life insurance was sold including substantially improving disclosures to consumers**…. (Exhibit 13) (emphasis added).

Mr. Weiss championed the rights of minority shareholders.  **Richard Spring** is on the Board of the University of Miami/Sylvester Comprehensive Cancer Center and Chair of its Cancer Research Committee.  In the early 1970s, Mr. Spring discovered that Elgin National Industries was being raided by another company.  As he began acquiring this undervalued stock, another company that was trying to merge with Elgin at an inadequate price sued Elgin.  Mr. Spring describes how Mr. Weiss fought for and protected him and the other shareholders during the litigation:

> As we began acquiring this undervalued stock at $8+ a share, we were sued by the Company for "interfering with their merger plan" Melvyn Weiss and his firm represented us.  After a year of heated litigation, the company acknowledged we did nothing improper, canceled the proposed merger, posted a full page apology in the NY papers, and paid a large settlement fee. Shareholders profited mightily as the stock rose to $100 a share.  If it was not for Mel's mighty effort, Elgin would have been absorbed at $12 a share, a small fraction of its true value.  **As a "special situation" security analyst, over the years, I witnessed Mel champion the rights of minority shareholders many times. I admire him greatly.**  (Exhibit 14) (emphasis added).

**Stanley Bernstein,**  a founding partner of Bernstein Liebhard & Lifshitz LLP, and head of another competitor law firm, explains how in  2001, he and Mr. Weiss were appointed by Judge Shira Scheindlin in the Southern District of New York as Chair and Vice-Chair of *In re: Initial Public Offering Securities Litigation*. According to Mr. Bernstein, the IPO Litigation is probably the largest and most complex securities litigation ever filed, involving over 100 lawyers and professionals.  He writes about Mr. Weiss, his competitor, his colleague.

> Throughout the long and difficult litigation Mr. Weiss was singularly focused on one goal: the expeditious and maximum recovery for the class members … I have also witnessed on numerous occasions a quality that Mr. Weiss has that is unfortunately all too rare in the Bar these days:  his word is his bond and his handshake is a commitment.  I believe this contributed to much of his success…

> Mr. Weiss deserves all the best sentiments I can convey under these difficult circumstances and I trust this letter is helpful.  (Exhibit 15).

Mr. Weiss is a true crusader for the rights of the downtrodden and the small investor.  **Victor Stewart** is a Senior Partner at Lovell Stewart Halebian LLP, a law firm engaged in antitrust, securities and commodities litigation.  He too has worked closely with Mel Weiss during the *In re IPO Securities Litigation* and echos Mr. Bernstein's observation regarding Mel Weiss's relentless fight on behalf of the shareholders represented in that case.

> I am writing this letter in the fervent belief that Mel Weiss deserves the Court's mercy when he comes before Your Honor for sentencing on June 2, 2008.

> In my personal experience, Mr. Weiss is a man of rare and exemplary character, and **a true crusader for the rights of the downtrodden and the small investor**, who without his help would often have had no recourse to redress their wrongs.  In a world of equivocation and indecisiveness, Mel Weiss has shone forth as a forceful and confident leader in ensuring fairness and equal protection under the laws.  (Exhibit 16) (emphasis added).

**Marvin Jacob**, a retired partner of Weil, Gotshal & Manges LLP, spent the

first 15 years of his 25 year legal career at the U.S. Securities and Exchange Commission.  There, he became familiar with Melvyn Weiss's work, but did not become personally involved with Mr. Weiss until about three years ago when designated as a mediator in the <u>Tyco</u> litigation.

> I was designated as one of three mediators in the <u>Tyco</u> litigation, the other two being retired Federal Judges.  After more than eighteen months of effort, we managed to bring the parties together and the case settled with a payment to public investors of almost three billion dollars.  I had extensive and close contact with Mr. Weiss during that time and had the opportunity to observe his efforts on behalf of his clients, the public interest in the case.  He was greatly respected, skilled and high minded in pursuit of his clients' interests and pleasant to work with and courteous with his adversaries.  **In a word he was a class act throughout.**  (Exhibit 17) (emphasis added).

**James Gilreath** has practiced law since 1967.  He credits Mel Weiss for what he describes as "brilliant ideas" that resulted in a just settlement for their clients in a tax shelter case and through Mel's insistence, allowed "small" taxpayers to become part of the settlement.

> In the tax shelter cases that I was working on with Mel, **he was able to mastermind a settlement which allowed small taxpayers to become part of a global class action which would never had been [*sic*] possible without the brilliant ideas he brought to the table.**  (Exhibit 18) (emphasis added).

The rich and the powerful, the large <u>and</u> small investors, all had Mel Weiss as their watchdog.  He did good, honest work for so many and on the day of his own judgment, these honorable acts must be counted.

A fierce, courageous advocate whose "priority" was to "right a wrong" and who has had a "positive effect on the lives of many, many people."  Rarely does any defendant stand before any court on the date of sentence with so many glowing testimonials put forward by so many responsible citizens who all plead on his behalf for this Court's leniency.

In the pages that follow, the Court will hear the voices of so many more citizens whose chorus of pleas is indeed most powerful.

### D.  For So Many Years, Milberg Weiss Partnered With The Government In Exposing Corporate And Consumer Fraud

Perhaps one of the great ironies in this case is the fact that for so many years, the Government itself turned to Mr. Weiss and his firm for help in exposing and helping prosecute corporations engaged in fraud.  Indeed, it was the groundwork laid by Milberg Weiss that often allowed the Government to then mount successful investigations of some of the world's largest corporations.  To cite just a few examples makes this point very clear.

The SEC filed enforcement actions <u>after</u> Milberg Weiss initiated lawsuits against Sabratek Corporation, Gateway Corporation, and the Rite Aid Corporation.  In these cases and others, Milberg Weiss was ahead of the government.  Indeed, Judge Dalzell observed in *Rite Aid*, that Milberg Weiss was **"at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings."**  *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003) (emphasis added).

Mr. Weiss and his firm were also well ahead of government investigators in exposing the massive fraud at WorldCom.  After Milberg Weiss's own investigation yielded evidence of massive fraud, the firm filed suit on behalf of shareholders in Mississippi in 2001.  The case was later dismissed, but the firm was right on the money, and the Government's subsequent prosecution was mounted on the work-product of Milberg Weiss as noted in *Forbes* Magazine:

> WorldCom book-cooking was laid out chapter, line and verse in a shareholder suit over a year ago.  Sadly, a judge with knotty political ties tossed it out as directors, auditors, regulators – and the press – snoozed. . . .

- 25 -

> The unheeded accusations first emerged in June 2001. . . .
> The complaint was backed by 100 interviews with former
> WorldCom employees and related parties.  The allegations
> were startling in their breadth and detail. . . .
>
> The Securities & Exchange Commission finally got
> around to looking into WorldCom's accounts nine months
> after the 113-page lawsuit was filed.  When it did, many of
> its inquiries read like a page from the shareholder suit's
> playbook.[1]

In some cases, Milberg Weiss also actively coordinated with government agencies to promote their shared interest in prosecuting fraud.  In the *Drexel/Miliken* case, where $2 billion was jointly recovered, Melvyn Weiss, personally, was appointed by Judge Milton Pollack as co-lead counsel with the RTC and the FDIC.  In the *American General* case, a company that perpetrated a century long fraud in its sales of burial policies to poor African-Americans, the firm partnered with the Insurance Commissioner of Florida, Bill Nelson (current U.S. Senator).

In the *Lucent* litigation the firm's in-house investigative team (led by a former FBI agent) conducted a detailed investigation that uncovered widespread fraud and helped secure $600 million in compensation for aggrieved shareholders.  *See In re Lucent Technologies, Inc. Sec. Litig.*, No. 00cv621 (AJL) (D.N.J.).  Throughout the case, Milberg Weiss worked with the SEC to share its findings and assist in the government's inquiry.

In yet another example, Milberg Weiss was the first to file a complaint against Martha Stewart.  Then, at the request of the U.S. Attorney's Office, the firm coordinated discovery with the government to prevent the defense from exploiting civil discovery for use in the criminal proceeding.

Other examples include the Ann Taylor case, in which Milberg Weiss, in cooperation with the SEC as *amicus curiae,* developed important Second Circuit

---

[1] "Asleep at the Switch," *Forbes*, July 22, 2002.

- 26 -

case law for the government; and the I-2 Technology cases, in which the firm recovered $87 million for class members and the SEC recovered an additional $10 million.  At the request of the SEC, Milberg Weiss agreed to distribute the SEC's $10 million to the class without charge.

**Stanley Sporkin** is a retired Federal Judge who served on the D.C. District Court for 14 years also served on the Securities and Exchange Commission, Chief of Enforcement, for almost 20 years.  He then became General Counsel to the CIA. Judge Sporkin who left the bench in 2000, is now in private practice.  As a result of his work at the SEC, Judge Sporkin learned first hand of the contributions to the SEC's regulation efforts by Melvyn Weiss.  In a compelling letter to your Honor he explains why Mr. Weiss and the class action lawsuits he filed played, and continue to play, an **"important"** role in holding corporate wrongdoers accountable:

> **Because of my background at the SEC, I know how important Mr. Weiss' role was in helping the securities regulation process.  Up until recently, when the SEC was given the power to get back from wrongdoers some of their ill-gotten gains, it was strictly up to class action lawyers to obtain those monies to compensate investors for their losses. Over those years, Melvyn Weiss was the leading plaintiff class action lawyer…**

> **The SEC simply does not have the resources to effect complete recoveries and thus it relies heavily on the plaintiffs' securities bar to assist it in its endeavors.**  (Exhibit 19) (emphasis added).

Simply put, Mr. Weiss and his firm did important legal work and they did it extremely well.  The criminal conduct that Mr. Weiss and a handful of his colleagues have acknowledged, cannot be allowed to completely besmirch a brilliant career and a lifetime of good, meaningful, honest work.

**E.      The Legacy Of Melvyn Weiss Will Always Include His Amazing Fight For A Group Of Ordinary Citizens Of Glen Avon, California, Victims Of Corporate Pollution, The Victims Of The Exxon Valdez Oil Spill, Helping Save The Southern California Marine Environment And Children Victimized In Nigeria**

### (1)      The Stringfellow Acid Pits Case

In Glen Avon, California, local children played in toxic water that was streaming down the streets, with toxic foam, making pretend beards on their faces. Families were devastated by illnesses and death, and some families also faced financial ruin as their property values went to zero while their land was poisoned. Melvyn Weiss took on the cause of Glen Avon in the early 1980s, and brought suit in what became known as the Stringfellow Acid Pits cases.

**Penny Newman**, a local resident and a leading community activist, tells this amazing story.  She eloquently describes the ordeal of what she describes as a "rag tag group of Moms" taking on corporate America.  Ms. Newman pleads with this Court for leniency on behalf of Melvyn Weiss who championed the cause of this working class community and who through years of vigorous litigation always treated them with patience, dignity and respect.  Ms. Newman explains:

> The Stringfellow Acid Pits, as they became to be called, was one of the first sites put on the federal National Priotiry [*sic*] List (NPL) under the new CERCLA law (Superfund).  From this toxic site were repeated episodes of overflowing of the pooled toxic waste that flooded our homes and the elementary school where my two boys attended school…Walking to school the children played in the water, making beards out of the toxic foam and coming [*sic*]'snowmen'.  More than five days went by before we found out the situation we were in.  We discovered that over many decades obvious airborne releases had occurred, and later the contamination and destruction of our entire drinking water aquifer.  We saw the affects [*sic*] upon our children with bloody noses, headaches, respiratory ailments and seizures…
>
> **We asked ourselves, How were we—a rag tag group of Mom's [*sic*] from an ordinary, hard working community ever begin to fight for our rights and our families' safety, against all these powerful people and corporations?**  We began searching for a lawfirm [*sic*] to represent us.  We

knew it would be a challenge—being a working class community none of us had money to put up for retainer fees for attorneys, much less funds for the experts, investigations and expenses a massive lawsuit would require. Attempting to find a lawfirm [*sic*] willing to pay for everything themselves with no guarantee of recovering their money was a monumental undertaking. **After much searching we met Mel Weiss.** He and his law firm, Milberg Weiss Bershad Hynes & Lerach, stepped forward to champion our case. More than 4,000 people signed up. From that day forward I and my friends and neighbors have been forever grateful to Mel and his lawfirm [*sic*]. **From that day forward I have considered Mel to be a steadfast and trusted personal friend**.
None of the plaintiffs ever had to put forward a dime to be represented—the firm footed the bills themselves for more than 8 years. While the case was pending, the firm dedicated ten lawyers in the California office to working full-time on our case alone… He never gave up on us. By persevering [*sic*] and hanging with us, we were ultimately able to settle the case for more than $110 million dollars.

Beyond the settlement funds, which were much appreciated by the families touched by illness and monetary loss, **the victory we experienced made all of us in the community feel that we had achieved justice—that ordinary people with the help of extraordinary [*sic*] and committed attorneys could take on powerful companies and the inept government agencies which promoted and established the Stringfellow Acid Pits— and actually win.** (Exhibit 20) (emphasis added).

### (2)   An Extraordinary Litigation – A Stunning Result and Then a Wonderful Act of Generosity

The Stringfellow case was not just another case to Mel Weiss. It became a cause. Milberg Weiss advanced more than $20 million dollars in "out of pocket" expenses to continue the legal battle. His clients became his friends and long after that case was won and settled, when he had no further legal obligation to the community he represented, Ms. Newman goes on to describe Mr. Weiss's further act of enormous generosity that truly separates Mr. Weiss from so many other lawyers.

**Mel's involvement with our community didn't end with the settlement.**  He continued to help our community recover from this tragedy.  In an attempt to revitalize our community, we were promised funds from the polluting companies funding to build a community park.  On December 21, 2000, a week before escrow was to close, the companies reniged [*sic*] on their promise.  We were all devastated, having gotten our hopes up that we could do something to improve and rebuild our community.  **After sitting and crying for hours, I called Mel…Mel explained he had an Executive meeting [*sic*] of the law firm in 30 minutes and to fax him some information.  The next morning Mel called and said we could have the money… "It's not a loan, Penny, it's a gift – Merry Christmas."**  I can't explain the gratitude and appreciation we have had for a man that would give so much and care so deeply for our community ….  **I realize that Mel Weiss has made some mistakes in his career and that he will be punished for them, but I would like this Court to consider when imposing a sentence, the good accomplished by this special man and his firm.**

These courageous, and principled actions must count for something!  It is clear to me, that without Mel's concern and legal talent and his willingness to stand up for the little guys, our community would have been abandoned and forgotten to suffer on our own.  For his efforts and…for the friendship and respect he showed us—we will be forever grateful.  (Exhibit 20) (emphasis added).

**Linda Spinney**, another victim-client in the Stringfellow Acid Pits case shares Ms. Newman's sentiments:

We went looking for a law firm that would be willing to take our case and be able to front the huge expenses required to litigate a case like this.  We entered into an agreement with a California firm.  After some time it became too much of a financial burden to that firm.  It became clear that we could not continue with this firm unless we found help.  **This is where Mel Weiss and his firm came to our rescue.**

. . . **During the many years of litigation I was able to work closely with Mel.**  During this time I had the opportunity to observe Mel's character.  He was kind man [*sic*] who genuinely cared about the plight of our community.  As the years passed and the cost mounted Mel and his firm was willing to stick with the case to the end, risking millions of dollars in expenses and attorney hours had the case not had a good outcome.

Mel always took the time to fully educate the steering committee on the law regarding the case and keep us informed of the risks and rewards of his negotiations with the defendants, always listening to our input.  I understand that you will be sentencing Mel soon and as someone who has seen what Mel's true character is I would hope that you will take this into consideration when you sentence him.  If you feel that he must spend time in prison I hope you will make it the minimum time possible.  If you would see fit to sentence him to some form of community service I am sure Mel would perform this service with enthusiasm and honor.  (Exhibit 21; *see also* letter of **Betty Stinson**, Exhibit 22).

**Sally Merha** and her family live in the small community of Glen Avon.  She too was represented by Mr. Weiss and writes not only of his legal skills but of his honest kindness.

In the beginning we were cautious.  Who ever heard of an attorney offering all his resources to help a community who didn't have extra money to attempt such a big undertaking?!  We didn't have to use our homes as collateral or find some other way to get money or just be on the outside looking in for lack of funding.  All Mel and his firm asked of us was to cooperate when we needed to fill out forms, supply information and documents or participate in medical testing.  That's all Mel asked in exchange for filing a massive toxic tort case.

My family and I were plaintiffs and I was part of a small group that worked with Mel and his firm.  **Mel was not only a professional, but personable and he really seemed to care about us as a community.  To him we were faces and not just names on paper.  He dedicated lawyers & staff for <u>us only</u>!  Soon his team also became part of our families and community… This community will be forever grateful for Mel Weiss.** (Exhibit 23) (emphasis added).

All too often lawyers, especially successful lawyers become enamored with their own accomplishments and forget who they represent.  Mr. Weiss paid careful attention to his roster of clients and despite his own extraordinary success, kept proper perspective and focused on the clients, who needed him to be their voice.

### (3)    The *Exxon Valdez* Litigation

**Macon Cowles** met Melvyn Weiss nearly 20 years ago, at the start of the Exxon Valdez Oil Spill Litigation.  He was lead counsel for the environmental

plaintiffs suing Exxon and Alyeska for the massive contamination of the Prince William Sound following the grounding of the Exxon Valdez in March 1989.  He writes how Mel Weiss taught him by his own example.

> I was the new lawyer entering this case—the one that the state and federal judges appointed as an additional lawyer to serve on the seven member Plaintiff's Executive Committee to coordinate the 170 cases that had been filed on behalf of tens of thousands of plaintiffs.  The reception that I got from the lawyers who had already elbowed their way on to the executive committee was cool—to say the least—and standoffish.

> **Mel Weiss—the dean of the class action lawyers in the case—first challenged me directly, in a room full of hostile plaintiff's lawyers, on the legitimacy of the environmental cases and the theories upon which those cases were based.  After I responded to a series of searching questions, Mel Weiss then welcomed me to a seat at the table, admiring, I think, the fact that I did not fold under his fierce challenge.  He thereafter extended himself personally and professionally.  He took me under his wing.  He accorded me respect, which helped me to operate effectively in a tough crowd.**  (Exhibit 24) (emphasis added).

**Kenneth L. Adams** is a litigation partner at Dickstein Shapiro LLP who has known Mel Weiss for nearly 35 years.  Mr. Adams and Mr. Weiss have worked together on the Plaintiffs' Executive Committee in the *Exxon Valdez* litigation for the entire **19** years the case has been in the courts.  He distinctly remembers a "locker-room" speech given by Mel Weiss about 4 years into the litigation, when the plaintiffs' team was frustrated by Exxon's unwillingness to take any responsibility for the disaster they wrought:

> Mel single-handedly lifted the spirits of and the confidence of a demoralized room full of plaintiffs' lawyers, who had never expected to have to try the case.  He reminded them of the reason they had chosen to represent plaintiffs rather than commit their careers to hourly work defending wealthy corporate interests.  He reminded them of what Exxon had done to the people of Alaska, before and after the oil spill, in an effort to keep its profits and stock price as high as possible, and in utter disdain of corporate responsibility. He reminded them of the arrogance with which Exxon opted for a legal

> strategy that assumed its superior resources would win a war of attrition against the underfunded plaintiffs.  And most of all, he challenged them to stand up to the bully that was kicking sand in the face of their clients. . . . Everyone was energized and renewed in their commitment to give their all for our collective clients, regardless of the hardship and the risk.  And in the end, we went out and kicked Exxon's butt in the courtroom.  (Exhibit 25).

Mr. Adams also recalls that as the litigation continued, the firm of one of the attorneys selected as a lead trial counsel started to complain about the expenditure of resources on the case with no end in sight.  Mel took the attorney aside and spoke to him.  Mr. Adams recalls the conversation in his letter:

> Mel knew how our colleague had to be feeling.  He took him aside and told him he did not need to worry about his own or his family's future.  That no matter how the case came out, and no matter how his firm treated him, Mel would take care of him if need be.  It had a powerful effect on our colleague, to know that he was not alone and that we were behind him regardless of the outcome.  He went forward from that day like a tiger unleashed, and I never again saw him worrying about the personal risks to himself and his family if we lost at trial.  (Exhibit 25).

When the *Exxon Valdez* case did finally go to trial in Alaska, **Brian O'Neill** of Faegre & Benson in Minneapolis, Minnesota, tried the case on behalf of 32,000 Alaskan fisherman and natives.  The case resulted in one of the largest verdicts in history.  Mr. O'Neill worked with Mr. Weiss every step of the way, and, as he explains to the Court, he turned to Mr. Weiss for guidance and support throughout the trial:

> Halfway through the five month trial, I was running out of energy, and began to believe each trial day and each witness was not going as it should.  In maritime terms, our ship may have been floundering.  Somehow or another, Mr. Weiss sensed that.  He flew from New York City to Anchorage, a 16 hour trip at the time, and took me and my wife Ruth out to dinner.  He directly reminded me that 32,000 Alaskans were counting on my efforts for their fair shot at justice.  The next morning he reviewed my game plane, [*sic*] pronounced it sound, and sent me off with renewed energy and direction…**Alaskan fishers and natives got their fair shot in the trial court.  I thank Mel Weiss for that.**  (Exhibit 26) (emphasis added).

(4)     **Saving the Southern California Marine Environment**

**John Knox** manages an environmental advocacy organization called Earth Island Institute (EII).  He explains how Mr. Weiss's skill and commitment helped stop a huge corporate entity from destroying the Southern California marine environment.

In the late 1980s, Mr. Knox realized that Southern California's marine ecosystem was negatively impacted by the operation of San Onofre Nuclear Generating Station which was then run by Southern California Edison.  EII along with other colleagues thought about bringing litigation under the Clean Water Act.  According to Knox, a "significant barrier" to bringing the litigation was finding a law firm that would take the monetary risk of carrying through with the litigation against Southern California Edison, a "formidable corporate defendant."  Melvyn Weiss was undaunted by Southern California Edison.

In his letter, Mr. Knox explains that Mr. Weiss's efforts on behalf of EII and the citizens of Southern California saved the Southern California marine environment and also helped establish an educational program for young people in Southern California:

> Milberg Weiss successfully represented our interests, and in 1992 a compromise settlement was concluded that was a landmark in the history of Clean Water Act litigation.  Edison would provide $15 million in benefits mitigating for the impacts of its SONGS power plant operations.  I met Mr. Weiss when he was the key negotiator in concluding the outlines of this proposed settlement during three days of meetings with a mediating retired Federal Judge in New Haven.  Many people have observed that it was probably not a coincidence that Mr. Weiss's negotiating skills were involved in concluding such a landmark agreement.  We felt fortunate to have his assistance.  Part of the settlement was the award of fees to Milberg Weiss, as provided in the Clean Water Act for citizen suit actions.

> The outcomes of the settlement redound to the benefit of the Southern California marine environment and its people.  Key research on restoring functional wetlands was concluded at San Diego State University.  An environmental education program called SEA Lab was set up in Redondo

Beach to serve young people in the entire LA Basin, and that program continues today as part of the Los Angeles Conservation Corps. And the interagency Southern California Wetlands Recovery Program has directly benefited from millions of dollars granted to support wetlands restoration and particularly public participation in wetlands restoration, with staff support from Earth Island Institute. (Exhibit 27).

Not just a monetary settlement. At the insistence of Mr. Weiss, the establishment of an educational program to benefit the victims and the local citizens so that future generations would be more careful and more respectful of environmental concerns.

### (5)   Caring About the Children in Nigeria – The "Quality of Mercy is Never Strained"

When evidence surfaced that there may have been improper drug testing conducted on children in Nigeria, Mr. Weiss, at the request of a lawyer who had been with the U.S. National Health Institute, was "instrumental" in initiating litigation against those responsible.

**Richard Altschuler** has practiced law for over 34 years, and is currently Mr. Weiss's co-counsel in a civil action pending in the Southern District of New York and Second Circuit Court of Appeals. Mr. Altshculer describes Mr. Weiss's tenacious advocacy on behalf of the innocent child victims in Nigeria:

> This case concerns the alleged improper drug testing by an international pharmaceutical corporation against Nigerian children. Mel was instrumental in the initiation of the case, as well as the orchestration of it… What really caught my attention is the fact that at various meetings, as well as during phone conferences between counsel, he was not in any rush to settle the case even though there could have been a significant legal fee. **In fact he was vociferous in making sure that all the plaintiffs, and/or their representatives, were adequately protected and represented**…

> To those people who do not personally know Mel Weiss, they may just consider him to be a class-action attorney. However, it is obvious to me, and to those who do know him, that he is a class-act attorney and human being.

As Shakespeare said **"The quality of mercy is never strained". [*sic*]** (Exhibit 28) (emphasis added).

A very appropriate quote on which to end this portion of our submission. Throughout his life, Mr. Weiss extended "mercy" to so many in this country and throughout the world. We ask your Honor to now show him "mercy" in his own hour of need and we respectfully repeat that the **"quality of mercy is never strained."**

### F.   The Pro Bono Work Undertaken By Melvyn Weiss And The Firm Is Unprecedented And The Good They Accomplished Is Nothing Short Of Spectacular

As a passionate advocate speaking on behalf of a very impressive client, it is a challenge to not overstate the client's personal and/or professional accomplishments. It is equally challenging to set a proper tone when speaking of a defendant's prior accomplishments in the context of a Sentencing Memorandum, which of course presumes, that despite the client's noble work, he or she nevertheless stands convicted of a crime.  In this case, as to Mr. Weiss, and <u>only</u> as to Mr. Weiss, it would be difficult if not impossible to overstate the significance of the *pro bono* work he has undertaken.  He championed so many important causes that collectively his efforts have benefited millions of citizens throughout the world.

### (1)   The Holocaust Litigation

Perhaps of greatest significance, is his devotion to obtain just compensation for millions of Holocaust victims and survivors who suffered brutal, inhumane treatment and indescribable loss during World War II.  Indeed, when one looks back at the Holocaust litigation undertaken by Mr. Weiss and his colleagues, it seems almost impossible to believe that they overcame what to many appeared to be insurmountable odds.  Men and women of less courage, faith, determination and raw talent might have been daunted by those odds.  Mr. Weiss and his colleagues persevered.   In the end, they achieved amazing success.  For this reason alone,

counsel respectfully suggests that it is incumbent on all involved in this proceeding, including the Government and the Court to recognize what Mr. Weiss is credited with accomplishing and hopefully recognize as well, that on his day of judgment, he should be given very real credit for this very important work.

Thus as the letters to your Honor confirm, Mr. Weiss played a leading role in recovering $6.25 billion ($1.25 billion in the "Swiss bank" cases, and $5 billion in the "slave labor" cases) for Holocaust victims and their families.  In the Swiss bank cases, Mr. Weiss, on a *pro bono* basis, represented plaintiffs who alleged that Swiss institutions knowingly retained and concealed the assets of holocaust victims, accepted and laundered the illegally obtained "Nazi loot" and transacted in the profits of slave labor.  Ultimately, Mr. Weiss was instrumental in obtaining a global settlement in that case with the defendants agreeing to pay $1.25 billion in four installments over three years.  **Milberg Weiss waived its fees in this case.**

**Michael Bazyler**, currently a Professor of Law and the "1939" Club Law Scholar in Holocaust and Human Rights Studies at Whittier Law School.  In his letter to your Honor, he summarizes Mr. Weiss's historic role in this unprecedented effort:

> For the last ten years, I have devoted the bulk of my research and scholarship on the litigation filed by Holocaust survivors and heirs in the United States to obtain both compensation and recognition of the injustices committed against them arising out of the financial crimes of the Holocaust.
>
> . . . In my interviews of the lawyers involved in the suit and other participants, including the Hon. Edward J. Korman of the Eastern District of New York, presiding over the suits, **all spoke about the critical role played by Mr. Weiss in resolving the litigation and obtaining the $1.25 billion successful settlement for the plaintiffs**.
>
> Mr. Weiss also was instrumental in having the elderly Holocaust survivors receive their Swiss banks settlement payments tax free.  As Judge Korman explains in one of his opinions:

> ***The truly outstanding post-settlement work that benefited the Settlement Fund and its beneficiaries by millions of dollars was that of Mel Weiss.*** *After Special Master Judah Gribetz called attention to the diminution of the Settlement Fund by taxes on earned interest as well as the taxation of benefits awarded to the members of the classes,* ***Mr. Weiss was instrumental in leading the effort to persuade Congress to adopt legislation exempting from taxation interest earned by the Settlement Fund and payments to its beneficiaries.***

The successful conclusion of the Swiss banks litigation led directly to the litigation against German companies for their criminal activities during the Nazi era… That litigation settled in December 1999, for 10 billion German marks (approximately US$ 5.2 billion), and became, and remains, the largest settlement of a human rights case in U.S. history.  **Mr. Weiss' role in this litigation and the negotiations of the settlement with German industry was even greater that [*sic*] in the Swiss banks litigation**…

Mr. Weiss' leading role in the monumental German settlement was noted by Ambassador [Stuart] Eizenstat…

> *We must be frank*. ***It was the American lawyers, though*** [*sic*] ***the lawsuits they brought in U.S. courts, who placed the long-forgotten wrongs by German companies during the Nazi era on the international agenda.  It was their research and their work which highlighted these old injustices and forced us to confront them. Without question, we would not be here without them***.  *The settlement we reached of 10 billion DM will help hundreds of thousands of victims, beyond those whom the lawyers represent, live out their declining years in more comfort.  For this dedication and commitment to the victims, we should always be grateful to these lawyers…* ***Special recognition is due Mel Weiss, Professor Burt Neuborne, Deborah Sturman, Michael Hausfeld, Martin Mendelsohn, Robert Swift, Ed Fagan, Michael Witti…*** (Exhibit 29) (emphasis added).

**Professor Burt Neuborne**, the Inez Milholland Professor of Civil Liberties at New York University School of Law, and Fellow of the American Academy of Arts and Sciences was one of the legal scholars who worked with Mr. Weiss in the Holocaust litigation.  Professor Neuborne is an eyewitness to the unrelenting fight waged by Mr. Weiss and to his heartfelt devotion to his clients in this litigation.

In his letter, Professor Neuborne describes Mr. Weiss's work in great detail, endeavoring to explain the monumental effort undertaken by Mr. Weiss.  He acknowledges the criminal conduct of Mr. Weiss, but implores the Court to consider the enormity of Mr. Weiss's effort to achieve justice on behalf of victims of the Holocaust when fashioning a sentence in this case. Professor Neuborne writes:

> **I believe strongly, however, that a truly just sentence should also reflect the unique – indeed almost incalculable – contribution to justice made by Mr. Weiss in connection with a decade of litigation, negotiation and advocacy on behalf of elderly Holocaust victims.**
>
> I write from deep personal knowledge of Mr. Weiss's leadership of the Holocaust litigation… I affirm without hesitation that Mr. Weiss was the heart and soul of both the Swiss bank and German slave labor litigation.  He conceived of the litigation, funded it, organized it, directed its strategy, led the negotiations, and developed the implementation mechanisms.  While I was proud to assist him in the process, it was Mr. Weiss who pulled the plough.
>
> . . . I found Mr. Weiss to be a brilliant strategist, and a completely committed advocate for the victims.  He could not have been kinder to me, educating me in the complexities of class action practice, and counseling me on a daily basis about how best to proceed.  He led the negotiations, and helped to develop our legal theory.  In my opinion, without Mr. Weiss, the Swiss bank case would not have moved forward.
>
> . . . Once the case was settled for $1.25 billion, it was Mr. Weiss who persuaded most of the lawyers to waive fees for having obtained the settlement, and who persuaded me to accept Judge Korman's post-settlement appointment as Lead Settlement Counsel in January, 1999… We have now distributed more than $1 billion to more than 400,000 victims throughout the world.  **While I am proud to have played a constructive role in the process, it was Mr. Weiss who played the crucial role in making it possible, and who played an unceasingly constructive role in making it happen.**
>
> Mr. Weiss's role in the German slave labor litigation was equally remarkable.  In 1996, the German Federal Constitutional Court ruled in *Krakauer* that a 1991 treaty had lifted the international bar to litigation on behalf of Holocaust victims that had been imposed by the London Debt Agreement of 1953.  Mr. Weiss brought the *Karakauer* case to my attention,

and urged me to join with him in seeking compensation on behalf of slave and forced laborers.  When I initially declined, he refused to take no for an answer.  I finally agreed to work with him.  **Mr. Weiss then filed the first of 60 cases on behalf of Nazi-era slave and forced laborers seeking compensation from German corporations.**  He provided invaluable unpaid assistance to other lawyers seeking to file similar cases.  Mr. Weiss led the discussions on strategy, and launched the nationwide movement that forced German industry to seek a negotiated resolution.

When Secretary Eizenstat convened the parties to the slave labor cases in an unprecedented international negotiation involving 17 major German companies and eight nations, he asked Mr. Weiss to play a leading role as spokesman for the victims.  While I expressed myself on occasion, it was Mr. Weiss who willingly assumed the emotional and financial burden of principal negotiator.  The complex negotiations lasted for 18 months, shuttling on a monthly basis between Bonn and Washington, D.C., culminating in Berlin in July 2000 in the creation of a $5.2 billion German Foundation "Remembrance, Responsibility and the Future," funded jointly by German industry and the German government, designed to compensate the victims.

Mr. Weiss played a central role at every stage of the process – from conceiving and funding the German slave labor litigation, to arguing the cases, to negotiating the innovative settlement that Chief Judge (now Attorney General) Mukasey has hailed as a "remarkable" achievement of justice.

Then-Chief Judge (now Attorney General)[Michael] Mukasey has stated:

> A lot of things get written about lawyers these days, most of them bad.  But the disposition here is a remarkable achievement for the lawyers in this case.  I want to thank each of you and all of you for what you have done.  **It is a remarkable, remarkable thing.... When lawyers get a bad rap, I will speak up for lawyers on the basis of this, if nothing else.**  Transcript of Proceedings before Chief Judge Mukasey, pp. 19-20.  *Winters v. Assicurazioni Generali*, 98 Civ. 9186 (December 8, 2000 SDNY) (MBM) (discussing the German Foundation settlement).

Although a powerful, successful lawyer by then, Professor Neuborne writes how Mr. Weiss never forgot who the clients were in this important litigation.

. . . I repeatedly watched Mr. Weiss speak patiently – even lovingly – to elderly victim after victim – providing counsel and reassurance; but most of

all providing them with the respect and dignity that had been stolen from them. One astonishing elderly woman not only spearheaded the slave labor litigation against Volkswagen, she wrote life-affirming poetry.  Mr. Weiss quietly arranged for the private publication of her poetry.

Mr. Weiss was also responsible for the decision to include non-Jews in the Holocaust litigation.  While the Holocaust was a tragedy of unimaginable scope for the Jewish people, Mr. Weiss recognized the universal nature of Nazi persecution.  In the Swiss bank case, he successfully urged the inclusion of Jehovah's Witnesses, Sinti-Roma (gypsies), gays, and the disabled as victims of Nazi oppression equally entitled to legal redress.  In the German slave labor cases, he was instrumental in assuring compensation for non-Jewish forced laborers from Eastern Europe who had never before received recognition or compensation.

**. . . I implore you to weigh Mr. Weiss's magnificent contribution to justice in the Holocaust cases in fashioning a truly just sentence in this tragic case.**  (Exhibit 30) (emphasis added).

Mr. Weiss was part of a large team of lawyers who worked on the Holocaust litigation.  However, Professor Neuborne credits Mr. Weiss above all for his commitment to Holocaust survivors, and he concludes that without Mr. Weiss, the litigation would never have been initiated and the historic settlements never have been reached.

**Professor Edward McGlynn Gaffney, Jr.**, a professor of criminal law, criminal procedure, constitutional law and professionally responsibility was also part of the team working on the Holocaust litigations.  In his view Mr. Weiss was the **champion** for victims of the Holocaust, and explains why in his letter:

As a Catholic lay theologian, I have been engaged for decades in interreligious dialogue with Jews.  Hence I can testify personally to the superb reputation of Mr. Weiss as **a champion of justice** for the surviving victims of the greatest atrocity and mass murder of the last century.  Mr. Weiss applied his formidable skills as a litigator and a negotiator to an extraordinary array of cases and claims dealing with the compensation of surviving Jews for the atrocious slave labor they were forced to perform during the war, and with restitution of assets of Jews (including art and bank accounts) seized by the

Nazis from 1933 to 1945, and unlawfully retained by banks and museums for decades. **He did so with courage, creativity, and tenacity, achieving results that many had deemed impossible before he became a central actor in these events.** You will find a candid assessment of Mr. Weiss's amazing work in these matters in the definitive study written by Ambassador Stuart E. Eizenstat, *Imperfect Justice*… Elie Wiesel notes at the end of his *Foreward* to this volume: "The duty to remember covers not only big accounts, huge palaces, and rare art collections but also less wealthy families, small merchant cobblers, peddlers, school teachers, water carriers, beggars – the enemy deprived them of their pathetically poor possessions, such as a prayer book, a shirt, a comb, eyeglasses, toys." **I write on Yom Hashoah – Holocaust Memorial Day – to make Your Honor aware that Mr. Weiss is deeply engaged in honoring the memory of these little people who were also victims. For this very purpose he founded a not-for-profit organization called the Holocaust Art and Remembrance Foundation, which has published the poems of a camp survivor and supports the post production of a documentary film on the mass rescue of over 50,000 Jews in Bulgaria in 1943.** (Exhibit 31) (emphasis added).

**Jean Geoppinger**, a non-Jewish associate attorney at Waite, Schneider, Bayless & Chesley Co., L.P.A., worked with Mr. Weiss in the Holocaust litigation. She agrees with Professor Neuborne that Mel deserves the credit for the historic settlement and that without him, the negotiations would have failed:

> Mel's commitment to Holocaust survivors is virtually unparalleled. Despite his busy schedule and the fact that he most certainly had numerous other matters vying for his attention, he has never once lost sight of the goal of securing a **"measure of justice"** for survivors during their waning years, or hesitated to utilize his many resources to accomplish that goal. When negotiations relating to the German Economic Foundation were at a standstill, he was a critical factor in breaking the logjam, which led to the establishment of the foundation. Additionally, he was a leading proponent of the Holocaust Survivors Tax Fairness Act, which ensures that victims of the Nazi regime, their heirs and estates pay no federal income tax on restitution payments received.

> . . . Not surprisingly, notwithstanding his present personal situation, his efforts on behalf of survivors continue to this day. During a recent meeting, in an attempt to educate and persuade assembled lawyers to carry on his

legacy of assisting survivors, Mel described standing in the salon of the presidential palace in Berlin, Schloss Bellevue, and listening to German president [sic] Johannes Rau beg forgiveness from the survivors on behalf of the German people. **His choice of that moment as the single most important in that litigation is the epitome of Mel.** (Exhibit 32) (emphasis added).

**Irwin Levin** is the managing partner of Cohen & Malad LLP and like Ms. Geoppinger, he too met Mr. Weiss when they were co-counsel in the Holocaust litigation, the professional achievement in which he takes the greatest personal satisfaction. Mr. Levin believes that the positive results of this litigation could not have been achieved without Mr. Weiss's guidance and commitment:

> As you may be aware, Mr. Weiss played a leading and essential role in the stewardship of that historic effort on behalf of Holocaust victims. Although well aware of his professional achievements and philanthropy, I first became acquainted with Mel in the context of that litigation and the highly complex negotiating sessions, many of which took place in Europe. **The unprecedented results could not have been achieved without Mr. Weiss' guidance and commitment, much of which he provided for no compensation.** I immediately developed an admiration not only for his negotiating skills, which involved developing consensus among a diverse group of lawyers, government officials, corporate representatives and non-governmental organizations, but also for his devotion to the interests of Holocaust survivors. (Exhibit 33) (emphasis added).

When the pressure was the most intense in the slave labor case, **Frederic Boloix**, a fine arts dealer in Sun Valley, Idaho, writes that during this time Mel seemed like a man **"possessed"** and discusses his view of what sort of person undertakes a daunting task like the slave labor litigation:

> Mel is a very passionate man and the reason for his great success is that he really loves what he does and it brings out a will and focus that are uncanny. **We met on several occasions while he was working on a case that was consuming him – he seemed like a man possessed.** I was a bit worried and asked his assistant Lois what was going on with him, she told me that he was spending every waking hour working on this particular case and was hardly sleeping at night. The case I am referring to ended up being one

of his greatest accomplishments: recovering wages and compensation for victims of slave labor during the Nazi regime – something he did pro-bono.  It is not often that I have seen this level of compassion converted into the will and energy to really make a difference.  **He [*sic*] is particularly driven when it comes to giving a voice to those who have none.**  The burning desire to help those who are victims of injustice is something that I believe one is born with – I don't think it can be learned or faked.  That is simply Mel's nature and it explains why he is a pioneer in his profession.  (Exhibit 34) (emphasis added).

### (2)  A Survivor's Book of Poetry Gets Published by Melvyn Weiss – A Lost Relative and Friend

Mr. Weiss persevered in both the Swiss Bank and the Slave Labor cases because he was driven to relieve some small part of the permanent anguish carried by the survivors of the Holocaust and the heirs of those who perished.  The Court need look only to the friendship that developed between Mr. Weiss and one of the survivors,  **Elly Gross,** to confirm that  his heart and soul were fully entwined in this litigation and that he understood what it meant  for each individual survivor.

Ms. Gross was a plaintiff in the Volkswagen slave labor litigation.  Mr. Weiss and Deborah Sturman, an Associate at Milberg Weiss, chose to work with Ms. Gross after viewing her testimony in Steven Spielberg's taped collection of Holocaust survivors.  In a <u>Prologue</u> to a book of her poetry that Mr. Weiss published, Mr. Weiss writes about what Ms. Gross endured during the Holocaust:

> Elly came into my office in the winter of 1998 bearing a smile on her sweet face; a smile I later realized is permanently affixed to cloak the unimaginable remembrances of a past so horrible that they transcend our ability to comprehend.
>
> This Holocaust survivor, at the age of 15 was transported from her home in Simleu-Silvaniei, Transylvania, with her 37 year old mother and 5 year old brother to Auschwitz – by cattle car.  On their arrival they were unloaded, with hundreds of others, only to be separated – one group to the left the other to the right – by a Nazi officer wearing white gloves.  Elly later learned that that officer was Dr. Josef Mengele, the infamous Nazi Doctor

who used human beings as medical guinea pigs.  Elly wound up on the right, her mother and brother on the left. Elly never again saw them alive.

After surviving over a year in several concentration camps, including Auschwitz, and working as a slave laborer at a Volkswagen plant, Elly was freed by the Allies and went back to Romania, married, had a son and daughter, and later moved to the United States.  Fifty years later, she participated, with teenagers from the United States, in the March of the Living, visiting Auschwitz and walking with the youths to the site of the murders, where she saw photographs of vicious images that she has endured every day of her life, those of the concentration camp and her life as a slave laborer.

But a particular photograph stood out among the others. First she spotted the white gloves that by a wave to the left, separated her forever from her loved ones.  Then, Elly was thunderstruck by the picture of her mother, holding her young brother in her arms, standing in front of the railroad cars, surrounded by hundreds of other prisoners.  **Rendered speechless, numbed by the vision that she thought she would carry forever only in her memory, Elly went home and started to write.  She spoke little, but wrote much. She wrote poems.  I promised that I would publish Elly's poems. Here they are.**  (Exhibit 35) (emphasis added).

Ms. Gross describes her relationship with Mr. Weiss in her own letter to the Court:

For future generations, Mr. Steven Spielberg, the film producer, collected testimonies from Holocaust survivors.  In 1998, Ms. Deborah Sturman, an Associate with the Milberg law firm chose me from Mr. Spielberg's collection to be the plaintiff on the case against Volkswagen.  At Fallersleben, Germany in 1944-1945, at the age of fifteen (15) I worked as a slave laborer for Volkswagen.

**Shortly after being chosen, I was invited to the law office in New York and there I met Mr. Melvyn Weiss.  At my first visit I felt like I found a lost relative or a friend.  He treated me with sincere warmth and respect.**

I have two stories to tell that will show how kind Mr. Weiss was to me. I wrote a book of poetry about my childhood memories.  As I sat in Mr.

Weiss's office with his assistant, he read a poem out loud.  I could tell that he understood the meaning of the poem and understood me.  He then surprised me by saying he would make sure the poems were published, he didn't forget.  It has been the basis for other books I have written and for over 200 lectures that I have given to students.

On another visit, he asked me how I am doing. I told him I wanted to honor the memory of my parents and brother with hospital beds at Rambam Hospital.  At first I didn't understand what [he] said.  **Then I realized that he said he would make a donation of - $5,000 to donate 6 beds at Rambam Hospital in memory of my parents and brother. "Elly, you don't have to worry anymore."  I realized what he meant, my long dream had come true.**

I know Mr. Weiss as a special kind, honest person.  It is hard to believe that he has to face the court.  I hope I have helped you understand, Your Honor, what a good, caring person Mr. Weiss is.  (Exhibit 36) (emphasis added).

**Bruce Prager**, a senior partner at Eisner LLP and close family friend claims that Mr. Weiss has given Holocaust survivors more than just monetary compensation, he has restored their hope:

His countless hours and indefatigable representation of those less fortunate are a true inspiration to me.  Mel's involvement in this matter, with no monetary reward to him, and I'm sure large out of pocket expenses, show the true essence of this fine human being.

While the world at large might have forgotten the atrocities of the Holocaust and World War II, Mel has given those survivors and heirs, hope and, more importantly a fierce advocate for their voices who have gone unheard from [*sic*] for far too many years.  (Exhibit 37).

The outcome in the Holocaust cases impacted millions of people, even many who were not themselves plaintiffs.  **Sheldon Adelman** has known Mr. Weiss for eleven years due to their involvement in many of the same charities.  He describes what it was like for him as a family member of Holocaust survivors to read about the litigation as it unfolded and a settlement reached:

- 46 -

In 1998, after *years* of pro-bono work on behalf of individuals affected by the Nazi atrocities committed during World War II, Melvyn I. Weiss settled a class action case against the Swiss Banks for their collaboration with the Nazi regime, and was awarded $1.25 billion dollars to be distributed among the survivors named in the suit.  Members of my family are survivors of the Holocaust and, while we were not a part of this suit and did not gain financially from the award in this case, we gained intense satisfaction as the facts of the case came to light and were reported world-wide and, more importantly, we gained a small measure of closure to this truly horrific chapter in our history.  Such closure would not have been possible but for the personal actions of one individual, Mel Weiss.  (Exhibit 38).

The Holocaust litigation involved bold, unprecedented experiments in the law that, according to Professor Neuborne, were driven by one lawyer's passion for justice.  What Mr. Adelman describes as a "small measure of closure", is really a description of the "magnificent justice" won for Holocaust victims by Mr. Weiss and his colleagues, who through devotion and legal genius forced the Swiss Banks and the German corporations to acknowledge what they did in World War II and forced them to accept a strong dose of accountability.  We will never know how many people, who, like Mr. Adelman privately experienced justice as they followed the Holocaust litigation and its resolution; to be sure, the number is in the millions of private citizens, 90 percent of whom were not Jewish, who know that it was Mr. Weiss who helped perform this magnificent service to mankind.

The issues faced by survivors of the Holocaust and their children are varied and very complex.  Mel Weiss, in one way or another tried to help all who came to him for guidance.  A perfect example is found in the letter by Ernest W. Michel, Executive Vice President Emeritus of the UJA Federation of New York.

Mr. Michel, whose parents were killed in Auschwitz, later learned that they were posthumously baptized by the Mormon Church.  He explains that because of Mel Weiss, who became chair of a Committee to consider this issue, they are now 13 years later, close to an agreement with the Mormon church to "put an end to this practice."  (Exhibit 39).

In truth we will never really know how many lives Mr. Weiss and his concern have positively impacted on. The number is undoubtedly staggering.

### (3) With The Guidance of Melvyn Weiss, The Milberg Weiss Firm Steps In to Help Victims of Terrorism

Following the horrific attack on the Twin Towers in New York City, Milberg Weiss represented victims and their families after the September 11, 2001 attacks. The firm's *pro bono* efforts drew praise from Kenneth Feinberg, the Special Master appointed by the Court to administer the September 11th Victim Compensation Fund.

> **Once again, as I have learned over the years here in New York, the Milberg Weiss firm steps up to the plate in the public interest time and time again.** The social conscience of the Milberg Weiss firm, acting through its excellent associates and partners, help deal with crises that confront the American people and others, and I am personally in the debt of Milberg Weiss for the work that it is doing... I am once again in Milberg Weiss's debt for their extraordinary willingness to help out in the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

*In re September 11 Victim Compensation Fund*, Preliminary Hearing, Claim No. 212-003658 (Dec. 9, 2003) (emphasis added).

### (4) The Definition of a "Wise Man" Who Continuously Gives of Himself to Help Others

In **Kenneth Feinberg's** letter to your Honor, he pays special tribute to Mel Weiss for his wisdom and his dedication to all of his clients, including those represented on a pro bono basis:

> For the past fifteen years I have worked with Mel Weiss in a professional capacity in a series of litigations and mediations in which I acted as mediator and arbitrator. In each of these matters – whether it be a complex commercial dispute or the resolution of Holocaust claims brought against the German government and industry – Mel Weiss has always exhibited the highest degree of competence, courtesy, and determination on behalf of his public and private clients. At the same time, Mel has always been available to counsel and advise his fellow lawyers on all matters large and small, professional and personal. **He is the definition of a "wise man," who**

**continuously gives of himself to help others.**  (Exhibit 40) (emphasis added).

### (5)     Representing Garment Workers in Asia

Milberg Weiss represented immigrant garment workers from Asia who were drawn to Saipan with promises of high pay.  What they found instead, were long hours, low pay, and miserable working conditions.  After years of hard-fought litigation, the case was settled for more than $20 million, plus an agreement by the manufacturers to comply with strict employment standards, including a guarantee of extra pay for overtime work, safe food, and drinking water.  **The firm agreed to waive its fees -- which amounted to about $16 million – as well as much of its costs.**  U.S. Rep. George Miller (D.-Calif.) noted, in appreciation:

> This is a great achievement, made even more impressive by the willingness of the attorneys to forgo compensation for their thousands of hours of expert involvement in the case.  (Press release of Rep. George Miller (July 28, 2003), U.S. Congressman and Senior Democratic Member of the Committee on Education and the Workforce, *available* at www.house.gov/georgemiller.).

### (6)     Volunteering to Serve His Own Community, Giving of His Time and Energy

In the 1990s Mr. Weiss served on the Nassau County Commission on Government Revision on a pro bono basis.  While working with the Commission, he met **Neal Lewis**, an attorney and the executive director of an environmental protection and a local government watchdog group, Neighborhood Network.  In his letter to your Honor, he recalls that on numerous occasions he heeded Mr. Weiss's advice to work with his co-Commissioners, including those opposed to reform efforts.  Moreover, although Mr. Lewis himself authored many reforms to the Nassau County charter, he credits Mr. Weiss with actually persuading the majority of the Commissioners to approve the reforms:

For several years in the 1990's I served, along with Mel Weiss, on the Nassau County Commission on Government Revision (also know [*sic*] as the Nassau Charter Revision Commission).  The Commission was appointed by the Nassau County Executive, after a successful lawsuit that challenged the weighted voting system of government utilized by the former Nassau Board of Supervisors…

**While I had authored many of the reforms, and I was often regarded as the chief catalyst in pushing the issues, Mel Weiss was also instrumental.**  Mr. Weiss was a very active member of the Charter Revision Commission – volunteering countless hours to the many meetings and public hearings.  **He played a pivotal, low key, mediating role in getting the reforms mentioned above approved by a majority of the Commission.  I often listened to his calming counsel as he persuaded me to temper my criticisms and encouraged me to work with the other members of the Commission, including those who were opposed to the reform efforts.**

My experience in working with Mel Weiss made me feel fortunate to be working with a true professional.  He was always soft-spoken, well informed, and focused on what was important.  (Exhibit 41) (emphasis added).

    **(7)**    **Melvyn Weiss and Milberg Weiss Rescue the Legal Aid Society and Contribute to Continuing Legal Education Programs**

In addition to the firm's pro bono efforts, Melvyn Weiss encouraged Milberg Weiss attorneys to contribute their services to legal aid programs on a regular basis. Indeed, in December 2003, Patricia M. Hynes, a member of the firm's Executive Committee from 1987 to 1999, served as Chair of the Board of Directors of the New York Legal Aid Society, the main purveyor of legal services to the city's poor. Milberg Weiss, through Ms. Hynes, was instrumental in rescuing Legal Aid from virtual bankruptcy.  While Milberg Weiss compensated Ms. Hynes for her time spent on Legal Aid's crisis, it did so on a *pro bono* effort to save the Legal Aid Society.  Ms. Hynes worked tirelessly to effectuate cost-saving measures that eliminated a $22 million operating deficit in 2004 and set the stage for balanced

budgets in each of the next two years.  In addition, Mr. Weiss arranged for the firm to contribute $1.3 million to the Legal Aid Society from unclaimed funds recovered in one of its class action settlements.

So too has Mr. Weiss himself participated in virtually every Continuing Legal Education program in which his presence was requested and he has actively encouraged other lawyers at the firm to follow that example.  In addition, Mr. Weiss and many firm attorneys served on ABA practice group committees, on state or local bar task forces, on judicial conferences and on magistrate selection panels. The firm's lawyers have held such positions as Chair of the ABA Standing Committee on the Federal Judiciary, Co-Chair of the Central District of California Attorney Delegation to the Ninth Circuit Judicial Conference, Co-Chair of the Class Action and Derivative Committee of the ABA Litigation Section, and Chair of the Federal Courts Committee of the New York City Bar Association.  Mr. Weiss and many of the firm's attorneys have also lectured at law schools, and served as faculty members in programs throughout the country.

In short, Melvyn Weiss started a successful law firm and staffed it with bright, creative, talented lawyers who have done and continue to do good legal work.  Mr. Weiss and several of his former colleagues have now acknowledged participation in criminal conduct that has unfortunately scarred their personal reputations and unfortunately tarnished the reputation of a firm that for so many years provided excellent legal work.  All counsel asks at this difficult time is that your Honor accept the criminal conduct, but not lose sight of all of the good accomplished by Mr. Weiss and the firm he built.

## V. <u>THE SCOPE OF THE CHARITY AND GENEROSITY OF MELVYN WEISS IS  BREATHTAKING</u>

Simply put, Melvyn Weiss has spent his entire adult life helping others. When not fighting for the underdog in the courtrooms of America, he was assisting or underwriting countless charities and non-profit organizations throughout the

world.  Far more impressive than the money he has given is the amount of **time** that he also contributed to so many causes, to so many in need.  His lifetime of generosity, humanity and kindness has resulted in tangible improvements in the lives of "thousands" and should earn him the leniency and respect of this honorable Court.

**Thomas R. Suozzi** is in his seventh year as the County Executive of Nassau County, New York.  He writes to share his impression of Mr. Weiss's "extraordinary public spirit."

> He is truly dedicated to serving others.  From the moment I met him I have marveled at the extent of his community, charitable and philanthropic activities, **which have benefited thousands of people.** (Exhibit 42) (emphasis added).

**Norman Harvey**, a former officer in the United States Air Force, recently resigned as Chairman of a Georgia Pacific subsidiary.  He has been a friend of Mr. Weiss for more than 25 years.  He describes Mr. Weiss as a "rare breed" because he gives of himself, with an open heart, expecting nothing in return.  In Mr. Harvey's view, Mr. Weiss has made generosity and charity a major part of his life and that his generosity to others makes him a **"true patriot."**  (Exhibit 43)(emphasis added).

So too does **David Boies** write eloquently of the nature and quality of Mr. Weiss's generosity:

> [A]s long as I have known Mr. Weiss he has been unusually generous both to individuals and to charities.  His generosity, has changed, and is changing, the lives of many far less fortunate than we are.  People give for a variety of reasons, and every gift to a good cause helps regardless of motivation. **However, it is particularly rewarding to see someone give, as Mr. Weiss has done, quietly and with no interest other than how he can share his good fortune with others.**  A lot of people, myself included, have given a lot less with more recognition.  (Exhibit 6) (emphasis added).

**A.      A "Compulsion" To Make The World A Better Place**

**William Matschke,** a former Milberg Weiss CFO, describes Mel's

commitment to helping others as a **compulsion** to find the way to make the world a better place.  For 16 years Mr. Matschke watched while Mr. Weiss acted on this "compulsion" to solve the world's problems:

> During this lengthy time period I observed first-hand, day after day, Mr. Weiss's outstanding character and his most impressive work ethic.  **Most importantly, and what I wish to stress to you for your consideration in his sentencing, is his enormous desire to use his position and skills to make the world a better place for those in need.  In fact, I would describe Mr. Weiss's commitment to charitable and *pro bono* endeavors as compulsive.**  He sought out opportunities to help, and he not only did so both with his time and his resources, but he encouraged and enabled those around him to join in these efforts as well. He led by example.  (Exhibit 44) (emphasis added).

His compulsion to do good, to help those in need, is documented in letter after letter that describe his exhaustive efforts to improve the lives of others through charitable activity.  We beg the Court's indulgence as we share only a handful of the remarkable acts of generosity that allow Mr. Weiss to appear before this Court for sentencing with much to be proud of despite the criminal conduct he stands convicted of.

### B.    Endowing The Loan Repayment Assistance Program At New York University School Of Law

Generosity hardly seems an adequate word to describe The Weiss endowment of New York University's Loan Repayment Assistance Program (LRAP).  Once again, Melvyn Weiss saw a need and filled it.  This time, it was the financial burdens of law school graduates willing to work in public interest and public sector positions, but saddled with enormous tuition debt.

Through his life's work, Mr. Weiss became keenly aware of the need for talented attorneys to advocate for the voiceless among us.  He understood that to make the public service career choice more palatable for young bright graduates, their law school tuition debt burden had to be lifted.  So Mel Weiss lifted it by endowing a Loan Repayment Assistance Program (LRAP) at NYU Law School, a

program that was soon the envy of every law school in the United States and today, is emulated in most of the law schools throughout the country.

**Richard Revesz**, Dean of New York University School of Law, has been on the NYU faculty for 23 years and is currently also the Lawrence King Professor of Law.  He assumed the deanship of NYU School of Law in 2002 when former Dean, John Sexton, moved on to become President of NYU.  In writing to the Court, Dean Revesz describes Mr. Weiss's legendary creation of the NYU LRAP program and his reliance on Melvyn Weiss as a member of the Board of NYU for guidance and support.

> As a faculty member, I had long known of Mel by reputation.  His generosity and leadership in endowing the Loan Repayment Assistance Program (LRAP) at the Law School was legendary.  NYU had introduced the LRAP program in 1984 to address the growing need for high quality lawyers at public interest law agencies.  Recognizing the financial constraint that the Law School's tuition places on students after graduation, LRAP was designed to alleviate the burden of Law School debt in order to enable graduates to pursue public interest careers.  Mel became a champion of the program, leading the charge to build its endowment as it became increasingly expensive commensurate with its success as more graduates entered the program.  He also funded a public interest forum to attract distinguished figures working in government and public interest careers to come and speak to students about their experience.  His support for a network of public interest initiatives has been instrumental in reinforcing the ethos of public service that is so important to the Law School's mission.

> **Under Mel's stewardship, the principle of full debt repayment for individuals who make a lasting commitment to public service law has become a cornerstone of our institutional philosophy.  Today, our LRAP program is one of the most generous in the nation, providing loan repayment support to more than 450 graduates.  We spend more on it – $4.3 million last year – than any other school, and typically fund around 12% of the graduating class.  This could not have been possible without Mel's commitment.  Thanks to his generosity, the program has had enormous success in attracting students committed to public service careers and in making it possible for them to fulfill their professional**

**goals.  His legacy has created an outstanding pool of public service lawyers to do work in every conceivable area of the law.**

. . . The court, understandably, has an image of Mel Weiss that has developed from the proceedings in which he has been involved.  I thought it important that the court also have an opportunity to see another view of him, one marked prominently by his admirable, genuine, and long-lasting contributions to public interest law and legal education.  (Exhibit 45) (emphasis added).

**John Sexton** has known Melvyn Weiss for over 20 years, first in his role as dean of New York University's School of Law and now as President of the University.  He believes that Mr. Weiss's commitment to public interest law and his endowment of the LRAP program has had a direct impact on New York University's most gifted students:

As a benefactor, Mel has had a direct impact on our gifted students. Over the years, he has generously supported our Loan Repayment Assistance Program, which eliminates the student loan debt of young graduates who commit their careers to public service.  He facilitated an annual forum in the area of public interest law, further conveying the importance of public service to students… He was named an honorary member of the NYU Chapter of the Order of the Coif, the national society that encourages excellence in legal education, in 1992.  The following year, we presented him with the Arthur T. Vanderbilt Medal, the Law School's highest honor.  (Previous recipients have included Senator Jacob Javits, New York State Chief Judge Judith Kaye, and former New York City Deputy Mayor Fritz W. Alexander II).  In 1999, the Law School Alumni Association presented him with their Alumni Achievement Award.  (Exhibit 46).

**Jonathan Abady**, a graduate of New York University School of Law first learned of Melvyn Weiss when he himself was a law student at NYU.  He writes that Mr. Weiss did more than just fund the program, he put time and energy into building the program through fundraising, and planning and continuously organizing the program:

Mel was one of the original founders of the loan forgiveness program at NYU, providing not only substantial personal monetary contributions, but also working tirelessly to raise money from others in the community and

involving himself in important planning aspects and organization of the program… **Mel was one of the early pioneers in this very important effort. Without him, there would likely be no loan forgiveness at NYU** (certainly not of the caliber that currently exists) and by extension, I believe it doubtful that this programming would have thrived and spread the way it eventually did in other law schools across the nation.  (Exhibit 47) (emphasis added).

## C.    Inspiring Generosity In Others

Mr. Weiss's own contributions are generous.  What is also remarkable however, is that he has inspired others as well and he does so by putting time and energy into the charities he supports.  For example, at NYU, he didn't just endow the LRAP program, he also sponsored a lecture series focused on practitioners in public interest arenas so that Program's success would continue.

### (1)    The Child Life Program

**Jeffrey Maidenbaum**, a colleague of Mr. Weiss, writes how Mr. Weiss inspires others to join him in philanthropic endeavors.

[M]y wife and I have been involved with the Childlife Program at North Shore University Hospital for many years.  This is a program designed to provide assistance in the hospital for sick children, many of who may be terminally ill.  **One year the organization decided to honor Mel Weiss for his charitable work.  The year that he was the honoree resulted in the most money raised by the program up to that time**.  **More importantly, his involvement made others aware of the program and many of those individuals who got involved with the organization because of Mel Weiss remain involved today.  He has a wonderful way of motivating others to do charitable deeds.**  (Exhibit 48) (emphasis added).

**Mark Goldberg**, a Certified Public Accountant and family friend, also supported Child Life, and he writes how Mel raised money for the program, but also spent time with the program's children:

He was nice enough to be an honoree one year which is a big endeavor to help raise money for this great cause.  He took time form [*sic*] his busy schedule at the law firm and devoted much time and energy to help raise hundreds of thousands of dollars for this program that aids the sick children.

He not only helped raise money but spent time with the sick children. (Exhibit 49).

> **(2)     Like the Holocaust Litigation the Devotion of Mr. Weiss to the Victims of a Terrorist Bombing in Argentina is Yet Another Moving Example of His Important Humanitarian Work**

In 1994, the Israeli Consulate in Argentina was attacked by terrorists.  When the Anti-Defamation League was organizing a humanitarian trip to show solidarity and pay tribute to the Argentinean people and the Jewish community in Argentina, Mel Weiss became actively involved.  While in Argentina on that first trip, Mr. Weiss forged lifelong relationships with many of the Argentineans he met.  He then worked tirelessly to create a memorial to the victims of the terrorist strike, to hold the perpetrators accountable and then, in the ensuing years, also loaned his art collection to the community as a free exhibit, to assist the Governor of Buenos Aires bring culture to his people.

**Saul Rotsztain** is one of the Argentinians who welcomed Melvyn Weiss to his country when Mr. Weiss visited with the Anti-Defamation League.  He describes how Mr. Weiss agreed to lend his Picasso collection to Buenos Aires for an art exhibit:

> In 1994 when the terrible terrorist attack destroyed the Jewish Center (AMIA), an important delegation of the Anti-Defamation League (ADL) of New York came to Buenos Aires to pay respect and to show solidarity to the Jewish community and the Argentinean people...
>
> I also introduced him to a foundation that supported poor children from poor families in a suburban area of Buenos Aires.  When Mr. Weiss visited the place where they provide food for the children, he was so impressed with the job the foundation was doing that he immediately started to support them.
>
> On another occasion when he met the Governor of that Province of Buenos Aires, the largest Province in Argentina, **the Governor asked him if he would be kind enough to lend his Picasso art collection to take to Buenos Aires for an exhibit to the public, especially teachers and**

**children.  Mel Weiss only put one condition for this event to take place and that was that they would allow everyone to attend the exhibition free of charge.  This event had a great cultural impact in Argentina, [*sic*] it was the highlight of the small capital of Buenos Aires, called La Plata.  Close to 100,000 people visited the exhibit.  It was "Picasso Para Todos" – Picasso for everyone.**   (Exhibit 50) (emphasis added).

He goes on to explain that when the investigation of the terrorist attacks on the Israeli Consulate stalled, the Argentinean Court requested Mel's assistance:

> Several members of the judiciary system, often requested advice from Mel Weiss and he was always ready to help them either by talking to them long distance or meeting with them personally if they were in the same location.  **When the investigation of the bombing of the Israeli Embassy by the Argentine Supreme Court stalled, the secretary of that Court sought Mel's assistance.  Mel brought them to the U.S. State Department whose help led to an indictment of an Iranian senior official, in absentia,** Mel and the Argentine Ambassador to the U.S. announced the indictment at the Embassy in Washington, D.C.  (Exhibit 50) (emphasis added).

**Dibo Attar** has been a close friend of Mr. Weiss for the last 25 years.  Mr. Attar accompanied Mr. Weiss on his first trip to Argentina in response to the bombings.  He too writes of Mel's commitment to the cause of healing Argentina and of his personal connection with the people of Argentina.

> He asked me to join him on a trip to Argentina he was making with the Anti-Defamation league, who were investigating the unsolved bombing of the Amia and the Israeli Embassy, in Buenos Aires.  I had many misgivings about the trip and the purpose, having lived in Buenos Aires and knowing the country.  **We met and went everywhere, to the Ministry of Defence [*sic*], Justice Dept., Secret Service, US Ambassador as well as President Menem and his chief of staff.  The perpetrators of the terrible bombings were not found, or horror resolved. Yet Mel in a short time and on many subsequent trips reached out and built many bridges to the Argentine leaders and community.**
>
> **. . . In one early breakfast meeting the funds were raised to dedicate land and build a Plaza in commemoration of the lost lives in the bombings.  He was instrumental in making things happen and his door was always open, always having a little more time after the absolutely last meeting.  He genuinely liked the people, and it was amazing to watch someone who**

**knew not one word of Spanish communicate and create bilateral friendships, warmth and good deeds.** (Exhibit 51) (emphasis added).

> **(3)      Picasso For Everyone – Including the Blind and the Disabled**

**Fernando Maurette**, a former National Congressman for Argentina who has also held numerous other government positions in that country first met Melvyn Weiss in 2000 at a gathering of the Anti Defamation League.  Having already been aware of Mr. Weiss's work in building a memorial park where the Israeli Embassy was destroyed in a terrorist attack in 1992, Mr. Maurette describes his own experience with Mr. Weiss:

> When I met Mr. Weiss I met a great human being, not only in the field of human rights and the defense of freedom, but also a sensitive and giving person. I remember him talking about his love of art and the work of Pablo Picasso in particular.  I also remember him telling me about his humble childhood in the Bronx and that his long work hours alongside his father would not allow him to visit museums and enjoy art.  When he learned about Argentina's historic and great appreciation of art, and knowing that many humble people in this country were not able to enjoy art, **he proposed to lend his outstanding private collection of 138 Picassos so that it would be exhibited in my country.  His one condition was that the exhibition had to be free of charge for everybody.**  We made it happen and the collection was exhibit [*sic*] from March 19th. [*sic*] to April 20th. [*sic*] of 2001 in the Teatro Argentino de La Plata and over 200,000 people attended it, the majority of which were children and humble people.  Mel also authorized a special tour for the blind and made available ramps for the disabled.  (Exhibit 52) (emphasis added).

After the ***Picasso for Everyone*** exhibition in Buenos Aires the Governor of the Provence at that time, Dr. Carlos Federico Ruckauf and his wife Dr. Maria Isabel Zapatero De Ruckauf wrote a letter of formal thanks to Mr. and Mrs. Weiss. In their letter they thank the Weisses and they describe the exhibition's significant positive impact on the Provence and on Argentinian citizens:

> "Picasso para todos"; as we have shown you it enjoyed enormous success among all kind of public, from children to grown ups, from followers of Picasso to those who, for the first time, got the chance to see one of his

works…. The Picasso exhibition renewed expectations over La Plata as an alternative center for cultural activities at the same level of Buenos Aires and since it was possible to host it in Teatro Argentino, the presence of your Collection brought many people to a building that, closed for almost 25 years, recovered prestige and sense of purpose with activities as this one. . . The success created a renewed hunger for new events like 'Picasso…" and this, besides being stimulating and rewarding for all those involved with the exhibition, shows that we should never underestimate what people expect from us neither what we do to fulfill those hopes, no matter how difficult times may be.  All above would have never existed if both of you were not inspired by your disposition to share what you have accomplished in life, utogether [*sic*] with a and a sense of public service [*sic*]worth of a true mecenas.  (Exhibit 53).

### (4)    Devoted to Finding Peace in the Middle East

For many years Mr. Weiss has devoted resources, time and energy to the Israel Policy Forum (IPF), a charitable organization working for peace in the Middle East.  **Nick Bunzl**, the Executive Director of Israel Policy Forum (IPF) admires Melvyn Weiss for his efforts:

Peace in the Middle East is a difficult but necessary objective.  Mr. Weiss has put his tremendous resources and bountiful connections behind this worthwhile goal.

As a major source of global instability that impacts America's foreign and defense policies and actions, it is imperative that all Americans work toward successfully resolving conflict in the greater Middle East. In this vein, I ask the court for leniency when sentencing Mr. Weiss. His actions to promote peace are deserving of this plea for mercy.  (Exhibit 54).

**Debra Wasserman,** an IPF Board Member, adds that Mr. Weiss has been an "extraordinary volunteer" for peace in the Middle East:

Mel and I developed a close working relationship during my years at Israel Policy Forum, a bipartisan group that galvanizes leaders in the business, philanthropic, entertainment and political communities to support an active American role in Middle East diplomacy.  **Mel was an extraordinary**

**volunteer, devoting unlimited hours and resources towards the growth of IPF.**

While I understand the grave charges that Mel is facing, I also know that this is a man who would never turn his back on a stranger or friend in need.  (Exhibit 55) (emphasis added).

### (5)    Promoting Educational Opportunities

For 150 years Alliance Israel Universelle has provided education to Jewish communities in North Africa, the Middle East, Israel and France.  **Yehuda Lancry** was the Israeli Ambassador to the United Nations from 1999-2002.  He is currently the Delegate for International Relations for Alliance Israel Universelle.  He often turned to Mel Weiss for support:

It goes without saying that the pledges of Melvyn translated into effective donations.  In fact, the whole process epitomized, to my humble opinion, the high degree of commitment of Melvyn to noble causes.  (Exhibit 56).

### (6)    The Alzheimer's Association

**Laurence Goldfein**, an attorney and longtime friend who served in the army with Mr. Weiss, writes of his friend's substantial contributions to the Alzheimer's Association and of Mr. Weiss's generosity:

[Susan, (Larry's wife and a friend of Mr. and Mrs. Weiss)] is a gerontologist with a specialty in Alzheimer's disease.  In the late 1990s she was (and still is) heading up a test project in advancing group methods for assisting those diagnosed with early stage Alzheimer's disease.  Susan approached Mel for help, and he immediately saw the great potential benefit in the project.  Mel's generosity in providing needed funding not only enabled the program to get off the ground, but he interested others in assisting this important effort.  Excellent results were achieved, and as an outgrowth, there now is a large annual conference where Alzheimer's patients, family members and professional caregivers meet together and receive programs designed to show how a better quality of life may be achieved for those afflicted with this dreaded disease.  Mel has continued his support of these efforts by the Alzheimer's Association… . (Exhibit 57).

### (7)    Parkinson's Disease Research

**Edwin Levy** has been friends with Melvyn Weiss for more than 20 years.
Mr. Levy himself has been actively involved with a number of charities.  He was a
Board member of Big Brothers, Big Sisters, did work for Brown University, and he
was a Board member of American Parkinson's Disease Foundation and Parkinson's
Action Network.  He is currently a trustee of the National Parkinson's Foundation,
trustee of Continuum Health Partners (Beth Israel Hospital) and a Board member
and Chairman of the Development Committee of the Michael J. Fox Foundation for
Parkinson's Research.  He describes Mr. Weiss's contributions to Parkinson's
research and his personal support as Mr. Levy wages his own battle with this terrible
disease:

> His generosity is accomplished with extreme dignity and no self-
> aggrandizement.  I know this to be true as I am a 15 year victim of
> Parkinson's disease and I can speak with first-hand knowledge of his
> magnanimousness and kindness.  He has been there for me from day one with
> both substantial contributions for the research effort and **a shoulder to lean
> on when necessary.**  (Exhibit 58)(emphasis added).

### (8)    Teenagers Fighting Addiction

**Curt Webster** and his family have known Melvyn Weiss for 20 years.  Mr.
Webster is very active in drug and alcohol education for Long Island teens.  Mel
Weiss has devoted time and resources to educating youth on the evils of drug and
alcohol abuse:

> His [Mr. Weiss's] specific donations to LICADD (which helps educate
> Long Island students about the dangers of alcohol and drug addiction and
> ways to avoid such) enabled our charity to reach even more schools and
> vulnerable children than was previously possible.  In addition, **Mel
> personally attended many of my charitable events, lending support in a
> very personal way that took much time and effort on his part.**  (Exhibit
> 59; *see also* Letter of William Baum, Exhibit 60).

**(9)     The Hanley Center Foundation**

In addition to trying to prevent addiction through his support of LICADD, Mr. Weiss also supports treatment centers, like the Hanley Center.  **Msgr. Ronald Beshara**, is Vice President of Mission and Spiritual Care at Hanley Center, one of the top six alcohol and drug treatment centers in the United States.  He has known Melvyn Weiss for over seven years:

> I personally know the Weiss family and have been witness to the gracious and mindful outreach of Melvyn and his Wife to the underprivileged and the needy throughout the world.  Moreover, **Melvyn has graciously supported as a benefactor the Hanley Center Foundation which offers life-saver funds to men and women who are struggling with addictions but are unable to continue paying for treatment.  His contributions for treatment have made a healing difference for many people**… (Exhibit 61) (emphasis added).

**(10)     Supporting Peace, Fighting Gun Violence and Supporting Art - The "Peace Angels Project" in Los Angeles, California**

**Linda Evola-Smidt** is the founder of the "Peace Angels Project" whose mission is to melt down weapons and then create a Peace Angel monument sculpted from the metal residue.  Her creative monument to Peace is now on display in Los Angeles and another project is now planned for New York City to be on display at the site of the World Trade Center:

> In 1998 my son and I moved to New York from Los Angeles and I began the intense work that is culminating now in creating the Peace Monuments in Los Angeles and New York. Mr. Weiss' vision made it possible for me to make the world wide contacts in the press and with the United Nations that will now lead to Peace Monuments in New York and worldwide…**As we melt down weapons and create the Peace Monument in New York, it will include a gesture of thank you to Mr. Weiss.**  (Exhibit 62) (emphasis added).

**(11)     Neighborhood Defender Services of Harlem**

Neighborhood Defender Services in Harlem is yet another of the many non-profit organizations that Mr. Weiss supports.  **Jonathan Abady** writes of Mel's

- 63 -

generosity:

> I am currently on the Board of Trustees for the Neighborhood Defender Service of Harlem (NDS), a non profit organization in New York that provides legal and other services to indigent residents of the Harlem community.  Mel has been a **strong and invaluable support to this organization**… .(Exhibit 47) (emphasis added).

In addition to the charities we have listed, Mr. Weiss supports and raises funds for many others including those dedicated to police and firemen.  **Richard "Bo" Dietl**, Chairman of Beau Dietl & Associates, a retired New York City Detective, and a private security consultant, describes the many philanthropic projects that he and Mr. Weiss have worked on together:

> He [Mr. Weiss] is without a doubt the most generous and gracious philanthropist I have ever come to know and love.  Some of the many charities for which he has been a principal contributor include **The National Center for Missing and Exploited Children, The Christopher Reeve Paralysis Foundation, United Cerebral Palsy, New York City Police & Fireman Widow & Children's Fund, CJ Foundation for SIDS, Tomorrow's Children Fund, Children's Medical Fund of New York, Hemophilia Association, Memorial Loan [*sic*] Kettering Cancer Center, Autism Speaks and St. Jude's Hospital.**  These are the charities for which I have worked with to raise money.  There are countless other charities to which Mr. Weiss has contributed and for which he has been the driving force. (Exhibit 63) (emphasis added).

### (12)   Discrimination And Civil Rights

**Seymour Reich**, a senior partner in the law firm of Gallet Dreyer & Berkey LLP, currently serves as the President of the Israel Policy Forum.  In the past he has served as -President of B'nai B'rith, Chairman of the Conference of Presidents of major American Jewish Organizations, and former President of the International Jewish Committee for Interreligious Consultations.  Mr. Reich writes of Mel's commitment to many **civil rights** causes:

> Mel has been personally involved in many other human rights activities in the United States.  **He has aligned himself with causes relating to civil**

**rights, racial discrimination, anti-Semitism, sexual abuse, poverty and to alleviate the down trodden.**  (Exhibit 64) (emphasis added).

Some charities large and well-known, others doing quiet and good work with little public acclaim; Mr. Weiss funds them all and tries to help them all.  A perfect example is the **Drum Major Institute** which was started after the assassination of Martin Luther King, Jr.  Mr. Weiss, who has sponsored an important educational fellowship, has worked hard on behalf of this charity designed to help middle-class citizens in America cope with educational and health issues.  No fanfare, just trying to help make the world a better place.

**D**.   **The Extraordinary Charity Of Melvyn Weiss Is Not Limited To Providing Support To A Large Well-Funded Organization**

**(1)   Everyone Can Count On Mr. Weiss in Hard Times**

For each of the large philanthropic projects that Mr. Weiss has involved himself in, there are dozens of unheralded acts of every day kindness towards family, friends, and even strangers.  Where there is a need, Mr. Weiss rises to the occasion.

**Jim Sheehy**, a doorman at the St. Regis Hotel, has always been treated kindly and respectfully by Mr. Weiss.  Still, he never would have expected the incredible generosity that Mr. Weiss demonstrated when, after he lost his life savings in an investment scheme, Mr. Weiss took on his case and recovered all of his life savings:

> One day about 7 years ago, I told him I had made a bad choice and lost all my life savings investing in a stock, the owner of the company convinced me to invest, and was also a guest of the Hotel.  This man lied to me about his Company.  **When Mr. Weiss found out about this he took control and brought a lawsuit on my behalf and recovered my full $135,000 loss and never charged me a dime!**  (Exhibit 65) (emphasis added).

Mr. Sheehy also describes how Mr. Weiss went to bat for **Willie Baker**, a co-worker fired without cause:

**When my co-worker Willie Baker was fired, for reasons none of us understood, Mr. Weiss had his firm handle the arbitration and they made a big recovery, also never charged Willie a dime.  Willie was able to take that money and move his family to Florida and start a new job,** (Exhibit 65) (emphasis added).

### (2)    A Rare Day When Someone is Not at His Door

**Arline Cohen**, a cousin of Mr. Weiss, is a Senior Development Executive of the largest world renowned, not-for-profit health & human service network.  She writes poignantly of one instance when she was present when a fellow Army veteran arrived unannounced, seeking Mel's help.  She goes on to explain why she believes Mr. Weiss was quick to help the veteran:

I can recall a particular occasion, being in Mel's office and having his assistant announce that a person Mel had served in the Army with and had no contact with since that time, was there requesting to see him.  Mel never wavered or checked his schedule, just said, of course I'll see him, guessing this was a person in need of his assistance.

**To Mel, this is just something you do—quietly, without any recognition, and very often anonymously.  It is difficult to estimate the numbers of individuals who Mel's deeds of compassion, generosity, and kindness have impacted, but I do know that it is a rare day that someone is not at his door.**  (Exhibit 66) (emphasis added).

**Robert Pirie,** a courtroom adversary of Mel's, is also his friend.  When Mr. Pirie's nephew, a war correspondent who lived in Cambodia for 15 years, became the only reporter invited to film the trial of mass murderer Pol Pot and interview him, he emerged with one of the greatest news scoops of the last 50 years.  He made arrangements to sell his exclusive photos worldwide including a one week exclusive to a major network in the U.S.  When the network failed to abide by the agreement, Mr. Pirie asked Mr. Weiss to help.  He describes what happened in his letter:

To his [nephew's] dismay, they then put his entire film on their website thereby destroying the value of his international rights and tried to claim credit for it even applying for international awards.  They then refused to pay him the money owed under their contract on the grounds he would use

it to sue them.  Convinced they had a young, inexperience freelance reporter of modest means, they stalled him for many years.  I finally stepped into help and invited Melvyn to meet him at lunch.  The instant Mr. Weiss heard the story he signed on as his counsel and, in very short order, achieved a substantial settlement.  The comment from senior counsel for the network when informed as to who was representing him was "that's awfully heavy artillery isn't it" to which I replied "just what you deserve."  **For a case the pecuniary rewards of which were modest, Mr. Weiss devoted a large amount of his own personal time, without which the highly satisfactory results would not have been achieved.**  (Exhibit 67) (emphasis added).

**Danny Markowitz** has known Melvyn Weiss and his family for more than 35 years.  He describes his relationship with Mr. Weiss during his own desperate years:

My career at that company abruptly ended with serious legal complications at which time Melvyn Weiss came to my defense.  He took on my case pro bono and from that point on guided my business and personal life providing a new path for my family and me.  Melvyn Weiss has been at my side ever since and has rescued us from near disaster on many occasions.  (Exhibit 68).

**Jonathan Jacoby** met Melvyn Weiss when he served as Executive Director of the Israel Policy Forum. Mr. Jacoby will never forget the thoughtfulness and compassion that Mr. Weiss extended to him when he learned that his child was diagnosed with a terrible illness, that would likely end in his death. Mr. Jacoby explains how much Mr. Weiss's compassion affected him:

Five years ago, my infant son was diagnosed with a rare neurological disorder that is invariably fatal.  I will never forget the moment I walked into Mel's office to explain why I would not be able to continue serving as executive director.  I will never forget the look in his eyes as he listened to me, trying to understand my son's disease, trying to understand how I was feeling.  I will never forget the embrace he gave me…Although I moved away from New York after my son's diagnosis, I have tried to keep up with Mel.  When I saw him last month, I offered him what he has always given me: support and friendship.  I could see the pain he felt about the hardships he has caused for others and I tried to listen and understand, just as he has done for me so often.  But the first thing Mel said had nothing to do with himself.  He asked me about my son.  His eyes were as sincere as they have ever been, if not more.  (Exhibit 69).

**Laurence Goldfein** wrote to the Court regarding Mel's support of Alzheimer Disease research.  He also recounts what Mel Weiss did to rescue <u>him</u> when his own career was in shambles:

> In the early 1980s I left the law and became a partner in a Wall Street securities firm.  In after only about five years that career change turned sour as a result of the October 1987 stock market crash.  As you might imagine this was a devastating event to me; no longer was I the prominent tax lawyer or investment banker.  At a time when I was depressed and searching to reestablish myself, Mel came to my rescue.  He not only gave me much needed emotional support but was instrumental in my landing a rewarding new career as general counsel and head of a consulting group with a major accounting firm.  (Exhibit 57).

**James and Debra Tomasello** are close friends of Melvyn Weiss.  Mr. Weiss came to their rescue during the most desperate times:

> A few years back, I ran into some very bad financial times and was in jeopardy of losing everything.  When Mel found out he called me, sat me down and asked what my problem was and how it came about.  Once Mel knew that my problem was just bad time and bad luck, he immediately stepped in and said "How much do you need to get you back on your feet?" I told him what I needed, and he without hesitation gave us a check. I asked him if I needed to sign a note, and he looked at me and said, "I know the kind of person you are, I am not worried". [*sic*]  **Only a man of great character and a man that has a huge heart would do something like this… There are people who get in trouble, but are really deep inside bad people.  Mel is not one of those people.**  (Exhibit 70) (emphasis added).

### (3)    Recognition and Respect for Every Child

**Robert Rosenfeld** is related to Melvyn Weiss through marriage.  His sister is married to Mr. Weiss's son, Gary.  Mr. Rosenfeld's son, Bradley, is autistic.  Many people find it difficult to interact with Bradley.  But Mr. Weiss is different; treating Bradley as an individual and with respect is automatic:

> As the father of an autistic child, Bradley, it would have been easier for Mel to have ignored my son's situation as many do.  But instead, Mel always went out of his way to approach Bradley as an individual entitled to recognition and respect.  Moreover, he has always shown me, as a parent of a

disabled child, sensitivity and concern exemplified by the questions he asked or information he provided that he thought might be helpful.  (Exhibit 71).

### (4)   Spontaneously Kind

**Daniel Benoit** is manager of the One Penn Plaza parking garage in New York City.  For eight years he attended to Mr. Weiss's car when he arrives at work.  He shares a story of spontaneous generosity by Mr. Weiss:

> I remember one time MR Weiss [*sic*] drove in the garage wearing a grey suit and I was telling him how nice the suit look [*sic*] on him and a couple days later I came in my office to find a nice suit in my office similar to the one MR Weiss [*sic*] was wearing when [*sic*] I ask where this came from my coworker Douglas Mesick told me MR Weiss [*sic*] left it for you.not [*sic*] forgetting on Christmas day he would give $1500.00 to the garage for the crew.  (Exhibit 72).

**Robert Capazzi** is a retired Mechanical Engineer who currently dedicates his time to charitable work.  He has known Melvyn Weiss for 28 years and shares one example of Mr. Weiss's spontaneous generosity:

> One evening we were having coffee outside a restaurant.  Mr. Weiss asked the waitress if she could bring him a liquor? [*sic*] The waitress said normally you would ask the cocktail waitress, but she would try to help, [sic] when she returned with the liquor he gave her $20.00.  The waitress said $20.00 was too generous, [*sic*] however it would go a long way to pay for special sneakers for her son.  Mr. Weiss asked how much the sneakers cost, she replied $95.00.  Mr. Weiss said "give me the $20.00" and gave her $100.00 and said buy your son the sneakers tomorrow.  Your Honor this is only one of many times I have seen Mr. Weiss demonstrate acts of kindness, good character and charity.  (Exhibit 73).

### (5)   Saving a Family Business from Ruin

Gail Goldberg's father and Mel Weiss have been a part of one another's lives for over 40 years.  Gail's father owned an architectural woodworking business.  The company's clients included law firms, Fortune 100 and Fortune 500 companies, and major New York City contractors.  The company was run by Ms. Goldberg, her father, and her brothers.

In the 1990s they were in jeopardy of losing everything.  At that time, the New York Construction industry was under intense scrutiny and large corporations hired consultants to vet contractors on every large-scale construction project.  Ms. Goldberg received information that one of the hired consultants investigated their family business and told a very important client that the company was under investigation for criminal wrongdoing.  The report was patently false, but the Goldbergs could not persuade the investigator or the client, and the reputation of the company was on the cusp of being destroyed when they were removed from the list of accepted bidders in a very big contract.  With their lifetime of work in jeopardy, the Goldbergs contacted Mr. Weiss.  He found time the very day they called to meet with them, and then he saved their company. Ms. Goldberg writes:

> Within the week, Mel met with our client's senior management and attorneys, and resolved the matter.  Although their consultant had refused to meet with me, or give me an opportunity to hear the information he had supposedly acquired, Mel was able to get to the heart of the matter.  He skillfully negotiated in a manner that enabled this consultant to save face, as well as the senior executive who hired him, while simultaneously putting an end to the false accusations, innuendo, and rumors.  We were allowed to participate in the sealed bid process, and keep our client; and most importantly, our reputations were left in tact and unsullied... Mel refused any payment and in his usual style was truly humble.  (Exhibit 74).

Unfortunately, Ms. Goldberg's parents are too old and infirm to write to the Court themselves.  Instead Ms. Goldberg includes with her letter, a letter that her parents wrote to Mr. Weiss after he saved their business and their reputations.  Mr. and Mrs. Goldberg concisely describe Mr. Weiss's efforts on behalf of so many people like themselves, who found themselves afraid and in need of help, and dialing Mr. Weiss's number. In August 2000 they wrote:

> **Without fanfare or hoopla, you quietly and humbly step into the fray to fight injustice, making everyone's life just a little bit better… a little bit fuller… a little bit richer.**  (Exhibit 74) (emphasis added).

### (6)    Saving A Company – Saving A Life

The letter of **Jonathan J. Silverman** is a sterling example of a very good life saved because Mel Weiss cared.  Jonathan is the 28-year-old son of Lois Silverman, who has worked as Mr. Weiss's Executive Assistant for many years.  Jonathan writes that in high school, he was a "lost soul" saved by Mel Weiss who taught him to be a man of "substance" and "honor:"

> I cannot imagine where I would be now if Mr. Weiss had not taken an interest in me.  I was a lost soul in high school, unable to finish school because of my inability to focus, procrastination and desire to have fun rather than study.  Because he allowed my mother to take time to spend with my teachers and me, I finally went on to get my GED.  I felt lost, but not alone, thanks to my mother, of course, but also thanks to Mr. Weiss who paid close attention to my progress, giving my mother and me the emotional support we needed at the time.

> . . . I went to military college to learn discipline and then onto Lehigh where I got my degree in accounting.  Still, something was missing.  When Mr. Weiss learned about this, he made sure that my mother brought me to his home so we could talk alone, uninterrupted.  I was amazed – and still am—when I heard what he had to say.  He was not only caring, but so perceptive that I felt like he could see right through me.  He was kind, firm and remarkably accurate when he gave me advice.  To this day, several years after the fact, I replay that conversation and remember to follow his wise words.  **That day on the pier, hearing the truth from him, changed my course.**  I applied myself more seriously to everything I worked on and studied**.  He taught me how to become a man of substance and honor.**  It may not sound like a revolutionary act, but it changed my life.  Can you ask for more from someone?

> . . . I don't know where I would be without him.  I hope that you find a way to bring justice to bear without us having to find out what life would be life without him, Your Honor.  (Exhibit 75) (emphasis added).

Many have written to this Court about the generosity of Mr. Weiss, about his interest in so many important charities and the work he has undertaken on behalf of

SENTENCING MEMORANDUM
ON BEHALF OF MELVIN I WEIS

so many not-for-profit organizations.  What may never be fully known however, is precisely how many fundamentally good young people, are today leading productive lives, because Mel Weiss took the time and made the effort to step into their life and provide guidance when they needed help most.

### E.    The Emerging Legacy Of Melvyn Weiss – His Kindness, Mentoring And Philanthropy

As with Jonathan Silverman, Mr. Weiss has been a powerful role model to many.  Many of the people who have written to Your Honor admit that but for the influence of Mel Weiss, charitable work would not be a part of their own lives.  By inspiring others by his example to join him in a life of generosity, philanthropy and kindness he has given the ultimate gift – a gift that will reverberate through generations.

### (1)    One of The Greatest Humanitarians of Our Time

In her letter **Kara Buzga,** who has been employed as a paralegal at Milberg for the past 12 years, elegantly captures his lasting impact on so many individuals who truly know him:

> While he has been portrayed otherwise by both the media and prosecution, he is, in my humble opinion, **one of the greatest humanitarians of our time. To me personally, he has been a friend, an ally, a mentor, teacher and inspiration . . . .** (Exhibit 76) (emphasis added).

Mr. Weiss gave a talk at a high school many years ago.  The text was preserved and then reproduced to honor his 60th birthday.  Former Milberg Weiss, CFO, **William Matschke** recalls that moment:

> When Mr. Weiss turned 60 in 1995, his assistant prepared a book of people's quotes about him along with Mr. Weiss's sketches … Also included in this book is a letter Mr. Weiss wrote to some high school students in 1994.  He told them:
>
> "To realize your full potential, I can only recommend the principles which have always guided me:

Believe in yourself and be willing to understand your shortcomings.
Stay in touch with your roots.
Work hard and with tireless dedication.
**Be compassionate and caring**.
**Contribute a portion of your success to philanthropy.**
Reserve time for yourself and those near and dear to you.
Be optimistic – look for the silver linings.
Be a person who "does it."
Add a new dimension to your life periodically." (Exhibit 44) (emphasis added).

**Adam Levitt** is one of the young people motivated by Mr. Weiss.  He is now a partner in the competitor law firm of Wolf, Haldenstein, Adler, Freeman & Herz LLC. As a young lawyer, his interactions with Melvyn Weiss inspired him as a lawyer, more importantly, Mr. Weiss also inspired Adam as a human being:

I quickly learned that Mel was a fiercely brilliant and gifted lawyer who truly cared about the clients he represented, the classes for which he sought certification, and the people who worked with and for him.  Of equal importance was what **I learned, just as quickly, about the quality and depth of Mel's heart – including the breadth and sincerity of his charitable activities,** his passion for both social and legal justice, and his true and unyielding concern for the rights of the weaker and less fortunate members of society.  (Exhibit 77) (emphasis added).

Regarding his own visit to the memorial at the former site of the Israeli Consulate in Argentina, Mr. Levitt writes:

I made a point of visiting the memorial garden that was constructed on the site of what used to be the Israeli Consulate – before it was destroyed by a terrorist attack in 1992.  At that memorial garden, there is a plaque commemorating that senseless hate crime and thanking those people who raised substantial funds or otherwise contributed to the creation of this important memorial.  Mel Weiss's name is prominently featured on that list, as he was an important and moving force in getting that memorial properly funded and built.  **It was his love of justice, his hatred of this senseless act of terror, and his persistent care and concern for the victims thereof that led Mel to take such extraordinary steps – not at home in the United States, but in a foreign country, some 7,000 miles away.  Very few people have the compassion and breadth of vision to look beyond their own lives**

**and countries to reach out to the world community and seek to improve the lot of the downtrodden or persecuted anywhere.  Mel is one of those people.**  (Exhibit 77) (emphasis added).

### (2)   A Spirit of Faith and Kindness for People of All Races and Creeds

**Clarence Henry** met Mel Weiss when he started working at Milberg Weiss as a legal assistant.  Mr. Weiss inspired him to accomplish all that he has achieved in the eighteen years that followed.  Mr. Henry has completed two graduate degrees—a Master of Arts (1995) and a Master of Education (1996) at Columbia University in New York City.  He has also completed a Ph.D. in Ethnomusicology at UCLA in 2000 and recently organized The Henry Center for Multicultural Education & Global Research, "to make a difference by inspiring African Americans, people of color, and many communities to achieve excellence in pursuing educational and professional goals so that they can contribute to the strength and growth of the American society."  After taking a leave to pursue graduate studies, Mr. Weiss welcomed Mr. Henry back to the firm when he needed a job:

> Judge Walter, I have described some of my educational and professional background as a way of demonstrating how Mr. Melvyn I. Weiss has influenced my life.  I credit a substantial amount of my achievements to this great man who I consider a father-figure and mentor.  I first became employed with Milberg LLP formerly Milberg Weiss in 1990 as a Legal Assistant.  Throughout my employment with this firm, Mr. Weiss and the staff continued to encourage me to pursue my goals.  Moreover, Mr. Weiss challenged me to excel in all aspects of my life.  With this challenge and encouragement I was eager to pursue graduate school and a doctoral degree at UCLA.

> When I returned to the New York City area in 2007, I was in need of employment.  Although it had been several years, Mr. Weiss and the staff again welcomed me back to the firm and influenced me to excel in achieving my goals.  This time one of my major challenges was to complete the writing

of my forthcoming book.  I must note that my interest in Ethnomusicology and research began during my early years of employment at Milberg LLP and in many ways it seems appropriate that the publication of my book will be culminated with the support, prayers, and encouragement of Mr. Weiss and my fellow co-workers.

I consider Mr. Weiss to be a "gentleman."  By this I mean that he possesses a spirit of faith, hope, and kindness for people of all races and creeds.  **Moreover, he is a leader, visionary, and a man of integrity…I continue to be blessed by the inspiration that Mr. Weiss has provided to me over the many years.**  (Exhibit 78) (emphasis added).

Mr. Weiss has been a mentor and role model to many.  Through his kindness, generosity of spirit and time, and by his example he made a real  difference in the lives of many who carry his legacy of working to make a difference in the lives of others.

### (3)    "You are Nothing Until You Improve the Lives of Others"

**David Bergman** is another person who gives Melvyn Weiss credit for teaching him to give back and to share his good fortune.  Mr. Bergman has come to know Mr. Weiss very well through the years due to his friendship with Mr. Weiss's son, Stephen.   He writes about how Mr. Weiss instilled in his children the importance of donating time and resources to charitable endeavors.  He writes that, but for Mr. Weiss, Mr. Bergman never would himself have become involved in any type of charitable activity:

More than just lavishing affection and instruction upon his children, as most fathers do, it always seemed as if Mel was mentoring Stephen towards a more meaningful and important life.  It was always about helping others, and impressing upon Stephen, and me as well, the importance of involvement in charitable and essential social causes.  Recognizing that I did not get this same sort of guidance anywhere in my life, Mel afforded me some of the same type of parental mentorship which he so effusively laid upon his own kids.  I cannot say with any certitude 22 years later, but I do believe his leadership was responsible to some significant degree for my decision to pursue a career as an attorney.

. . . Philanthropy would become an important part of my life, and this I can attribute solely to Mel's guidance. "Look how fortunate you are," was always his lesson, but "you are nothing until you improve the lives of others". [*sic*] I helped establish, and still serve as both General Counsel and Executive Officer of, the largest national widow's and orphan's organization for the families of fallen policemen and firemen.  **I am ashamed to say that I would never have been the type of person inclined to such pursuits had it not been for Mel, his overt lessons, and his incredible example.**  I would never have experienced the many personal rewards I have achieved through my charitable pursuits.  (Exhibit 79) (emphasis added).

**William Carmody**, a partner at Susman Godfrey LLP became acquainted with Melvyn Weiss through Professor Arthur Miller.  He sees Mr. Weiss as the embodiment of all the best qualities in mankind:

I can attest that he truly embodies the spirit of all the characteristics we humans admire: selflessness, generosity, compassion and integrity.  Although his calendar was overwhelming, over the last ten years, **Mel took me under his wing and instilled these values in me, setting an example as a lawyer and a person in a manner wholly at odds with the charges to which he has pleaded guilty**.

. . . Although he came from poverty growing up in the Bronx, he has lived a life of immense generosity; not merely financial, but one of substance in which he has given of his heart, his mind, his time and efforts.  While many in our world are moved solely by the dollars that one gives to others, I have benefitted [*sic*] from Mel's true character and self.  In the ten years I have known him, he has remained loyal to his friends, family and community.  He remains devoted to – and has not disparaged – even those who have abandoned their friendships with him.  (Exhibit 80) (emphasis added).

**Marilyn Geller** has been a legal secretary at Milberg Weiss for 25 years.  During that time she has witnessed many "unsolicited acts of generosity" and kindness by Mr. Weiss toward firm employees.  She writes how Mr. Weiss offered to fund treatment for employees seeking physical and psychological help and is deeply grateful to Mr. Weiss for his efforts to help his employees after the trauma of the attacks on September 11, 2001:

During that terrible time immediately following 9/11/2001 because of the profound traumas inflicted by terrorists on our firm's 300 employees, Mr. Weiss personally had a well-known psychologist, Kimberley Heart flown here from Los Angeles. From our office, there was a clear view of the planes exploding into the two World Trade Center buildings, which caused indelible anguish for many of us. Mel rented an apartment explicitly to accommodate Kimberley Heart's stay in New York to minister to those employees afflicted with deep emotional suffering at that horrendous period in our history. Ms. Heart remained with us in New York for several months. (Exhibit 81).

**Ismael Alvarado** has been an employee at Milberg Weiss since August 1991. He is deeply grateful to Mr. Weiss for the help he provided when Ismael was suffering severe health problems:

In 1999, I gained a substantial amount of weight, which caused severe health problems including diverticulitis and hernias in the abdominal area… I needed to undergo additional surgery and was informed that my insurance plan would not cover the expenses, so I turned to Mr. Weiss. Mr. Weiss was generous enough to refer me to an excellent surgeon who was able to remove the hernia and perform gastric bypass simultaneously. He even offered to assist me financially so that I would not go into debt. After arguing my medical dilemma with the insurance company, it was decided that they would cover the expense. I have since lost over 100 pounds and am in good health and in better spirits. **Thanks to Mr. Weiss' intervention, I have been able to live a better life with and for my family**…. (Exhibit 82) (emphasis added).

### (4) We All Lose if Mr. Weiss Is Gone

**Lois Silverman** has been Mr. Weiss's Executive Administrative Assistant, friend and confidante for almost 15 years. As a single mother, she turned to Mr. Weiss for help with her own children. She has "overwhelming feelings of gratitude, respect and affection for Mel." She writes of his kindness to her, her family, strangers, employees colleagues and friends. She has witnessed it all:

As a single parent, when my son, Jon, became a rebellious teenager, I felt lost, but not for long. Mel gave me time off to be with Jon and his teachers, gave Jon a job with the Firm and spent time advising him about how to become a productive young adult. Jon remembers those conversations and attributes his

currents success, in part, to Mel's advice.  When my daughter got married and money was a little tight, Mel paid for her wedding.  It was no big deal to him.  How much do you need, he asked and happily wrote out a check.

The one time I didn't mind his generosity was when my Temple was failing financially and he lent us $50,000 without imposing terms on us; we could repay him when we had the funds.  He saved The Reform Temple of Forest Hills which also meant he helped to preserve Reform Judaism in Central Queens because we are the largest Reform presence in the area…

He maintains that to live in a happy, peaceful, just society we must adhere to principles of compassion and morality.  Everyone has mentioned leniency because of his accomplishments, goodness and ethics… **We all lose if Mel is gone for a significant period of time.**  (Exhibit 83) (emphasis added).

### a.  Helping a Family Adopt Orphaned Children

**Kenneth Schultz** is the current Controller at Milberg Weiss and has been with the firm since 1999.  During the summer of 2005, Mr. Schultz and his wife decided to participate in a program that brings children from orphanages around the world to the United States for a few weeks over the summer.  When Mel Weiss learned that the Schultz family was hosting three orphans from Russia, he called Mr. Schultz into his office.  In his letter, Mr. Schultz explains what happened:

Mr. Weiss called me into his office, told me how impressed he was with our family's decision to help out these orphans, and told me to itemize all of my expenses incurred during the time we housed these children for purposes of reimbursing our family.

Ultimately, my wife and I decided to adopt these children. Mr. Weiss was thrilled when I had informed him of our decision.  It was at this time that the firm had started losing staff and attorneys.  I had concerns about the possibility of spending time away from work as we attempted to adopt the children.  Mr. Weiss told me not to worry about the time I might have to spend away from the firm in our efforts to bring the kids home to the United States.  In fact, he wanted to make sure I was reimbursed for my travel costs incurred to and from Russia.  He made it clear to me that getting these children out of the orphanage (where conditions were horrific to say the least) and bringing them home was of the utmost importance.  (Exhibit 84).

### b.      Bonuses for Employees in Good Times and Bad

**Mandy Wong** is currently employed as an Accounting Manager at Milberg Weiss.  She has been with the firm for almost 14 years and respects Mr. Weiss for the care he extends to all of the firm's employees:

> The Firm always offer bonus to the staff at year-end, around [sic]. However, this particular year was not a good one.  The Firm did not have enough cash to do so. Many of the partners believed there was no reason to give bonus, but Mr. Weiss insisted on doing so.  His word was "…they worked as hard as always, we need to do something for them…"  At the end, the Firm decided to borrow money to paid [sic] for the bonus.  I cannot forget his generosity till this day…As I am writing this letter, I was overcome with emotion. I feel tremendous sadness at his current situation.  Please consider an arrangement in these processes which does not cause any additional grief for him and his family.  (Exhibit 85).

### c.      A Father to Many

**Carl Morris** has worked for Milberg Weiss in a clerical capacity for the past 15 years. Mr. Weiss is a father figure to him:

> Your Honor, next to my biological father, Melvyn Weiss has been the most influential male figure (in an upbuilding way) in my life.  He's always been approachable and **would listen to the personal concerns of others with genuineness of heart.**  When I was going through my divorce, he encouraged me to do all in my power to make my marriage work but if that would not prevail, not to live the rest of my life miserably.  He's made it possible that my son is able to attend one of the finest education institutions (Penn State University) in our nation.  Last Thanksgiving, I had the privilege of escorting his 97 year old mother to his home for the annual festivities.  He has expressed to me his sadness of this current situation and knowing him as I do, when he spoke regretfully, I felt his soul.  (Exhibit 86) (emphasis added).

**Elizabeth White** has been employed in the records department at Milberg Weiss for over 31 years.  In her opinion, Mr. Weiss is a "personable and approachable" employer who even offered to pay her education expenses:

> I consider Mr. Weiss to be a family member and a mentor.  Moreover, he has continually challenged me to excel in my life and profession.  In my personal experience, Mr. Weiss has demonstrated a constant concern for all

the employees of the firm.  He is an employer who is personable and approachable.  When I experience problems, he always made himself available to help.

Mr. Weiss has often encouraged me to pursue my professional and educational goals.  For example, one of my goals was to pursue a college degree.  However, being a single mother made it difficult to achieve this goal.  When my children were older, Mr. Weiss offered to pay my educational expenses.  In addition, by working for Mr. Weiss and the firm I have had many other opportunities, such as purchasing my own home and helping my children to pursue their educational goals.  Professionally, Mr. Weiss has greatly influenced me to become a leader.  I try to apply many of his teachings on the job that have inspired my long career with the firm.  (Exhibit 87).

**Belinda Taylor** has worked as a receptionist at Milberg Weiss for 30 years. For the past 3 years, she has worked part-time in the firm with the legal library staff. She describes Melvyn Weiss's great kindness during her desperate times:

As a longtime employee, Mr. Weiss has always treated me with high levels of respect, sincerity, and professionalism.  I feel that he is an exceptional person who has greatly influenced my life in many positive ways and capacities…For example, when my daughter became pregnant out of wedlock, I was greatly upset.  When Mr. Weiss learned of my concerns he invited me into his office to discuss the situation.  As I tearfully relayed the problems about my daughter he offered me great emotional support and advice.  What made this meeting special was that he challenged me to look beyond the current situation and envision a promising future for my family. To this day I continue to be appreciative of his advice and encouragement. Moreover, I now have a closer relationship with my daughter and also have a wonderful grandson who is 16 years old.  (Exhibit 88).

**Vernesha Griffith** has worked as a receptionist at Milberg Weiss for the past fifteen years.  To this day, she is still grateful for the positive experience of working with Melvyn Weiss:

The reason why I am writing is to tell you about the man I have come to know, Mr. Melvyn Weiss.  **He has been like a father figure to me, and always treated me with kindness and respect**.  One day, in January of 1994,

I almost passed out from being dizzy and the paramedics were called.  While I was waiting to be treated, Mr. Weiss came out and asked what was wrong.  He was on his way to a meeting at the time, but he saw how upset I was and he had housekeeping get cold towels for my head.  **Mr. Weiss sat there with me the whole time and just talked to me like a father would to his daughter to calm me down**.  When the paramedics came, Mr. Weiss came to me and took my hand and gave me a kiss on my forehead, and said to me, "Don't worry, you're going to be fine."  No one has ever done that for me.  I know Mr. Weiss was running late for his meeting, but the kindness that was shown, I will never forget.  (Exhibit 89) (emphasis added).

**Francis P. Karam** is currently a partner at competing firm Bernstein, Liebhard & Lifshitz, LLP.  In 1999, Mr. Weiss gave Mr. Karam a chance by hiring him as an associate at Milberg Weiss.  Mr. Karam was an unconventional choice for a class action litigation firm at the age of 44, because until that time, he was working as a solo practitioner in a primarily state court criminal practice.  Mr. Karam learned a great deal from working with Mr. Weiss and credits him with changing his life:

> Mel Weiss took a chance on me when I was far from a conventional hire.  The opportunity he gave me turned my career for the better in a big way.  It changed my life and that of my family. . ..  When I went to work at Milberg Weiss it was my pleasure to work very hard at one of the most professionally run law firms I have ever seen.  Mel Weiss set the tone. I was lucky enough to work personally with Mel on several cases.  What impressed me about his legal thinking was the effort he took to analyze critically our own arguments as rigorously as those of our adversary.  He consistently told his lawyers to take great care to state facts correctly and never to overstate a position or argument... **He had the insight to see something in my character that was not on my resume.  In taking that chance he conferred a great benefit on me and my family for which I will always be grateful.** (Exhibit 90) (emphasis added).

#### d.     My Home is Your Home

**Larissa Cespedes** has known Mr. Weiss and his family since July 2007.  Her parents work for Mr. Weiss and help care for their home in Long Island.  Ms. Cespedes, a young college student at Dartmouth, explains that Mr. Weiss is more than just her parents' employer; he is an "inspirational" individual who has treated

her and her parents with the utmost respect and kindness and treated her as if she were a member of the Weiss family.

At the age of 18, I have not come across an individual quite as inspirational as Melvyn Weiss. He is to me more than just my parents' employer. He is the one who offers me a place to stay when I am on vacation from college (Dartmouth College) because my parents and I do not have a home of our own. **It is extremely refreshing to find an individual such as him that treats my parents as actual human beings rather than just people who clean his house everyday**. From experience, it is quite difficult and extremely rare to find someone who is willing to take into account the needs of his workers as if they were his own. He is aware of every minimal need and is willing to help in every situation. Not only has he offered me a home, but also what is most important to me is that for once my parents are treated well in their job and that alone evokes great gratitude…**He has accepted my family into his home and has treated my parents and myself with the utmost respect.** (Exhibit 91) (emphasis added).

These letters all describe a "common" theme – that Mr. Weiss treats everyone, regardless of their situation in life, with kindness and respect. Now it is he who is in need. All we ask is that your Honor treat him with at least some measure of the great kindness that he has extended throughout his life.

**F.      Even If The Sentencing Guidelines Were Mandatory, This Court Would Be Authorized To Depart Downward From The Guideline Range Because Of The "Extraordinary" Charitable And Civic Work Mr. Weiss Undertook Throughout His Life**

As this Court well knows, the Sentencing Guidelines are no longer mandatory and a Guideline analysis is today, only one of many factors a Court is to consider when fashioning an appropriate sentence in any given case. Counsel respectfully submits that even if the Guidelines were still mandatory, however, this Court would still have the legal authority to order a substantial downward departure from the appropriate Guideline sentence because of the truly "extraordinary" charitable and civic work undertaken by Mr. Weiss throughout a lifetime marked with unconditional generosity coupled with a breathtaking array of service to different charities, communities and worthy organizations throughout the world.

In pertinent part, Section 5H1.11 of the Sentencing Guidelines provides:

> Military, civic, charitable or public service; employment related contributions and similar prior good works are not **ordinarily** relevant in determining whether a departure is warranted.  (Emphasis added).

When however, as in this case, the charity and civic work engaged in by a defendant is extensive in scope and indeed **"extraordinary",** courts throughout the country have recognized the authority of a sentencing Court to order a substantial downward departure from the Guideline sentence that would otherwise apply.

A very important factor that a sentencing court is to consider when determining the extent of a departure under 5H1.11, is the nature, extent, and quality of the contributions by the defendant, with some courts recognizing that the "time" contributed by a defendant to a charitable organization is to be more highly rewarded than those cases in which the contributions of a defendant consist exclusively of the giving of money.  Where such good works have been "extraordinary," a downward departure is appropriate, even under a mandatory Guidelines system, "if the [discouraged] factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), *citing Koon v. United States*, 518 U.S. 81, 96 (1996); *accord United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998).  In *Canova*, the court affirmed a downward departure, finding that the record "plainly demonstrate[d] the 'exceptional degree' of the defendant's public service and good works.  *Id*. at 358-359.

In *United States v. Serafini*, 233 F. 3d 758, 773, 774 (3d Cir. 2000), the Third Circuit found that because "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need," the district court's downward departure was not an abuse of discretion, since the facts depicted the defendant "as an exceptionally giving

person."  The court noted that the defendant's acts "weren't acts of just giving money, they were acts of giving time, of giving one's self."  Notably, in *Serafini*, the Third Circuit highlighted the letters of three individuals testifying to the defendant's charitable works:  the first came from a friend who sought and received from the defendant, a $300,000 guarantee to secure treatment for a family member's brain tumor; the second came from an individual (and constituent of the defendant, an elected official) who, having sustained serious injury in an accident that rendered him incapacitated, was hired by the defendant and the individual credits the defendant with "turning his life around"; the third letter came from a widow who approached the defendant because she was about to lose her home and to whom the defendant gave a check for $750 with no expectation of repayment.  *Id.* at 773-774.

The letters submitted in support of Melvyn I. Weiss demonstrate that he engaged in hundreds of extremely impressive acts of charity on a daily basis throughout his adult life and through those efforts, altered the lives of hundreds if not thousands of people throughout the world.  In this way, he is more like the defendant in *United States v. Adelson*, for whom "[o]ver 100 persons from all walks of life submitted detailed letters attesting, from personal knowledge, to Adelson's good works and deep humanity."  441 F.Supp.2d 506, 513, 515 (S.D.N.Y. 2006) (Sentencing memorandum in support of non-guidelines sentence); *see also United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled young women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend, where the court found no basis to overturn the district court's finding that these efforts were exceptional); *see also United States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005) (affirming the District Court's order granting Cooper a four-level downward departure given the defendant's exceptional service); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (affirming departure based in part on defendant's long history of community

service and his strong support in the community, even among the family of the victim).

Here, as demonstrated in so many of the letters written to your Honor, the acts of kindness, giving and charity by Mr. Weiss, went far beyond the "ordinary" and have continued for over 50 years. Not only has Mr. Weiss given of his own financial means, but person after person who has written to the Court attests to how Mr. Weiss repeatedly acted selflessly in order to assist others in their time of need, and of his constantly giving of himself in ways that went far and above what is normally expected of a relative, neighbor and citizen. It is respectfully submitted that Mr. Weiss should now be given credit for the **extraordinary** life he has led, a life that is so out of character with his offense conduct.

As Judge Rakoff in the Southern District of New York so eloquently explained:

> **[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.** This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*Adelson*, 441 F.Supp.2d at 513-514 (emphasis added).

In this case, Mr. Weiss brings to his day of sentencing, a <u>lifetime</u> of very significant financial contributions to worthy causes and organizations throughout the world. Perhaps even more impressive, is his lifetime of providing personal and professional time, legal scholarship, talent and tireless efforts to dozens of different <u>non</u>-profit organizations and charities devoted to improving the quality of life for millions of needy people throughout the world and the thousands of hours of *pro*

1   *bono* work he contributed and at his direction, hundreds of other professionals

2   participated in.

3       This lifetime of important work is documented in the letters we have

4   submitted, which through their collective eloquence speak directly to this issue.  All

5   who have written ask this court to sentence Mr. Weiss with compassion and great

6   leniency because in the minds of so many, Mr. Weiss has earned that consideration

7   and compassion at this most difficult time in his life.

8       Counsel respectfully submits that even if this Court looks to the Guidelines

9   for guidance in attempting to structure an appropriate sentence in this case, it is

10   important to consider the recognized departure for "extraordinary" charity, cited

11   with approval by so many other Courts, especially in a case like this where the

12   undisputed facts support a finding that Mr. Weiss engaged in a lifetime of charity,

13   and civic work on a level that is almost breathtaking.  As Judge Rakoff observed in

14   *Adelson,* this life of good work **<u>must</u>** count for something when standing before a

15   sentencing court.

16       In her June 2, 2008 letter to your Honor, Probation Officer Kelly J. Watson

17   characterizes Mr. Weiss's "philanthropic activities as impressive" and then uses that

18   fact and others to urge the imposition of a **33** month sentence of imprisonment, the

19   low end of the recommended Guideline range and the "maximum" sentence

20   permitted under the Rule 11 Plea Agreement.  With great respect for Ms. Watson,

21   we note that when she concluded that Mr. Weiss's charity was "impressive," she did

22   not have the hundreds of letters we have now provided, as they were not  yet

23   available for submission.  When theses letters and their contents are fully and

24   carefully considered it is not possible to view the charity of Mr. Weiss as anything

25   less than <u>extraordinary</u>.

26

27

28

## VI. SO MANY PLEAD FOR GREAT LENIENCY AND A SENTENCE THAT CONSIDERS THE "TOTAL" LIFE OF THIS GREAT MAN

### A. Colleagues and Adversaries Ask the Court For Justice with Mercy

**Stephen Susman,** a competitor of Mr. Weiss, has been identified generically as someone who was foreclosed from leadership in certain class action litigation because of conduct to which Mr. Weiss and his colleagues have pled guilty. It is as a putative "victim" that he urges the Court to nevertheless treat Mr. Weiss with great leniency:

> I hope you will take into consideration that a lenient sentence will allow Mel to continue to engage in charitable and humanitarian activities. His conduct may have excluded from the market competitors like me, **but that harm pales in comparison to the benefits Mel achieved for the classes of victims he represented. That passion to help others should not be extinguished by incarceration.** (Exhibit 92) (emphasis added).

### B. To Judge Melvyn Weiss on the Totality of His Career and Life

**Daniel Weinstein**, a former California Superior Court Judge who co-founded JAMS and has since mediated complex cases in which Mr. Weiss was lead counsel, asks for great leniency for Mr. Weiss, citing his "lifetime of good deeds:"

> A day does not go by that Mel doesn't help some person in distress, some fallen sparrow, or some poor soul whose luck has run out. **These good deeds are done without fanfare or recognition but they are constant, numerous and widespread.** Ask the doorman in his building, the paralegal whose tuition he paid, the Israeli refugee who needed some early assistance to get a job, the secretary whose medical bills were paid and it goes on and on. These are just rumbles I have picked up over the years of his many "mitzvahs" which have escaped public recognition. There is a veritable ocean of plain folks out there who if given the chance would add their voice to this chorus… **It is inappropriate for me to comment on what his punishment should be, but I fervently hope he is not ineligible for the kind of compassion and mitigation that a lifetime of good deeds has earned him.** (Exhibit 93) (emphasis added).

**Benedict Morelli** is President of the New York State Trial Lawyers

Association.  He views Mr. Weiss as a tireless advocate who should be sentenced on the totality of his outstanding career as a brilliant attorney and relentless caregiver.

> **Although I have had two other opportunities to write letters on behalf of other lawyers I knew who had legal problems, I did not get involved because I did not believe in writing on behalf of men whom I considered unworthy of my endorsement.  I chose to write this time because I believe that a man such as Melvyn Weiss, who has been an important icon to many, should be judged on the totality of his career and life.**  (Exhibit 94) (emphasis added).

## C.     A Force for Good in the Corporate Universe

**Bernard Nussbaum**, a former Assistant United States Attorney, Senior Counsel to the House Judiciary Committee, and Counsel to the President of the United States in 1993 and 1994, has been on the opposite sides of many litigations involving Mr. Weiss.  Mr. Nussbaum notes how Mr. Weiss always represented his clients with great integrity, and that he has been a "force for good" in corporate America.  Mr. Nussbaum asks the Court to consider Mr. Weiss's entire career and to "temper justice with mercy:"

> I do not presume to comment on the facts of the case which is before Your Honor – and this letter is not intended to excuse any wrongdoing which Mel has acknowledged – but I do know that Mel has expressed deep remorse and his legacy as a leader of the Bar has been significantly tarnished.  **But when one looks at his entire professional career he has, on balance, been a force for good in the corporate universe and I would hope that is taken into account when he is sentenced**.

> While, thankfully, I have not had to do it myself, I know from my years of practice, as a prosecutor and a defense attorney, how difficult sentencing can be.  **I do hope Your Honor will temper justice with mercy and sentence Mel fairly**.  In the final analysis, that is all anyone can ask.  (Exhibit 95) (emphasis added).

**Richard Middleton Jr.**, a colleague of Mr. Weiss, has tried civil cases throughout the United States,  has  served as President of the American Association for Justice (formerly the Association of Trial Lawyers of American), and currently serves as National Co-Chair of the American Civil Trial Bar Roundtable.  Mr.

Middleton credits Mr. Weiss with having shaped the development of law over many decades:

> As this extraordinary man now awaits the Court's decision of his fate, **it is left to others to meekly try to describe his incredible goodness in words that more often than not fail to convey the feelings people have for him and the good he has accomplished for others.** It is my hope that in pronouncing the sentence on Mel Weiss that Your Honor will take into consideration his longstanding beneficence to the public, his remarkable achievements as a member of the bar, his age and unequivocal acceptance of responsibility for his own transgressions. **If ever leniency has been appropriate to consider, I believe it is certainly so for Mel Weiss**, whose great achievements and monumental advancements of justice have been so paramount for so long. (Exhibit 96) (emphasis added).

**James Green** came to know Melvyn Weiss when he was appointed by Judge Lewis A. Kaplan of the Southern District of New York to the Plaintiff's Steering Committee (PSC) in the Rezulin products liability litigation. Mr. Green worked with Mr. Weiss for several years. He asks the Court to note the "virtuous" quality within Mr. Weiss.

> Because of this experience with Mr. Weiss and his unfailing demonstration of proper ethical conduct, I was shocked and saddened by his plea of guilty to certain crimes… **I write as a journeyman lawyer, at the bar for over thirty years, who while terribly saddened and disappointed by Mr. Weiss's criminal conduct, nevertheless saw and experienced a virtuous quality within this man. That tangible quality has caused me to add my voice to your honor's deliberation by this letter**. (Exhibit 97) (emphasis added).

**Joseph Grano Jr.**, Chairman and Chief Executive Officer of UBS PaineWebber, and until July of 2005, Chairman of the Homeland Security Council for President George W. Bush, knows Melvyn Weiss primarily as an adversary. He asks the Court to give Mr. Weiss an opportunity to atone for his wrongs and to sentence him with great leniency and mercy:

> Your Honor, I do not pretend to understand how one deals with a man who throughout his lifetime personified "giving of oneself" and who suddenly must face the consequences of an illegal misstep. **I can only hope that your**

**judgment of him considers the totality of his contributions to society** . . . Finally Your Honor, this man's reputation, mental state, dignity and future are obviously in your hands. I beg you to embrace him with those hands and **allow him a chance to pay for his mistakes without destroying his life.** I am honored to call him my friend regardless of the outcome. (Exhibit 9) (emphasis added).

**Martin Bell** acknowledges the magnitude of Mr. Weiss's philanthropy, but suggests that the Court also look to smaller acts of kindness and generosity by Mr. Weiss which, in his view, serve as a strong reflection of his innate caring nature:

> I do not really know him that well. But that is precisely why I feel compelled to write, so that you can appreciate the reach of those Mel Weiss has helped and inspired – that **the case for leniency is not just a few famous names or a few select causes, but rather a life also marked by innumerable small acts of kindness and generosity that reflect the truly good and caring person Mel Weiss is**… It's fair to say that long before I ever met Mel Weiss he was, by his example, an inspiration to me to be [sic] better lawyer, a better Jew, a better person. (Exhibit 98) (emphasis added).

**Victor Stewart** worked closely with Melvyn Weiss during the *In re IPO Securities Litigation*. He reminds the Court of the insufferable punishment Mr. Weiss is currently enduring and will live with in his heart for the rest of his life. For this reason, Mr. Stewart implores the Court to show mercy:

> It was a reputation that he spent a lifetime building, and now it lies in ashes around him. **He has already suffered greatly, and will have to live with the consequences of his actions for the rest of his life.** Surely that is punishment enough, to have fallen so far in the face of the many more great legal works which now, sadly, will have to be left undone. **Considering his age and the great good that Mel can still do for so many people, I would implore the Court to show mercy.** (Exhibit 16) (emphasis added).

**Ed Gaffney,** whose letter is referenced earlier in this submission, urges the Court to take into account the good Mr. Weiss can still do for society if given the opportunity:

> No matter what has occurred in the matter now before you – of which I have no information or knowledge – **no presentence report in this matter**

**would be complete if it overlooked the millions of people who have been helped through the astonishing legal career of Mr. Weiss.**

**. . . I strongly urge you to take into account *the enormous good to our society that the defendant will do if you let him do it***… He can do on a *pro bono* basis a host of superb things for the arts, for charities, for the survivors of the Shoah, for persons in all stations of life who are in need of his boundless generosity, for lawyers who need to hear from someone like him about the duty to advocate zealously *within the bounds of the law* (a lesson he can teach much more effectively after his plea than I or any other law professor who is not in his circumstances).  (Exhibit 31) (emphasis added).

**Professor Arthur Miller** hopes the Court will grant to Mr. Weiss the mercy he deserves because of his lifelong commitment to improving the lives of others:

Melvyn I. Weiss is a man who has had a meaningful career and has had a significant and positive affect on the lives of many, many people.  **I mourn, from the bottom of my heart, his present situation.  It is like watching a brother in continuing pain** – the end of his professional career, lost stature and dignity, the deprivation of certain philanthropic activities, and now the prospect of incarceration.  I hope that in the exercise of your discretion you are able to afford him leniency in recognition of his years of meaningful professional and community service, productivity, and commitment to others, knowing that he plans to continue those endeavors in the future.  **It would be a shame if the people who could benefit from his talents and willingness to engage in good works were deprived of his help any longer than was absolutely necessary.**  (Exhibit 2) (emphasis added).

**Steve Bursey**, a 27 year veteran of the FBI, has managed Milberg's investigative unit for 11 years.  As someone who has worked closely with Mr. Weiss and knows him very well, Mr. Bursey observes that confining a talented man like Mr. Weiss would be a great waste of the resources he could provide to so many:

I know that Mr. Weiss has, on numerous occasions, provided financial and/or moral support to many employees of the firm, such as paying for medical procedures.  **Unsolicited assistance was rendered quietly and without fanfare.  People here, especially the support staff, adore Mel and it was particularly moving to see their reaction when he expressed his remorse for what has happened** – a lot of tears followed by a standing ovation.

Although not an attorney, I have spent the bulk of my adult life with the Department of Justice and am aware of sentencing guidelines.  I feel compelled to tell you, however, that **the thought of Mel Weiss languishing in confinement strikes me as a great waste of talent.**  (Exhibit 99) (emphasis added).

**Dibo Attar**, who has maintained a very close friendship with Mr. Weiss argues for the Court to afford his close friend a second chance:

Please weigh the good that this man has done generously and repeatedly, [*sic*] The love and caring for his family, friends and many causes.  He will repeatedly be cited as an example of a wrongdoer, how those that know must not err, the tragic fall from grace.  **This man of contrasts deserves redemption, deserves a second chance in his waning years to do good.**  And as an example of a brilliant man that has erred and lost his way, I feel certain he will be a true example of a man that has fallen and can find the road back and be an example to society and the pride and joy of his family… **I beg humbly and from the heart for your leniency, compassion and mercy.** (Exhibit 51) (emphasis added).

**Gary Kushner**, a partner at Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn LLP admires Mr. Weiss and sees him as a protector of people's rights.  He urges the Court to consider his revolutionary contributions to the justice system when passing sentence:

**I respectfully urge the Court to consider that Mr. Weiss, in a very palpable way, has repeatedly contributed to the achievement of justice**, which does not take place in our adversary system without the marshaling of expert legal talent, economic resources, hard work and tenacity.  In passing sentence, I respectfully invite the Court to consider that these are the qualities Mel Weiss best exemplifies.  (Exhibit 100) (emphasis added).

### D.    Our Planet is a Better Place Because of Men Like Melvyn Weiss

**Frederic Boloix**, a fine arts dealer in Sun Valley, Idaho, has known  Melvyn Weiss for 20 years.  Mr. Boloix observes that individuals like Mr. Weiss who have the ability to treat <u>both</u> clients and friends with the utmost compassion, deserve leniency:

This man is a glowing example of how it is possible for a single person to have a wide reaching impact on a community, a country and the world. Your honor, **I believe our planet is a better place because of rare individuals like Mel Weiss** and for this reason I ask for your leniency. (Exhibit 34) (emphasis added).

**Philip Shapiro**, President and Chief Executive Officer of Liberty Maritime Corporation, has witnessed Mr. Weiss give of his time and expertise to many charitable organizations.  He believes Mr. Weiss can still make contributions to improving the lives of many, if given the opportunity.  He begs the Court for mercy:

> **I hope that you will decide that there is too much talent and goodness remaining in Mr. Weiss' mind, heart and soul to prohibit him from contributing to society and serving those who need assistance.  His remorse is clear and spoken.  Please be compassionate and merciful to him – not because he has not done something wrong, but rather to allow him to do something good for society in return for your graciousness and leniency.**  (Exhibit 101) (emphasis added).

So many people from so many different walks of life all united in an effort to obtain leniency for a man they all believe to be worthy of great compassion.[2]

**VII.   MR. WEISS HAS ALREADY SUFFERED VERY SEVERE PUNISHMENT THAT WILL CONTINUE FOR THE BALANCE OF HIS LIFE AND HIS REMORSE IS MOST GENUINE**

As confirmed in many of the letters written by those who know him best, the shame Mr. Weiss has suffered and will continue to suffer is overwhelming.  Given the level he attained in his career as one of the true "giants" of the Bar, to now stand before a Sentencing Court having acknowledged participation in a criminal conspiracy is, to put it mildly, a terrible punishment that Mr. Weiss will suffer for the rest of his life

---

[2] Attached hereto as Exhibit 114 are an additional 161 letters in support of Mr. Weiss we respectfully request your Honor to read and consider.  Finally, Exhibits 115, 116, and 117 are filed concurrently herewith under seal and involve additional information for the Court's consideration of Mr. Weiss.

To be fully candid, it is difficult to imagine a greater punishment than the punishment that has already been imposed by the public humiliation Mr. Weiss and his family have suffered and will continue to suffer as he now deals with the prospect of incarceration and the indignity of disbarment. Indeed, the fact that one of the greatest lawyers of this generation will no longer be able to practice law is a level of punishment that only people who really know Mr. Weiss can fully appreciate.

The consequences that have already befallen Mr. Weiss at the advanced age of 73, are substantial and harsh. We beg your Honor to impose a minimum period of incarceration, so that Mr. Weiss can hopefully very soon return to the important work he can pursue as a private citizen -- service to his community-- service that he has actively engaged in throughout his life, community service that he has performed better than anyone else.

Melvyn Weiss has shared his regret and remorse with his family and longtime friends like **Peter R. Klein,** who has known Mr. Weiss for more than 30 years:

> To see Mel in his current state of mind is most distressing and I can assure you that his remorse is extreme. You can see the remorse in his face and more importantly in his words. I suspect you will receive many letters of this type so I will make mine short. I typically do not repeat myself in a document but it needs to be re-stated that Mel is remorseful to the point that words can't describe his current state of mind. (Exhibit 102).

**Laurence Goldfein**, a lifelong friend, describes how deeply Mr. Weiss understands the gravity of his misdeeds:

> I have spent a great deal of private time with Mel over the last few months. While it has been a troubling period for him, he has come to grips with the reality of his wrongdoing. In that regard, he has a number of times expressed to me the remorse that his misconduct caused to the very legal system he has cherished. Perhaps a means can be considered where he can provide a service now which in some way may help ameliorate those wrongs. (Exhibit 57).

**Melvyn Ruskin,** a former prosecutor understands that a person's acceptance of responsibility and true remorse are critical factors a sentencing court must consider:

> As a friend of Mel's and as an attorney, I was saddened to learn of Mel's guilty plea but credit him with taking the difficult step of acknowledging his criminal wrongdoing.  The destruction of reputation and public disgrace arising from this has been devastating to Mel and his family.  I know that he is extremely and sincerely remorseful and that if he could turn the clock back and undo his behavior, he would do so.  (Exhibit 103).

The sincerity of a defendant's acceptance of responsibility is an important factor a court must look to.  How Mr. Weiss explained his criminal conduct to his own family is a powerful indicator of how a defendant has come to terms with his criminal conduct.

Mr. Weiss discussed his criminal conduct and his decision to plead guilty with his oldest granddaughter, **Jennifer Weiss**.  Ms. Weiss, who just finished her Sophomore year at the University of Pennsylvania writes to your Honor:

> **While my grandfather has pleaded guilty to certain crimes, he has expressed to me how deeply regretful he is about his misconduct.  I truly believe that this feeling is heartfelt, and for this I am asking you to sentence him with leniency.**  (Exhibit 104) (emphasis added).

Mr. Weiss's remorse is obvious.   The punishment he has already suffered is just as obvious.  In his own letter to your Honor Mr. Weiss verifies that he has accepted responsibility for his criminal conduct with a fullness of his heart:

> **Looking up from the bottom of the deep pit into which I have descended has been painful.  I have spent day after day, and sleepless nights reflecting on how I could have permitted myself to stray so far off course from the hopes and desires I established for my life's work.**
>
> **Our country's justice system and our adherence to the rule of law, has always been in my mind, what distinguishes the United States from the rest of the world.  The ability of our citizens to obtain access to our courts, no matter how rich or poor we are, is one of the hallmarks of our society.  The guilt I am feeling knowing that I have violated the law and**

**contributed to doing harm to that access has wounded me enormously.**
(Exhibit 105) (emphasis added).

## VIII.  <u>MR. WEISS HAS BEEN DEVOTED TO HIS FAMILY THROUGHOUT HIS LIFE</u>

One of the considerations a court may look to when determining the "character" of the person about to be sentenced, is whether or not a particular defendant is a good person who despite his criminal conduct, nevertheless attended to the needs of his family and as in this case, the greater community at large. Hundreds of people have attested to the devotion of Melvyn Weiss to his community and to his family.  His wife of **50** years, Bobbi Weiss, writes of her husband's deep devotion to his family, his three children, their six grandchildren and to his mother, who at age 98 is still alive and productive

**Mrs. Jean Weiss**, the defendant's mother, is nearly **98** years old and currently resides in a senior residence in Teaneck, New Jersey.

For many years Mel's father, who died 27 years ago, worked as an accountant whose clients were small business owners who sometimes could not even pay for his services.  Mel's sister, **Rita Fox**, explains how her father continued to work with these clients even when they had no money to pay for his services, kindness that his son Melvyn obviously inherited.  Mrs. Fox describes how her brother Melvyn provided for his own father just as he has for so many others.

My father was adored by all who knew him – friends, family and clients – for his kindness and sensitivity . . . Mel from the time he could read and write, always helped out.  When Dad started having mini strokes at age 63, Mel handled his clients and by 65, with much compassion, had dad retire, sell his house and move to Florida.  He died at 70, and thanks to my brother, we feel he lived a good life."  (Exhibit 106) (emphasis added).

Mrs. Fox goes on to explain that her brother's "life-long compassion for people comes from Dad" while "his intellect, leadership skills and perseverance" was inherited from his mother.

1   Jean Weiss, the defendant's mother, is now legally blind and in July 2008
2   will be **98** years old.  To this day, Jean Weiss and her son share a love for art and
3   music.  Mr. Weiss visits his mother every week and they discuss politics, lectures
4   Mrs. Weiss has attended and he patiently helps this remarkable woman keep track of
5   where each family member is and what they are doing.

6   **Alberta Kessler,** Mr. Weiss's first cousin, credits Mr. Weiss for taking such
7   "wonderful" care of his mother:

8   Mr. Weiss has provided a most wonderful situation for his mother and that
9   will continue until her last breath.  She is alert and aware and her son is the
    light of her life.  (Exhibit 107).
10

11   Due to her advanced age and frail condition, Jean Weiss has not been told of
12   her son's current legal problems.  Mel's 95-year-old uncle, **Isidore Bystock** is
13   worried about how his sister will react to news of Mel's impending incarceration,
14   writing that he is "afraid of what the shock of the news of Mel's troubles will do to
15   my sister, at this late stage of her life."  (Exhibit 108).  To be frank, one of Mr.
16   Weiss's greatest concerns regarding his impending incarceration is the knowledge
17   that he may not be at his mother's side should she fall ill or even die in the coming
18   months.

19   While there are obvious family issues that every defendant must address when
20   he or she is faced the with prospect of incarceration, we bring this fact to the
21   attention of the Court so that your Honor may consider this grave concern in a case
22   where recidivist behavior nor community safety is a concern.  We ask the Court to
23   consider a sentence in which Mr. Weiss is to be incarcerated for the absolute
24   <u>minimum</u> time contemplated in the Plea Agreement and to substitute a period of
25   home confinement or community service as an alternative for up to half that
26   sentence.  The community will benefit and a 98-year-old very good woman may not
27   have to face such a grave loss at this late stage of her life.

28

1   Mel and Bobbi Weiss have three children, Gary, Steven and Leslie.  Gary

2   and, his wife Nancy have three children, two attending high school in Jericho, Long

3   Island and one attending the University of Pennsylvania.  Stephen and Debra Weiss

4   have three children who range in age from 5 to 16 years old.  Each of them attends

5   school in Manhattan, attending classes that range from pre-K to ninth grade.

6   **Leslie Weiss**, the defendant's daughter, is 40 years old and was trained as a

7   speech pathologist, but is currently focusing on charitable activities.  Her letter to

8   your Honor is submitted under separate cover and under seal.

9   Mel's son Gary met his wife **Nancy** during their sophomore year at the

10   University of Pennsylvania.  **Nancy Weiss** has known Mr. Weiss for nearly half her

11   life and when she married Gary, Mr. Weiss embraced her as a daughter:  She

12   quickly learned that for Mel, family is "number one", ahead of "anyone or

13   anything".  Although his work often took him away from home and family, his

14   presence was always felt and he was never more than a phone call away.  Nancy

15   writes that there is no better father-in-law than Mel Weiss and that he has taught her

16   about giving back to her community, describing Mel's extraordinary generosity:

17

18   Mel has always been a source of love, guidance and support for me.  He has
19   never made a distinction between his in-law children and his own --- we are
     all his family.  This strong sense of family spreads deeper than his immediate
20   relations.  He has embraced my parents, my four siblings and their spouses
     and their children with the same love and devotion he demonstrates to his
21   own family… He impresses on those that are close to him that one man can
22   make a difference.  Not a day goes by that someone in my circle of friends
     and family does not acknowledge and appreciate my father-in-law's
23   generosity.  His generosity goes beyond the financial - - - it is with his heart
24   and soul that he continues to help mankind in various areas.  (Exhibit 109).

25   Nancy goes on to describe how Mr. Weiss used a recent family trip to Israel

26   to impress upon his entire family, once again, that they, as the most privileged in

27   society, have a responsibility to help those who are suffering.

28

Our entire family of 13 was fortunate to visit some of the schools and day care centers located outside of Jerusalem, where recent immigrants from Ethiopia are enrolled.  It is here that they not only learn the Hebrew language, but they learn an entirely new and foreign culture.  My father-in-law, along with his wife, children and six grandchildren got down on his hands and knees and played in a sandbox with preschool-aged children.  He spoke with Ethiopian immigrants who were currently going through the educational system and was truly moved by their stories of sexual, educational and religious oppression which they had suffered in the former country. . . We were all so inspired by our entire Israel experience and we left that country with a broader understanding of the strife of others and the challenge that we, as privileged citizens of the world, face in an effort to give back to those who truly need our help for their very existence.  This family vacation is just one example of how my father-in-law was able to demonstrate to those closest to him what he believes are our responsibilities in this world.  (Exhibit 109).

**Gary Weiss,** Mr. Weiss's son, writes of the important example set for him by his father from the time he was a child:

As a child, I observed the work ethic that has defined him to this day.  He worked tirelessly, both on behalf of and for the benefit of his clients and for the welfare of his family.  He traveled constantly for business but always tried to get home on the weekends to be with us. . .  **His focus has always been to help and protect people who otherwise would be underrepresented.**  That principle has extended far past his professional life.  He has done so through activism, charity and his selfless personal acts, all of it in his own free time.  If this sounds a bit overdramatic, I can only respond by saying that he taught me and my siblings to do the same. . .  For almost 15 years, I have been a member of the New Leadership Division of the North Shore-Long Island Jewish Health System in Manhasset, NY …

The circumstances that led my father to this fate have weighed heavily on him.  He has shown enormous remorse and shame, but understands the importance of accepting responsibility.  His once confident demeanor and glowing spirit has clearly been weakened by his disappointment in himself.  (Exhibit 110) (emphasis added).

**Stephen Weiss**, like his brother, recalls that no matter what was happening in his father's professional life, he always knew that his father was never really that far away, even if they were on opposite coasts:

> . . . [H]e never complained, and always remained singularly committed to his family and his profession.  Time was always a scarce commodity for my father, yet he somehow managed to include me and my two siblings in his daily regimen.  Even when he was 3,000 miles away, I remember with great clarity how he would call us each evening and ask us about our day as we passed the phone from one to the next.

Now a founding partner in his own law firm, Stephen also writes of lessons learned "at the feet of an old lion of our bar":

> I have no doubt that my own abiding commitment to philanthropy germinated from the examples set by my father during my early lifetime.  I am honored to have had the opportunity to serve over the past decade on several philanthropic boards and committees and will forever cherish the memory of having shared with my father the International Humanitarian Achievement Award in 2002 from the Shaare Zedek Medical Center for *pro bono* legal work that we jointly performed on its behalf…

> Having worked with my father professionally for over 25 years – as a messenger in the early years running packages throughout the city until my feet blistered, and more recently as a co-counsel learning at the feet of an old lion of our bar—I feel uniquely qualified to assert that there isn't a practitioner in the United States who reveres the law and our profession more fully than Melvyn I. Weiss.  I speak with the fullest conviction that there hasn't been a day during my lifetime when my father didn't view with profound respect the responsibilities of a lawyer to our society.  That my father strayed from certain basic tenets of our profession cannot be contested.  But I pray that Your Honor will accept that his respect for the institution of law has never wavered…

> **I wish to relate one final lesson that my father conferred to me.  Years ago, he urged me never to forget that what is for me a day in my professional life is most often for my client their life's greatest trauma.  That principle has guided my father's 50 years of practice and will forever guide mine.**  (Exhibit 111) (emphasis added).

From the moment that **Barbara Weiss** first met Melvyn Weiss, she "knew there was something special about him."  They married two years later and on

December 27, 2008, they will celebrate their **50th** wedding anniversary.  She writes

to the Court about the "Mel that only [she] is privileged to know:"

> . . . **I have never known him to say no to a client, friend, family or acquaintance who needed his help, either personally, professionally or financially.**  His generosity to philanthropic causes is legendary.  He is the rock that provides strength to so many people in their time of need… There is no doubt that he is a changed man.  The spark is missing from his eyes, the hardy guffaws are absent, and the nightmares he must be having cause his sleep to be disturbed.  **Recently, at our Seder, I saw him looking at his 6 grandchildren and his eyes were moist.  He later asked me "Do you think they still respect me?"  I know they do.**  (Exhibit 112) (emphasis added).

Despite his criminal conduct, we believe that Mr. Weiss has earned the

respect of many, including his grandchildren, hopefully, also this Court.

**IX.   IN DETERMINING THE APPROPRIATE SENTENCE FOR MR. WEISS, WE RESPECTFULLY REMIND THE COURT OF THE POSITION THE GOVERNMENT  TOOK AT WILLIAM  LERACH'S SENTENCE; THAT 24 MONTHS IMPRISONMENT WAS CLEARLY ADEQUATE PUNISHMENT TO SATISFY THE REQUIREMENTS OF 18 U.S.C. § 3553(A)**

As counsel have with great respect suggested throughout this Memorandum,

it would be most appropriate in the case of Melvyn Weiss for your Honor to

consider a sentence of 18 months imprisonment [the lowest sentence permitted

under the Plea Agreement] and to then substitute at least half of that period of

imprisonment with either community service and/or home confinement.

Should your Honor conclude however, that a prison sentence greater than 18

months is appropriate, we then respectfully suggest that a sentence of 24 months is

sufficient to reflect the seriousness of the offense and promote respect for the law,

the position publicly advanced by the government during the sentencing proceedings

of William Lerach on February 11, 2008.

Thus as your Honor will recall, during the sentencing of William Lerach, your

Honor specifically questioned Assistant United States Attorney Robert McGahan on

this issue and pressed him to convince your Honor <u>why</u> a sentence of 24 months imprisonment was, in the case of William Lerach, appropriate.  In the recorded colloquy between your Honor and Assistant United States Attorney Robert J. McGahan on this issue, both the Court and the government conceded that there is an element of "subjectivity" in determining what the appropriate prison sentence should be, with the government however, ultimately urging "24 months" as an appropriate sentence that "comports with Section 3553 (a)." (*See* Lerach Sentencing Minutes dated February 11, 2008 at 65-69).

We respectfully urge your Honor to accept counsel's plea for a sentence of imprisonment not to exceed 18 months.  We believe that we have provided your Honor with compelling support for a lenient sentence in the case of Mr. Weiss that would fully comport with the requirement of § 3553(a), that a sentence should be adequate but not greater than necessary to address the seriousness of the criminal conduct and promote respect for the law.

Despite our plea for great leniency, should your Honor conclude that a prison sentence greater than 18 months is required, we respectfully urge your Honor to conclude that a sentence for Mr. Weiss greater than the 24 month sentence imposed in the case of William Lerach would be fundamentally unfair and given their respective age disparity constitute a far more severe punishment than necessary.

**X.**     <u>**ON THE DATE OF HIS SENTENCING, MR. WEISS WILL BE ALMOST 73 YEARS OLD, ELEVEN YEARS OLDER THAN WILLIAM LERACH ON THE DATE OF HIS OWN SENTENCING**</u>

In arguing that a sentence of 24 months imprisonment was adequate punishment in the case of William Lerach (*see* Lerach Sentencing Transcript, Feb. 11, 2008 at 65-69), the Government has, we respectfully submit, set what should under any circumstances be considered by your Honor to be the "**maximum**" sentence to impose in the case of Melvyn Weiss, considering that the core underlying criminal conduct which both Mr. Weiss and Mr. Lerach engaged in was

1    the same.  Mr. Weiss, however, will be **eleven** years older than was Mr. Lerach on

2    the date of his own sentencing.

3         One need not engage in a sophisticated actuarial analysis to come to the

4    obvious conclusion that the life expectancy of a 73-year-old man is substantially <u>less</u>

5    than that of a 62-year-old man when both are in relatively good health.  Although

6    obvious, it is still worth noting that a 24 month sentence of imprisonment is far more

7    difficult for a 73-year-old man to contemplate and endure than the same sentence

8    imposed on one who begins that sentence at age 62.  Simply put, a 24 month

9    sentence of imprisonment is a much more severe punishment in the case of Mr.

10   Weiss than in the case of Mr. Lerach, because of the age of Mr. Weiss at the time he

11   will be required to serve his sentence.

12        In addition to all of the other issues a Court must consider where the issue of

13   sentencing disparity creates reasonable concern, we ask your Honor to consider the

14   age disparity between Mr. Weiss and Mr. Lerach.  For the Government to argue in

15   the same case, that a 24 month sentence is sufficient in the case of Mr. Lerach, a

16   much younger man, the Government should have great difficulty urging a more

17   severe sentence for Mr. Weiss, especially when as in this case, both men essentially

18   engaged in the same criminal conduct.

19        **Stanley Sporkin**, himself a retired District Court Judge, knows full well the

20   factors the Court must consider when sentencing a man like Melvyn Weiss.  In his

21   important letter to your Honor, Judge Sporkin notes the age of Mr. Weiss,

22   acknowledging the concern that Mr. Weiss may not have many more productive

23   years ahead of him.  Noting that this is the **"first"** such letter he has ever written on

24   behalf of a defendant, Judge Sporking notes:

25        I know what a judge faces when called upon to sentence an individual.
26   It was the most difficult part of my judicial role.  Stripping a person of his
     freedom is not a decision that is lightly made.  In preparing to sentence
27   someone I would look at that person's entire life.  I would balance the many
28   good things with those that brought about the breach in the law… I know you

will hear from many of Mr. Weiss's friends, both professional and social, who will tell you the many wonderful things Mr. Weiss has done for his fellow citizens… I am providing my views in the hope that they will aid the court in dealing with the daunting task before it to impose a fair and just sentence**.**

**At the age of 72 his remaining productive years may not be that many.**  While he must pay the price for his actions, he certainly does not need to be given a sentence that would preclude him from ever being able to once again become a productive member of society…This is the first such letter on behalf of an individual defendant that I have ever written.  (Exhibit 19) (emphasis added).

**Nicholas Politan,** also a retired Federal Judge who served in the District of New Jersey from 1987 to 2002, expresses profound respect for Mr. Weiss as a lawyer, and as a fellow septuagenarian, Judge Politan begs this Court to understand at their age, each moment is priceless:

I only ask that you consider his whole life and the whole man, Mel Weiss. Both he and I are 72 years old, soon to be 73 this year.  We are in the twilight of our lives.  **At this age every month, every week and every day is precious.**  (Exhibit 113) (emphasis added).

A sentence of **24** months imprisonment is more severe than required and under any circumstances should be the absolute "maximum" sentence your Honor should consider.

# XI.   **CONCLUSION**

Melvyn I. Weiss has accepted responsibility for his criminal conduct and will face disbarment.  He has also agreed to pay a severe financial penalty.  Mr. Weiss will be almost 73 years old on the date of sentence and poses no threat whatsoever, nor is there any concern that he will ever again engage in any recidivist criminal conduct.

The hundreds of people who have written to this Court on behalf of Mr. Weiss verify beyond dispute that despite his criminal conduct, Mr. Weiss has been a very generous, compassionate member of society who has throughout his life contributed greatly to the betterment of society and the world at large.

Mr. Weiss has earned the compassion of this Court and we respectfully urge your Honor to impose the lowest sentence allowed under the Plea Agreement the parties have entered into.

DATED:  May 23, 2008          Respectfully submitted,

BRAFMAN & ASSOCIATES, P.C.

By _____

BENJAMIN BRAFMAN

Attorneys for Defendant
MELVYN I. WEISS

DATED:  May 23, 2008          Respectfully submitted,

BROWN & WHITE LLP

By _____

THOMAS M. BROWN

Attorneys for Defendant
MELVYN I. WEISS

DEFENDANT MELVYN I. WEISS'S
SENTENCING MEMORANDUM