1   Thomas N. FitzGibbon (SBN: 169194)
    TNF@ptflaw.com
2   **PFEIFFER THIGPEN & FITZGIBBON LLP**
    233 Wilshire Boulevard, Ste. 220
3   Santa Monica, CA  90401
    Telephone: (310) 451-5800
4   Facsimile: (310) 451-1599
5
6   Luke A. McGrath *(Pro Hac Vice Pending)*
    LZM@bickelbrewer.com
7   James S. Renard *(Pro Hac Vice Pending)*
    JSR@bickelbrewer.com
8   **BICKEL & BREWER**
9   767 Fifth Avenue, 50th Floor
    New York, New York 10153
10  Telephone: 212-489-1400
    Facsimile: 212-489-2384
11
12  Attorneys for Intervenor
13  *Sam Wyly*
14
15          **UNITED STATES DISTRICT COURT**
16          **CENTRAL DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18  UNITED STATES OF AMERICA, | Case No. 2:05-CR-587-JFW-3 |
| | [Assigned to Hon. John F. Walter] |
| 19          Plaintiff, | |
| 20  - against - | **EXHIBITS 1-3 TO DECLARATION OF LUKE A. MCGRATH IN SUPPORT OF INTERVENOR SAM WYLY'S MOTION TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER** |
| 21 | |
| 22  MILBERG WEISS BERSHAD & SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. SCHULMAN, SEYMOUR M. LAZAR, and PAUL T. SELZER | |
| 23 | |
| 24 | Date:      February 9, 2009 |
| | Time:      9:00 a.m. |
| 25          Defendants. | Room:      16 |
| 26 | |

27
28

Pfeiffer Thigpen & FitzGibbon LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

FILED 2009 JAN 20 AM 10: 53

# Exhibit 1

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON FEBRUARY 22, 2000
                                  REGISTRATION NO. 333-
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
-------------------------

FORM S-4
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933
-------------------------

COMPUTER ASSOCIATES INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

| DELAWARE | 7372 | 13-2857434 |
|----------|------|------------|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

-------------------------

COMPUTER ASSOCIATES INTERNATIONAL, INC.
ONE COMPUTER ASSOCIATES PLAZA
ISLANDIA, NEW YORK 11749-7000
(631) 342-5224
(Address, including zip code, and telephone number, including area code, of
registrant's principal executive offices)
-------------------------------

STEVEN M. WOGHIN, ESQ.
SENIOR VICE PRESIDENT AND GENERAL COUNSEL
COMPUTER ASSOCIATES INTERNATIONAL, INC.
ONE COMPUTER ASSOCIATES PLAZA
ISLANDIA, NEW YORK 11749-7000
(631) 342-5224
(Name, address, including zip code, and telephone number, including area code,
of agent for service)
-------------------------------

COPIES TO:

SCOTT F. SMITH, ESQ.
STEPHEN A. INFANTE, ESQ.
J. D. WEINBERG, ESQ.
COVINGTON & BURLING
1330 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019
(212) 841-1000
-------------------------------

APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE OF THE SECURITIES TO THE
PUBLIC: As soon as practicable after this registration statement becomes
effective and upon consummation of the transactions described in the enclosed
prospectus.

If the securities being registered on this Form are being offered in
connection with the formation of a holding company and there is compliance with
General Instruction G, check the following box.  / /

If this Form is filed to register additional securities for an offering
pursuant to Rule 462(b) under the Securities Act, check the following box and
list the Securities Act registration statement number of the earlier effective
registration statement for the same offering.  / /

If this Form is a post-effective amendment filed pursuant to Rule 462(d)
under the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering.  / /
-------------------------------

CALCULATION OF REGISTRATION FEE

| TITLE OF EACH CLASS OF SECURITIES TO BE REGISTERED (1) | AMOUNT TO BE REGISTERED (2) | PROPOSED MAXIMUM OFFERING PRICE PER UNIT (3) | PROPOSED MAXIMUM AGGREGATE OFFERING PRICE (3) | AMOUNT OF REGISTRATION FEE |
|---|---|---|---|---|
| Common Stock, par value $.10 per Share (including the associated preferred stock purchase rights) | 56,340,000 shares | N/A | $3,615,625,000 | $954,525 |

Source: CA, INC., S-4, February 22, 2000

STERLING SOFTWARE, INC.
300 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 981-1000

Sterling Software is a worldwide developer and provider of systems management, business intelligence and application development software products and services, as well as a supplier of specialized IT services for sectors of the federal government. Founded in 1981, Sterling Software's customers include approximately 90% of the Fortune 100 and encompass a worldwide installed base of more than 20,000 customer sites. Sterling Software operates through four principal business segments: systems management, application development, business intelligence and federal systems. Worldwide revenue from Sterling Software's systems management, application development, business intelligence and federal systems business segments represented 36%, 34%, 10% and 23%, respectively, of Sterling Software's total fiscal year 1999 revenues. Approximately 37% of Sterling Software's revenues were generated outside of the United States in fiscal year 1999.

As of December 31, 1999, Sterling Software employed approximately 3,800 employees in 90 offices worldwide. Sterling Software has direct sales offices in 21 countries and distributors and agents in approximately 40 additional countries.

Sterling Software reported $907 million in revenues for the fiscal year ended September 30, 1999.

27

BACKGROUND OF THE OFFER

In late 1999, in the course of its normal reviews of its business, Computer Associates' senior management reviewed and analyzed the company's position in the marketplace and possible new areas into which Computer Associates could enter to further differentiate the company from its competitors. In that review, management identified data storage and application development and services as areas in which Computer Associates could improve its competitive position. One of the conclusions reached by senior management was the need to further expand its product and service offerings in these areas.

Computer Associates' senior management identified the OS/390 platform as one hardware platform in which it did not compete for disk storage management tools and for which it also desired to extend its object oriented application development tool offerings. Management also identified Sterling Software as a company that has products and services in these areas as well as other areas that are complementary to Computer Associates' product lines, and that could be a possible acquisition candidate.

Independently from the management reviews, in late 1999 a representative of Morgan Stanley & Co. Incorporated, contacted Sanjay Kumar, President and Chief Operating Office of Computer Associates, to inquire as to whether Computer Associates might be interested in acquiring Sterling Software. At that time, Mr. Kumar advised Morgan Stanley that Computer Associates was not interested in acquiring Sterling Software.

On January 14, 2000, Mr. Kumar met with representatives of Morgan Stanley to hear Morgan Stanley's industry and strategic views. During the course of the conversation, the possibility was raised again that Computer Associates might be interested in acquiring Sterling Software. Following the Morgan Stanley meeting, Mr. Kumar called Sam Wyly, Chairman of Sterling Software, to discuss the possibility of a business combination between Computer Associates and Sterling Software.

On January 18, 2000, Mr. Kumar met Mr. Wyly in Dallas to discuss the potential business combination and valuation issues.

On January 23, 2000, Mr. Kumar, along with Ira Zar, Chief Financial Officer, and Charles McWade, Senior Vice President of Computer Associates, and representatives of Morgan Stanley, met with Mr. Wyly, Sterling Williams, President and Chief Executive Officer, and other members of senior management of Sterling Software. Sterling Software's management presented an overview of Sterling Software's business information.

At the quarterly meeting of Computer Associates' Board of Directors on January 25, 2000, Mr. Kumar raised the possibility of an acquisition of Sterling Software and outlined the strategic rationale for such an acquisition.

Mr. Kumar and Mr. Williams spoke on a number of occasions between January 26 and February 3, 2000 to discuss valuation issues and possible structure and timing considerations. On February 4, 2000, Mr. Kumar met with Mr. Williams and Logan Wray, Chief Financial Officer of Sterling Software, to review valuation and financial issues and the possible benefits of a business combination.

On February 6, 2000, in a call with Mr. Williams, Mr. Kumar indicated that Computer Associates was interested in pursuing a possible business combination at a valuation of between $38.25 and $39.25 per share for each share of Sterling Software's common stock. Computer Associates' interest in such a combination was

subject to its completing to its satisfaction a due diligence review and mutually satisfactory definitive agreements, as well as the approval of the Computer Associates' Board of Directors. Mr. Kumar indicated that at that time he thought the combination would be structured as a stock for stock merger and would use purchase accounting. Mr. Kumar and Mr. Williams also discussed timing, structure and logistic issues.

28

On February 7 and 8, 2000, Mr. Kumar and Mr. Williams continued the discussion of the terms and timing of a possible transaction. Mr. Kumar indicated on February 8, 2000 that Computer Associates would be willing to increase the valuation to $39.50 per share and to agree to other specified conditions about the terms of the merger, such as a 10% collar and the treatment of stock options.

On February 9, 2000, Computer Associates and Sterling Software entered into confidentiality agreements and representatives of Computer Associates and its counsel, Covington & Burling, met in Dallas with representatives of Sterling Software and its counsel, Skadden Arps, to continue Computer Associates' due diligence review and begin negotiating definitive agreements. Due diligence reviews and document negotiations continued into the early morning of February 14, 2000. Mr. Kumar left Dallas on the evening of February 13 and returned early the morning of February 17 with additional members of Computer Associates senior management to continue due diligence reviews of Sterling Software's business and operations.

The Computer Associates Board of Directors met by conference call on February 10, 2000 and again on February 13, 2000. In the February 10 meeting, Mr. Kumar reviewed the status of the possible business combination with Sterling Software and the status of the due diligence review. In the February 13 meeting, Mr. Kumar and Mr. Zar reported on the status of the potential transaction and the board unanimously approved the acquisition of Sterling Software and authorized Mr. Kumar and the officers of the company to enter into the merger agreement.

Before the open of the New York Stock Exchange on February 14, 2000, Computer Associates and Sterling Software entered into the merger agreement and announced the transaction.

29

## THE OFFER

### BASIC TERMS

EXCHANGE OF SHARES; EXCHANGE RATIO. We are offering to exchange 0.5634 shares of Computer Associates common stock for each outstanding share of common stock of Sterling Software that is validly tendered and not properly withdrawn. We sometimes refer to this number of Computer Associates shares as the "exchange ratio."

ADJUSTMENTS TO EXCHANGE RATIO. We will reset the exchange ratio if, at the time that the offer has cleared waiting periods under applicable antitrust laws and the SEC has declared effective the registration statement of which this prospectus is a part, the average of the daily average of the high and low sales price per share of Computer Associates common stock on the NYSE Composite Transaction Tape over the ten trading days immediately preceding the first day on which we have obtained all those regulatory clearances, which we call the "average Computer Associates trading price," is greater than $77.12 or less than $63.10.

If at the end of that ten trading day period the average Computer Associates trading price is greater than $77.12, then the number of shares of Computer Associates common stock that we are offering to exchange for each share of Sterling Software common stock will be reset to be $43.45 divided by the average Computer Associates trading price. This reset is designed to provide you with a number of Computer Associates shares having a value of $43.45 on the reset date, based on the average Computer Associates trading price, for each of your Sterling Software shares.

If at the end of that ten trading day period the average Computer Associates trading price is less than $63.10, then the number of shares of Computer Associates common stock that we are offering to exchange for each share of Sterling Software common stock will be reset to be $35.55 divided by the average Computer Associates trading price. This reset is designed to provide you with a number of Computer Associates shares having a value of $35.55 on the reset date, based on the average Computer Associates trading price, for each of your Sterling Software shares.

The market value of the Computer Associates shares you receive in exchange for each share of Sterling Software might differ from their market value based on the trading price at such time on the reset date, the date on which the offer is consummated, the date of the merger or the date you receive our shares in exchange for your Sterling Software shares.

CASH OPTION. If the average Computer Associates trading price is less than $63.10, we have the option when we reset the exchange ratio to reduce it by paying some cash in substitute for Computer Associates shares. We sometimes

Source: CA, INC., S-4, February 22, 2000

Exhibit 1

refer to this option as the "cash option." The maximum amount of cash for each
Sterling Software share that we may substitute for Computer Associates shares in
that case is the amount by which the average Computer Associates trading price
multiplied by the exchange ratio of 0.5634 falls short of $35.55. If we choose
to elect the cash option, the exchange ratio will be reset to be the portion of
$35.55 that we are not paying in cash, divided by the average Computer
Associates trading price.

    ILLUSTRATIVE TABLE OF EXCHANGE RATIOS AND VALUE OF OFFER/MERGER
CONSIDERATION.  The columns in the following table present:

    - illustrative values of the average Computer Associates trading price
      within a range of $60.00 to $85.00 per share,

    - the exchange ratio illustrating the number of Computer Associates common
      shares that would be issued for one share of Sterling Software common
      stock at each of the average Computer Associates trading prices presented
      in the table and

    - the illustrative values of the consideration that would be issued in
      connection with the offer and the merger for one Sterling Software common
      share, which illustrative values are determined by

                                    30

    multiplying each of the average Computer Associates trading prices
    presented in the table by the corresponding exchange ratio and, in some
    cases, giving effect to an exercise of the cash option.

|                                              |                | VALUE OF OFFER/MERGER CONSIDERATION | | |
| AVERAGE COMPUTER ASSOCIATES TRADING PRICE    | EXCHANGE RATIO | VALUE OF SHARES | CASH   | TOTAL   |
| -------------------------------------------- | -------------- | --------------- | ------ | ------- |
| $60.00(1)..................................  | 0.5925         | $35.55          | --     | $35.55  |
| $60.00(2)..................................  | 0.5780         | $34.68          | $0.87  | $35.55  |
| $60.00(3)..................................  | 0.5634         | $33.80          | $1.75  | $35.55  |
| $63.10.....................................  | 0.5634         | $35.55          | n/a    | $35.55  |
| $65.00.....................................  | 0.5634         | $36.62          | n/a    | $36.62  |
| $70.00.....................................  | 0.5634         | $39.44          | n/a    | $39.44  |
| $75.00.....................................  | 0.5634         | $42.26          | n/a    | $42.26  |
| $77.12.....................................  | 0.5634         | $43.45          | n/a    | $43.45  |
| $80.00.....................................  | 0.5431         | $43.45          | n/a    | $43.45  |
| $85.00.....................................  | 0.5112         | $43.45          | n/a    | $43.45  |

------------------------

(1) Assuming the exchange ratio resets without Computer Associates exercising
    the cash option.

(2) Assuming Computer Associates elects to pay 50% of the maximum amount of cash
    permitted under the cash option.

(3) Assuming Computer Associates elects to pay the maximum amount of cash
    permitted under the cash option.

    THE VALUES OF COMPUTER ASSOCIATES SHARES IN THE TABLE ABOVE ARE ILLUSTRATIVE
ONLY AND DO NOT REPRESENT THE ACTUAL AMOUNTS PER STERLING SOFTWARE COMMON SHARE
THAT MIGHT BE REALIZED BY ANY STERLING SOFTWARE STOCKHOLDER ON OR AFTER
CONSUMMATION OF THE OFFER OR THE MERGER. THE AMOUNT ANY STERLING SOFTWARE
STOCKHOLDER MIGHT REALIZE UPON SALE IN THE MARKET OF THE COMPUTER ASSOCIATES
COMMON SHARES RECEIVED BY SUCH STOCKHOLDER IN THE OFFER OR THE MERGER WILL
DEPEND UPON THE MARKET PRICE PER SHARE OF COMPUTER ASSOCIATES COMMON SHARES AT
THE TIME OF SALE, WHICH WILL FLUCTUATE DEPENDING UPON ANY NUMBER OF REASONS,
INCLUDING THOSE SPECIFIC TO COMPUTER ASSOCIATES AND THOSE THAT INFLUENCE THE
TRADING PRICES OF EQUITY SECURITIES GENERALLY.

    FLUCTUATIONS IN MARKET PRICE.  The average Computer Associates trading price
used to reset the exchange ratio is based on an average calculated over a ten
trading day period prior to the reset date and therefore might be different from
the actual market value of a share of Computer Associates common stock on the
reset date. The market value based on the trading price at such time of the
Computer Associates shares you receive in exchange for each share of Sterling
Software might actually be below $35.55 or above $43.45. In addition, from the
time the exchange ratio is reset, or from the date of the merger agreement if no
reset occurs, until the time you receive your Computer Associates shares through
the offer or the merger, the market value based on the trading price at such
time of the consideration you will receive will rise and fall along with the
trading price of Computer Associates common shares.

    MORE INFORMATION ABOUT EXCHANGE RATIO.  We will notify you by issuing a
press release announcing the final exchange ratio and filing that press release
with the SEC. The press release will state
now much cash, if any, we have elected to pay in partial consideration for your

Source: CA, INC., S-4, February 22, 2000

Exhibit 1

Sterling Software shares under the cash option, if we exercise it. Sterling Software stockholders can call our information agent, MacKenzie Partners, Inc., at any time toll free at (800) 322-2885 to request information about the exchange ratio and any reset of the exchange ratio, including, once determined, the average Computer Associates trading price for the offer.

PREFERRED STOCK PURCHASE RIGHTS. Our offer to acquire Sterling Software common stock is also an offer to acquire Sterling Software preferred stock purchase rights (Sterling Software rights), and, when

31

we refer to the shares of Sterling Software common stock, we are also referring to the associated Sterling Software rights, unless we indicate otherwise. In addition, all references to the Sterling Software rights include the benefits to holders of those rights pursuant to the Sterling Software rights agreement, including the right to receive any payment due upon redemption of those rights. The number of shares Computer Associates common stock and amount of cash, if we elect to pay a portion of the consideration in cash, receivable by holders of Sterling Software common stock in the offer and the merger includes payment for the associated Sterling Software rights, and under no circumstances will additional consideration be paid for the Sterling Software rights. Also, the shares of common stock of Computer Associates to be issued in the offer and the merger include the associated Computer Associates preferred stock purchase rights. When we refer to shares of Computer Associates common stock, we are also referring to these associated rights, unless we indicate otherwise.

TRANSFER CHARGES. If you tender your shares, you will not be obligated to pay any charges or expenses of the depositary. Except as set forth in the instructions to the letter of transmittal, transfer taxes on the tender of Sterling Software common stock pursuant to the offer will be paid by us or on our behalf. If you are the record owner of your shares and you tender your shares in the offer, you will not have to pay brokerage fees or incur similar expenses. If you own your shares through a broker or other nominee, and your broker exchanges the shares on your behalf, your broker may charge you a fee for doing so. You should consult your broker or nominee to determine whether any charges will apply.

INTEREST. We will not pay interest on any cash amount payable for Sterling Software shares in the offer or the merger regardless of any delay in making such payment.

MERGER. We are making this offer in order to acquire control of, and ultimately the entire common equity interest in, Sterling Software. We intend, as soon as possible after consummation of the offer, to seek to have Sterling Software and Silversmith Acquisition Corp. consummate the merger. At the effective time of the merger, each share of Sterling Software common stock, except for shares held by Sterling Software, us or any of our or Sterling Software's subsidiaries, will be converted into the right to receive the same number of Computer Associates shares (and same amount of cash, if any) per Sterling Software share as is paid in the offer, subject to appraisal rights that may be available under Delaware law. If we obtain all of the shares of Sterling Software pursuant to the offer and the merger, former stockholders of Sterling Software would own approximately 8% of the shares of common stock of Computer Associates, based upon the number of shares outstanding of Computer Associates on February 7, 2000 and of Sterling Software on February 9, 2000, and assuming that the exchange ratio is not reset.

CONDITIONS OF OFFER. Our obligation to exchange shares of Computer Associates common stock for Sterling Software shares pursuant to the offer is conditioned upon several conditions referred to below under "Conditions of the Offer," including the minimum tender condition, the antitrust condition, the registration statement effectiveness condition and other conditions that are discussed in that section.

STOCKHOLDERS LIST. We have relied on Sterling Software's stockholders list and security position listings to communicate with you and to distribute the offer to you. We may send this prospectus, related letter of transmittal and other relevant materials to you and to brokers, dealers, commercial banks, trust companies and similar persons whose names, or the names of whose nominees, appear on Sterling Software's stockholders list or, if applicable, who are listed as participants in a clearing agency's security position listing.

TIMING OF THE OFFER

The offer is currently scheduled to expire at midnight, New York City time, on Monday, March 20, 2000.

32

EXTENSION, TERMINATION AND AMENDMENT

Subject to the terms of the merger agreement, we expressly reserve the right, in our sole discretion, at any time or from time to time, to extend the period of time during which the offer remains open, and we can do so by giving oral or written notice of such extension to the depositary. If the offer is extended for any reason, we will make an announcement to that effect no later than 9:00 A.M., New York City time, on the next business day after the previously scheduled expiration date. Subject to the terms of the merger

# Exhibit 2

## to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

**DECLARATION OF SANJAY KUMAR**

1.      My name is Sanjay Kumar.  I am over eighteen years old and fully competent and qualified in all respects to make this declaration.  The facts set forth herein are true and correct and, unless otherwise qualified, are within my personal knowledge.

2.      With regard to facts stating the revenue figures for revenue recognized for certain customer contracts and for CA's earnings per share ("EPS") estimates, at the time I had general knowledge of the magnitude of the revenue involved in those contracts and the general EPS estimated.  The revenue figures and EPS estimates stated herein have been confirmed and refined by review of supplemental information.

3.      I am currently incarcerated in Fairton, New Jersey.

**A.     Background**

4.      I was formerly the President, Chief Executive Officer and Chairman of the Board of Computer Associates, now known as CA, Inc. ("CA" or the "Company").  Specifically, I was employed by CA beginning in August 1987 when CA acquired my then employer UCCEL. From April 1989 to December 1992, I was CA's Senior Vice President for Planning.  From January 1993 to December 1994, I was CA's Executive Vice President for Operations. Effective January 1994, I became CA's President and Chief Operating Officer ("COO"), as well as a member of CA's Board of Directors.  In August 2000, I became CA's Chief Executive Officer ("CEO") and relinquished the title of COO.  In November 2002, I became the Chairman of CA's Board of Directors.  On April 14, 2004, I stepped down as CA's Chairman and CEO and also resigned from CA's Board of Directors.

5.      As is more fully laid out in my plea allocution, in *U.S. v. Kumar*, 04 CR 846 E.D.N.Y., I have pled guilty to all counts of the indictment brought against me in that matter (the "Indictment").  Attached hereto as Exhibit A is a true and correct copy of the court

1

770337_6

transcript of my plea allocution. Also attached hereto as Exhibit B is a true and correct copy of the Indictment.

6.     The crimes alleged in the Indictment relate to obstruction of justice and an accounting fraud at CA.  The Indictment alleged, among other things, that CA executives engaged in a practice now known as the 35-Day Month.  The 35-Day Month, in reality, was a practice in which CA's fiscal quarters started and ended about five days late.  Through this practice, CA included within one quarter's revenue the revenue associated with license agreements finalized in the first few days of the subsequent quarter and did not include revenue recognized in the present quarter's first five days.

7.     By the time I first worked at CA in 1987, this practice was firmly entrenched at the Company and was considered to be the way CA did business.  Charles Wang ("Wang"), who co-founded and ran CA from before that time, personally directed the implementation of this practice in my presence.  I came to understand from conversations with Wang and Peter Schwartz ("Schwartz"), CA's then CFO, that recognition of revenue was of critical importance in order to meet Wall Street's expectations for CA's EPS.  Wang told me on many occasions that CA must meet these "consensus estimates" at all costs.

8.     I know that CA agreed to a Deferred Prosecution Agreement and related exhibits ("DPA").  The US Department of Justice and CA agreed to the DPA as a result of the investigation by both the Securities Exchange Commission ("SEC") and the US Department of Justice (together, the "Government") into the fraud at the Company.  Attached hereto as Exhibit C is a true and correct copy of the DPA.

**B.     My Communications With The CA Special Litigation Committee**

9.     My personal knowledge of the general facts averred herein was communicated to CA's Special Litigation Committee (the "SLC") in 2006.   The members of the SLC,

2

770337_6

themselves, interviewed me on many occasions in 2007.  At each interview, copious notes were taken on the information I provided.

10.     During those interviews and subsequent communications, I supplied information to the SLC regarding the knowledge possessed by members of the Board of the fraudulent accounting practices that occurred at the Company.  I told them, for example, that Lewis Ranieri ("Ranieri") and Alfonse D'Amato ("D'Amato") had knowledge of the late contract issues and that this knowledge dated back to at least early calendar year 2003.  I also informed them that these Board members took steps to protect Wang and conceal the facts relating to these accounting practices.

11.     At page 347 of the report issued by the SLC (the "SLC Report"), the SLC asserts that, "[t]he majority of the Board understood that [the settlement of the CA class action litigation in 2003 (the "2003 Settlement")] was final when they authorized it in August 2003." While the Board considered the economics of the settlement to be final, David Nachman informed the Board in my presence regarding the economics of any settlement, the process necessary to settle a class action lawsuit and that any settlement would not be final until approved by the Court.

12.     After October 2003, I specifically raised to the Board the question of whether the 2003 Settlement would go forward in light of the increased likelihood that information, which called into question the financials of the Company, would eventually be made public.  John Savarese, in response, told the Board that any such information wouldn't affect "the deal."  I understood that CA would insist that plaintiffs' counsel follow through on its intention to state, in some form during the settlement process, that they were aware of the pending Government investigations and that they would not object to the settlement.

3

770337_6

Exhibit 2

13.    I further know that the Board of Directors, including, but not limited to, Ranieri, was specifically concerned about the Settlement and Fairness Hearing scheduled for late 2003 (the "Fairness Hearing"). Ranieri told me to contact him as soon as I heard of the results of the Fairness Hearing.    Like many at the Company, all members of the Board understood the potential settlement to be a major event.    I further know that when I did contact Ranieri by telephone and informed him that the Court had approved the 2003 Settlement, he expressed relief that the Court approved the agreement.

**C.    Accounting At CA**

14.    I know the 35-Day Month practice was well known at CA and, in fact, almost everyone who worked at the Company knew that this was how CA closed its quarters.

15.    In addition, I often participated in helping close business at the end of the quarter in order to meet CA's revenue consensus estimates.    CA executives sometimes referred to the practice as the quarter-end cut-off practice because revenue was recognized after the end of the month, or quarter-end since the quarter started and ended about five days late.    I never heard CA Executives use the phrase "35-Day Month"; I first heard that phrase when it was used by the Government.

16.    I know that in each of the four quarters of fiscal year 2000, CA reported revenue associated with numerous license agreements that had been finalized after the quarter close in the previous quarter and did not count revenue from the first few days of the quarter.

17.    The first quarter of CA's fiscal year 2000 included the period from April 1, 1999 to June 30, 1999 (the "First Quarter").    At around the time when the First Quarter ended on June 30, 1999, Ira Zar ("Zar"), CA's then CFO, informed me that CA would likely not generate sufficient revenue to meet the consensus estimates for the quarter.    As usual, I communicated this to Wang.

4

770337_6

18.    In response, at Wang's direction, around July 8, 1999, I traveled to Paris, France, where I met with the Chief Information Officer of GIE Informatique AXA for AXA group ("AXA"). During the meeting, AXA agreed to go through with a previously negotiated license agreement by which AXA agreed to pay CA approximately $32 million. The written license agreement, which I had personally signed, was sent to AXA before my meeting in Paris. Based on this license agreement with AXA, CA improperly recognized as revenue in the First Quarter approximately $19 million, which I understand was the value of the agreement CA calculated pursuant to Generally Accepted Accounting Principles (the "GAAP Value").

19.    On July 20, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release regarding that disclosure. In these public documents, CA reported its quarterly financial results for the First Quarter that included revenue associated with license agreements finalized after June 30, 1999. CA reported EPS of $0.49 exclusive of non-recurring charges.

20.    The 35-Day Month was so ingrained in the CA's culture, that it was normal procedure to close business beyond the last day of the month during the five day period afterward sometimes known as the "flash period." However, if we could not close enough business to meet Wall Street consensus estimates, then myself and or Ira Zar would inform Charles Wang that we had failed or were unlikely to meet the consensus estimates and that we needed to extend the close of the quarter beyond the five day period. In each and every instance, when that circumstance occurred, Wang told us to keep CA's books "open," beyond the five days after the end of the fiscal quarter, often stating, "failure is not an option." At this particular time, during the October 1999 flash period, despite our efforts, Zar informed me that CA had not generated sufficient revenue to meet the consensus estimates of $0.59 per share.

5

21.   We informed Wang and he directed us to keep CA's books open beyond the usual five day period.  Thereafter, our senior regional sales managers attempted to close additional business.

22.   Previously, on or about October 4, 1999, CA finalized an agreement by which First Data Resources agreed to pay CA approximately $176 million.  As was CA's practice, the written license agreement was dated to appear as though the agreement had been finalized and signed on September 30, 1999.  Based on this license agreement with First Data, CA recognized as revenue in the Second Quarter approximately $97 million, which was the GAAP Value of the agreement.

23.   Similarly, on or about October 6, 1999, shortly after Wang spoke to CSC's Chairman and CEO, CA entered into a license agreement by which CSC, a CA customer, agreed to pay CA approximately $102 million.  Pursuant to CA's practice, the written license agreement was made to appear as though the agreement had been finalized and signed on September 30, 1999.  Based on the license agreement with CSC, CA recognized as revenue in the Second Quarter approximately $65 million, which was the GAAP Value of the agreement.

24.   On or about October 19, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release.  In these public documents, CA reported its quarterly financial results for the Second Quarter that included revenue associated with license agreements finalized after September 30, 1999 and that did not include revenue from contracts closed in the first few days of July.  In its filings and statements, CA reported EPS of $0.60 exclusive of non-recurring charges.

25.   The third quarter of CA's fiscal year 2000 included the period from October 1, 1999 to December 31, 1999 (the "Third Quarter").  Around the end of the flash period after the

6

Third Quarter ended on December 31, 1999, Zar informed me that CA had not generated sufficient revenue to meet the consensus estimates.

26. As the Third Quarter came to a close, I specifically informed Wang of our progress toward meeting our Wall Street consensus estimates. Wang was concerned that this quarter would present difficulties because of the change to the new millennium commonly known as "Y2K issues." Wang did not take his usual year end vacation at this time and stayed in New York and monitored our progress. I informed Wang that we would not meet the consensus estimates by the end of the flash period. In response, Wang instructed us to keep the quarter open until we could close enough business to meet the consensus estimates.

27. On January 6, 2000, a senior sales manager informed me that she had completed negotiating a license agreement by which a CA customer, EDS, agreed to pay CA approximately $300 million. I was pleased we closed the deal and informed Wang that day that we were that much closer to achieving our "number" for the quarter, ending December 31, 1999. The written license agreement, which I had personally signed, had an effective date of December 31, 1999, but did not bear an execution date. Due in part to this license agreement with EDS, CA recognized as revenue in the Third Quarter approximately $180 million, which was the GAAP Value of the agreement.

28. On or about January 26, 2000, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release. In these public documents, CA reported revenue for the Third Quarter that included revenue associated with license agreements finalized after December 31, 1999 but did not include revenue from agreements closed in the first few days of October. CA reported EPS of $0.91 exclusive of non-recurring charges.

7

29.     The fourth quarter of CA's fiscal year 2000 included the period from January 1, 2000 to March 31, 2000 (the "Fourth Quarter").  Around the end of March 2000, Zar informed me and others that CA had not generated sufficient revenue to meet the consensus estimates for the quarter ending March 31, 2000.

30.     At this time, CA had scheduled its annual sales "kick-off" events earlier than usual, and sales people were being taken out of their territories to attend the events.  Zar advised me that achieving the consensus estimates was going to be "tight."  When we informed Wang that we did not think we could make our "number" in light of the sales events, Wang was upset that our sales people were not in their offices when we were so close to missing our numbers.  Wang asked whether we had enough deals "in the pipeline" – which I understood to mean he wanted to know if we had enough contracts pending, which, if finalized, would generate enough revenue to meet our consensus estimates.  We responded, "yes," we did.  After he expressed his displeasure with the state of affairs, Wang instructed us to "keep going," since "pre-announcing [that we failed to generate enough business to meet our consensus estimates] is not an option," and instructed us to keep CA's books "open" until we had closed enough business to meet the consensus estimates.

31.     On or about April 7, 2000, a senior CA sales executive, finalized a license agreement by which a CA customer, Cellco Partnership (d/b/a Verizon Wireless) ("Cellco"), agreed to pay CA approximately $16 million.

32.     Previously, on or about April 6, 2000, at approximately 11:53 a.m., this sales executive sent an e-mail relating to the negotiations with Cellco, which read, in part: "If we could get someone to ask them to 'do us a favor' and sign the contract, leaving the date block blank (they technically can't backdate the signature block, even though the contract says an

8

effective date of 3/31/00 . . the new company wasn't technically formed until 4/1/00). I'll take care of fixing any mistakes that they inadvertently leave off the fax contract."

33.    Based on this license agreement with Cellco, CA recognized as revenue in the Fourth Quarter approximately $13 million, which was the GAAP Value of the agreement.

34.    In the March quarter, I understood that a CA sales executive was trying to finalize a license agreement by which a CA customer, Charles Schwab, agreed to pay CA approximately $30 million. I understood that the written license agreement was signed in April 2000, but backdated to make it appear as though the agreement had been finalized and signed on March 31, 2000. Based on this license agreement with Charles Schwab, CA recognized as revenue in the Fourth Quarter approximately $16 million, which was the GAAP Value of the agreement.

35.    On or about May 15, 2000, CA filed with the SEC its annual report on Form 10-K and issued a related press release. In these public documents, CA reported revenue for the Fourth Quarter that included revenue associated with license agreements finalized after March 31, 2000 but not revenue for contracts closed in the first few days of January. CA reported EPS of $1.13 exclusive of non-recurring charges.

**D.    CA Purchases Sterling Software While Reporting That It Is Meeting Its Consensus Estimates**

36.    During the time period discussed above, between the end of 1999 and March 2000, I was involved, as President and COO of CA, in the negotiation of the purchase by CA of Sterling Software, Inc. ("Sterling"), a company that had been co-founded by Sam Wyly ("Wyly"). Wang, a few senior CA executives, and I directed the negotiations leading to the final agreement for that purchase, which was consummated in March 2000.

9

37.    The details of the negotiations and purchase of Sterling were disclosed by CA in a Form S-4 and publicly filed with the SEC on February 22, 2000. Attached hereto as Exhibit D is a true and correct copy of the relevant pages of the S-4.

38.    In January 2000, I met with representatives of Morgan Stanley during which they advised me that Sterling was for sale. After this meeting, I called Wyly and discussed with him the possibility of a business combination between CA and Sterling.

39.    Shortly thereafter, on January 18, 2000, I met with Wyly in Dallas to discuss the potential business combination. As disclosed in the S-4, at that meeting I discussed with Wyly "valuation issues" regarding the potential business combination.

40.    On January 23, 2000, I participated in a meeting with Zar, Charles McWade, and representatives from Morgan Stanley and Sterling's Board of Directors. At this meeting and in subsequent meetings with Sterling Williams ("Williams"), the CEO and a co-founder of Sterling Software, various aspects of the combination of Sterling and CA were discussed.

41.    On February 6, 2000, I informed Williams that CA was interested in pursuing a business combination with Sterling at a valuation of between $38.25 and $39.25 per share for each share of Sterling common stock. On February 7 and 8, 2000, I continued my discussions with Williams and informed him that CA would increase its valuation of Sterling stock to $39.50 per share. Because CA was using CA stock as the "currency" of the transaction, CA calculated its valuation of Sterling in terms of CA stock. Ultimately, it was agreed that the merger would go forward wherein each Sterling share would be exchanged for 0.5634 shares of CA. That means that in dollar terms, each Sterling share was worth $32.19 compared to CA's closing price of $57.13 on March 30, 2000 – the date of the merger.

10

42.     As is now common knowledge, at the time before, during, and for a limited time after the negotiation of the Sterling merger, CA had a practice of opening and closing its quarters generally five days late.

43.     On February 14, 2000, before the opening of the New York Stock Exchange, CA publicly announced its agreement to purchase Sterling.

44.     As part of the agreement that CA negotiated, Wyly and other Sterling shareholders would exchange their Sterling stock and stock options for CA stock and stock options.

45.     The Sterling purchase was consummated on March 30, 2000, the next to last day of CA's Fourth Quarter of fiscal year 2000.  At around the end of the next quarter, around July 2 or July 3 2000, Wang, Zar, the Board, other CA executives and I participated in making the decision to disclose that CA would not meet its earning estimates for that First Quarter of fiscal year 2001.  CA made the disclosure in a press release on or about July 3, 2000.  By the close of business on July 5th, CA's stock lost more than 40% of its value.

46.     I further know, as discussed above, that at the time before and during the negotiation of the Sterling merger, CA reported that it had met Wall Street consensus estimates for CA's Third Quarter ending December 31, 1999 and Fourth Quarter 2000 ending March 30, 2000.  CA met those estimates while operating under the "35-Day Month" practice.

**E.     CA Defends Against Wyly's Proxy Contests**

47.     In June 2001, I received notice that Wyly and another CA shareholder, Ranger Governance, Ltd. ("Ranger"), had initiated a shareholder proxy contest seeking to replace me and all of the other CA Board members.  Subsequently, Wyly and Ranger sought to replace Wang and three other Board members.  In August of 2001, I attended the CA shareholder meeting where CA's shareholders voted to retain the entire Board, defeating the proxy bid.

11

48. In response to Wyly's proxy effort, CA's Board had engaged the law firm of Wachtell, Lipton, Rosen & Katz ("WLRK"). WLRK, on behalf of the Company, brought a suit against Wyly and Ranger. Thereafter, I was named in an individual capacity in a third-party complaint filed by Wyly and Ranger. Wyly and Ranger initiated a second proxy fight in June 2002. We settled the pending proxy litigation, in July 2002. With Wang's and the Board's blessing, CA agreed to a settlement with Wyly to resolve the second proxy contest.

49. During this time, I publicly defended CA's New Business Model and stayed away from discussing the historical accounting practices at CA because I did not want the issue of the 35-Day Month to come up, even though I had ended the 35-Day Month practice in October 2000 after I became the CEO.

50. When the New Business Model was adopted in October 2000, many on the Board, including Artzt, Ranieri, D'Amato and Willem de Vogel ("de Vogel"), knew of our practice of booking revenue for a few days past quarter end.

51. In early 2002, Stephen Perkins of Ranger visited CA's Islandia offices, and shortly after the visit, Ranger wrote to the Board asking for a change in CA's top management. Attached hereto as Exhibit E is a true and correct copy of that letter.

52. The Board discussed how to respond to the Ranger letter.

53. It was suggested by Wang and WLRK that CA's "Independent Directors" ought to respond to Ranger's letter. Thus, in response to Ranger's letter, on April 11, 2002, CA's "Independent Directors" wrote to Ranger stating that Ranger's "attacks on CA's accounting practices are unjustified. We have reviewed CA's accounting practices and have satisfied ourselves—as has KPMG, the Company's auditors—that CA's accounting is appropriate and

12

transparent." This statement, which CA published in a subsequent SEC filing, I believe related solely to the New Business Model.

54.     The Independent Directors did not, themselves, each review CA's accounting. Instead, Walter P. Schuetze ("Schuetze") and a few other Board members reviewed the accounting methodology relating to the New Business Model. Based upon my knowledge, they did not investigate CA's past accounting.

55.     Some of the Directors knew that some of CA's historical accounting and public disclosures may not have been fully accurate. CA's disclosure in its 10-K for fiscal year 2001 reported anew CA's past financials for fiscal years 1998, 1999 and 2000 because of a revenue reclassification issue. In this disclosure, CA recalculated its past financials according to the New Business Model's methodology to provide a means of comparison to CA's then current disclosures, which, for the first time, were reported under the New Business Model. To my knowledge, CA did not correct these numbers to account for any effect of the 35-Day Month practice before applying the New Business Model methodology and reporting these numbers in its 10-K.

**F.     The Class Actions And Government Investigation.**

56.     In July and August of 1998, numerous class action and derivative lawsuits were filed against me, CA and certain of its executives, officers and directors (the directors, "Board Members"). These lawsuits alleged violations of securities laws and accounting improprieties at CA.

57.     In 2002 and 2003, additional class action and derivative lawsuits were filed against me, CA and others (together the class and derivative actions filed in 1998, 2002 and 2003, the "Actions").

13

58.    Similarly, starting in 2002, the United States Attorney's Office for the Eastern District of New York and the Securities Exchange Commission began an investigation of CA.

59.    I maintained documents related to my work at CA on my computer and in other locations in my office at CA. I remember that I was asked to collect documents relating to certain topics at the time of the Actions. At the time, I reviewed my files in and around my desk in my office and collected documents. No one else reviewed my office files for documents. I also printed out documents from my computer and put those printouts together with copies of other documents from my office files in a glossy bright yellow file folder. A few weeks later, CA's general counsel, Steven Woghin, picked up the folder from my office. Prior to sometime in 2003, other than the documents I provided in the yellow file folder, I was not personally asked to provide any other documents to defense counsel or to CA's legal department in connection with the Actions.

60.    Later, in 2003, I was asked for documents with respect to certain transactions related to specific customers and "quarter end" issues. All of the information that I turned over in response to these requests came from documents in my possession or the CA corporate files.

## G.    CA Board Members With Knowledge Of CA's Improper Accounting Practices.

61.    As discussed below, I know that many of CA's Board Members were aware, to varying degrees, of the 35-Day Month practice at CA.

### 1.    Willem de Vogel

62.    I know that de Vogel was aware of the practice that has become known as the 35-Day Month at CA during his tenure on the CA Board. For example, based on my conversations with de Vogel and other CA Board Members and executives, I know de Vogel would call up CA executives three to five days after the quarter's end to inquire, "how are we doing?" or "how do the numbers look?" to determine how CA was progressing in the final days of the

14

770337_6

"quarter" (as CA defined its quarters). De Vogel would call at the end of the flash period because it was common knowledge that we often finalized contracts through the fifth day after the end of the month, instead of the last calendar day of the month.

63.   I recall that de Vogel twice served as a member of CA's Board, the second tenure beginning in 1991, and continuing until August, 2002, during which time de Vogel served as a member of the Audit Committee. When he was a Board Member, de Vogel understood CA's accounting practices, including the 35-Day Month. De Vogel would often discuss CA's financials at Board meetings and elsewhere in my presence. I often heard de Vogel discussing accounting issues with CA's Chief Financial Officer, Schwartz, and later, Schwartz's successor, Zar.

## 2.   Lewis Ranieri

64.   I know Ranieri was aware of the accounting practice known as the 35-Day Month. I know this because Ranieri and I discussed this issue during the Government investigation. In addition, in April 2003, I told Ranieri that a former joint venture partner was attempting to blackmail CA. The former partner was involved in transactions with EMS, a CA customer. I told Ranieri about the fact that the former partner had threatened to go to the media about the EMS transactions. Ranieri advised me that I should put the past "behind me." I understood Ranieri to mean that I should fix the problem at all costs.

65.   Earlier, in 2001, D'Amato recommended to me that the Board should invite Ranieri to become a member. At that time, I did not know who Ranieri was but around the time he joined the Board on June 26, 2001, I met him for the very first time in my capacity as CEO. Later, at my suggestion, the Board appointed Ranieri as Lead Independent Director, a position he held from May 14, 2002 until April 20, 2004. Ranieri also served on the Audit Committee

15

from January 21, 2003, until April 20, 2004.  When I stepped down as Chairman of the CA Board, Ranieri replaced me.

66.   I also know Ranieri was not totally forthcoming in disclosing what he and the Board knew or learned of the 35-Day Month practice.  I know this because Ranieri told me that in order to put CA's past behind the Company, it would be best to keep certain Board members in the dark about some aspects of the 35-Day Month practice.  Specifically, Ranieri instructed me not to divulge the full extent of the 35-Day Month practice to Schuetze, the Chair of the Audit Committee.  I know that Ranieri also instructed another CA executive not to divulge the full extent of the 35-Day Month practice to Schuetze.

67.   Ranieri often joked with me by saying that "Schuetze would have a heart attack" if he knew about the 35-Day Month issue.  As discussed below, at that time, Schuetze did not know the full extent of the problems with CA's 35-Day Month practice.  Ranieri specifically instructed me that Schuetze, a former SEC accountant, would "turn on us" if he found out about CA's historical 35-Day Month issue.

68.   Ranieri was involved in the drafting of the CA press release, issued on October 8, 2003 (the "October 8 Press Release").  I know this because Ranieri, the lawyers, some Board members, CA's Public Relations Department, and I worked together to finalize the October 8 Press Release.  Attached hereto as Exhibit F is a true and correct copy of the October 8 Press Release.

69.   I received the first draft of the October 8 Press Release sometime after Ranieri and the Audit Committee instructed me to ask Zar for his resignation.  After the lawyers circulated the draft, CA's Public Relations Chief called me to tell me that, in his opinion, the

16

draft could not be published in its then current form because it would cause confusion if it did not clearly indicate that there would be no change in leadership of CA after Zar resigned.

70.   The Public Relations Chief asked me if I was to remain in control of the Company. I stated "yes" and told him to confirm that fact with Ranieri. Ranieri told both the Public Relations person and myself, that, yes, I would remain in charge of CA.   I then asked the Public Relations Department to work with Ranieri and the lawyers to edit the October 8 Press Release. In addition to Schuetze's portion of the draft release, a new section was added which stated that CA's Corporate Governance was the "gold standard" and that, notwithstanding the disclosure of what appeared to be accounting issues at the Company, CA's Board was independent and that its "decisive action" resulted in the discovery of the disclosed accounting issues.

71.   I knew that some Board members and I knew that the release was not complete in its disclosure or the 35-Day Month practice.

72.   In fact, Ranieri told me that he regretted having to "spill the blood" of Zar but that it was necessary in order to protect the rest of the CA "family."

### 3.   Alfonse D'Amato

73.   I know D'Amato was aware of the practice at CA of starting and ending the quarters late. He was also aware of Wang's participation in those practices. In fact, D'Amato told me on more than one occasion that it was best not to discuss Wang's involvement. Wang told me that he had asked D'Amato to help resolve the Government investigations.

74.   In connection with D'Amato's attempt to bring about a resolution of the Government investigations, D'Amato asked me to provide him with a brief written account of why CA was a good company and should not be indicted.   When he made this request,

17

770337_6

Exhibit 2

D'Amato warned me, "Don't piss on the past." The phrase "Don't piss on the past" was D'Amato's standard phrase for instructing me not to implicate Wang.

75. Earlier, in 1999, Wang told me that he had asked D'Amato to be on CA's Board.

76. I know that D'Amato and Wang were friends. Sometime in late 2005 or early 2006, I was surprised to learn that, for several years during D'Amato's tenure on the Board and Audit Committee, D'Amato received payments directed by Wang and paid through The Smile Train, a charitable organization, to D'Amato's consulting firm, Park Strategies LLP.

77. In 1998 Wang told me and others that he had engaged D'Amato as a consultant for CA before D'Amato became a Board member. Once D'Amato joined CA's Board in 1999, Schwartz told me that CA could not continue to pay consulting fees to D'Amato. When I informed Wang what Schwartz had said, Wang stated that he would "take care of it." I initially assumed Wang meant that he would tell D'Amato that CA had to discontinue paying D'Amato's fees. After I understood in 2005 or 2006 about the Smile Train payments discussed above, I came to understand that Wang really meant at the time that he would "take care of it" by paying D'Amato indirectly through a charity he co-founded, The Smile Train.

78. I came to understand this as a result of a communication I received in late 2005 or early 2006 from an anonymous source. This source suggested I review public records of companies controlled by or influenced by Wang. Eventually, I came upon the public records of Smile Train and, according to my understanding of papers filed by Smile Train with the Internal Revenue Service, it appears that the charity paid D'Amato approximately $390,000 from 1999 through 2003. Attached hereto as Exhibit G are true and correct copies of Internal Revenue Service filings demonstrating payments from Smile Train to Park Strategies, LLP.

18

79.     I also know that D'Amato and Ranieri were extremely close, so close in fact that Ranieri allowed D'Amato to use office space in Ranieri's offices. D'Amato told me he was close to Ranieri when D'Amato recommended Ranieri to the CA Board. In addition, when I was CEO, I went to Ranieri's office and met with Ranieri. While there, I had to take a phone call. Ranieri's secretary instructed me to use "Al's office" and directed me to an office close to Ranieri's office in which D'Amato worked.

80.     I also know that D'Amato was very close to Shirley Strum Kenny ("Kenny").

**4.     Russell Artzt**

81.     I know Artzt, a co-founder of CA with Wang in 1976 and a member of the CA Board from 1980 until 2005, knew about the fraud at the Company and actively participated in concealing CA's improper accounting practices from the public, plaintiffs in the Actions, the Government and other Board Members. In reality every Senior Executive and most every employee in sales and finance knew of this 35-Day Month practice.

82.     I know this because, over the course of numerous conversations, Artzt and I discussed the Government investigation and the 35-Day Month practice. In one conversation, Artzt told me that he questioned whether I should implicate Wang when asked by the Government about CA's accounting practices. By the end of the conversation, however, Artzt thought it was best not to disclose the 35-Day Month practice or Wang's involvement. Artzt told me to remain silent because he thought that D'Amato would "get this fixed."

83.     From early in my career at CA, I understood that Artzt was well aware of the 35-Day Month. I know this because Artzt often assisted CA's Sales teams during post-quarter negotiations and played an instrumental role in persuading a number of CA customers to sign license agreements after the close of the quarter in which the revenue associated with the agreement would be recognized. I know, based on my conversations with Artzt, that Artzt

19

770337_6

knew that CA would recognize the revenue associated with these post-quarter license agreements in the previous quarter in order to meet CA's Wall Street estimates.

84.   I told the SLC of Artzt's involvement with the 35-Day Month practice and how Ranieri went out of his way to protect Artzt.

### 5.   Charles Wang

85.   Wang was not only aware of the accounting improprieties such as the 35-Day Month, he also actively participated in concealing those improper accounting practices from the public, plaintiffs in the Actions, the Government and certain Board Members.  Wang knew that CA's quarters were "open" for five days into the next month per his directive and he sometimes instructed CA to keep CA's books "open" after the usual "five days" to execute license agreements and to recognize revenue from those agreements in the previously ended quarters.

86.   Wang and I were very close personally and professionally.  We discussed virtually every aspect of the business weekly, if not daily.  The relationship with Wang went downhill by the end of 2000 because Wang did not like the New Business Model, its success or the accolades that I received for putting it into place, and was regretting giving up the CEO title.  It culminated in Wang firing me over breakfast around late November 2001. He told me the Board backed him and supported his decision to fire me.  I agreed to leave CA and hand the CEO job back to Wang.  A few days later, I learned that Wang had lied to me and the Board knew nothing about any of this.  Soon after, an emergency Board Meeting was convened, and in the end I agreed to stay as CEO at the Board's request.  Our relationship improved for a time, but by the late summer of 2002 it got bad again. Wang resigned from the Board in November, 2002.

87.   I know that Wang participated in or directed two "wash transactions," which had no economic substance: the Consortio and EMS transactions.  The revenue associated with

20

these transactions was recognized in the third and fourth quarters of fiscal year 2000. Attached hereto as Exhibits H and I, are true and correct copies of the Government's Memorandum In Aid of Sentencing and notes from an FBI interview with the founder of Consortio submitted as evidence by the Government during my sentencing.

88.     Given the importance of "making our numbers" during that time period, I kept Wang closely apprised of CA's dealings with Consortio. As a matter of fact, it was Wang who first fostered a relationship with Ray Cheng, the CEO of Consortio, at the executive level from CA. The license agreement with Consortio had a face value of approximately $44.5 million dollars. Based on the license agreement with Consortio, CA recognized approximately $34 million dollars, the GAAP value of the transaction.

89.     At my sentencing hearing the Government identified the EMS transaction as an improper "wash transaction" with no economic substance. Attached hereto as Exhibit J are true and correct copies of email strings discussing the EMS transactions submitted as evidence by the Government during my sentencing.

90.     In calendar year 2002, former EMS employees involved in these transactions contacted CA and attempted to blackmail CA. In essence, these former EMS employees threatened to disclose the transaction between CA and EMS to the news media, entered into purposefully to create an appearance of economic substance when in fact, there was no economic substance to the transaction. Because the original transactions were supervised by Wang, I sought Wang's guidance as to our response to the threats of blackmail. Attached hereto as Exhibit K is a true and correct copy of an email in which Wang, via his executive assistant, directed me not to do anything until I received further instruction from him. Ultimately, Wang suggested that we "resolve" the matter directly with EMS's CEO.

21

91.    Wang participated in obstructing justice during the Government investigations. I know that D'Amato and others gave Wang updates on the Government investigations. In discussions with myself and other CA executives, Wang insisted that CA stonewall the Government, explaining that, if CA did so, the investigation would eventually "go away." Pursuant to these orders, I know that Wang's loyalists, including myself, obstructed the Government investigation, by delaying the disclosure of information, and withheld from the Government information that would have disclosed the improper accounting practices at CA. I also understood from CA's lawyers that like me, Wang was interviewed by the Government. He was also interviewed by the Audit Committee's lawyers. I understood from CA's lawyers that Wang denied knowledge of or any involvement in the 35 Day Month practice to both the Government and to CA's lawyers.

**H.    CA's Response To The Government Investigations**

92.    I know that CA's response to the Government investigations was driven by a desire to disclose just enough to reach a settlement. D'Amato and Ranieri each told me that they were pushing to obtain commitments from the Government regarding an acceptable way to resolve the investigation. They each acknowledged to me on many occasions that the Government's investigation, if allowed to continue without a settlement, would potentially destroy CA.

93.    At a Board meeting on July 2, 2003, WLRK reported to me and the rest of the Board that the Government had demanded that CA conduct an independent internal investigation. I agreed that an investigation was needed, thinking that such an investigation might expose the historical problems at the Company without me having to point the finger to the past, but would not result in any criminal proceedings. Accordingly, I recommended and the Board authorized the Audit Committee to conduct an "independent" internal investigation.

22

770337_6

As discussed above, I knew that two of the three members of the Audit Committee, Ranieri and D'Amato, were already generally aware of the Company's 35-Day Month issue and were committed to assisting the Company in minimizing the damage to the Company.

94.    I was nominally involved in the Audit Committee's decision to hire Robert J. Giuffra, Jr. ("Giuffra") of Sullivan & Cromwell ("S&C") to conduct the "independent internal investigation." Schuetze, who lived in Texas, asked me to interview law firms, in New York, to assist the Audit Committee and give Schuetze a recommendation. However, within hours, D'Amato called me and said, "I got your man."

95.    D'Amato made it clear that I should recommend Giuffra. I knew of Giuffra through D'Amato because I was told that he represented D'Amato's brother, Armand, in a case in which Armand's criminal conviction was ultimately overturned. D'Amato told me on many occasions that after Giuffra helped Armand, they were like family. D'Amato told me that, "Bob will call you."

96.    I have personal knowledge that Giuffra undertook conducting CA's defense against the Government investigation to minimize the investigation's depth and any damage that might be done to D'Amato, Ranieri and Wang. At one point, Giuffra told me that he understood "what the game is" and that he would do whatever he could to arrange a settlement with the Government.

97.    From the first of my conversations with Giuffra, he acted like he already had the job. Regardless, I felt it best to make Giuffra go through the motions. When he arrived at our offices, I spoke with him for approximately thirty minutes. After thirty minutes, I asked CA's general counsel, Woghin, to continue and finish the interview with Giuffra.

23

98.  Almost immediately, the lawyers from WLRK complained to me and others that they were upset about the process in which they appeared to be replaced by S&C. Indeed, I watched S&C immediately begin taking the reins of CA's defense away from WLRK. As a result, I witnessed a tremendous amount of infighting between the two law firms.

99.  By this time, Marty Lipton and John Savarese ("Savarese") of WLRK had informed me and others, including the Board, that they knew there were some "late" contracts for which revenue had been included in earnings reports possibly incorrectly. Nonetheless, WLRK told me that the SEC would likely treat it as a "books and records" issue.

## I.  The Misleading October 8 Press Release

100.  The October 8 Press Release was issued after the Audit Committee interviewed Zar. Schuetze realized that the 35-Day Month practice was more extensive than he was led to believe. The Board and the lawyers wanted to issue a release but the end result was that the release tried to paint a picture of the problem that could still allow CA to settle with the Government.

101.  I know that the October 8 Press Release minimized the magnitude of the 35-Day Month practice at CA and the extent of the involvement by sales, finance and senior management employees, as well as the knowledge by some CA Board Members of those practices at the Company. I know that D'Amato and Ranieri, as well as Wang, Artzt and others at this time, knew that the 35-Day Month practice was part of CA's past and--unless the revenue from contracts excluded from the beginning of the quarter (and included in the previous quarter) was approximately the same amount as the revenue included after the close of that quarter from contracts closed after the quarter end—resulted in CA reporting incorrect revenue figures meeting Wall Street's consensus estimates.

24

102. I know that the reasons for terminating Zar and other CA employees stated in October 8 Press Release were not complete. I know that the Press Release reported that Zar, CA's CFO, was not considered to have actively participated in any wrongdoing but was merely responsible for overseeing CA's financial reporting during the relevant period. I know this was false because it was clear by that time that Zar had participated in the improper accounting at the Company.

103. For example, I know that the Audit Committee offered to interview Zar and provide a summary of the interview to the Government. After the interview, Ranieri, D'Amato and Giuffra told me that Schuetze had been asking probing questions for which Zar had no answer but that Ranieri and D'Amato had tried on numerous occasions to ask questions that might put Zar in a better light. Ultimately, Ranieri told me that Zar provided inconsistent explanations or no explanations at all for some of the issues raised by Schuetze. As a result, Schuetze was pushing the Audit Committee to fire him. Further, Ranieri told me he felt bad for having to "turn" on Zar. Ranieri told me that Zar had "done the right thing" and as a result, Ranieri would try to help Zar get a new job and ensure that CA would give him a severance package. Accordingly, I know that, as of October 3, 2003, CA's lawyers, management and Board Members knew that Zar, CA's CFO, had participated in the fraud.

104. As discussed above, I know that during the drafting of the Press Release, WLRK, S&C and the Audit Committee already knew of many late contracts, some of which were significant in terms of size, and that CA's CFO was implicated in the fraud.

## J.    The October 20 Board Dinner

105. On October 20, 2003, a regularly scheduled dinner of the Board and senior management took place at the 21 Club in New York City in a private room upstairs. I attended

25

the dinner with the then-current Board Members, including, among others, Ranieri and D'Amato.

106. Before the dinner, I stood with Ranieri and others (including D'Amato and Richards) by the bar, that was setup in the room, discussing, among other things, the status of the Government investigation. Ranieri said, as he had to me time and again, that he had been through Government investigations before and, in his opinion, CA had to "play hard-ball" with the Government. From past conversations, I know, and it was obvious to all that by "hard-ball," Ranieri meant for us to stonewall in order to force the Government to conclude its investigation and settle with CA.

107. As the discussion continued, Richards, CA's Head of Worldwide Sales, walked outside of the room into the restaurant's hallway with Ranieri. I caught up with them after and joined in a discussion that was taking place in the hallway outside the room—and outside of the earshot of the others (the "Discussion").

108. In the Discussion, Richards raised the following thoughts to Ranieri in my presence. Richards told Ranieri that:

      a)      he was concerned because he was required to meet with the SEC in a matter of days;

      b)      he would have to rely on his Fifth Amendment Right against self-incrimination and not speak to the SEC; and

      c)      if he spoke to the SEC and told the truth about Wang and the historical 35-Day Month practice, the SEC would discover the full extent of the 35-Day Month practice.

109. Ranieri was clearly concerned at the prospect of Richards opening up to the SEC and ruining chances of a prompt settlement with the SEC. Ranieri told Richards that:

26

a) as long as he was in the Company, Ranieri would protect him;

b) if Richards took the "Fifth," because Richards was an "executive officer," the Board would be forced to fire him; and

c) if Richards went into the interview and the SEC reported back to the Audit Committee that Richards had participated in the 35-Day Month practice, the Board would be forced to fire him.

110.   In sum, Ranieri presented Richards with only two options—go into the SEC interview and not discuss the 35-Day Month or, if asked directly about the 35-Day Month, lie. In fact, when Richards asked Ranieri, in substance, "what am I supposed to do, tell them Charles started all this and that this was the way it was when I got here?" Ranieri answered him directly that he should not delve into the past or Wang because doing so would make it impossible to "end this thing." Ranieri told Richards not to worry because he and D'Amato would "make this thing go away", if everyone "stuck together."

111.   I have no doubt that Richards had the same understanding of Ranieri's instructions as I had. Richards has since pled guilty to, among other things, obstruction of justice and perjury charges based upon his testimony to the SEC.

**K.   Conclusion**

112.   Before August 2007, I had not met with or discussed the matters contained herein with lawyers at Bickel & Brewer.

113.   In addition, due to the constraints of my incarceration, I have not been able to meet with lawyers for Bickel & Brewer for longer than three hours at a time every month or so. As a result, we were not able to finalize this declaration before August 2008.

114.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2008

Sanjay Kumar

27

770337_6

Page 35 of 84                           Exhibit 2

# Exhibit 3

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

EOC:DBP/ERK
F.#2004r02093
CA.DPAgt.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - against -               Cr. No. 04-837 (ILG)

COMPUTER ASSOCIATES
INTERNATIONAL, INC.,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFERRED PROSECUTION AGREEMENT

The defendant COMPUTER ASSOCIATES INTERNATIONAL, INC.

("CA"), by its undersigned attorneys, pursuant to authority granted by its Board of

Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit

A), and the United States Attorney's Office for the Eastern District of New York (the

"Office"), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

Except as specifically provided below, and in accordance with the provisions specified in

paragraphs 22 and 24 below, this Agreement shall be in effect for a period of 18 months.

<u>Information</u>

     1.     The United States will file an Information in the United States

District Court for the Eastern District of New York charging CA with (a) securities fraud

in violation of Title 15, United States Code, Section 78j(b) (Count 1), and (b) obstruction

of justice in violation of Title 18, United States Code, Section 1512(c)(2) (Count 2) (the

"Information").

2

Acknowledgment of Violation of Law and Acceptance of Responsibility

2.      CA accepts and acknowledges that, as set forth in detail in the

Information (a copy of which is attached hereto as Exhibit B) and the Stipulation of Facts

(attached hereto as Exhibit C), both of which are incorporated herein by reference,

through the conduct of certain CA executives, officers and employees during the relevant

time period, CA:

(a)      filed and caused to be filed for certain of CA's fiscal

periods materially false and misleading financial reports and other documents with the

Securities and Exchange Commission (the "SEC"), and made other materially false and

misleading public statements and omissions, in connection with the purchase and sale of

CA securities, relating to improper accounting practices employed at CA involving the

accelerated recognition of revenues associated with multiple backdated software license

agreements; and

(b)      obstructed an investigation being conducted by a grand jury

sitting in the Eastern District of New York, with the assistance of the Federal Bureau of

Investigation (the "FBI"), involving accounting and financial fraud at CA (the "Grand

Jury Investigation"), and an investigation being conducted by the SEC involving

accounting and financial fraud at CA (the "SEC Investigation").

3.      CA accepts and acknowledges full responsibility for the conduct

set forth in the Information and in the Stipulation of Facts by entering into this

Agreement and by, among other things: (a) the remedial actions that CA has taken to date

(described in paragraph 4 below); (b) CA's continuing commitment of full cooperation

with the Office, the FBI and the SEC (collectively, the "Investigative Entities"); (c) CA's

agreement to fulfill all of the undertakings CA has made in this Agreement, including to

177

3

pay $225,000,000 in restitution to compensate former and current CA shareholders for losses caused by the conduct set forth in the Information and the Stipulation of Facts; (d) CA's agreement to comply in the future with Federal criminal laws, including Federal securities laws; and (e) CA's issuance of up to 5.7 million shares of CA Common Stock and payment of cash, at a total cost to CA to date of approximately $163 million, to compensate present and former CA shareholders in connection with the following cases brought in the United States District Court for the Eastern District of New York, In re Computer Associates Class Action Securities Litigation, 98 Civ. 4839 (TCP), In re Computer Associates 2002 Class Action Securities Litigation, 02 Civ. 1226 (TCP), Ambler v. Computer Associates, 02 Civ. 6281 (TCP), and Federman v. Artzt, et. al, 03 Civ. 4199 (TCP).

4.       CA represents that its Board of Directors and current senior management have taken numerous remedial actions in response to the misconduct at CA that has been discovered by the Grand Jury Investigation, the SEC Investigation and an internal investigation conducted by CA (described in paragraph 5 below). These remedial actions have included:

(a)      terminating CA officers and employees who were responsible for the improper accounting, inaccurate financial reporting, and obstruction of justice set forth in the Information and Stipulation of Facts;

(b)      terminating CA officers and employees who refused to cooperate with CA's internal investigation or who otherwise took steps to obstruct or impede that investigation; and

4

(c)      appointing new management, including, but not limited to, an Interim Chief Executive Officer, a new Chief Operating and Chief Financial Officer, a new Head of Worldwide Sales, and a new General Counsel.

<u>Continuing Obligation of Cooperation</u>

5.       In late-July 2003, CA, through its Audit Committee, retained the law firm of Sullivan & Cromwell LLP ("S&C") to conduct an internal investigation into CA's accounting and financial practices.  In December 2003, CA's internal investigation was expanded to include an inquiry into whether any of CA's officers and employees obstructed or failed to cooperate with the Grand Jury Investigation and the SEC Investigation.  CA's internal investigation was conducted with the assistance of a forensic accounting team from PricewaterhouseCoopers ("PwC") and involved more than 100 interviews and the review of hundreds of thousands of pages of documents and e-mails. CA has shared with the Investigative Entities the results of its internal investigation, including documents that might otherwise have been withheld under the attorney-client privilege and the work-product doctrine.  CA acknowledges and understands that its prior, ongoing and future cooperation are important and material factors underlying the Office's decision to enter into this Agreement, and, therefore, CA agrees to continue to cooperate fully and actively with the Investigative Entities and with any other agency of the government designated by the Office ("Designated Agencies") regarding any matter about which CA has knowledge or information.

6.       During the term of this Agreement, CA agrees that its continuing cooperation shall include, but not be limited to, the following:

(a)      Completely and truthfully disclosing all information in its possession to the Investigative Entities about which the Investigative Entities may

Exhibit 3      179

5

inquire, including but not limited to all information about activities of CA, present and former members of CA's Board of Directors, and CA's officers, employees, and agents;

(b)     Assembling, organizing and providing all documents, records, and other evidence in CA's possession, custody, or control as reasonably may be requested by any of the Investigative Entities or Designated Agencies;

(c)     Not asserting, in relation to the Investigative Entities, any claims of attorney-client privilege or attorney work-product doctrine as to any documents, records, information or testimony requested by the Investigative Entities related to: (i) factual internal investigations concerning the conduct set forth in the Information and the Stipulation of Facts; or (ii) legal advice given contemporaneously with, and related to, such conduct. Such materials are referred to hereinafter as the "Confidential Materials." By producing the Confidential Materials pursuant to this Agreement, CA does not intend to waive the protection of the attorney-client privilege or the attorney work-product protection, or any other privilege applicable, as to third parties. The Investigative Entities will maintain the confidentiality of the Confidential Materials pursuant to this Agreement and will not disclose them to any third party, except to the extent that any Investigative Entity determines, in its sole discretion, that disclosure is otherwise required by law or would be in furtherance of the discharge of its duties and responsibilities.

(d)     Using its reasonable best efforts to make available its present and former officers and employees to provide information and/or testimony as requested by the Investigative Entities or any of the Designated Agencies, including sworn testimony before a grand jury or in court proceedings, as well as interviews with

180

Exhibit 3

6

law enforcement authorities.  Cooperation under this paragraph shall include identification of witnesses who, to CA's knowledge and information, may have material information concerning the conduct set forth in the Information and the Stipulation of Facts.

        (e)      Providing testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Investigative Entities or any of the Designated Agencies, including information and testimony concerning the conduct set forth in the Information and Stipulation of Facts.

        (f)      With respect to any information, testimony, documents, records or physical evidence provided by CA to the Investigative Entities, any of the Designated Agencies or a grand jury, other than Confidential Materials, CA consents to any and all disclosures of such materials to such Designated Agencies as the Office, in its sole discretion, deems appropriate.  With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, CA further consents to:  (i) any order sought by the Office permitting such disclosures; and (ii) the Office's ex parte or in camera application for such orders; and

        (g)      Providing active assistance, including assistance by S&C and PwC, in connection with any investigation, criminal prosecution, civil trial or other legal proceeding brought by the Investigative Entities, including any proceeding seeking to obtain disgorgement (or other similar relief) of compensation (including compensation received pursuant to any CA stock option or similar plan) from any present or former CA

officer or employee.  CA and its Board of Directors will fully support efforts by the

Investigative Entities to obtain disgorgement of compensation from any present or former

CA officer or employee who engaged in any improper conduct while employed at CA.

To the extent permitted by applicable law, CA may be entitled to apply as a victim, on

behalf of itself and/or its present or former shareholders, for an award of some or all of

the amount of any such disgorged compensation obtained by the Investigative Agencies

from such present and former CA officers or employees.

      7.     CA agrees that, following the expiration of this Agreement as

specified in paragraph 24 below, CA will continue to fulfill the cooperation obligations

set forth in paragraph 6 above in connection with any investigation, criminal prosecution

or civil proceeding brought by any of the Investigative Entities relating to or arising out

of the conduct set forth in the Information and the Stipulation of Facts.  CA's obligation

to cooperate is not intended to apply in the event that CA is a defendant in any such

proceeding.

### Payment of Restitution to CA Shareholders

      8.     In addition to CA's payment of compensation to current and

former CA shareholders in connection with the civil litigation described in paragraph 3

above, CA agrees to pay an additional $225,000,000 for purposes of restitution to current

and former CA shareholders who suffered losses because of the conduct of certain former

CA officers and employees set forth in the Information and Stipulation of Facts,

according to the following schedule: $75,000,000 within 30 days of the date of approval

by the Court of this Agreement to defer prosecution, as specified in paragraph 23 below;

$75,000,000 within one year of the date of the Court's approval of this Agreement to

defer prosecution; and $75,000,000 within 18 months of the Court's approval of this

8

Agreement to defer prosecution. The monies paid by CA in accordance with this paragraph shall constitute the "Restitution Fund." In the event that the Restitution Plan (defined in paragraph 11 below) has not been approved by the Court by the date of the first payment specified above to the Restitution Fund, CA shall deposit such funds in an interest-bearing account at a financial institution under terms approved by the Office.

9.     CA agrees that it will not, in connection with the monies it pays into the Restitution Fund, seek, obtain or accept any reimbursement or other payments or credits from any insurer of CA or of any of its divisions or subsidiaries.

10.     CA agrees to retain and to compensate an individual or entity to administer the distribution of the proceeds of the Restitution Fund to current and former CA shareholders (the "Fund Administrator"). The Fund Administrator's compensation will not be paid out of the Restitution Fund. CA will ensure, as a condition of retention, that the Fund Administrator agree to abide by all the terms and conditions set forth in this Agreement. The identity and terms of retention and compensation of the Fund Administrator must be approved by the Office. Within 30 days of the date of execution of this Agreement, CA will submit to the Office a proposal setting forth the identity and terms of retention and compensation of the Fund Administrator. The Office will approve or disapprove the proposed Fund Administrator within 15 days of its receipt of a proposal. If the Office disapproves the proposed Fund Administrator, CA will, within 30 days of receipt of notice of such disapproval, submit a revised proposal, which the Office will approve or disapprove within 15 days. The procedure set forth in this paragraph will continue, as necessary, until such time as the Office approves a proposed Fund Administrator.

183

9

11.     Within six months of the retention of the approved Fund Administrator, the Fund Administrator will prepare and submit to the Office a plan (the "Restitution Plan") setting forth the procedures governing the activities of the Fund Administrator, including but not limited to (a) the procedures by which present and former CA shareholders injured by the conduct set forth in the Information and Stipulation of Facts will be identified, and (b) the procedures by which the financial losses of such CA shareholders will be determined and restitution for such losses will be paid. In connection with the preparation of the Restitution Plan, CA shall assist and cooperate with the Fund Administrator. Because the restitution paid pursuant to this Agreement is not ordered as part of a judgment of conviction, the provisions of 18 U.S.C. §§ 3663 et seq. are inapplicable. The Restitution Plan must be approved by the Office and the Court. The Office will approve or disapprove the Restitution Plan within 30 days of its receipt. If the Office disapproves the proposed plan, the Fund Administrator will, within 30 days of receipt of notice of such disapproval, submit a revised plan, which the Office will approve or disapprove within 30 days.   This process will continue, as necessary, until a plan is approved by the Office. Then, the Office and CA will jointly submit the approved Restitution Plan to the Court for its approval. If the Court rejects the approved Restitution Plan, the procedure set forth in this paragraph will be repeated until such time as the Court approves a Restitution Plan.

Corporate Reforms

12.     CA agrees to add new independent directors to its Board of Directors and to undertake corporate governance reforms such that, by December 31, 2005, CA will have:

Exhibit 3   184

10

       (a)      in addition to former SEC Commissioner Laura Unger, added a minimum of two new independent directors to CA's Board of Directors, so that no less than two-thirds of the members of CA's Board of Directors will be independent directors;

       (b)      established a Compliance Committee of the Board of Directors (the "Compliance Committee"), either as a separate committee or as part of a reconstituted Corporate Governance and Compliance Committee or Audit and Compliance Committee, to examine CA's Internal Audit Department and the compliance functions within CA's Legal and Finance Departments, including compliance with all of the terms and conditions of this Agreement;

       (c)      established a new Disclosure Committee composed of the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Compliance Officer, Chief Accounting Officer and General Counsel that meets and confers, under the direction of a duly elected chairperson, prior to significant filings with the SEC and the issuance of significant press releases; and

       (d)      established enhanced corporate governance procedures providing for improved shareholder, community and governmental communications with CA and its Board of Directors. Such measures will include: (i) inclusion of a report of the Compliance Committee on CA's website and in each annual proxy statement mailed to CA shareholders during the term of this Agreement describing CA's efforts to comply with this Agreement and to implement the recommendations of the Independent Examiner (described below) regarding best-in-class corporate compliance and ethics programs; and (ii) adoption of procedures to ensure that all inquiries raised by

Exhibit 3    185

11

government entities, or by CA shareholders, customers, suppliers and employees, regarding compliance and ethics matters receive prompt review, including reporting of such matters, as appropriate, to the Compliance Committee and, where appropriate, the full Board of Directors.

13.     By December 31, 2005, CA agrees to:  (a) establish new comprehensive records management policies and procedures, as well as testing programs to ensure compliance therewith, and (b) take steps to implement best practices with respect to the recognition of software license revenue, including enhanced quarter-end contract cut-off procedures, both subject to the review of the Independent Examiner.

14.     CA agrees to establish a comprehensive Compliance and Ethics Program such that, by December 31, 2005, CA will:

(a)     establish a comprehensive ethics and compliance training program for all CA employees designed to minimize the possibility of future violations of the Federal securities and other laws by CA;

(b)     appoint an independent, senior-level Chief Compliance Officer, after consultation with the Office, who will report directly to both the Compliance Committee and the General Counsel; and

(c) amend CA's senior executive compensation plans to add an enhanced component to CA's performance-based programs tied to the establishment and maintenance of high ethical and compliance standards throughout CA.

15.     CA agrees that, by December 31, 2005, CA will reorganize its Finance Department, including, but not limited to, the appointment of a Corporate Controller, a Chief Accounting Officer, and a Financial Controller for each of CA's

12

primary business functions -- Direct Sales, Indirect Sales, Development and Services, or their successors. The Corporate Controller and Chief Accounting Officer will report to the Chief Financial Officer but will also communicate directly, as appropriate, with the Board of Directors and CA's external auditors. CA also agrees to begin the process of implementing, by December 31, 2005, an improved worldwide financial and enterprise resource planning ("ERP") information technology system to improve controls, eliminate errors caused by existing manual processes, and enhance CA's ability to audit its own systems. CA's implementation of the ERP system will be subject to the review of the Independent Examiner (see below), and an assessment of such implementation of the ERP system will be included in the Independent Examiner's reports issued under Paragraph 19(g) of this Agreement.

16.    By December 31, 2005, CA agrees to reorganize and enhance its Internal Audit Department, including hiring at least five additional internal auditors. CA's Internal Audit Department will report to both the Audit Committee of CA's Board of Directors and CA's General Counsel.

17.    By December 31, 2005, CA agrees to establish a written plan designed to ensure the improvement and ongoing effectiveness of communications with all governmental agencies engaged in inquiries or investigations relating to CA, its subsidiaries or affiliates. The plan shall address, consider and include:

(a)    Regular reporting by CA's management and outside and internal counsel to the Compliance Committee and, as appropriate, the full Board of Directors regarding communications with government agencies engaged in inquiries or

13

investigations relating to CA, including, but not limited to, providing copies of all written
communications to and from such government agencies to the Compliance Committee;

        (b)     Complete and prompt access for government agencies to all
CA staff and management;

        (c)     Meetings with the Board of Directors or committees thereof
upon the request of such governmental agencies engaged in inquiries and investigations
of CA; and

        (d)     Training for CA personnel designed to improve
communication and cooperation with such governmental agencies engaged in inquiries
and investigations of CA.

      18.    By December 31, 2005, CA agrees (a) to enhance its current
telephone hotline to provide a means for employees anonymously to report any potential
violations of law or other misconduct, (b) to publicize within CA the existence and
purpose of the hotline, and (c) to ensure all employees that no negative action will be
taken against any employee who makes a report through the hotline.

<u>Appointment of Independent Examiner</u>

      19.    In accordance with the procedure specified in paragraph 20 below,
CA agrees to retain and compensate an independent individual or entity to examine CA's
compliance with this Agreement, to conduct a comprehensive review of the areas
specified in subparagraphs (a) to (f) below, and to make recommendations to the Board
of Directors for review and implementation, after consultation with the Office, regarding
best practices in these areas (the "Independent Examiner").  The Independent Examiner
will, in addition to examining CA's compliance with this Agreement:

14

       (a)      examine CA's practices for the recognition of software license revenue;

       (b)      examine CA's internal accounting controls (the Independent Examiner may, if appropriate, rely on CA's external accountant's report on the effectiveness of CA's internal accounting controls pursuant to Section 404 of the Sarbanes-Oxley Act);

       (c)      examine CA's implementation of an improved ERP information technology system;

       (d)      examine CA's Internal Audit Department;

       (e)      examine CA's ethics and compliance policies;

       (f)      examine CA's records management policies and procedures;

       (g)      within six months of appointment, issue a written report to the Office, the SEC and to CA's Board of Directors making recommendations regarding best practices for the areas specified in subparagraphs (a) to (f) above; and

       (h)      issue written quarterly reports to the Office, the SEC and to CA's Board of Directors on CA's compliance with this Agreement during the term of the Independent Examiner's appointment.

       20.      Within 30 days of the date of execution of this Agreement, CA will submit to the Office and the SEC a proposal setting forth the identity, qualifications, and proposed terms of retention of five candidates (either individuals or entities) to act as the Independent Examiner.  The Independent Examiner's compensation shall not be paid out of the Restitution Fund.  The Office and the SEC, within 30 days of such notice, will

Exhibit 3

189

15

jointly either (a) approve three of the candidates, or (b) require CA to propose additional candidates within 15 days. This process will continue, as necessary, until the Office and the SEC have jointly approved three candidates. Then, the Office, the SEC and CA will jointly submit the three approved candidates to the Court. The Office and the SEC may, in their discretion, make a recommendation to the Court regarding the three candidates. The Court shall select the Independent Examiner from the three approved candidates and issue an order appointing the Independent Examiner. If the Court rejects all three approved candidates, the procedure set forth in this paragraph will be repeated until such time as the Court approves an Independent Examiner. The procedures set forth in this paragraph are subject to the approval of the Court. If the Court does not approve the procedures set forth in this paragraph, the Office, the SEC and CA will agree upon a different procedure for the appointment of the Independent Examiner, and neither CA nor the Office will be relieved of any of the other terms, conditions and obligations set forth in this Agreement.

21.    CA agrees that the Independent Examiner shall have reasonable access to all of CA's books and records and the ability to meet privately with CA employees. Except in respect of communications with the Office or the SEC, the Independent Examiner shall maintain the confidentiality of any non-public business and financial information of CA. At the conclusion of the Independent Examiner's engagement, subject to the approval of the Office, the Independent Examiner shall return to CA all documents reflecting or referring to non-public business and financial information of CA.

16

22.     The Independent Examiner shall have a term of engagement of 18 months from the date of the Court's order appointing the Independent Examiner. If, at the conclusion of this 18-month period, less than all recommended reforms (to the extent deemed significant by the Office) have been substantially implemented for at least two successive quarters, or significant exceptions have been noted in the course of the Independent Examiner's most recent quarterly review under paragraph 19(h), the Office and the SEC may, in their discretion, extend the term of appointment of the Independent Examiner until such time as all recommended reforms (to the extent deemed significant by the Office) have been substantially implemented for at least two successive quarters, or no significant exceptions have been noted in the course of the Independent Examiner's most recent quarterly review. Prior to extending the term of this Agreement, the Office and the SEC will provide CA with an opportunity to be heard with respect to CA's implementation of reforms recommended by the Independent Examiner, including as to the significance of such reforms, and a reasonable opportunity to cure any exceptions noted by the Independent Examiner. Because CA's implementation of a new ERP system is projected to extend over more than 18 months from the appointment of the Independent Examiner, CA's inability to implement fully such a system shall not be a basis to extend the Independent Examiner's term or this Agreement.

<u>Deferral of Prosecution</u>

23.     In consideration of CA's remedial actions to date and its commitment to:  (a) accept and acknowledge responsibility for its conduct; (b) continue its cooperation with the Office, the SEC and any of the Designated Agencies; (c) make the payments specified in paragraphs 3 and 8 above; (d) comply with Federal criminal laws, including Federal securities laws; and (e) otherwise comply with all of the terms of

Exhibit 3   **191**

17

this Agreement, the Office shall recommend to the Court that prosecution of CA on the

Information be deferred for a period of 18 months from the date of the Court's order

appointing the Independent Examiner or until such time as the Independent Examiner's

term of engagement is completed, whichever is later.   CA shall expressly waive all rights

to a speedy trial pursuant to the Sixth Amendment of the United States Constitution,

Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b),

and any applicable Local Rules of the United States District Court for the Eastern District

of New York for the period during which this Agreement is in effect.

     24.     The Office agrees that, if CA is in compliance with all of its

obligations under this Agreement, the Office will, within 30 days of the expiration of 18

months from the date of Court's order approving the appointment of the Independent

Examiner or until such time as the Independent Examiner's term of engagement is

completed, whichever is later, seek dismissal with prejudice as to CA of the Information

filed against CA pursuant to paragraph 1 of this Agreement, and this Agreement shall

expire, except as provided in paragraph 7 above.  Except in the event of a breach of this

Agreement, the Office will bring no additional charges against CA relating to or arising

out of the matters set forth in the Information or in the Stipulation of Facts.  CA and the

Office understand that the Agreement to defer prosecution of CA must be approved by

the Court, in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court decline to

approve the Agreement to defer prosecution for any reason, both the Office and CA are

released from any obligation imposed upon them by this Agreement, and this Agreement

shall be null and void.

192

25.    It is further understood that should the Office determine that CA has deliberately given materially false, incomplete, or misleading information pursuant to this Agreement, has committed any federal crimes subsequent to the date of this Agreement, or has otherwise knowingly, intentionally and materially violated any provision of this Agreement, CA thereafter shall be subject to prosecution for any Federal criminal violation of which the Office has knowledge.  Any such prosecution may be premised on any information provided by or on behalf of CA to the Office, the FBI, the SEC or any of the Designated Agencies at any time.  Moreover, CA agrees that any such prosecution relating to the allegations in the Information that are not time-barred as of the date of this Agreement may be commenced against CA in accordance with this Agreement, notwithstanding the expiration of any applicable statute of limitations between the signing of this Agreement and the expiration of this Agreement under paragraph 24.  By this Agreement, CA expressly intends to and does waive any rights in this respect.  Such waiver is knowing, voluntary and in express reliance on the advice of CA's counsel.

26.    It is further agreed that in the event that the Office determines that CA has knowingly, intentionally and materially violated any provision of this Agreement: (a) all statements made by or on behalf of CA to the Office, the FBI, the SEC or any of the Designated Agencies, including but not limited to the Stipulation of Facts, or any testimony given by CA before a grand jury, or elsewhere, whether before or after the date of this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Office against CA; and (b) CA shall not assert any claim under the United States Constitution,

19

Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of

Evidence, or any other federal rule, that statements made by or on behalf of CA before or

after the date of this Agreement, or any leads derived therefrom, should be suppressed.

27.     CA agrees that it shall not, through its attorneys, Board of

Directors, agents, officers or employees, make any public statement, in litigation or

otherwise, contradicting its acceptance of responsibility or the allegations set forth in the

Information or Stipulation of Facts.  Any such contradictory statement by CA, its present

or future attorneys, Board of Directors, agents, officers or employees shall constitute a

breach of this Agreement and CA thereafter shall be subject to prosecution as specified in

paragraphs 23 to 26.  The decision as to whether any such contradictory statement will be

imputed to CA for the purpose of determining whether CA has breached this Agreement

shall be at the sole discretion of the Office.  Upon the Office's notifying CA of any such

contradictory statement, CA may avoid a finding of a breach of this Agreement by

publicly repudiating such statement within 72 hours after receipt of notice by the Office.

This Paragraph is not intended to apply to any statement made by any current or former

CA officer, director or employee who has been charged with a crime or other wrongdoing

by the government or an agency thereof.

28.     CA agrees that the decision whether conduct and/or statements of

any individual will be imputed to CA for the purpose of determining whether CA has

knowingly, intentionally and materially violated any provision of this Agreement shall be

in the sole discretion of the Office, provided, however, that the statements of any former

officer, director or employee of CA shall not be attributed to CA such purpose.  Should

the Office determine that CA has committed a knowing, intentional and material breach

Exhibit 3 194

20

of any provision of this Agreement, the Office shall provide written notice to CA, addressed to its General Counsel, Kenneth V. Handal, Esq., One Computer Associates Plaza, Islandia, New York 11749, and to CA's counsel, Robert J. Giuffra, Jr., Esq., Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, or to any successor that CA may designate, of the alleged breach and provide CA with a two-week period from the date of receipt of such notice in which to make a presentation to the Office, or its designee, to demonstrate that no breach has occurred, or, to the extent applicable, that the breach was not knowing, intentional or material, or has been cured. Upon request by CA, the Office may agree in writing to extend this two-week period, including to provide CA with an opportunity to cure any breach of this Agreement. The parties to this Agreement expressly understand and agree that should CA fail to make a presentation to the Office, or its designee, within the two-week period (or other period agreed to by the Office), the Office may conclusively presume that CA is in knowing, intentional and material breach of this Agreement. The parties further understand and agree that the exercise of discretion by the Office or its designee under this paragraph is not subject to review in any court or tribunal outside the United States Department of Justice.

      29.    Except to the extent permitted by the Office, CA agrees that, if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, CA shall include in any contract for sale or merger a provision binding the purchaser/successor to CA's obligations described in this Agreement.

Exhibit 3   **195**

.21

30.    It is understood that this Agreement is binding on CA and the United States Attorney's Office, but specifically does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by CA or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any licensing authorities, the Agreement, the cooperation of CA and its compliance with its obligations under this Agreement, and any corporate reforms specified in this Agreement.  It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individual or other entity other than the parties hereto, and that nothing in the Agreement shall be construed as acknowledging that the Agreement, including the Information or the Stipulation of Facts and the evidence underlying the Agreement, the Information or the Stipulation of Facts, shall be admissible in any proceeding other than a proceeding brought by the Office.  Moreover, CA may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

31.    CA and the Office agree that, upon filing of the Information in accordance with paragraph 1 hereof, this Agreement (including its attachments) shall be publicly filed in the United States District Court for the Eastern District of New York.

32.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between CA and the Office.  No modifications or additions to this Agreement

22

shall be valid unless they are in writing and signed by the Office, CA's attorneys, and a

duly authorized representative of CA.

Dated:  Brooklyn, New York
        September 22, 2004

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney
                                    Eastern District of New York

                        By:  _____
                                    David B. Pitofsky
                                    Principal Deputy Chief, Criminal Division

                             _____
                                    Eric O. Corngold
                                    Chief, Business & Securities Fraud Unit

AGREED AND CONSENTED TO BY:

_____
Lewis S. Ranieri
Chairman of the Board
Computer Associates International, Inc.
Defendant

_____
Robert J. Giuffra, Jr., Esq.
Sullivan & Cromwell LLP
Counsel to Defendant

                                    SO ORDERED:

                                    /s/ I. Leo Glasser
                                    _____
                                    THE HONORABLE I. LEO GLASSER
                                    UNITED STATES DISTRICT JUDGE
                                    EASTERN DISTRICT OF NEW YORK

## COMPUTER ASSOCIATES INTERNATIONAL, INC.
## CERTIFICATE OF CORPORATE RESOLUTION

I, Kenneth D. Cron, do hereby certify that I am the Chief Executive Officer of Computer Associates International, Inc. ("Computer Associates"), a Delaware corporation, and that the following is a complete and accurate copy of resolutions adopted by the Board of Directors of Computer Associates (the "Board of Directors") at a meeting held on September 21, 2004 at which a quorum was present:

**RESOLVED:** That Lewis S. Ranieri, Chairman of the Board of Directors, be and hereby is authorized to act on behalf of the Corporation, and in his sole discretion:

(1) to negotiate, approve and execute the deferred prosecution agreement between Computer Associates and the U.S. Department of Justice ("Department of Justice"), in substantially the form attached to the minutes of this meeting, and any amendments thereto, and to consent to the filing of an information and stipulation of facts, in substantially the form attached to the minutes of this meeting, and any amendments thereto, in the United States District Court for the Eastern District of New York (the "DOJ Deferred Prosecution Agreement"); and

(2) to negotiate, approve and make the offer of settlement of Computer Associates, in substantially the form attached to the minutes of this meeting, and any amendments thereto, to the United States Securities and Exchange Commission ("Commission") in connection with the investigation conducted by the Commission (the "SEC Settlement").

**RESOLVED FURTHER:** That the aforementioned Officer be and hereby is authorized to undertake such action as he may deem necessary and advisable, including the execution of such documentation as may be required by the Department of Justice and the Commission, in order to carry out the foregoing, including the payment of forfeitures and fees to carry into effect the intent and purpose of these resolutions.

**RESOLVED FURTHER:** That Robert J. Giuffra, Jr., Esq. of Sullivan & Cromwell LLP, be and hereby is retained as legal counsel to Computer Associates to represent Computer Associates, and to make any representations or agreements in its name and on its behalf that he deems necessary or appropriate, in any judicial or other legal proceeding relating to the DOJ Deferred Prosecution Agreement and SEC Settlement.

I further certify that the aforesaid resolutions have not been amended or revoked in any respect and remain in full force and effect.

IN WITNESS WHEREOF, I have executed this Certificate as a sealed instrument this __ day of September, 2004.

By: _____

Kenneth D. Cron
Chief Executive Officer
Computer Associates International, Inc.

State of                              )

County of                    ) ss.:
                             )

On September __, 2004, Kenneth D. Cron, a person known to me, personally appeared before me and acknowledged executing the foregoing Certificate of Corporate Resolution with full authority to do so on behalf of Computer Associates International, Inc. as its Chief Executive Officer.


_____
Notary Public

State of New York
Commission No. _____
My commission expires on _____

EOC:DBP/ERK
F.#2004r02093
CA.INF.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - against -

COMPUTER ASSOCIATES
INTERNATIONAL, INC.

          Defendant.

- - - - - - - - - - - - - - - - x

I N F O R M A T I O N

Cr. No. ___04-837 (ILG)___
(T. 15, U.S.C., §§ 78j(b)
and 78ff; T. 18, U.S.C.,
§§ 1512(c)(2) and 3551 et
seq.)

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise stated:

I.   Background

    A.   The Defendant

      1.  COMPUTER ASSOCIATES INTERNATIONAL, INC. ("CA"), was a Delaware corporation with its headquarters and principal place of business located in Islandia, New York. CA was one of the world's largest providers of computer software for use by businesses. CA's reported revenue for its fiscal year ending March 31, 1999 was $5.253 billion. CA's reported revenue for its fiscal year ending March 31, 2000 was $6.776 billion.

      2.  CA was a publicly traded corporation, the common stock of which was listed on the New York Stock Exchange. CA's shareholders were located throughout the United States, including in the Eastern District of New York.

Exhibit 3  200

2

3.   CA did not sell or transfer title to its software products to its customers.  Instead, CA licensed its software products pursuant to license agreements by which CA's customers agreed to pay a one-time license fee and annual usage and maintenance fees.

B.   Certain Relevant Accounting Principles

4.   As a public company, CA was required to comply with the rules and regulations of the United States Securities and Exchange Commission (the "SEC").  The SEC's rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public.

5.   Under the SEC's rules and regulations, CA and its officers were required to (a) make and keep books, records and accounts which, in reasonable detail, fairly and accurately reflected the company's business transactions, including its revenue and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) which included financial

201

3

statements that accurately presented CA's financial condition and the results of its business operations in accordance with GAAP.

6.    Under GAAP, four conditions were required to be met in order for revenue associated with a software license agreement to be recognized:  (a) persuasive evidence of an arrangement was required to have existed; (b) delivery of the licensed products was required to have occurred; (c) the license fee was required to have been fixed or determinable; and (d) the collectibility of the license fee was required to have been probable.

7.    When a written contract was used to memorialize a license agreement, the GAAP "persuasive evidence" criterion required that the contract be signed by both vendor and customer. Accordingly, under GAAP, in order for CA properly to have recognized revenue from a license agreement in a particular fiscal quarter, the license agreement was required to have been signed by both CA and its customer within that quarter.

8.    When a license agreement was finalized, for accounting purposes CA allocated its revenue among the license fee and the usage and maintenance fees, with 80 percent or more normally allocated to the license fee.  CA then calculated the present value of the license fee, which was normally collected incrementally over the term of the agreement.  The present value of the license fee, which was referred to within CA as the "GAAP

4

Value," was then recognized as revenue in the quarter in which the agreement was purportedly finalized and signed.

C.   <u>Consensus Estimates</u>

9.   CA regularly issued public predictions at the outset of each fiscal quarter of the revenue and earnings it expected to earn during that quarter.  Based in part on these predictions, professional stock analysts estimated what they believed would be CA's total revenue during the period and predicted the earnings per share of CA stock.  The average of the estimates of the professional analysts was commonly referred to as the "consensus estimate."

10.   CA's officers, executives and directors understood that CA's failure to meet or exceed the consensus estimate for a quarter would likely result in a substantial decrease in the company's stock price.  For example, on July 3, 2000, CA issued a press release which reported that the company expected "financial results for the first quarter [of fiscal year 2001] ending June 30, 2000 to be less than current Wall Street estimates."  In the press release, CA cited as one of the factors contributing to its failure to meet the consensus estimate "the fact that several large contracts that were expected to close in the final days of the quarter have been delayed . . . ."  On the date of the press release, which was issued after the market closed, CA's stock price closed at $51.12 per share.  On the next trading day,

5

July 5, 2000, CA's stock price opened at $29.00 per share, representing a percentage drop of slightly more than 43 percent.

D.   The Scheme to Defraud: the "35-Day Month"

11.   Prior to and during CA's fiscal year 2000, which ended March 31, 2000, numerous CA officers and executives engaged in a systemic, company-wide practice of falsely and fraudulently recording and reporting within a fiscal quarter revenue associated with certain license agreements even though those license agreements had not in fact been finalized and signed during that quarter.  This practice, which was sometimes referred to within CA as the "35-day month" or the "three-day window," violated GAAP and resulted in CA's filing of materially false financial statements.

12.   The practice was referred to as the "35-day month" because it involved artificially extending months, primarily the last month of a fiscal quarter, beyond the true end of the month. The practice did not, however, only result in months that were artificially extended to 35 days.  Instead, months were often artificially extended even longer.  Nonetheless, for the sake of simplicity, the practice is referred to hereinafter as the "35-day month practice."

13.   The central goal of the 35-day month practice was to permit CA to report that it met or exceeded its projected quarterly revenue and earnings when, in truth, CA had not met its

6

projected quarterly revenue and earnings. As a result of the practice, CA reported falsely to investors and regulators during numerous fiscal quarters, including each of the four quarters of CA's fiscal year 2000, that it had met or exceeded its consensus estimates. In fact, in each of the four quarters of fiscal year 2000, CA improperly recognized and falsely reported hundreds of millions of dollars of revenue associated with numerous license agreements that had been finalized after the quarter close. In so doing, CA made misrepresentations and omissions of material fact which were relied upon by members of the investing public.

14. As part of the 35-day month practice, certain CA executives routinely extended CA's fiscal quarters, normally for three business days. This practice, which was known as "keeping the books open," was designed and executed so that CA could falsely record and report revenue associated with license agreements finalized after the end of fiscal quarters. The period including three business days after the end of fiscal quarters was referred to within CA as the "flash period."

15. As a further part of the 35-day month practice, certain CA executives regularly met and conferred with each other in the days leading up to and following the end of fiscal quarters, including during the flash period. The purpose of these meetings was to determine whether CA had generated for the quarter just ended, including during the flash period, sufficient

7

revenue to meet the consensus estimate. In each of the four quarters of CA's fiscal year 2000, the CA executives collectively determined that the total revenue generated for the quarter by the end of the flash period was less than needed to meet the consensus estimate. In each such instance, the CA executives caused CA to keep its books open for additional days beyond even the flash period to generate sufficient revenue to meet the consensus estimate.

16. As a further part of the 35-day month practice, while CA's books were held open, certain CA executives instructed CA sales managers and salespeople to negotiate and finalize additional license agreements, which were backdated to disguise the fact that the agreements had been finalized after the end of the fiscal quarter. CA then fraudulently recorded and reported in the earlier quarter revenue associated with the backdated agreements.

17. As a further part of the 35-day month practice, certain CA officers and executives concealed the existence of the practice from CA's outside auditors. Among other things, CA executives engaged in a practice of "cleaning up" copies of backdated license agreements before providing copies of the agreements to CA's outside auditors. This practice included, but was not limited to, removing from license agreements facsimile stamps and other notations which showed the true date on which

8

the agreements were finalized.  This practice was designed and carried out to prevent CA's outside auditors, and by extension the investing public, from learning of CA's failure to meet or exceed the consensus estimates for the given quarter.

(1)  First Quarter of Fiscal Year 2000

18.  The first quarter of CA's fiscal year 2000 included the period from April 1, 1999 to June 30, 1999 (the "First Quarter").  The consensus estimate for the First Quarter was that CA's earnings would be 47 cents per share.  When the First Quarter ended on June 30, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

19.  For the First Quarter, CA improperly recognized revenue associated with approximately 22 license agreements having an aggregate GAAP Value of approximately $240 million.  Of this total, approximately $120 million was associated with license agreements signed by CA customers after June 30, 1999, while approximately $120 million was associated with license agreements countersigned by CA after June 30, 1999.  The improperly recognized revenue represented approximately 20 percent of CA's reported revenue for the First Quarter.

20.  On or about July 20, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release.  In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the

207

9

First Quarter that included revenue associated with license agreements finalized after June 30, 1999.  Through its false filings and statements, CA reported earnings per share of 49 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the First Quarter by two cents per share.

     (2)   <u>Second Quarter of Fiscal Year 2000</u>

     21.  The second quarter of CA's fiscal year 2000 included the period from July 1, 1999 to September 30, 1999 (the "Second Quarter").  The consensus estimate for the Second Quarter was that CA's earnings would be 59 cents per share.  When the Second Quarter ended on September 30, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

     22.  For the Second Quarter, CA improperly recognized revenue associated with approximately 58 license agreements having an aggregate GAAP Value of approximately $560 million. Of this total, approximately $470 million was associated with license agreements signed by CA customers after October 30, 1999, while approximately $90 million was associated with license agreements countersigned by CA after October 30, 1999.  The improperly recognized revenue represented approximately 35 percent of CA's reported revenue for the Second Quarter.

Exhibit 3 208

10

23.   On or about October 19, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release.   In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the Second Quarter that included revenue associated with license agreements finalized after September 30, 1999.   Through its false filings and statements, CA reported earnings per share of 60 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the Second Quarter by one cent per share.

(3)   <u>Third Quarter of Fiscal Year 2000</u>

24.   The third quarter of CA's fiscal year 2000 included the period from October 1, 1999 to December 31, 1999 (the "Third Quarter").   The consensus estimate for the Third Quarter was that CA's earnings would be 90 cents per share. When the Third Quarter ended on December 31, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

25.   For the Third Quarter CA improperly recognized revenue associated with approximately 49 license agreements having an aggregate GAAP Value of approximately $570 million. Of this total, approximately $400 million was associated with license agreements signed by CA customers after December 31, 1999, while approximately $170 million was associated with

Exhibit 3

209

11

license agreements countersigned by CA after December 31, 1999.
The improperly recognized revenue represented approximately 32
percent of CA's reported revenue for the quarter.

26.  On or about January 26, 2000, CA filed with the
SEC its quarterly report on Form 10-Q and issued a related press
release.  In these public documents, CA falsely reported its
quarterly financial results, in that CA reported revenue for the
Third Quarter that included revenue associated with license
agreements finalized after December 31, 1999.  Through its false
filings and statements, CA reported earnings per share of 91
cents exclusive of non-recurring charges and thereby created the
false and fraudulent appearance that CA exceeded the consensus
earnings estimate for the Third Quarter by one cent per share.

(4)  Fourth Quarter of Fiscal Year 2000

27.  The fourth quarter of CA's fiscal year 2000
included the period from January 1, 2000 to March 31, 2000 (the
"Fourth Quarter").  The consensus estimate for the Fourth Quarter
was that CA's earnings would be $1.13 per share.  When the Fourth
Quarter ended on March 31, 2000, CA had not generated sufficient
revenue to meet the consensus estimate.

28.  For the Fourth Quarter CA improperly recognized
revenue associated with approximately 36 license agreements
having an aggregate GAAP Value of approximately $380 million.
Of this total, approximately $200 million was associated with

12

license agreements signed by CA customers after March 31, 2000, while approximately $180 million was associated with license agreements countersigned by CA after March 31, 2000.  The improperly recognized revenue represented approximately 18 percent of CA's reported revenue for the quarter.

29.  On or about May 15, 2000, CA filed with the SEC its annual report on Form 10-K and issued a related press release.  In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the Fourth Quarter that included revenue associated with license agreements finalized after March 31, 2000.  Through its false filings and statements, CA reported earnings per share of $1.13 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had met the consensus earnings estimate for the Fourth Quarter.

E.   Obstruction of Justice

30.  In or about the beginning of 2002, the United States Attorney's Office for the Eastern District of New York (the "United States Attorney's Office"), the Federal Bureau of Investigation (the "FBI") and the Northeast Regional Office of the SEC began investigations into CA's accounting practices, including whether, during the late-1990s and thereafter, CA engaged in improper accounting practices with the intent to overstate its fiscal quarterly revenue to make it appear as

13

though the company had met consensus estimates.  Since June 2002,
a grand jury sitting in the Eastern District of New York had been
considering evidence about CA's accounting practices.  (These
investigations are referred to collectively as the "Government
Investigations.")

31.  In or about February 2002, CA retained a law firm
(the "Company's Law Firm") to represent it in connection with the
Government Investigations.  Through the Company's Law Firm, CA
represented to the United States Attorney's Office, the FBI and
the SEC that it was committed to cooperating fully with the
Government Investigations.  This representation was also made
publicly by CA in press releases, SEC filings and other public
statements.  Additionally, in a press release issued on February
20, 2002, CA denied that it had engaged in any improper
accounting practices, declaring:  "The reporting of our financial
results has always been in accordance with applicable accounting
principles."

32.  Shortly after being retained in February 2002, the
Company's Law Firm met with certain CA executives in order to
inquire into their knowledge of the practices that were the
subject of the Government Investigations.  During these meetings,
the CA executives did not disclose, falsely denied and otherwise
concealed the existence of the 35-day month practice.  Moreover,
the CA executives concocted and presented to the Company's Law

Exhibit 3     **212**

14

Firm an assortment of false justifications, the purpose of which was to support their false denials of the 35-day month practice. The CA executives knew, and in fact intended, that the Company's Law Firm would present these false justifications to the United States Attorney's Office, the SEC and the FBI so as to obstruct and impede the Government Investigations.

33.   For example, during a meeting with attorneys from the Company's Law Firm, CA's Chief Executive Officer, Sanjay Kumar, and CA's Chief Financial Officer, Ira Zar, discussed the fact that former CA salespeople had accused CA of engaging in the 35-day month practice.   Kumar falsely denied that CA had engaged in such a practice and suggested to the attorneys from the Company's Law Firm that because quarterly commissions paid to CA salespeople regularly included commissions on license agreements not finalized until after the end of the quarter, the salespeople might assume, incorrectly, that revenue associated with those agreements was recognized by CA within the quarter.   Kumar knew that this explanation was false and intended that the Company's Law Firm would present this false explanation to the United States Attorney's Office, the SEC and the FBI as part of an effort to persuade those entities that the accusations of the former salespeople were unfounded and that the 35-day month practice never existed.

Exhibit 3            213

15

34.  During the course of the Government Investigations, the United States Attorney's Office, the FBI and the SEC regularly requested that CA produce certain CA employees to be interviewed.  As part of his duties as General Counsel, Steven Woghin coordinated CA's compliance with the government's requests.  Sanjay Kumar frequently met and conferred with Woghin during the course of the Government Investigations.  Among other things, Kumar instructed Woghin to meet with CA employees prior to their being interviewed by the government or by the Company's Law Firm to coach the employees on how to answer questions without disclosing the existence of the 35-day month practice. On several occasions, Kumar himself coached CA employees on how to answer questions without disclosing the existence of the 35-day month practice.

35.  On September 6, 2002, CA executive Lloyd Silverstein was interviewed by the United States Attorney's Office, the FBI and the SEC.  Prior to that interview, in August and early-September 2002, Silverstein met and conferred with several other CA executives.  During these meetings, the executives agreed that, acting in concert, they would deny and otherwise fail to disclose the existence of the 35-day month practice, in part by giving intentionally vague or misleading answers to questions about the existence of the practice. Accordingly, during the September 6, 2002 interview, Silverstein

16

did not disclose and otherwise concealed the existence of the 35-day month practice.

36.   In or about July 2003, the Audit Committee of CA's board of directors retained a second law firm (the "Audit Committee's Law Firm") to conduct an internal investigation into CA's accounting practices, focusing on the 35-day month practice. As part of its internal investigation, the Audit Committee's Law Firm conducted interviews of CA executives and employees.

37.   On or about October 6, 2003, January 14, 2004, January 22, 2004, and April 6, 2004, Sanjay Kumar was interviewed by attorneys from the Audit Committee's Law Firm.  During these interviews, Kumar did not disclose, but instead falsely denied and otherwise concealed, the existence of the 35-day month practice.  Kumar knew that certain of the statements he made during the interviews were false and that he otherwise concealed during the interviews information which he knew to be material to the Government Investigations.  Kumar further knew, and in fact intended, that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

38.   On October 23, 2003, CA's Head of Worldwide Sales, Steven Richards, testified under oath before the SEC in the Matter of: Computer Associates, Inc., File No. NY 7008.  The testimony was taken in Central Islip, New York.  During his

Exhibit 3          215

17

testimony, Richards gave knowingly and willfully false testimony in an attempt to conceal the existence of the 35-day month practice.

39.  On November 5, 2003, Sanjay Kumar was interviewed by FBI agents and others at the United States Attorney's Office in Brooklyn, New York.  During the interview, Kumar made materially false statements and representations in an attempt to conceal the existence of the 35-day month practice.

### COUNT ONE
(Securities Fraud)

40.  The allegations contained in paragraphs 1 through 39 are realleged and incorporated as if fully set forth in this paragraph.

41.  On or about and between April 1, 1998 and September 30, 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant COMPUTER ASSOCIATES INTERNATIONAL, INC. did knowingly and willfully, directly and indirectly:  (a) use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b5), in that the defendant did knowing and willfully, directly and indirectly, (1) employ devices, schemes, and artifices to defraud; (2) make untrue statements of material fact and omit to state material facts necessary in order to make statements made, in light of the

Exhibit 3

216

18

circumstances under which they were made, not misleading; and
(3) engage in acts, practices, and courses of business which
would and did operate as a fraud and deceit upon members of the
investing public, in connection with purchases and sales of CA
securities, and by use of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and
78ff; Title 18, United States Code, Sections 3551 et seq.)

## COUNT TWO
### (Obstruction of Justice)

42.  The allegations contained in paragraphs 1 through
39 are realleged and incorporated as if fully set forth in this
paragraph.

43.  In or about and between February 2002 and April 6,
2004, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant
COMPUTER ASSOCIATES INTERNATIONAL, INC. did knowingly,
intentionally and corruptly obstruct, influence and impede
official proceedings, to wit:  the Government Investigations.

(Title 18, United States Code, Sections 1512(c)(2) and
3551 et seq.)

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Exhibit 3

217

## STIPULATION OF FACTS

In any criminal proceeding brought by the United States Attorney's Office for the Eastern District of New York, the following stipulation by Computer Associates International, Inc. ("CA") shall be admissible against CA pursuant to Rules 801(d)(2) and 804(b)(3) of the Federal Rules of Evidence:

<u>Computer Associates</u>

1.  CA is a Delaware corporation with its headquarters and principal place of business located in Islandia, New York. CA is one of the world's leading providers of computer software for use by businesses. CA's reported revenue for its fiscal year ending March 31, 1999 was $5.253 billion. CA's reported revenue for its fiscal year ending March 31, 2000 was $6.776 billion.

2.  CA is a publicly traded corporation, the common stock of which is listed on the New York Stock Exchange. CA's shareholders are located throughout the United States, including in the Eastern District of New York.

3.  CA does not sell or transfer title to its products to its customers. Instead, CA licenses its products pursuant to license agreements by which CA's customers agree to pay a one-time license fee and an annual usage and maintenance fee.

4.  Since at least April 1, 1998, under Generally Accepted Accounting Principles ("GAAP"), four conditions must be satisfied for revenue associated with a software license agreement to be recognized: (a) persuasive evidence of an arrangement exists; (b) delivery of the licensed products has occurred; (c) the license fee is fixed or determinable; and (d) the collectibility of the license fee is probable. When a written contract is used to memorialize a license agreement, the GAAP "persuasive evidence" criterion requires that the contract be signed by both software vendor and customer. Accordingly, under GAAP, for CA properly to recognize revenue from a license agreement in a particular fiscal quarter, the license agreement must be signed by both CA and its customer within that quarter.

5.  Until CA's adoption of its New Business Model in October 2000, when a software license agreement was finalized, for accounting purposes CA allocated its revenue among the license fee and the usage and maintenance fees, with 80 percent or more normally allocated to the license fee. CA then calculated the present value of the license fee, which was normally collected incrementally over the term of the agreement. The present value of the license fee, which was referred to within CA as the "GAAP Value," was then recognized as revenue in the quarter in which the agreement was purportedly finalized and signed.

6.  Prior to and during CA's fiscal year 2000, professional stock analysts estimated what they believed would be CA's total revenue during a quarter and predicted the earnings per share of CA stock. The average of the estimates of the

2

professional analysts was commonly referred to as the "consensus estimate." CA's failure to meet or exceed the consensus estimate for a quarter would likely result in a substantial decrease in the company's stock price. For example, on July 3, 2000, CA issued a press release which reported that the company expected "financial results for the first quarter ending June 30, 2000 to be less than current Wall Street estimates." In the press release, CA cited as one of the factors contributing to its failure to meet the consensus estimate "the fact that several large contracts that were expected to close in the final days of the quarter have been delayed . . . ." On the date of the press release, which was issued after the market closed, CA's stock price closed at $51.12 per share. On the next trading day, July 5, 2000, CA's stock price opened at $29.00 per share, representing a percentage drop of slightly more than 43 percent.

The Scheme to Defraud: the "35-Day Month"

7.      Prior to and during CA's fiscal year 2000, which ended March 31, 2000, multiple former CA officers, executives and employees engaged in a systemic, company-wide practice of falsely and fraudulently recording and reporting within fiscal quarters revenues associated with certain license agreements even though those license agreements had not in fact been finalized and signed during the given quarter. This practice, which was sometimes referred to within CA as the "35-day month" or the "three-day window," violated GAAP and resulted in CA's filing of materially false financial statements. The practice was referred to as the "35-day month" because it involved artificially extending months, primarily the last month of a fiscal quarter, for accounting purposes, beyond the true end of the month. The practice did not, however, only result in months that were artificially extended to 35 days. Instead, months were often artificially extended even longer. Nonetheless, for the sake of simplicity, the practice is referred to hereinafter as the "35-day month practice."

8.      The central goal of the 35-day month practice was to permit CA to report that it met or exceeded its projected quarterly revenue and earnings when, in truth, CA had not met its projected quarterly revenue and earnings. As a result of the practice, CA reported falsely to investors and regulators during multiple fiscal quarters, including each of the four quarters of CA's fiscal year 2000, that it had met or exceeded its consensus estimates. In fact, during each of the four quarters of fiscal year 2000, CA improperly recognized and falsely reported hundreds of millions of dollars of revenue associated with numerous license agreements that had been finalized after the quarter close. In so doing, CA made misrepresentations and omissions of material fact which were relied upon by members of the investing public.

9.      As part of the 35-day month practice, certain former CA executives routinely extended CA's fiscal quarters, normally for three business days. This practice, which was often referred to as "keeping the books open," was designed and executed so that CA could falsely record and report revenue associated with backdated license agreements finalized after the end of a fiscal quarter. The

3

period including three business days after the end of a fiscal quarter was referred to within CA as the "flash period."

10.   As a further part of the 35-day month practice, certain former CA executives regularly met and conferred with each other in the days leading up to and following the end of fiscal quarters, including during the flash period. The purpose of these meetings was to determine whether CA had generated, for the quarter just ended, including during the flash period, sufficient revenues to meet the consensus estimate. In each of the four quarters of CA's fiscal year 2000, the former CA executives collectively determined that the total revenue generated for the quarter was less than needed to meet the consensus estimate. In each such instance, CA kept its books open for additional days beyond even the flash period in order to generate sufficient revenues to meet the consensus estimate.

11.   As a further part of the 35-day month practice, while CA's books were held open, certain former CA executives instructed CA sales managers and salespeople to negotiate and finalize additional license agreements, which were backdated to disguise the fact that the agreements had been finalized after the end of the fiscal quarter. CA then fraudulently recorded and reported in the earlier quarter revenue associated with the backdated agreements.

12.   As a further part of the 35-day month practice, numerous former CA officers and executives concealed the existence of the improper practice from CA's outside auditors. Among other things, CA executives engaged in a practice of "cleaning up" copies of backdated license agreements before providing copies of the agreements to CA's outside auditors. This practice included, but was not limited to, removing from license agreements facsimile stamps and other notations which showed the true date on which the agreements were finalized. This practice was designed and carried out to prevent CA's outside auditors, and by extension the investing public, from learning of CA's failure to meet or exceed the consensus estimates for the given quarter.

13.   For the first quarter of CA's fiscal year 2000, which ended June 30, 1999, CA improperly recognized revenue associated with approximately 22 license agreements with an aggregate GAAP Value of approximately $240 million. Of this total, approximately $120 million was associated with license agreements signed by CA customers after June 30, 1999, while approximately $120 million was associated with license agreements countersigned by CA after June 30, 1999. The improperly recognized revenue represented approximately 20 percent of CA's reported revenue for the quarter. On or about July 20, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release. In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the first quarter of fiscal year 2000 that included revenue associated with license agreements finalized after June 30, 1999. Through its false filings and statements, CA reported earnings per share of 49 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance

4

that CA had exceeded the consensus earnings estimate for the quarter by two cents per share.

14.    For the second quarter of CA's fiscal year 2000, which ended September 30, 1999, CA improperly recognized revenue associated with approximately 58 license agreements with an aggregate GAAP Value of approximately $560 million. Of this total, approximately $470 million was associated with license agreements signed by CA customers after September 30, 1999, while approximately $90 million was associated with license agreements countersigned by CA after September 30, 1999. The improperly recognized revenue represented approximately 35 percent of CA's reported revenue for the quarter. On or about October 19, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release. In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the second quarter of fiscal year 2000 that included revenue associated with license agreements finalized after September 30, 1999. Through its false filings and statements, CA reported earnings per share of 60 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the quarter by one cent per share.

15.    For the third quarter of CA's fiscal year, which ended December 31, 1999, CA improperly recognized revenue associated with approximately 49 license agreements with an aggregate GAAP Value of approximately $570 million. Of this total, approximately $400 million was associated with license agreements signed by CA customers after December 31, 1999, while approximately $170 million was associated with license agreements countersigned by CA after December 31, 1999. The improperly recognized revenue represented approximately 32 percent of CA's reported revenue for the quarter. On or about January 26, 2000, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release. In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the third quarter of fiscal year 2000 that included revenue associated with license agreements finalized after December 31, 1999. Through its false filings and statements, CA reported earnings per share of 91 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA exceeded the consensus earnings estimate for the quarter by one cent per share.

16.    For the fourth quarter of CA's fiscal year 2000, which ended March 31, 2000, CA improperly recognized revenue associated with approximately 36 license agreements with an aggregate GAAP Value of approximately $380 million. Of this total, approximately $200 million was associated with license agreements signed by CA customers after March 31, 2000, while approximately $180 million was associated with license agreements countersigned by CA after March 31, 2000. The improperly recognized revenue represented approximately 18 percent of CA's reported revenue for the quarter. On or about May 15, 2000, CA filed with the SEC its annual report on Form 10-K and issued a related press release. In these public documents, CA falsely reported its quarterly financial results, in

221

that CA reported revenue for the fourth quarter of fiscal year 2000 that included revenue associated with license agreements finalized after March 31, 2000. Through its false filings and statements, CA reported earnings per share of $1.13 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had met the consensus earnings estimate for the quarter.

Obstruction of Justice

17.  In or about the beginning of 2002, the United States Attorney's Office for the Eastern District of New York (the "United States Attorney's Office"), the Federal Bureau of Investigation (the "FBI") and the Northeast Regional Office of the Securities and Exchange Commission (the "SEC") began investigations into CA's accounting practices, including whether, during the late-1990s and thereafter, CA engaged in improper accounting practices with the intent to overstate its fiscal quarterly revenue to make it appear as though the company had met consensus estimates. Since June 2002, a grand jury sitting in the Eastern District of New York has been considering evidence about CA's accounting practices. (These investigations are referred to collectively as the "Government Investigations.")

18.  In or about February 2002, CA retained a law firm (the "Company's Law Firm") to represent it in connection with the Government Investigations. Through the Company's Law Firm, CA represented to the United States Attorney's Office, the FBI and the SEC that it was committed to cooperating fully with the Government Investigations. This representation was also made publicly by CA in press releases, SEC filings and other public statements. Additionally, in a press release issued on February 20, 2002, CA denied that it had engaged in any improper accounting practices, declaring: "The reporting of our financial results has always been in accordance with applicable accounting principles."

19.  Shortly after being retained in February 2002, the Company's Law Firm met with certain former CA officers and executives in order to inquire into their knowledge of the practices that were the subject of the Government Investigations. During these meetings, the former officers and executives did not disclose, falsely denied and otherwise concealed the existence of the 35-day month practice. Moreover, the former officers and executives concocted and presented to the Company's Law Firm an assortment of false justifications, the purpose of which was to support their false denials of the 35-day month practice. The former officers and executives knew, and in fact intended, that the Company's Law Firm would and did present these false justifications to the United States Attorney's Office, the FBI and the SEC, and further knew and believed that their false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

20.  On September 6, 2002, former CA executive Lloyd Silverstein was interviewed by FBI agents and others at the United States Attorney's Office in Brooklyn, New York. During the interview, Silverstein made materially false statements and

6

representations in an attempt to conceal the existence of the 35-day month practice and his involvement in the practice.

21. In late-July 2003, the Audit Committee of CA's Board of Directors retained a second law firm (the "Audit Committee's Law Firm") to conduct an internal investigation into CA's accounting practices, focusing on the 35-day month practice. As part of its internal investigation, the Audit Committee's Law Firm conducted interviews of, and met with, CA executives and officers. During these interviews and meetings, certain former CA officers and executives did not disclose, falsely denied and otherwise concealed the existence of the 35-day month practice. Moreover, the former officers and executives concocted and presented to the Audit Committee's Law Firm, and members of CA's Audit Committee, an assortment of false justifications, the purpose of which was to support their false denials of the 35-day month practice. The former officers and executives knew and believed that their false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

22. Before being interviewed by the Company's Law Firm, the Audit Committee's Law Firm and the U.S. Attorney's Office, the FBI and the SEC, certain former CA officers and executives met and conferred with one another. During these meetings, the former officers and executives agreed that, acting in concert, they would falsely deny and otherwise conceal the existence of the 35-day month practice, in part by giving intentionally vague or misleading answers to questions about the existence of the practice.

Exhibit 3