1    Thomas N. FitzGibbon (SBN: 169194)
     TNF@ptflaw.com
2    **PFEIFFER THIGPEN & FITZGIBBON LLP**
     233 Wilshire Boulevard, Ste. 220
3    Santa Monica, CA 90401
     Telephone: (310) 451-5800
4    Facsimile: (310) 451-1599
5

6    Luke A. McGrath *(Pro Hac Vice Pending)*
     LZM@bickelbrewer.com
7    James S. Renard *(Pro Hac Vice Pending)*
     JSR@bickelbrewer.com
8    **BICKEL & BREWER**
9    767 Fifth Avenue, 50th Floor
     New York, New York 10153
10   Telephone: 212-489-1400
     Facsimile: 212-489-2384
11

12   Attorneys for Intervenor
13   *Sam Wyly*

14

15         **UNITED STATES DISTRICT COURT**

16        **CENTRAL DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18   UNITED STATES OF AMERICA, | Case No. 2:05-CR-587-JFW-3 |
| 19        Plaintiff, | [Assigned to Hon. John F. Walter] |
| 20      - against - | **EXHIBITS 4-6 TO DECLARATION OF LUKE A. MCGRATH IN SUPPORT OF INTERVENOR SAM WYLY'S MOTION TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER** |
| 21 | |
| 22   MILBERG WEISS BERSHAD & | |
| 23   SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. | |
| 24   SCHULMAN, SEYMOUR M. LAZAR, and PAUL T. SELZER | Date:      February 9, 2009 |
| 25 | Time:      9:00 a.m. |
| 26      Defendants. | Room:      16 |

27

28

Pfeiffer Thigpen & FitzGibbon LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

FILED
2009 JAN 20 AM 10:53

# Exhibit 4

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - -X

3    UNITED STATES OF AMERICA,          :    CR-04-0024 (ILG)
                                        :
4                   v.                  :    U.S. Courthouse
                                        :    Brooklyn, New York
5                                       :
     LLOYD SILVERSTEIN,                 :
6                                       :
                                        :
7            Defendant.                 :
                                        :
8                                       :    January 22, 2004
                                        :    2:30 o'clock p.m.
9    - - - - - - - - - - - - - - -X

10

11              TRANSCRIPT OF ARRAIGNMENT & PLEADING
            BEFORE THE HONORABLE I. LEO GLASSER
12          UNITED STATES DISTRICT JUDGE

13

     APPEARANCES:
14

     For the Government:
15                                  ROSLYNN R. MAUSKOPF
                                    United States Attorney
16                             By:  MICHAEL CORNACCHIA
                                    Assistant U.S. Attorney
17                                  147 Pierrepont Street
                                    Brooklyn, New York 11201
18

     For the Defendant:           JAMES WALDEN, ESQ.
19

20
     Court Reporter:               Sheldon Silverman
21                                 225 Cadman Plaza East
                                   Brooklyn, New York 11201
22
                                   (718) 260-2537
23

     Proceedings recorded by mechanical stenography, transcript
24   produced by CAT.

25

SS,  OCR,  CSR,  CM,  CRR

2



```
 1              THE CLERK:  Criminal cause for arraignment and
 2    pleading, United States versus Lloyd Silverstein.
 3              THE COURT:   Good afternoon.
 4              I understand your client wishes to plead to an
 5    information?
 6              MR. WALDEN:   He does, your Honor.
 7              THE COURT:   Swear Mr. Silverstein.
 8    L L O Y D      S I L V E R S T E I N,
 9              having been duly sworn, was examined and
10              testified as follows:
11              THE CLERK:  Your name?
12              THE WITNESS:  Lloyd Silverstein.
13              THE COURT:   Mr. Silverstein, you just swore to
14    tell the truth.  Everything you're going to say to me this
15    afternoon should be truthful.
16              THE DEFENDANT: Yes, sir.
17              THE COURT:   Because it's a crime, it's called
18    perjury, to tell a lie after you swore to tell the truth; do
19    you understand that?
20              THE DEFENDANT:   Yes.
21              THE COURT:   How old are you?
22              THE DEFENDANT:   48.
23              THE COURT:   How far have you gone in school?
24              THE DEFENDANT:   Through college.
25              THE COURT:   Have you been under the care of a
```

*SS, OCR, CSR, CM, CRR*

Exhibit 4

3

1  physician recently?

2              THE DEFENDANT:   I'm sorry?

3              THE COURT:   Have you been under the care of a

4  physician recently?

5              THE DEFENDANT:   Under the care of a psychiatrist.

6              THE COURT:   Does this care that you've received in

7  any way interfere with your ability to understand what's

8  going on here today?

9              THE DEFENDANT:   No, sir, not at all.

10             THE COURT:   Have you taken any medicine, pills or

11 drugs of any kind within the past few days?

12             THE DEFENDANT:   Paxil and a drug for high blood

13 pressure.

14             THE COURT:   Does that affect your ability to

15 understand what's going on around you?

16             THE DEFENDANT:   No.

17             THE COURT:   You understand why you're here?

18             THE DEFENDANT:   Yes, sir.

19             THE COURT:   Understood everything I've said to you

20 so far?

21             THE DEFENDANT:   Yes, sir.

22             THE COURT:   Mr. Walden, do you have any questions

23 about Mr. Silverstein's competence to participate here today?

24             MR. WALDEN:   None whatsoever, your Honor.

25             THE COURT:   I'll make a finding to that effect.

4

1           Do you have a copy of the information?

2           Mr. Silverstein, if you look at that document,

3    you'll notice that on the upper right hand part of that page,

4    in capital letters, the word "INFORMATION" appears.  You see

5    that?

6           THE DEFENDANT:   Yes, sir.

7           THE COURT:   If you go down that page a little bit,

8    immediately under the caption of this case, you'll see that

9    it says the United States Attorney charges; you see that?

10          THE DEFENDANT:   Yes, sir.

11          THE COURT:   The reason that I call that to your

12   attention is because the crime with which you're charged in

13   this document is what the Constitution of the United States

14   refers to as a capital offense.  It's more commonly known as

15   a felony, which is a crime punishable by imprisonment for

16   more than a year.

17          The Constitution of the United States provides that

18   if a person is charged with a capital offense, he has a right

19   to be charged by a grand jury and the grand jury makes such a

20   charge in a paper which is called an indictment.  You're not

21   being charged on a paper called an indictment.  You're being

22   charged by the United States Attorney.  So, you have a

23   perfect right to say to me this afternoon that you would like

24   to enjoy the right which the Constitution gives you which is

25   to be indicted by a grand jury.

5



1           You also can, if you wish, decide to give up that

2   right, and to enable you to determine whether you wish to

3   give up that right knowingly, I'll briefly tell you what a

4   grand jury is and when a grand jury would return an

5   indictment.

6           A grand jury is made up of not less than 16 nor

7   more than 23 people.  A grand jury returns an indictment if

8   at least 12 of those people have probable cause to believe

9   that a person has committed a crime.  If you tell me this

10  afternoon that you wish to enjoy the right which our

11  constitution gives you, namely to be indicted by a grand



12  jury, I suspect what the government would do would be to

13  impanel a grand jury, present such evidence as they have in

14  this matter to that body and ask them to return an

15  indictment.  I don't know whether they will or they won't.

16  That would depend upon whether 12 members of that body would

17  have probable cause to believe that you've committed this

18  crime.

19           Do you understand all that?

20           THE DEFENDANT:   Yes, sir.

21           THE COURT:   You've discussed all that with

22  Mr. Walden?

23           THE DEFENDANT:   Yes, sir.

24           THE COURT:   Do you understand your right to be

25  indicted by a grand jury?

*SS, OCR, CSR, CM, CRR*

6



1          THE DEFENDANT:   Yes, sir.

2          THE COURT:   You wish to give up that right?

3          THE DEFENDANT:   Yes, I'm waiving it.

4          THE COURT:   You're doing that voluntarily?

5          THE DEFENDANT:   Yes, sir.

6          THE COURT:   Mr. Walden, do you know of any reason

7   why Mr. Silverstein shouldn't?

8          MR. WALDEN:   None whatsoever, your Honor.

9          THE COURT:   I have a waiver of indictment before

10   me.  I take it that's your signature as counsel for the

11   defendant?

12          MR. WALDEN:   Yes, sir.

13          THE COURT:   Mr. Silverstein has been fully advised

14   of his right to be indicted by a grand jury, which I'm

15   satisfied he understood, and with that understanding

16   knowingly and voluntarily waived it.  The waiver of

17   indictment has been executed.  I accept it and direct that it

18   be filed.

19          Before I can accept your plea, Mr. Silverstein, the

20   law requires me to make sure that you're aware of the variety

21   of rights of which you are entitled to exercise.  Before I do

22   that, let me tell you the crime with which you're charged,

23   and I'm not going to go through the introductory paragraphs.

24          I take it you've discussed all of that with

25   Mr. Walden.  The substance of this information, beginning at



7

1   Paragraph 16, charges that on or about and between August,

2   2002, to September 30th of 2002, both dates being approximate

3   and inclusive, within the Eastern District of New York, you,

4   together with others, knowingly, intentionally, corruptly

5   conspired to obstruct, influence and impede official

6   proceedings, to wit, the investigations in violation of

7   Title 18 of the United States Code Section 1512(c)(2), which

8   provides that whoever obstructs, influences or impedes any

9   official proceeding or attempts to do so commits a crime.

10  That's the crime you're charged with conspiring to commit and

11  an investigation is embraced within the definition of

12  official proceeding or at least a grand jury investigation is

13  of Section 1515 of Title 18 of the United States Code.

14          The information goes on to provide it was a part of

15  the conspiracy that in or about August and September of 2002,

16  you met with several senior level CA executives, CA meaning

17  Computer Associates International, who instructed you not to

18  disclose the existence of the 35 day month practice to the

19  law firm or to those conducting the investigations.

20          It was further part of that conspiracy that in or

21  about August of 2002, you met with members of the law firm

22  and did not disclose the existence of the 35 day month

23  practice and thereafter the law firm informed you that you

24  would be interviewed by the United States Attorney's Office,

25  by the FBI and by the SEC.



SS, OCR, CSR, CM, CRR

8

1         It was further part of the conspiracy that during

2  the interview you falsely stated in words or substance that

3  the purpose of the three day window was to provide a period

4  of time after the end of fiscal quarters in which license

5  agreements that were probably signed before the end of the

6  quarters could be administratively processed.  You

7  intentionally did not disclose during the interview what the

8  true purpose of the three day window was to provide a period

9  of time after the end of fiscal quarters during which license

10  agreements could be finalized and signed and then backdated

11  to make it appear as though it had been finalized and signed

12  within the quarters so that revenues associated with the

13  licenses could be falsely booked in the incorrect quarters.

14         It was further part of the conspiracy that you well

15  knew and believed that at the time of the interview that

16  certain of the statements you made during the interview were

17  false; that during the interview you otherwise intentionally

18  concealed information which you knew to be material to the

19  investigations and you further well knew and believed that

20  your false statements and concealment of material information

21  at the interview would have the effect of instructing and

22  impeding the investigations.

23         In furtherance of the conspiracy and in order to

24  accomplish its objectives within the Eastern District of

25  New York on September 6th, 2002, in Brooklyn, New York, you

*SS, OCR, CSR, CM, CRR*

9

1   made statements during an interview conducted by members of

2   the United States Attorney's Office, the FBI and the SEC.

3          You've discussed this charge fully with Mr. Walden,

4   have you?

5          THE DEFENDANT:   Yes, sir.

6          THE COURT:   Before I can accept your plea, as I've

7   indicated, Mr. Silverstein, the law requires me to make sure

8   that there are a number of rights you can exercise and can be

9   insisted upon by you.   First of all I want to make sure you

10  have a right to say to me you're not guilty of that charge.

11  If you tell me that, there will be a public trial by jury.

12  It will be conducted within the time required by law.   You'll

13  be represented by your lawyer at that trial and at that trial

14  you would be presumed innocent of this charge, which means

15  that you wouldn't have to prove your innocence.   You wouldn't

16  have to prove anything at all.

17          If you're having trouble hearing me, don't hesitate

18  to tell me that.

19          THE DEFENDANT:   No.

20          THE COURT:   I appear to have a frog in my throat

21  this afternoon.

22          I think I told you that you wouldn't have to prove

23  your innocence, wouldn't have to prove anything at all.   The

24  government would have to prove your guilt and the government

25  would have to prove that so that a unanimous jury of 12

*SS, OCR, CSR, CM, CRR*

Exhibit 4

10

1  persons would be satisfied beyond a reasonable doubt of your

2  guilt; do you understand that?

3          THE DEFENDANT:   Yes, sir.

4          THE COURT:   At that trial you would have a right

5  to confront your accusers, have a right to see who the

6  witnesses against you would be.  Your lawyer would have the

7  right to cross examine those persons for you.  He would have

8  the right to object to any evidence he believes the Rules of

9  Evidence should exclude from that trial.  Do you understand

10 that?

11         THE DEFENDANT:   Yes, sir.

12         THE COURT:   At that trial, too, you could, if you

13 wish, testify under oath for yourself, have witnesses brought

14 here to testify for you.  You could offer such evidence at

15 your trial as you think might be useful to you but you

16 needn't do any of those things.  You would have a right to

17 remain silent at that trial.  If you did remain silent, I

18 would instruct the jury that they must not think or infer

19 your guilt because you've remained silent and said nothing

20 and did nothing.  I would instruct the jury that you're

21 exercising a valuable right which our constitution gives you

22 and all others charged with a crime.  It's called the

23 privilege against self-incrimination which, in simple terms,

24 means that a person can't be compelled to convict himself out

25 of the words of his own mouth.  Do you understand that?

11

1        THE DEFENDANT:   Yes, sir.

2        THE COURT:   If you plead guilty this afternoon,

3   you'll be giving up all these rights which I've just

4   explained to you.  There won't be a trial.  The government

5   will not be called upon to prove that you committed that

6   crime so that a unanimous jury of 12 persons would be

7   satisfied beyond a reasonable doubt that you did and you will

8   not have had the opportunity to confront your accusers to see

9   who the witnesses against you would be.  A judgment of guilt

10  will be entered and you'll be sentenced on another day.  Do

11  you understand that?

12        THE DEFENDANT:   Yes, sir.

13        THE COURT:   I think I said if you plead guilty

14  this afternoon and if I accept your plea, what I had in mind

15  when I said that, Mr. Silverstein, is the requirement which

16  the law imposes upon me to make sure that I'm not accepting a

17  plea from an innocent person.  So, I'm going to ask you some

18  questions regarding this crime with which you're charged.  To

19  the extent that you answer them, you will have given up your

20  right to remain silent.  You will be convicting yourself out

21  of the words of your own mouth; do you understand that?

22        THE DEFENDANT:   Yes.

23        THE COURT:   Did Mr. Walden tell you that the

24  maximum sentence which the statute you're charged with

25  violating provides for is imprisonment up to five years?

12



1          THE DEFENDANT:   Yes, sir.

2          THE COURT:   Did he also tell you that in addition

3    to a term of imprisonment, a period of supervised release of

4    up to three years may follow that term?

5          THE DEFENDANT:   Yes, sir.

6          THE COURT:   Did Mr. Walden explain what supervised

7    release means?

8          THE DEFENDANT:   Yes, sir.

9          THE COURT:   You believe you understand it?

10          THE DEFENDANT:   Yes, sir.

11          THE COURT:   Would you like me to explain it to you



12    as well or do you think you understand it?

13          THE DEFENDANT:   You can explain it as well.

14          THE COURT:   I'm going to explain it,

15    Mr. Silverstein, by giving you an example.  The example I'm

16    going to give you will use numbers.  I just want to make sure

17    you understand that the numbers I'm using have absolutely

18    nothing to do with what your sentence will be because, as I

19    speak to you this afternoon, I don't know for sure what your

20    sentence will be.  I won't know it until I've had an

21    opportunity at some later date to review a presentence

22    report.

23          Just by way of illustration, assume you're

24    sentenced to a term of imprisonment of three years and the

25    court adds a three year term of supervised release to follow.



13

1   At the end of your three years of imprisonment, you're going

2   to be released.  You'll be released on condition that you

3   observe a whole series of rules and regulations such as not

4   to commit another crime, not to engage or be involved with or

5   associated with felons, things of that sort.

6           Assume that you've been out in the community for

7   two years and you violate one of those conditions, one of

8   those rules, and the court finds that you did.  You may be

9   brought back to serve an additional term of two years of

10  imprisonment.  So, it might be an additional term to the

11  three years which has already been imposed.  Do you

12  understand that?

13          THE DEFENDANT:   Yes, sir.

14          THE COURT:   Did Mr. Walden also tell you you could

15  be fined up to $250,000?

16          THE DEFENDANT:   Yes, sir.

17          THE COURT:   In the event that restitution is

18  deemed to be appropriate and applicable to this case,

19  restitution, if it is applicable, will be imposed because

20  restitution would be mandatory.  Do you understand that?

21          THE DEFENDANT:   Yes.

22          THE COURT:   Do you know what restitution means?

23          THE DEFENDANT:   Yes, sir.

24          THE COURT:   Did Mr. Walden also tell you that

25  regardless of what the sentence is, you will be required to

14

1   pay a special assessment of $100?

2          THE DEFENDANT:   Yes, sir.

3          THE COURT:   You know what that's all about?

4          THE DEFENDANT:   Yes, sir.

5          THE COURT:   I suppose and I'm certain Mr. Walden

6   has also explained to you that your sentence will also be

7   determined by guidelines.

8          THE DEFENDANT:   Yes, sir.

9          THE COURT:   I don't know whether some prediction

10  was or wasn't made for you as to what the guidelines might be

11  in your case, but if one has been made, I just want to make

12  sure you understand that it was only a prediction or an

13  educated guess as to what the guidelines might be in your

14  case, which is not binding on me.  If it should turn out the

15  guidelines are higher than may have been predicted, and

16  you're understandably unhappy about that, you won't be

17  permitted to withdraw your plea that you'll enter here today;

18  do you understand that?

19         THE DEFENDANT:   Yes.

20         THE COURT:   In a proper case, a person could be

21  sentenced more severely or more leniently than the guidelines

22  might require.  I don't know as I talk to you whether yours

23  would be a proper case for either, but if a person is

24  sentenced more severely, he could appeal that sentence and if

25  he's sentenced more leniently, the government might; do you

15

1  understand that?

2  THE DEFENDANT:   Yes, sir.

3  THE COURT:   Do you have any questions about

4  anything I've explained to you so far?

5  THE DEFENDANT:   No, sir.

6  THE COURT:   Mr. Walden, do you have know any

7  reason why Mr. Silverstein shouldn't plead to the

8  information?

9  MR. WALDEN:   None whatsoever, your Honor.

10  THE COURT:   How do you plead to that charge that

11  I've read to you a while ago, Mr. Silverstein?

12  THE DEFENDANT:   I plead guilty.

13  THE COURT:   You're telling me that voluntarily?

14  THE DEFENDANT:   Yes, sir.

15  THE COURT:   Nobody is forcing you to say that?

16  THE DEFENDANT:   No, sir.

17  THE COURT:   That plea is in consideration of an

18  agreement that you've entered into with the government?

19  THE DEFENDANT:   Yes, sir.

20  THE COURT:   You've gone over that agreement with

21  Mr. Walden?

22  THE DEFENDANT:   Yes, sir.

23  THE COURT:   Would you like me to go over it with

24  you as well?

25  THE DEFENDANT:   No, sir.

*SS, OCR, CSR, CM, CRR*

Exhibit 4

16

1          THE COURT:   I just want to make sure,

2   Mr. Silverstein, that you fully understand one paragraph of

3   this agreement.  It's Paragraph 6.  It provides that if the

4   government has determined that you have fully and completely

5   discharged all of your obligations under that agreement, at

6   the time of sentence the government will make a motion before

7   me which, if I grant it, will permit me to impose a sentence

8   without regard to what the guidelines might be.  I just want

9   to make sure that you understand that I'm not obliged to

10  grant that motion and should I deny it for reasons which

11  would be sufficient unto me at the time, you won't be

12  permitted to withdraw your plea for that reason; do you

13  understand that as well?

14          THE DEFENDANT:   Yes, sir.

15          THE COURT:   I also want to call your attention to

16  Paragraph 4-A which the government has agreed not to pursue

17  other matters against you.  I think it's Rule 11 which

18  requires me to either approve or disapprove that part of the

19  agreement or reserve.  I'll reserve on that until after I've

20  read the presentence report.  If I reject that portion of the

21  agreement, you'll be permitted to withdraw your plea here

22  today; do you understand that?

23          THE DEFENDANT:   Yes, sir.

24          THE COURT:   Has anybody made any promise to you as

25  to what your sentence will be?

*SS, OCR, CSR, CM, CRR*

17

1          THE DEFENDANT:   No, sir.

2          THE COURT:   I think I told you a minute or two ago

3   that I don't know what your sentence will be.   If anybody has

4   made such a promise, they would be misleading you.   I also

5   want to make sure that you're aware of the fact that at the

6   very end of this agreement you have said that you've read the

7   entire agreement, discussed it with your attorney and you

8   understand all its terms and you've entered into it knowingly

9   and voluntarily; is that correct?

10          THE DEFENDANT:   Yes, sir.

11   Q    If you had gone to trial, Mr. Silverstein, the

12   government would have had to prove three things to the

13   satisfaction of a unanimous jury if that jury is justified in

14   returning a verdict of guilty.   The crime with which you're

15   charged is the crime of conspiracy.   Conspiracy is very

16   simply defined as an agreement between two or more people,

17   one of those persons being you, an agreement to commit a

18   crime.   In this case it would be the crime which I've

19   indicated to you, impeding, obstructing an official

20   proceeding.

21          Three things the government would have to prove and

22   prove beyond a reasonable doubt is, first, that there was

23   such an agreement between you and one or more other persons.

24   So, I will ask you whether you and one or more other persons

25   did have an agreement to commit the crime which is referred

18





1   to in this information.

2           MR. WALDEN:   May I be heard?

3           THE COURT:   Sure.

4           MR. WALDEN:   With your permission, Mr. Silverstein

5   has some words that he composed that would form the factual

6   basis for the plea, if your Honor is inclined to hear them.

7           THE COURT:   I'll be happy to hear them, but I

8   think it might be very simple if Mr. Silverstein would listen

9   to the questions that I'm asking and answer them.

10          When I said, Mr. Silverstein, the first element of

11  this offense that the government would have to prove is the

12  existence of an agreement to commit that crime and when I say

13  the government would have to prove an agreement between you

14  and one or more other people, I don't mean to suggest that

15  would have to prove that you and one or more other persons

16  sat down and signed a written contract.  It could be enough

17  if the government proves a meeting of the minds, a common

18  understanding between you and one or more persons that you

19  would commit this crime; do you understand that?

20          THE DEFENDANT:   Yes, sir.

21          THE COURT:   Was there such an agreement?

22          THE DEFENDANT:   Yes.

23          THE COURT:   The second thing the government would

24  have to prove is that you were party to that agreement

25  knowingly, voluntarily and understanding of what it was that

19



1   you were agreeing to; is that true?

2            THE DEFENDANT:   Yes, your Honor.

3            THE COURT:   The third thing the government would

4   have to prove is that there was an overt act which was

5   committed during the course of and in furtherance of the

6   conspiracy and the overt act which is alleged is that on

7   September 6th of the year 2002 in Brooklyn, New York, you

8   made statements during an interview conducted by members of

9   the United States Attorney's Office, the FBI and the SEC; is

10  that true?

11           THE DEFENDANT:   Yes.

12           THE COURT:   Did you want to read something else to

13  me?

14           THE DEFENDANT:   From approximately 1988 until

15  October, 2003, I was employed by Computer Associates

16  International Software Company.  From 1999 until October,

17  2001, my title was divisional senior vice-president of global

18  sales operations.  In that position, I was responsible for,

19  among other things, helping the sales organization with the

20  business terms and conditions for software licenses.

21           While at CA, I became aware of a widespread

22  practice of booking license revenue in the current quarter

23  from deals that closed early in the subsequent quarter.  When

24  I first learned of this practice, I believed that it was

25  wrong because it could be used to make it appear that CA had



20

1  met its quarterly earnings expectations when, in fact, it had

2  not.  Indeed, I believed that the company was using this

3  practice for that purpose.

4      I therefore questioned a high level person about

5  it.  I was told that the practice was not proper but also

6  that it was immaterial.  While I believed the practice was

7  wrong, I chose to follow it.  I should not have done that.

8  Instead, I furthered the practice in a number of ways

9  including by communicating the practice to members of the

10 sales force that it was okay to backdate contracts and make

11 it look as though the deals had been signed in the quarter.

12 This went on from at least 1998 until 2000.

13      In 2002, I learned that the government was

14 conducting an investigation of CA's accounting practice.

15 I was told that I had to be interviewed by the company's

16 outside attorneys who would be reporting the results of the

17 investigation to the government.  I was told by a CA

18 executive not to discuss the company's end-of-quarter

19 practice with the outside lawyers.  When I met with the

20 outside lawyers, I did not do so.  That was also wrong.

21      Later, I was asked to speak to the government

22 directly.  Several CA executives told me, in substance, not

23 to disclose the practice.  When I was interviewed by the

24 government in September, 2002, I did not do so.  I knew this

25 would impede the government's investigation of CA's

20

1  met its quarterly earnings expectations when, in fact, it had

2  not. Indeed, I believed that the company was using this

3  practice for that purpose.

4          I therefore questioned a high level person about

5  it. I was told that the practice was not proper but also

6  that it was immaterial. While I believed the practice was

7  wrong, I chose to follow it. I should not have done that.

8  Instead, I furthered the practice in a number of ways

9  including by communicating the practice to members of the

10 sales force that it was okay to backdate contracts and make

11 it look as though the deals had been signed in the quarter.

12 This went on from at least 1998 until 2000.

13         In 2002, I learned that the government was

14 conducting an investigation of CA's accounting practice.

15 I was told that I had to be interviewed by the company's

16 outside attorneys who would be reporting the results of the

17 investigation to the government. I was told by a CA

18 executive not to discuss the company's end-of-quarter

19 practice with the outside lawyers. When I met with the

20 outside lawyers, I did not do so. That was also wrong.

21         Later, I was asked to speak to the government

22 directly. Several CA executives told me, in substance, not

23 to disclose the practice. When I was interviewed by the

24 government in September, 2002, I did not do so. I knew this

25 would impede the government's investigation of CA's

*SS, OCR, CSR, CM, CRR*



21



1  accounting practices.  My conduct in this regard was wrong

2  and that is why I've come forward today to accept

3  responsibility for those actions.

4          THE COURT:   Is there anything further,

5  Mr. Cornacchia?

6          MR. CORNACCHIA:   No.

7          THE COURT:   Mr. Walden?

8          MR. WALDEN:   Nothing.

9          THE COURT:   Mr. Silverstein has been fully

10 advised.  I'm satisfied he understood his rights and with

11 that understanding, he knowingly and voluntarily pleaded

12 guilty to an information which is numbered 04-CR-0024.

13 There's a factual basis for that plea and I'll accept it.

14         THE CLERK:   Sentencing on April 28th at

15 10:00 o'clock.

16         THE COURT:   What are the conditions of bail?

17         MR. CORNACCHIA:   Your Honor, we would recommend

18 that the court follow the recommendation of the Pretrial

19 Services; that is, Mr. Silverstein would be released on his

20 own recognizance, but surrender any passports, not apply for

21 passports and his travel be restricted to the continental

22 United States.

23         THE COURT:   You want to be heard on that?

24         MR. WALDEN:   No.

25         THE COURT:   So ordered.

*SS, OCR, CSR, CM, CRR*

22

1        MR. WALDEN:   Thank you, Judge.

2        THE COURT:   Mr. Walden, there's an application the

3   minutes of these proceedings be sealed?

4        MR. CORNACCHIA:   Unsealed, permit it to be

5   unsealed and the caption read United States versus

6   Silverstein.

7        THE COURT:  Very well.

8        MR. WALDEN:   Thank you, Judge.

9        MR. VASILESCU:   My name is Alex Vasilescu.   I'm a

10  senior trial counsel with the United States Securities &

11  Exchange Commission.  Minutes ago we filed a related civil

12  action against Mr. Silverstein.  Mr. Silverstein has also

13  consented in our case to a partial judgment imposing

14  injunctive relief and other equitable relief but leaving the

15  issue of civil penalty or disgorgement to be decided at a

16  later time.  The parties would like to tender to the court

17  the partial consent.

18        THE COURT:   Mr. Walden?

19        MR. WALDEN:    I consent on behalf of

20  Mr. Silverstein.

21        May I ask the matter be put over until April 28th,

22  consistent with the sentencing date your Honor has set?

23        THE COURT:   No objection to my signing this today?

24        MR. WALDEN:   No.

25        THE COURT:   Why don't you submit it?

23

1                    THE CLERK:  I'll take it.

2                    MR. VASILESCU:   Here's a courtesy copy of the

3      complaint.

4                    THE COURT:   Have you gone over this, Mr. Walden?

5                    MR. WALDEN:   Yes, Judge.

6                    (Whereupon, this matter concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SS, OCR, CSR, CM, CRR*

# Exhibit 5

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - - - - - - - - - - - -X

     UNITED STATES OF AMERICA,

4                                    :    CR-04-330
                                          (ILG)
5        -against-                   :    United States Courthouse
                                          Brooklyn, New York
6    DAVID KAPLAN,
                                     :    April 8, 2004
7                  Defendant.             2:30 p.m.
     - - - - - - - - - - - - - - - - - - - - - - - - -X
8
                    TRANSCRIPT OF PLEA
9             BEFORE THE HONORABLE I. LEO GLASSER
              UNITED STATES DISTRICT COURT JUDGE
10

11

     APPEARANCES:
12
     For the Government:       ROSLYNN R. MAUSKOPF, ESQ.
13                             UNITED STATES ATTORNEY
                               BY:  ERIC KOMITEE, AUSA
14                             One Pierrepont Plaza
                               Brooklyn, New York 11201
15

16
     For the Defendant:        JOHN S. SIFFERT, ESQ.
17

18

19

20

21

22   Official Court Reporter:      Stephanie Drexler, RPR
     Ph. (718) 260-2644            225 Cadman Plaza East
23   Fax (718) 260-4505           Brooklyn, New York 11201

24        Proceedings recorded by computerized stenography.
               Transcript produced by CAT.
25

2

```
 1            THE CLERK:  Criminal cause for arraignment and
 2  pleading, U.S.A. v. David Kaplan.
 3            Parties please come forward.
 4            MR. KOMITEE:  Eric Komitee for the United States.
 5  Good afternoon, your Honor.
 6            THE COURT:  Afternoon.
 7            MR. SIFFERT:  John Siffert for defendant, Mr.
 8  Kaplan.  Mr. Kaplan is with me.
 9            THE COURT:  I understand Mr. Kaplan wishes to plead
10  to an information here today.
11            MR. SIFFERT:  Yes, your Honor.
12            THE COURT:  Would you swear Mr. Kaplan.
13            (Defendant sworn.)
14            THE CLERK:  Please give your name.
15            THE DEFENDANT:  David Kaplan.
16            THE COURT:  Mr. Kaplan, you just swore to tell the
17  truth so everything you are going to say to me this morning
18  should be truthful because it's a crime, called perjury, to
19  tell a lie after you swore to tell the truth.
20            Do you understand that?
21            THE DEFENDANT:  Yes, I do.
22            THE COURT:  How old are you?
23            THE DEFENDANT:  37.
24            THE COURT:  Have you been under the care of a
25  physician within the past few weeks?
```

3

1        THE DEFENDANT:  No.

2        THE COURT:  Have you taken any medicines or pills or

3   drugs of any kind within the past few days?

4        THE DEFENDANT:  Just a prescription medication.

5        THE COURT:  What is that prescription medication

6   for?

7        THE DEFENDANT:  A foot infection.

8        THE COURT:  Does this medicine that you take

9   interfere with your ability to know what's going on around

10   you?

11        THE DEFENDANT:  No, it doesn't.

12        THE COURT:  Do you understand why you are here?

13        THE DEFENDANT:  Yes, I do.

14        THE COURT:  Have you understood everything I have

15   said to you so far?

16        THE DEFENDANT:  Yes, I do.

17        THE COURT:  How far have you gone in school?

18        THE DEFENDANT:  Undergraduate degree.

19        THE COURT:  Mr. Siffert, do you have any questions

20   about Mr. Kaplan's competence to participate here?

21        MR. SIFFERT:  I do not, your Honor.

22        THE COURT:  I make a finding to that effect.

23        Do you have a copy of the information before you?

24        MR. SIFFERT:  Yes, I do, your Honor.

25        THE COURT:  Mr. Kaplan, if you look at that paper,

4



1   you will see that on the upper right-hand side immediately

2   opposite the caption is the word "information" in capital

3   letters.

4           Do you see that?

5           THE DEFENDANT:  Yes, I do.

6           THE COURT:  If you go down a little bit underneath

7   the caption on the left, you will see the words "the United

8   States Attorney charges."

9           Do you see that?

10          THE DEFENDANT:  Yes, I do.

11          THE COURT:  And the reason that I call those things

12  to your attention is because the crimes with which you are



13  charged are what the Constitution of the United States refers

14  to as capital offenses, otherwise known as felonies, which are

15  crimes punishable by imprisonment for more than a year.  And

16  the Constitution of the United States provides that if a

17  person is to be charged with a capital offense or a felony, he

18  has a right to be charged by a Grand Jury and a Grand Jury

19  makes such an accusation, brings such a charge by way of a

20  paper that's called an indictment.

21          You are being charged not by the Grand Jury but as I

22  just pointed out to you you are being charged by the United

23  States Attorney.  And this paper in which the charges against

24  you are contained is not an indictment, it's an information.

25          So you have a right to say to me this afternoon that

5

1    you would like to enjoy the right which our Constitution gives

2    you to be indicted by a Grand Jury.  If you do, I suspect --

3    first, nothing else will happen here today but I suspect the

4    government would then cause a Grand Jury to be empanelled to

5    present such evidence as it has and request the Grand Jury to

6    indict you.  I don't know whether they would or wouldn't.

7             You also have a right, if you wish, to surrender

8    this privilege which the Constitution gives you to be indicted

9    by a Grand Jury provided you do this knowingly and

10   voluntarily.  And to permit you to make an informed judgment

11   about that let me very briefly tell you what a Grand Jury is

12   and when a Grand Jury returns an indictment.

13            A Grand Jury is made up of no less than 16 and no

14   more than 23 people.  And a Grand Jury returns an indictment

15   if the evidence which has been presented to it satisfies at

16   least 12 members of that body there is probable cause to

17   believe that a person has committed a crime.

18            And so as I have indicated to you, if you wish to

19   enjoy your right to be indicted by the Grand Jury, the

20   government will undoubtedly empanel one, present such evidence

21   as it has in this case, ask the Grand Jury to indict you;

22   whether they will or not, I don't know, that would depend upon

23   if 12 members of that body had probable cause to believe you

24   committed those crimes.

25            Do you understand all that?

6

1    THE DEFENDANT:  Yes, I do.

2    THE COURT:  Did you discuss all that with

3  Mr. Siffert?

4    THE DEFENDANT:  Yes, I did.

5    THE COURT:  Do you understand your right to be

6  indicted by a Grand Jury.

7    THE DEFENDANT:  Yes, I do.

8    THE COURT:  Do you wish to give up that right?

9    THE DEFENDANT:  Yes, I do.

10    THE COURT:  Are you giving it up voluntarily?

11    THE DEFENDANT:  Voluntarily, yes.

12    THE COURT:  Mr. Siffert, do you know of any reason

13  Mr. Kaplan shouldn't?

14    MR. SIFFERT:  No, your Honor.

15    THE COURT:  You have signed this waiver of

16  indictment, did you, Mr. Kaplan?

17    THE DEFENDANT:  Yes, I did.

18    THE COURT:  Mr. Siffert, you witnessed it?

19    MR. SIFFERT:  Yes, sir.

20    THE COURT:  Mr. Kaplan has been fully advised of his

21  right to be indicted by a Grand Jury.  I'm satisfied that he

22  understood it.  With that understanding, he knowingly and

23  voluntarily executed a waiver of indictment here in open court

24  which I will accept.

25    I'm going to very briefly review the charges against

7

1  you, Mr. Kaplan, and then as the law requires me to do, I'm

2  going to advise you, as I must, of the rights which you have

3  in connection with this information as you stand here before I

4  can accept your plea.

5        To begin with, this indictment contains

6  approximately 20 or so introductory paragraphs which I will

7  summarize.  I won't read them word for word.  It describes a

8  company called Computer Associates International, a Delaware

9  corporation, a publicly traded corporation on the New York

10 Stock Exchange which had considerable revenues in the years

11 1999 and 2000.

12        I take it you have gone over all this with

13 Mr. Siffert?

14        THE DEFENDANT:  Yes, I have, your Honor.

15        THE COURT:  The shares of Computer Associates, which

16 I will refer to as the company from here on in, were traded on

17 the New York Stock Exchange to persons all over the country

18 including the Eastern District of New York.  The business of

19 the company was to license its product to customers pursuant

20 to license agreements; customers agreed to pay a one-time

21 license fee then an annual usage and maintenance fee.

22        The company was required to comply with all rules

23 and regulations of the Securities and Exchange Commission, the

24 SEC, being a public company and those rules and regulations

25 were designed to protect the investing public by making sure

8

1   that the company's financial information was accurately

2   disclosed and reported to the investing public.

3           Under the SEC's rules and regulations, its officers

4   were required to keep books, keep records, keep accounts which

5   in reasonable detail accurately reflected the company's

6   business transactions including its revenues and expenses,

7   required to devise and maintain a system of internal

8   accounting controls which would be enough to provide

9   reasonable assurance that the company's transactions were

10  recorded as necessary to permit the preparation of financial

11  statements which were required by generally accepted

12  accounting principles.

13          The company's officers and executives were required

14  to prepare and file quarterly reports, 10-Q reports, annual

15  reports known as 10-K reports which included financial

16  statements that accurately represented the company's financial

17  condition.  Under those generally accepted accounting

18  practices, four conditions were required to be met if the

19  revenue associated with the licensing agreement was to be

20  recognized.  To begin with, there had to be persuasive

21  evidence of an arrangement that existed.  There had to be

22  delivery of the licensed products to have occurred.  The

23  license fee was required to have been fixed or determinable.

24  And the collectability of the license fee was required to have

25  been probable.

9

When written contracts were used to memorialize a
license agreement, the accounting principles persuasive
evidence criteria required that the contracts had been signed
by both the seller and the buyer.  Accordingly, under those
accounting principles for the company to have recognized
revenue from the licensed agreement in a particular fiscal
quarter, the license agreement had to have been signed by the
company and its customer within that quarter.

You are a certified public accountant.  You were
employed by the company from 1990 to 2003.  You held a variety
of positions in that company, Sales Accounting, General
Accounting, Financial Reporting Departments.  In 1997 to 2001
you served as the company vice president of Financial
Reporting.  And from 2001 to 2003, you served as the company's
senior vice president of Finance and Administration.

As head of the company's Financial Reporting
Department, you and those you supervised worked with the
company's Sales, Sales Accounting and Legal Departments as
well as a department called the Global Sales Organization to
make sure that the company properly reported its financial
position and revenue as required by those accepted accounting
principles and SEC regulations.

Among other responsibilities you participated in the
tabulation of the company's quarterly revenues on a contract
by contract basis.  The company regularly issued public



40

1   predictions at the outset of each fiscal quarter of the

2   revenue it expected to earn during that quarter and based in

3   part on those predictions, professional stock analysts

4   estimated what they believed would be the company's total

5   revenue during the period and predicted the earnings per share

6   of the company's stock.  The average of the estimates of the

7   professional analysts is commonly referred to as the consensus

8   estimate.

9          The company's officers, executives and directors

10  understood the company's failure to meet or exceed the

11  consensus estimate for a quarter would likely result in a

12  substantial decrease in the company's stock price.  For

13  example, on July 3rd, 2000, the company issued a press release

14  which reported that the company expected financial results for

15  the first quarter ending June 30th, 2000 to be less than

16  current Wall Street estimates.  In that press release the

17  company cited as one of the factors contributing to its

18  failure to meet the consensus estimate the fact that several

19  large contracts that were expected to close in the fiscal days

20  of the quarter were delayed.

21         On the date of the press release which was issued

22  after the market closed, the company's stock price closed at

23  $51.12 per share.  On the next trading day, which was July

24  5th, 2000, the company's stock price opened at $29 a share

25  representing a drop of slightly more than 43 percent.

11

1        Prior to and during the company's fiscal year 2000

2   which ended on March 31st, 2000, numerous company officers and

3   executives including you engaged in a systemic company-wide

4   practice of falsely and fraudulently recording and reporting

5   within a fiscal quarter revenues associated with certain

6   license agreements even though those license agreements were

7   not in fact finalized and signed during that quarter.  That

8   practice was sometimes referred to within the company as the

9   "35-day month" or the "three-day window."  It violated the

10  generally accepted accounting principles.

11        That practice was referred to as the 35-day month

12  because it involved artificially extending months, primarily

13  the last month of a fiscal quarter, for accounting purposes

14  beyond the true end of the month.  The practice did not,

15  however, only result in months that had for accounting

16  purposes 35 days instead, months were often extended even

17  longer.  Nonetheless for the sake of simplicity the practice

18  is referred to hereafter as the 35-day month practice.

19        The central goal of that practice was to permit the

20  company to report that it met or exceeded its projected

21  quarterly revenues and earnings when in truth it hadn't met

22  those projected revenues and earnings.

23        As a result of that practice, the company reported

24  falsely to investors and regulators during multiple fiscal

25  quarters including each of the four quarters of the company's

12

1   fiscal year 2000 that it had met or exceeded its consensus

2   estimates.  Indeed, in the last three quarters of fiscal year

3   2000 alone, the company improperly recognized and falsely

4   reported hundreds of millions of dollars of revenue associated

5   with numerous license agreements that had been finalized after

6   the quarter ended.  In so doing, the company made

7   misrepresentations, made omissions of material fact which were

8   relied upon by members of the investing public.

9          As part of that 35-day month practice, the company's

10  sales managers and salespeople were instructed and pressured

11  by high-level company executives to among other things

12  backdate license agreements finalized in the days immediately

13  following the end of the fiscal quarter to make it appear as

14  though the agreements were finalized before the end of that

15  quarter.

16         As a further part of the 35-day month practice, you

17  and other high- and mid-level executives of the company

18  routinely extended the company's fiscal quarters normally for

19  three business days.  That practice which was done often or

20  was often referred to as keeping the books open.  It was

21  designed and executed so that the company could falsely record

22  and report revenues associated with backdated license

23  agreements finalized after the end of fiscal quarters.  The

24  period between the end of the company's fiscal quarter and the

25  date on which the books were actually closed was referred to

13

1    within the company as the "flash period."

2           As a further part of the 35-day month practice, you

3    consulted with high-level executives at the company during

4    flash periods in the fiscal year 2000 concerning whether the

5    company generated enough license agreement revenue to meet the

6    consensus estimates for the recently-ended quarters.  When

7    informed that the company hadn't yet generated sufficient

8    revenue to meet the consensus estimates, these high-level

9    executives directed you and others to keep the books open

10   until additional backdated contracts were finalized and

11   signed.

12          As a result of the company's having kept the books

13   open in this way, the company was able to report that it met

14   the consensus estimates when in fact it hadn't done so.

15   Numerous company officers and executives including you

16   concealed the existence of the 35-day month practice from the

17   company's outside auditors.  Among other things company

18   executives engaged in a practice of "cleaning up" copies of

19   backdated license agreements before providing copies of those

20   agreements to the company's auditors.  That practice included

21   but wasn't limited to removing license agreements, facsimile

22   stamps and other notations which showed the true date on which

23   the agreements were finalized.

24          You knew that the purpose of this practice was to

25   prevent the company's auditors and by extension the investing



14



1   public from learning of the company's failure to meet or

2   exceed the consensus estimates for the given quarter.

3            In or about the beginning of 2002, the United States

4   Attorney's Office for this district, the FBI and the

5   northeastern region of the SEC began investigations into the

6   company's accounting practices including whether during the

7   late 1990s and thereafter the company engaged in improper

8   accounting practices with the intent to overstate its fiscal

9   quarterly revenues to make it appear as though the company had

10  met consensus estimates.  Since June of 2002, a Grand Jury

11  sitting in the Eastern District of New York has been

12  considering evidence about the company's accounting practices

13  and those investigations are referred to collectively

14  hereafter as government investigations.

15           In or about February of 2002, the company retained a

16  law firm to represent it in connection with its government

17  investigations.  Through the company's law firm, the company

18  represented to the United States Attorney's Office and to the

19  SEC that it was committed to cooperating fully with the

20  government investigations.  This representation was also made

21  publicly by the company in press releases and SEC filings and

22  other public statements.

23           Additionally, in a press release issued on February

24  20, 2002, the company denied that it had engaged in any

25  improper accounting practice declaring "the reporting of our

15

1  financial results has always been in accordance with

2  applicable accounting principles."

3        After being retained in February of 2002, the

4  company's law firm met with you and other company executives

5  in order to inquire into their knowledge of the practices that

6  were the subject of the government investigations.  You and

7  others agreed in advance of those meetings you would not

8  disclose, you would falsely deny and otherwise conceal the

9  existence of the 35-day month practice.

10        Moreover, you and others presented to the company's

11  law firm an assortment of false and misleading justifications

12  the purpose of which was to explain away evidence of the

13  35-day month practice.  You and others knew and in fact

14  intended that the company's law firm would present these false

15  and misleading justifications to the United States Attorney's

16  Office, to the SEC and the FBI.

17        For example, during a meeting with attorneys for the

18  company's firm, law firm, on or about May 3rd, 2002, you

19  falsely denied that the 35-day month practice existed.  You

20  further stated that license agreement revenues were generally

21  booked in the quarter in which the agreements were signed,

22  that if errors occurred in that practice, the errors would

23  have been caught and reversed through the application of

24  financial controls in place at the company.

25        At the time you made such statements, you knew them

16

1   to be false and misleading and you knew and intended they

2   would be transmitted to the United States Attorney's Office,

3   to the SEC and to the FBI.

4           Subsequent to your interview by the company's law

5   firm, in or about July of 2003, the audit committee of the

6   company's board of directors retained a second law firm that

7   was the audit committee's law firm to conduct a separate

8   internal investigation into the company's accounting practices

9   focusing on the 35-day month practice.  As part of its

10  internal investigation, the audit company's law firm

11  interviewed you on or about October 2nd, 2003 at which time

12  you falsely denied the existence of the 35-day month practice.

13  You stated that you were unaware that the company recognized

14  revenue from backdated contracts and quarters prior to their

15  actual execution.

16          You further falsely stated that the post quarter end

17  contract activity at the company related only to the

18  processing of contracts signed prior to the quarter's end.

19  You knew and intended that these false statements would also

20  be transmitted to the United States Attorney's Office, to the

21  SEC and to the FBI.

22          Those 21 paragraphs that I just read to you are to

23  be realleged and incorporated in the first and second counts

24  of this information which now charge that in or about and

25  between 1997 and 2000, those dates being approximate and

17



1  inclusive, within the Eastern District of New York and

2  elsewhere you together with others knowingly, willfully,

3  directly and indirectly conspired to commit fraud in

4  connection with the purchase and sale of common stock issued

5  by Computer Associates in violation of various sections of the

6  United States Code and the Code of Federal Regulations;

7  conspired to make and caused to be made false and misleading

8  statements of material fact in applications, reports,

9  documents required to be filed under the Securities and

10 Exchange Act of 1934 and the rules and regulations issued

11 pursuant to that act in violation of various sections of Title

12 15 of the United States Code; further conspired to falsify



13 Computer Associates' books, records and accounts, the making

14 of which was required by sections of Title 15 of the United

15 States Code, Title 17 of the Code of Federal Regulations in

16 violation of those statutes; conspired to circumvent Computer

17 Associates' internal accounting controls as required by the

18 United States Code.

19         And in furtherance of that conspiracy, in order to

20 effectuate its objectives, within the Eastern District of New

21 York and elsewhere, you met with a high-level Computer

22 Associates' executive in Islandia, New York on or about

23 January 4th, 2000.

24         The second charge, Count Two, began as, again, as I

25 indicated and incorporates as though they were fully set forth

18

1  those introductory paragraphs which I have summarized for you.

2  And Count Two charges that in or about and between February of

3  2002 and February of 2004, those dates being approximate and

4  inclusive, within the Eastern District of New York and

5  elsewhere, you together with others knowingly, intentionally,

6  corruptly conspired to obstruct, influence and impede

7  government investigations in violation of Section 1512C(2) of

8  Title 18 of the United States Code.

9           Those government investigations were official

10 proceedings.

11          As part of your conspiracy, beginning in or about

12 February of 2002, you and another high-level Computer

13 Associates' executive agreed falsely to deny and otherwise

14 conceal the existence of the 35-day month practice, to devise

15 false and misleading justifications the purpose of which was

16 to counter or explain away evidence of the 35-day month

17 practice.

18          Conspirators communicated these false and misleading

19 justifications to the company's law firm and to the audit

20 committee's law firm and others knowing and with the intent

21 that they would in turn be presented to the United States

22 Attorney's Office, the SEC and the FBI.  You and others well

23 knew and believed that these false statements together with

24 their concealment of material information would have the

25 effect of obstructing and impeding the government

19

1  investigations.

2       It's further part of the conspiracy that after

3  February of 2002, you met with another Computer Associates'

4  executive, agreed with that individual to deny the existence

5  of the 35-day month practice, to conceal its existence by

6  presenting various false and misleading justifications for

7  that conduct that was improper.  You and others well knew and

8  believed that those false statements, concealment of material

9  information would have the effect of obstructing and impeding

10  the government investigation.

11       It's a further part of the conspiracy that on or

12  about May 23rd, 2002, you while being interviewed by members

13  of the company's law firm did not disclose but instead

14  concealed the existence of the 35-day month practice.  It was

15  a further part of the conspiracy that on or about October 2nd,

16  2003, you met with the audit committee's law firm and falsely

17  denied the existence of the 35-day month practice.  And at the

18  time you met with the company's law firm and the audit

19  committee's law firm, you well knew and believed that your

20  false statements and concealment of material information would

21  have the effect of obstructing and impeding the government

22  investigations.

23       In furtherance of that conspiracy, to accomplish its

24  objectives, within the Eastern District of New York and

25  elsewhere on or about October 2nd, 2003 you met with members

1   of the audit committee's law firm in Islandia, New York.

2           I'm certain you discussed all that extensively with

3   Mr. Siffert?

4           THE DEFENDANT:  Yes, I did.

5           THE COURT:  You are satisfied with the

6   representation you have been receiving from Mr. Siffert?

7           THE DEFENDANT:  Yes, I am.

8           THE COURT:  I indicated to you earlier on that the

9   law requires me to make sure that there are a number of rights

10  that you enjoy as you stand here this afternoon and which I'm

11  obliged to advise you of and if there is anything I say to you

12  that you don't understand, don't hesitate to interrupt me.  I

13  will give you an opportunity to talk it over with Mr. Siffert.

14          The first thing I want to make sure that you

15  understand is you have a perfect right to say to me this

16  afternoon that you didn't commit those crimes, that you are

17  innocent.  If you tell me that, there will be a public trial,

18  it will be before a jury, it will be a trial that will be held

19  within the time required by law.  You will be represented by

20  the lawyer of your choice at that trial.  And you would be

21  presumed innocent at it.  By that I mean to say that you would

22  not have to prove that you did not commit these crimes.  You

23  would not have to prove anything at all.  The government would

24  have to prove that you did commit them.  And the government

25  would have to prove it so that a unanimous jury of 12 people

1    would be satisfied beyond a reasonable doubt that you

2    committed those crimes.

3              Do you understand that?

4              THE DEFENDANT:  Yes, I do.

5              THE COURT:  At that trial, Mr. Kaplan, you would

6    have the right to confront your accusers, have the right to

7    face the witnesses against you.  Your lawyer would have the

8    right to cross-examine those persons for you.  You would have

9    the right to object to any evidence that the government seeks

10   to introduce at that trial which he believes would not be

11   admissible in accordance with the rules of evidence.

12             Do you understand that?

13             THE DEFENDANT:  Yes, I do.

14             THE COURT:  At that trial too you could, if you

15   wanted to, testify for yourself under oath.  You could have

16   witnesses brought here to testify for you.  You could offer

17   such evidence at that trial as you think might be useful to

18   you but you needn't do any of those things.  You have a right

19   to remain silent at your trial, say nothing, do nothing.  And

20   if you did exercise that right, I would instruct the jury they

21   mustn't think you are guilty because you are not saying

22   anything.  I would instruct the jury that you are exercising a

23   very precious privilege which the Constitution confers upon

24   all of us, it's known as the privilege against self

25   incrimination which in effect means that a person can't be

22

1  forced to convict himself out of the words of his own mouth.

2        Do you understand all that?

3        THE DEFENDANT:  Yes, I do.

4        THE COURT:  If you plead guilty this afternoon and

5  if I accept your plea, you will be giving up all these rights

6  which I just explained to you, there will not be a trial and

7  the government would not be called upon to prove that you are

8  guilty of the crimes that I have just read to you, you will

9  not have the opportunity to know even who the witnesses

10  against you would be.  A judgment of guilt will be entered

11  this afternoon and you will be sentenced on another day.

12        Do you understand that?

13        THE DEFENDANT:  Yes, I do.

14        THE COURT:  I said to you a minute ago, Mr. Kaplan,

15  that if you plead guilty and if I accept your plea.  I

16  couldn't accept your plea unless I'm sure that you are in fact

17  guilty of the crimes to which you intend to tell me you are

18  guilty of.  The law requires me to make sure of that.  So I'm

19  going to ask you some questions about them and to the extent

20  you answer those questions, you will be giving up that

21  privilege against self incrimination and you will be

22  convicting yourself out of the words of your own mouth.

23        Do you understand that?

24        THE DEFENDANT:  Yes, I do.

25        THE COURT:  Mr. Siffert explained to you that the

23

1   maximum sentence which the statute you are charged with

2   violating provides for is imprisonment up to five years,

3   Mr. Siffert explained that?

4           THE DEFENDANT:  Yes, he has.

5           THE COURT:  And did he also explain in addition to

6   any term of imprisonment, the Court could add a period of

7   supervised release up to three years?

8           THE DEFENDANT:  Yes, he has.

9           THE COURT:  Did Mr. Siffert explain what supervised

10  release means?

11          THE DEFENDANT:  Yes, he has.

12          THE COURT:  Do you think you understand it?

13          THE DEFENDANT:  I do.

14          THE COURT:  Would you like me to explain it to you?

15          THE DEFENDANT:  No, I think I understand.

16          THE COURT:  Did he also tell you you could be fined

17  up to $250,000?

18          THE DEFENDANT:  Yes, he has.

19          THE COURT:  Did he explain to you that if

20  restitution is found to be mandatory by rules which are

21  applicable, you will be directed to make restitution?

22          THE DEFENDANT:  Yes, he has.

23          THE COURT:  Did Mr. Siffert also tell you that

24  regardless of what the sentence is, you will be required to

25  make a payment of $100 which is a special assessment and

24

1   mandatory?

2           THE DEFENDANT:  Yes, he has.

3           THE COURT:  Did he also tell you that your sentence

4   may be imposed to run consecutively on each of those counts?

5           THE DEFENDANT:  Yes, he has.

6           THE COURT:  Did Mr. Siffert also advise you that

7   your sentence will ultimately be determined by guidelines?

8           THE DEFENDANT:  Yes, he has.

9           THE COURT:  You understand that to mean that your

10  sentence will be somewhere between the minimum and the maximum

11  number of months?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And was some prediction made to you as

14  to what the guidelines in your case might be?

15          THE DEFENDANT:  No.

16          THE COURT:  I don't know as I talk to you,

17  Mr. Kaplan, what the guidelines in your case are for sure.  So

18  no prediction should have been made for you.  If one were, it

19  was just that, an educated guess which wouldn't be binding on

20  me.

21          Do you understand that?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  In a proper case, a person could be

24  sentenced more harshly or more leniently than the guidelines

25  may require.  I don't know whether yours would be a proper

25

1    case for either.

2          If you are sentenced more severely, you could appeal

3    that sentence.  If you are sentenced more leniently, the

4    government might.

5          Do you have questions about anything I have

6    explained to you so far?

7          THE DEFENDANT:  No, I don't.

8          THE COURT:  Mr. Siffert, do you know of any reason

9    why Mr. Kaplan shouldn't plead to those two charges?

10         MR. SIFFERT:  I do not, your Honor.

11         THE COURT:  How do you plead to those charges,

12   Mr. Kaplan, guilty or not guilty?

13         THE DEFENDANT:  Guilty, your Honor.

14         THE COURT:  Sorry?

15         THE DEFENDANT:  Guilty.

16         THE COURT:  You are telling me that voluntarily?

17         THE DEFENDANT:  Yes, I am.

18         THE COURT:  No one is forcing you to say that here

19   today?

20         THE DEFENDANT:  No, your Honor.

21         THE COURT:  You are telling me that in consideration

22   with an agreement that you entered into with the government?

23         THE DEFENDANT:  That's correct, your Honor.

24         THE COURT:  You have gone over that agreement in

25   some detail with Mr. Siffert?

26

1          THE DEFENDANT:  Yes, I have.

2          THE COURT:  Would you like me to review it with you

3   as well?

4          THE DEFENDANT:  I don't know if it's necessary for

5   you to review it with me.

6          THE COURT:  I don't know either.  If you would like

7   me to, I will.

8          THE DEFENDANT:  It's not necessary.

9          THE COURT:  I want to make sure you understand that

10  in one paragraph of that agreement, paragraph 6, you and the

11  government both agreed that in the event the government has

12  indicated satisfaction that you have discharged all of the

13  obligations which you have assumed by the terms of this

14  agreement, on the day that you will be sentenced, the

15  government will make a motion before me which is described in

16  that paragraph as a motion pursuant to 5K1.1 guidelines.  If I

17  grant that motion, the sentence which I impose need not be

18  with regard to the guidelines, it would be without regard to

19  what the guidelines might otherwise require.  But I want to

20  make sure you understand that I'm not obligated to grant that

21  motion.  And if for reasons sufficient unto me I deny it and

22  sentence you in accordance with the guidelines, you will not

23  be able to withdraw your plea for that reason.

24          Do you understand that?

25          THE DEFENDANT:  Yes, I do.

27

1          THE COURT:  I'm going to show you the last page of

2    this agreement, Mr. Kaplan, and ask you whether you recognize

3    any signature on that page.

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  Whose signature do you recognize?

6          THE DEFENDANT:  My own.

7          THE COURT:  You placed your signature under a legend

8    which reads you read the entire agreement, you discussed it

9    with your lawyer, you understood all of its terms and you are

10   entering into that agreement knowingly and voluntarily, you

11   understood that you made that certification?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Has anybody made any promises to you as

14   to what your sentence will be?

15         THE DEFENDANT:  No.

16         THE COURT:  I think I just told you I don't know

17   what your sentence will be so if anybody has made any promises

18   to you, they would be lying.

19         If you had gone to trial, Mr. Kaplan, on the two

20   counts with which you are charged, the government would have

21   had to prove essentially three things as to each count if the

22   jury were to be acting properly in deciding that you are

23   guilty, the crimes with which you are charged in each count,

24   crime of conspiracy.  And to establish the guilt of a person

25   charged with conspiracy, the government would have to prove

28

1    three things.  The government would have to prove first that

2    there was a conspiracy, that you knowingly and intentionally

3    were a party to that conspiracy and that one or more of the

4    overt acts which are alleged was committed in furtherance of

5    and during the course of that conspiracy.

6          Conspiracy, Mr. Kaplan, is very simply defined as an

7    agreement between two or more people to commit a crime.  When

8    I say it's defined as an agreement, I don't mean to suggest

9    you have to go to a lawyer's office together with your

10   coconspirators and sign a formal document that you are

11   entering into such an agreement.  It would be enough if the

12   government proved to the satisfaction of a unanimous jury that

13   you and one or more other persons had a common understanding,

14   had a meeting of the minds with respect to the first count

15   that you would commit what is referred to as securities fraud

16   and described as such in that count and I would ask you

17   whether you and one or more other persons had an agreement,

18   had an understanding, had a meeting of the minds that you

19   would commit the crime of securities fraud as it is charged in

20   Count One and as it was related that crime was committed in

21   all of the paragraphs that I read to you.

22         Did you have such an agreement with one or more

23   persons?

24         THE DEFENDANT:  Yes, I did.

25         THE COURT:  You were a party to that agreement

29

1   knowing full well what it was you were agreeing to?

2          THE DEFENDANT:  Yes, I was.

3          THE COURT:  With respect to Count One, the

4   securities count, was it true that in furtherance of that

5   conspiracy and in order to accomplish its objectives on or

6   about the 4th of January of the year 2000, which was during

7   the course of that conspiracy, you met with a high-level

8   company executive of Computer Associates in Islandia, New

9   York; is that true?

10          THE DEFENDANT:  Yes, it is.

11          THE COURT:  Did you also have an agreement,

12   understanding, a meeting of the minds with one or more other

13   people that you were going to obstruct, impede the government

14   investigation which you knew was ongoing into the fraudulent

15   accounting practices of Computer Associates?

16          THE DEFENDANT:  Yes, I did.

17          THE COURT:  You were a party to that agreement fully

18   understanding what it was you were agreeing to?

19          THE DEFENDANT:  Yes, I was.

20          THE COURT:  Was it true also that in order to

21   accomplish the objective of that conspiracy, on or about

22   October 2nd, 2003 within the Eastern District of New York you

23   met with members of the audit committee's law firm in

24   Islandia, New York; is that true?

25          THE DEFENDANT:  Yes, it is.



30

1          THE COURT:  Am I correct in understanding you have

2   something you would like to read to the Court?

3          THE DEFENDANT:  That's correct, your Honor.

4          THE COURT:  I will hear you.

5          THE DEFENDANT:  As a vice president and senior vice

6   president of Computer Associates International from 1997 to

7   2000, I agreed with other executives to create false books and

8   records and false filings in the Securities and Exchange Act

9   of 1934.  I did so by agreeing to report quarterly earnings

10  based upon contracts signed by Computer Associates' customers

11  after the close of the quarter in violation of accounting

12  rules.  I agreed to do these things in order to mislead the

13  investing public.

14         In furtherance of the conspiracy, I met with a

15  high-level Computer Associate's executive in Islandia, New

16  York, on January 4th, 2000.

17         From 2002 to 2003, I agreed with other executives to

18  mislead and deceive lawyers working for Computer Associates

19  and its audit committee who were investigating the revenue

20  recognition practices of Computer Associates.  I agreed to

21  deceive these lawyers by providing false and misleading

22  answers at interviews conducted by the lawyers.  I understood

23  that these lawyers would report their findings to the

24  government.

25         In furtherance of the conspiracy I met with members

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

31

1  of the audit committee's law firm in Islandia, New York on

2  October 2nd, 2003.

3          I do plead guilty and accept responsibility for my

4  actions.

5          THE COURT:  Mr. Siffert, anything else you want to

6  call to the Court's attention?

7          MR. SIFFERT:  No, your Honor.

8          THE COURT:  Mr. Komitee?

9          MR. KOMITEE:  No, your Honor.

10         THE COURT:  Mr. Kaplan has been fully advised of his

11 rights.  I'm satisfied he understood them.  And with that

12 understanding he pleaded to the counts of an information which

13 is numbered CR-04-330.  I'm satisfied there is a factual basis

14 for his plea and I will accept it.

15         THE CLERK:  Sentencing July 21st at 10:00 a.m.

16         MR. KOMITEE:  Your Honor, the parties have an

17 agreement with respect to bail.  That agreement has been

18 memorialized on a bond which I understand is being handed up

19 to the Court.  This bond is identical to the bond from this

20 morning and satisfactory from the government's perspective.

21         THE COURT:  I take it that the terms of his release

22 on bond is a personal recognizance bond in the sum of

23 $500,000?

24         MR. KOMITEE:  $500,000.

25         THE COURT:  His travel is restricted to the

32

1  continental or the United States?

2          MR. KOMITEE:  That's correct, your Honor.

3          THE COURT:  He has surrendered his passport to the

4  government?

5          MR. SIFFERT:  He will do so, your Honor.  We have

6  it.

7          MR. KOMITEE:  He will have by May 1st.

8          THE COURT:  He is to report once a month to Pretrial

9  Services by telephone?

10         MR. KOMITEE:  That's correct.

11         THE COURT:  It sets forth all the conditions of

12  presentence release?

13         MR. KOMITEE:  It does.

14         THE COURT:  So ordered.

15         Thank you.

16         MR. KOMITEE:  Thank you, Judge.

17         THE COURT:  Sentence is when?

18         THE CLERK:  July 21st at 10:00.

19         THE COURT:  I take it you are not making an

20  application to have the records of this proceeding sealed?

21         MR. KOMITEE:  We are not, your Honor.

22         THE COURT:  Is a representative of the SEC here?

23         MR. SIFFERT:  Yes, he is.

24         MR. VASILESCU:  Your Honor, Alex Vasilescu for the

25  United States Securities and Exchange Commission.

33

1    Earlier today we filed a complaint charging various

2  securities violations against David Kaplan.  Mr. Kaplan has

3  already consented to a partial judgment where he neither

4  admits nor denies the allegations in the complaint and

5  consents to injunctive and equitable relief and we

6  respectfully request the Court enter the partial judgment.

7    MR. SIFFERT:  We are negotiating further to get a

8  final judgment and we hope to have that soon.

9    THE COURT:  With respect to this partial final

10  judgment, Mr. Kaplan, have you gone over the contents of that

11  partial final judgment with Mr. Siffert?

12    THE DEFENDANT:  Yes, I have.

13    THE COURT:  You understand it?

14    THE DEFENDANT:  Yes, I do.

15    THE COURT:  You are consenting to its entry?

16    THE DEFENDANT:  Yes, I am.

17    THE COURT:  I have granted it.

18    MR. VASILESCU:  May the parties approach the bench

19  off the record?

20    THE COURT:  Sure.

21    (Discussion held off the record.)

22    MR. VASILESCU:  Thank you, your Honor.

23    (The matter was concluded.)

24

25

# Exhibit 6

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2

3   ------------------------------X
    UNITED STATES OF AMERICA,
4                                 :   CR-04-329
                                      (ILG)
5      -against-                  :   United States Courthouse
                                      Brooklyn, New York
6   DAVID RIVARD,
                                  :   April 8, 2004
7              Defendant.             11:00 a.m.
    ------------------------------X
8
                   TRANSCRIPT OF PLEA
9          BEFORE THE HONORABLE I. LEO GLASSER
           UNITED STATES DISTRICT COURT JUDGE
10

11

    APPEARANCES:
12

13  For the Government:      ROSLYNN R. MAUSKOPF, ESQ.
                             UNITED STATES ATTORNEY
14                           BY:  MICHAEL CORNACCHIA, AUSA
                                  DAVID PITOFSKY, AUSA
15                           One Pierrepont Plaza
                             Brooklyn, New York 11201
16

17  For the Defendant:       JOHN CARROLL, ESQ.

18

19

20

21

22
    Official Court Reporter:     Stephanie Drexler, RPR
23  Ph. (718) 260-2644           225 Cadman Plaza East
    Fax (718) 260-4505           Brooklyn, New York 11201
24
              Proceedings recorded by computerized stenography.
25                Transcript produced by CAT.

2

1          THE CLERK:  Criminal cause for arraignment and

2    pleading, U.S.A. v. David Rivard.

3          Counsel, please come forward.

4          MR. CORNACCHIA:  For the United States, Michael

5    Cornacchia.

6          MR. CARROLL:  For the defendant, Mr. Rivard, John

7    Carroll from Clifford Chance.

8          THE COURT:  Is Mr. Rivard here?

9          MR. CARROLL:  He is.

10          THE COURT:  Have him come up.

11          (The defendant appears before the Court.)

12          THE COURT:  I understand Mr. Rivard wishes to plead

13    to an information; is that correct?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Would you swear him in.

16          (Defendant sworn.)

17          THE CLERK:  Please give your name.

18          THE DEFENDANT:  David Rivard, R I V A R D.

19          THE COURT:  Mr. Rivard, you just swore to tell the

20    truth so everything you are going to say to me from here on in

21    should be truthful because it's a crime, it's called perjury,

22    to tell a lie after you swore to tell the truth.

23          Do you understand that?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  How old are you?

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

3

1        THE DEFENDANT:  36.

2        THE COURT:  How far have you gone in school?

3        THE DEFENDANT:  I graduated college, bachelor's.

4        THE COURT:  Have you been under the care of a

5   physician within the past few weeks?

6        THE DEFENDANT:  Yes, but just for stress.

7        THE COURT:  Have you taken any medicines or pills or

8   drugs of any kind within the past few weeks?

9        THE DEFENDANT:  Just Zoloft.

10        THE COURT:  Does What you take interfere with your

11   ability to understand what's going on around you?

12        THE DEFENDANT:  Absolutely not.

13        THE COURT:  Do you understand everything that I have

14   said to you so far?

15        THE DEFENDANT:  Yes, your Honor.

16        THE COURT:  Mr. Carroll, do you have any question

17   about Mr. Rivard's competence to participate in these

18   proceedings?

19        MR. CARROLL:  I do not.

20        THE COURT:  I make a finding to that effect.

21        Do you have a copy of the information handy?

22        MR. CORNACCHIA:  Yes, Judge.

23        THE COURT:  Put it in front of Mr. Rivard.

24        Mr. Rivard, the document in which you are charged

25   with several offenses, if you look at it, at the upper

4

1   right-hand side of that document in capital letters, you will

2   see the word "information."

3              Do you see that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  If you go down that page just a little

6   bit under the caption on the left of that page, you will see

7   that it reads "the United States Attorney charges."

8              Do you see that?

9              THE DEFENDANT:  Sure.

10             THE COURT:  The reason that I call that to your

11  attention is that the crimes with which you are charged are

12  characterized by our Constitution as capital offenses,

13  sometimes more commonly known as felonies, which are crimes

14  punishable by imprisonment for more than a year.  And the

15  Constitution of the United States provides that if a person is

16  going to be charged with a capital offense or a felony, he has

17  the right to be charged by a Grand Jury and the Grand Jury

18  makes such a charge in a document that's called an indictment.

19             As I just indicated to you, you are not being

20  charged by the Grand Jury.  This document reads "the United

21  States Attorney charges."  And the document in which you are

22  charged is not an indictment, it's an information.

23             So you have a perfect right to say to me today that

24  you wish to enjoy the right which our Constitution gives you

25  which is to be charged by a Grand Jury in a document which is

5

1  called an indictment.

2          Do you understand all that so far.

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  You also have the right, if you wish, to

5  give up that constitutional guarantee provided you do so

6  voluntarily and knowingly.  And in order to make an informed

7  judgment as to whether you want to waive that right, let me

8  tell you very briefly what a Grand Jury is and when a Grand

9  Jury returns an indictment.

10         A Grand Jury is made up of no less than 16 and no

11 more than 23 people and the Grand Jury returns an indictment

12 when at least 12 of those people, based upon what has been

13 presented to them, have probable cause to believe that a

14 person has committed a crime.  If you stand on your

15 constitutional guarantee to be indicted by a Grand Jury, I

16 suspect that what would happen here today would be that the

17 government would impanel a Grand Jury, present such evidence

18 as it has in connection with this case to that body and ask

19 them to return an indictment; whether the Grand Jury would or

20 would not, I don't know.  That would depend on whether 12

21 members of that body would have probable cause to believe that

22 you committed this crime.

23         Do you understand that all?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  Did you have an opportunity to discuss

6

1    all that with Mr. Carroll?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Do you want to give up your right to be

4    indicted by a Grand Jury?

5            THE DEFENDANT:  Yes, your Honor.

6            THE COURT:  And to be charged by the United States

7    Attorney?

8            THE DEFENDANT:  Yes.

9            THE COURT:  You are giving up that right

10   voluntarily?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Nobody has forced you to do that?

13           THE DEFENDANT:  No.

14           THE COURT:  Mr. Carroll, do you know of any reason

15   why Mr. Rivard should not give up that right?

16           MR. CARROLL:  I do not, your Honor.

17           THE COURT:  This waiver of indictment has been

18   executed here this morning by Mr. Rivard?

19           MR. CARROLL:  It has, your Honor.

20           THE COURT:  Witnessed by you?

21           MR. CARROLL:  That's correct, your Honor.

22           THE COURT:  Mr. Rivard has been fully advised of his

23   right to be indicted by a Grand Jury which I'm satisfied he

24   understands.  With that understanding, he knowingly and

25   voluntarily waived that indictment.  He has executed a waiver

7

1    here in open court which I will accept and direct it be filed.

2        Before I can accept your plea, Mr. Rivard, the law

3    requires me to make sure that you fully understand a number of

4    rights which you have as you stand here so I will go over

5    those with you and make sure that you understand what it is

6    that you have been accused of.  This introduction contains a

7    series of background paragraphs and I will summarize them for

8    you.

9        I take it you have gone over these carefully with

10   Mr. Carroll?

11        MR. CARROLL:  We have, your Honor.

12        THE COURT:  I will go over them with you again in

13   summary fashion.

14        It begins by identifying Computer Associates

15   International, referred to hereafter as CA, as a Delaware

16   corporation which was headquartered in Islandia, New York.  It

17   was the leading manufacturer and distributor of computer

18   software used by businesses.  It reported revenues for the

19   fiscal year ending March 31st, '99 of 5.253 billion and it's

20   revenues for the fiscal year ending March 31, 2000 was 6.776

21   billion.  CA was publicly traded on the New York Stock

22   Exchange.  Persons who held shares in that corporation were

23   located throughout the United States including this district.

24        CA did not sell or transfer the title to its

25   products to its customers, instead, it licensed those products

8

1   in accordance with licensing agreements pursuant to which the

2   customers agreed to pay a one-time license fee and an annual

3   usage and maintenance fee.  As a public company, CA was

4   required to comply with the rules and regulations of the SEC

5   and those rules and regulations were designed to protect the

6   investing public by ensuring that the company's financial

7   information was accurately recorded and disclosed to them.

8           Under the SEC's rules and regulations, CA and its

9   officers were required to make and keep books, records,

10  accounts which in reasonable detail fairly and accurately

11  reflected the company's business transactions including its

12  revenues and expenses.  It required the company to devise and

13  maintain a system of internal accounting controls which were

14  enough to provide reasonable assurance that the company's

15  transactions were recorded as necessary to permit the

16  preparation of financial statements in accordance with

17  generally accepted accounting principles.

18          The company was required to file with the SEC on

19  form 10-Q quarterly reports and on form 10-K annual reports

20  which included financial statements that accurately

21  represented the company's financial condition and the results

22  of its business operations in accordance with generally

23  accepted accounting principles.

24          Under those principles, four conditions were

25  required to be met for revenue associated with the license

9

1   agreements to be recognized:  There had to be persuasive

2   evidence of an arrangement that was required to have existed.

3   A delivery of the licensed products was required to have

4   occurred.  The license fee was required to have been fixed or

5   determinable.  And the collectability of the license fee was

6   required to have been probable.

7          When written contracts were used to memorialize a

8   license agreement, the accounting principles persuasive

9   evidence criteria required the contracts to have been signed

10  by both the vendor and the customer.

11         Accordingly, under those accounting principles, in

12  order for the company to have properly recognized revenue for

13  a licensed agreement in a particular fiscal quarter, the

14  license agreement was required to have been signed by both the

15  company and its customer within that quarter.

16         You, a certified public accountant who was employed

17  by the company from 1998 to 2003, from 1998 to 2001 you were

18  the company's vice president of Sales Accounting.  From 2001

19  until 2003, you served as the company's vice president of

20  finance.  And as head of the company's Sales Accounting

21  Department, you and those you supervised worked with the

22  company's Sales and Legal Departments as well as the

23  department called the Global Sales Organization to ensure that

24  the revenue generated by license agreements could be

25  recognized by the company for accounting purposes.

10

1      The revenue from these agreements could not be

2  recognized by the company until Sales Accounting's approval

3  was obtained.  Accordingly, you and Sales Accounting personnel

4  reviewed license agreements and recommended changes when

5  necessary to ensure revenue recognition.  In those instances,

6  you as a Sales Accounting manager signed the license

7  agreements on behalf of the company.

8      The company regularly issued public predictions at

9  the beginning of each fiscal quarter of the revenue it

10 expected to earn during that quarter and based in part on

11 those predictions, professional stock analysts estimated what

12 they believed would be the company's total revenue during the

13 period and predicted the earnings per share of the company's

14 stock.  And the average of the estimates of the professional

15 analysts was commonly referred to as the consensus estimate.

16     The company's officers, executives and directors,

17 including you, understood that the company's failure to meet

18 or exceed the consensus estimate for a quarter would likely

19 result in a substantial decrease in the company's stock price.

20 For example, on July 3rd, 2000, the company issued a press

21 release which reported that the company expected financial

22 results for the first quarter ending June 30th, 2000 to be

23 less than current Wall Street estimates.  In the press release

24 the company cited as one of the factors contributing to its

25 failure to meet the consensus estimate the fact that several

11

1 large contracts that were expected to close in the final days

2 of the quarter had been delayed.  On the date of the press

3 release which was issued after the market closed, the

4 company's stock price closed at $51.12 per share.  On the next

5 trading day, July 5th, 2000, the company's stock price opened

6 at $29 a share representing a percentage drop of slightly more

7 than 43 percent.

8 Prior to and during the company's fiscal year 2000

9 which ended March 31st, 2000, numerous company officers and

10 executives, including you, engaged in a systemic company-wide

11 practice of falsely and fraudulently recording and reporting

12 within a fiscal quarter revenues associated with certain

13 licensing agreements even though those licensing agreements

14 had not in fact been finalized and signed during that quarter.

15 This practice which was sometimes referred to within the

16 company as the "35-day month" or the "three-day window"

17 violated the generally accepted accounting principles.  The

18 practice was referred to as the 35-day month because it

19 involved artificially extending months, primarily the last

20 month of the fiscal quarter, for accounting purposes beyond

21 the true end of the month.

22 The practice did not, however, only result in months

23 that had for accounting purposes 35 days, instead months were

24 often extended even longer.  Nonetheless for the sake of

25 simplicity, the practice is referred to hereinafter as the

12

1    35-day month practice.  The central goal of that practice was

2    to permit the company to report that it met or exceeded its

3    projected quarterly revenues and earnings when in truth the

4    company had not met them.

5              As a result of the practice, the company reported

6    falsely to investors and regulators during multiple fiscal

7    quarters, including each of the four quarters of the company's

8    fiscal year 2000, that it had met or exceeded its consensus

9    estimates.  Indeed, in the last three quarters of fiscal year

10   2000 alone, the company improperly recognized and falsely

11   reported hundreds of millions of dollars of revenue associated

12   with numerous license agreements that had been finalized after

13   the quarter closed.  In so doing the company made

14   misrepresentations and omissions of material facts which were

15   relied upon by members of the investing public.

16             As part of 35-day month practice, the company's

17   sales managers and salespeople were trained, instructed and

18   pressured by high-level company executives to, among other

19   things, backdate license agreements finalized in the days

20   immediately following the end of the fiscal quarter to make it

21   appear as though the agreements had been finalized before the

22   end of that fiscal quarter.  As a further part of the 35-day

23   month practice, you and other high-level and mid-level

24   executives at the company routinely extended the company's

25   fiscal quarters normally for three business days.

13

1          This practice which was often referred to as

2    "keeping the books open" was designed and executed so that the

3    company could falsely record and report revenues associated

4    with backdated license agreements finalized after the end of

5    fiscal quarters.  The period between the true end of the

6    company's fiscal quarter and the date on which the company's

7    books were actually closed was referred to within the company

8    as the "flash period."

9          As a further part of the 35-day month practice, you

10   signed multiple license agreements for the company which you

11   knew or had reason to know were finalized and executed by the

12   company's customers after the fiscal quarter had ended but

13   that bore execution dates that falsely indicated that the

14   agreements were signed before the end of the fiscal quarter.

15          You routinely signed these falsely-dated agreements

16   and in some instances falsely dated your signature to make it

17   appear that those agreements were finalized in the preceding

18   quarter.  In each instance knowing that agreements had been

19   finalized after a fiscal quarter had ended, you caused the

20   license revenue from the agreements to be recorded and

21   reported falsely as earned in the earlier fiscal quarter.  And

22   as a further part of the 35-day month practice, you advised

23   and assisted the company's sales personnel in finalizing

24   license agreements during the flash period at the same time

25   you met with high-level company executives to review and

14

1   report on the progress of the negotiation of those agreements.

2          Numerous company officers and executives, including

3   you, concealed the existence of the 35-day month practice to

4   the company's outside auditors.  Among other things company

5   executives engaged in a practice of "cleaning up" copies of

6   backdated license agreements before providing copies of the

7   agreements to the company's auditors.  This practice included

8   but was not limited to removing from license agreements

9   facsimile stamps and other notations which showed the true

10  date on which the agreements were finalized.  You engaged in

11  this practice and directed other company employees to engage

12  in this practice which was designed and carried out to prevent

13  the company's auditors, by extension the investing public,

14  from learning of the company's failure to meet or exceed the

15  consensus estimate for the given quarter.

16         In or about the beginning of 2002, the United States

17  Attorney's Office for this district, the Federal Bureau of

18  Investigation and the northeast regional offices of the SEC

19  began investigations into the company's accounting practices

20  including whether during the late 1990s and thereafter the

21  company engaged in improper accounting practices with the

22  intent to overstate its fiscal quarterly revenues to make it

23  appear as though the company had met consensus estimates.

24  Since June of 2002, a Grand Jury sitting in the Eastern

25  District of New York has been considering evidence about the

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

15

1  company's accounting practices.  These investigations are

2  referred to collectively as the government investigations.

3       In or about February of 2002, the company retained a

4  law firm to represent it in connection with the government

5  investigation.  Through the company's law firm, the company

6  represented to the United States Attorney's Office and the SEC

7  that it was committed to cooperating fully with the government

8  investigations.  This representation was also made publicly by

9  the company in press releases and SEC filings and in other

10 public statements.

11      Additionally, in a press release issued on February

12 20th, 2002, the company denied that it had engaged in any

13 improper accounting practices declaring "the reporting of our

14 financial results has always been in accordance with

15 applicable accounting principles."  After being retained in

16 February 2002, the company's law firm met with you and other

17 company executives in order to inquire into your knowledge and

18 their knowledge of the practices that were the subject of the

19 government investigations.  During those meetings you and

20 others did not disclose, falsely denied and otherwise

21 concealed the existence of the 35-day month practice.

22      Moreover, you and others concocted and presented to

23 the company's law firm an assortment of false justifications

24 the purpose of which was to counter or explain evidence of the

25 35-day month practice.  You and others knew and in fact

16

1   intended that the company law firm would present these false

2   justifications to the United States Attorney's Office, the SEC

3   and the FBI.

4           For example, during the meeting with attorneys from

5   the company's law firm, you falsely denied that the 35-day

6   month practice existed.  You falsely stated that the flash

7   period existed merely to provide sales personnel with a period

8   of time to submit agreements that had been previously

9   finalized in the fiscal quarter that had ended.  You falsely

10  explained that any improper booking of revenues from

11  agreements finalized after the end of fiscal quarters were

12  caused by "human error."

13          You knew that these explanations were false and

14  intended that the company's law firm would present these false

15  explanations to the United States Attorney's Office, the SEC

16  and the FBI as part of an effort to persuade those entities

17  that accusations about the 35-day month practice were

18  unfounded.

19          Those allegations are now realleged and incorporated

20  as though they were fully set forth in Count One which charges

21  that in or about and between June of 1998 and December of

22  2000, within the Eastern District of New York and elsewhere,

23  you together with others knowingly and willfully directly and

24  indirectly conspired, A, to commit fraud in connection with

25  the purchase and sale of common stock issued by Computer

17

1  Associates in violation of Title 15 of the United States Code,

2  Sections 78J and 78FF and Title 18 of the Code of Federal

3  Regulations, Section 240.10(b)(5); B, to conspire to make and

4  cause to be made false and misleading statements of material

5  fact and applications, reports and documents required to be

6  filed under the Securities and Exchange Act of 1934 and the

7  rules and regulations thereunder in violation of Title 15,

8  Section 78FF of the United States Code; conspired to falsify

9  Computer Associates' books, records and accounts the making

10  and keeping of which was required by Title 15, Section

11  78B(2)(a) of the United States Code and Title 17 of the Code

12  of Federal Regulations, Section 240.13(b)(2)(1) in violation

13  of Title 15, Section 78N(b)(5), 78FF of the United States

14  Code; conspired to circumvent Computer Associates' internal

15  accounting controls as required by Title 15, Section

16  78N(b)(2)(b) in violation of Section 78N(b)(5) and 78FF, Title

17  15 of the United States Code.

18          In furtherance of that conspiracy and to effect its

19  objects, within the Eastern District of New York and

20  elsewhere, you together with others committed and caused to be

21  committed among others the following overt acts:

22          A, on or about December 29th, 1998 at the

23  headquarters of Computer Associates in Islandia, New York, you

24  sent an e-mail to other Computer Associates' executives

25  informing them that "January 5" would be the "last day of

18

1   business for December," the third quarter of the company's

2   fiscal year in 1999 which ended on December 31st, 1998.

3        B, on or about October 5th, 1999, at Computer

4   Associates' headquarters in Islandia, New York, you signed on

5   behalf of that company an approximately $176 million license

6   agreement which was backdated to make it appear as though the

7   agreement had been executed on September 30, 1999, the last

8   day of the second quarter of the company's fiscal year 2000.

9        C, on or about April 7, 2000, at the company's

10  headquarters in Islandia, New York, you signed on behalf of

11  the company an approximately $32 million license agreement

12  which was backdated to make it appear as though you had

13  executed it on March 31, 2000, the last day of the

14  fourth-quarter of the company's fiscal year of 2000 all in

15  violation of Section 371, Title 18 of the United States Code.

16       The second count again incorporates all of the

17  introductory background paragraphs that I had summarized for

18  you as though they had been fully set out and charges that in

19  or about and between February of 2000 and February 10th of --

20  sorry, February 2002 and February 10th of 2004, both dates

21  being approximate and inclusive within the Eastern District of

22  New York and elsewhere, you together with others knowingly and

23  intentionally and corruptly conspired to obstruct, influence

24  and impede official proceedings, namely the government

25  investigations, in violation of Section 1512C(2) of Title 18

19

1   of the United States Code.

2       It was part of the conspiracy that beginning in or

3   about February of 2002, you and other high-level Computer

4   Associates' executives agreed to deny falsely and otherwise

5   conceal the existence of the 35-day month practice, to device

6   false justifications whose purposes was to counter or explain

7   away evidence of the 35-day month practice.  The conspirators

8   communicated these false justifications to the company's law

9   firm and others knowing and with the intent that they would in

10  turn be presented to the United States Attorney's Office, the

11  SEC, the FBI and you and others well knew and believed these

12  false statements together with their concealment of material

13  information would have the effect of obstructing and impeding

14  the government investigations.

15      It was further part of the conspiracy that after

16  February of 2002, you met with Computer Associates' executives

17  and employees and agreed with those individuals to deny the

18  existence of the 35-day month practice and to conceal its

19  existence by presenting various false justifications for

20  conduct that was improper.  You and others well knew and

21  believed that such false statements and concealment of

22  material information would have the effect of obstructing and

23  impeding the government investigations.

24      It was further part of the conspiracy that on or

25  about August 5th, 2002, you while being interviewed by members

1   of the company's law firm did not disclose but instead denied

2   and otherwise concealed the existence of the 35-day month

3   practice.  You well knew and believed that your false

4   statements and concealment of material information would have

5   the effect of obstructing and impeding the government

6   investigations.  And in furtherance of that conspiracy and to

7   effect your objectives within the Eastern District of New York

8   and elsewhere on or about August 5th, 2002, you met with

9   members of the company's law firm in Islandia, New York to

10  discuss this in detail with Mr. Carroll.

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Are you fully satisfied with the

13  assistance and representation you have been receiving from

14  Mr. Carroll?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  I indicated to you early on, Mr. Rivard,

17  that before I can accept your plea, the law requires me to

18  make sure that you are fully familiar with the various rights

19  that you have as you stand here this morning.  The first thing

20  I want to make sure you understand is you have a perfect right

21  to say to me that you are not guilty of these charges.  And if

22  you say that, there will be a public trial, it will be a trial

23  to a jury, it will be a trial which will be held within the

24  time required by law.  You will be represented by the lawyer

25  of your choice at that trial.  And at that trial, you would be

21

1   presumed innocent of these charges which means that you would

2   not have to prove your innocence.  You would not have to prove

3   anything at all.  The government would have to prove your

4   guilt and the government would have to prove it so that a

5   unanimous jury of 12 persons would be satisfied beyond a

6   reasonable doubt of your guilt.

7          Do you understand that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  At that trial you would have a right to

10  confront your accusers.  You would have a right to see who the

11  witnesses against you would be.  Your lawyer would have a

12  right to cross-examine those persons for you.  Your lawyer

13  would have a right to object to any evidence which he believed

14  the law of evidence would preclude the Court from receiving.

15         Do you understand that?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  And at that trial too you could, if you

18  wish, Mr. Rivard, testify under oath for yourself.  You can

19  have witnesses summoned here to testify on your behalf.  You

20  could offer such evidence at that trial as you think might be

21  useful to you.  But you needn't do any of those things.  You

22  have a right to remain silent at that trial, say nothing and

23  do nothing.

24         And if you did remain silent and did nothing else, I

25  would instruct the jury that it would be terribly wrong for

1    them to infer that you are guilty because you are not saying

2    anything.  I would instruct the jury that your exercising a

3    significant privilege which the Constitution of the United

4    States affords to you and all the rest of us, it's known as

5    the privilege against self incrimination.  In simpler terms it

6    means a person can't be forced to convict himself out of the

7    words of his own mouth.

8              Do you understand all that?

9              THE DEFENDANT:  I do, your Honor.

10             THE COURT:  If you plead guilty this morning and if

11   I accept your plea, you will be giving up all those rights

12   which I have just explained to you.  There will not be a

13   trial.  The government will not be required to prove your

14   guilt to the satisfaction of a unanimous jury beyond a

15   reasonable doubt.  You will not have had the opportunity to

16   see who the witnesses against you would be.  I would direct a

17   judgment of guilt to be entered this morning and you will be

18   sentenced on another day.

19             Do you understand that?

20             THE DEFENDANT:  I do, your Honor.

21             THE COURT:  If you were listening very carefully,

22   Mr. Rivard, you would have just heard me say that if you plead

23   guilty and if I accept your plea and what I had in mind when I

24   said if I accept your plea was the insistence of the law that

25   I be sure that I am not accepting a plea of guilty from a

23

1   person who is in fact innocent.  And in order to ensure myself

2   you are in fact guilty of the crimes with which you are

3   charged, I'm going to ask you some questions about it and to

4   the extent you answer them, you will be giving up that

5   privilege of self incrimination that I mentioned a few minutes

6   ago and you will be convicting yourself out of the words of

7   your own mouth.

8           Do you understand all that?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Did Mr. Carroll advise you that the

11  maximum sentence which the law provides for a violation on

12  each of these counts is imprisonment up to five years, did he

13  tell you that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Did he also tell you with respect to

16  each count following any term of imprisonment the Court could

17  add a period of supervised release which could be up to three

18  years?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Did Mr. Carroll explain supervised

21  release to you?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  Do you believe you understand it or

24  would you like me to explain it to you?

25          THE DEFENDANT:  I believe I understand it.

24

1    THE COURT:  Did he also tell you that you could be

2  fined up to $250,000?

3    THE DEFENDANT:  Yes, your Honor.

4    THE COURT:  And if restitution is found to be

5  applicable, you may be directed to make restitution?

6    THE DEFENDANT:  Yes.

7    THE COURT:  You know what that means?

8    THE DEFENDANT:  Yes.

9    THE COURT:  Were you also told regardless of what

10  the sentence is, you must be directed to pay a special

11  assessment of $100, did Mr. Carroll advise of you that?

12    THE DEFENDANT:  Yes, your Honor.

13    THE COURT:  You were also advised, I think I just

14  did that, the sentence on each of these counts may run

15  consecutively?

16    THE DEFENDANT:  Yes.

17    THE COURT:  You understand what that means?

18    THE DEFENDANT:  Yes.

19    THE COURT:  You were also advised I'm sure that

20  notwithstanding what the sentence required by the statute you

21  violated may be, you will be sentenced in accordance with

22  guidelines?

23    THE DEFENDANT:  Yes, your Honor.

24    THE COURT:  You understand that means that your

25  sentence will be somewhere between the minimum number of

25

1   months and the maximum number of months as determined by the

2   application of guideline provisions?

3           THE DEFENDANT:  Yes, your Honor.

4           THE COURT:  And was some prediction made for you as

5   to what the guidelines in your case may be?

6           THE DEFENDANT:  For sentencing?

7           THE COURT:  Yes.

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  I don't know what you were told by way

10  of a prediction as to what the guidelines in your case may be

11  but I want to make sure that you understand that I haven't any

12  idea as I talk to you this morning precisely what the

13  guidelines in your case are.  I will not know that until after

14  I have had an opportunity to read a Presentence Report.

15          In a proper case a person could be sentenced more

16  leniently or more severely than the guidelines may require.  I

17  don't know if yours is a proper case for either a more severe

18  or more lenient guideline application.  But if you are

19  sentenced more severely than the guidelines normally provide

20  for, you could appeal that sentence.  If you are sentenced

21  more leniently, the government might.

22          The point of all this is, Mr. Rivard, if whatever

23  the guidelines turn out to be are higher than what they were

24  predicted for you that they might be and you are

25  understandably unhappy about that, you won't be permitted to

26

1    withdraw the plea you might enter here this morning.

2            Do you understand?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Do you have any questions about anything

5    I have explained to you so far?

6            THE DEFENDANT:  No.

7            THE COURT:  Mr. Carroll, do you know of any reason

8    Mr. Rivard shouldn't plead to two counts of this information?

9            MR. CARROLL:  I do not, your Honor.

10           THE COURT:  How do you plead to those charges that I

11   have read to you, Mr. Rivard?

12           THE DEFENDANT:  Guilty.

13           THE COURT:  Are you telling me that voluntarily?

14           THE DEFENDANT:  Yes, your Honor.

15           THE COURT:  Nobody is forcing you to say that here

16   today?

17           THE DEFENDANT:  No.

18           THE COURT:  You are entering that plea in

19   consideration of an agreement you entered into with the

20   government?

21           THE DEFENDANT:  Yes.

22           THE COURT:  You have gone over that agreement with

23   Mr. Carroll?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  Would you like me to go over it with

27

1   you?

2          THE DEFENDANT:  No.

3          THE COURT:  I just want to make sure you understand,

4   fully understand one paragraph of this agreement, paragraph 6,

5   which says in essence that if the government determines that

6   you have fully and completely to their satisfaction discharged

7   all of your obligations under this agreement, on the day of

8   sentencing the government will make a motion before me, it's

9   referred to in this agreement as a motion pursuant to Section

10   5K1.1 of the guidelines.  If I grant that motion, I can impose

11   a sentence without regard to what the guidelines may require

12   but I want to make sure you understand I'm not obliged to

13   grant that motion.

14          THE DEFENDANT:  I do, your Honor.

15          THE COURT:  Should I deny it, you won't be permitted

16   to withdraw your plea for that reason.

17          I want to show you this document and ask if you

18   recognize any signature on that page.

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Yours?

21          THE DEFENDANT:  Yes.

22          THE COURT:  You told me you had gone over this

23   agreement and you didn't have me go over it with you.  I want

24   to make sure you understand you are in effect certifying you

25   read it, discussed it with your lawyer, you understand all of

28

1   its terms and you have entered into that agreement knowingly

2   and voluntarily.

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Has anybody made any prediction to you

5   what your sentence will be?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  If they have, Mr. Rivard, I just want to

8   make sure you understand as I indicated to you a little while

9   ago I don't know for sure what your sentence will be.

10          THE DEFENDANT:  I understand.

11          THE COURT:  So whatever prediction somebody made to

12   you as to what your sentence will be may be very misleading.

13   I don't know what your sentence will be as I talk to you this

14   morning.

15          THE DEFENDANT:  I understand.

16          THE COURT:  If you had gone to trial on the charges

17   in this information, both Count One and Count Two, each of

18   which charges you with the crime of conspiracy, the government

19   would have had to prove three things to the satisfaction of a

20   unanimous jury if that jury would be justified in returning a

21   verdict of guilty.  The government would have to prove first

22   that there was a conspiracy as charged.  The government would

23   have to prove that you knowingly, willfully, intentionally

24   became a member of that conspiracy and were a part of it.  And

25   finally, the government would have to prove that one or more

1    of the overt acts which are alleged in each of these counts

2    was committed during the course of and for the purpose of

3    furthering the objectives of that conspiracy.

4         A conspiracy, Mr. Rivard, is very simply defined as

5    an agreement between two or more people to commit a crime, you

6    being one of those persons.  When I say that a conspiracy is

7    defined as an agreement, I don't mean to suggest that that

8    agreement had to be in writing.  It would be enough if the

9    government proved that you and one or more other persons had a

10   meeting of the minds, had a common understanding that you

11   would commit the crime of securities fraud as alleged in Count

12   One as I read it to you.

13        The second thing the government would have to prove

14   as I have indicated is that you knowingly and intentionally

15   were a party to that conspiracy.

16        So first let me ask you whether you and one or more

17   other persons had a common understanding, had an agreement,

18   had a meeting of the minds that you would commit what has been

19   characterized in Count One as securities fraud.

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  Did you have such an agreement?

22        THE DEFENDANT:  Yes, your Honor.

23        THE COURT:  As charged in Count One?

24        THE DEFENDANT:  That's correct.

25        THE COURT:  Were you a party to that agreement

30

1   knowingly, intentionally, fully understanding what you were

2   agreeing to?

3         THE DEFENDANT:  Yes, your Honor.

4         THE COURT:  And for the purpose of furthering the

5   objectives of that agreement on December 29th of 1998 at the

6   headquarters of Computer Associates in Islandia, New York, did

7   you send an e-mail to other Computer Associates' executives

8   informing them that "January 5" would be the last day of

9   business for December for the company's third quarter of

10  fiscal year 1999 which ended December 31st, 1998, did you send

11  such an e-mail to those executives?

12        THE DEFENDANT:  Yes, your Honor.

13        THE COURT:  That was for the purpose of furthering

14  the objectives of that stock fraud conspiracy; is that

15  correct?

16        THE DEFENDANT:  That's correct, your Honor.

17        THE COURT:  Did you also have an agreement with one

18  or more other persons that you would obstruct, influence and

19  impede government investigations in connection with the stock

20  fraud?

21        THE DEFENDANT:  Yes, your Honor.

22        THE COURT:  And you entered into that agreement

23  knowingly, intentionally, fully understanding what you were

24  agreeing to?

25        THE DEFENDANT:  Yes, your Honor.

31

1          THE COURT:  And to further the objectives of that

2    agreement, is it correct that within the Eastern District of

3    New York and elsewhere on or about the 5th of August in the

4    year 2002, you met with members of the company's law firm in

5    Islandia, New York and the purpose of that meeting was to

6    obstruct and impede government investigations into the

7    securities fraud you were also engaged in and conspired to

8    commit; is that correct?

9          THE DEFENDANT:  That's correct, your Honor.

10         THE COURT:  Anything further, Mr. Cornacchia?

11         MR. CORNACCHIA:  There is an allocution the

12   defendant would like to read.

13         THE COURT:  I'm happy to hear it.

14         THE DEFENDANT:  Your Honor, in August 1998 I took a

15   job with Computer Associates as you mentioned in Islandia, New

16   York in the Sales Accounting Department.  My annual

17   compensation began at about $140,000 a year and over a

18   five-plus year period I worked there it was increased to

19   approximately $280,000 including bonuses.  I also received

20   some stock options from which I netted approximately $5,000.

21         My job responsibilities included participating in

22   the Sales Accounting Departments, processing of software

23   contracts with Computer Associates' customers as you

24   mentioned.  The company recognized revenue on contracts after

25   the contracts passed through Sales Accounting and got

32

1   approved.

2        I joined Computer Associates with good intentions.

3   After I joined I learned that the company's executives were

4   participating in this misconduct.  I should have quit.  I

5   shouldn't have agreed to participate with them in that

6   misconduct and I did.  I made a mistake.  I will never -- I

7   sincerely regret doing that.

8        While I was employed at Computer Associates I joined

9   with other Computer Associates' employees, including employees

10   senior to me, to wrongfully and falsely cause the company to

11   record revenue on certain sales contracts in one reporting

12   period when in fact under GAAP, generally accepted accounting

13   principles, the revenue was not earned by the company until

14   subsequent.  In particular, I signed agreements which I knew

15   or had reason to know had been backdated by customers and I

16   also backdated my own signature on occasion.

17        I also assisted CA sales personnel in finalizing

18   license agreements during the post quarter end flash period

19   and I reported to senior officers on the progress of those

20   agreements.  I also instructed my staff to clean up faxed

21   copies of certain license agreements, to remove all processing

22   notations including fax times and dates before these copies

23   were provided to the auditors.

24        To the best of my knowledge, transactions involved

25   in these practices were bona fide sales, they were real goods

33

sold for real cash received.  However, I knew the accounting
principles require that a sale be complete before a company
can recognize revenue on that sale.  Even though I knew that
certain sales were not complete by the end of a reporting
period, for example, certain contractual terms and conditions
had been finalized after the reporting period. I and others
caused the company to record revenue on these not yet final
sales.

I knew that my actions and the actions of others
involved in this conduct would make it seem to Computer
Associates' investors as though Computer Associates had earned
more money in a particular reporting period than the company
actually had earned in that period.

In 2002, I and other Computer Associates' executives
understood that the SEC was investigating Computer Associates
for accounting improprieties and other things.  We also knew
the company had retained a law firm to deal with these
matters.  Based on my discussions with these executives, I
understood that they would try to convince everyone, including
government authorities, any errors in recognizing revenue
resulted from good faith mistakes rather than from intentional
misconduct.  However, I knew that the inaccurate accounting
was intentional and was designed to make the company's
operating results look better.

I agreed that if I was asked I would go along with

34

1   the story that they intended to tell and not reveal any

2   intentional wrongdoing to the law firm retained to investigate

3   these matters.

4          Earlier this year I decided to tell the U.S.

5   Attorney and the SEC that I wanted to face up to what I had

6   done and cooperate with their investigations.  I also agreed

7   that I would plead guilty.

8          I understand the potential consequences of these

9   decisions.  I'm trying to do what I can to help remedy the

10  wrong that I have caused and others committed.  I deeply

11  regret participating in this misconduct.  I knew at the time

12  what I was doing was wrong and I should have quit.  I should

13  have walked away but I didn't, I agreed to participate.

14         I accept full responsibility for my actions.  I

15  sincerely apologize to any people that might have been harmed

16  by this.

17         Thank you.

18         THE COURT:  Anything else?

19         MR. CORNACCHIA:  No, your Honor.

20         MR. CARROLL:  Nothing else, your Honor.

21         THE COURT:  Mr. Rivard has been fully advised of his

22  rights.  I'm satisfied he understood them.  With that

23  understanding he knowingly and voluntarily pleaded guilty to

24  two counts of an information which is numbered CR-04-329.

25  There is a factual basis for that plea and I will accept it.

35

1        THE CLERK:  Sentencing on July 20th at 10:00 a.m.

2        MR. CORNACCHIA:  Your Honor, in terms of status,

3  custody status, we agreed on a $500,000 PRB to be signed by

4  the defendant.

5        THE COURT:  Okay.

6        No reporting requirements?

7        MR. CORNACCHIA:  No reporting requirements.

8        THE COURT:  So ordered.

9        Thank you very much.

10        MR. CARROLL:  Thank you, your Honor.

11        THE COURT:  You are welcome.

12        THE DEFENDANT:  Thank you.

13        THE COURT:  You are welcome.

14        Are you requesting that the minutes of this

15  proceeding be sealed?

16        MR. CORNACCHIA:  We are not making that request.

17        I have been handed a partial final judgment from the

18  SEC.

19        THE COURT:  Mr. Rivard, you signed these consent

20  judgments?

21        THE DEFENDANT:  Yes.

22        THE COURT:  You went over those with Mr. Carroll,

23  you understood what it was you were signing?

24        THE DEFENDANT:  Yes, your Honor.

25        MR. VASILESCU:  Alex Vasilescu, senior trial counsel

36



1  for the United States Securities and Exchange Commission.

2  Your Honor, we have previously brought to your

3  chambers a partial judgment on consent that has been executed

4  without admitting or denying the allegations in the complaint

5  filed this morning by Mr. David Rivard.  And the SEC

6  respectfully requests that the Court enter the partial

7  judgment which provides for injunctive relief as well as an

8  immediate officer and director bar.

9  THE COURT:  I have just executed that judgment.  I

10  have signed it.

11  Thank you.

12  MR. VASILESCU:  Thank you.

13  MR. CARROLL:  Thank you.

14  (Pause.)

15  MR. PITOFSKY:  Judge, David Pitofsky.

16  The terms of the bond, it's a $500,000 unsecured

17  bond signed by the defendant as discussed.  In addition, the

18  defendant has agreed that his travel will be restricted to the

19  continental United States, that he will surrender his passport

20  to Pretrial Services today, he brought his passport with him,

21  and that he will report by telephone to Pretrial Services one

22  time per month.

23  Obviously, this is subject to the Court's approval

24  but this is the agreement of the parties.

25  THE COURT:  So ordered.

37

1          MR. PITOFSKY:   Thank you.

2          (The matter was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

Exhibit 6