1  Thomas N. FitzGibbon (SBN: 169194)
   TNF@ptflaw.com
2  **PFEIFFER THIGPEN & FITZGIBBON LLP**
3  233 Wilshire Boulevard, Ste. 220
   Santa Monica, CA 90401
4  Telephone: (310) 451-5800
   Facsimile: (310) 451-1599
5

6  Luke A. McGrath *(Pro Hac Vice Pending)*
   LZM@bickelbrewer.com
7  James S. Renard *(Pro Hac Vice Pending)*
   JSR@bickelbrewer.com
8  **BICKEL & BREWER**
9  767 Fifth Avenue, 50th Floor
   New York, New York 10153
10 Telephone: 212-489-1400
   Facsimile: 212-489-2384
11

12

13 Attorneys for Intervenor
   *Sam Wyly*
14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18 UNITED STATES OF AMERICA,          Case No. 2:05-CR-587-JFW-3
                                      [Assigned to Hon. John F. Walter]
19          Plaintiff,

20        - against -                 **EXHIBITS 7-8 TO DECLARATION
                                      OF LUKE A. MCGRATH IN
21                                    SUPPORT OF INTERVENOR SAM
                                      WYLY'S MOTION TO
22 MILBERG WEISS BERSHAD &            INTERVENE AND FOR RELIEF
   SCHULMAN LLP, DAVID J.             FROM PROTECTIVE ORDER**
23 BERSHAD, STEVEN G.
   SCHULMAN, SEYMOUR M.               Date:     February 9, 2009
24 LAZAR, and PAUL T. SELZER          Time:     9:00 a.m.
                                      Room:     16
25          Defendants.

26

27

28

*(left margin, vertical)* Pfeiffer Thigpen & FitzGibbon LLP / 233 Wilshire Blvd., Suite 220 / Santa Monica, California 90401

# Exhibit 7

## to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2

3   - - - - - - - - - - - - - - - - - - - - - - - - -X

    UNITED STATES OF AMERICA,
4                                   :   CR-04-331
                                        (ILG)
5       -against-                   :   United States Courthouse
                                        Brooklyn, New York
6   IRA ZAR,
                                    :   April 8, 2004
7               Defendant.              3:00 p.m.
    - - - - - - - - - - - - - - - - - - - - - - - - -X
8
                    TRANSCRIPT OF PLEA
9           BEFORE THE HONORABLE I. LEO GLASSER
            UNITED STATES DISTRICT COURT JUDGE
10

11  APPEARANCES:

12  For the Government:     ROSLYNN R. MAUSKOPF, ESQ.
                            UNITED STATES ATTORNEY
13                          BY:  DAVID PITOFSKY, AUSA
                            One Pierrepont Plaza
14                          Brooklyn, New York 11201

15

16  For the Defendant:     JOHN S. SIFFERT, ESQ.

17

18

19

20

21

22  Official Court Reporter:     Stephanie Drexler, RPR
    Ph. (718) 260-2644           225 Cadman Plaza East
23  Fax (718) 260-4505           Brooklyn, New York 11201

24     Proceedings recorded by computerized stenography.
            Transcript produced by CAT.
25

2

1    THE CLERK:  Criminal cause for arraignment and

2  pleading, Ira Zar.

3    Parties please come forward.

4    MR. PITOFSKY:  David Pitofsky for the government.

5    MR. LAWLER:  Andrew Lawler for Mr. Zar.

6    THE COURT:  I understand your client wishes to plead

7  to an information.

8    MR. LAWLER:  That is correct, your Honor.

9    THE COURT:  Swear him in.

10    (Defendant sworn.)

11    THE CLERK:  Please give your name.

12    THE DEFENDANT:  Ira Zar.

13    THE COURT:  Mr. Zar, you have just taken an oath to

14  tell the truth and it's a crime of perjury to tell a lie after

15  you swore to tell the truth.

16    Do you understand that?

17    THE DEFENDANT:  Yes.

18    THE COURT:  How old are you?

19    THE DEFENDANT:  40 -- 42 years old.

20    THE COURT:  How far have you gone in school?

21    THE DEFENDANT:  Through college.

22    THE COURT:  Are you currently or have you been under

23  the care of a physician within the past few weeks?

24    THE DEFENDANT:  No.  I have visited with a

25  psychiatrist but I don't consider myself under the care.

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

5

1          THE COURT:  Have you taken any medicines or drugs or
2    pills of any kind within the past week or so?
3          THE DEFENDANT:  No.
4          THE COURT:  Do you understand why you are here?
5          THE DEFENDANT:  Yes.
6          THE COURT:  Have you understood everything I have
7    said to you so far?
8          THE DEFENDANT:  Yes.
9          THE COURT:  Mr. Lawler, do you have any questions
10   about your client's competence to participate here?
11         MR. LAWLER:  I do not, your Honor.
12         THE COURT:  I make a finding to that effect.
13         Do you have a copy of the information handy
14   Mr. Lawler?  Not for me.
15         MR. LAWLER:  Yes.
16         THE COURT:  Mr. Zar, if you look at that paper that
17   Mr. Lawler is holding, you look at the right-hand side of that
18   first page, you will see in capital letters the word
19   "information."  Do you see that?
20         THE DEFENDANT:  Yes.
21         THE COURT:  Then if you go down that page a little
22   bit on the left under the caption, you see it says "the United
23   States Attorney charges," do you see that?
24         THE DEFENDANT:  Yes.
25         THE COURT:  The reason that I draw that to your

4

1   attention is because the crimes with which you are charged in

2   this document are what are referred to by the Constitution of

3   our country as capital offenses, more commonly known as

4   felonies.  A felony is a crime punishable by imprisonment for

5   more than a year.  And the Constitution of the United States

6   provides that if a person is to be charged with a capital

7   offense or a felony, he has a right to be charged by a Grand

8   Jury and the Grand Jury makes such a charge, makes such an

9   accusation by way of a paper that's called an indictment.

10          The paper which you have just looked at is not an

11   indictment, it's an information and the charge is not by the

12   Grand Jury, it says "the United States Attorney charges."  So

13   you have a right to say to me today that you would like to

14   enjoy the right which our Constitution gives you, you would

15   like to enjoy the right to be indicted by a Grand Jury.

16          If you tell me that, nothing else will happen here

17   today.

18          You also have the right to waive, give up, surrender

19   your constitutional right to be indicted by a Grand Jury.  And

20   in order to make sure if you wish to waive that right you are

21   doing so knowingly, voluntarily, I want to make sure you

22   understand what a Grand Jury is and when a Grand Jury returns

23   an indictment.  I'm sure Mr. Lawler has explained that to you

24   but the law obliges me to do it as well.

25          A Grand Jury is made up of not less than 16 or more

5



1  than 23 people.  When a Grand Jury returns an indictment, at
2  least 12 of those people have probable cause to believe based
3  upon the evidence that has been presented to it that a person
4  has committed a crime.  So if you tell me that you would like
5  to enjoy the right the Constitution gives you to be indicted
6  by a Grand Jury, I suspect that the government would empanel a
7  Grand Jury, present such evidence as it has in this case to
8  that body and ask them to return an indictment.  Whether 12
9  people would or would not be satisfied that there is probable
10  cause to believe you committed these crimes or not, I don't
11  know.
12          Do you understand all that?
13      THE DEFENDANT:  Yes.
14      THE COURT:  You discussed all that with Mr. Lawler?
15      THE DEFENDANT:  Yes.
16      THE COURT:  You know your right to be indicted by a
17  Grand Jury?
18      THE DEFENDANT:  Yes.
19      THE COURT:  Do you want to give up that right?
20      THE DEFENDANT:  Yes.
21      THE COURT:  You are giving up that right
22  voluntarily?
23      THE DEFENDANT:  Yes.
24      THE COURT:  Nobody is compelling you to do it?
25      THE DEFENDANT:  No.



STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

6

1        THE COURT:  Mr. Lawler, do you know of any reason

2  why Mr. Zar shouldn't?

3        MR. LAWLER:  I do not.

4        THE COURT:  Mr. Zar has executed this waiver here in

5  court and you witnessed it?

6        MR. LAWLER:  We executed it across the hall, your

7  Honor.

8        THE COURT:  You witnessed the signature?

9        MR. LAWLER:  I did.

10        THE COURT:  Mr. Zar has been fully advised of his

11  right and I'm satisfied he understood it.  With that

12  understanding he knowingly and voluntarily executed a waiver

13  of indictment which I'm satisfied with and that will be filed

14  and I will accept it.

15        Have you gone over this information with Mr. Lawler,

16  have you?

17        THE DEFENDANT:  Yes.

18        THE COURT:  The law obliges me to make sure that you

19  understand what it is that you intend to plead to so I'm going

20  to review it with you.  I won't read much of it word for word

21  but I'm going to go over some of the introductory paragraphs

22  with you.

23        It begins by identifying Computer Associates

24  International which I will refer to herein as the company and

25  it indicates that it's a Delaware corporation, public company,

7

1  stock is traded on the New York Stock Exchange and its stock

2  is held by shareholders situated throughout the United States

3  including the Eastern District of New York.

4          This is the Eastern District of New York.  The

5  geographic area known as the Eastern District of New York

6  includes all of Brooklyn, all of Queens, all of Staten Island,

7  all of Nassau and Suffolk Counties.  The company didn't sell

8  or transfer its product to its customers, instead, it licensed

9  its product to its customers in accordance with the license

10  agreements which the customers paid for a one-time license fee

11  and then they paid an annual usage and maintenance fee.

12  Because this was and is a public company, it's required to

13  comply with the rules and regulations of the SEC.  Those rules

14  and regulations are designed to protect the members of the

15  investing public to make sure that the company's financial

16  information which it disseminates to the investing public is

17  accurate.

18          And under the SEC's rules and regulations, the

19  company's officers are required to keep books which fairly and

20  accurately reflect the company's business transactions

21  including its revenues and expenses, required to devise and

22  maintain a system of internal accounting controls, to provide

23  reasonable assurance that the company's transactions are

24  accurately recorded and are necessary to permit the

25  preparation of financial statements in accordance with the

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

generally accepted accounting principles.

Rules and regulations require its officers to file quarterly reports with the SEC, those are known as 10-Q reports, annual reports, 10-K reports, with the SEC. Those reports include financial information that accurately presents the financial condition of the company and the results of its business operations.

Under those general accounting principles, four conditions are required to be met if the revenues associated with the license agreement are to be recognized for accounting purposes. There has to be persuasive evidence of an agreement which has been in existence. There has to be delivery of that licensed product. There has to be a license fee which was fixed or determinable. And the collectability of that license fee was required to have been probable. And there was a written contract to memorialize a license agreement. That generally accepted accounting principles known as GAAP require that there be persuasive evidence that the contracts were signed by both the seller and the customer, by Computer Associates and its customers.

And under GAAP, if the company was to properly recognize its revenue from a license agreement in a particular fiscal quarter, that agreement was required to have been signed by both the company and its customer within that quarter.

9

1        You were employed by the company in 1982 to 2003 and

2    during that time, you occupied a variety of positions.  From

3    approximately June of '98 to October of 2003, you were the

4    company's chief financial officer, CFO.  Your duties as the

5    CFO included but weren't limited to overseeing the company's

6    financial reporting and Sales Accounting Departments.

7        During your tenure as the CFO, you reported directly

8    to the president of the company and beginning in August of

9    2000, you also held the title of the chief executive officer,

10   that is, the company's president is also the chief executive

11   officer.

12       The company regularly issued public predictions at

13   the beginning of each fiscal quarter of the revenue it

14   expected to earn during that quarter.  Based in part on those

15   predictions, professional stock analysts estimated what they

16   believed would be the company's total revenue during the

17   period and predicted the earnings per share of the company's

18   stock.  The average of the estimates of the professional

19   analysts was commonly referred to as the consensus estimate.

20   The company's officers, executives and directors including you

21   understood that the company's failure to meet or exceed the

22   consensus estimates for a quarter would likely result in a

23   substantial decrease in the price of the company's stock.

24       For example, on July 3rd of 2000, the company issued

25   a press release which reported that the company expected

10

1   "financial results for the first quarter ending June 30th,

2   2000 to be less than current Wall Street estimates."

3          In that press release the company cited as one of

4   the factors contributing to its failure to meet the consensus

5   estimate "the fact several large contracts that were expected

6   to close in the final days of the quarter had been delayed.

7          On the date of that press release which was issued

8   after the market closed, the company's stock price closed at

9   $51.12 a share.  On the next trading date, which was July 5th,

10  2000, the company's stock price opened at $29 a share, a 43

11  percent decline in the price of that stock.

12         Prior to and during the company's fiscal year 2000,

13  which ended on March 31st of that year, many of the company's

14  officers and executives including you engaged in a systemic

15  company-wide practice of falsely and fraudulently reporting

16  and recording within a fiscal quarter revenues associated with

17  certain license agreements even though those license

18  agreements had not in fact been finalized during that quarter.

19  That practice is sometimes referred to within the company as

20  the "35-day month" or the "three-day window."  And that

21  violated the generally accepted accounting principles.

22         The practice was referred to as 35-day month because

23  it artificially extended the month primarily the last month of

24  a fiscal quarter for accounting purposes beyond the true end

25  of the month.  The practice did not, however, only result in

11

1  months that had for accounting purposes 35 days.  Instead,

2  months were often extended even longer.  But for the sake of

3  simplicity the practice is referred to in what I'm going to

4  read hereafter as the 35-day month practice.

5       The simple goal of that 35-day month practice was to

6  permit the company to report it met or exceeded its projected

7  quarterly revenues and earnings when in truth, the company had

8  not done so.

9       As a result of the practice, the company reported

10 falsely to investors and regulators during multiple fiscal

11 quarters, including each of the four quarters of the 2000

12 fiscal year, that it had met or exceeded its consensus

13 estimates.  In the last three quarters of fiscal year 2000

14 alone, the company improperly recognized and falsely reported

15 hundreds of millions of dollars of revenue associated with

16 numerous license agreements that had been finalized after the

17 close of the quarter and in doing so, the company made

18 misrepresentations, omitted to state material facts which were

19 relied upon by members of the investing public.

20      As part of the 35-day month practice, the company's

21 sales managers and salespeople were instructed and pressured

22 by high-level company executives to among other things

23 backdate license agreements which were finalized in the days

24 immediately following the end of the fiscal quarter to make it

25 appear as though the agreements were finalized before the end

12

1    of that fiscal quarter.

2              As a further part of the 35-day month practice, you

3    and other high- and mid-level executives at the company

4    routinely extended the company's fiscal quarters normally for

5    three business days.  This practice was often referred to as

6    "keeping the books open."  It was designed and executed so

7    that the company could falsely record and report revenues

8    associated with backdated license agreements which were

9    finalized after the end of fiscal quarters.

10             The period between the true end of the company's

11   fiscal quarter and the date on which the company's books were

12   actually closed was referred to within the company as the

13   "flash period."

14             As a further part of the 35-day month practice, you

15   regularly met and otherwise conferred with two other

16   high-level company executives referred to as executive number

17   1 and executive number 2 in the days leading up to and

18   following the end of the fiscal quarters including during the

19   flash period.  The purpose of these meetings was to determine

20   whether the company generated for the quarter that just ended

21   including during the flash period sufficient revenues to meet

22   the consensus estimate.

23             In at least two quarters of the company's fiscal

24   year 2000, you and the two executives collectively determined

25   that the total revenue generated for the quarter was less than

13

1    the consensus estimate even after including the revenue

2    improperly generated and reported during the flash period.

3    And in each such instances, acting with the concurrence of

4    those two executives, you and others caused the company to

5    keep its books open for additional days beyond even the flash

6    period to generate enough revenue to meet the consensus

7    estimate.

8              For example, on or about January 6th, 2000, you met

9    and conferred with those two executives at the company's

10   headquarters in Islandia, New York.  Three executives

11   collectively determined that as of that date, even including

12   revenues from license agreements generated during the flash

13   period, the company's total revenues were more than $30

14   million below what was necessary to meet the consensus

15   estimate for the quarter ended December 31st, 1999.

16             Later the same day, executive number 2 directed a

17   senior company sales manager to negotiate and finalize a

18   multi-million dollar license agreement with a company customer

19   that would be customer number 1.  On or about January 6th of

20   2000 and January 7th of 2000, the sales manager enticed

21   customer number 1 into executing an approximately $60 million

22   license agreement by offering customer number 1 a substantial

23   discount in the license fee.  The agreement was signed on or

24   about January 7th, 2000 but backdated to make it appear as

25   though it had been executed on December 31st, 1999.

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

14

1          You and others then caused the company to recognize

2    improperly in the fiscal quarter ended December 31st, 1999

3    approximately $35 million in revenue associated with that

4    agreement.

5          On January 26, 2000, the company issued a press

6    release in which it falsely and fraudulently announced that it

7    met the consensus estimate for the quarter ended December

8    31st, 1999.

9          Numerous company officers and executives including

10   you concealed the existence of the 35-day month practice from

11   the company's outside auditors.  Among other things, the

12   company executives engaged in a practice of "cleaning up"

13   copies of backdated license agreements before providing copies

14   of the agreements to the company's auditors.  This practice

15   includes but was not limited to the removing from license

16   agreements facsimile stamps and other notations which showed

17   the true date on which the agreements were finalized.

18         You were fully aware of and encouraged that practice

19   which was designed and carried out to prevent the company's

20   auditors and by extension the investing public from learning

21   of the company's failure to meet or exceed the consensus

22   estimates for the given quarter.

23         In or about the beginning of the year 2002, the

24   United States Attorney's Office for this district, the FBI and

25   the northeast regional office of the SEC began investigation

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

15

1   into the company's accounting practices including whether

2   during the late 1990s and thereafter the company engaged in

3   improper accounting practices with the intent to overstate its

4   fiscal quarterly revenues to make it appear as though the

5   company had met the consensus estimates.

6        Since June of 2002, a Grand Jury sitting in this

7   district has been considering evidence about the company's

8   accounting practices.  Those investigations are referred to as

9   government investigations.

10       In or about February of 2002, the company retained a

11  law firm to represent it in connection with the government

12  investigations.  Through the company's law firm the company

13  represented to the United States Attorney's Office and to the

14  SEC that it was committed to cooperating fully with the

15  government investigations.  This representation was also made

16  publicly by the company in press releases and SEC filings and

17  in other public statements.

18       Additionally, in a press release issued on February

19  20, 2002, the company denied that it engaged in any improper

20  accounting practices and it declared "the reporting of our

21  financial results has always been in accordance with

22  applicable accounting principles."

23       Shortly after being retained in February 2002, the

24  company's law firm met with you and with other company

25  executives in order to inquire into your knowledge of the

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

16

1    practices that were the subject of the government

2    investigations.  During those meetings you and others did not

3    disclose, falsely denied and otherwise concealed the existence

4    of the 35-day month practice.  Moreover you and others

5    concocted and presented to the company's law firm an

6    assortment of false justifications the purpose of which was to

7    counter or explain away evidence of the 35-day month practice.

8    You and others knew and in fact intended that the company's

9    law firm would present those false justifications to the

10   United States Attorney's Office, to the SEC and to the FBI.

11          For example, during a meeting with the attorneys

12   from the company's law firm, you and executive number 1

13   discussed the fact that former company salespeople had accused

14   the company of engaging in the 35-day month practice.  In your

15   presence executive number 1 falsely denied that the company

16   engaged in such a practice and suggested to the attorneys from

17   the company's law firm that because quarterly commissions paid

18   to company salespeople regularly included commissions on

19   license agreements not finalized until after the end of the

20   quarter, salespeople might assume incorrectly that revenues

21   associated with those agreements were recognized by the

22   company within the quarter.

23          Executive number 1 knew that this explanation was

24   false and intended the company's law firm would present that

25   false explanation to the United States Attorney's Office, the

17



1   SEC and the FBI as part of an effort to persuade those

2   entities that the accusations of the former salespeople were

3   unfounded.  The company's law firm also arranged for

4   interviews of company executives and employees by the United

5   States Attorney's Office, the SEC and the FBI.

6          For example, on or about September 6th of 2002,

7   Lloyd Silverstein, then a company executive, was interviewed

8   by members of the United States Attorney's Office, the SEC and

9   the FBI.  Before that interview, you and others met with

10  Silverstein and encouraged him not to disclose the existence

11  of the 35-day month practice but rather to present various

12  false justifications.  Accordingly, during this interview,

13  Silverstein made statements which he knew to be false and

14  otherwise concealed information which he knew to be material

15  to the government investigation.

16          In or about July of 2003 the audit committee of the

17  company's board of directors retained a second law firm

18  referred to as the audit committee's law firm to conduct an

19  internal investigation into the committee's accounting

20  practices focusing on the 35-day month practice.

21          As part of its internal investigation, the audit

22  committee's law firm conducted an interview of the company

23  executives and employees.  On or about October 3rd, 2003, you

24  were interviewed by attorneys from the audit committee's law

25  firm.  During that interview, you did not disclose, instead

18

1   denied and otherwise concealed, the existence of the 35-day

2   month practice.

3          For example, you falsely stated that during the

4   company's fiscal year 2000, all license agreements recognized

5   as revenue in a given quarter were signed by the customer

6   prior to the end of the quarter.  Additionally, during that

7   interview you did not disclose the participation of other

8   high-level company executives including but not limited to the

9   two executives in the 35-day month practice.

10          You and others also met with company executives

11  prior to the executives being interviewed by the audit

12  committee's law firm.  You and others encouraged these

13  individuals to deny the existence of the 35-day month practice

14  during their interviews and to offer various false

15  justifications intended to create the appearance that the

16  company had not engaged in improper accounting practices.

17          That brings us to the first charge of this

18  information, Count One, which incorporates the 25 paragraphs

19  that I just read for you or summarized for you as though they

20  are realleged and incorporated in this count.  And the count

21  charges that in or about and between June of 1998 and December

22  of 2000, those dates being approximate and inclusive, within

23  the Eastern District of New York and elsewhere, you together

24  with others knowingly and willfully, directly and indirectly

25  conspired, A, to commit fraud in connection with the purchase

19

1   and sale of common stock issued by Computer Associates in

2   violation of Title 15 of the United States Code and several of

3   its sections, Title 17 of the Code of Federal Regulations and

4   conspired, B, to make and cause to be made false and

5   misleading statements of material facts in applications,

6   reports and documents required to be filed under the SEC Act

7   of 1934 and the rules and regulations thereunder in violation

8   of the United States Code.

9        You conspired, C, to falsify Computer Associates'

10  books, records and accounts the making and keeping of which is

11  required in the United States Code and the Code of Federal

12  Regulations in violation of those statutes and regulations.

13       You conspired, D, to circumvent the company's

14  internal accounting controls as required by the United States

15  Code and in violation thereof.  And in furtherance of that

16  conspiracy and to effect its objectives, within the Eastern

17  District of New York and elsewhere, you together with others

18  committed and caused to be committed among others the

19  following overt acts:

20       A, on or about October 6th, 1999, at the company's

21  headquarters in Islandia, New York, you signed on behalf of

22  Computer Associates an approximately $102 million license

23  agreement which was backdated to make it appear as though the

24  agreement had been executed on September 30th, 1999, the last

25  day of the second quarter of Computer Associates' fiscal year

20

1   2000.

2           B, on or about January 6th, 2000, at Computer

3   Associates' headquarters in Islandia, New York, you met with

4   executive number 1 and executive number 2.

5           C, on or about January 6th, 2002, executive number 2

6   placed a telephone call from the headquarters of Computer

7   Associate in Islandia, New York to the Computer Associates'

8   sales manager.

9           D, in or about early April 2000, after meeting with

10  executive number 1 and others, you caused Computer Associates'

11  books with the quarter ended March 31, 2000 to be held open in

12  order to allow Computer Associates to meet the consensus

13  estimate for that quarter all in violation of Section 371 of

14  Title 18 of the United States Code.

15          The second count again incorporates the introductory

16  paragraphs which I reviewed with you and charges that in or

17  about and between June of 1998 and December of 2000, those

18  dates being approximate and inclusive, within the Eastern

19  District of New York and elsewhere you together with others

20  knowingly and willfully, directly and indirectly used and

21  employed manipulative and deceptive devices and contrivances

22  in violation of Rule 10(b)(5), the rules and regulations of

23  the SEC and that you together with others knowingly and

24  willfully, directly and indirectly, number 1, employed

25  devices, schemes and artifices to defraud, number 2, to make

21

1   untrue statements of material fact and omit to state material

2   facts necessary in order to make the statements made not

3   misleading in light of the circumstances under which they were

4   made and 3, engaged in acts, practices and courses of business

5   which would and did operate as a fraud and deceit upon members

6   of the investing public in connection with the purchases and

7   sales of Computer Associates' common stock and by the use of

8   interstate commerce and the mails in violation of the United

9   States Code.

10          And the third charge again incorporates the

11  introductory paragraphs which I summarized and alleges that in

12  or about and between February of 2002 and February 10th of

13  2004, those dates being approximate and inclusive, within the

14  Eastern District of New York and elsewhere, you and others

15  knowingly and intentionally and corruptly conspired to

16  obstruct, influence and impede official proceedings namely the

17  government investigations in violation of Title 18 of the

18  United States Code.

19          It was part of that conspiracy that beginning in or

20  about February of 2002, you and other high-level Computer

21  Associates' executives agreed falsely to deny and otherwise

22  conceal the existence of the 35-day month practice, to devise

23  false justifications the purpose of which was to counter or

24  explain away evidence of the 35-day month practice.  The

25  conspirators communicated these justifications to the

22

1   company's law firm and to the audit committee's law firm

2   knowing and with the intent knowing they would in turn be

3   presented to the United States Attorney's Office, to the SEC

4   and the FBI.

5          You and others well knew and believed that these

6   false statements together with their concealment of material

7   information would have the effect of obstructing and impeding

8   the government investigations.  As a further part of that

9   conspiracy that beginning in or about February of 2002, you

10  and others met with Computer Associates executives and

11  employees prior to their being interviewed by the company's

12  law firm and the audit committee's law firm, United States

13  Attorney's Office, the SEC and the FBI and encouraged these

14  individuals not to disclose the existence of the 35-day month

15  practice.  And to conceal its existence by presenting false

16  justifications for conduct that was improper.  You and others

17  well knew and believed that such false statements and

18  concealment of material information would have the effect of

19  obstructing and impeding the government investigations.  It

20  was further part of the conspiracy that on or about October

21  3rd, 2003, you while being interviewed by members of the audit

22  committee's law firm did not disclose and otherwise concealed

23  the existence of the 35-day month practice.  You well knew and

24  believed that the false statements and concealment of material

25  information would have the effect of obstructing and impeding

23

1  government investigations.

2         And for the purpose of furthering the objectives of

3  that conspiracy during the course of it, within the Eastern

4  District of New York and elsewhere, you traveled from the

5  Computer Associates' headquarters in Islandia, New York to the

6  audit committee's law firm offices in Manhattan.

7         Have you gone over those charges in this information

8  with Mr. Lawler?

9         THE DEFENDANT:  Yes.

10        THE COURT:  You are satisfied with the

11  representation you have been receiving from Mr. Lawler?

12        THE DEFENDANT:  Yes.

13        THE COURT:  There are a number of rights which I'm

14  obliged to make sure you understand as you stand here this

15  afternoon, Mr. Zar, before I can accept your plea to those

16  charges.  First, I want to make sure you understand you have a

17  perfect right to say to me that you did not commit either one

18  of those crimes.  You have the perfect right to say to me you

19  are innocent.

20        And if you do, there will be a speedy and public

21  trial.  It will be a trial before a jury of 12 persons.  You

22  will be represented by your lawyer of your choice at that

23  trial.  And you would be presumed innocent of these charges.

24        What that means, Mr. Zar, that you would not have to

25  prove that you committed these crimes, did not commit these

24

1   crimes, that you are innocent of those crimes.  You would not

2   have to prove anything.  The government would have to prove

3   that you did commit them and the government would have to

4   prove it so that a unanimous jury of 12 people would be

5   satisfied beyond a reasonable doubt that you committed those

6   crimes.

7           Do you understand that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  At that trial you would have the right

10  to confront your accusers.  You would have the right to see

11  who the witnesses against you would be.  Your lawyer would

12  have the right to cross-examine those persons for you.  He

13  would have the right to object to any evidence the government

14  would seek to introduce against you if your lawyer believed

15  the rules of evidence should not be received by this Court.

16          Do you understand that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  At that trial too you could if you

19  wanted to testify on your own behalf under oath.  You could

20  have witnesses summoned here to testify for you.  You could

21  offer such evidence on your own behalf as you think might be

22  useful to you but you don't have to do any one of those

23  things.  You have a right to remain silent at your trial, say

24  nothing, do nothing.

25          If you did remain silent and did nothing else, I

25

1   would instruct the jury they would be terribly wrong if they

2   concluded that you were guilty because you remained silent and

3   offered no evidence on your behalf.  I would instruct the jury

4   that you are exercising a valuable privilege which the

5   Constitution confers upon all of us, the privilege against

6   self incrimination which in this context means a person can't

7   be forced to convict himself out of the words of his own

8   mouth.

9             Do you understand that?

10            THE DEFENDANT:  Yes.

11            THE COURT:  If you plead guilty this afternoon and

12  if I accept your plea, you will have been giving up all of

13  these rights which I just explained to you, there will not be

14  a trial and the government will not be required to prove that

15  you are guilty of these crimes and prove it so a unanimous

16  jury of 12 people would be satisfied beyond a reasonable doubt

17  that you are and you will not have had the opportunity to see

18  who your accusers would be.  A judgment of guilt will be

19  entered and you will be sentenced on another day.

20            Do you understand all that?

21            THE DEFENDANT:  Yes.

22            THE COURT:  I'm sure you just heard me say if you

23  plead guilty and if I accept your plea and what I had in mind

24  and meant when I say said if I accept your plea was the

25  obligation which the law imposes upon me, that I'm not

26

1    accepting a plea of guilty from somebody who is innocent.  The

2    law imposes upon me the obligation to be sure that the person

3    who tells me he is guilty in fact is.  So I'm going to ask you

4    a couple of questions about these crimes with which you are

5    charged and to the extent you answer them, you will be giving

6    up that privilege of self incrimination that I have told you

7    about, you will be convicting yourself out of the words of

8    your own mouth.

9             Do you understand that?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Did Mr. Lawler tell you that the maximum

12   sentence which the law you are accused of violating in the two

13   conspiracy counts, Counts One and Three, provides for

14   imprisonment up to five years?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Did Mr. Lawler explain that to you?

17            THE DEFENDANT:  Yes. .

18            THE COURT:  Did he also tell you that in addition to

19   any term of imprisonment on those two conspiracy counts, the

20   Court could add a period of supervised release of up to three

21   years?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Did Mr. Lawler explain supervised

24   release to you?

25            THE DEFENDANT:  Yes, he did.

27

1        THE COURT:  Do you believe you understand it?

2        THE DEFENDANT:  I did.

3        THE COURT:  Would you like me to go over it with you

4    as well?

5        THE DEFENDANT:  I think I understand it.

6        THE COURT:  Did he also tell you that you may be

7    fined up to $250,000 or twice the gross gain or loss,

8    whichever is greater?

9        THE DEFENDANT:  Yes.

10       THE COURT:  That if restitution is found to be

11   applicable, it would be mandatory?

12       THE DEFENDANT:  Yes.

13       THE COURT:  Did Mr. Lawler tell you that?

14       THE DEFENDANT:  Yes.

15       THE COURT:  Were you also advised that in each of

16   those counts you will be required to pay a special assessment

17   of $100?

18       THE DEFENDANT:  Yes.

19       THE COURT:  With respect to the second count, the

20   substantive count, what is known and referred to as the

21   substantive count of securities fraud, did Mr. Lawler explain

22   to you that the maximum term the statute you are accused of

23   violating provides for is imprisonment up to ten years, did he

24   tell you that?

25       THE DEFENDANT:  Yes.

28

1    THE COURT:  Did he also tell you with respect to

2  that count as well, the Court could add a period of supervised

3  release of up to three years, did he tell you that?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Did he also tell you that the Court

6  could impose a fine of up to a million dollars, did he tell

7  you that?

8    THE DEFENDANT:  Yes.

9    THE COURT:  That if restitution is deemed to be

10  applicable, restitution would be mandatory, did he tell you

11  that?

12    THE DEFENDANT:  Yes.

13    THE COURT:  Were you also informed that a special

14  assessment of $100 would be required with respect to that

15  count as well?

16    THE DEFENDANT:  Yes.

17    THE COURT:  Did Mr. Lawler tell you that the

18  sentence on each of those three counts may be imposed to run

19  consecutively?

20    THE DEFENDANT:  Yes.

21    THE COURT:  Did he advise of you that?

22    THE DEFENDANT:  Yes.

23    THE COURT:  Is it correct, Mr. Pitofsky, that with

24  respect to Counts One and Three, the maximum fine was 250,000

25  or twice the gross gain or loss, whichever is greater?

29

1        MR. PITOFSKY:  Yes, your Honor.

2        THE COURT:  I didn't think that was true in the

3   allocutions with respect to either Mr. Kaplan or --

4        MR. PITOFSKY:  -- Mr. Rivard.

5        THE COURT:  I think that's what the plea agreement

6   said.  You may want to check it.

7        MR. PITOFSKY:  We will, your Honor.

8        THE COURT:  In any event, I don't recall telling

9   either of them that.

10       MR. PITOFSKY:  We will check the statute and check

11  the plea agreements.

12       THE COURT:  I don't know if it would have any

13  significant impact on the validity of the plea but in any

14  event, it may be my memory is playing tricks on me, Mr.

15  Pitofsky, you may want to check that.

16       MR. PITOFSKY:  We will.

17       THE COURT:  Mr. Lawler has also told you I'm sure,

18  Mr. Zar, that your sentence will be determined by guidelines?

19       THE DEFENDANT:  Yes.

20       THE COURT:  You understand that to mean that your

21  sentence will be somewhere between the minimum number of

22  months and a maximum number of months?

23       THE DEFENDANT:  Yes.

24       THE COURT:  And was some prediction made to you with

25  respect to what the guidelines in your case might be?

30

1          THE DEFENDANT:  No.

2          THE COURT:  I don't know what the guidelines in your

3   case are as I talk to you.  I just want to make sure you know

4   that.  And I should tell you too in a proper case, a person

5   could be sentenced more severely or more leniently than the

6   guidelines may require.  I don't know as I talk to you whether

7   yours would be a proper case for either.  But if you are

8   sentenced more severely, you could appeal that sentence.  And

9   if you are sentenced more leniently, the government might.

10          Do you have any questions about anything I have

11   explained to you so far?

12          THE DEFENDANT:  No.

13          THE COURT:  Mr. Lawler, do you know of any reason

14   why Mr. Zar shouldn't plead to the three counts of that

15   information?

16          MR. LAWLER:  I do not, your Honor.

17          THE COURT:  How do you plead to the three counts I

18   read to you, Mr. Zar, do you plead guilty or not guilty?

19          THE DEFENDANT:  Guilty.

20          THE COURT:  And you are telling me that because you

21   are?

22          THE DEFENDANT:  Yes.

23          THE COURT:  You are telling me that voluntarily?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Nobody is compelling you to say that

31



1  here today?

2          THE DEFENDANT:  No.

3          THE COURT:  You are telling me that in consideration

4  of an agreement that you have entered into with the

5  government?  You entered into an agreement with the

6  government?

7          THE DEFENDANT:  Yes.

8          THE COURT:  In consideration of that plea?

9          THE DEFENDANT:  Yes.

10         THE COURT:  You have gone over that agreement with

11  Mr. Lawler?

12         THE DEFENDANT:  Yes.

13         THE COURT:  I believe you understand all of it?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Would you like me to go over it with you

16  as well?

17         THE DEFENDANT:  I don't believe so.

18         THE COURT:  I want to make sure you do understand

19  that in one paragraph, it's paragraph 6, the agreement

20  provides that if the United States Attorney's Office concludes

21  and determines that you have discharged all of your

22  obligations under this agreement to their satisfaction, at the

23  time of your sentence, they will make a motion before me which

24  is referred to in the agreement as a motion pursuant to

25  Section 5K1.1 of the sentencing guidelines.  I'm not obliged



32

1   to grant that motion.  If I do, I can sentence you without

2   regard to what the guidelines may require but I'm not obliged

3   to grant it.

4          I want to make sure you understand that.  And if for

5   reasons sufficient unto me I deny that motion and you are

6   unhappy understandably, you will not be permitted to withdraw

7   your plea for that reason.

8          Do you understand that?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Do you recognize any signature on this

11  page (indicating)?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Whose signature do you recognize?

14         THE DEFENDANT:  It's mine.

15         THE COURT:  You understand when you signed it, it

16  was directly under two sentences that you have read the entire

17  agreement, you discussed it with your lawyer, understood all

18  of its terms and you have entered into that agreement

19  knowingly and voluntarily?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Has anybody made any prediction for you

22  as to what your sentence will be?

23         THE DEFENDANT:  No.

24         THE COURT:  I think I indicated I don't know what

25  your sentence will be as I talk to you so if anybody has made



33

1    any prediction for you, they would be misleading you.

2            Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Let me ask you some questions about the

5    two conspiracy counts first, Counts One and Three.

6            Had you gone to trial, Mr. Zar, the law would have

7    required the government to prove three elements with respect

8    to each of those counts and prove them so that a unanimous

9    jury of 12 people would be satisfied they had been proved

10   beyond a reasonable doubt.

11           The first element the government would have to prove

12   is that there was a conspiracy as charged, in Count One, the

13   conspiracy to commit securities fraud and in Count Three a

14   conspiracy to obstruct justice.

15           The second thing the government would have to prove,

16   you were knowingly and intentionally a party to that

17   conspiracy.

18           And the third thing the government would have to

19   prove is at least one overt act as charged was committed

20   during the course of and in furtherance of the objectives of

21   that conspiracy.

22           Do you understand that?

23           THE DEFENDANT:  Yes.

24           THE COURT:  A conspiracy, Mr. Zar, is very simply

25   defined as an agreement between two or more people, one of

34

1  whom is you, to commit a crime.  The essence of the crime of

2  conspiracy is the agreement.  And by agreement, I don't mean

3  to suggest that it has to be in writing.  It would be enough

4  if the government satisfied the jury beyond a reasonable doubt

5  that you and one or more other persons had a common

6  understanding, a meeting of the minds you were going to commit

7  securities fraud.

8          By securities fraud, I mean the fraud as I have read

9  it to you in Count One and as it was described in some detail

10  in the 25 introductory paragraphs I read to you.

11          Did you have such an agreement with one or more

12  persons essentially you were going to report license

13  agreements that were finalized after the end of a quarter and

14  report that they were finalized during the course of a

15  quarter?

16          THE DEFENDANT:  Yes.

17          THE COURT:  You were a party to that agreement

18  knowingly, fully understanding what you were agreeing to?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And in Count One, is it also true that

21  on or about October 6th, 1999, that at Computer Associates'

22  headquarters in Islandia, New York, you signed on behalf of

23  that company an approximately $102 million license agreement

24  and you backdated it to make it appear as though the agreement

25  was executed on September 30, 1999, the last day of the second

35

1    quarter of that company's fiscal year 2000; is that true?

2           THE DEFENDANT:  I don't remember the specific date I

3    signed.  And I have now had the opportunity to look at

4    documents afterwards and I do believe that to be the case,

5    yes.

6           THE COURT:  Do you remember that on or about January

7    6th in the year 2000 you met with executives number 1 and 2 at

8    the Computer Associates' headquarters or do you remember on or

9    about that date, do you remember that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  With respect to Count Three, conspiracy

12   to obstruct justice, did you have an agreement, meeting of the

13   minds, an understanding with one or more other persons that

14   you were going to falsely deny that you reported finalizing of

15   licensing agreements after the end of the quarter but report

16   they were finalized during the quarter and that you were going

17   to encourage others to deny the existence of that 35-day month

18   practice when asked about it by the U.S. Attorney's Office, by

19   the FBI, by the SEC; is all that true?

20          THE DEFENDANT:  Yes.

21          THE COURT:  You had such an agreement?

22          THE DEFENDANT:  Yes.

23          THE COURT:  You were a party to that agreement fully

24   understanding what you were agreeing to; is that true?

25          THE DEFENDANT:  Yes.

Case 2:05-cr-00587-JFW Document 589 Filed 01/20/09 Page 38 of 76 Page ID #:6560

THE COURT: In furtherance of that conspiracy, is it true that you traveled from Computer Associates' headquarters in Islandia, New York to the offices of the audit committee's law firm in Manhattan for the purpose of giving effect to that agreement to obstruct justice, to obstruct a government investigation into these security fraud practices; is that true?

THE DEFENDANT: Yes.

THE COURT: With respect to the second count which is referred to as the substantive count of securities fraud, did you together with others employ deceptive practices in violation of Rule 10B(5)? Do you know what 10B(5) is all about?

THE DEFENDANT: Yes.

THE COURT: Which is as the chief financial officer of Computer Associates, you were intimately familiar with the details of 10B(5) and what the company's obligations were in that regard?

THE DEFENDANT: I'm familiar with the details, yes.

THE COURT: You knowingly and willfully used deceptive devices together with others to defraud, to make untrue statements of fact, to omit to make statements which in the light of circumstances under which they were made were misleading and engaged in practices or business practices which operated as a fraud and deceit upon members of the

STEPHANIE DREXLER, RPR
OFFICIAL COURT REPORTER

Page 38 of 76                    Exhibit 7

37

1   investing public; is that true?

2         THE DEFENDANT:  Yes.

3         THE COURT:  And in accomplishing that fraudulent and

4   deceptive practice upon the investing public used or wired

5   telephone facsimile machines or other instrumentalities of

6   interstate commerce?

7         THE DEFENDANT:  Yes.

8         THE COURT:  Most of that was done in Islandia, New

9   York?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Am I correct in understanding that

12   Mr. Zar wishes to read something to the Court?

13         MR. LAWLER:  Yes, your Honor.

14         THE COURT:  I will hear you.

15         THE DEFENDANT:  From 1982 through October 2003 I was

16   employed at Computer Associates and served as chief financial

17   officer from June 1998 through October 2003.  During my tenure

18   as CFO I was responsible for the financial functions which

19   included financial reporting and sales accounting.

20         During the period mentioned in Count One,

21   particularly the fiscal year end of March 31st, 2000, I agreed

22   with other executives of Computer Associates to participate in

23   a practice of improperly recording revenue in the company's

24   financial statements for periods other than when the

25   contractual arrangements were completed.  This practice of

38

extending the quarter end whereby contracts that were completed in the early days of one quarter but recorded as revenue in the preceding quarter had the effect of falsely meeting external quarterly expectations.

In particular for the quarter ended March 31st, 2000, I caused the books to be held open to allow contracts that were finalized in early April 2000 to be recorded in March 2000. While I caused the practice to soon end after the end of fiscal year 2000, I knew that my conduct was wrong at the time.

When Computer Associates initiated an internal investigation, I agreed with others not to reveal the facts relating to the practice of extending the quarter end and to offer false or misleading explanations for the practice.

When I spoke with certain Computer Associates' executives before they were interviewed by the company law firm, we discussed false or misleading justifications that could be offered to explain the practice of extending the quarter end.

In addition, on October 3rd, 2003, I was interviewed by members of the audit committee's law firm at their offices and in answering questions concealed the true facts concerning the practice. I understood that the information I gave the audit committee and information other witnesses gave to the committee's lawyers would be passed on to the government and

39

1   would have the effect of impeding the government's

2   investigation.  I knew that what I was doing was wrong and

3   accept full responsibility for my actions.

4           I apologize for my actions.

5           THE COURT:  Anything further?

6           MR. LAWLER:  No, your Honor.

7           THE COURT:  Mr. Pitofsky?

8           MR. PITOFSKY:   Only the matter of release on bail.

9   Again, with the Court's approval the parties have agreed to

10  the defendant being released on a $500,000 personal

11  recognizance bond.  He will surrender his passport to Pretrial

12  Services this afternoon and not travel outside the continental

13  United States.  He agreed to report to Pretrial Services once

14  a month during the pendency of this case.

15          THE COURT:  Mr. Zar has been fully advised of his

16  rights.  I'm satisfied he understood them.  And with that

17  understanding he knowingly and voluntarily pleaded to the

18  three counts of an information which is numbered CR-04-331.

19  I'm satisfied there is a factual basis for that plea so I will

20  accept it and I will so order the terms of his release.

21          THE CLERK:  Sentencing on July 22nd at 10:00 a.m.

22          THE COURT:  Is that date acceptable?

23          MR. LAWLER:  Yes, it is, your Honor.

24          MR. PITOFSKY:   Thank you, your Honor.

25          THE COURT:  These proceedings are concluded.

40

1        Thank you very much.

2        Does the gentleman from the SEC want to be heard?

3        MR. VASILESCU:  Good afternoon.  Alex Vasilescu for

4   the United States Securities and Exchange Commission.

5        Earlier today, your Honor, the SEC filed a related

6   civil action against defendant Ira Zar charging him with

7   violating the anti-fraud provisions of the securities laws,

8   aiding and abetting the company in violation of anti-fraud

9   provisions of the securities laws as well as other provisions,

10  filings and books and records provisions as well as making

11  inaccurate statements to the auditors.

12       Mr. Zar even prior to the filing of this complaint

13  had worked out an agreement with the SEC in which he consents

14  to a partial judgment without admitting or denying the

15  allegations of the complaint in which he consents to the Court

16  ordering a permanent injunction against him for violating the

17  securities provisions as well as an officer and director bar.

18  The issue of discouragement and a civil penalty is left to be

19  resolved at a later time and the parties hope to work that out

20  at a later time.

21       The SEC respectfully requests the Court enter the

22  equitable relief the parties agree to.

23       THE COURT:  Mr. Lawler?

24       MR. LAWLER:  No objection, your Honor.

25       THE COURT:  Mr. Zar, you have gone over the

41

1    complaint and partial judgment with Mr. Lawler and you

2    understand its terms?

3            THE DEFENDANT:  Yes.

4            THE COURT:  I will so order it.  I have signed it.

5            MR. VASILESCU:  Thank you.

6            (The matter was concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 8

## to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

Page 1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ---------------------------------------x
    UNITED STATES OF AMERICA,
3           Plaintiff,

                        04 CR 837
4
5       versus          United States Courthouse
                        225 Cadman Plaza East
6                       Brooklyn, N.Y.  11201
    STEVEN WOGHIN,
7
        DEFENDANT.
8
    ---------------------------------------x
9
                        September 22,  2004
10                      12:10 p.m.
        TRANSCRIPT OF PLEA
11  Before:  HON. I. LEO GLASSER,
                        DISTRICT COURT JUDGE
12
                        APPEARANCES
13
    ROSLYNN R. MAUSKOPH
14  United States Attorney - Eastern District of New York
    One Pierrepont Plaza
15  Brooklyn, New York  11201
        ERIC KOMITEE, ESQ.
16      ERIC CORNGOLD, ESQ.
    Assistant United States Attorney
17
18  ATTORNEY FOR DEFENDANT:
19  MATTHEW FISHBEIN, ESQ.
20
21
    Court Reporter:  ALLAN R. SHERMAN, CSR, RPR
22          225 Cadman Plaza East Rm 374
            Brooklyn, New York  11201
23          Tel: (718) 260-2529  Fax: (718) 254-7237

Proceedings recorded by mechanical stenography, transcription
25    by CAT.

PLEA

Page 2

1          THE CLERK:  Criminal cause for a pleading, United

2     States of America versus Steve Woghin.

3          Counsel, please step forward.

4          MR. KOMITEE:  For the government, Eric Komitee.

5          Good afternoon, your Honor.

6          MR. FISHBEIN:  I guess it is afternoon, your Honor.

7          Matthew Fishbein, Debevoise & Plimpton for Steven

8     Woghin.

9          THE COURT:  Are you ready to proceed, Mr. Fishbein?

10         MR. FISHBEIN:  Yes, we are, your Honor.

11         (Defendant sworn by the Clerk of the Court.)

12         THE CLERK:  Could you please state your name for the

13    record.

14         MR. GIUFFRA:  Steven Woghin.

15         THE COURT:  Mr. Woghin, you just swore to tell the

16    truth so everything you are going to say to me this afternoon

17    should be truthful.

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  As I'm sure you know, it's a crime of

20    perjury to tell a lie after you have swore to tell the truth?

21         THE DEFENDANT:  I understand.

22         THE COURT:  How old are you?

23         THE DEFENDANT:  Fifty-seven.

24         THE COURT:  Are you currently under the care of a

25    physician?

          ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Have you taken any medicines or pills or

3    drugs of any kind in the past two weeks?

4          THE DEFENDANT:  No.

5          THE COURT:  Do you understand why you are here?

6          THE DEFENDANT:  Yes.

7          THE COURT:  You understood everything this I have

8    said to you so far?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Mr. Fishbein, do you have any questions

11   about Mr. Woghin's competence to participate in this

12   proceeding?

13         MR. FISHBEIN:  None at all.

14         THE COURT:  I'll make a finding to that effect.

15         Do you have a copy of the information before you?

16         MR. FISHBEIN:  We do, your Honor.

17         THE COURT:  Mr. Woghin, the document in which the

18   charges against you are contained is not an indictment.

19   Charges are being preferred by the United States Attorney in

20   the document that is called an information.  I'm sure that you

21   probably understand what it is I'm about to advise you of as

22   well as your lawyer does and as well as I do.

23         The law requires me to make sure that there are

24   certain things that you do understand.

25         The reason that I call the fact that the document in

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 4

1  which these charges are contained to your attention is an

2  information and that the charges are brought by the United

3  States Attorney is because the crimes with which you are

4  charged are referred to in the Constitution of the United

5  States as capital offenses, otherwise known as a felony.

6       The Constitution says that if a person is going to

7  be charged with a felony or a capital offense, he has a right

8  to insist that the charge be brought by a Grand Jury.

9       This charge or these charges are not being brought

10 against you by a Grand Jury but by the United States Attorney.

11 So you have a perfect right to say to me today that you'd

12 lying to enjoy the constitutional right to be indicted by a

13 Grand Jury.

14      If you do, nothing else will happen here today.  You

15 also have a right to knowingly, voluntarily surrender your

16 constitutional right, waive it so that you may make an

17 informed judgment about it and I'm sure Mr. Fishbein has told

18 you all about it but let me tell you again.

19      If you do wish to enjoy your constitutional right to

20 be indicted, I suspect what will happen is the government will

21 impanel a Grand Jury to present such evidence as it has in

22 this case to that body and ask them to return an indictment.

23      The Grand Jury is made up of no less than 16, no

24 more than 23 people.  A Grand Jury returns an indictment if at

25 least 12 of those people have probable cause to believe that a

            ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

1  crime has been committed and that a designated person, you in

2  this case, committed it.

3       I don't know whether a Grand Jury will return such

4  an indictment.  That depends on whether 12 people would have

5  probable cause to believe that you committed those crimes.

6       Do you understand that all?

7       THE DEFENDANT:  Yes.

8       THE COURT:  Did you discussed it all with Mr.

9  Fishbein?

10      THE DEFENDANT:  Yes.

11      THE COURT:  Do you understand your right to be

12  indicted by a Grand Jury?

13      THE DEFENDANT:  Yes.

14      THE COURT:  And you wish to give up that right?

15      THE DEFENDANT:  Yes.

16      THE COURT:  Nobody is forcing you to do it?

17      THE DEFENDANT:  No.

18      THE COURT:  And you have executed, you have signed

19  this document called waiver of indictment?

20      THE DEFENDANT:  Yes.

21      THE COURT:  And Mr. Fishbein, that is your signature

22  as a witness to it?

23      MR. FISHBEIN:  Yes, it is, your Honor.

24      THE COURT:  Mr. Woghin has been fully advised of his

25  rights to be indicted by a Grand Jury.  I'm satisfied that he

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 6

1    understood them and with that understanding, he knowingly and

2    voluntarily waived that right and has executed a waiver of

3    indictment in open court which I'll approve and direct be

4    filed.

5         I'm told you wish to plead to an information which

6    I'm going to just summarize for you, Mr. Woghin.

7         You were employed as the general counsel to Computer

8    Associates, is that correct?

9         THE DEFENDANT:  Yes.

10        THE COURT:  And Computer Associates International

11   was a Delaware corporation publicly traded on the New York

12   Stock Exchange, had shareholders throughout the United States,

13   including the Eastern District of New York, it was one of the

14   world's or perhaps still is one of the world's largest

15   providers of computer software, has an income in the billions

16   of dollars.

17        Computer Associates doesn't sell its product, its

18   computer software.  It licenses it to purchasers for a

19   one-time license fee and annual maintenance and usage fees

20   thereafter.

21        As a publicly traded corporation, it's required to

22   comply with rules and regulations of the SEC.  Those rules and

23   regulations are designed essentially to protect the investing

24   public by requiring a public corporation, Computer Associates,

25   to keep accurate records, to prepare financial statements,

         ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

1  reports which are true, not misleading so that investors who
2  choose to read those reports, read those statements, hear
3  those statements, can make an informed and diligent judgment
4  as to whether they wish to invest in that corporation or not.
5      The financial statements which Computer Associates
6  or any corporation regulated by the SEC is required to
7  maintain and file must be prepared in accordance with
8  generally accepted accounting practices.  And those practices
9  required Computer Associates to have evidence of an existing
10 arrangement which in that case would pertain to the licensing
11 agreements between CA and its customers.
12     I'm sure the delivery of those products and
13 services, licensed software required a fixed or determinable
14 license fee and also indicate that collection of the fee was
15 more likely than not, it was probable.
16     The license agreement had to be signed by both the
17 purchaser and by Computer Associates.  And they were to be
18 signed within the parameters, the time parameters of a fiscal
19 quarter if they were to be recognized within that quarter as
20 earnings, revenue properly attributable to that quarter.
21     You were employed by Computer Associates between
22 1992 and 2004.  You held a variety of offices with CA.  You
23 were a vice president in '93.  You were a senior vice
24 president and general counsel in '95 and in that latter
25 capacity you reported directly to the chief operating officer
       ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 8

1    and the chief executive officer, Samjay Kumar.

2         You also supervised all the lawyers in the legal

3    department in Computer Associates.

4         Revenue predictions which were issued quarterly were

5    used by stock analysts to make estimates as to what the

6    earnings potential within any given quarter by Computer

7    Associates might be.  Those estimates were made public.  Those

8    estimates were also contained in press releases and financial

9    statements which were filed by Computer Associates and to a

10   large extent, the stock price, price at which persons were

11   willing to purchase shares of Computer Associates stocks

12   depended to a large extent upon the estimated earnings of

13   Computer Associates within any given quarter.

14        A practice was developed by Computer Associates to

15   attempt to assure that the revenue estimates which they had

16   proclaimed for any given quarter were going to be met or

17   exceeded and that required them to be able to report that

18   revenue within a given quarter would be adequate to justify

19   the estimate as to what the revenue, earnings of shares would

20   yield in any given quarter.

21        The license agreements, the totality of which within

22   any given quarter indicated what the revenue of CA during that

23   quarter was, had to be signed by the would-be purchaser and

24   countersigned by CA within that quarter.  When it became

25   apparent toward the end of any given quarter to responsible

                ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 9

1 management or I should say management responsible for the
2 operation of Computer Associates, which included the chief
3 operating officer, chief financial officer, chief executive
4 officer, you as general counsel reporting directly to
5 Mr. Kumar, when it became apparent that the revenue within
6 that quarter was not going to be sufficient to justify the
7 estimated earnings per share because there weren't enough
8 license agreements completed within that quarter, a 35-day
9 month practice was instituted whereby license agreements were
10 signed and countersigned after the expiration of a quarter,
11 were backdated or reported as having been completed within
12 that quarter.
13         Those practices are spelled out in more detail in
14 paragraphs 12 through 16 of this information which reads:
15         Prior to and during CA's fiscal year of 2000 which
16 ended on March 31, 2000, numerous CA officers and executives
17 engaged in a systematic and company-wide practice of falsely
18 and fraudulently recording and reporting within a fiscal
19 quarter revenue associated with certain license agreements
20 even though those license agreements were not in fact
21 finalized and signed during that quarter.
22         That practice was referred to within CA as the
23 35-day month or the three-day window and that practice was in
24 violation of the generally accepted accounting practices and
25 resulted in the filing of materially false financial
        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

1    statements.

2         A practice which was referred to as the 35-day month

3    was referred to in that way because it involved artificially

4    extending months, primarily the last month of the fiscal

5    quarter, beyond the true end of the month.  The practice

6    didn't only result in months that were artificially extended

7    to 35 days, months were frequently extended artificially even

8    beyond the 35-day period.  Nevertheless, for the sake of

9    simplicity, the practice is referred to in this information as

10   the 35-day month practice.

11        The central goal of that practice was to permit the

12   corporation to report that it met or exceeded its projected

13   quarterly revenue and earnings when in truth it hadn't done so

14   at all.  And as a result of the practice, CA reported falsely

15   to investors and regulators during numerous fiscal quarters

16   including each of the four quarters of the 2000 fiscal year

17   that it had met or exceeded the consensus estimates which was

18   the estimate of expected earnings.

19        In fact in each of the four quarters of the fiscal

20   year 2000, Computer Associates improperly recognized, falsely

21   reported hundreds of millions of dollars of revenue associated

22   with numerous license agreements that were finalized after the

23   quarter closed.  And in doing that, CA made

24   misrepresentations, made omissions of material fact which were

25   relied upon by members of the investing public.  And as part

          ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 11

1   of that 35-day month practice, the attorneys employed by

2   Computer Associates who were supervised by you routinely

3   participated in the negotiation and drafting of software

4   license agreements during the week following the calendar end

5   of the fiscal quarter and you believed that the purpose of a

6   significant portion of this post-quarter end activity was to

7   generate revenue for Computer Associates to be improperly

8   recognized in the prior fiscal quarter and the execution dates

9   of agreements finalized after the end of fiscal quarters were

10  backdated so as to disguise the fact that the agreements were

11  finalized after the quarter ended.  And as a part of that

12  35-day practice, you participated in the negotiation or

13  drafting of backdated license agreements.  For example, on or

14  about January 6, 2000 you composed the first draft of a

15  license agreement between CA and a customer referred to as

16  customer number 1 despite the fact that the corporation's

17  calendar fiscal quarter closed four days earlier.  Your first

18  draft contained a typewritten signature date of December 31,

19  1999 on the signature blocks provided for the corporation's

20  and the customer's signature.  At the time you drafted the

21  software licensing agreement with customer number 1, you knew

22  and believed that CA would improperly record and report the

23  revenue associated with that license agreement in the quarter

24  that ended December 31, 1999.  And in or about the beginning

25  of 2002, the United States Attorney's Office for the Eastern

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 12

1  District of New York, the FBI and the Northeast Regional

2  Office of the SEC began to investigate Computer Associates's

3  accounting practices which included during the late '90s and

4  thereafter, the corporation engaged in improper accounting

5  practices for the purpose of overstating its fiscal quarterly

6  revenue so as to make it appear as though the company had met

7  its earnings estimate for that quarter referred to as

8  consensus estimates.

9        Since June of 2002, a Grand Jury sitting in the

10 Eastern District of New York has been considering evidence

11 about the corporation's accounting practices.  Those

12 investigations are referred to collectively as the government

13 investigations.

14        In or about February of 2002, Computer Associates

15 retained a law firm to represent it in connection with the

16 government investigations.  Through the company's law firm the

17 corporation represented to the United States Attorney's

18 Office, the FBI and the SEC that it was committed to

19 cooperating fully with the government investigations.  This

20 representation was also made publicly by Computer Associates

21 in press releases, in SEC filings and in other public

22 statements.

23        Additionally, in a press release released on

24 February 20, 2002 Computer Associates denied that it engaged

25 in any improper accounting practices.  It declared, "Reporting

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court Eastern District of New York

PLEA

Page 13

1  of our financial results has always been in accordance with

2  applicable accounting principles."

3      Shortly after being retained in February of 2002,

4  the company's law firm met with you and other corporate

5  executives in order to inquire into their knowledge of the

6  practices that were the subject of the government

7  investigations. During those meetings, you and others didn't

8  disclose, you falsely denied, otherwise concealed the

9  existence of the 35-day month practice. Moreover, you and

10  others presented to the company's law firm an assortment of

11  false justifications, the purpose of which was to support a

12  false denial of the 35-day month practice. You and others

13  knew and in fact intended that the company's law firm would

14  present those false justifications to the United States

15  Attorney's Office and the FBI and the SEC.

16      During the course of the government investigations,

17  the United States Attorney's Office, the FBI and the SEC

18  periodically requested that Computer Associates produce

19  certain of the company's employees to be interviewed. As part

20  of your duties as general counsel, you coordinated the

21  corporation's compliance with the government's requests, you

22  frequently met and conferred with Samjay Kumar during the

23  course of the government investigations. Among other things,

24  Kumar instructed you to meet with Computer Associates

25  employees prior to their being interviewed by the government

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 14

1  or by the company's law firm and to coach them on how to

2  answer questions without disclosing the existence of the

3  35-day month practice.  You subsequently met with various

4  Computer Associates employees and you instructed them

5  regarding how they should answer questions when they were

6  interviewed by the government or the company's law firm.

7  Those instructions were intended by you to cause the corporate

8  employees that you met with to conceal the existence of that

9  35-day month practice.  Your instructions had their intended

10  effect in that several individuals with whom you did meet in

11  fact made statements to the government or the company's law

12  firm and failed to acknowledge, in some cases falsely denied

13  that a 35-day month practice existed.

14      Your purpose in causing corporate employees falsely

15  to deny the knowledge of the 35-day month practice to the

16  company's law firm was to prevent the government from learning

17  that that practice existed.  For example, on one occasion you

18  meet with a Computer Associates employee, employee number 1,

19  prior to a scheduled interview with the company's law firm and

20  that employee communicated to you that he or she knew that

21  CA's license agreements were regularly executed following the

22  close of the calendar quarter and then recognized as revenue

23  for the prior quarter.  You repeatedly instructed the employee

24  not to speculate, not to acknowledge any facts that were not

25  personally known to that employee.  You gave those

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

Exhibit 8

PLEA

Page 15

1   instructions despite the fact that you knew and understood

2   that the employee was in fact speaking from personal

3   knowledge.  When the employee described those facts confirming

4   the existence of the 35-day month practice, your instructions

5   to the employee were intended to persuade the employee not to

6   acknowledge in interviews with the company's law firm or the

7   government that a 35-day month practice had in fact existed at

8   Computer Associates.  Those introductory paragraphs which I've

9   fairly summarized for you are now realleged or deemed to be

10  realleged and incorporated as if they were fully set forth in

11  the paragraphs which make up count one of this information

12  which alleges that on or about and between April 1, 1998

13  and April 6, 2004, those dates being approximate and

14  inclusive, within the Eastern District of New York and

15  elsewhere, you together with others knowingly, willfully,

16  directly and indirectly conspired; A, to commit fraud in

17  connection with the purchase and sale of securities issued by

18  Computer Associates in violation of Section 78(b), 78(j)(b)

19  and 78(ff) of Title 15 of the United States Code, Title 17 of

20  the United States Code of Federal Regulations,

21  Section 240.10(b)(5); and B, conspired to make and cause to be

22  made false and misleading statements of material fact in

23  applications reports and documents required to be filed under

24  the Securities & Exchange Act of 1934 and the rules and

25  regulations thereunder in violation of Section 78(ff), Title

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

1  15 of the United States Code, conspired to falsify Computer

2  Associates's books, records and accounts, the making and

3  keeping of which was required by Title 15 of the United States

4  Code Section 78(mb)(2)(A) and Title 17 of the CFR, section

5  240.13(b)(2-1) in violation of Title 15 of the United States

6  Code Section, 78(mb)(5) and 78(ff) and conspired to circumvent

7  Computer Associates' internal accounting controls as required

8  by the United States Code, and in furtherance of the

9  conspiracy and to effect its objects within the Eastern

10  District of New York and elsewhere, you committed and caused

11  to be committed among others, the following overt act:

12          On or about January 6, 2000, you drafted a

13  software license agreement that bore a backdated execution

14  date.

15          Count two incorporates and realleges all of the

16  introductory paragraphs, paragraphs 1 through 22, and alleges

17  that in or about and between February of 2002 and

18  April 6th of 2004, those dates being approximate and

19  inclusive, within the Eastern District of New York and

20  elsewhere, you knowingly, intentionally and corruptly

21  obstructed, influenced and impeded official proceedings,

22  namely, the government investigations in violation of

23  Section 1512(c)(2) of Section 2 and Section 3551 and sections

24  which follow it of Title 18 of the United States Code.

25          There are additional allegations as to count one

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 17

1    which read --

2         MR. FISHBEIN:  Your Honor, I just conferred with Mr.

3    Komitee.  My understanding is those additional allegations,

4    it's now the government's practice to notify but that is not

5    encompassed by the plea this morning.

6         THE COURT:  Related to Blakely matters, is that the

7    idea?

8         MR. KOMITEE:  Yes, your Honor.

9         THE COURT:  You've had an opportunity to discuss

10   these charges with Mr. Fishbein, have you?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Before I can accept your plea, the law

13   requires that I make sure that there are a number of rights

14   that you understand that you have as you stand here today.

15        The first thing I want to make sure you understand

16   is that you have a perfect right to say to me this afternoon

17   that you are not guilty of these crimes, and if you tell me

18   that, as you probably may, there will be a speedy and a public

19   jury trial.  You will be represented by your lawyer at that

20   trial and you would be presumed innocent of these charges

21   which means that you wouldn't have to prove your innocence,

22   you wouldn't have to prove anything at all.  The government

23   would have to prove your guilt and the government would have

24   to prove it so that a unanimous jury of 12 persons would be

25   satisfied beyond a reasonable doubt of your guilt.

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 18

1       Do you understand that?

2       THE DEFENDANT:  Yes, I do, your Honor.

3       THE COURT:  At that trial, you would have a right to

4  confront your accusers, have a right to see who the witnesses

5  against you would be.  Your lawyer would have a right to

6  cross-examine those persons for you.

7       You would have a right to object to any evidence

8  which the government would seek to introduce against you which

9  he believes should not be received by this Court.

10      Do you understand that?

11      THE DEFENDANT:  Yes.

12      THE COURT:  You also could, if you wished, testify

13  under oath for yourself.  You could summon witnesses here to

14  testify for you.  You could offer such evidence on your behalf

15  as you think might be useful to you.  But you don't have to do

16  any of those things.  You have a right to remain silent, say

17  nothing, do nothing and if you did remain silent and did

18  nothing else, I would instruct the jury that it would be

19  completely wrong for them to infer that you are guilty because

20  you are neither saying anything nor doing anything as you are

21  sitting in this courtroom.

22      I would make sure the jury understands that you are

23  exercising your privilege which the Constitution of the United

24  States gives you and all other persons accused of a crime.

25  That is known as the privilege against self-incrimination.  In

       ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 19

1    simple terms, it means a person can't be required to convict

2    himself out of the words of his own mouth.

3            Do you understand all that?

4            THE DEFENDANT: Yes, your Honor.

5            THE COURT:  If you plead guilty this afternoon, and

6    if I accept that plea, you'll be giving up all these rights

7    which I just explained to you.  There will not be a trial.

8    The government will not be called upon to prove that you

9    committed these crimes so that a unanimous jury of 12 people

10   would be satisfied that you did beyond a reasonable doubt and

11   you will not have had the opportunity to see who the witnesses

12   against you would be.

13           A judgment of guilt would be entered.  You would be

14   sentenced on another day.

15           Do you understand that?

16           THE DEFENDANT: Yes, your Honor.

17           THE COURT:  If you listened very carefully,

18   Mr. Woghin, you would have heard me say a minute or so again

19   that if you plead guilty and if I accept your plea.  What I

20   had in mind when I said if I accept your plea, it is the

21   obligation which the law imposes upon me to make sure that I

22   am not accepting a plea of guilty from a person who is

23   innocent.

24           So I'm going to ask you some questions about these

25   two crimes with which you are charged and to the extent that

            ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 20

1  you answer them, you will be convicting yourself out of the

2  words out of your own mouth.

3      Do you understand that?

4      THE DEFENDANT:  Yes.

5      THE COURT:  Did you have something you wanted to

6  say?

7      MR. FISHBEIN:  Yes, your Honor.  I didn't mean to

8  interrupt.

9      With my assistance, Mr. Woghin has prepared an

10  allocution that he is prepared to give.  We have conferred

11  with Mr. Komitee who has reviewed it and I understand that

12  your Honor may have some additional questions, but if

13  your Honor would like to proceed that way, Mr. Woghin is

14  prepared to do that.

15      THE COURT:  I'll get to that in just a minute.

16      MR. FISHBEIN:  Thank you.

17      THE COURT:  Did Mr. Fishbein advise you, Mr. Woghin,

18  that the maximum term of imprisonment which count one, the

19  conspiracy to commit securities fraud, which is the statute

20  which you are charged with violating in that count, is

21  imprisonment up to five years, did he tell you that?

22      THE DEFENDANT:  Yes.

23      THE COURT:  Did he also tell you that in addition to

24  any term of imprisonment, the Court could add a term of

25  supervised release of up to three years?

      ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 21

1          THE DEFENDANT:  Yes.

2          THE COURT:  Did he explain what supervised release

3    means?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you understand it?

6          THE DEFENDANT:  Yes, judge.

7          THE COURT:  Did he also tell you that you could be

8    fined up to $250 thousand?

9          THE DEFENDANT:  Yes.

10         THE COURT:  And that you would be required to make

11   restitution which would be mandatory if restitution is

12   applicable as part of any sentence that is imposed, did he

13   tell you that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Did he also tell you that regardless of

16   what the sentence is, the law would require me to direct you

17   to pay a special assessment of a hundred dollars?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Did Mr. Fishbein also tell you that with

20   respect to the obstruction of justice count, the statute you

21   are charged with violating, in that count it provides for a

22   maximum term of imprisonment of 20 years?

23         He told you that?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  In addition to which the Court could add

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 22

1   a period of supervised release as well of up to three years?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  And that you could be fined up to

4   $250 thousand?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And restitution, if restitution is

7   applicable, is mandatory, you would be directed to make

8   restitution in an amount which will be determined at a later

9   date, you were told that?

10         THE DEFENDANT:  Yes, I was, your Honor.

11         THE COURT:  And you would also be required to pay a

12  special assessment of $100 on that count, so a total of $200

13  by way of special assessments.

14         Did Mr. Fishbein also tell you that these sentences

15  may run consecutively?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Did he also advise you about the fact

18  that sentence may be imposed in accordance with United States

19  Sentencing Guidelines?

20         THE DEFENDANT:  He did so advise me.

21         THE COURT:  I don't know whether some prediction was

22  or wasn't made for you as to what the guidelines in your case

23  may be.  If such a prediction was made, it's just that, an

24  educated guess.  I don't know for sure as I talk to you this

25  afternoon what the guidelines in your case are.  If it turns

           ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 23

1  out that the guidelines are higher than has been predicted and

2  you are understandably unhappy about that, you won't be

3  permitted to withdraw your plea for that reason.

4       Do you understand that?

5       THE DEFENDANT:  Yes.

6       THE COURT:  Do you have any questions about anything

7  I have explained to you so far?

8       THE DEFENDANT:  No.

9       THE COURT:  Is there some reason that you are aware

10 of, Mr. Fishbein, why Mr. Woghin should not plead to these

11 counts?

12      MR. FISHBEIN:  No, your Honor.

13      THE COURT:  How do you plead to the two counts of

14 the information, Mr. Woghin?

15      THE DEFENDANT:  Guilty.

16      THE COURT:  Anybody forcing you to tell me that here

17 today?

18      THE DEFENDANT:  No.

19      THE COURT:  You are telling me that voluntarily?

20      THE DEFENDANT:  Yes.

21      THE COURT:  And you are telling me this in

22 consideration of an agreement that you entered into with the

23 government?

24      THE DEFENDANT:  Yes.

25      THE COURT:  And you have gone over that agreement

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 24

1   with Mr. Fishbein?

2          THE DEFENDANT: Yes, I have.

3          THE COURT: And would you like me to review it with

4   you as well?

5          THE DEFENDANT: I believe I understand the terms of

6   that agreement.

7          THE COURT: I just want to make sure that you

8   understand specifically in paragraph seven, which in essence

9   says that if you discharge all of the obligations which this

10  agreement imposes upon you and you have discharged all of

11  those obligations to the satisfaction of the Office of the

12  United States Attorney for the Eastern District of New York,

13  on the day of sentence, the United States Attorney will make a

14  motion before me which is referred to in paragraph seven as a

15  motion pursuant to Section 5K1.1 of the United States

16  guidelines, if I grant that motion, I could impose a sentence

17  without regard to what the guidelines may require but I just

18  want to make sure that you understand that I'm not required to

19  grant that motion, and if for reasons which would be

20  satisfactory unto me, or sufficient unto me, I deny the motion

21  and sentence you in accordance with the guidelines, you won't

22  be permitted to withdraw the plea that you have entered here a

23  few minutes ago.

24          Do you understand that?

25          THE DEFENDANT: I do understand that.

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 25

1      THE COURT:  Did Mr. Fishbein speak to you at all

2   about the case of United States versus Blakely, did he tell

3   you about that?

4      THE DEFENDANT:  We have discussed it.

5      THE COURT:  And as I understand it, the additional

6   information with respect to count one, please correct me if

7   I'm wrong, constitutes an agreement by you that you would

8   waive the implications of Blakely.  And by that, I mean that

9   prior to the decision in that case, facts which may cause

10  guidelines to be enhanced were determined to exist or not

11  exist by the Court, they did not have to be submitted to a

12  jury to be determined by them as existing beyond a reasonable

13  doubt.  And you have agreed to waive any determination that

14  facts which may enhance the guidelines be submitted to a jury

15  and agree that they may be determined by me by a fair

16  preponderance of the evidence.

17      Do you understand all that?

18      THE DEFENDANT:  I understand that and I waive those

19  rights.

20      THE COURT:  Mr. Fishbein, is there something about

21  that explanation which is in any way deficient?

22      MR. FISHBEIN:  No, your Honor, I think it's clear to

23  all concerned that Mr. Woghin retains the right to contest any

24  aggravating factors the government may argue for but we

25  understand that he waives any right to argue that the

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

1    guidelines are unconstitutional.

2         THE COURT:  Any factor that may result in an

3    enhancement of the guidelines would have to be submitted to a

4    jury beyond a reasonable doubt, you are waiving that, do you

5    understand that?

6         THE DEFENDANT:  Yes, sir.

7         THE COURT:  On the very last page of this

8    cooperation agreement there is what I refer to correctly or

9    incorrectly as a certificate.  It says you have read the

10   entire agreement, you have discussed it with your lawyer, you

11   understand all of its terms and you are entering into that

12   agreement knowingly and voluntarily and you signed it and you

13   understand, Mr. Woghin, what all of that implies?

14        THE DEFENDANT:  Yes, I do.

15        THE COURT:  Has anybody made any promise to you as

16   to what your sentence will be?

17        THE DEFENDANT:  No one has.

18        THE COURT:  I haven't any idea as to what your

19   sentence will be as I talk to you here this afternoon, so if

20   anybody has made a promise to you, they would be misleading

21   you.

22        With respect to count one, which is the conspiracy

23   count, conspiracy to commit securities fraud, if you had gone

24   to trial, Mr. Woghin, the government would have had to prove

25   three things to the satisfaction of a unanimous jury beyond a

               ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 27

1   reasonable doubt.

2        The first thing the government would have had to
3   prove is the existence of a conspiracy as charged.

4        Conspiracy is defined very simply as an agreement
5   between two or more parties, you being one of them, to commit
6   a crime.  In this case it would be an agreement to commit the
7   crime of securities fraud.

8        When I say that a conspiracy is simply defined as an
9   agreement, I don't opinion to suggest that it requires a
10  written agreement with signatures, acknowledged before a
11  Notary Public or Commissioner of Deeds.

12        The government would have to prove that you and one
13  or more people had a meeting of the minds, a common
14  understanding that you would engage the securities fraud.

15        Did you have such an agreement with one or more
16  other parties, Mr. Woghin?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  You entered into that agreement
19  knowingly and voluntarily?

20        THE DEFENDANT:  Yes.

21        THE COURT:  And that agreement was an agreement that
22  you would commit fraud in connection with the purchase and
23  sale of securities or, Mr. Fishbein, is what it is that
24  Mr. Woghin wishes to read to me or to declare to me something
25  that he would wish to do at this point?

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

PLEA

Page 28

1          MR. FISHBEIN: I think it might be appropriate,

2    your Honor.

3          He is also prepared to allocute to the second count.

4          Would you like him to proceed with that as well?

5          THE COURT:  Sure.

6          THE DEFENDANT:  Your Honor, from 1992 through

7    April of this year I worked in the legal department at

8    Computer Associates in Islandia, New York, serving as its

9    general counsel since 1995.

10         Beginning in the late 1990s, I became involved in a

11   conspiracy to violate the Federal Securities Laws by allowing

12   the legal department that I supervised to routinely

13   participate in the negotiation and drafting of software

14   license agreements on behalf of the company during the week

15   following the calendar end of the fiscal quarters.

16         I believed that the purpose of this post-quarter end

17   activity, including a backdated agreement that I personally

18   worked on in January of 2000 was to generate revenue for CA

19   which could be improperly recognized in the prior fiscal

20   quarter.  And I further understood that falsely reporting

21   revenue in Computer Associates' books and records and

22   securities filings violated the Federal Securities Laws.

23         In 2002, the government began an investigation of

24   Computer Associates' accounting practices.  Among other things

25   the investigation focused on whether CA improperly recognized

          ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

Exhibit 8

Page 29

1   revenue in certain quarters based on contracts that were not

2   signed until after the close of the prior quarter.

3          Despite my personal involvement with a backdated

4   contract and my growing suspicions that there was a widespread

5   problem, I failed to bring these matters to the attention of

6   the outside law firm assisting the company and participated in

7   impeding the government's investigation.

8          For example, I met with various CA employees and

9   instructed them regarding the manner in which they were to

10  answer questions when they were interviewed by the government

11  or the company's outside law firm.  These instructions were

12  intended to cause the CA employees to withhold potentially

13  harmful information.  I also permitted the company' outside

14  law firm to present justifications and explanations to the

15  government that I knew or suspected to be false.

16         Your Honor, I am ashamed to be standing here today

17  and that I played any role to allowing CA to recognize revenue

18  improperly and in keeping the truth from the government.

19         It is entirely inconsistent with my behavior

20  throughout my more than 30 year legal career and I am hopeful

21  that my cooperation with the government in its investigation

22  will begin to make amens for the harm that I have caused.

23         THE COURT:  With respect to this false information

24  which you advised employees to communicate to the law firm and

25  to the government, you advised them with the intent to

        ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 30

1   obstruct the investigation which the government was conducting

2   of the practices, the accounting practices of Computer

3   Associates?

4        THE DEFENDANT:  Yes, sir.

5        THE COURT:  This wasn't simply a case of

6   carelessness or negligence, it was done intentionally with the

7   purpose of obstructing that investigation, is that correct?

8        THE DEFENDANT:  Yes, your Honor, that is correct.

9        THE COURT:  All of this took place out in Islandia,

10   that was Suffolk County?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Anything else, Mr. Komitee?

13        MR. KOMITEE:  No, your Honor.

14        THE COURT:  Mr. Woghin has been fully advised of his

15   rights.  I'm satisfied that he understood them and with that

16   understanding, he knowingly and voluntarily pleaded guilty to

17   an information which is numbered 04 CR 847.  There is a

18   factual basis for that plea and I'll accept it.

19        Now, before we proceed any further, I believe that

20   there was a consent judgment, was there, which has been --

21        MR. FISHBEIN:  My understanding, your Honor, is that

22   the SEC filed the consent judgment this morning.

23        MR. BRUCKMANN:  Good morning, your Honor.

24        Christopher Bruckmann on behalf of the Securities &

25   Exchange Commission.

     ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

Page 31

1        The consent judgment has not been filed.  It was

2    executed by Mr. Woghin and we respectfully request that the

3    Court review the judgment and approve it, sign it and have it

4    entered.

5        THE COURT:  Mr. Woghin, you have signed that consent

6    judgment?

7        THE DEFENDANT:  Yes.

8        THE COURT:  You understood it?

9        THE DEFENDANT:  Yes.

10       THE COURT:  You signed it certainly with the advice

11   of counsel after discussing it with him?

12       THE DEFENDANT:  Yes.

13       THE COURT:  Do we have a sentence date?

14       THE CLERK:  Sentencing is currently scheduled for

15   Friday, December 10th at 11:00 a.m.

16       THE COURT:  Are there some bail applications which

17   anybody wishes to make?

18       MR. KOMITEE:  The parties are agreed with respect to

19   bail that an appropriate set of conditions for Mr. Woghin's

20   release pending sentencing are a personal recognizance bond in

21   the amount of $500,000, that is travel be restricted to the

22   Continental United States and that his passport be surrendered

23   to the Pretrial Service department.

24       THE COURT:  No reporting requirements?

25       MR. KOMITEE:  We don't believe that any are required.

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York

PLEA

1    under the circumstances.

2          THE COURT:  Mr. Fishbein?

3          MR. FISHBEIN:  We are agreeable to those conditions.

4          THE COURT:  So ordered.

5          Thank you very much.

6          MR. KOMITEE:  Thank you.

7          MR. FISHBEIN:  Thank you, your Honor.

8          (Matter concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

          ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter

United States District Court  Eastern District of New York