Thomas N. FitzGibbon (SBN: 169194)
TNF@ptflaw.com
**PFEIFFER THIGPEN & FITZGIBBON LLP**
233 Wilshire Boulevard, Ste. 220
Santa Monica, CA 90401
Telephone: (310) 451-5800
Facsimile: (310) 451-1599

Luke A. McGrath *(Pro Hac Vice Pending)*
LZM@bickelbrewer.com
James S. Renard *(Pro Hac Vice Pending)*
JSR@bickelbrewer.com
**BICKEL & BREWER**
767 Fifth Avenue, 50th Floor
New York, New York 10153
Telephone: 212-489-1400
Facsimile: 212-489-2384

Attorneys for Intervenor
*Sam Wyly*

FILED
2009 JAN 20 AM 10:53
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

Pfeiffer Thigpen & FitzGibbon LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

- against -

MILBERG WEISS BERSHAD & SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. SCHULMAN, SEYMOUR M. LAZAR, and PAUL T. SELZER

Defendants.

Case No. 2:05-CR-587-JFW-3
[Assigned to Hon. John F. Walter]

**EXHIBIT 9 TO DECLARATION OF LUKE A. MCGRATH IN SUPPORT OF INTERVENOR SAM WYLY'S MOTION TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER**

Date: February 9, 2009
Time: 9:00 a.m.
Room: 16

# Exhibit 9

## to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------x

UNITED STATES OF AMERICA,
Plaintiff,

04 CR 846

versus

United States Courthouse
225 Cadman Plaza East
Brooklyn, N.Y. 11201

STEPHEN RICHARDS,
SANJAY KUMAR,
DEFENDANTS.

-----------------------------------------x

April 24, 2006
2:00 p.m.

TRANSCRIPT OF PLEA

Before: HON. I. LEO GLASSER,
DISTRICT COURT JUDGE

APPEARANCES

ROSLYNN R. MAUSKOPF
United States Attorney - Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York 11201
ERIC KOMITEE, ESQ.
AMY WALSH, ESQ.
Assistant United States Attorneys

ATTORNEY FOR DEFENDANT:
DAVID ZORNOW, ESQ.
CHRISTOPHER GUNTHER, ESQ.
For Richards

JOHN P. COONEY, ESQ.
ROBERT FISKE, ESQ.
DENIS MCINERNEY, ESQ.
For Kumar

Court Reporter: ALLAN R. SHERMAN, CSR, RPR
225 Cadman Plaza East Rm 374
Brooklyn, New York 11201
Tel: (718) 260-2529 Fax: (718) 254-7237

Proceedings recorded by mechanical stenography, transcription by CAT.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York

b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 3 of 90 Exhibit 9

Plea

Page 2

THE CLERK: Criminal cause for pleading, United States of America versus Sanjay Kumar, Sanjay Kumar and Stephen Richards, docket number 04 CR 846.

MR. ZORNOW: For the defendant Stephen Richards, David Zornow and Christopher Gunther.

MR. COONEY: For the defendant, Sanjay Kumar, John P. Cooney, Robert Fiske and Denis McInerney.

MS. WALSH: Amy Walsh and Eric Komitee for the government.

THE COURT: I think we can do counts one through seven for both defendants together and do eight and nine so that we don't have to go through this extensive allocution twice.

MR. COONEY: That is fine, your Honor.

THE COURT: Is that satisfactory to counsel?

MR. ZORNOW: That is fine.

MR. COONEY: You remember, your Honor, that we moved some time ago to redact portions of the indictment because we asserted that count one included both allegations of fraud and allegations of obstruction.

THE COURT: Yes.

MR. COONEY: We have not yet accomplished the redaction but we have agreed with the government as to what that redaction will be and it affects counts one through five.

There are three basic elements to the redaction.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 4 of 90 Exhibit 9

One is that the allegations concerning when the conspiracy of the fraud ends would change from 2004, as it's presently alleged, until October of 2000.

So we're truncating the period of the conspiracy alleged.

Secondly, the government has agreed that the overt acts in paragraph 79 AA through JJ which are the obstruction overt acts should be considered redacted for the purposes of this plea.

THE COURT: I think we dealt with that a long time ago.

MR. KOMITEE: We have.

MR. COONEY: And the third almost is there are some cross-references in those paragraphs, that is in those counts. There are references to including by reference various paragraphs and we have agreed that in counts one through five those cross-references should be limited to the fraud allegations not the obstruction allegations.

THE COURT: There is one other minor correction that should be made which I hadn't noticed before and maybe neither of you had either.

In count four there was a filing on January 26, 1999 with respect to the fiscal quarter ending December 31, 1999.

MS. WALSH: Yes, your Honor.

THE COURT: I take it that should be January 26,

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 4

2000.

MS. WALSH: Correct.

MR. COONEY: Yes, your Honor.

THE COURT: I don't believe we picked that one up.

MS. WALSH: No, we hadn't.

THE COURT: Is there any objection to that administerial correction to the indictment?

MR. COONEY: No, your Honor.

MR. ZORNOW: No, your Honor.

THE COURT: We have eliminated AA through JJ in count one and we are shortening the duration of the conspiracy, if I understand you all correctly, from April 1, 1998 to April 6th, 2000?

MR. COONEY: No, that is the way it reads now. It would be --

THE COURT: Right now, it reads April 6, 2004.

MR. COONEY: It could be October 2000, your Honor.

THE COURT: From April 1, 1998 to?

MR. COONEY: To October 2000.

MR. KOMITEE: October 31.

THE COURT: This is the last superseding indictment?

MS. WALSH: Yes.

THE COURT: So that hadn't been done before?

MS. WALSH: No.

THE COURT: Did I have a stipulation which I am not

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York

b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 6 of 90 Exhibit 9

Plea

Page 5

recalling?

MR. KOMITEE: This is all a function of the defendants' motion to strike references in the securities fraud counts that allude to obstruction conduct as being conduct in furtherance of the securities fraud.

All of thee changes flow from that same concept. We indicated in our responsive papers that we did not oppose that motion by the defendants. Once one agrees to that, it flows as a matter of course that the conspiracy ends in October of 2000 because all of the conduct following that is obstructive.

THE COURT: We never got around to making the appropriate adjustments to the indictment until now, is that the idea?

MR. KOMITEE: Yes, we have not done so.

THE COURT: That should be read on or about and between April 1st, 1998 to October 2000?

MR. KOMITEE: October 31, 2000.

MR. COONEY: That is fine, your Honor.

THE COURT: That would be true for counts one through five, is that right?

MR. ZORNOW: One and two as to the date.

MR. COONEY: It's paragraph 81, your Honor.

THE COURT: I have it.

Is that all?

MR. COONEY: The other thing is that if you look at

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 7 of 90 Exhibit 9

paragraph 77 and paragraph 80 and paragraph 82, there are cross-references for inclusion by reference various allegations in the prologue and those cross-references would be limited to paragraphs one through 53.

THE COURT: In both?

MR. COONEY: In all three, your Honor. In paragraph 77, 80 and 82.

THE COURT: 1 through 53.

Is that it?

MR. ZORNOW: I think so, your Honor.

MR. COONEY: I think so.

THE COURT: I should tell you late on Friday I concluded a rather lengthy opinion denying your motion to reconsider the suppression which I will file today to keep the record complete.

Is there anything else?

Why don't Mr. Richards and Mr. Kumar come up.

Would you swear them.

(Defendants sworn by the clerk of the Court.)

THE CLERK: Please state your names for the record.

DEFENDANT KUMAR: Sanjay Kumar.

DEFENDANT RICHARDS: Stephen Richards.

THE COURT: Mr. Kumar and Mr. Richards, each of you were just sworn to tell the truth so everything you are going to say to me this afternoon must be truthful because it's a

b19969d7-b60c-464d-a46a-6a92962a4ee9

Plea

Page 7

lie or a crime to tell a lie after you swore to tell the truth. You may be prosecuted either for perjury or false statements if anything you say to me is untrue.

Do you understand that, Mr. Kumar?

DEFENDANT RICHARDS: Yes.

DEFENDANT KUMAR: Yes.

THE COURT: How old are you Mr. Kumar?

DEFENDANT KUMAR: 44.

THE COURT: How far have you gone in school?

DEFENDANT KUMAR: I attended university for about three years.

THE COURT: Are you currently under the care of a physician?

DEFENDANT KUMAR: No, your Honor.

THE COURT: Have you taken any pills, medicines, drugs of any kind within the past few days?

DEFENDANT KUMAR: No, sir.

THE COURT: Have you ever been treated for mental illness?

DEFENDANT KUMAR: No, sir.

THE COURT: Do you fully understand why you are here?

DEFENDANT KUMAR: Yes.

THE COURT: Have you understood everything that I have said to you so far?

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 9 of 90 Exhibit 9

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Cooney, do you have any questions about Mr. Kumar's competence to participate in these proceedings?

MR. COONEY: No, your Honor.

THE COURT: I'll make a finding to that effect.

Mr. Richards, how old are you?

DEFENDANT RICHARDS: 41.

THE COURT: How far have you gone in school?

DEFENDANT RICHARDS: Through university.

THE COURT: Are you currently under the care of a physician?

DEFENDANT RICHARDS: Yes, I am.

THE COURT: For what?

DEFENDANT RICHARDS: Depression medication.

THE COURT: Have you taken that medication within the past few hours or within the past day?

DEFENDANT RICHARDS: Yes, I have.

THE COURT: Does that medication interfere with your ability to understand what is going around you?

DEFENDANT RICHARDS: Absolutely not.

THE COURT: You understand why you are here?

DEFENDANT RICHARDS: Yes.

THE COURT: Have you understood everything that I have said to you so far?

b19969d7-b80c-464d-a46a-6a92962a4ee9

DEFENDANT RICHARDS: Yes.

THE COURT: Have you ever been treated for mental illness before?

DEFENDANT RICHARDS: No.

THE COURT: Mr. Zornow, do you have any question about Mr. Richards' competence to participate in these proceedings?

MR. ZORNOW: No, your Honor.

THE COURT: I'll make a making to that effect.

I've been informed that each out of wishes to plead to an indictment which I'm going to read. It's rather extensive but I'm going to read it.

It contains a number of introductory paragraphs which are relevant to the indictment and they read as follows. In photograph one: Computer Associates International, Inc., which will hereafter be referred to as CA, was a Delaware corporation with its headquarters and principal place of business located in Islandia, New York.

CA was one of the world's largest providers of computer software for use by businesses. CA's reported revenue for its fiscal year-ending March 31, 1989 was 5.253 billion dollars.

CA's reported revenue for its fiscal year ending March 31, 2000 was 6.776 billion dollars.

Paragraph 2, CA was a publicly traded corporation,

b19969d7-b80c-464d-a46a-6a92962a4ee9

the common stock of which was listed on the New York Stock Exchange.

CA's shareholders were located throughout the United States, including the Eastern District of New York.

Paragraph 3: CA did not sell or transfer title to its software product to its customers. Instead, CA licensed its software products pursuant to license agreements by which CA's customers agreed to pay a one time license fee and annual usage and maintenance fees.

B, paragraph 4: As a public company, CA was required to comply about the rules and regulation of the SEC. The SEC's rules and regulations were designed to protect members of the investing public by, among other things, assuring that a company's financial information was accurately recorded and disclosed to the investing public.

Paragraph 5: Under the SEC's rules and regulations, CA's and its officers were required to make and keep books, records, accounts which in reasonable detail fairly and accurately reflected the company's business transactions, including its revenue and expenses.

B, devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, which may

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 11

hereinafter be referred to as GAAP.

And C, file with the SEC quarterly reports on form 10-Q and annual reports on form 10-K which included financial statements that accurately presented CA's financial condition and the results of its business operations in accordance with GAAP.

6, under GAAP, four conditions were required to be met in order for revenue associated with the software license agreement to be recognized.

A, persuasive evidence of an arrangement was required to have existed.

B, delivery of the licensed products were required to have occurred.

C, the license fee was required to have been fixed and determinable.

And D, the collectibility of the license fee was required to have been probable.

7: When a written contract was used to memorialize a license agreement, the GAAP "persuasive evidence" criterion required that the contract be signed by both vendor and customer.

Accordingly, under GAAP, in order for CA properly to have recognized revenue from a license agreement in a particular fiscal quarter, the license agreement was required to have been signed by both CA and its customer within that

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 13 of 90 Exhibit 9

Plea

Page 12

quarter.

8: The GAAP criteria in that collectibility be probable was defined to mean that the payments were "likely to occur" as set forth in the payment schedule in a given license agreement.

9: When a license agreement was finalized and signed, for accounting purposes, CA allocated its revenue among the license fee and the usage and maintenance fees with 80 percent or more normally allocated to the license fee. CA then calculated the present value of the license fee which was normally collected incrementally over the term of the agreement. The present value of the license fee which was referred to within the CA as the "GAAP value" was then recognized as revenue in a quarter in which the agreement was purportedly finalized and signed.

Paragraph 10: The defendant Sanjay Kumar was employed by CA beginning in August 1987. In April 1989 to December 1992, Kumar was CA's senior vice president for planning. From January 1993 to December 1994, Kumar was CA's executive vice president for operations. Effective January 1994, Kumar became CA's president and chief operating officer as well as a member of CA's board of directors. In August 2000, Kumar became CA's chief executive officer and relinquished the title of chief operating officer. In November of 2002, Kumar became the chairman of CA's board of

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19989d7-b80c-464d-a46a-6a92962a4ee9

Page 14 of 90 Exhibit 9

Plea

Page 13

directors. And on April 14th of 2004, Kumar stepped down as CA's chairman and CEO, chief executive officer and also resigned from CA's board of directors.

11, the defendant Stephen Richards was employed by CA beginning in or about 1988 through the company's Australian subsidiary. In or about April of 1998 Richards became a general manager in CA's sales department. In April 1999 Richards became CA's head of North American sales. In April of 2000 Richards became CA's head of worldwide sales. In April 26 of 2004 Richards resigned from CA.

I think we can skip Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein. Let's move on to paragraph 17.

CA regularly issued public predictions at the outset of each fiscal quarter of the revenue and earnings that it expected to earn during that quarter. Based in part on these predictions, professional stock analysts estimated what they believed would be CA's total revenue during the fiscal quarter and predicted the earnings per share of CA's stock.

The average of the estimates of the professional analysts is commonly referred to as the "consensus estimate".

Paragraph 18: CA's officers, executives and directors, including the defendant Sanjay Kumar and Stephen Richards, understood that CA's failure to meet or exceed the consensus estimate for a quarter would likely result in a

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 15 of 90 Exhibit 9

substantial decrease in the company's stock price.

For example, on July 3rd, 2000, CA issued a press release which reported that the company expected "financial results for the first quarter of fiscal year 2001 ending June 30th, 2000 to be less than current Wall Street estimates." In the press release CA cited as one of the factors contributing to its failure to meet the consensus estimate "the fact that several large contracts that were expected to close in the final days of the quarter had been delayed."

On the date of the press release which was issued after the market closed, CA's stock price closed at $51.12 per share. On the next trading day, July 5, 2000, CA's stock price opened at $29 per share, representing the percentage drop of slightly more than 43 percent.

Paragraph 19: Prior to and during CA's fiscal year 2000, which ended March 31, 2000, numerous CA officers and executives including the defendants Sanjay Kumar and Stephen Richards engaged in a systemic company-wide practice of falsely and fraudulently recording and reporting within a fiscal quarter revenue associated with certain license agreements even though those license agreements had not in fact been finalized and signed during that quarter.

This practice, which was sometimes referred to within CA as the "35 day month" or the "three day window"

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 15

violated GAAP and resulted in the filing of materially false financial statements.

20: The practice was referred to as the "35 day month" because it involved artificially extending months, primarily the last month of a fiscal quarter, beyond the true end of the month. The practice did not however only result in months that were artificially extended to 35 days. Instead, months were often artificially extended even longer. Nonetheless, for the sake of simplicity, the practice is referred to hereinafter as the "35 day month practice."

21: The central goal of the 35 day month practice was to permit CA to report that it met or exceeded its projected quarterly revenue and earnings when in truth CA had not met its projected quarterly revenue and earnings. As a result of the practice, CA reported falsely to investors and regulators during numerous fiscal quarters, including each of the four quarters of CA's fiscal year 2000, that it had met or exceeded its consensus estimates.

In fact, in each of the four quarters of fiscal year 2000, CA improperly recognized and falsely reported hundreds of millions of dollars of revenue associated with numerous license agreements that had been finalized after the quarter closed.

In so doing, CA made misrepresentations and omissions of material fact which were relied upon by members

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 17 of 90 Exhibit 9

Plea

Page 16

of the investing public.

22: As part of the 35 day month practice, the defendant Sanjay Kumar with the assistance of Ira Zar and others, routinely extended CA's fiscal quarters normally for three business days. This practice which was known as "keeping the books open" was designed and executed so that CA could falsely record and report revenue associated with license agreements finalized after the end of fiscal quarters. The period including three business days after the end of fiscal quarters was referred to within CA as the "flash period."

23: As a further part of the 35 day month practice, the defendants Sanjay Kumar and Stephen Richards regularly met and conferred with each other and with Ira Zar in the days leading up to and following the end of fiscal quarters, including during the flash period.

The purpose of these meetings was to determine whether CA generated for the quarter just ended, including during the flash period, sufficient revenue to meet the consensus estimate.

In each of the four quarters of CA's fiscal year 2000, Kumar, Richards and Zar collectively determined that the total revenue generated for the quarter by the end of the flash period was less than needed to meet the consensus estimate in each such instance.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 18 of 90 Exhibit 9

Plea

Page 17

Kumar and Zar caused CA to keep its books open for additional days beyond even the flash period to generate sufficient revenue to meet the consensus estimate.

As a further part of the 35 day month practice, while CA's books were held open, the defendants Sanjay Kumar and Stephen Richards instructed CA's sales managers and salespeople to negotiate and finalize additional license agreements which were backdated to disguise the fact that the agreements had been finalized after the end of the fiscal quarter.

CA's salespeople regularly transmitted the backdated license agreements by facsimile to CA's headquarters. CA then fraudulently recorded and reported in the earlier quarter revenue associated with the backdated agreements.

25: As a further part of the 35 day month practice, numerous CA officers and executives concealed the existence of the practice from CA's outside auditors. Among other things, CA executives engaged in a practice of "cleaning up" copies of backdated license agreements before providing copies of the agreements to CA's outside auditors. This practice included but was not limited to removing from license agreements facsimile stamps and other notations which showed the true date on which the agreements were finalized.

This practice was designed and carried out to prevent CA's outside auditors and by extension the investing

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 19 of 90 Exhibit 9

public from learning of CA's failure to meet or exceed consensus estimates for the given quarter.

Paragraph 26: The first quarter of CA's fiscal year 2000 included the period from April 1, 1999 to June 30, 1999, which was the first quarter. The consensus estimate for the first quarter was that CA's earnings would be 47 cents per share and when the first quarter ended on June 30, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

Paragraph 27: On or about and between July 1, 1999 and July 8, 1999, the defendants Sanjay Kumar and Stephen Richards met and conferred with Ira Zar and others regarding the status of CA's revenue for the first quarter.

In an effort to generate additional revenues during this period, Kumar and Richards instructed CA's sales executives and sales managers to continue to negotiate and finalize additional license agreements which were falsified to make it appear as though the agreements had been finalized by June 30, 1999.

In total, for the first quarter, CA improperly recognized revenue associated with four license agreements having an aggregate GAAP value of approximately $122 million. The improperly recognized revenue represented approximately 10 percent of CA's reported revenue for the first quarter.

For example, on or about July 8, 1999, this is

b19969d7-b80c-464d-a46a-6a92962a4ee9

paragraph 29, the defendant Sanjay Kumar traveled by CA corporate jet to Paris, France where he met with the chief information officer of a CA customer, hereafter referred to as customer number 1. During the meeting Kumar negotiated and finalized the license agreement by which customer number 1 agreed to pay CA approximately $32 million. The written license agreement which Kumar personally signed was falsely backdated to make it appear as though the agreement had been finalized and signed on June 30, 1999. Based on the falsified license agreement with customer number 1, CA improperly recognized as revenue in the first quarter approximately $19 million which was the GAAP value of the agreement.

Paragraph 30: On or about July 20, 1999, CA filed with the SEC its quarterly report on form 10-Q and issued a related press release. In these public documents, CA falsely reported its quarterly financial results in that CA reported revenue for the first quarter that included revenue associated license agreements finalized after June 30, 1999.

Through its false filings and statements, CA reported earnings per share of 49 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the first quarter by 2 cents per share.

31: The second quarter of CA's fiscal year 2000 included the period from July 1, 1999 to September 30, 1999,

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 20

which was the second quarter. The consensus estimate for second quarter was that CA's earnings would be 59 cents per share and the first quarter ended on September 30, 1999. I guess that should read second quarter. CA had not generated sufficient revenue to meet the consensus estimate.

On or about and between October 1, 1999 and October 7, 1999, the defendant Sanjay Kumar and Stephen Richards met and conferred with Ira Zar and others regarding the status of CA's revenue for the second quarter.

In an effort to generate additional revenue during this period, Kumar and Richards instructed CA's sales executives and sales managers to continue to negotiate and finalize additional license agreements which were falsely dated to make it appear as though the agreements had been finalized by September 30, 1999.

In fact, because the defendant Sanjay Kumar was displeased that he personally had to "save" the first quarter by negotiating the license agreement with customer number 1, he required CA's senior regional sales executives to travel from their regional sales offices to CA's corporate headquarters in Islandia, New York in order to work on finalizing contracts during the period leading up to and including the first week of October 1999.

Paragraph 34: For example, on or about October 4, 1999, a senior CA's sales executive, which will be referred to

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 22 of 90 Exhibit 9

as CA's sales executive number 1, acting on the specific instructions of the defendants Sanjay Kumar and Stephen Richards, finalized the license agreement by which a CA customer, customer number 2, agreed to pay approximately $176 million to CA. The written license agreement fraudulently made it appear that the agreement had been finalized and signed on September 30, 1999.

Based on the falsified license agreement with customer number 2, CA improperly recognized as revenue in the second quarter approximately $97 million which was the GAAP value of the agreement.

35: Similarly on or about October 6, 1999, CA entered into a license agreement by which CA customer number 3 agreed to pay CA approximately $102 million. The written license agreement fraudulently made it appear that the agreement had been finalized and signed on September 30, 1999.

Based on the falsified license agreement with customer number 3, CA improperly recognized as revenue in the second quarter approximately $65 million which was the GAAP value of the agreement.

In total, for the second quarter, CA improperly recognized revenue associated with approximately 33 license agreements having an aggregate GAAP value of approximately $467 million. The improperly recognized revenue represented approximately 29 percent of CA's report revenue for that

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 22

quarter.

On or about October 19, 1999, CA filed with the SEC its quarterly report on form 10-Q and issued a related press release. In these public documents CA falsely reported its quarterly financial results in that CA reported revenue for the second quarter that included revenue associated with license agreements finalized after September 30, 1999.

I take it second quarter should be properly read third quarter, should it?

MS. WALSH: In paragraph 37, no. 38.

THE COURT: I'm in 37. I think that it's September 30, 1999. That would have been the third quarter,wouldn't it?

MR. KOMITEE: In the third calendar quarter of the year, but it's CA's second quarter because they are on a March 31 fiscal year.

THE COURT: So the date references are correct?

MS. WALSH: Yes.

THE COURT: Through its false filings and statements, CA reported earnings per share of 60 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate in the second quarter by one cent per share.

Paragraph 38: The third quarter of CA's fiscal year

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 24 of 90 Exhibit 9

Plea

Page 23

2000 included the period from October 1, 1999 to December 31, 1999, the third quarter. The consensus estimate for the third quarter was that CA's earnings would be 90 cents share. When the third quarter ended on December 31, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

Paragraph 39: On or about and between January 1, 2000 and January 7, 2000, the defendants Sanjay Kumar and Stephen Richards met, conferred with Ira Zar and others, regarding the status of CA's revenue for the third quarter. In an effort to generate additional revenues during this period, Kumar and Richards instructed CA sales executives and sales managers to continue to negotiate and finalize additional license agreements which were falsely dated to make it appear as though the agreements had been finalized by December 31, 1999.

For example, paragraph 40: On or about January 6, 2000, the defendant Stephen Richards directing a senior CA sales executive, sales executive number 2, to negotiate and finalize a multi-million dollar license agreement with CA customer number 4.

On or about January 6, 2000 and January 7, 2000, sales executive number 2 induced customer number 4 into executing an approximately 60 million-dollar license agreement by offering customer number 4 a substantial discount in the license fee. The written license agreement was signed on or

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 25 of 90 Exhibit 9

Plea

Page 24

about January 7, 2000 but backdated to make it appear that the agreement had been finalized and signed on December 31st, 1999. Based on the falsified license agreement with customer number 4, CA improperly recognized as revenue in the third quarter approximately $38 million which was the GAAP value of the agreement.

41: Similarly on or about January 6, 2000, the defendant Sanjay Kumar completed negotiations of a license agreement by which CA customer number 5 agreed to pay CA approximately $300,000,000. The written license agreement which Kumar personally signed had an effective date of December 31, 1999 but did not bear any execution date. Based on the intentionally undated license agreement with customer number 5, CA improperly recognized as revenue in the third quarter approximately $180 million which was the GAAP value of the agreement.

42: In another instance, on or about December 31, 1999, the defendant Sanjay Kumar directed a senior CA executive number 1 to negotiate and finalize a multi-million dollar license agreement with CA customer number 6. CA possessed an ownership interest in customer number 6 and as a result had substantial rights regarding its operation, including among other things the right to nominate two individuals to its board of directors. At the time, customer number 6 was nearly insolvent and its survival depended

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 26 of 90 Exhibit 9

heavily on the prospect of future infusions of investment capital by CA.

Paragraph 43: Thereafter on or about and between December 31, 1999 and January 5, 2000, senior executive number 1 negotiated a license agreement with customer number 6 with the face value of approximately $44.5 million despite the fact that Kumar, senior executive number one and customer number 6 well knew and believed that customer number 6 would not be able to meet its payment obligations under the agreement. This agreement was signed on or about January 5, 2000 but bore a backdated signature date to make it appear as though it had been signed on December 31, 1999.

In order to induce the chief executive officer, customer number 6, to sign and backdate the license agreement, Kumar instructed senior executive number 1 to tell the chief executive officer of customer number 6 in substance not to worry if customer number 6 could not pay the amount due under the license agreement.

Based on the license agreement with customer number 6, CA improperly recognized as revenue in the third quarter approximately $34 million which was the GAAP value of the agreement. In the next quarter CA reversed this revenue in its internal accounting records because of the improbability of collecting the payment due, but did not publicly restate its license agreement revenues for the third

b19969d7-b80c-464d-a46a-6a92962a4ee9

quarter or otherwise disclose the 34 million-dollar reversal to the investing public.

44: In total, for the third quarter, CA improperly recognized revenue associated with approximately 19 license agreements having aggregate GAAP value of approximately $401 million. The improperly recognized revenue represented approximately 22 percent of CA's reported revenue for the quarter.

Paragraph 45: On or about January 26, 2000, CA filed with the SEC its quarterly report on form 10-Q and issued a related press release. In these public documents, CA falsely reported its quarterly financial results in that CA reported revenue for the third quarter that included revenue associated with license agreements finalized after December 31, 1999.

Through its false filings and statements, CA reported earnings per share of 91 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA exceeded the consensus earnings estimate for the third quarter by one cent per share.

Paragraph 46: The 4th quarter of CA's fiscal year 2000 included the period from January 1, 2000 to March 31, 2000, the 4th quarter.

The consensus estimate for the 4th quarter was that CA's earnings would be $1.13 per share. When the 4th quarter

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 27

ended on March 31, 2000, CA had not generated sufficient revenue to meet the consensus estimate.

On or about and between April 1, 2000 and April 7, 2000, the defendants Sanjay Kumar and Stephen Richards met and conferred with Ira Zar and others regarding the status of CA's revenue for the 4th quarter.

In an effort to generate additional revenues during that period, Kumar and Richards instructed CA's sales executives and sales managers to continue to negotiate and finalize additional license agreements which were falsely dated to make it appear as though the agreements had been finalized by March 31, 2000.

Paragraph 48: For example, on or about April 7, 2000, a senior CA sales executive number 3, acting on the specific instructions of the defendants Sanjay Kumar and Stephen Richards, finalized a license agreement by which a CA customer number 7 agreed to pay CA approximately $16 million. Although sales executive number 3 pressured customer number 7 to sign the written license agreement with an execution date of March 31, 2000, customer number 7 refused but agreed to sign the agreement without an execution date. On the specific instructions of Richards, sales executive number 3 wrote in by hand a March 31, 2000 execution date on the written agreement which he then sent by facsimile to CA's headquarters.

Based on the falsified license agreement with

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 29 of 90 Exhibit 9

customer number 7, CA improperly recognized as revenue in the fourth quarter approximately $13 million which was the GAAP value of the agreement.

Paragraph 49: Similarly, on or about April 7, 2000 a senior CA sales executive number 4, acting on the instructions of the defendants Sanjay Kumar and Stephen Richards, finalized a license agreement by which CA customer number 8 agreed to pay CA approximately $18 million. The written license agreement was signed on or about April 7, 2000 but CA's signature was backdated to make it appear that the agreement had been signed on March 31, 2000. Based on the falsified license agreement with customer number 8, CA improperly recognized as revenue in the third quarter approximately $10 million which was the GAAP value of the agreement.

Similarly, on or about April 7, 2000, sales executive number 1, acting on the instructions of the defendant Sanjay Kumar, finalized a license agreement by which a CA customer number 9 agreed to pay CA approximately $30 million. The written license agreement was signed on or about April 7, 2000 but backdated to make it appear that the agreement had been finalized and signed on March 31, 2000. Based on the falsified license agreement with customer number 9, CA improperly recognized as revenue in the fourth quarter approximately $16 million which was the GAAP value of

b19969d7-b80c-464d-a46a-6a92962a4ee9

the agreement.

51: Finally, on or about April 6, 2000, a senior CA sales executive number 5, acting on the specific instructions of the defendant Stephen Richards finalized the license agreement by which CA customer number 10 agreed to pay CA approximately $39 million. The written license agreement was signed on or about April 6, 2000 but backdated to make it appear that the agreement had been finalized and signed on March 31, 2000. Based on the falsified license agreement with customer number 10, CA improperly recognized as revenue in the fourth quarter approximately $29 million which was the GAAP value of the agreement.

52: In total, for the fourth quarter CA improperly recognized revenue associated with approximately 14 license agreements having an aggregate GAAP value of approximately $199 million. The improperly recognized revenue represented approximately 9 percent of CA's reported revenue for the quarter.

On or about May 15, 2000, CA filed with the SEC its annual report on form 10-K and issued a related press release. In these public documents CA falsely reported its quarterly financial results in that CA reported revenue for the fourth quarter that included revenue associated with license agreements finalized after March 31, 2000. Through its false filings and statements, CA reported earnings per share of

b19969d7-b80c-464d-a46a-6a92962a4ee9

$1.13 exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had met the consensus earnings for the fourth quarter.

Paragraph 54: In or about the beginning of 2000, the United States Attorney's Office for the Eastern District of New York, Federal Bureau of Investigation, referred to hereafter as the FBI, and northeast regional office of the SEC began investigations into CA's accounting practices, including whether during the late 1990s and thereafter CA engaged in improper accounting practices with intent to overstate its fiscal quarterly revenues and make it appear as though the company had met consensus estimates.

Since June 2002, a Grand Jury sitting in the Eastern District of New York had been considering evidence about CA's accounting practices. These investigations are referred to collectively as the government investigations.

Paragraph 55: In or about February of 2002 CA retained a law firm, referred to hereafter as the company's law firm, to represent it in connection with the government investigations. Through the company's law firm, CA represented to the United States Attorney's Office, the FBI and the SEC, that it was committed to cooperating fully with the government investigations. This representation was also made publicly by CA in press releases, SEC filings and other public statements.

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 31

Additionally, in a press release issued on February 20, 2002, CA denied that it had engaged in any improper accounting practices declaring, "The reporting of our financial results has always been in accordance with applicable accounting principles."

56: Shortly after being retained in February of 2002, the company's law firm met with the defendant Sanjay Kumar and other CA executives in order to inquire into their knowledge of the practices that were the subject of the government investigations. During these meetings, Kumar and others did not disclose, falsely denied and otherwise concealed the existence of the 35 day month practice. Moreover, Kumar and others concocted and presented to the company's law firm and assortment of false justifications, the purpose of which was to support their false denials of the 35 day month practice. Kumar and others knew and in fact intended that the company's law firm would present these false justifications to the United States Attorney's Office, the SEC and the FBI so as to obstruct and impede the government investigations.

57: For example, during a meeting with attorneys from the company's law firm, the defendants Sanjay Kumar and Ira Zar discussed the fact that former CA salespeople had accused CA of engaging in the 35 day month practice. Kumar falsely denied that CA had engaged in such a practice and

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 33 of 90 Exhibit 9

Plea

Page 32

suggested to the attorneys from the company's law firm that because quarterly commissions paid to CA salespeople regularly included commissions on license agreements not finalized until after the end of a quarter, the salespeople might assume incorrectly that revenue associated with those agreements was recognized by CA within that prior quarter.

Kumar knew that this explanation was false and intended that the company's law firm would present this false explanation to the U.S. Attorney's Office, the SEC and the FBI as part of an effort to persuade those entities that the accusations of the former salespeople were unfounded and that the 35 date month practice never existed.

58: During the course of the government's investigations, the United States Attorney's Office, the FBI and the SEC regularly requested that CA produce certain CA employees to be interviewed.

As part of his duties as general counsel, Stephen Woghin coordinated CA's compliance with the government's requests. The defendant Sanjay Kumar frequently met and conferred with Woghin during the course of the government investigations. Among other things, Kumar instructed Woghin to meet with CA employees prior to their being interviewed by the government or by the company's law firm to coach the employees on how to answer questions without disclosing the existence of the 35 day month practice. On several occasions

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 34 of 90 Exhibit 9

Kumar himself coached CA employees on how to answer questions without disclosing the existence of the 35 date month practice.

59: On September 6, 2000, Lloyd Silverstein was interviewed by the United States Attorney's Office, the FBI and the SEC. Silverstein met and conferred with several CA executives. During these meetings the executives agreed that acting in concert they would deny and otherwise fail to disclose the existence of the 35 day month practice in part by giving intentionally vague and misleading answers to questions about the existence of the practice.

Accordingly, during the September 6, 2006 interview, Silverstein did not disclose and otherwise concealed the existence of the 35 day month practice.

60: Additionally, in or about February of 2003, while the government investigations were pending, an individual residing in Asia, whose identity is known to the Grand Jury, referred to as individual number 1, contacted the defendant Sanjay Kumar. Individual number 1 was the principal of a company that had entered into a 27 million-dollar license agreement with Computer Associates dated March 30, 2000. CA recognized part of the revenue associated with this contract in the fourth quarter. Without this revenue, CA would have missed the consensus earnings estimate for the fourth quarter. Substantially contemporaneously with the March 30, 2000

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 34

license agreement, CA agreed to purchase a software program from individual number 1's company in a similar dollar amount. Neither company used or sold the software that it licensed or purchased from the other.

61: In a series of communications to the defendant Sanjay Kumar and others in early 2003, individual number 1 indicated among other things that his company had entered into the 4th quarter license agreement as a "favor" to CA. Individual number 1 went on to advise Kumar that "future consequences" would befall CA if it did not adequately compensate individual number 1 and to urge Kumar "not underestimate the importance of his request."

In an effort to prevent the government from discovering that the license agreement with individual number 1' company constituted an improper "revenue swap," that is, an exchange of cash and inventory devoid of economic substance under GAAP, Kumar instructed Stephen Woghin, the then general counsel of CA, to solve the issue raised by individual number 1.

62: In response Woghin and another CA executive travelled to Hawaii to meet with individual number 1 to offer him money. During these negotiations, individual number 1 stated that if necessary, he would go to the government which he knew was then investigating CA to inform the government of accounting improprieties surrounding the March 30, 2000

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 36 of 90 Exhibit 9

Plea

Page 35

license agreement.

In response, upon Woghin's return, the defendant Sanjay Kumar authorized CA to enter into a consulting agreement pursuant to which CA would pay individual number 1 $3.7 million despite the fact that CA did not need and never used consulting services of individual number 1.

Paragraph 63: On or about February 19, 2003 and April 29, 2003, the defendant Stephen Richards was interviewed by the company's law firm. During these interviews Richards did not disclose but instead falsely denied and otherwise concealed the existence of the 35 day month practice.

At the time of the February 19th, 2003 and April 29, 2003 interviews, Richards well knew and believed that certain of the statements he made during his interviews were false and that he otherwise concealed during the interviews information which he knew to be material to the government investigations.

Richards further well knew and in fact intended that his false statements and concealment of material information would have the effect of obstructing and impeding the government investigations.

64: In or about July 2003, the audit committee of CA's board of directors retained a second law firm, the audit committee's law firm, to conduct an internal investigation into CA's accounting practices focusing on the 35 day month practice.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 37 of 90 Exhibit 9

Plea

Page 36

As part of the internal investigation, the audit committee's law firm conducted interviews of CA executives and employees.

65: On or about October 6, 2003, January 14, 2004, January 22, 2004 and April 6, 2004, the defendant Sanjay Kumar was interviewed by attorneys for the audit committee's law firm. During these interviews Kumar did not disclose but instead falsely denied and otherwise concealed the existence of the 35 day month practice. For example, Kumar falsely stated that he had never monitored end of quarter contracting activity to determine whether CA would meet analysts' earning estimates. Kumar admitted that he occasionally encouraged sales people to close deals after the end of quarters but stated falsely that these efforts were unrelated to revenue recognition.

66: The defendant Sanjay Kumar well knew and believed that at the time of the October 6, 2003, January 14, 2004, January 22 and April 6, 2004 interviews, that certain of the statements he made during the interviews were false and that he otherwise concealed during the interviews information which he knew to be material to the government investigations.

Kumar further well knew and in fact intended that his false statements and concealment of material information would have the effect of obstructing and impeding the government investigations.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 38 of 90 Exhibit 9

Plea

Page 37

On or about October 22, 2003, the defendant Stephen Richards was interviewed by the audit committee's law firm. During this interview Richards did not disclose but instead falsely denied and otherwise concealed the existence of the 35 day month practice. At the time of the October 22, 2003 interview, Richards well knew and believed that certain of the statements he made during the interview were false and that he otherwise concealed during the interview information which he knew to be material to the government investigations.

Richards further well knew and in fact intended that his false statements in concealment of material information would have the effect of obstructing and impeding the government investigations.

Paragraph 68: On October 23rd, 2003, the defendant Stephen Richards testified under oath before the SEC in the matter of Computer Associates, Inc. file number NY 7008. The testimony was taken in Central Islip, New York. During his testimony, Richards gave knowingly and willfully false testimony in an attempt to conceal the existence of the 35 day month practice and his involvement in the practice.

69: For example, the defendant Stephen Richards conceded that when he was the head of CA's sales department he pressured CA's sales managers after the ends of quarters to finalize license agreements. Richards falsely stated, however, that he did so only because the sales managers had

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 39 of 90 Exhibit 9

Plea

Page 38

not reached their sales quota for the quarter and that revenue recognition was not a motivation for pressuring the sales managers.

Paragraph 70: The defendant Stephen Richards further falsely stated that he had assumed that CA's finance department recognized the revenue from license agreements in the appropriate quarters even though the agreements contained false signature dates. Richards further falsely stated that he believed that CA's finance and sales accounting departments had adequate "procedures and controls" to determine that the agreements were in fact not executed until after the end of the applicable quarter.

At the time he made these statements, Richards well knew and believed that revenue from license agreements had been booked prematurely and that CA's finance department did not in fact have procedures in place to avoid improperly booking revenue from falsely dated license agreements.

71: The defendant Stephen Richards well knew and believed at the time of the October 23rd, 2003 testimony that certain of the statements he made during the testimony were false and that he otherwise concealed during the testimony information which he knew to be material to the government investigations. Richards further well knew and believed that his false statements and concealment of material information would have the effect of obstructing and impeding the

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 40 of 90 Exhibit 9

Plea

Page 39

government investigations.

72: On November 5, 2003, the defendant Sanjay Kumar was interviewed by FBI agents and others at the United States Attorney's Office in Brooklyn, New York. During this interview Kumar made materially false statements and representations in an attempt to conceal the existence of the 35 day month practice and his involvement in the practice.

73: For example, the defendant Sanjay Kumar falsely stated in words or substance that he was never aware of any CA license agreements that were finalized after the end of the fiscal quarter but for which associated revenue was recognized in the prior quarter. Kumar admitted that he was aware that CA had a practice of having a "three day window" after the end of fiscal quarters but falsely stated that the purpose of the three day window was merely to "clean up" paperwork and process contracts administratively.

74: The defendant Sanjay Kumar further falsely stated that he was unaware of any instance in which he or anyone else at CA called a salesperson after the end of a quarter and encouraged the salesperson to finalize additional license agreements for the purpose of counting the business in the prior quarter because CA was short on revenue for the prior quarter. Kumar conceded that he encouraged salespeople to finalize deals after the end of quarters but falsely stated that his sole purpose in doing so was to motivate the sales

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 41 of 90 Exhibit 9

Plea

Page 40

people when their performance and diminished.

75: The defendant Sanjay Kumar further falsely stated that he did not have meetings at the end of fiscal quarters to discuss whether CA had met its forecasted revenue expectations. Kumar falsely stated that he simply assumed that unless he had heard otherwise, CA had generated enough revenue to meet the consensus estimate.

76: The defendant Sanjay Kumar well knew and believed at the time of the November 5, 2003 interview that certain of the statements he made during the interview were false, that he otherwise concealed during the interview information which he knew to be material to the government investigations. And Kumar further well knew and believed that his false statements and concealment of material information would have the effect of obstructing and impeding the government investigations.

Count one, paragraph 77: The allegations contained in paragraphs one through 53 are realleged and incorporated as they are fully set forth in this paragraph.

78: On or about and between April 1, 1998 and October 31, 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Sanjay Kumar and Stephen Richards together with Ira Zar, Stephen Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly and willfully directly

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 42 of 90 Exhibit 9

Plea

Page 41

and indirectly conspire; A, to commit fraud in connection with the purchase and sale of securities issued by CA in violation of Title 15 of the United States Code, Section 78j(b) and 78ff and Title 17 CFR Section 240.10b-5.

B, to make and cause to made false and misleading statements of material fact in applications, reports and documents required to be filed under the SEC, Securities & Exchange Act of 1934 and rules and regulations thereunder, in violation of Title 15 of the United States Code Section 78ff.

Subparagraph C, to falsify CA's books, records and accounts, the making and keeping of which was required by Title 15 of the United States Code and Title 17 of the Code of Federal Regulations in violation of Title 15, Section 78m(b)(5) and 78ff of the United States Code.

D, to circumvent CA's internal accounting controls as required by Title 15, Section 78m(b)(2)(B), in violation of Title 15, Section 78m(b)(5) and 78ff of the United States Code.

E, to devise a scheme and artifice to defraud shareholders and to obtain money and property from CA shareholders, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, to cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate and

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 43 of 90 Exhibit 9

Plea

Page 42

foreign commerce, in violation of Title 18, Section 1343 of the United States Code sections.

Paragraphs 79: In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants Sanjay Kumar and Stephen Richards, together with Ira Zar, Stephen Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, committed and caused to be committed among others the following overt acts:

A, on or about July 6, 1999, Kumar and Richards met with Zar at CA's headquarters in Islandia, New York.

B, in or about early July 1999, after meeting with Kumar and Richards, Zar caused CA's books for the first quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

C on or about July 8, 1999, Kumar traveled by CA corporate jet from Farmingdale, New York to Paris, France.

D, on or about July 8, 1999, Kumar signed a $32 million license agreement with customer number 1 which was backdated to make it appear that the agreement had been finalized and executed on June 30, 1999.

E, on or about July 20, 1999, Kumar, Zar, Kaplan and others caused CA to file with the SEC a quarterly on form 10-Q which was materially false and fraudulent.

F, on or about -- I'll skip that and I'll skip G. Let me move to H.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 44 of 90 Exhibit 9

Plea

Page 43

On or about October 5, 1999, Kumar and Richards met with Zar at CA's headquarters in Islandia, New York.

Subdivision I, in or about early October 1999, after meeting with Kumar and Richards, Zar caused CA's books and records for the second quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

Paragraph K, on or about October 19, 1999, Kumar, Zar, Kaplan and others caused CA to file with the SEC quarterly report on form 10-Q which was materially false and fraudulent.

L, on or about January 6, 2000, Kumar and Richards met with Zar at CA's headquarters in Islandia, New York.

M, in or about early January of 2000, after meeting with Kumar and Richards, Zar caused CA's books for the third quarter to be held open in order to allow CA to meet the consensus estimate for the quarter.

N, on or about January 6, 2000, Richards placed a telephone call from CA's headquarters in Islandia, New York to sales executive number 2.

P, on or about January 6, 2000, Kumar signed the intentionally undated license agreement with customer number 5.

Q, on or about January 6, 2000, at CA's headquarters in Islandia, New York, Kumar gave a facsimile copy of the intentionally undated executed license agreement with customer

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 45 of 90 Exhibit 9

Plea

Page 44

number 5 to Zar.

R, on or about January 6 of 2000, Kumar, Zar, Kaplan and others, caused CA to file with the SEC a quarterly report on form 10-Q which was materially false and fraudulent.

S, on or about April 6, 2000, Kumar and Richards met with Zar at CA's headquarters in Islandia, New York.

T, in or about early April 2000, after meeting with Kumar and Richards, Zar caused CA's books for the fourth quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

U, on or about April 6, 2000, at approximately 11:53 a.m., sales executive number 3 sent an E-mail to Kumar and Richards relating to the negotiations with customer number 7 which read in part, "If we could get someone to ask them to 'do us a favor' and sign the contract leaving the date blank, they technically can't backdate the signature block even though the contract says an effective date of 3/31/2000. The new company wasn't technically formed until April 1, 2000. I'll take care of fixing any mistakes that they inadvertently leave off the fax contract."

V, on or about April 7, 2000, at approximately 11:20 p.m. sales executive number three sent an E-mail to Kumar and Richards relating to the end of the negotiations with customer number 7 which read in part, "Stick a fork in me. The eagle has landed. I'm taking my kids shopping

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 46 of 90 Exhibit 9

Plea

Page 45

tomorrow on you, signed Mr. B."

W, on or about April 8, 2000, at approximately 7:33 a.m., Kumar sent an E-mail to sales executive number 3 and Richards which read, "Mr. B, shopping is on me, signed Mr. K."

Y, on or about May 15, 2000, Kumar, Zar, Kaplan and others, caused CA to file with the SEC an annual report on form 10-K which was materially false and fraudulent.

Z, on or about and between May 16, 2000 and May 22, 2000, in a series of E-mails, Richards instructed sales executive number 3 to write in a March 31, 2000 execution date on the official copy of the license agreement with customer number 7.

Count two, the allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

81, in or about and between April 1, 1998 and October 31, 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Sanjay Kumar and Stephen Richards, together with Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10(b)(5) of the rules and regulations of the Securities & Exchange Commission, in that the defendants, together with others, did knowingly

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 47 of 90 Exhibit 9

Plea

Page 46

and willfully, directly and indirectly, employ devices, schemes and artifices to defraud, make untrue statements of material fact and omit to state material facts necessary in order to make statements which were made in light of the circumstances under which they were made not misleading, and engaged in acts, practices and courses of business which would and did operate as a fraud and deceit on members of the investing public in connection with purchases and sales of CA securities by the use of interstate commerce and the mails, in violation of various sections of the United States Code, Titles 15 and 18.

Count three through five, paragraph 82: The allegations contained in paragraphs 1 through 53 are alleged and incorporated as fully set forth.

Paragraph 83: In or about the dates listed below, within the Eastern District of New York and elsewhere, the defendants Sanjay Kumar and Stephen Richards, together with others, did unlawfully, willfully and knowingly make and cause to be made statements and reports and documents required to be filed with the SEC under the Securities & Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, count number 3: On October 19, 1999, a form 10-Q for Computer Associates International, Inc. for the fiscal quarter ended September 30, 1999 was filed; and on

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b60c-464d-a46a-6a92962a4ee9

Page 48 of 90 Exhibit 9

Plea

Page 47

January 26, 2000 -- this is count four -- a form 10-Q for Computer Associates International, Inc. for the fiscal quarter ended December 31, 1999 was filed.

Count number 5; a form 10-K for Computer Associates International, Inc. for the fiscal year ended March 31, 2000 was filed on May 15, 2000, all in violations of the appropriate sections of the United States Code.

Count six, the allegations contained in paragraphs 1 through 76 and 79 are realleged and incorporated as fully set forth.

Paragraph 85: In or about and between February of 2002 and April 6th of 2004, those dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Sanjay Kumar and Stephen Richards, together with others, did knowingly, intentionally and corruptly conspire to obstruct, influence and impede the official proceedings, namely, government investigations in violation of Sections 1512(k) of Title 18 of the United States Code.

Paragraph 86 and 87: The allegations contained in paragraphs 1 through 76 and 79 are realleged and incorporated as if they were fully set forth. And this count alleges that in or about and between February of 2002 and April 6th of 2004, those dates being approximate and inclusive within the Eastern District of New York and elsewhere, the defendants

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 49 of 90 Exhibit 9

Sanjay Kumar and Stephen Richards, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede and attempt to obstruct, influence and impede official proceedings, namely, government investigations in violation of sections 1512(c)(2) and 2, Title 18 of the United States Code.

Count eight, the allegations contained in paragraphs 1 through 53 and 68 through 71 are realleged and incorporated as if fully set forth.

And paragraph 89 charges that: On or about October 23, 2003, within the Eastern District of New York, the defendant Stephen Richards, having taken an oath before a competent tribunal officer in person in a case in which the law of the United States authorized an oath to be administered, namely, in sworn testimony before the Securities & Exchange Commission, that he would testify, declare, depose and certify truly, did knowingly, willfully and contrary to his oath, state and subscribe to material matters as set forth below in the underlying portions of the SEC proceeding transcript pages which he did not then and there believe to be true.

Page 153, lines 13 through 17; page 153, line 24 through page 154 line 14.

"Question: Do you remember any practice within your group of your people tendering to clients in negotiations contracts that have signature dates placed in them?

b19969d7-b80c-464d-a46a-6a92962a4ee9

"Answer: Yes, I do.

"Question: What was the purpose of that practice?

And the portions which are alleged to be perjurious reads:

"Answer: Frankly, a very, very subtle sales tool. It is just something to remind the customer that they have a commitment to us to complete a transaction in a certain timeframe.

Page 179, line 20 through page 180, line 3.

"Question: Did you ever have an understanding at Computer Associates that contacts would be executed by customers after the end of the quarter by a few days and still count for the quarter?

And the answer which is alleged to have been perjurious is that: "I had an understanding that there could be non-material modifications made to an agreement after that particular period of time but that a binding agreement still had to have been in place at the conclusion of the quarter.

And on page 206 of that transcript, line 11 through page 208 line 1, the following questions and answers appeared.

"Question: In those two years when you were head of North America, one, and head of North America sales, what was going on in Islandia regarding the days after the quarter ended when you are calculating your commitment? Was there any reconciliation done that you are aware of to see how close

b19969d7-b80c-464d-a46a-6a92962a4ee9

Computer Associates had come to reaching the Street's estimates in its earnings?

The answer which was alleged to have been perjurious was:

"Answer: Not to my knowledge.

"Question: Were you involved in any discussions with let's say Mr. Kumar regarding whether Computer Associates was going to be able to reach the Street's estimates?

And the answer which was alleged to have been perjurious was:

"I don't believe so.

"Question: Did you have any discussions with anybody in the final days of the quarter or in the final days after the quarter ended, the first days after a quarter ended, regarding calculations whether Computer Associates were going to reach the Street's estimates?

And the answer which is alleged to be perjurious was:

"I can absolutely tell you that in time frame I used to find out our performance the same time as everybody else did, when the press release was published.

The answer is alleged to be in violation of Section 1621 of the United States Code.

Finally, count nine which incorporates in this count paragraphs 1 through 67 and 72 through 76 alleges as follows

in paragraph 91: On or about November 5, 2003, within the Eastern District of New York, the defendant Sanjay Kumar, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the Federal Bureau of Investigation, did knowingly and willfully; A, falsely conceal and cover up by trick, scheme and device one or more material fact; and B, make one or more materially false, fictitious and fraudulent statements and representations, in that he falsely stated and represented to a special agent of the FBI; one, that he was never aware of any CA license agreements that were finalized after the end of a fiscal quarter but for which associated revenue was recognized in the prior quarter, that he was not aware that CA had engaged in a practice of finalizing license agreements during the "flash period" and recognizing revenue associated with such agreements in the prior fiscal quarter, and that the purpose of the "three day window" was merely to clean up" paperwork and process contracts administratively.

2, that he was unaware of any instance in which he or the defendant Stephen Richards or anyone else at CA called a CA salesperson after the end of a quarter and encouraged the salesperson to finalize additional license agreements for the purpose of counting the business in the prior quarter because CA was short on revenue for the prior quarter, and that in those instances in which he pushed salespeople to finalize

b19969d7-b80c-464d-a46a-6a92962a4ee9

deals after the end of quarters, his sole purpose in doing so was to motivate the salespeople when their performance had diminished.

And three, that he did not have meetings at the end of fiscal quarters to discuss whether CA had met its forecasted revenues, that he simply assumed that unless he heard otherwise, CA had generated enough revenue to meet consensus estimates, and as Kumar then and there well knew and believed, each of those statements and representations was materially false and designed to conceal and coverup the existence of the 35 day month practice, in violation of Section 10001 of Title 18 of the United States Code.

Mr. Kumar and Mr. Richards, before I can accept your plea to the counts in which each of you may be named, the law imposes upon me an obligation to make sure that each of you understands a variety of rights that you have in connection with this proceeding.

The first thing I want to make sure that each of you understands is that just as you have on a prior occasion, you told me that you were not guilty of the counts of the indictment in which you are named, you can persist in that plea of not guilty here this afternoon and continue to tell me that you are not guilty. And if you do, there will be a trial which, as you know, is scheduled to begin on May 8th. You will be represented by your respective lawyers at that trial

b19969d7-b80c-464d-a46a-6a92962a4ee9

and at that trial each of you would be presumed to be innocent of the charges which have been made against you.

What that means is that neither of you would have to prove your innocence, that you were not guilty of the crimes with which you were charged. Each of you would be presumed to be innocent. You wouldn't have to prove anything at all. The government would have to prove that you were guilty and the government would have to prove it so that a unanimous jury of 12 people would be satisfied beyond a reasonable doubt that you are guilty of the crimes with which you were charged.

Do you understand that, Mr. Kumar?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: Do you understand that, Mr. Richards?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: At that trial, each of you would have the right to confront your accusers. Each of you would have the right to face the witnesses against you. Your respective lawyers would have the right to cross-examine those witnesses. They would also have a right to object to any evidence which they believed ran afoul of the Rules of Evidence.

Do you understand that, Mr. Kumar?

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes, I do.

THE COURT: Finally, each of you may, if you wish,

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 54

testify on your own behalf at your trial. You have the right to compel witnesses to attend at your trial. You have the right to offer any evidence which you think may be useful to you at your trial, but you are not obligated to do any of those things. Each of you has the right to say nothing and do nothing at your trial. And if you say nothing and do nothing, I will instruct the jury that it would be wrong for them to infer that you are guilty because you are remaining silent and perhaps not even offering any evidence on your behalf. I would instruct the jury that each out of is exercising a precious right which the Constitution of this country gives you and everybody else charged with a crime. It's the privilege against self-incrimination.

In simpler terms, it means that the person cannot be compelled to convict himself out of the words of his own mouth.

Do you understand that, Mr. Kumar?

DEFENDANT KUMAR: It's clear, your Honor.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: If you plead guilty here this afternoon, you'll be giving up all these rights which I just explained to you.

There will not be a trial. The government will not be called upon to prove that you committed the crimes with

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 56 of 90 Exhibit 9

Plea

Page 55

which you are charged and prove it to a unanimous jury of 12 people beyond a reasonable doubt.

You will not have had the opportunity to see who the witnesses against you would be. A judgment of guilt will be entered this afternoon and you'll be sentenced on another day.

Do you understand that?

DEFENDANT KUMAR: Yes, sir, I do.

DEFENDANT RICHARDS: Yes, sir.

THE COURT: If you were listening very carefully, you might have heard me say that if you plead guilty and if I accept your plea, and what I had in mind when I said if I accept your plea is the obligation which the law imposes upon me to make sure that I am not accepting a plea of guilty from somebody who is innocent.

And so toward that end, I will be asking each of you some questions regarding the crimes with which you are charged. And to the extent that you answer those questions, you will be convicting yourselves out of the words of your own mouth.

Do you understand all that, Mr. Kumar?

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes.

THE COURT: Did your lawyers advise you, Mr. Kumar and Mr. Richards, with respect to count one, that is the count

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 57 of 90 Exhibit 9

Plea

Page 56

which charges each of you with a conspiracy to commit securities fraud, that the maximum term of imprisonment with respect to that count is five years to which the Court may add a period of supervised release of up to three years?

Do you understand what supervised release is, Mr. Kumar?

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes.

THE COURT: The lawyers have explained that to you, have they?

DEFENDANT KUMAR: Yes.

DEFENDANT RICHARDS: Yes.

THE COURT: You may also be fined up to $250,000 or twice the gross gain or loss from the offense of conspiracy to commit securities fraud, whichever is greater.

You may be directed to make restitution in an amount which will be determined by the Court between now and the date of sentence.

Regardless of what the sentence is, you'll be required to pay a special assessment of $100 and there may be administrative sanctions, possibly including a bar from service as an officer or director of a public company.

And Mr. Richards, with respect to the crimes with which you are charged, at the end of your sentence you may be

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 58 of 90 Exhibit 9

removed from the United States.

Have your lawyers informed you of all of that with respect to count one, Mr. Kumar?

DEFENDANT KUMAR: They have, your Honor.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes.

THE COURT: With respect to count 2, the maximum term of imprisonment which the statute provides for is 10. Years.

A period of supervised release of up to three years may follow any term of imprisonment which may be imposed. The Court could impose a maximum fine on that count of up to a million dollars.

Restitution in an amount to be determined by the Court between now and the date of your sentence is to be determined. You may be required to make restitution. In fact, it may be mandatory that restitution be ordered.

There will be a 100-dollar special assessment on that count as well, and the same administrative sanctions which I've indicated with respect to the first count may be imposed and the same possibility of removal with respect to you, Mr. Richards, will be true for that counsel as well.

With respect to counts three to five, the maximum term of imprisonment on each of those counts is 10 years. A

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 58

period of supervised release of up to three years may follow a term of imprisonment on each of those counts. A maximum fine of a million dollars on each of those counts may be imposed. Restitution as has been indicated with respect to the counts I discussed with you previously may be directed.

There would be another hundred dollar special assessment, which is mandatory, which will be imposed.

The same administrative sanctions may also follow and the same possibility of removal with respect to you, Mr. Richards, as well.

Count six, the conspiracy to obstruct justice, the maximum term of imprisonment provided for by the statute you are charged with violating on that count is imprisonment up to 20 years.

Again, a maximum term of supervised release of up to three years which may be imposed in addition to any term of imprisonment.

A maximum fine of up to $250,000 or twice the gross gain or loss from the offense, whichever is greater, may also be imposed.

Restitution may also be imposed in an amount to be determined between now and sentence by the Court.

And another hundred dollar special assessment will be mandatory, with the same possibility of removal with respect to you, Mr. Richards, may follow.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 60 of 90 Exhibit 9

Plea

Page 59

Although I haven't asked you with respect to each of those counts, I take it your lawyers have informed you of the possibility penalties with respect to each of those counts and the counts which follow which I will now discuss with you.

Is that correct, Mr. Kumar?

DEFENDANT KUMAR: They have, your Honor.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes.

THE COURT: With respect to count seven, which is the obstruction of justice count, the maximum sentence which the statute you are charged with violating there provides for is imprisonment up to 20 years, to be followed by a term of supervised release of up to three years.

A fine of $250,000 or twice the gross gain or loss from the offense, whichever is greater may be imposed.

Restitution would also be applicable.

And another hundred dollar special assessment is mandatory with respect to that in addition to the removal with respect to Mr. Richards, which I've advised him of earlier.

Count eight, which is the perjury count against Mr. Richards, the statute you are charged with violating there provides for a term of imprisonment of up to five years, in addition to which a period of supervised release of up to three years may be imposed. A fine of $250,000 may also be

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 61 of 90 Exhibit 9

imposed. Restitution if applicable will be mandatory. There is a hundred dollar special assessment which is mandatory in addition to the possibility of removal for Mr. Richards.

Count nine, false statement which Mr. Kumar has been charged, the maximum sentence which the statute there alleged to be violated provides for is imprisonment up to five years to which a term of supervised release of up to three years may be added.

A fine of $250,000 may also be added as well as restitution, a $100 special assessment which is mandatory, and sentences on each of those counts may also run consecutively.

Do you understand what that means, Mr. Kumar?

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: Yes.

THE COURT: Am I correct in assuming that each of you has discussed the guidelines with your respective lawyers?

DEFENDANT KUMAR: I have your Honor.

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: Very briefly, up until January 1, 2005, the guidelines were mandatory in federal court.

They were mandatory from November 1, 1987 to January 1, 2005.

What that means is that the Court was obliged to impose a sentence which was determined by the guidelines. And

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 61

on January 1, 2005, effective on that date the guidelines were declared to be unconstitutional by the Supreme Court of the United States.

Almost immediately thereafter the Court of Appeals for this circuit decided that although the guidelines were no longer mandatory and were unconstitutional, they must nevertheless continue be consulted by trial court judges, District Court judges, and must be considered in determining what the appropriate sentence shall be.

I take it that all of that has been discussed with each of you and I don't know whether any prediction or estimate was made for you, Mr. Kumar; for you, Mr. Richards, by your respective lawyers as to what the guidelines referred to, consulted by the Court might be.

If some estimate or prediction had been made, I just want to make sure that you understand that it was simply that, a prediction, an estimate or an educated guess, none of which is binding on me.

I have no firm idea as I talk to each of you this afternoon what your sentence might be.

If your sentence turns out to be higher than may have been predicted or estimated for you and you are understandably unhappy about that, you won't be permitted to withdraw a plea that you will enter here this afternoon.

Do you understand that, Mr. Kumar?

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 63 of 90 Exhibit 9

DEFENDANT KUMAR: Yes.

THE COURT: Mr. Richards, do you understand that?

DEFENDANT RICHARDS: I do.

THE COURT: Do you have any questions about anything I have explained to you so far, Mr. Kumar?

DEFENDANT KUMAR: No.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: No.

THE COURT: Mr. Cooney, do you know any reason why Mr. Kumar shouldn't plead to the counts of the indictment?

MR. COONEY: No, your Honor.

THE COURT: Mr. Kumar, how do you plead to the counts of the indictment which I just read to you, have gone over with you, guilty or not guilty?

DEFENDANT KUMAR: Guilty, your Honor.

THE COURT: Mr. Zornow, do you know any reason why Mr. Richards shouldn't be pleading guilty here this afternoon?

MR. ZORNOW: No, your Honor.

THE COURT: How do you plead to the charges that have been preferred against you, Mr. Richards, and which I have reviewed with you?

DEFENDANT RICHARDS: Guilty, your Honor.

THE COURT: Mr. Kumar, are you entering that plea voluntarily?

DEFENDANT KUMAR: I am.

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 63

THE COURT: Anybody making any threats against you or in any way induced or compelled you to enter the plea of guilty here today?

DEFENDANT KUMAR: No.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: No.

THE COURT: Has anyone made any promise to you as to what your sentence will be?

DEFENDANT KUMAR: No.

THE COURT: Mr. Richards?

DEFENDANT RICHARDS: No.

THE COURT: I think I told each of you just a minute ago I have no idea what your sentences are going to be as I talk to you. If anybody made any promises to you, they would be misleading you.

Do you understand that?

DEFENDANT KUMAR: I understand that, your Honor.

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: I told you a while ago that before I can accept your plea of guilty, the law requires me to make certain that I am not accepting a guilty plea from somebody who is in fact innocent.

Let me ask you some questions with respect for the 9 counts of this indictment.

The first count charges each of you with conspiracy

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 65 of 90 Exhibit 9

Plea

Page 64

to commit securities fraud. Had you gone to trial, the government would have had to prove three things to the satisfaction of a unanimous jury beyond a reasonable doubt if that jury were to be justified in returning a verdict of guilty.

The government would have had to prove first that there was a conspiracy as charged. The government would have to prove that you knowingly, intentionally, willfully became a party to that conspiracy.

And finally, the government would have to prove that an overt act, one or more overt acts were committed during the course of and in furtherance of that conspiracy.

Conspiracy, Mr. Kumar and Mr. Richards, is very simply defined as an agreement. It's the crux of the crime of conspiracy, an agreement between two or more people to commit a crime, each of you having to be one of those people.

And when I say the government would have to prove an agreement to commit the crime of securities fraud, I don't mean to suggest that either one of you believe or understand that the government would have to prove that there was a written agreement between you and one or more other people that you were going to commit this crime. It would be enough if the government established to the satisfaction of a unanimous jury beyond a reasonable doubt that each of you and one or more other persons had a meeting of the mind, a common

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 66 of 90 Exhibit 9

Plea

Page 65

understanding that you would commit the crime of securities fraud.

Let me ask each of you, unless there is some allocution. I notice that there was a piece of paper that seemed to have appeared.

MR. COONEY: Yes, your Honor.

THE COURT: I'll listen to it and determine whether or not that satisfies the factual basis for the plea with respect to count one.

I'm going to review each of those counts separately.

MR. COONEY: Yes, your Honor.

Mr. Kumar does have a statement.

DEFENDANT KUMAR: May I?

THE COURT: By all means.

DEFENDANT KUMAR: Your Honor, I began my career at Computer Associates in 1987 when I was hired as a research and development manager for the company. And from 1994 through July of 2000, I was the president and chief operating officer of the company.

Your Honor, during fiscal year 2000, I was aware that there was a practice of recognizing the revenue from certain contracts, though closed in the early days of one quarter, in the prior quarter's revenue results to meet Wall Street consensus estimates referred to as keeping the books open in the indictment.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 67 of 90 Exhibit 9

I, in concert with others at CA, followed this practice by working to complete a license agreement with AXA, in the first half of July 1999, knowing and intending that the revenue from that agreement would be recognized in the quarter ending June of 1999.

I knew that this practice of recognizing revenue from contracts signed after the end of the quarter was wrong and that it violated GAAP.

I also knew that the failure to disclose this practice could mislead those involved in the purchase and sale of CA securities.

I knew when I signed the form 10-Q and form 10-K filings referenced in counts three, four and five of the indictment, which Computer Associates was required to make with the SEC for fiscal year 2000 pursuant to the Securities & Exchange Act of 1934, that they were materially false in that they did not disclose this practice.

Beginning in 2002 when the practice of keeping the books open was being investigated by the company and the government, I agreed with others at CA not to reveal it and thereby impede those investigations.

When I was interviewed by the FBI on November 5, 2003, I falsely stated that I was not aware of CA license agreements being finalized after the end of fiscal quarter but for which associated revenue was recognized in the prior

Plea

Page 67

quarter.

I attempted to minimize the significance of the practice of keeping the books open in my mind because it did not involve double counting any revenue and because it did not impact the cash position of the company.

Your Honor, nonetheless, I knew that my conduct was wrong and resulted in violations of GAAP and as a consequence, inaccurate public financial reports.

Your Honor, I take full responsibility for participating in this practice and I apologize for my actions which I deeply regret.

Thank you.

THE COURT: That strikes me as an allocution which was intended to satisfy the 8 counts in which Mr. Kumar is named.

MR. KOMITEE: Yes, your Honor.

THE COURT: Is that the view of the government as well?

MR. KOMITEE: Your Honor, Mr. Kumar indicated that he understood that the misstatements made by Computer Associates at his direction could mislead those involved in the purchase and sale of CA securities.

The modifier that I think may be missing from that indication is that the misleading of those investors would be with respect to a material fact, and there was no disclosure

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 69 of 90 Exhibit 9

as to what that material fact would be or why it would be that an investor in CA securities would find there was something they wanted to know in the full mix of information available.

THE COURT: Let me go back.

With respect to the first count, Mr. Kumar, the conspiracy to commit securities fraud, did you have an agreement with one or more other persons with respect to the allegations in count two and with respect to the allegations in count three and five, namely, did you have an agreement, an understanding with one or more other persons that you were going to engage in what has been referred to throughout this indictment as the 35 day month practice of backdating income which should have been attributable to the preceding month but was not received on the month thereafter?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: And you entered into that agreement with one or more other persons voluntarily, you understood what it was that you were agreeing to?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: And for the purpose of furthering the objectives of that conspiracy, did you on or about July 8, 1999 travel by corporate jet from Farmingdale, New York to Paris, France?

DEFENDANT KUMAR: I did, your Honor.

THE COURT: And that was for the purpose of

b19969d7-b80c-464d-a46a-6a92962a4ee9

furthering the objectives of this conspiracy?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: On or about January 6, 2000, did you sign and intentionally undate a license agreement with customer number 5?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: With respect to count two, that is known as the substantive count of securities fraud, is it true, Mr. Kumar, that between April 1, 1998 and October 31, 2003, you and others knowingly, willfully employed deceptive devices in violation of Rule 10(b)(5)?

You know what Rule 10(b)(5) is all about?

DEFENDANT KUMAR: Yes, sir.

THE COURT: And together with others, you made statements which were untrue, statements of material fact, and omitted to make statements of material fact which would have made those that you had made not misleading, and you engaged in a course of business which operated as a fraud upon members of the investing public in connection with the purchase and sailing of Computer Associates securities.

MR. COONEY: Your Honor, you said October 2003. I think the Court meant October 2000.

THE COURT: I said October 31, 2003, you are right. It should have been October 31, 2000.

That misstatement to the contrary notwithstanding,

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 70

is everything else that I asked you about with respect to count two correct?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: And in connection with committing that securities fraud, did you use facilities of interstate commerce such as telephones, faxes?

DEFENDANT KUMAR: Yes, sir.

THE COURT: With respect to counts three through five, counts three through five charge you with having made, caused to be made, statements and reports which were required to be filed with the SEC which you knew to be false and misleading, namely, a document form 10-Q for the fiscal quarter ended September 30, 1999, filed on October 19, 1999, you knew to be false and misleading?

DEFENDANT KUMAR: Yes, sir.

THE COURT: And that would be true of the document form 10-Q for the fiscal quarter ended December 31, 1999, filed on January 26, 1999?

DEFENDANT KUMAR: Yes, sir.

THE COURT: You knew that was false and misleading and caused it to be filed?

DEFENDANT KUMAR: Yes.

THE COURT: With respect to the document filed on May 15, 2002 the quarter ended March 31, 2002, you knew that that document which was a 10-K also contained facts which were

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4e09

Page 72 of 90 Exhibit 9

Plea

Page 71

false and misleading?

MS. WALSH: I think that is 2000, your Honor.

THE COURT: May 15, 2000 and March 31, 2000, is that correct?

DEFENDANT KUMAR: Yes, your Honor.

THE COURT: By the way, with respect to these offenses which I've inquired about, the conspiracy to commit securities fraud and securities fraud in count two and counts three through five, all the events which gave rise to those offenses were committed within the Eastern District of New York, were they, the Eastern District of New York encompassing all of Brooklyn, all of Queens, all of Staten Island and all of Nassau and Suffolk Counties?

DEFENDANT KUMAR: Yes, sir, it also included the trip to France.

THE COURT: That was an overt act, but the offense itself, the conspiracy itself, the agreement itself between you and others, that took place I take it at CA headquarters in Islandia, New York.

DEFENDANT KUMAR: Yes, sir.

THE COURT: That would be true of count two, the securities fraud itself and the filings, counts three through five?

DEFENDANT KUMAR: Yes, sir.

THE COURT: In count six, did you and one or more

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 73 of 90 Exhibit 9

Plea

Page 72

other persons, persons who were named in count six, Ira Zar, Stephen Woghin, David Kaplan, David Rivard, Stephen Richards, Lloyd Silverstein, did you have an agreement with one or more of those persons that you would knowingly and intentionally obstruct or influence or impede government investigations?

DEFENDANT KUMAR: Yes, sir.

THE COURT: And you entered into that agreement with one or more of those persons fully understanding what it was that you were agreeing to?

DEFENDANT KUMAR: Yes.

THE COURT: And that took place in the Eastern District of New York as well?

DEFENDANT KUMAR: Yes, sir.

THE COURT: With respect to count seven, between February of 2002 and April 6 of 2004, did you and Stephen Richards do what you conspired to do in count six, that is, did you knowingly and intentionally obstruct, influence and impede or attempt to obstruct and influence or impede a government investigation?

DEFENDANT KUMAR: Yes, sir.

THE COURT: That also happened in the Eastern District of New York?

DEFENDANT KUMAR: Yes, sir.

THE COURT: And with respect to count nine, on or about November 5, 2003, there was an investigation conducted

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 74 of 90 Exhibit 9

Plea

Page 73

by the FBI, the executive branch of the government, and in connection with that investigation, did you knowingly and willfully, falsely, coverup by some scheme one or more material facts to make one or more materially false, fraudulent statements and representations that you falsely stated and represented to a special agent of the FBI that you were never aware of any CA license agreements that were finalized after the end of a fiscal quarter but for which revenue associated with those license agreements were recognized in the prior quarter, that you weren't aware that CA engaged in a practice of finalizing license agreements during the flash period recognizing revenue associated with those agreements in a prior fiscal quarter, that you didn't know anything about the purpose of the three day window, it was merely to clean up paperwork and process contracts administratively, is that correct?

DEFENDANT KUMAR: Yes, sir.

THE COURT: That you were also unaware of any instance in which you, Stephen Richards or anybody else at Computer Associates called a Computer Associates salesperson after the end of a quarter and encouraged that person to finalize additional license agreements for the purpose of counting business in the prior quarter because you were short of revenue for that quarter, you made all those statements to an FBI agent, you knew they were false and misleading, is that

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 75 of 90 Exhibit 9

Plea

Page 74

correct?

DEFENDANT KUMAR: Yes.

THE COURT: And that took place in Brooklyn?

DEFENDANT KUMAR: Yes, sir.

THE COURT: Anything further with respect to Mr. Kumar, Mr. Cooney?

MR. COONEY: No, your Honor.

THE COURT: The government?

MR. KOMITEE: No, your Honor.

MS. WALSH: No, your Honor.

THE COURT: Mr. Richards, with respect to count one, did you have an agreement, a meeting of the minds, an understanding with one or more other persons that you were going to engage and commit the crime of securities fraud?

DEFENDANT RICHARDS: Yes, your Honor, I did.

THE COURT: You entered into that agreement fully understanding, fully knowing what it was that you were agreeing to?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: When I say that you agreed to commit the crime of securities fraud, that was a fraud in connection with the sale of or in connection with Computer Associates securities; false, misleading statements of material fact were agreed to be made in reports that were filed with the SEC and in furtherance of that scheme to defraud, is that correct, Mr.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 76 of 90 Exhibit 9

Plea

Page 75

Richards, that on or about January 6 of 2000 you placed a telephone call from CA headquarters in Islandia, New York to sales executive number 2, is that correct?

DEFENDANT RICHARDS: That's correct, sir.

THE COURT: And on or about April 8, 2000, at approximately 7:30 in the morning Mr. Kumar sent an E-mail to sales executive number 3 and you which read: Mr. B's shopping is on me, is that correct?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: All of those and the other overt acts which I read early on were committed by you, Mr. Richards, in furtherance of the conspiracy to commit securities fraud?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: They were committed during the course of that conspiracy and much of that took place in the Eastern District of New York?

DEFENDANT RICHARDS: Yes, sir.

THE COURT: And count two charges you with actually committing the crime in addition to conspiring to commit it, actually committing the crime of securities fraud by employing manipulative devices in violation of Rule 10(b)(5).

You know what Rule 10(b)(5) of the rules of the SEC is?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: And in connection with that, you

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 77 of 90 Exhibit 9

Plea

Page 76

employed schemes to defraud, to make untrue statements of material fact, omit to make statements of material fact which would have made the statements that you did make misleading?

DEFENDANT RICHARDS: Yes.

THE COURT: Having omitted them?

DEFENDANT RICHARDS: Yes.

THE COURT: And that was done in the Eastern District of New York as well?

DEFENDANT RICHARDS: Yes, sir, it was.

THE COURT: And is it also true, Mr. Richards, that on October 19 there was a filing with the SEC pursuant to the Securities & Exchange Act of 1934 and the regulations which were promulgated pursuant to that Act, filings which were false and misleading regarding a form 10-Q for Computer Associates for the fiscal quarter ended September 30, 1999, is that correct?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: And on January 26 of the year 2000, there was a false and fraudulent filing on a form 10-Q for the fiscal year-ended December 31, 1999 for Computer Associates?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: And on May 15, 2000, there was a false statement with respect to material facts on a form 10-Q filing for Computer Associates for the period ended for the fiscal year-ended March 31, 2000?

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 78 of 90 Exhibit 9

Plea

Page 77

DEFENDANT RICHARDS: Yes, your Honor.

Might I add one point?

THE COURT: By all means.

DEFENDANT RICHARDS: I never had direct responsibility for the filing or the preparation of those documents, but based on my understanding of the actions of myself and my organization, it was reasonable for me to believe that those filings would be false.

THE COURT: You were not only charged in count three through five with the violation of the Securities & Exchange Act, but you were also charged with the violation of Section 2 of Title 18 of the United States Code, which provides in essence that a person who aids or abets the commission of a crime by another is responsible for it as if he personally committed it.

DEFENDANT RICHARDS: I understand, your Honor.

THE COURT: Did you aid and abet the commission of those false and fraudulent filings with the SEC?

DEFENDANT RICHARDS: Yes.

THE COURT: And did that take place in the Eastern District of New York?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: Is it also true, Mr. Richards, that you agreed with the other persons names in count six who are Mr. Kumar, Ira Zar, Steve Woghin, David Kaplan, David Rivard,

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York

b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 79 of 90 Exhibit 9

Plea

Page 78

that you agreed with them that you would knowingly, intentionally conspire to obstruct justice by impeding the government investigation?

DEFENDANT RICHARDS: Yes, your Honor.

THE COURT: And you entered into that agreement, you had that understanding, that meeting of the minds with one or more other people knowingly?

DEFENDANT RICHARDS: Yes, sir, I did.

THE COURT: And you entered into that agreement knowing what you were entering into?

DEFENDANT RICHARDS: Yes.

THE COURT: That took place in Islandia, New York?

DEFENDANT RICHARDS: Yes, it did.

THE COURT: With respect to count seven, between February of 2002 and April 6 of 2004, you knowingly, intentionally did obstruct and influence and impede an official investigation, government investigation, an official proceeding?

DEFENDANT RICHARDS: Yes, sir.

THE COURT: You did that intentionally, you fully understood what it was that you were doing?

DEFENDANT RICHARDS: Yes, sir.

THE COURT: That took place in the Eastern District of New York as well?

DEFENDANT RICHARDS: Yes.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York

b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 80 of 90 Exhibit 9

THE COURT: With respect to count eight, you were called to give testimony under oath before the Securities & Exchange Commission on or about October 23, 2003, is that right?

DEFENDANT RICHARDS: Yes, sir.

THE COURT: You were asked a series of questions. One of those questions was: Do you remember any practice within your group, your people, tendering to clients in negotiation contracts that have signature dates already placed on them? You answered: Yes, I do.

The question was: What was the purpose of that practice?

And your answer was: Frankly, a very, very subtle sales tool, just something to remind the customer that they have a commitment to us to complete a transaction in a certain timeframe.

You knew that answer to be false?

DEFENDANT RICHARDS: Your Honor, I knew that answer to be true but I withheld information that was an extension of that answer that it also facilitated the practices that we were pursuing in the company at that time.

THE COURT: At the time you made that statement, did you believe it not to be true?

DEFENDANT RICHARDS: I believed that there were other elements that I didn't disclose at that time.

THE COURT: By not disclosing it, that statement is not true?

DEFENDANT RICHARDS: Yes, sir.

THE COURT: And you understood that at the time?

DEFENDANT RICHARDS: Yes, I did, sir.

THE COURT: In answer to the question: Did you ever have an understanding at Computer Associates that contracts could be executed by customers after the end of the quarter by a few days and still count for the quarter? And your answer was: I had an understanding that there could be non-material modifications made to an agreement after that particular period time but that a binding agreement still had to have been in place at the conclusion of the quarter.

With respect to that statement, did you then and there believe that statement to be true?

DEFENDANT RICHARDS: In part, but not in full, your Honor.

THE COURT: With respect to part of that statement, you knew it to be false?

DEFENDANT RICHARDS: Yes, I did.

THE COURT: Then you were asked whether in the 2 years when you head of North America 1 and North America sales, what was going on in Islandia regarding the days after the quarter ended when you were calculating your commitment, was there any reconciliation done that you were aware of to

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 81

see how close Computer Associates had come to reaching the Street's estimates in its earnings?

And your answer was: Not to my knowledge.

Then you were asked: Were you involved in any discussions with let's say Mr. Kumar regarding whether Computer Associates was going to be able to reach the Street's estimates?

Your answer was: I don't believe so.

Then you were asked: Did you have any discussions with anybody in the file days of the quarter, in the final days after a quarter ended for the first days after a quarter ended regarding calculations whether Computer Associates was going to reach the Street's estimates?

And your answer was: I can absolutely tell you that in that timeframe, I used to find out our performance the same as everybody else did and when the press release was published.

Is that true, did you believe that statement to be true at the time you made it?

DEFENDANT RICHARDS: I believe the statement to be true in the final paragraph but not in the previous paragraphs.

THE COURT: When you said that it wasn't to your knowledge that after the quarter ended there were calculations made with respect to your commitment.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 83 of 90 Exhibit 9

Plea

Page 82

DEFENDANT RICHARDS: Yes.

THE COURT: That was false?

DEFENDANT RICHARDS: That was false.

THE COURT: And in answer to the question as to whether you were involved in any discussion with Mr. Kumar regarding whether Computer Associates was going to be able to reach the Street's estimate, you said I don't believe so, that was false as well?

DEFENDANT RICHARDS: That was also false, your Honor.

THE COURT: And all of that happened in Brooklyn, did it or in Islandia?

DEFENDANT RICHARDS: Central Islip, your Honor.

THE COURT: Anything further Mr. Zornow?

MR. ZORNOW: No, your Honor.

THE COURT: The government?

MR. KOMITEE: Both defendants have now indicated they understood their false statements to the investing public to be material.

I would just ask that the record reflect both defendants' understanding that because it's a legal term, a material fact is one that would have been significant to a reasonable investor's investment decision.

The defendants obviously are not lawyers. I think that it's important to the full reflection of what they

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 84 of 90 Exhibit 9

Plea

Page 83

understand their conduct to have been that they reflect that understanding as well.

THE COURT: Mr. Kumar, did you hear what Mr. Komitee has just asked me to inquire?

DEFENDANT KUMAR: I'm not sure if I understood what he said.

MR. KOMITEE: The gist, your Honor, is that a material fact as defined in the law is one fact that would have been significant to a reasonable investor's investment decision.

THE COURT: In other words, Mr. Kumar, with respect to false filings, with respect to statements that you made which you knew to be false, the statements of material fact, material fact is defined by the statute as a fact which would have had an effect on an investors's decision-making process.

Is that correct?

DEFENDANT KUMAR: Yes, it's possible, your Honor, yes.

THE COURT: Did you think it would if you indicated that the Street's estimate was met and you knew that it wasn't and that statement was made publicly, would that have affected a decision to be made by a prudent investor in the purchase and sale of Computer Associates stock?

DEFENDANT KUMAR: I could see the possibility where it could, your Honor.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 85 of 90 Exhibit 9

Plea

Page 84

THE COURT: What would your view of that be, Mr. Richards?

Would you agree that it would, material fact, that is those false statements with respect to when income was attributed to a particular quarter when consensus estimates were not reached but statements or accounting practices were adopted for the purpose of reflecting that they were reached which were known to be false, do you believe that would have affected the decision-making process of somebody buying or selling stock?

DEFENDANT RICHARDS: Yes, I do.

THE COURT: Anything else?

MR. KOMITEE: Your Honor, on Richards' indication with respect to the false SEC filings, your Honor clarified with respect to the mental state requirement, but Mr. Richards indicated that even though he was wasn't personally involved in the preparation of these false filings, he said that it would have been reasonable for him to believe.

THE COURT: I think that I specifically indicated to Mr. Richards that he was charged with a violation of Section 2 of Title 18, which is an aiding and abetting statute. I asked him what he understood what that meant and did he in fact aid and abet and he said that he did.

I'm satisfied that there is a factual basis for his plea with respect to that.

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 86 of 90 Exhibit 9

Plea

Page 85

Maybe you weren't listening very carefully, Mr. Komitee.

Anything else?

MR. ZORNOW: Mr. Richards, had a statement he wanted to read.

THE COURT: By all means.

DEFENDANT RICHARDS: Your Honor, we have gone over a majority of that. In essence, I wanted to express my apologies to the Court for the representations that I have made in the past and the behavior of myself throughout this process.

I recognize that the actions on my part have been particularly inappropriate. They certainly are not representative of the person that I think I am. For that, I am truly apologetic, particular to the Court and to the people who have been impacted by this particular case.

THE COURT: Mr. Richards and Mr. Kumar have been fully advised of their rights with respect to this matter, with respect to the counts in which they are charged, with respect to their pleas.

I'm satisfied that there is a factual basis for their pleas; with respect to Mr. Richards and Mr. Kumar to counts 1 through seven, and with respect to Mr. Kumar with respect to count nine and with respect to Mr. Richards to count eight, there is a factual basis for those pleas and I'll

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 87 of 90 Exhibit 9

accept them.

THE CLERK: Sentencing set for Thursday July 20th, 2006 at 10:00 a.m.

THE COURT: What is the bail situation here today?

MR. COONEY: May I just ask with respect to the sentence date, we were hoping to put this case over for sentence in mid-September, the week of September 11th. I think there is a good deal of information we are going to want to submit to the Court.

THE COURT: I have no problem with that if the government doesn't.

MS. WALSH: No, your Honor. That is fine.

THE CLERK: Monday, September 11th at 10:00 a.m.

THE COURT: Does anybody want to talk to me about what the bail situation is like?

MR. KOMITEE: Your Honor, Mr. Richards and the government have agreed to a modification of the conditions on which he is released pending sentencing that calls for the addition of one more surety to his bond.

We have an understanding that that person will be actually signing the bond before the duty magistrate in this building today.

We would ask that it be made a condition of his bond by your Honor that that signature be entered no later than the close of business on Wednesday. So if for some reason that

b19969d7-b80c-464d-a46a-6a92962a4ee9

Plea

Page 87

hasn't happened today, it has to happen within the next 48 hours.

THE COURT: So ordered.

What are the other terms and conditions of bail so we have those clearly enough indicated for the record?

MR. COONEY: Mr. Kumar is presently released on a 5 million-dollar personal recognizance bond co-signed by his wife and secured by his home.

THE COURT: Mr. Kumar's passport has been surrendered?

MR. COONEY: Of course, and his travel is restricted to the United States.

THE COURT: And for Mr. Richards?

MR. ZORNOW: For Mr. Richards, it's also a 5 million-dollar bond which is secured by $250,000 in cash. It's co-signed by his wife.

He has also surrendered his passport and his travel is restricted to the United States.

THE COURT: In addition, there was an additional condition that was imposed by the government which was agreed upon as I understand it.

MR. ZORNOW: Yes.

THE COURT: An additional signatory to the bond.

MR. ZORNOW: Yes.

MR. ZISKE: Because of a personal situation, can we

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 89 of 90 Exhibit 9

Plea

Page 88

make the sentencing date September 12th instead of the 11th?

THE COURT: September 12th is fine.

I have no doubt, Mr. Kumar and Mr. Richards, that your respective counsel have advised you as to what the penalties may be for violating any of the terms of bail.

They can be quite serious.

If there is nothing further, these proceedings are finished.

(Matter concluded.)

ALLAN R. SHERMAN, CSR, RPR Official Court Reporter
United States District Court Eastern District of New York
b19969d7-b80c-464d-a46a-6a92962a4ee9

Page 90 of 90 Exhibit 9