1  Thomas N. FitzGibbon (SBN: 169194)
   TNF@ptflaw.com
2  **PFEIFFER, THIGPEN & FITZGIBBON LLP**
3  233 Wilshire Boulevard, Ste. 220
   Santa Monica, CA 90401
4  Telephone: (310) 451-5800
   Facsimile: (310) 451-1599
5

6  Luke A. McGrath *(Pro Hac Vice Pending)*
   LZM@bickelbrewer.com
7  James S. Renard *(Pro Hac Vice Pending)*
   JSR@bickelbrewer.com
8  **BICKEL & BREWER**
9  767 Fifth Avenue, 50th Floor
   New York, New York 10153
10 Telephone: 212-489-1400
   Facsimile: 212-489-2384
11

12 Attorneys for Intervenor
13 *Sam Wyly*

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18  UNITED STATES OF AMERICA,      | Case No. 2:05-CR-587-JFW-3
                                    | [Assigned to Hon. John F. Walter]
19          Plaintiff,

20          - against -             | **PART 1 OF EXHIBIT 10 TO**
                                    | **DECLARATION OF LUKE A.**
21                                  | **MCGRATH IN SUPPORT OF**
                                    | **INTERVENOR SAM WYLY'S**
22  MILBERG WEISS BERSHAD &         | **MOTION TO INTERVENE AND**
    SCHULMAN LLP, DAVID J.          | **FOR RELIEF FROM PROTECTIVE**
23  BERSHAD, STEVEN G.              | **ORDER**
    SCHULMAN, SEYMOUR M.
24  LAZAR, and PAUL T. SELZER       | Date:    February 9, 2009
                                    | Time:    9:00 a.m.
25          Defendants.             | Room:    16
26

27

28

# Exhibit 10

to

## Declaration of Luke A. McGrath

## In Support of Intervenor Sam Wyly's Motion to Intervene And For Relief from Protective Order

                    Exhibit 10

# CA, INC.
# SPECIAL LITIGATION COMMITTEE REPORT

### WILLIAM MCCRACKEN
### RENATO ZAMBONINI

Prepared with assistance from Fried, Frank, Harris, Shriver & Jacobson LLP

Douglas H. Flaum
David B. Hennes
Carmen J. Lawrence

April 13, 2007

Exhibit 10

I.  EXECUTIVE SUMMARY .................................................................................. 1

   A.  The Formation of the SLC ................................................................... 1

   B.  The SLC's Investigation...................................................................... 2

   C.  The SLC's Findings With Respect to CA's Systemic Corporate Failure ............. 4

   D.  The SLC's Conclusions with Respect to the Claims in the 2005 Derivative
      Complaint.......................................................................................... 9

II.  THE COMPANY ......................................................................................... 44

III. THE 2005 DERIVATIVE ACTION .............................................................. 45

   A.  The 2003 Settlement and the Rule 60(b) Motions ............................. 46

   B.  The Derivative Complaints: Claims.................................................... 53

   C.  The Derivative Complaints: Individual Defendants............................ 58

IV.  FORMATION OF THE SLC ......................................................................... 90

   A.  Board Resolutions .............................................................................. 90

   B.  The Members of the Special Litigation Committee of the Board of Directors of
      CA, Inc.............................................................................................. 91

   C.  SLC Independence Review ................................................................. 95

   D.  Retention of Counsel ....................................................................... 100

V.  SLC WORK PLAN ................................................................................... 101

   A.  Phase I: The SLC's Limited Investigation ....................................... 102

   B.  Phase II: After the Guilty Pleas of Messrs. Kumar and Richards..... 108

VI.  THE 35-DAY MONTH PRACTICE ............................................................. 114

   A.  Origins of the Fraud: Wall Street's Estimates and the Hockey Stick Effect..... 114

   B.  The Scope and Impact of the Fraud ................................................. 118

   C.  The Criminal Defendants and Departmental Roles........................... 127

VII. ADDITIONAL ACCOUNTING ISSUES .......................................................... 138

i

Exhibit 10

VIII.   BOARD OVERSIGHT DURING THE PERIOD OF FRAUDULENT CONDUCT ......... 139

    A.   The Key Employee Stock Ownership Plan ....................................................... 140

    B.   The KESOP Shares Vest ................................................................................. 146

    C.   The Promulgation of SOP 97-2 ....................................................................... 148

    D.   The July 21, 1998 Press Release ...................................................................... 150

    E.   Derivative and Class Action Litigation Filed in Response to the KESOP and the
        July 21 Press Release ..................................................................................... 154

    F.   CA Changes Outside Auditors from E&Y to KPMG ....................................... 156

    G.   CA's "New Business Model" ............................................................................. 161

    H.   April 29, 2001 New York Times Article .......................................................... 164

IX.   THE GOVERNMENT INVESTIGATION AND THE SETTLEMENT OF THE CLASS
    ACTION AND DERIVATIVE LITIGATION ............................................................. 181

    A.   2002 – Commencement of the Government Investigation ................................. 181

    B.   January 2003 – June 2003:  The Government Investigation Escalates ............. 204

    C.   June 2003 – A Settlement Framework is Reached ........................................... 217

    D.   July 2003 – The Audit Committee Investigation is Authorized ....................... 220

    E.   August 2003 – The Settlement is Approved .................................................... 225

    F.   Post-Settlement Approval; the Audit Committee Investigation Continues ...... 238

    G.   December 2003 – The Settlement is Finalized ................................................. 271

    H.   2004 – The Guilty Pleas ................................................................................. 273

X.   APPLICABLE LAW AND ANALYSIS OF THE CLAIMS ........................................ 282

    A.   Count One:  Violation of The Public Company Accounting Reform and Investor
        Protection Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C. § 7243 .................... 282

    B.   Count Two:  Statutory Contribution Against the Individual Defendants and
        Auditor Defendants ....................................................................................... 286

    C.   Count Three: Breach of Fiduciary Duty ........................................................... 296

    D.   Count Four:  Restitution and Unjust Enrichment ............................................. 364

ii

E.    Count Five:  Corporate Waste ........................................................366

F.    Count Six:  Fraud .........................................................................375

G.    Count Seven:  Violations of Section 14(a) of the Exchange Act ......................378

H.    Count Nine:  Common Law Contribution and Indemnity.................................382

XI.   CONCLUSION ................................................................................386

Exhibit 10

I.  **EXECUTIVE SUMMARY**

A.  *The Formation of the SLC*

The Special Litigation Committee (the "SLC") of CA, Inc. ("CA" or the "Company") (formerly known as Computer Associates International, Inc.) was formed by the CA Board of Directors (the "CA Board") on February 1, 2005 in response to the filing of a consolidated amended derivative complaint on January 7, 2005 (the "2005 Derivative Action"), which alleges various claims on behalf of CA against twenty-two (22) current and former CA directors, officers, and employees and its current and former independent auditors. The claims in the 2005 Derivative Action arise out of a massive accounting fraud perpetrated by the Company's senior-most executives from as far back as the late 1980s through 2001, and their cover-up of that fraud, which lasted through mid-2004. That conduct – the practice of extending CA's fiscal quarters beyond their natural conclusion to prematurely recognize additional revenue – has come to be known as, and will be referred to as, "the 35-Day Month."

As a result of this conduct, CA was forced to restate $2.2 billion in revenues, and the ensuing cover-up has been described by the U.S. Attorney's Office for the Eastern District of New York (the "USAO") as "the most brazen and most comprehensive obstruction that we've witnessed in recent history." To date, eight of the Company's former senior executives have pled guilty to federal securities fraud and/or obstruction of justice charges. The Company itself has acknowledged that, through the conduct of those CA executives, it violated the law and accepted responsibility as part of a Deferred Prosecution Agreement ("DPA") entered into with the USAO, dated September 22, 2004.

In its authorizing resolution, the CA Board charged the SLC to investigate the claims made in the 2005 Derivative Action, and to determine and control the Company's response to those claims. The CA Board has also charged the SLC to "determine and control"

1

the Company's response to certain motions for relief from judgment, made pursuant to Federal Rule of Civil Procedure 60(b), that were filed in connection with the 2005 Derivative Action. This report constitutes a summary of the SLC's investigative efforts and findings, and the SLC's determination as to whether, in exercising its business judgment under Delaware law in the best interests of CA and its shareholders, the claims alleged in the 2005 Derivative Action should be pursued, dismissed, or otherwise resolved.[1]

### B.   *The SLC's Investigation*

The SLC, through and with the assistance of counsel, conducted an independent, in-depth, and extensive factual investigation, including: (i) conducting ninety (90) interviews of CA's current and former directors, officers, employees, and outside advisors; (ii) reviewing millions of pages of documents; and (iii) hiring four (4) expert consultants, in order to determine whether pursuit of any or all of the claims alleged in the 2005 Derivative Action would be in the best interests of the Company. The SLC hired the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") to assist it with respect to all facets of its investigation, except for analyzing claims alleged against KPMG and Ernst & Young ("E&Y"), the Company's current and former outside auditors, respectively. The SLC hired the law firm of Cohen & Gresser LLP to investigate the claims alleged against KPMG and E&Y, and Fried Frank did not participate in that aspect of the investigation.

The SLC reviewed the underlying merits of each claim with counsel, and considered myriad factors, including the factual and legal validity of the claims, the likelihood

---

[1]   On October 31, 2006, the CA Board charged the SLC to investigate, and to determine and control the Company's response to another derivative suit filed in the Delaware Court of Chancery on September 13, 2006, which alleges claims that are virtually identical to those alleged in the 2005 Derivative Action (the "Delaware Derivative Action"). This report also addresses the claims alleged in the Delaware Derivative Action.

Exhibit 10

of recovery of damages if those claims were successful, potential costs to the Company in legal fees, advancement and indemnity costs, and possible interference with the Company's on-going operations by diverting management time and focus, should it determine to go forward with any given claim.  During its investigation, the SLC received the cooperation of the Company, the Company's current and former outside counsel, and all of the individual defendants named in the 2005 Derivative Action and the Delaware Derivative Action, except for defendant Charles Wang, the Company's co-founder and former Chairman and Chief Executive Officer ("CEO"), who refused to be interviewed by the SLC.[2]  Defendant E&Y, the Company's former outside auditor, likewise would not cooperate with the SLC's investigation.  The SLC does not believe that the refusal of these two defendants to cooperate materially impeded its ability to perform its mandate or to reach its conclusions.

The SLC benefited substantially from not having to start from scratch its investigation of the 35-Day Month fraud.  Rather, many of the facts underlying the 2005 Derivative Action had already been established through the government investigation into CA's accounting practices, which resulted in the above-noted guilty pleas and the Company entering into the DPA.  Likewise, the SLC has been able to utilize, where it concluded that the information was reliable, the investigative materials generated by CA's Audit Committee, which, on behalf of the CA Board and with the assistance of outside counsel, began an independent investigation into CA's accounting practices in July 2003.

---

[2]     Sanjay Kumar, CA's former Chairman, CEO, and President, and Stephen Richards, CA's former head of North American and worldwide sales, each agreed to cooperate with the SLC only after they were sentenced by U.S. District Judge I. Leo Glasser in connection with their criminal cases, which occurred on October 30 and November 2, 2006, respectively.  The SLC believes that their cooperation, which began in late December (Richards) and late January (Kumar), and had the effect of delaying the issuance of this report, was substantial and materially aided the SLC's investigation.

Exhibit 10

Given that the facts underlying the 35-Day Month practice at CA had already been established and are undisputed, the focus of the SLC's investigation was to determine the role and relative culpability, if any, of each of the defendants named in the 2005 Derivative Action in the accounting fraud and subsequent cover-up, including whether members of CA's Board failed to exercise appropriate oversight at various points in time. At the same time, the SLC sought to understand the underlying systemic corporate failures that caused, and allowed, the fraud to occur and to continue for as long as it did. Because the fraud was orchestrated by the most senior members of CA management, with the participation and acquiescence of countless more junior CA employees, the SLC believes that it is both instructive and vital to understand, and where possible to explain, the causes for that management failure.[3]

C.   **The SLC's Findings With Respect to CA's Systemic Corporate Failure**

(a)   *Failure of CA's Leadership*

First and foremost, CA suffered from a profound failure of leadership. In many ways, CA never outgrew the start-up mentality that characterized its inception in 1976, but was incompatible with a publicly-traded, multi-billion dollar, international software enterprise. CA's two primary managers and leaders throughout its existence – Charles Wang, CA's co-founder, and Sanjay Kumar, his successor and protégé – were the dominant and guiding forces behind its culture, a culture created by Mr. Wang and perpetuated by Mr. Kumar. Under their leadership, CA grew rapidly by acquiring approximately eighty-five (85) companies in the 1980s and 1990s. However, this rapid growth was not accompanied by similar growth and maturity in CA's management practices, as the Company continued to operate in a manner

---

[3]   The role and relative culpability of E&Y and KPMG is the subject of a separate report by the SLC and will not be addressed in this report.

4

Exhibit 10

consistent with that of a small start-up company, lacking appropriate control processes and procedures at the management level.

Here is where CA's leaders, in particular, Mr. Wang, who was CEO for the vast majority of the period when the 35-Day Month occurred at CA, failed the Company. Mr. Wang shunned written policies and procedures in the apparent belief that they fostered bureaucracy and inefficiency. He avoided and discouraged group meetings, rarely, if ever, gathering even his most senior executives together in an organized way to discuss business. He reserved decision-making to a very limited group of executives that he controlled and dominated. As one witness aptly explained to the SLC, Mr. Wang ran CA as if he were "running it out of his garage." While the SLC recognizes that excessive controls and procedures may contribute to bureaucracy and inefficiency, CA fell far short of approaching what was necessary to control a Fortune 500 company.

Mr. Wang caused additional harm to CA by creating a "culture of fear," which caused CA employees, at all levels, to refrain from offering dissenting opinions. He did this by making personnel decisions in an arbitrary manner, routinely firing CA personnel on a subjective basis. This had the effect of suppressing corporate dialogue, by both lower and mid-level employees, as well as in the highest ranks of senior management. According to one witness, CA employees felt as if they were constantly "hanging on by their fingernails." In the SLC's view, this culture was the breeding ground in which the 35-Day Month practice originated and later flourished. This atmosphere proved particularly toxic at CA, since, under Mr. Wang, missing Wall Street estimates was to be avoided at all costs.

This problem was exacerbated by Mr. Wang's preference for promoting from within, rather than looking outside the Company for experienced candidates to fill CA's

5

Exhibit 10

executive suite. As a result, Mr. Wang surrounded himself with young executives of limited experience – including CA's Chief Financial Officer ("CFO"), and the heads of Financial Reporting and Sales Accounting – whom he and Mr. Kumar could easily dominate. Thus, while it appeared by reviewing titles and an organizational chart that CA had the typical group of senior financial executives, in reality, CA's senior management was often too young, too inexperienced, and too dependent on CA's senior leaders to make meaningful judgments and to provide a credible alternative voice or dissenting opinion.

Mr. Kumar perpetuated Mr. Wang's practices as President and COO while he served under Mr. Wang. Mr. Kumar was universally described as a micromanager, intimately involved in every aspect of CA's business. Mr. Kumar acted as Mr. Wang's right hand, providing Mr. Wang with critical information about CA's business (indeed, the SLC identified few, if any, people other than Mr. Kumar who had regular personal contact with Mr. Wang) and effectuating the decisions made by Mr. Wang. After he became CEO in August 2000, Mr. Kumar continued to operate as a micro-manager and maintained the (inexperienced) executive suite put in place by Mr. Wang, which he continued to dominate and control directly.

(b)     *Organizational Weaknesses*

As a result of this culture and the "tone at the top," the SLC found that CA had several organizational weaknesses that left the Company vulnerable in many respects.

*Reporting Structure*. CA suffered from a substantial failure to communicate, both within and across departments. During the period in which the fraud occurred, the Company employed a horizontal organizational structure that discouraged open communication among employees of different departments and limited access to important company information, as well as power and control, to a select and small group of senior executives. As

6

Exhibit 10

such, CA was devoid of the mid-level managers normally found in other companies of similar size, and the senior managers to whom they reported retained decision-making authority for an unusually large array of issues. The SLC repeatedly heard that there was no such thing as a meeting at CA and that decisions were made quickly and without proper consideration and analysis. This allowed the proverbial "buck" to stop with very few people in a large organization.

*Processes and Procedures*. Given the lack of leadership on this issue by Mr. Wang, processes and procedures were not viewed as a priority at CA. Despite the fact that it was (and is) one of the largest software companies in the world, CA employed what was essentially a homegrown hodge-podge of accounting and financial reporting systems. CA's processes required far too much manual intervention for a company of CA's size. For example, the SLC found that, at the quarter end, CA's CFO manually reviewed contracts for revenue recognition issues and then created handwritten lists of contracts to be booked. This lack of clear processes and procedures allowed for manipulation and was one factor that permitted the deception to go unnoticed for many years.

*Training and Education*. CA's lack of training, coupled with an absence of written policies and procedures, created a work force, from top to bottom, that was unable to recognize the wrongfulness of its own conduct and, at its core, to look out for the best interests of the Company and its shareholders. An egregious example of this failure is that CA did not have a written set of revenue recognition policies and procedures, which left employees to learn from word-of-mouth and by e-mail what was "appropriate" accounting policy and practice.

Further, as noted above, CA historically promoted from within, creating senior management ranks largely trained by CA and in the CA "way." While this is not definitionally

7

Exhibit 10

a negative, in CA's case, it ensured that management was dominated by individuals who embraced the "CA way" of doing things (i.e., one that did not emphasize proper policies, procedures, or controls) and lacked outside perspective.  The SLC believes that a prime example of this phenomenon is the promotion of Ira Zar to the position of CFO in June of 1998.  Mr. Zar came to CA straight out of college, and was only thirty-six (36) years old when he was appointed CFO at the recommendation of Mr. Wang, and with the support of Mr. Kumar.  Mr. Zar had worked under senior CA managers for his entire career, had no independent experience in the software industry or otherwise, and was not a certified public accountant ("CPA").  Because of this, and while universally regarded as smart and sophisticated, Mr. Zar lacked the stature and experience to recognize, and prevent, the serious ramifications of the 35-Day Month practice.  Indeed, the SLC found that CA's executive suite was populated by individuals who lacked industry and business experience and savvy and were too willing to put "job security" (and the benefits that accompanied a senior leadership position) above doing what they knew was right.

     *Internal Finance and Audit Controls.*  As noted above, CA's controls did not grow at the same rate as the organization, and, as a result, there were severe weaknesses in its systems.  For example, the head of the Internal Audit department until January 2000, who was not a CPA and headed three (3) other divisions at CA at the same time, remained in this capacity and with these responsibilities throughout this period of growth.  Further, in 2001, by which time CA was a Fortune 500 company, its Internal Audit department consisted of only five (5) full and part time employees.  Because it had limited capabilities, Internal Audit generally performed only international and non-critical domestic work.

     Indeed, in keeping with CA's tradition of promoting from within, both

executives who headed Internal Audit during the period of fraudulent conduct were promoted from other departments at CA, and neither had prior experience with the internal audit function. Not surprisingly, during the period of the fraud, no one viewed Internal Audit with respect. In fact, some current and former CA employees were surprised to learn, when being interviewed by the SLC during 2006, that CA even had an Internal Audit department in the past. The failure to have a functioning Internal Audit department with the size and sophistication to match the Company's growth contributed to allowing the Finance and Sales departments to openly engage in the conduct that they used to perpetrate the fraud at CA.

In the end, the fraud at CA was directed by a group of CA's most senior managers who acted intentionally to violate the accounting rules and then covered it up. However, the fraud pervaded the entire CA organization at every level, and was embedded in CA's culture, as instilled by Mr. Wang, almost from the Company's inception. Indeed, the improper practices became CA's standard practices to the point that the fraud was "hidden in plain sight" and became part of CA's normal day-to-day business. CA's failure to have an organizational structure, policies, and practices consistent with that of a multi-billion dollar market-cap, publicly-traded company contributed substantially to promoting an environment which allowed the fraud to begin and to continue at the levels it did for as long as it did.

With this description of CA's culture as a prologue, this report now turns to a summary and analysis of the claims alleged in the 2005 Derivative Action.

D.     **The SLC's Conclusions with Respect to the
        Claims in the 2005 Derivative Complaint**

The SLC has categorized the claims made in the 2005 Derivative Action into six (6) different groups of defendants (some of which overlap against certain defendants). A brief

9

Exhibit 10

summary of each of the categories, and the SLC's conclusion with respect to each group, is as

follows:

- **The Criminal Defendants.** The seven (7) former CA officers and employees who have
  pled guilty to various charges of securities fraud and/or obstruction of justice – Mr.
  Kumar, Mr. Richards, Mr. Zar, Steven Woghin (CA's former General Counsel), David
  Kaplan (CA's former head of Financial Reporting), David Rivard (CA's former head of
  Sales Accounting), and Lloyd Silverstein (CA's former head of the Global Sales
  Organization). (For ease of reference, throughout this report, these defendants will be
  referred to collectively as the "Criminal Defendants").[4]  The 2005 Derivative Action
  alleges that the Criminal Defendants are liable to CA for breaches of fiduciary duty,
  corporate waste, common law fraud, violation of § 14(a) of the Securities Exchange Act
  of 1934 (the "Exchange Act"), common law and statutory contribution, and unjust
  enrichment as a result of their criminal conduct.

  *The SLC has concluded that it is in the best interests of the Company to pursue claims
  arising from this conduct against the Criminal Defendants to the fullest extent possible,
  bounded only by their assets and the cost of recovery. The SLC has reached a
  settlement with Mr. Kumar, pursuant to which the Company will receive a $15.25
  million judgment against Mr. Kumar secured in part by real property and executable
  against his future earnings, and, as a result, it will seek dismissal of all claims against
  him.[5] The SLC anticipates reaching settlements with the remaining Criminal
  Defendants shortly after the conclusion of their criminal restitution proceedings. To the
  extent that settlements are not reached, the SLC will direct the Company to vigorously
  pursue these claims.*

- **The Former Officer Defendants.** The three (3) former CA officers who have not been
  criminally prosecuted, but who are nonetheless alleged to have been actively involved
  in, or responsible for, the 35-Day Month practice – Peter Schwartz (CA's former CFO,

---

[4]   This group does not include Thomas Bennett, CA's former Senior Vice President of Business
Development (2000-2004), who is the eighth CA executive to have pled guilty to federal criminal
charges, as he is not named as a defendant in the 2005 Derivative Action or the Delaware Derivative
Action.

[5]   The SLC's settlement with Mr. Kumar follows an agreement Mr. Kumar reached with the USAO
concerning his criminal restitution (the "Restitution Order"). The Restitution Order, which was jointly
submitted by the USAO and Mr. Kumar to the Honorable I. Leo Glasser for approval on March 30, 2007
(04-CR-00846 (ILG) Docket No. 332-2), provides for (a) the entry of a judgment in the amount of
$798,600,000 against Mr. Kumar, (b) the payment of $50 million by Mr. Kumar into a fund to be
distributed by the Feinberg Group (the "Feinberg Fund") on or before July 31, 2007 for the benefit of
CA's shareholders, (c) the payment of $2 million by Mr. Kumar to the United States, on or before
December 31, 2008, to be distributed to the victims of Mr. Kumar's criminal offenses, and (d) post-
incarceration payments by Mr. Kumar in annual payments equal to twenty percent (20%) of "total
income" as defined by the IRS on Form 1040, with certain modifications. Based on his sworn financial
disclosures, the SLC believes that, following his agreement with the USAO, Mr. Kumar had no material
assets remaining.

10

Exhibit 10

1985-1998), Charles McWade (CA's former head of Financial Reporting, 1994-1997, and business development, 1997-2001), and Michael McElroy (CA's former senior vice president of Legal, 1988-2004). (For ease of reference, throughout this report, these defendants will be referred to collectively as the "Former Officer Defendants"). The 2005 Derivative Action alleges that the Former Officer Defendants are liable to CA for breaches of fiduciary duty, corporate waste, common law fraud, violations of § 14(a) of the Exchange Act, common law and statutory contribution, and unjust enrichment as a result of their alleged knowledge of, and participation in, the 35-Day Month practice.

*The SLC has concluded that it is in the best interests of the Company to pursue claims against Mr. Schwartz as it has determined that he knew of, and participated in, the 35-Day Month practice, and has directed the Company to vigorously pursue this claim (including filing all necessary Rule 60(b) motions) and to regularly report to the CA Board regarding the status of the litigation. The SLC has reached a settlement with Mr. McWade, pursuant to which the Company will receive $1 million from Mr. McWade and, as a result, it will seek dismissal of all claims against him. After weighing various factors in the exercise of its business judgment, such as, among other things, the cost of litigation and Mr. McElroy's inability to satisfy a meaningful judgment, the SLC has determined to seek dismissal of the claims with respect to Mr. McElroy.*

- **The KESOP Defendants.** The three (3) beneficiaries of CA's 1995 Key Employee Stock Ownership Plan (the "KESOP") – Charles Wang, Sanjay Kumar, and Russell Artzt – pursuant to which they received an award of 20.25 million shares of CA common stock, then valued at $1.1 billion, on May 21, 1998. (For ease of reference, throughout this report, these defendants will be referred to collectively as the "KESOP Defendants"). The 2005 Derivative Action alleges that the KESOP Defendants were unjustly enriched at the expense of CA's shareholders by their receipt of the KESOP shares as a result of the fraud perpetrated at the Company.

*The SLC has concluded that it is in the best interests of the Company to pursue this claim against Mr. Wang as it has concluded that he knew of, directed, and participated in, the 35-Day Month practice, and has directed the Company to vigorously pursue this claim (including filing all necessary Rule 60(b) motions) and to regularly report to the CA Board regarding the status of the litigation. The SLC has reached a settlement with Mr. Artzt, pursuant to which the Company will receive $9 million from Mr. Artzt (the cash equivalent of approximately 354,890 KESOP shares) and, as a result, it will seek dismissal of all claims against him. The SLC notes that during its investigation, it did not uncover evidence that Mr. Artzt directed or participated in the 35 Day-Month practice or was involved in the preparation or dissemination of the financial statements that led to the KESOP's accelerated vesting. As noted above, the SLC has reached a settlement with Mr. Kumar, pursuant to which it will seek dismissal of all claims against him.*

- **The Oversight Director Defendants.** The one (1) current and seven (7) former CA Board members who served on the CA Board during the period of the fraudulent conduct – Russell Artzt (1981-2005), Alfonse D'Amato (1999 – present), Willem de

Vogel (1981-1990, 1991-2002), Richard Grasso (1994-2002), Shirley Strum Kenny (1994-2002),[6] Sanjay Kumar (1994-2004), Roel Pieper (1999-2002), and Charles Wang (1981-2003). (For ease of reference, throughout this report, these defendants will be referred to collectively as the "Oversight Director Defendants"). The 2005 Derivative Action alleges that the Oversight Director Defendants are liable to CA for breaches of fiduciary duty, corporate waste, common law fraud, violations of § 14(a) of the Exchange Act, and common law and statutory contribution as a result of their alleged failure to properly oversee the Company during the period of fraudulent conduct, and that the management directors (Messrs. Wang, Kumar, and Artzt) are liable to CA for their role in the fraud.

*The SLC has concluded that it is in the best interests of the Company to pursue claims arising from this conduct against Mr. Wang in the manner described above. As noted above, the SLC has reached settlements with Messrs. Artzt and Kumar, pursuant to which it will seek dismissal of all claims against them. The SLC will seek dismissal of these claims with respect to the remaining directors since the SLC believes that these claims lack merit.*

- ***The Settlement Director Defendants.*** The seven (7) current and one (1) former CA Board members who served on the CA Board during the USAO investigation and who authorized the Company to enter into a settlement of certain class action and derivative litigation in August of 2003 and later the DPA – Kenneth Cron (2002-2006), Alfonse D'Amato, Gary Fernandes (2003 – present), Robert La Blanc (2002 – present), Jay Lorsch (2002 – present), Lewis Ranieri (2001 – present), Walter Schuetze (2001 – present), and Alex Vieux (2002-2004)[7] (For ease of reference, throughout this report, these defendants will be referred to collectively as the "Settlement Director Defendants"). The 2005 Derivative Action alleges that the Settlement Director Defendants are liable to CA for breaches of fiduciary duty, corporate waste, violations of § 14(a) of the Exchange Act, and common law and statutory contribution because they authorized the above-described settlement and entered into the DPA, both without seeking contribution from the Criminal Defendants. The Settlement Director Defendants, in addition to Messrs. Wang and Artzt, are also alleged in the Kaufman Complaint to have breached their fiduciary duties by failing to properly oversee the Company during the government investigation.

*The SLC has concluded that it is in the best interests of the Company to seek dismissal of the settlement and DPA-related claims in their entirety since the SLC believes that these claims lack merit, except that it will pursue this claim against Mr. Wang in the manner described above. The SLC has reached a settlement with Mr. Artzt, pursuant to which it will seek dismissal of all claims against him.*

---

[6]   Dr. Kenny is not named as a defendant in the 2005 Derivative Action, but is named as a defendant in the Delaware Derivative Action.

[7]   Mr. Vieux is not named as a defendant in the 2005 Derivative Action, but is named as a defendant in the Delaware Derivative Action.

- *The Auditor Defendants.* The Company's current and former outside auditors, KPMG and E&Y, respectively.  As noted above, the claims alleged against these defendants are analyzed in a separate SLC report.

      The following constitutes an executive summary of the findings of the SLC with respect to each of the above-described groups of defendants.  The details and facts underlying these conclusions are set forth at length later in this report.[8]

      *The Criminal Defendants.*  The Criminal Defendants have each admitted, in connection with their guilty pleas and to the SLC, that they participated in and facilitated the 35-Day Month practice and then conspired to conceal the practice from CA's Board and the USAO.  By way of example, Sanjay Kumar, Stephen Richards, and Ira Zar have each admitted that they regularly and improperly held CA's books open at the ends of CA's fiscal quarters in order to ensure that CA generated enough revenue to meet Wall Street analyst estimates, often at the direct instruction of Mr. Wang.  Steven Woghin, David Kaplan, David Rivard, and Lloyd Silverstein (along with Messrs. Kumar and Richards) have each admitted that they negotiated, executed, and/or improperly accounted for license agreements that were completed in the days immediately following the quarter end.  These individuals also encouraged CA employees under their supervision to take actions in furtherance of the 35-Day Month practice.  During the government investigation into CA's accounting practices, these CA senior executives – which included the Company's CEO, CFO, and General Counsel – lied to the Board about the existence of the 35-Day Month practice and otherwise deceived the government and the Audit Committee.  This conduct is undisputed and, to date, the Company has suffered and continues to suffer, substantial harm as a result of their conduct.

---

[8]    Where the SLC has determined that it has valid and viable claims that it intends to pursue, it has not detailed in this report all of the facts that it has uncovered during the course of its investigation.

13

During the years in which the Criminal Defendants openly engaged in fraud, CA paid them hundreds of millions of dollars in undeserved compensation (mostly to Mr. Kumar). To date, CA has been required, under Delaware law, to advance the Criminal Defendants, in total, in excess of $25 million in legal fees in connection with their criminal prosecutions. Further, as a direct result of their conduct, the Company was required to pay: (i) $225,000,000 in restitution to CA's shareholders and $1,916,259 for the restitution fund administrator's fees pursuant to the DPA; (ii) over $3,200,000 for Independent Examiner's fees pursuant to the DPA; (iii) $174,000,000 to CA shareholders in the settlement of certain civil litigation; and (iv) at least $80,000,000 in investigative fees and costs. These out-of-pocket costs alone total nearly $500,000,000. The harm that these former senior CA executives have caused goes beyond the monetary, as CA still must grapple with the legacy of their criminal conduct and its effect on CA's core constituents, including its employees, customers, shareholders, and suppliers.

The SLC has concluded that the claims against the Criminal Defendants clearly have merit and should be pursued. The SLC believes that the Criminal Defendants should be compelled to return the compensation they were paid but did not earn and to reimburse CA for the substantial costs it has incurred as a direct result of their conduct. To that end, as described further below, but limited by the fact that many of the Criminal Defendants do not have significant assets and those assets that do exist are subject to restitution orders sought and obtained by the USAO in connection with their criminal sentences, the SLC has already begun to discuss settlement with, and to pursue recovery from, the Criminal Defendants.

To date, and as noted above, the SLC has reached a settlement with Mr. Kumar, pursuant to which the Company will receive a judgment in the amount of $15,250,000 secured

Exhibit 10

in part by real property and executable against his future earnings. This amount is in addition to the $52 million that Mr. Kumar will repay to CA's shareholders as part of his criminal restitution proceedings. As a result, the SLC will seek dismissal of all claims against Mr. Kumar.

*The Former Officer Defendants.* As to the Former Officer Defendants – Peter Schwartz, Charles McWade, and Michael McElroy – the results of the SLC's investigation were varied.

*Peter Schwartz.* Mr. Schwartz was CA's CFO from 1985 to June 1998 and is alleged in the 2005 Derivative Action to have been "the primary architect of the scheme to pump up CA's revenues from $58 million in 1994 to $5 billion in 1998," by "directing" the 35-Day Month practice. 2005 Compl. ¶ 162. However, the 2005 Derivative Complaint alleges no specific acts of fraudulent conduct attributed to Mr. Schwartz or specific facts related to how he "directed" the practice. Two divergent accounts of Mr. Schwartz's involvement in the 35-Day Month practice emerged during the SLC's investigation. In his interview with the SLC, Mr. Schwartz emphatically denied that the 35-Day Month practice occurred during his tenure as CFO, while others, including certain of the Criminal Defendants interviewed by the SLC, credibly insisted that Mr. Schwartz not only knew about the practice, but that he was one of its originators. Indeed, certain of the Criminal Defendants described specific conversations they had with Mr. Schwartz evidencing his knowledge and approval of the practice.

In addition, there is one fact that is certain. PricewaterhouseCoopers ("PwC"), which was retained by the SLC to examine certain of CA's financial reporting periods, concluded that CA prematurely recognized revenue on backdated contracts during at least the first quarter of CA's fiscal year 1998 (April 1, 1997 – June 30, 1997) through the first quarter of

fiscal year 1999 (April 1, 1998 – June 30, 1998), the last quarter Mr. Schwartz served as CFO. The SLC also found that the 35-Day Month practice existed, and was in fact the standard operating procedure at CA, during much of Mr. Schwartz's tenure as CFO.  Given that Mr. Schwartz was known for his intimate involvement in the minute details of CA's business (as he was, by his own account, the "first to arrive" and "last to leave"), it is, in the SLC's view, not credible that the practice could have continued and flourished without his knowledge.  As such, the SLC rejected Mr. Schwartz's protestations of ignorance concerning the 35-Day Month practice, in the face of contrary witness testimony, and found his position not to be credible.

Moreover, as CA's long-time CFO, Mr. Schwartz was responsible for the accounting processes and procedures (or lack thereof) that allowed the 35-Day Month practice to flourish.  In fact, the SLC finds it incredible that the CFO of a to-be Fortune 500 Company could be ignorant of a revenue recognition fraud when it is his responsibility to ensure the integrity of CA's financial operations.  Accordingly, the SLC has concluded that it is in the best interests of the Company to pursue claims against Mr. Schwartz for the full amount of the enormous harm caused to CA.

***Charles McWade.***  Mr. McWade held various senior positions at CA such as head of Sales Accounting (1983-1994), head of Financial Reporting (1994-1997), and vice president of Business Development (1998-2001).  Mr. McWade is alleged to have participated in, and been one of the originators of, the 35-Day Month practice with Mr. Schwartz, to whom he reported directly.  The 2005 Derivative Action alleges that Mr. McWade, "supervised the development, negotiation and sale of software licensing agreements for which revenue was . . . prematurely recognized and he encouraged, directed, or consented to other CA employees doing the same." 2005 Compl. ¶ 165.  However, the 2005 Derivative Complaint alleges no acts

Exhibit 10

of specific fraudulent conduct attributed to Mr. McWade or facts related to how he "supervised" the practice.

As noted above, the SLC has reached a settlement with Mr. McWade pursuant to which the Company will receive $1 million and, as a result, will seek dismissal of all claims against him.

*Michael McElroy.*  Mr. McElroy, a CA licensing lawyer who worked at the Company from 1988 to 2004, is alleged to have participated in the 35-Day Month by drafting, negotiating, and executing licensing agreements after the quarter end that were backdated to the prior quarter and "encourag[ing] and instruct[ing] other CA employees to do the same." 2005 Compl. ¶ 165.  In contrast to Mr. Schwartz, Mr. McElroy was more forthcoming with the SLC regarding his involvement in the 35-Day Month practice.

Mr. McElroy admitted to the SLC, and the documentary record establishes, that he participated in the negotiation and finalization of contracts after the quarter end.  Indeed, those in the Legal Department, including Mr. McElroy, openly joked about the 35-Day Month practice, often remarking that it was the "32nd" or "33rd" of the month.  Mr. McElroy eventually came to learn that CA was recognizing revenue from those contracts in the prior quarter, but nonetheless claimed that he did not understand that this was wrong from an accounting perspective.  He assumed, but took no steps to confirm, that the Finance department was properly determining when it was appropriate to book revenue.

To the SLC, Mr. McElroy exemplified the "see no evil, hear no evil" approach taken in the Legal department, led by Mr. Woghin, with respect to post-quarter contracting activity.  Instead of acting as a gatekeeper to protect CA, Mr. McElroy, and others in the Legal department, blindly hoped that CA's finance and accounting personnel ensured that CA was in

17

Exhibit 10

compliance with applicable accounting standards, but did nothing to verify that this was so in the face of contrary evidence.  The SLC has concluded that, while the Company has potentially valid claims against Mr. McElroy, it has, in the exercise of its business judgment, and balancing the various factors, including Mr. McElroy's financial status, the cost of pursuing claims against him, and the litigation risk of establishing that he acted with the requisite scienter or played a role in revenue recognition, concluded that it is in the best interests of the Company to seek dismissal of the claims asserted against him.

*The KESOP Defendants.*  As a result of the 35-Day Month practice, Messrs. Wang, Kumar, and Artzt received, on an accelerated basis, a massive stock award that they neither deserved nor earned.  At the time, the KESOP award – in excess of $1.1 billion – was *one of the largest single payout to corporate officers by a public company ever.*[9]  Pursuant to the terms of the KESOP, when the Company's stock price traded above $53.33 (adjusted to reflect three separate three-for-two stock splits) for sixty (60) days in a twelve (12) month period, as it did on May 21, 1998, 18,900,000 shares of CA common stock granted to the KESOP Defendants vested on an accelerated basis and were no longer subject to forfeiture.[10]

---

[9]     Louise Kehoe and William Lewis, *Computer Associates Chief May Get $550m Bonus*, Financial Times, May 21, 1998 ('The stock option bonus, said by pay experts to be one of the largest of its kind in the U.S., is to be split three ways"); Gary Silverman, *Execs Pay Worth a Whole Lot of Burgers*, Newsday, May 22, 1998, at A73 ('"The size of the grant is without parallel,' said Graef Crystal, an executive-compensation expert in San Diego. 'It's like if someone pole vaulted 70 feet'").

[10]    As a result of the May 21, 1998 accelerated vesting, Charles Wang received 11,340,000 CA shares; Sanjay Kumar received 5,670,000 CA shares; and Russell Artzt received 1,890,000 CA shares. Following the accelerated vesting, and as is described at length below, shareholders filed derivative lawsuits in the Delaware Court of Chancery and the U.S. District Court for the Eastern District of New York alleging that CA's Compensation Committee improperly adjusted the KESOP award for stock splits, and therefore, the KESOP Defendants received 9.5 million shares in excess of what the plan allowed. In December 2000, pursuant to a settlement of the derivative litigation in Delaware, Messrs. Wang, Kumar, and Artzt returned 4.5 million of the 18.9 million KESOP shares that vested on May 21, 1998. Charles Wang returned 2,700,000 shares; Sanjay Kumar returned 1,350,000 shares; and Russell Artzt returned 450,000 shares. In exchange for the return of the shares, the Messrs. Wang, Kumar, and Artzt received a release from the Company for all claims related to the KESOP shares. The three

Since the accelerated vesting, the Company has publicly acknowledged, and the SLC has confirmed, that CA's earnings for the third and fourth quarters of fiscal year 1998 (September 1997 – March 1998) and the first quarter of fiscal year 1999 (April – June 1998), the three quarters in which CA's shares traded above the levels required to trigger the KESOP vesting, were materially overstated due to CA's fraudulent revenue recognition practices. Given that CA's stock price was materially and fraudulently inflated during the period it traded above the level required for the accelerated vesting, and the KESOP would not actually have vested in the absence of fraud, the SLC has concluded that Messrs. Kumar, Wang and Artzt were unjustly enriched by their receipt of the KESOP shares under Delaware law, which defines unjust enrichment as "the unjust retention of a benefit to the loss of another . . . against the fundamental principles of equity and justice." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). The Company is entitled to restitution, and to the return of the improperly awarded KESOP shares, "even when the defendant retaining the benefit is not the wrongdoer." *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

Here, the recipients of the KESOP undoubtedly received a substantial benefit to the detriment of the Company and its shareholders that in good conscience they should not be allowed to keep. This is particularly true with respect to Messrs. Wang and Kumar, since they originated and directed the 35-Day Month practice and were ultimately responsible for CA's financial statements. As noted above, the SLC has directed the Company to pursue claims against Mr. Wang on a variety of theories, including unjust enrichment with respect to his

---

executives also received 1,350,000 KESOP shares that vested on January 11, 1996, and that, as result of the accelerated vesting, were no longer subject to forfeiture.

19

receipt of the KESOP shares.  As also noted above, the SLC has reached settlements with Messrs. Artzt and Kumar, pursuant to which it will seek dismissal of all claims against them.

*The Oversight Director Defendants.*  Messrs. Wang, Kumar, and Artzt, along with the non-management Oversight Director Defendants – Alfonse D'Amato, Willem de Vogel, Richard Grasso, Shirley Strum Kenny, and Roel Pieper – are also alleged to have breached their fiduciary duties by participating in and by failing to take steps to prevent and uncover the 35-Day Month practice.  However, the 2005 Derivative Complaint fails to articulate any facts as to how the non-management Oversight Director Defendants knew or should have known of the fraud, but rather alleges that, "the duration and magnitude of the fraud at CA demonstrates a pervasive failure of oversight," and that "[i]t is impossible to imagine how this fraud could have been perpetrated under the very noses of CA's purportedly sophisticated Directors absent a complete failure of oversight or their knowing participation." 2005 Compl. ¶¶ 215-16.

Because the 2005 Derivative Complaint provided no areas of inquiry to pursue to determine whether a failure of oversight occurred, the SLC first identified, and then investigated two primary theories of potential culpability under Delaware law.  Under Delaware law, a failure of oversight occurs when "either (1) the directors knew, or (2) should have known that violations of the law were occurring *and*, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, *and* (4) that such failure proximately resulted in the losses complained of."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (emphasis added).

This test can be satisfied by showing either that (i) "the directors utterly failed to implement *any* reporting or information systems or controls," or "having implemented such a

system or controls, *consciously* failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention," *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added); or (ii) that the directors "had notice of serious misconduct and simply failed to investigate," i.e. intentionally ignored "red flags," *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006). A violation of the duty of oversight constitutes a breach of the duty of loyalty, and as such, a plaintiff must prove intentional bad faith conduct on the part of the directors. *See id.* It is worth noting that the Delaware courts have consistently observed that this claim is one of, if not the most, difficult theories under which to establish liability.

With this framework in mind, the SLC investigated (i) the adequacy of the reporting systems and controls in place at the Company during the period of fraudulent conduct, and (ii) potential "red flags" that could have alerted the directors to the 35-Day Month practice, but were ignored.

*First*, the SLC examined the information and reporting systems in place during the period of fraudulent conduct, and found that the Board had legally adequate reporting systems in place at the time. For example, at all times relevant to the 2005 Derivative Action, CA had a duly constituted Audit Committee. CA's Audit Committee retained "big four" accounting firms – E&Y, and later KPMG – as its independent, outside accountant to audit CA's consolidated financial statements and to review CA's internal accounting controls worldwide. The Audit Committee met periodically throughout each fiscal year, and on each occasion met with CA's outside auditors without management present. The Audit Committee also met regularly with representatives from CA's internal audit department without management present.

Exhibit 10

The SLC also examined the specific information the Board received regarding the accounting systems and controls in place during the period of fraudulent conduct. By all accounts, and as discussed above, CA lacked the accounting controls needed by a company of its size and caliber. This was first reported to the Audit Committee in KPMG's management letter for fiscal year 2000. This report in no way suggested that CA's internal controls were materially deficient or that a revenue recognition fraud was occurring; rather KPMG characterized the Company's accounting systems as being "less integrated" and requiring "more manual intervention than is typical" for a company of similar size. The Audit Committee was told that CA's management was working to address this issue. Thus, based on its receipt of information such as this, the SLC believes that the Board was receiving relevant and legally sufficient information regarding CA's accounting systems.

Further, the SLC found that, based on the information that the Board received, the directors had no reason to believe that CA's accounting systems were deficient, and did not consciously fail to monitor the Company's operations. At the conclusion of each fiscal year, CA's outside auditors issued a "clean" or "unqualified" audit opinion, and their management letters did not reflect *any* matters that they considered to be material weaknesses.[11] At no time did E&Y, KPMG, or CA's Internal Audit department ever tell the CA Board that CA's accounting systems and controls were inadequate, let alone that a revenue recognition fraud was occurring. As such, the SLC concludes that the non-management Oversight Director

---

[11]    An "unqualified opinion" is defined as an "independent auditor's opinion that a Company's financial statements are fairly presented, in all material respects, in conformity with generally accepted accounting principles." John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 765 (6th ed. 2003). A material weakness is "a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Public Company Accounting Oversight Board Bylaws and Rules Standards – AS2.

Defendants satisfied their fiduciary duties under Delaware law by having legally sufficient information and reporting systems and controls in place during the relevant time period.

*Second*, as noted above, the 2005 Derivative Action is devoid of any "red flags" or events that were ignored and should have alerted the non-management Oversight Director Defendants (which excludes Messrs. Artzt, Kumar, and Wang) to the existence of the 35-Day Month practice.[12] However, as part of its investigation, the SLC independently sought to discover if any of these events existed and to examine the adequacy of the CA Board's responses to those events. During its investigation, the SLC discovered no evidence whatsoever that the non-management Oversight Director Defendants were ever made aware of the 35-Day Month practice. Rather, the SLC identified several potential "red flags" that, taken alone or together, might have put the Board on notice of potential misconduct. However, in the SLC's view, as discussed below, the potential "red flags" that it identified, once examined closely, either did not constitute "red flags" or were pursued by the non-management Oversight Director Defendants in a legally adequate manner.

At the outset, it is important to note that almost all of the Criminal Defendants whom the SLC interviewed that interacted with the CA Board acknowledged that they lied to the directors and/or CA's outside counsel and otherwise actively concealed the 35-Day Month practice. When asked pointedly, those Criminal Defendants explicitly stated that there was nothing the non-management Oversight Directors could have done to uncover the fraud given the information that they were provided. Indeed, certain of the Criminal Defendants indicated that, in all likelihood, they would have continued to lie to those directors had they attempted to

---

[12]    Under Delaware law, this pleading failure would have justified the SLC in seeking dismissal. *See Shaev.* 2006 WL 391931, at *1 (dismissing complaint where "new complaint alleges . . . literally nothing to suggest that the defendants willfully or recklessly ignored information that would have led to the discovery of the misconduct at issue").

dig deeper. This conduct continued even after the government investigation began, when certain of the Criminal Defendants did, in fact, lie directly to the Audit Committee and the Board as a whole. These admissions, made at a time when the Criminal Defendants had no incentive or reason to protect the CA Board, were a meaningful factor in the SLC's analysis of this claim.

*The Vesting of the KESOP Shares and the Subsequent Stock Drop*. The first potential "red flag" identified by the SLC that could have given rise to director concern was the vesting of the KESOP on May 21, 1998. As discussed above, the accelerated vesting of the KESOP, pursuant to which Messrs. Wang, Kumar, and Artzt received CA stock then-valued at $1.1 billion, was tied to the Company's stock price. However, as vesting became likely and imminent, the non-management Oversight Director Defendants took no additional, incremental steps whatsoever to ensure the accuracy of CA's financial statements, notwithstanding this immense accelerated transfer of shareholder wealth and the temptation to tamper with the Company's financial performance that it could create. Instead, the only step taken by any director was to ensure that the number of days CA's stock traded above the target price required for vesting was counted correctly.

Then, within sixty days of the vesting of the KESOP, on July 20, 1998, the CA Board held its regular quarterly meeting. At that meeting, the Board was informed that CA management expected the Company's growth to slow in the coming months. According to most of the participants, Mr. Kumar explained to the Board that he had recently met with CA's top sales executives from around the world and learned anecdotally that some of CA's multi-national customers were reducing their spending, and deferring purchasing decisions, due to the

then-existing economic "crisis" in Asia.[13]  As a result of the stated concerns (which were supported by Mr. Wang), the Board, led by director Richard Grasso, insisted that those concerns immediately be disclosed by the Company to the market.  The next day, on July 21, 1998, CA issued a press release announcing its quarterly results, but also warning that CA's growth would slow for the reason noted above (and others).  On the following day, the price of CA's stock dropped by thirty-one percent (31%).

The SLC was troubled by the timing of these events.  Had CA management "learned" of this information sixty days earlier, and had it been promptly disclosed to the market (as the Board later advocated that it should), the KESOP would not have vested on May 21, 1998.  However, despite its proximity to the vesting of the KESOP, the timing of when CA management learned of CA's slowing growth resulting from the Asian economic crisis, or whether these problems actually existed, was never fully explored by the Board.

Finally, almost immediately following the July 21 press release and the resultant stock price drop, shareholders filed a series of class action lawsuits.  The Board was advised, as early as August 1998, that the lawsuits claimed that CA's senior officers knew the information disclosed in the July 21 press release at an earlier date, but did not disclose that information in order to allow the KESOP shares to vest.  At the same time, however, Mr. Woghin, the Company's General Counsel, told the Board that there was no substance to these lawsuits.  Mr. Woghin reported to the Board that the suits contained no particularized factual allegations – and they did not in actuality – and merely alleged, in essence, that a fraud "must have occurred."

These events, taken together, could have raised a specter that something was amiss at the Company.  However, even if viewed most skeptically, these events would not have

---

[13]  There is a factual dispute as to whether Mr. Kumar or Mr. Schwartz first raised this issue with the Board, but resolution of this issue is not material to the SLC's conclusion.

constituted a "red flag" pointing to the 35-Day Month practice. Indeed, the potential issue raised by these events, namely, the timeliness of management's disclosure of material information – slowing growth resulting from the Asian economic crisis – does not relate to CA's revenue recognition practices, which was the ultimate problem.

In addition, there were numerous factors supporting the directors' conduct: (i) at the time the KESOP vested, CA's outside accountants were in the process of completing their audit for the fiscal year ending March 31, 1998, and did not recommend to the Audit Committee that it take any further action to verify the accuracy of CA's financials as a result of the imminent vesting; (ii) the non-management Oversight Defendant Directors, none of whom had any experience in the software industry, were entitled to rely upon CA management's statements (which were supported by Mr. Wang) regarding when they learned of CA's "slowing growth" in the absence of any contradictory information; and (iii) following the filing of the class action litigation, Mr. Woghin described the suits dismissively to the Board as typical strike suits with no factual substance. Under these circumstances, the SLC concludes that these events did not constitute a "red flag" indicating potential unlawful revenue recognition practices and the Board was not legally obligated to do more in response to these events.

*The New Business Model.* The second set of facts identified by the SLC as potential "red flags" began with CA's May 11, 2000 Board meeting, where Mr. Kumar proposed that CA adopt a "new business model." Under the new business model, CA would recognize revenue from licensing agreements, its primary source of revenue, on a ratable basis, as opposed to recognizing all of the revenue from a contract up front, as was its historical practice. The Board declined to approve a transition to the new business model initially, but

instead concluded that management first needed to evaluate how the investing public would perceive and understand it, and report back to the Board with its findings. On October 24, 2000, after receiving the information that it had previously requested, CA's Board authorized management to implement the new business model.

While some members of the press questioned CA's motive for moving to a ratable revenue recognition model, suggesting that CA moved to the new model in order to mask declining performance, the press did not assert that it was designed to cover up a pre-existing scheme to improperly recognize revenue. With the benefit of hindsight, it can easily be surmised that one of the purposes animating management's desire to move to the new business model was to end the 35-Day Month practice. Indeed, several witnesses have told the SLC that the desire to end the 35-Day Month was, in fact, one of the reasons behind the switch (although this was denied by Mr. Kumar, the new business model's primary proponent). However, and critical here, there is absolutely no evidence that any outside director knew of the 35-Day Month practice, much less the impact the new business model would have on it.

Moreover, the SLC found that the decision to adopt the new business model was supported by several legitimate business reasons, and, at the time, was considered by many on the CA Board and outside the Company to be forward thinking, conservative, and a positive step for the Company. Further, the CA Board did not simply rubber-stamp the new business model at management's behest, but rather requested that management perform a significant amount of additional work and report back to it in order to allow the directors to make an educated decision. As such, the SLC concludes that the decision to adopt the new business model did not constitute a "red flag" and the known facts would not have led a reasonable director to suspect that the motivation for the new business model was to end a long-running

27

Exhibit 10

fraud at the Company. The Board did not breach its duty of oversight by failing to investigate further at that time.

    *The New York Times Article.* Finally, the SLC identified as a potential "red flag" an April 29, 2001 article by Alex Berenson of The New York Times, entitled "A Software Company Runs Out of Tricks; The Past May Haunt Computer Associates." Mr. Berenson's article, which was featured prominently in the Sunday edition of the paper, accused CA of using several "accounting tricks," including the 35-Day Month, to inflate its revenue and earnings, and remarked that CA stood for "creative accounting." Specifically, the article stated, in its fifth paragraph, that "[t]he practices were so widespread that employees joked that C.A. stood for 'Creative Accounting,' and that March, June, September and December, when fiscal quarters end, had 35 days, giving the company extra time to close sales and book revenue." However, notwithstanding this sentence, the 35-Day Month practice was not the focus of the article and received no mention beyond that quoted above. Rather, the article focused primarily on CA's new business model, its Unicenter software, and its method of accounting for maintenance and license revenue.

    While it is unlikely that the New York Times article constituted a "red flag" under Delaware law (*see McCall v. Scott*, 239 F.3d 808, 819-20 (6th Cir. 2001) (press reports are a "red flag" only when "taken as a whole" with numerous other indicia of fraud)), the SLC nonetheless carefully examined the circumstances surrounding this newspaper story, including interviewing most of the key participants twice. In the end, the SLC, after substantial and extensive deliberations, found that the non-management Oversight Director Defendants took legally adequate steps to address the allegations made in the article.

28

Exhibit 10

Following the publication of the article, Dr. Kenny, Chair of the Audit Committee, was tasked by Mr. Kumar to investigate the merits of the allegations. On May 8, 2001, nine (9) days after the article was published, but on only one (1) day's notice, Dr. Kenny convened a meeting with CA's management and KPMG and E&Y to address the allegations in the article. Given the passage of time, the record is scarce as to exactly what was discussed at this meeting, which is reported to have lasted forty-five (45) minutes to an hour. Nonetheless, at the meeting, CA management, and Mr. Zar in particular, assured Dr. Kenny that CA had at all times used appropriate accounting practices. Likewise, and more importantly, Dr. Kenny sought and received assurances from both E&Y and KPMG that CA's accounting during the period at issue in the article was appropriate. Dr. Kenny took no further action to re-review CA's financial statements at the time, and requested no further follow-up from management or the auditors. By all accounts, the 35-Day Month was not specifically raised or discussed during the meeting.

Dr. Kenny reported to the non-management Oversight Director Defendants directly after the meeting. In her report, Dr. Kenny stated that management, and CA's outside auditors, had assured her that there was no substance to the allegations in the article and that CA used no "accounting tricks." While the SLC found that Dr. Kenny may have misconstrued, and therefore overstated, the assurances actually given to her by the auditors, Dr. Kenny relied upon her understanding of those assurances, and, in concert with the other members of the Audit Committee, Alfonse D'Amato and Willem de Vogel, determined that no further action was necessary at the time.

While the SLC believes that it would have been a better response for the Audit Committee as a whole to have: (i) questioned the audit firms and management more thoroughly

regarding each of the allegations in the article, including the 35-Day Month; (ii) taken more time, and given more time to the auditors, to evaluate and prepare their response to the specific allegations in the article; and (iii) obtained independent advice from outside advisors with respect to the allegations in the article, simply because other steps could have been taken does not mean that what the Board did do was legally insufficient.  As such, the SLC found that, even if the New York Times article were considered a "red flag," the non-management Oversight Director Defendants engaged in legally sufficient oversight, did not demonstrate a conscious disregard of their responsibilities, and did not breach their duty of oversight or care.

The SLC also examined Dr. Kenny's independence in light of her personal and professional relationship with Mr. Wang.  The SLC was concerned about Mr. Wang's donation of the Charles B. Wang Center for Asian and Asian American Culture to the State University of New York at Stony Brook (the building cost over $52 million), where Dr. Kenny served as President.  The donation was announced in 1996 (after Dr. Kenny joined the Board), and the building was completed in October 2002.  Dr. Kenny was named as Chair of the Audit Committee on June 6, 2000, at which time the Board determined that Dr. Kenny was independent within the meaning of the New York Stock Exchange ("NYSE") independence rules in place at that time.[14]  However, the SLC was troubled by the fact that the Board does not

---

[14]   The NYSE rules in effect in June 2000 specify the relationships that disqualify a director from being considered "independent" for purposes of serving as a member of an issuer's audit committee.  A director will not be considered "independent" if, among other things, he or she has:

> been employed by the corporation or its affiliates in the current or past three years;
>
> an immediate family member who is, or has been in the past three years, employed by the corporation or its affiliates as an executive officer;
>
> been (i) a partner, controlling shareholder, or executive officer of an organization that has a business relationship with the corporation or (ii) has had a direct business relationship with the corporation (e.g., a consultant), unless the corporation's board determines in its business judgment that the relationship does not interfere with the director's exercise of independent

appear to have considered at length, either at the time Dr. Kenny joined the Board in 1994 or at the time she was appointed head of the Audit Committee, whether this relationship, which was publicly known and discussed at the Board level, impaired her independence.

In the end, based upon the SLC's interviews of Dr. Kenny and others, the SLC found no evidence that Dr. Kenny's relationship with Mr. Wang impaired her ability to independently evaluate the allegations made in the article, adversely impacted or affected the analysis that she performed, or ultimately colored her conclusions. That said, it is far from a best practice to have the head of the Audit Committee have such an important and meaningful relationship to the CEO (which Mr. Wang was in June 2000 when she was appointed), and would likely not be permissible under today's independence rules.

Overall, the SLC reaches a different conclusion with respect to Mr. Wang, who was the Company's CEO and Chairman during much of the period in which the fraudulent conduct occurred. The SLC has uncovered credible and corroborated evidence that Mr. Wang both directed and participated in the 35-Day Month practice by (i) instructing his subordinates, including Messrs. Kumar, Richards and Zar, to obtain additional revenue after the closes of quarters to be counted in the prior quarter in order to meet analyst expectations, and (ii) negotiating and participating in the negotiation of deals that he knew to be backdated. Indeed, it is the SLC's view that Mr. Wang was the direct cause of the 35-Day Month practice, both due to his actual conduct and the culture that he established, and that it existed for most, if

---

judgment. Business relationships can include commercial, industrial, banking, consulting, legal, accounting and other relationships. A director can have this relationship directly with the company, or the director can be a partner, officer or employee of an organization that has the business relationship; or

been employed as an executive of another entity where any of the corporation's executives serve on that entity's compensation committee.

Exhibit 10

not all, of his tenure as CEO. It was only under Mr. Kumar's watch as CEO that the practice ended with the implementation of the new business model.

As such, the SLC believes that Mr. Wang breached his fiduciary duties to CA by knowingly participating in the 35-Day Month practice. In addition, the SLC believes that Mr. Wang failed CA's shareholders, failed CA's employees, and failed CA's customers by failing to protect the assets of CA through an appropriate management structure and to install the necessary procedures and controls in the hands of properly-trained and experienced executives. At the same time, Mr. Wang missed no opportunity to enrich himself at CA's expense. Accordingly, the SLC has directed the Company to vigorously pursue a claim for breach of fiduciary duty, among other claims, as noted above, against Mr. Wang for the full amount of the enormous harm caused to CA.

The SLC was particularly troubled by Mr. Wang's refusal to cooperate with the SLC's investigation, claiming, through his counsel, that any interview would be duplicative of prior testimony that he has given. The SLC believes that this excuse lacks credibility and moral force. Mr. Wang, as the Company's co-founder, and former CEO and Chairman, had an obligation to cooperate with a duly-appointed, independent committee of the Board investigating the reasons for a massive financial fraud that occurred under his leadership at the Company he created. Mr. Wang had a duty to contribute to the SLC's understanding of these events so that, at the very least, steps can be taken to ensure that they are not repeated. Mr. Wang abdicated that duty.

*The Settlement Director Defendants.* The 2005 Derivative Action alleges that the Settlement Director Defendants breached their duty of care to the Company when, in August 2003, they authorized the settlement of then-pending class action and derivative

litigation, and allowed the settlement to become final before U.S. District Court Judge Thomas Platt in December of 2003. Because the settlement was "global" and encompassed a derivative action, which was brought on behalf of the Company, the Company's officers and directors (including certain of the Criminal Defendants) received releases from the Company in connection with the settlement. Plaintiffs allege, again without setting forth any facts, that the Settlement Director Defendants knew at the time they authorized the global settlement that CA's senior management had engaged in fraud, but nonetheless breached their duty of care by failing to seek contribution from those individuals in exchange for the releases.

Under Delaware law, a directors' decision to authorize a settlement will be protected by the business judgment rule, a judicial presumption that the directors acted in a manner consistent with the duty of care – that is, "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In order to rebut this presumption, it must be shown that the directors acted with (i) fraud, (ii) illegality, (iii) a conflict of interest, (iv) or gross negligence. Thus, the SLC sought to determine whether the CA Board's decision was tainted by any of the above factors such that its decision constituted a breach of the duty of care.

It is clear that the decision to authorize the settlement occurred at a difficult time for the CA Board and the Company. By August 2003, the Company had been embroiled in the class action litigation for five (5) years, had been defending a joint USAO and Securities and Exchange Commission ("SEC") investigation for over a year and a half, and, at the request of the USAO, had just authorized the Audit Committee to conduct an internal investigation into CA's accounting practices. To fully understand the context in which the decision to settle the civil litigation was made, some additional background about the government investigation is in

33

Exhibit 10

order.  The progression of the government investigation can be broken down into roughly two (2) phases.

From February 2002 through January 2003, the Board was informed repeatedly by CA management that the Company had done nothing wrong and by the Company's counsel, Wachtell, Lipton, Rosen & Katz LLP ("WLRK"), that it had found little to no substance to the accounting issues being examined as part of the government investigation.  WLRK's advice and assessment turned out to be accurate in many respects, as nearly all of the issues originally being investigated by the government were resolved in CA's favor or otherwise became non-issues, from which the Board took comfort.  Further, the Board was told by management that the April 29, 2001 New York Times article and the government investigation that followed (which focused on the same general issues) were both the result of (i) disgruntled former employees with little actual knowledge who fed the government and the press inaccurate information, and (ii) cooperation between the plaintiffs' lawyers at the Milberg Weiss law firm, lead counsel in the class action litigation, and the government.

Beginning in January 2003, when the CA Board learned that the government had recently issued grand jury subpoenas to CA and its customers, the CA Board recognized that there were revenue recognition issues that it was told were, in fact, being addressed.  The message the Board received about the government investigation, however, changed substantially in July 2003.  At a July 2, 2003 Board meeting, the Board was told by WLRK that: (i) the government refused to settle any charges arising out of the investigation of CA on a civil basis because it "believed that senior management of the company had intentionally held quarters open and used backdated contracts to meet earnings estimates"; and (ii) Ira Zar, David Rivard, and Lloyd Silverstein – then three of the Company's senior financial managers – had

34

Exhibit 10

been identified as "subjects" of the government's investigation. At that time, the Board was also told that the government had suggested that the Board authorize its own independent investigation into CA's accounting practices, which the Board did at that meeting. This news came as a shock to many Board members, although some still believed that, because the government had not provided the Company with any evidence of wrongdoing by CA's executives, it was only "saber-rattling" to extract a better settlement.

At the same time, the civil class action and derivative litigation was progressing towards a settlement, with the help of mediation by a retired U.S. District Judge. At a June 18, 2003 Board meeting, counsel to CA in the class actions, Piper Rudnick, told the Board that the parties to the litigation had reached a preliminary settlement, and outlined the terms of the proposed agreement to the Board. The Board was universally pleased to learn that the settlement was an "all-stock" deal, involving the issuance of 5.7 million shares of CA stock (then-valued at approximately $130 million) and did not involve a cash payment by the Company. Counsel further advised the Board that a settlement would likely have a favorable impact on the government investigation. At the suggestion of counsel, the Board formed an independent committee to evaluate the proposed settlement. After receiving periodic updates regarding the settlement, in August 2003, two separate and independent committees were formed to evaluate the terms and merits of the settlements of the class action and derivative litigation, respectively, and to recommend a course of action for the Company.

The class action settlement committee, comprised of directors D'Amato (who served as chair), Lorsch, Ranieri, and Schuetze, was represented by Peter Fleming of Curtis, Mallet-Prevost & Mosle LLP, one of the senior members of the New York trial bar. At a telephonic committee meeting to consider the settlement, Mr. Fleming told the committee that:

(i) the Company faced potential liability of two (2) to five (5) billion dollars at trial; (ii) the Company's summary judgment motion would likely be denied and that a trial was likely; (iii) the federal judge who presided over the parties' mediation had recommended a settlement amount that was larger than the agreed-upon amount; and (iv) CA must win every trial that it faced, and only needed to lose one for a substantively catastrophic outcome to occur. Mr. Fleming's talking points state that he recommended the settlement "in the strongest possible way."

The members of the committee generally recalled Mr. Fleming's advice, particularly the downside risk of two (2) to five (5) billion dollars. After considering Mr. Fleming's advice, and the committee's prior knowledge of the litigation (including the advice of WLRK and others that the existence of the class action suit was an impediment to resolving the government investigation), the committee decided to recommend the class action settlement to the full Board. This is a decision the SLC cannot and does not quibble with, either as a matter of process under Delaware law, or on its merits. This was a decision that was, and remains, in CA's best interest in all respects and was supported by valid business considerations.

The derivative settlement committee, comprised of directors Lorsch (who served as chair), Cron, Fernandes, La Blanc, Schuetze, and Vieux (i.e., those directors not named as defendants in the 2003 Derivative suit), had, in the view of the SLC, a more difficult decision to make. This committee was represented by James McGuire, then counsel at White & Case LLP, now a New York State Supreme Court Justice (Appellate Division), who was assisted by Richard Holwell, then a partner at White & Case, now a U.S. District Judge for the Southern District of New York. This committee was faced with, among other things, the task of

36

Exhibit 10

determining whether, in the context of settling the derivative case, it was in CA's best interests to grant releases to its officers and directors as part of the global settlement.

Though recollections vary, contemporaneous evidence establishes that the committee asked Mr. McGuire two questions on that subject during the telephonic meeting in which it considered the settlement: (i) whether the settlement of the derivative case could be delayed pending the outcome of the Audit Committee's investigation, and (ii) whether some defendants could be carved out of the releases in the settlement. Mr. McGuire answered "no" to both questions, advising the Committee that any attempt to delay or restructure the settlement would jeopardize the "global" deal that had been negotiated. Further, the committee considered the advice that the directors had previously received from counsel regarding the favorable impact a civil settlement may have on the government investigation. After weighing the risks and rewards associated with the derivative settlement, the committee likewise decided to recommend the derivative settlement to the full Board.

The SLC found its evaluation of the derivative settlement committee's actions to be one of the more difficult tasks it faced. In the end, the SLC concluded that the directors employed a rational decision-making process and made what has proven to be a good business decision in the context of a global settlement. There were valid business considerations that the Board reasonably and honesty believed, and these considerations drove and supported the decision to authorize the settlement. That said, the SLC was concerned by the selection of counsel for the derivative settlement committee (picked by management), and the time spent considering these issues (one relatively short telephonic meeting). However, these facts do not suggest that the decision or process was the product of gross negligence,[15] was outside the

---

[15]   Gross negligence is defined under Delaware law as "reckless indifference to or deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *In re The Walt Disney*

Exhibit 10

bounds of reason, or was for any disloyal or bad faith reason.  As such, this decision is protected by the business judgment rule.  In addition, because there was no bad faith conduct, this decision is also protected by the Company's Certificate of Incorporation and Delaware General Corporation Law § 102(b)(7).

Finally, the SLC found that the Settlement Director Defendants did not breach their fiduciary duty in connection with their oversight of the Company throughout the government investigation.  It bears repeating that liability for breach of fiduciary duty in this context hinges on whether the directors "had notice of serious misconduct and simply failed to investigate," i.e. intentionally ignored "red flags."  *Stone*, 911 A.2d at 360.  Here, the Board had a clear red flag – the investigation commenced by the USAO and SEC.  In response, the Board retained WLRK as Company counsel, and directed WLRK to cooperate with the government in order to resolve the investigation as quickly as possible.  In addition, the Board retained PwC to evaluate the allegations of improper accounting raised by the government, and directed and supervised PwC during its work.  At the later suggestion of the USAO, the Board immediately authorized the Audit Committee to conduct a full-scale independent investigation with the assistance of independent counsel, Sullivan & Cromwell LLP ("S&C").  It is worth noting that, while S&C certainly played a key role, Audit Committee chair Walter Schuetze (the former Chief Accountant to the SEC) was personally involved in all major interviews and actions and was the driving force behind the Audit Committee's investigation.

Once the 35-Day Month practice was uncovered in September and October of 2003, the Audit Committee promptly requested and received the resignations of Messrs. Zar,

*Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citation omitted); *see also Albert v. Alex Brown Mgmt. Serv., Inc.*, 2005 WL 2130607, at * 4 (Del. Ch. Aug. 26, 2005) ("Gross negligence . . . involves a devil-may-care attitude or indifference to duty amounting to recklessness") (citation omitted).

Rivard, and Silverstein.  In response to further events, the Audit Committee terminated the employment of Mr. Kaplan in December 2003, and Messrs. Richards, Woghin, and others in April 2004.  Ultimately, Mr. Kumar resigned at the Board's request in June 2004.  Given the actions taken by the Board throughout the government investigation, the SLC concludes that the Board did not intentionally "ignore" the government investigation in bad faith.  To the contrary, the SLC found that the Board responded to the government investigation in an adequate manner.

*        *        *

In sum, and to state the obvious, for most of its history CA was not a model of corporate governance.  The scope of the SLC's investigation -- of claims against twenty-two (22) individuals and entities -- revealed flaws in how the business was managed.  In addition, while the directors fulfilled their fiduciary obligations, the SLC found that they did not always grasp the opportunities that should be the aspirational goal of every board.[16]  As such, although not part of the SLC's mandate, the SLC nonetheless believes that it is appropriate, for the benefit of the current and future members of CA's Board (and others), to comment on the Board's response to these events.  In offering this commentary, the SLC recognizes that it is easy, with the clarity of hindsight, to criticize the Board's reactions to these events given what is now known about the scope and magnitude of the fraud.  The SLC also offers this

---

[16]     Chancellor Chandler's influential decision in the *Disney* matter recognized this distinction:

> But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability.  But they are not required by the corporation law and do not define standards of liability.

*Disney*, 907 A.2d at 745 n.399.

39

Exhibit 10

commentary while acknowledging that the Company's most senior managers, who directly controlled the information flow to the Board, engaged in active efforts to conceal information from the Board (and some have pled guilty to serious federal crimes).

The SLC believes that the non-management Oversight Directors were presented with opportunities, at several points in time, where they could have engaged in a searching analysis. The Board could have taken incremental steps to seek verification of the Company's financials when the vesting of the KESOP was imminent; it could have actively probed the accountants once the KESOP vested; it could have probed management's explanation as to the timing of when it learned of the effects of the events in Asia; it could have connected the news of slowing growth in Asia to the billion dollar stock award that vested eight (8) weeks earlier; it could have treated the allegations made in the shareholder litigation following the vesting of the KESOP in a less cursory fashion; it could have probed management, specifically Mr. Zar, and its outside accountants, more thoroughly when the New York Times article was published; it could have sought independent legal or accounting advice and taken more time to consider the issue. The events discussed above, alone or in concert, may have put a skeptical director on alert that something was amiss, but no director at CA drew that conclusion.

Likewise, the SLC believes that, although the directors satisfied their duties during the government investigation, there are still things that the CA Board could have done better (and thus provide lessons for this and other boards). First, the SLC found that the CA Board could have taken steps to more fully understand the role played, and actions taken (and not taken), by WLRK in its representation of the Company during the investigation. The SLC found that the directors believed that WLRK was conducting a full scale investigation "to get to the bottom of things," when instead WLRK was hired to defend the Company and not to

uncover wrongdoing.  Second, in 2003, when the government expressed dissatisfaction with CA's document collection and production efforts, the CA Board could have probed to understand what had occurred and, if a problem existed, taken action to remedy that problem, such as insisting that outside counsel actively assist the Company with the collection efforts rather than relying exclusively on inside legal staff to do this critical job.  The SLC recognizes, however, that WLRK never suggested to the Board that any additional action be taken at any time, and the Board was continually assured by inside and outside counsel that the Company was fully cooperating with the government.  Third, overall, the CA Board could have viewed the assurances it received from management – especially those made after January 2003 when it learned that CA and its customers had received grand jury subpoenas – with a greater skepticism and insisted that outside counsel independently assess and verify those assertions.

This is a theme that the SLC will return to throughout this report – that the CA Board, at various points in time, too often accepted the explanations and assurances of CA management and its advisors without applying a high degree of skepticism or fully understanding the details of what was being done.  Such skepticism and careful probing of management and advisors might have led the directors to take further action in situations where, although action was not required to satisfy their fiduciary duties under Delaware law, it nonetheless might have benefited the Company and saved it from further harm.

This leads to several additional conclusions that the SLC takes away from its investigation concerning a board's use of outside, professional advisors, whether those professionals are legal, financial, accounting, or otherwise.  While these conclusions may seem intuitive, in hindsight, the SLC, in both this investigation and in drawing on its own Board experiences, has found this not always to be so.  The SLC believes that it is imperative that

Boards clearly define, and understand, the scope of the engagement of those professionals. It is

clear that those professionals hired by a Board will understand, and adhere to the scope of that

engagement, and a Board must ensure that it has the same understanding of that scope. As a

corollary, a Board must ensure that it remains updated and aware of what those professionals

are doing during the course of the engagement, so in the event that circumstances change, a

Board can likewise change the scope of the professionals' engagement, if necessary. Moreover,

especially in situations as critical as the one that CA confronted, the professionals have a

responsibility to take all necessary steps to make sure that the Board – and not just Company

management – understands precisely what the professionals are, and are *not*, doing. But in the

end, at all times, the onus is on the Board to actively and appropriately manage and supervise

its professionals, and without having these understandings, a Board will not have the

wherewithal to do so.

       In considering the lessons learned from its investigation, the SLC believes it

equally important to highlight those instances where directors went far beyond the level of

conduct required under law and instead did approach the ideal all directors should aspire to

attain. Clearly in this category is the internal investigation undertaken by CA's Audit

Committee, and particularly its chair, Walter Schuetze. As soon as the Board learned of the

government's suggestion that the Audit Committee conduct its own investigation of CA and its

management, that request was approved. The Audit Committee promptly hired its own

independent counsel that was free from interference and influence by CA management and

began the process of imaging computers and understanding the facts that could be gleaned from

the documentary record. When those documents showed that a problem clearly existed, the

Audit Committee took swift and effective action, including promptly seeking the resignations

of the three (3) executives in charge of the sales accounting function. The Audit Committee continued its efforts by conducting scores of interviews and regularly meeting with the government.

Importantly to the SLC, while the Audit Committee certainly relied on its professionals, it did not delegate its work. Instead, the Audit Committee members, particularly Mr. Schuetze, personally participated in the investigation – conducting the interviews, meeting with the USAO and the SEC and, in a hands-on fashion, directing the investigation. Indeed, Mr. Schuetze spent a substantial amount of time in New York (away from his Texas home) supervising the Audit Committee's work. Director and Audit Committee member Lewis Ranieri also deserves credit for his actions and leadership during the Audit Committee investigation. While obviously this level of personal sacrifice and dedication goes far beyond that which is required by Delaware law, it is an exemplar of director dedication.

In sum, CA's recent past has been filled with a seemingly endless stream of litigation, investigations, criminal prosecutions, and overall disruption as a result of the criminal 35-Day Month practice. All of these distractions continue to work to the detriment of CA's core business -- developing and selling software on behalf of its public shareholders. The SLC believes it is time for the Company to finally resolve any and all outstanding issues associated with the criminal activity that occurred at the Company in order to allow it to move forward and focus on the future. To that end, the SLC has concluded that it is in the Company's best interest to pursue certain meritorious claims against those who directed and benefited most from the fraud (where those suits can reasonably lead to a monetary recovery), but seek dismissal of the claims against others who can best be characterized as victims of a complex and sophisticated criminal scheme, including a well-orchestrated and purposeful obstruction by those guilty of the

malfeasance.[17]

## II.  THE COMPANY

CA, a Delaware corporation, has its principal place of business in Islandia, New York.  The Company was co-founded in 1976 by Charles Wang and Russell Artzt, and Mr. Artzt remains with the Company as Executive Vice President in charge of products.  CA is one of the largest computer software companies in the world, and more than ninety-eight percent (98%) of Fortune 1000 companies use its software products.

In fiscal year 2006,[18] CA had revenue of $3.64 billion, and employed over 15,000 people.  The bulk of CA's earnings come from revenue generated by contracts in which CA licenses its software products.  CA's common stock trades on the NYSE.  The four (4) primary departments within the Company that will be referred to throughout this report, are the Sales department ("Sales"), the Finance department ("Finance"),[19] the Sales Accounting department ("Sales Accounting"), and the Global Sales Organization ("GSO" or "Global Sales Operations").

---

[17] One final note is appropriate.  The SLC believes that certain aspects of this costly litigation and investigation are the direct result of a plainly inaccurate account of the facts surrounding the discovery of the 35-Day Month practice at CA reported in the press.  The entire claimed basis for the Rule 60(b) Motions is that the so-called "23 Boxes" of documents, which were first reported in a Wall Street Journal article, were "secretly" withheld from the government and Company counsel.  Had the documents not been hidden, the theory goes, many harms could have been avoided, and the 2003 Settlement may never have happened.  However, contrary to public perception, the SLC found that there was no "secret" cache of "23 boxes" of documents that were collected and hidden, but instead, the SLC found that the Company's document collection efforts were deficient in many respects, and, once remedied, substantial amounts of incriminating documents were collected and produced to the government.  Moreover, there was no material information in those documents that was not disclosed in CA's October 8, 2003 press release announcing the resignations of Mr. Zar and others.

[18] CA's fiscal year begins on April 1 and ends on March 31.  Its first quarter ends on June 30, its second quarter on September 30, and its third quarter on December 31.

[19] The Financial Reporting department ("Financial Reporting") falls under the supervision of the Finance department.

III.     THE 2005 DERIVATIVE ACTION

        *Overview.*  In June and July of 2004, certain parties affiliated with Sam Wyly and two individual CA shareholders, Bert Vladimir and Irving Rosenzweig, filed three derivative actions in the U.S. District Court for the Eastern District of New York (the "Eastern District"), captioned *Ranger Governance, Ltd. v. Wang et al.*, 04-2697, *Vladimir v. Wang et al.*, 04-2789, and *Rosenzweig v. Wang et al.*, 04-2959.  By order dated October 19, 2004, the three derivative actions were consolidated and re-captioned *In re Computer Associates International Inc., Derivative Litigation*, 04-2697 (TCP).  On January 7, 2005, the operative Consolidated Stockholders Derivative Complaint was filed.  *See* Consolidated Stockholders Derivative Complaint, dated Jan. 7, 2005 (the "2005 Derivative Complaint").  As discussed in detail below, the 2005 Derivative Complaint asserts eight (8) causes of action against twenty-two (22) current and former CA directors, officers, and employees, as well as claims against CA's current and former independent auditors, KPMG and E&Y, respectively.  *See* 2005 Derivative Compl. ¶¶ 8-30, 32-33.

        The filing of the 2005 Derivative Complaint precipitated the creation of the SLC by CA's Board, which occurred by resolution dated February 1, 2005.  In that resolution, the CA Board authorized the SLC to (i) control and determine the Company's response to the 2005 Derivative Complaint, and (ii) control and determine the Company's response to three motions that were filed under Federal Rule of Civil Procedure 60(b), seeking relief from the final judgments entered in the 1998 and 2002 class actions and related derivative litigation.  On October 31, 2006, the CA Board authorized the SLC to control and determine the Company's response to a substantially similar derivative complaint filed in the Delaware Court of Chancery, captioned *Kaufman v. Kumar, et. al.*, 06 Civ. 2418-N (the "Kaufman Complaint") that raises substantially similar claims.

45

Exhibit 10

Because the history of the prior class action and derivative litigation is material to the SLC's investigation, the history of those litigations is described below in brief.

A.     *The 2003 Settlement and the Rule 60(b) Motions*

1.     **The Class Action and Derivative Litigation**

As noted above, following the July 21, 1998 press release announcing that CA expected slowing growth, and the resultant thirty-one percent (31%) stock drop, a number of class action lawsuits were filed in the Eastern District against CA and certain of its officers, alleging various violations of federal securities laws. By order dated October 9, 1998, those individual cases were consolidated and captioned *In re Computer Associates Class Action Securities Litigation*, 98 Civ. 4839 (TCP) (the "1998 Class Action").

The 1998 Class Action alleged that CA began to experience serious financial difficulties prior to the vesting of the KESOP shares, and that these difficulties led CA to artificially inflate its revenues, in part, to protect the interests of the beneficiaries of the KESOP. The plaintiffs claimed that CA: (i) inflated revenue by recognizing revenue on long-term contracts upfront, allegedly in violation of generally accepted accounting principles ("GAAP"); (ii) offered excessive discounts to make revenue appear larger on certain products; and (iii) engaged in certain unspecified "improper revenue recognition practices that artificially inflated CA's operating results." On November 15, 1999, U.S. District Judge Thomas Platt denied the defendants' motion to dismiss the complaint, and discovery proceeded, with both sides collectively taking over fifty (50) depositions. In that litigation, CA also produced hundreds of thousands of pages of documents.

In February 2002, following the announcement that the USAO and SEC had commenced a preliminary investigation into CA's accounting practices, another series of class action lawsuits were filed against CA and certain of its officers and directors. By order dated

July 25, 2002, those individual cases were consolidated by Judge Platt and captioned *In re Computer Associates 2002 Class Action Securities Litigation*, 02 Civ. 1226 (TCP) (the "2002 Class Action") (collectively with the 1998 Class Action, the "Class Actions"). The 2002 Class Action, which was also consolidated with the 1998 Class Action, expanded the end of the class period for the 1998 Class Actions from July 22, 1998 to February 25, 2002. Further, the 2002 Class Action included certain allegations of accounting fraud not originally found in the 1998 Class Action, including the allegation that CA improperly extended its quarters.

Also in 2002, CA shareholder Charles Federman filed a derivative action in the Delaware Court of Chancery against certain CA directors, officers, and employees arising out of the same conduct alleged in the Class Actions. The derivative action was subsequently transferred to the Eastern District in August 2003, and captioned *Federman v. Artzt, et. al.*, 03 Civ. 4199 (TCP) (the "2003 Derivative Action"). On August 25, 2003, Judge Platt consolidated the 2003 Derivative Action with the Class Actions. Plaintiffs in the 2002 Class Action and the 2003 Derivative Action served no additional discovery requests of their own, but received the discovery produced to plaintiffs in the 1998 Class Action.

On September 5, 2002, following the close of discovery in the 1998 Class Action, the CA defendants in the Class Actions filed a motion for summary judgment, seeking dismissal of all claims. That motion remained pending when, in May 2003, the parties to the Class Actions participated in mediation supervised by retired U.S. District Judge Frederick B. Lacey. In June 2003, the parties to the Class Actions and the 2003 Derivative Action reached a "global settlement," pursuant to which (i) all of the then-pending shareholder litigation against and on behalf of CA would be resolved, and (ii) CA would pay shareholders 5.7 million shares of CA stock (the "2003 Settlement"). The 2003 Settlement was later modified to include a cash

component if CA shares traded below a designated level on the date the settlement became

final.  *See* Stipulation and Agreement of Settlement of Securities Class Actions with CA

Defendants ¶¶ 3, 6(b), *In re Computer Assocs. Class Action Sec. Litig.*, 98 Civ. 4839 (TCP)

(E.D.N.Y. Aug. 25, 2003)); Stipulation and Agreement of Settlement of Derivative Actions ¶ 3,

*Federman v. Artzt, et al.*, 03 Civ. 4199 (TCP) (E.D.N.Y. Aug. 25, 2003)).

Following a fairness hearing held before Judge Platt on December 5, 2003, the

2003 Settlement was approved as fair by orders signed on December 8, 2003 and entered

December 10 and 11, 2003.

The release granted in the 2003 Derivative Action, which ran from the Company

to its officers and directors, provided:

> Upon the Effective Date of this Settlement, *Plaintiff and CA
> shareholders, derivatively on behalf of CA, and CA*, on their own
> behalf and on behalf of their respective predecessors, successors,
> affiliates, heirs, executors, administrators, successors and assigns,
> and any person they represent, for good and valuable
> [consideration] *shall, by operation of the Order of Final
> Judgment and Dismissal, release and be deemed to release and
> forever discharge, and shall forever be enjoined from
> prosecuting, any Settled Derivative Claims and/or Unknown
> Claims against any of the Released Parties* including, without
> limitation, any claim relating to the parties [sic] entry into this
> Settlement.

Stipulation and Agreement of Settlement of Derivative Actions ¶ 3, *Federman v. Artzt, et al.*,

03 Civ. 4199 (TCP) (E.D.N.Y. Aug. 25, 2003) (emphasis added)).  The term "Released Parties"

was defined to include the named defendants[20] and "all other current and former officers and

directors of CA." *Id.* ¶ 1(d).  Because the release is limited to "officers and directors," certain

of the Criminal Defendants who were not corporate officers – David Kaplan, David Rivard, and

---

[20]     The named defendants were Directors Artzt, de Vogel, Grasso, Ranieri, D'Amato, Kenny, Kumar,
Pieper, and Wang.

48

Exhibit 10

Lloyd Silverstein – are not covered. In contrast, former CA officers Sanjay Kumar, Stephen Richards, Steven Woghin, and Ira Zar are, technically, covered by the terms of the release.

Similarly, the release granted in connection with the Class Actions stated:

> By operation of the Order and Final Judgment, upon the Effective Dates of this Settlement and without any further action, *Representative Plaintiffs and all the members of the Settlement Class* on behalf of themselves, their heirs, executors, administrators, successors and assigns, and any person they represent, for good and valuable consideration, *shall, with respect to each and every Settled Claim, release and forever discharge, and shall forever be enjoined and barred from prosecuting any settled Claims against any of the Released Parties.*

Stipulation and Agreement of Settlement of Securities Class Actions with CA Defendants ¶ 3(a), *In re Computer Assocs. Class Action Sec. Litig.*. 98 Civ. 4839 (TCP) (E.D.N.Y. Aug. 25, 2003) (emphasis added). In the settlement of the Class Actions, "Released Parties" was defined to include CA and all of its "past or present . . . officers, directors . . . [and] employees." *Id.* ¶ 1(p). Thus, the release in the Class Actions is broader than the release in the 2003 Derivative Action because it covers "employees," in addition to officers and directors. As such, all of the defendants named in the 2005 Derivative Complaint are covered by this release.

2.    **The Rule 60(b) Motions**

In connection with the filing of the 2005 Derivative Complaint, three separate Rule 60(b) motions were filed in the Eastern District by (i) Sam Wyly and his related Wyly entities (collectively, the "Wyly Movants");[21] (ii) Ranger Governance, Ltd. ("Ranger

---

[21]    In addition to Mr. Wyly, those joining in his request for Rule 60(b) relief were Cheryl Wyly, Donald R. Miller, Jr., The Andrew David Sparrow Wyly Trust, The Cheryl R. Wyly Marital Trust, The Christiana Parker Wyly Trust, The Emily Ann Wyly Trust, The Jennifer Lynn Wyly Trust, The Kelly Wyly Elliott Trust, The Lisa Wyly Revocable Trust, The Martha Caroline Wyly Trust, The Charles Joseph Wyly III Trust, The Laurie L. Wyly Revocable Trust, Dortmund Limited, East Carroll Limited, Elegance Limited, Greenbriar Limited, Marmalade, Ltd., Miller Family Partners, Quayle Limited, Stargate, Ltd., and Tallulah, Ltd.

49

Exhibit 10

Governance") (a Wyly-led group of investors separate from the Wyly Movants), Bert Vladimir,

and Irving Rosenzweig; and (iii) Muriel Kaufman, respectively.[22]

(a)    *The Wyly Movants*

On December 7, 2004, the Wyly Movants filed a motion seeking relief from the

December 10, 2003 order approving the settlement of the Class Actions (the "Class Action Rule

60(b) Motion"), claiming that the class action settlement was procured by fraud,

misrepresentation, and other misconduct.[23]  At this time, Mr. Wyly and Ranger Governance are

also involved in concurrent litigation with CA, arising from settlement agreements entered into

with CA by Mr. Wyly and Ranger Governance following two proxy contests waged by Mr.

Wyly and Ranger Governance during the summers of 2001 and 2002.  *See* Amendment to

Change in Control Severance Agreement, February 14, 2000 ¶ 10 (the "2002 Wyly

Agreement") (collectively, the "Proxy Settlement Agreements").

When Ranger Governance filed its derivative complaint on behalf of CA on June

29, 2004, CA informed it that the lawsuit was barred by the non-compete provisions in the

Proxy Settlement Agreements.  In response, on August 9, 2004, Mr. Wyly and Ranger

Governance filed a complaint in state court in Texas seeking a declaration that Ranger

---

22    As discussed further below, at the time Ms. Kaufman filed her Rule 60(b) motion, she had not yet filed a derivative complaint.

23    As discussed below, the SLC has opposed this motion on various grounds, including, among others, that (i) the Wyly Movants lack standing to challenge the releases given in the Class Actions since they were not lead plaintiff (and their counsel was not lead counsel) in the underlying Class Actions, and (ii) reopening of the Class Actions offered no potential benefit to CA or its shareholders; to the contrary, it would expose the Company to unnecessary expense and potential liability. *See* Order Consolidating All Actions And Appointing Lead Plaintiffs And Approving Selection Of Lead Counsel, *Barroway, et. al., v. Computer Assocs. Int'l, Inc., et. al.*, 98 Civ. 4839 (TCP) (E.D.N.Y. Oct. 9, 1998); Order (1) Consolidating All Related Actions; (2) Appointing Lead Plaintiffs; (3) Approving Lead Plaintiffs' Selection of Counsel; and (4) Establishing Briefing Schedule, *In re Computer Assocs. Class Action Sec. Litig.*, 02 Civ. 1226 (TCP) (E.D.N.Y. July 25, 2002) (collectively, the "Lead Plaintiff & Counsel Orders"). The SLC's position is more fully articulated in its memoranda of law dated March 18, 2005 and November 1, 2006, and in a memorandum that will be filed shortly after the filing of this report.

Governance's pursuit of this action did not violate the Proxy Settlement Agreements.  Mr. Wyly and Ranger Governance also claimed that they were entitled to damages (i) because the Proxy Settlement Agreements, and the related predecessor agreements, were allegedly procured by fraud, and (ii) because CA allegedly breached the Ranger Agreement by failing to elect an independent director to its Board and failing to impose certain heightened corporate governance standards.  On September 10, 2004, CA removed the Wyly state court action to the U.S. District Court for the Northern District of Texas, and on September 1, 2005, it was transferred to the Eastern District, where it remains pending concurrently with the 2005 Derivative Action.

        (b)    *The Individual Derivative Plaintiffs*

            (i)    Muriel Kaufman

On October 5, 2004, Muriel Kaufman, a CA shareholder who was not a party to any of the prior litigation, filed her own Rule 60(b) motion seeking to vacate the final judgment in the 2003 Derivative Action, but not the final judgment in the Class Actions.  On September 14, 2004, Ms. Kaufman filed an action under § 220 of the Delaware General Corporation Law seeking to obtain certain of CA's books and records.  As a result, CA produced to Ms. Kaufman numerous documents relevant to this action.  Ultimately, and as noted above, on September 13, 2006, Ms. Kaufman filed a separate derivative complaint in the Delaware Court of Chancery asserting claims that are substantially duplicative of the claims alleged in the 2005 Derivative Complaint.[24]

---

[24]    On December 19, 2006, the SLC sought dismissal of the Kaufman Complaint as duplicative of this action because (i) the 2005 Derivative Action was filed two years prior to the Kaufman Complaint, and (ii) the 2005 Derivative Action, which involves the same parties and issues, provides a forum for prompt and complete justice.  Briefing on that motion has not yet been completed.

       Exhibit 10

(ii)     Ranger Governance, Bert Vladimir, and Irving
Rosenzweig

On December 9, 2004, Ranger Governance (Mr. Wyly's entity), Bert Vladimir,

and Irving Rosenzweig, plaintiffs in the 2005 Derivative Action, collectively filed a motion for

relief under Rule 60(b) seeking to vacate the final judgment in the 2003 Derivative Action,

making the same arguments that the Wyly Movants made in seeking to upset the final judgment

in the Class Actions (the "Derivative Rule 60(b) Motions"). The three Rule 60(b) motions are

referred to here collectively as the "Rule 60(b) Motions," unless otherwise noted.

3.     **The 2005 Derivative Action is Stayed**

By orders dated January 27, 2005 and February 8, 2005, U.S. Magistrate Judge

Thomas Boyle stayed discovery in the 2005 Derivative Action pending the outcome of the Rule

60(b) Motions, finding that, "the outcome of [the Rule 60(b) Motions] will define and

determine the scope of the claims that may be raised in the present case." *See* Order at 2,

*Computer Assocs. Int'l, Inc., Derivative Litig.*, 04 Civ. 2697 (TCP) (ETB) (E.D.N.Y. Feb. 8,

2005).

4.     **The SLC's Motion to Stay and Response to the Rule 60(b) Motions**

On February 14, 2005, the SLC, prior to its retention of Fried Frank as counsel,

filed a motion to stay all proceedings with respect to the 2005 Derivative Action and the

Derivative Rule 60(b) Motions, pending the outcome of its investigation. On April 8, 2005,

after Fried Frank was retained, the SLC filed a memorandum in further support of its February

14 motion to stay the 2005 Derivative Action.

On March 18, 2005, the SLC filed its responses to the Rule 60(b) Motions. The

SLC opposed the Class Action Rule 60(b) Motion filed by the Wyly Movants because

reopening of the Class Actions offered no potential benefit to CA or its shareholders; to the

Exhibit 10

contrary, it would expose the Company to unnecessary expense and potential liability. In its

opposition to certain discovery requests made by the Wyly Movants, dated November 1, 2006,

the SLC also argued that because the Wyly Movants were not appointed lead plaintiffs in the

Class Actions (and its counsel was not appointed lead counsel) by Judge Platt under the Private

Securities Litigation Reform Act, they lack standing to seek to upset the settlement of the Class

Actions. Following the conclusion of its investigation, and understanding the process by which

the CA Board settled the Class Actions, the SLC has only strengthened its belief that the

settlement of the Class Actions should remain intact and undisturbed.

       With respect to the Derivative Rule 60(b) Motions, the SLC took no position as

to the merits of the motions, but instead asked the Court to stay any resolution to allow the SLC

time to conduct its investigation and determine the Company's response to both the 2005

Derivative Action and the Derivative Rule 60(b) Motions. This was necessary, the SLC

advised the Court, because of the possibility that (i) it would join in certain aspects of the

request for Rule 60(b) relief at such time as the SLC completed its investigation, and/or (ii)

settle certain claims in the 2005 Derivative Action, and/or (iii) seek to have certain aspects of

the 2005 Derivative Action dismissed, in the latter two cases (both of which have happened)

rendering substantial portions of the requested relief moot.[25]

B.    *The Derivative Complaints: Claims*

       The 2005 Derivative Complaint asserts eight (8) causes of action against twenty-

two (22) current and former CA directors, officers, and employees (collectively, the "individual

---

[25]    In connection with the Rule 60(b) Motions, the movants sought and received substantial document
discovery, including (i) the so-called "23 boxes" of documents referenced in a Wall Street Journal article,
and (ii) the discovery materials (i.e., produced documents and deposition transcripts) from the underlying
Class Actions and the 2003 Derivative Action. In all, the SLC has produced approximately 250,000
pages of documents. The movants' request for additional deposition discovery, which the SLC has
opposed, has been fully briefed.

                         Exhibit 10

defendants") as well as five (5) causes of action against CA's current and former outside auditors, KPMG and E&Y. *See* 2005 Derivative Compl. ¶¶ 8-33. Counts one through seven and count nine relate to the individual defendants; counts eight, ten, and eleven, and part of counts two and nine, relate to the auditor defendants (and will not be discussed in this report). *See id.* ¶¶ 251-319. In addition, the Kaufman Complaint asserts three causes of action against certain of the individual defendants, which are substantially duplicative of the claims asserted in the 2005 Derivative Action. *See* Kaufman Compl. ¶¶ 102-117. The allegations in the Kaufman Complaint are identified and discussed separately below.

        1.    **The 2005 Derivative Complaint**

        *Count One.* Count one alleges that Charles Wang, Sanjay Kumar, Peter Schwartz, and Ira Zar, all former CA CEOs or CFOs, are liable to CA under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243. *See* 2005 Derivative Compl. ¶¶ 251-262.[26] Specifically, count one asserts that these defendants must disgorge all bonuses and other incentive-based compensation and profits on stock sales for the twelve (12) months after the first public issuance or filing of CA's financial statements for the fiscal years 1998, 1999, 2000, and 2001 (the period from March 31, 1998 to March 31, 2002) because CA restated its financials for fiscal year 2000 and part of fiscal year 2001, and admitted in the DPA that it improperly recognized revenue from at least 1998 through 2001. *See* 2005 Derivative Compl. ¶¶ 260-262.

---

[26]    Section 304 provides, in relevant part, that if an issuer of securities is required to make an accounting restatement due to material noncompliance, as a result of misconduct, with a financial reporting requirement under the securities laws, both the CEO and CFO of the issuer shall reimburse the corporation for any bonus or other incentive-based or equity-based compensation received by those individuals during the twelve (12) month period following the first public issuance or filing with the SEC, whichever comes first, of the financial document embodying the financial reporting requirement.

Exhibit 10

*Count Two.* Count two alleges that the Criminal Defendants, the Former Officer Defendants, the Oversight Director Defendants (except Shirley Strum Kenny and Alfonse D'Amato), and the auditor defendants are liable to CA for contribution under the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. 78u-4(f)(8), which states that "[a] covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages." *See* 2005 Derivative Compl. ¶¶ 264-266. Specifically, count two asserts that the 5.7 million shares that CA was required to pay pursuant to the 2003 Settlement should be recovered, in part, from those defendants under § 78u-4(f)(8). *See id.* ¶ 265.

*Count Three.* First, count three alleges that the Criminal Defendants, the Former Officer Defendants, and the Oversight Director Defendants (except Shirley Strum Kenny and Alfonse D'Amato) are liable for breaching their fiduciary duties under Delaware law for failing to properly oversee CA during the years in which the fraud occurred. *See id.* ¶¶ 271-273. Second, this count alleges that the Settlement Director Defendants (except Alex Vieux) improperly (i) approved the 2003 Settlement, in which CA granted releases to its current and former directors and officers, and (ii) the DPA, both without seeking contribution from the wrongdoers. *See id.* ¶¶ 86-89, 263.

*Count Four.* Count four alleges that the Criminal Defendants, the Former Officer Defendants, and Messrs. Wang and Artzt are liable for common law restitution and unjust enrichment, and are required to return to CA all bonuses, incentive payments, and other undeserved and unwarranted benefits that they received under CA's 1991, 1995, and 2000 executive compensation and incentive plans. *See id.* ¶¶ 279-283.

***Count Five***.  Count five alleges that the Criminal Defendants, the Former Officer Defendants, and the Oversight Director Defendants (except Shirley Strum Kenny and Alfonse D'Amato) are liable for common law corporate waste for (i) paying undeserved compensation to the Criminal Defendants, the Former Officer Defendants, and the Oversight Director Defendants, and (ii) approving the 2003 Settlement and the DPA without seeking contribution from the wrongdoers.  *See id.* ¶¶ 284-286.

***Count Six***.  Count six alleges that the Criminal Defendants, the Former Officer Defendants, and the Oversight Director Defendants (except Shirley Strum Kenny and Alfonse D'Amato) are liable for common law fraud for failing to disclose known facts regarding misconduct by those who participated in the 35-Day Month practice.  *See id.* ¶¶ 288.  This count further alleges that the above-described defendants misrepresented CA's financial results, which resulted in the transfer of undeserved compensation to certain CA executives.  *See id.* ¶¶ 289-290.

***Count Seven***.  Count seven alleges that the Criminal Defendants, the Former Officer Defendants, the Settlement Director Defendants (except Alex Vieux), Russell Artzt, Willem de Vogel, and Charles Wang caused CA to file false and materially misleading proxy statements relating to CA's 2002 Incentive Plan (the "2002 Plan") and the 2003 CA Compensation Plan for Non-Employee Directors (the "2003 Plan") in violation of § 14(a) of the Exchange Act.  *See id.* ¶¶ 292-298.  Specifically, count seven alleges that the challenged proxy statements failed to disclose (i) violations of federal securities laws, (ii) the participation of certain individual defendants in the securities violations and accounting fraud, and (iii) the failure of certain individual defendants to cooperate with government authorities investigating accounting improprieties and the involvement of certain directors in the obstruction of justice.

Exhibit 10

*Id.* ¶ 296. It is further alleged that the 2002 Plan and 2003 Plan were approved by shareholders as a result of the false and misleading proxy statements, and would not have been approved if material information had been properly disclosed. *Id.* ¶¶ 294-297.

      ***Count Nine.*** Count nine alleges that the auditor and individual defendants (except Shirley Strum Kenny and Alex Vieux) are liable for common law contribution and indemnification for the 5.7 million shares CA paid in the 2003 Settlement and the $225 million CA paid pursuant to the DPA. *Id.* ¶¶ 304-307.

      2.    **The Kaufman Complaint**

      The Kaufman Complaint asserts three (3) causes of action against certain of the individual defendants that are substantially duplicative of those raised in the 2005 Derivative Action.

      ***Count One.*** Count one alleges that the Criminal Defendants (except David Kaplan and David Rivard), the Oversight Director Defendants (except Roel Pieper), and the Settlement Director Defendants are liable to CA for breaching their fiduciary duties by, among other things, (i) failing to properly oversee CA during the period in which the fraud occurred, (ii) failing to properly oversee CA during the government investigation into the Company's accounting practices, and (iii) causing the Company to approve the 2003 Settlement. *See* Kaufman Compl. ¶¶ 102-105. This claim is virtually identical to count three in the 2005 Derivative Complaint, and, as such, it will be analyzed in conjunction with that claim.

      ***Count Two.*** Count two alleges that the Criminal Defendants (except David Kaplan and David Rivard), the Oversight Director Defendants (except Roel Pieper), and the Settlement Director Defendants are liable to CA for common law corporate waste for (i) using corporate assets to eliminate their personal exposure to liability as the result of the claims alleged in the Class Actions and the 2003 Derivative Action, and (ii) paying undeserved

compensation to certain CA executives based on CA's fraudulent financial results. *See id.* ¶¶ 106-110. This claim is virtually identical to count five in the 2005 Derivative Complaint, and, as such, it will be analyzed in conjunction with that claim.

*Count Three.* Count three alleges that the Criminal Defendants (except David Kaplan and David Rivard), the Oversight Director Defendants (except Roel Pieper), and the Settlement Director Defendants are liable to CA for common law contribution and indemnification for causing CA to pay (i) all the consideration as part of the 2003 Settlement, and (ii) the penalties and other monetary compensation paid to the government in connection with the DPA. *Id.* ¶¶ 111-113. This claim is virtually identical to count nine in the 2005 Derivative Complaint, and, as such, it will be analyzed in conjunction with that claim.

C.   *The Derivative Complaints: Individual Defendants*

The following constitutes a brief overview of each of the individual defendants named in the 2005 Derivative Complaint and the Kaufman Complaint, including their roles at the Company, the claims alleged against them, and the SLC's conclusions as to whether the Company has a viable claim against each defendant.[27]

1.   **The Criminal Defendants**

Beginning on January 22, 2004, seven (7) of CA's senior-most executives were charged with, and ultimately pled guilty to, federal criminal charges of securities fraud and obstruction of justice in connection with the 35-Day Month practice. Each of the Criminal Defendants has been criminally sentenced, as described below. A decision on the issue of criminal restitution to be paid by the Criminal Defendants has been deferred by U.S. District

---

[27]   Former CA directors Shirley Strum Kenny and Alex Vieux are named as defendants in the Kaufman Complaint, but not in the 2005 Derivative Action. Dr. Kenny and Mr. Vieux are included in the descriptions below, along with those who were named as defendants in the 2005 Derivative Action.

Judge I. Leo Glasser until April 2007, and the SLC understands the Criminal Defendants are engaged in discussions with the USAO on this issue.

*David Kaplan.* Mr. Kaplan, a CPA, joined Ernst & Whinney (which later became E&Y) as a Staff Accountant after graduating from the State University of New York at Binghamton in 1989. After one year at Ernst & Whinney, Mr. Kaplan joined Canada Drive Royalty Acquisitions, a CA subsidiary, in 1990. From 1990 to 1993, Mr. Kaplan worked as a controller for Canada Drive Royalty Acquisitions. From 1993 to 1997, Mr. Kaplan worked in various finance-related departments at CA, including Sales Accounting, General Accounting, and Financial Reporting. In 1997, Mr. Kaplan became Vice President of Financial Reporting, and in 2001 he was appointed Senior Vice President of Finance and Administration. Mr. Kaplan resigned from CA on December 3, 2003, after refusing to submit to an interview by CA's Audit Committee.

On April 8, 2004, Mr. Kaplan pled guilty to one (1) federal criminal count each of (i) conspiracy to obstruct justice, and (ii) conspiracy to commit securities fraud, for his role in the 35-Day Month practice. *See* Transcript of Plea at 16-20, 25, 30-31, *United States v. David Kaplan*, Cr. No. 04-330 (ILG) (E.D.N.Y. Apr. 8, 2004) ("Kaplan Plea Tr."). Also on April 8, 2004, the SEC filed a complaint against Mr. Kaplan alleging that he violated various federal securities laws. *See* Complaint ¶¶ 28-44, *S.E.C. v. David Kaplan*, 04 Civ. 1465 (ILG) (E.D.N.Y. Apr. 8, 2004) ("Kaplan SEC Complaint"). Specifically, the SEC complaint alleged that Mr. Kaplan: (i) created false internal books and records and prepared false and misleading Forms 10-K and 10-Q; (ii) mislead CA's outside auditors; and (iii) obstructed the SEC's investigation. *See id.* ¶¶ 20-27.

On November 1, 2004, the SEC and Mr. Kaplan entered into a final consent judgment whereby Mr. Kaplan consented, without admitting or denying the allegations against him, to a final judgment that required him to disgorge $128,770 in ill-gotten gains and interest and imposed a $100,000 civil penalty. *See* Final Judgment by Consent Against Defendant David Kaplan at 4-5, *S.E.C. v. David Kaplan*, 04. Civ. 1465 (ILG) (E.D.N.Y. Nov. 1, 2004). As a result of that judgment, Mr. Kaplan is permanently enjoined from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company. *See id* at 1-4, 6.

As part of its investigation, the SLC interviewed Mr. Kaplan on June 8, 2006 and November 15, 2006. On January 29, 2007, Mr. Kaplan was sentenced to six (6) months home detention followed by three (3) years supervised release. In connection with Mr. Kaplan's sentencing, the SLC submitted a letter to the Court advising it of his cooperation in the SLC's investigation, which, in the SLC's view, evidenced his attempt to ameliorate the immense harm that his criminal conduct has caused CA. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser, U.S. District Judge, Eastern District of New York (Jan. 26, 2007).

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Kaplan for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); and indemnification (count nine). The SLC has begun a discussion with Mr. Kaplan's counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Kaplan's criminal restitution obligation is determined.

*Sanjay Kumar.*  Mr. Kumar began his CA career in August 1987, after CA acquired Texas-based software maker Uccel.  After the Uccel acquisition, Mr. Kumar became CA's Manager of Research and Development.  In November 1988, Mr. Kumar rose to the position of Vice President and, in April 1989, Senior Vice President for Strategic Planning. Mr. Kumar served as CA's Executive Vice President for Operations from January 1993 to December 1993, and then, on January 20, 1994, was promoted to President and COO, at which time he joined the CA Board.

On August 4, 2000, the CA Board, at Mr. Wang's recommendation, appointed Mr. Kumar to succeed Mr. Wang as CEO, and, on November 15, 2002, Mr. Kumar was named Chairman of the CA Board.  *See* Minutes of a Meeting of the CA Board at 1-2 (Aug. 4, 2000); Minutes of a Meeting of the CA Board at 1-2 (Nov. 15, 2002).  Mr. Kumar resigned these positions at the request of the CA Board on April 20, 2004, at which time he took the title of Chief Software Architect.  *See* Press Release, Computer Assocs. Int'l, Inc., CA Announces Management Changes (Apr. 21, 2004).  On June 4, 2004, Mr. Kumar resigned from CA.  *See* Press Release, Computer Assocs. Int'l, Inc., Kumar to Leave Computer Associates (June 4, 2004).

On September 17, 2004, Mr. Kumar (along with Mr. Richards) was indicted on nine (9) counts of securities fraud and obstruction of justice for his role in directing the 35-Day Month practice at CA, and then orchestrating a cover-up of the practice.  *See* Indictment ¶¶ 21-39, 41-48, 50-59, 64-79, 82-83, *United States v. Sanjay Kumar & Stephen Richards*, Cr. No. 04-846 (ILG) (E.D.N.Y. Sept. 23, 2004) ("Kumar/Richards Indictment").  On June 29, 2005, the USAO filed a superseding indictment against Mr. Kumar, which re-alleged eight (8) of the counts made against him in the original indictment and provided further factual details in

support of those allegations. *See* Superseding Indictment ¶¶ 22-39, 41-50, 52-53, 56-58, 60-61,

65-66, 72-87, 90-91, *United States v. Sanjay Kumar & Stephen Richards*, Cr. No. 04-846 (ILG)

(E.D.N.Y. June 28, 2006) ("Kumar/Richards Superseding Indictment").

       On September 22, 2004, the SEC filed a complaint against Mr. Kumar. The

SEC complaint alleged that Mr. Kumar helped orchestrate and further the 35-Day Month

practice by: (i) deciding with other CA executives to extend CA's fiscal quarters until CA had

reached a predetermined revenue target; (ii) in at least fiscal year 2000, helping CA obtain

various contracts after the quarter-end, including backdated contracts, while knowing or

recklessly disregarding the fact that CA would prematurely recognize the revenue from those

contracts; (iii) signing false forms filed with the SEC while knowing or recklessly disregarding

the fact that those filings were materially false and misleading; and (iv) obstructing the

investigation of CA's outside counsel, CA's Audit Committee, and the government. *See*

Complaint ¶¶ 2, 16-39, *S.E.C. v. Sanjay Kumar & Stephen Richards*, 04 Civ. 4104 (ILG)

(E.D.N.Y. Sept. 22, 2004) ("Kumar/Richards SEC Complaint").

       On April 24, 2006, two (2) weeks before his criminal trial was set to begin, Mr.

Kumar (along with Mr. Richards) pled guilty to all of the charges lodged against him in the

superseding indictment. *See* Transcript of Plea at 67-68, 73-75, *United States v. Sanjay Kumar*

*& Stephen Richards*, Cr. No. 04-846 (ILG) (E.D.N.Y. Apr. 24, 2006) ("Kumar/Richards Plea

Tr.").

       On June 14, 2006, the SEC and Mr. Kumar entered a partial consent judgment

whereby Mr. Kumar consented, without admitting or denying the allegations against him, to a

final judgment that permanently enjoined him from (i) violating the federal securities laws, and

(ii) serving as an officer or director of a public company. *See* Judgment Imposing a Permanent

Injunction and other Equitable Relief by Consent Against Defendant Sanjay Kumar at 1-4, *S.E.C. v. Sanjay Kumar & Stephen Richards*, 04 Civ. 4104 (ILG) (E.D.N.Y. June 14, 2006).

On November 2, 2006, Mr. Kumar was sentenced to twelve (12) years imprisonment. In connection with Mr. Kumar's sentencing, the SLC submitted a letter to the Court advising it of his failure to cooperate in the SLC's investigation, which, in the SLC's view, evidenced his continuing failure to make any attempt to ameliorate the immense harm he has caused to CA and its core constituents, including its employees, customers, shareholders, and suppliers. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Oct. 24, 2006). Following his sentencing, Mr. Kumar agreed to cooperate with the SLC's investigation and was interviewed by the SLC on seven (7) occasions beginning on January 29, 2007, and continuing through February 28, 2007.

In March 2007, Mr. Kumar and the USAO reached an agreement concerning Mr. Kumar's criminal restitution obligation, the result of which is that Mr. Kumar will pay for the benefit of CA's shareholders $52 million over the next twenty-four (24) months, and then additional sums out of any future earnings. Following this agreement, the SLC entered into negotiations with Mr. Kumar to settle CA's numerous claims against him. These negotiations were hampered by the fact that, in the SLC's view, based on a review of his sworn financial statements, Mr. Kumar had no material assets remaining following his agreement with the USAO. Nonetheless, the SLC has entered into a binding term sheet with Mr. Kumar, to be followed by a definitive agreement, in which Mr. Kumar will consent to the entry of a judgment in the amount of $15,250,000 to be secured in part by real property owned by Mr. Kumar's wife and executable against Mr. Kumar's post-incarceration earnings. The settlement will be presented to the Court for approval in the near future as part of an omnibus motion seeking the

63

Exhibit 10

approval of multiple settlements. Thus, as a result of these agreements, CA and its shareholders should receive in excess of $67 million from Mr. Kumar.

*Stephen Richards.* Mr. Richards, a native Australian, worked at Ernst & Whinney in Sydney, Australia for six (6) months in 1987 before joining CA Australia in May 1988 as a Technical Support Analyst. Mr. Richards then moved into CA's Pre-Sales Department in 1989, and began working in the Sales Department in 1990, where he worked until 1998. Mr. Richards moved to the U.S. in April 1998 when he became the General Manager of Sales for the Northeastern and South Central U.S. regions. In April 1999, Mr. Richards was promoted to head of North American Sales, and on February 29, 2000, Mr. Richards became the head of Worldwide Sales. Mr. Richards resigned from CA on April 26, 2004. *See* CA Press Release, CA Announces Interim CEO and New COO (Apr. 26, 2004).

On September 17, 2004, Mr. Richards was indicted on nine (9) counts of securities fraud and obstruction of justice for his role in directing the 35-Day Month practice at CA, and then covering it up. *See* Kumar/Richards Indictment ¶¶ 18-20, 22-23, 25-27, 29-31, 33-40, 42-47, 49-50, 60-63, 69-81, 84-96. On June 29, 2005, the USAO filed a superseding indictment against Mr. Richards, which re-alleged eight (8) of the counts made against him in the original indictment and provided further factual details in support of those allegations. *See* Kumar/Richards Superseding Indictment ¶¶ 19-21, 23-28, 30-40, 44-49, 51-55, 63-64, 67-71, 77-89. On April 24, 2006, two (2) weeks before his criminal trial was set to begin, Mr. Richards (along with Mr. Kumar) pled guilty to all of the charges lodged against him in the superseding indictment. *See* Kumar/Richards Plea Tr. at 75-83.

On September 22, 2004, the SEC filed a complaint against Mr. Richards. The SEC complaint alleged that Mr. Richards furthered the 35-Day Month practice by: (i)

Exhibit 10

participating with other CA executives in the practice of extending CA's fiscal quarters until CA had reached a predetermined revenue target; (ii) instructing and allowing subordinates to negotiate and obtain contracts after the quarter-end while knowing or recklessly disregarding the fact that CA would improperly recognize the revenue from those contracts; (iii) knowingly or recklessly failing to alert CA's Finance or Sales Accounting departments that CA salespersons under Mr. Richards were obtaining contracts with backdated signature dates after the quarter-end; and (iv) obstructing the investigation of CA's outside counsel, CA's Audit Committee, and the government. *See* Kumar/Richards SEC Complaint ¶¶ 3, 40-54.

On June 14, 2006, the SEC and Mr. Richards entered a partial consent judgment whereby Mr. Richards consented, without admitting or denying the allegations against him, to a final judgment that permanently enjoins him from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company. *See* Judgment Imposing a Permanent Injunction and Other Equitable Relief by Consent Against Defendant Stephen Richards at 1-4, *S.E.C. v. Sanjay Kumar & Stephen Richards*, 04 Civ. 4104 (ILG) (E.D.N.Y. June 14, 2006). The SEC and Mr. Richards have not yet reached agreement on the monetary penalty that Mr. Richards will be required to pay.

On November 14, 2006, Mr. Richards was sentenced to seven (7) years imprisonment. In connection with his sentencing, the SLC submitted a letter to the Court informing it of Mr. Richards' failure to cooperate in the SLC's investigation, which, in the SLC's view, evidenced his continuing failure to make any attempt to ameliorate the immense harm he has caused to CA, and its core constituents, including its employees, customers, shareholders, and suppliers. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Oct. 24, 2006). Following his sentencing, Mr. Richards agreed to

65

Exhibit 10

cooperate with the SLC's investigation, and was interviewed by the SLC on December 22, 2006.

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Richards for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); and indemnification (count nine). The SLC has begun a discussion with Mr. Richards' counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Richards' criminal restitution obligation is determined.

*David Rivard*. Mr. Rivard, a certified public accountant, began his career as an auditor at E&Y from 1989 to August 1998. During that time, E&Y was CA's independent auditor, and Mr. Rivard made his initial contact with CA in 1991 when working on the CA audit. Mr. Rivard was involved with every E&Y audit of CA from 1991 through 1998, and was the Audit Senior Manager in charge of the day-to-day operations of E&Y's fiscal year 1998 audit of CA. Mr. Rivard joined CA in August 1998 as the Vice President of Sales Accounting at the invitation of Ira Zar, who had recently been appointed CA's CFO. On September 7, 2001, Mr. Rivard became the Vice President of Finance. On October 7, 2003, Mr. Rivard resigned from CA at the request of the Audit Committee and Mr. Kumar. *See* Press Release, Computer Assocs. Int'l, Inc., Computer Associates Announces Preliminary Results of Board Inquiry (Oct. 8, 2003).

On April 8, 2004, Mr. Rivard pled guilty to one (1) federal criminal count each of: (i) conspiracy to obstruct justice, and (ii) conspiracy to commit securities fraud. *See* Transcript of Plea at 28-34, *United States v. David Rivard*, Cr. No. 04-329 (ILG) (E.D.N.Y.

April 8, 2004) ("Rivard Plea Tr."). On January 30, 2007, Mr. Rivard was sentenced to four (4) months of home detention and three (3) years of supervised release. Also on April 8, 2004, the SEC filed a complaint against Mr. Rivard alleging that he violated various federal securities laws. *See* Complaint ¶¶ 20-32, *S.E.C. v. David Rivard*, 04 Civ. 1464 (ILG) (E.D.N.Y. Apr. 8, 2004) ("Rivard SEC Complaint"). Specifically, the SEC complaint alleged that Mr. Rivard (i) acted as CA's signatory on many backdated contracts; (ii) himself backdated the date of his signature of many contracts (iii) disseminated information throughout CA which furthered the 35-Day Month practice; and (iv) directed the alteration of records to hide the 35-Day Month practice from outside auditors. *Id.* ¶ 20.

On November 1, 2004, the SEC and Mr. Rivard entered into a final consent judgment whereby he consented, without admitting or denying the allegations against him, to a final judgment that required him to disgorge $83,700 in ill-gotten gains and interest and imposed a $75,000 civil penalty. *See* Final Judgment by Consent Against Defendant David Rivard at 5, *S.E.C. v. David Rivard*, 04 Civ. 1464 (ILG) (E.D.N.Y. Nov. 1, 2004). As a result of that judgment, Mr. Rivard is permanently enjoined from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company.

As part of its investigation, the SLC interviewed Mr. Rivard on June 22 and June 29, 2006. On January 30, 2007, Mr. Rivard was sentenced to four (4) months home detention followed by three (3) years supervised release. In connection with Mr. Rivard's sentencing, the SLC submitted a letter to the Court advising it of his cooperation in the SLC's investigation, which, in the SLC's view, evidenced his attempt at ameliorating the immense harm that his criminal conduct has caused CA. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Jan. 26, 2007).

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Rivard for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); and indemnification (count nine). The SLC has begun a discussion with Mr. Rivard's counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Rivard's criminal restitution obligation is determined.

*Lloyd Silverstein*. Prior to joining CA, Mr. Silverstein worked as an accountant at Holtz Rubenstein & Co. from 1977 to 1982. From 1982 to 1988, Mr. Silverstein worked as a controller and CFO at Microwave Power Devices. Mr. Silverstein began his CA career in 1988 as the Director of Finance, and held that position until 1993, when he moved to Sales Accounting. In 1997, Mr. Silverstein became head of Sales Accounting, and from October 1998 to October 2001, Mr. Silverstein was Vice President in charge of the Global Sales Organization, a department that served as a liaison between the Finance, Sales, and Legal departments. In October 2001, Mr. Silverstein moved to the Strategic Licensing and Pricing department. On October 7, 2003, Mr. Silverstein resigned from CA at the request of the Audit Committee and Mr. Kumar. *See* Press Release, Computer Assocs. Int'l, Inc., Computer Associates Announces Preliminary Results of Board Inquiry (Oct. 8, 2003).

On January 22, 2004, Mr. Silverstein pled guilty to one (1) federal criminal count of conspiracy to obstruct justice. *See* Transcript of Arraignment & Pleading at 6-9, 15, 19-21, *United States v. Lloyd Silverstein*, Cr. No. 04-0024 (ILG) (E.D.N.Y., Jan. 22, 2004) ("Silverstein Plea Tr."). Also on January 22, 2004, the SEC filed a complaint against Mr. Silverstein alleging violations of various federal securities laws. Complaint ¶¶ 28-39, *SEC v.*

*Lloyd Silverstein*, 04 Civ. 255 (ILG) (E.D.N.Y. Jan. 22, 2004) ("Silverstein SEC Complaint"). Specifically, the SEC complaint alleged, among other things, that Mr. Silverstein and others at CA "engaged in a practice in which CA held its books open after the end of each quarter and improperly recorded, in that elapsed quarter, revenue from the contracts that had not been finalized and executed before the expiration of the quarter." *Id.* ¶ 1. At that time, Mr. Silverstein entered into a partial consent judgment whereby he consented, without admitting or denying the allegations against him, to a final judgment that permanently enjoins him from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company. *See* Partial Final Judgment Imposing a Permanent Injunction and Other Equitable Relief by Consent Against Defendant Lloyd Silverstein at 2-4, *S.E.C. v. Lloyd Silverstein*, 04 Civ. 255 (E.D.N.Y. Jan. 30, 2004). The SEC and Mr. Silverstein have not yet reached agreement on a monetary penalty that Mr. Silverstein will be required to pay.

As part of its investigation, the SLC interviewed Mr. Silverstein on October 13, 2006. On January 31, 2007, Mr. Silverstein was sentenced to six (6) months home detention followed by three (3) years supervised release. In connection with Mr. Silverstein's sentencing, the SLC submitted a letter to the Court advising it of his cooperation in the SLC's investigation, which, in the SLC's view, evidenced his attempt to ameliorate the immense harm that his criminal conduct has caused CA. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Jan. 30, 2007).

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Silverstein for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); and indemnification (count nine). The SLC has

begun a discussion with Mr. Silverstein's counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Silverstein's criminal restitution obligation is determined.

*Steven Woghin.* Mr. Woghin graduated from the University of Michigan Law School in 1971. Upon graduation, he worked as an attorney for the U.S. Postal Service for one year. From 1972 to 1982, Mr. Woghin worked as an attorney in the anti-trust division of the Department of Justice. From 1982 to 1985, Mr. Woghin worked as a Special Assistant U.S. Attorney in the Eastern District of Virginia. In 1985, Mr. Woghin left the U.S. Attorney's Office for the private sector, working first for a small firm in New York City, and then later as a partner specializing in litigation at Arter & Hadden LLP in Dallas, Texas.

At Arter & Hadden, Mr. Woghin developed a relationship with Mr. Kumar, who was then at Uccel Corp., when Mr. Woghin represented Uccel in several litigations. After CA acquired Uccel in 1987, Mr. Woghin was asked to represent CA in several litigation matters. Mr. Woghin developed a business relationship with CA over time, and joined CA in 1992 as a Vice President in the Legal department. He remained in that position until Mr. Kumar, unsolicited by Mr. Woghin, offered him the position of Senior Vice President and General Counsel in 1995, which he accepted. Mr. Woghin was fired from CA by Mr. Kumar on April 8, 2004.

On September 22, 2004, Mr. Woghin pled guilty to one (1) federal criminal count each of: (i) obstruction of justice, and (ii) conspiracy to commit securities fraud. *See* Transcript of Plea at 13-16, 23, 28-30, *United States v. Steven Woghin*, Cr. No. 04-847 (ILG) (E.D.N.Y. Sept. 22, 2004) ("Woghin Plea Tr."). Also on September 22, 2004, the SEC filed a complaint against Mr. Woghin alleging that he violated various federal securities laws. *See*

Exhibit 10

Complaint ¶¶ 4, 37-54, *S.E.C. v. Steven Woghin*, 04 Civ. 4087 (ILG) (E.D.N.Y. Sept. 22, 2004) ("Woghin SEC Complaint"). Specifically, the SEC complaint alleged, among other things, that Mr. Woghin furthered the 35-Day Month practice by: (i) signing materially false and misleading financial statements; (ii) approving backdated contracts, including drafting a contract with a misleading date; and (iii) allowing CA's Legal department to approve contracts while knowing or recklessly disregarding the fact that the contracts contained false and misleading signature dates. *Id.* ¶ 2. At that time, Mr. Woghin entered into a partial consent judgment whereby he consented, without admitting or denying the allegations against him, to a final judgment that permanently enjoins him from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company. *See* Partial Final Judgment Imposing a Permanent Injunction and Other Equitable Relief by Consent Against Defendant Steven Woghin at 1-5, *S.E.C. v. Steven Woghin*, 04 Civ. 4087 (ILG) (E.D.N.Y. Sept. 30, 2004). The SEC and Mr. Woghin have not yet reached agreement on a monetary penalty that Mr. Woghin will be required to pay.

As part of its investigation, the SLC interviewed Mr. Woghin on July 31, 2006 and November 15, 2006. On January 16, 2006, Mr. Woghin was sentenced to two (2) years imprisonment. In connection with Mr. Woghin's sentencing, the SLC submitted a letter to the Court advising it of his cooperation in the SLC's investigation, which, in the SLC's view, evidenced his attempt to ameliorate the immense harm that his criminal conduct has caused CA. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Jan.12, 2007).

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Woghin for breach of fiduciary duty (count

Exhibit 10

three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); indemnification (count nine).  The SLC has begun a discussion with Mr. Woghin's counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Woghin's criminal restitution obligation is determined.

*Ira Zar.*  Mr. Zar began his business career at CA in 1982 upon graduation from Baruch College.  Although not a CPA, between 1982 and 1994, Mr. Zar worked in various financial-related positions at CA, including Controller, International Controller, manager of Financial Reporting, and head of Sales Accounting.  In April 1994, Mr. Zar became Senior Vice President of Finance, as well as Treasurer.  On June 22, 1998, Mr. Zar was appointed CFO following the resignation of Peter Schwartz. On October 7, 2003, Mr. Zar resigned from CA at the request of the Audit Committee and Mr. Kumar.  *See* Press Release, Computer Assocs. Int'l, Inc., Computer Associates Announces Preliminary Results of Board Inquiry (Oct. 8, 2003).

On April 8, 2004, Mr. Zar pled guilty to one (1) federal criminal count each of: (i) conspiracy to obstruct justice, (ii) securities fraud, and (iii) conspiracy to commit securities fraud.  *See* Transcript of Plea at 18-23, 33-39, *United States v. Ira Zar*, Cr. No. 04-331 (ILG) (E.D.N.Y. Apr. 8, 2004) ("Zar Plea Tr.").

Also on April 8, 2004, the SEC filed a complaint against Mr. Zar alleging that he violated various federal securities laws.  The SEC complaint alleged that Mr. Zar: (i) oversaw and implemented the 35-Day Month practice; (ii) backdated contracts; (iii) oversaw the preparation and filing of false and misleading SEC filings; and (iv) obstructed the investigation of CA's outside counsel, CA's Audit Committee, and the government.  *See* Complaint ¶¶ 20-35, *S.E.C. v. Ira Zar*, 04 Civ. 1463 (E.D.N.Y. Apr. 9, 2004).  At that time, Mr. Zar entered into

a partial consent judgment whereby he consented, without admitting or denying the allegations against him, to a final judgment that permanently enjoins him from (i) violating the federal securities laws, and (ii) serving as an officer or director of a public company. *See* Partial Final Judgment Imposing a Permanent Injunction and Other Equitable Relief by Consent Against Defendant Ira Zar at 1-5, *S.E.C. v. Ira Zar*, 04 Civ. 1463 (E.D.N.Y. Apr. 9, 2004). The SEC and Mr. Zar have not yet reached agreement on a monetary penalty that Mr. Zar will be required to pay.

As part of its investigation, the SLC interviewed Mr. Zar on July 28, 2006 and November 15, 2006. On January 26, 2007, Mr. Zar was sentenced to seven (7) months imprisonment followed by seven (7) months home detention. In connection with Mr. Zar's sentencing, the SLC submitted a letter to the Court advising it of his cooperation in the SLC's investigation, which, in the SLC's view, evidenced his attempt to ameliorate the immense harm that his criminal conduct has caused CA. *See* Letter from William McCracken and Renato Zambonini to the Honorable I. Leo Glasser (Jan. 24, 2007).

Based on his admitted knowing and intentional criminal conduct, the SLC has directed the Company to pursue claims against Mr. Zar for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); violation of § 14(a) of the Exchange Act (count seven); and indemnification (count nine). The SLC has begun a discussion with Mr. Zar's counsel concerning a settlement of the Company's claims against him, and expects that a settlement will be reached shortly after Mr. Zar's criminal restitution obligation is determined.

2.    **Former Officer Defendants**

The following defendants served as officers at CA during the period in which the fraud occurred, but have not been criminally indicted by USAO or sued by the SEC.

73

*Michael McElroy*.  Mr. McElroy graduated from New York University Law

School in 1969.  Upon graduation, Mr. McElroy worked as an associate at a small law firm

named Valicenti Leighton Reid & Pine.  In 1975, when the Valicenti firm dissolved, Mr.

McElroy joined another small firm called Burke & Burke Daniels Leighton & Reid ("Burke &

Burke"), at which Tony Wang (Charles Wang's brother) and Arnold Mazur, both of whom later

became senior CA executives, were partners.  Mr. McElroy worked at Burke & Burke until

1987, when the firm merged to become Satterlee, Stephens, Burke & Burke.

In January 1988, Tony Wang offered Mr. McElroy a position in CA's New York

office as a Vice President in the Legal department, which he accepted.  Mr. McElroy was

promoted to the position of Senior Vice President in the Legal department in 1989.  He served

as the Company's Corporate Secretary from April 1988 to April 1991, and from January 1997

to October 22, 2002.[28]  As a lawyer at CA, Mr. McElroy reported to Mr. Woghin, and was

unofficially known as CA's senior licensing attorney.  On April 19, 2004, Mr. McElroy was

fired from CA for cause.  As part of its investigation, the SLC interviewed Mr. McElroy on July

27, 2006.

As described further below, the SLC, in the exercise of its business judgment,

has determined that dismissal of the claims alleged against Mr. McElroy in the 2005 Derivative

Complaint is in the best interests of CA.  The SLC has received and reviewed a sworn financial

statement prepared by Mr. McElroy which evidences that Mr. McElroy's net worth (excluding

protected retirement assets) is less than $500,000, and concludes that the costs of litigation

against him, including its obligations to advance legal fees and costs under Delaware law,

outweigh any possible recovery that it may obtain.  Moreover, Mr. McElroy, while a senior

---

[28]     The last Board meeting that Mr. McElroy attended as Corporate Secretary was October 22, 2002.

lawyer, was not involved with or responsible for revenue recognition or financial reporting decisions. Thus, as a matter of economic resource allocation and fairness, the SLC has determined, in the exercise of its business judgment, to seek dismissal of the claims against Mr. McElroy.

*Charles McWade.* Prior to joining CA, Mr. McWade worked at Ernst & Whinney from 1969 to 1983, where he ultimately became a partner. After CA became a public company in 1981, the Company hired E&Y as its outside auditor, and Mr. McWade worked on the CA audit. Mr. McWade joined CA in July 1983, after he was offered a position by Tony Wang and Abraham Poznanski, CA's then-CFO. Mr. McWade served as CA's Treasurer and in other senior financial positions until 1994. From 1994 to 1997, Mr. McWade served as head of the Financial Reporting department, and from 1998, until he resigned on April 2, 2001, Mr. McWade was a Senior Vice President in charge of development, primarily responsible for mergers and acquisitions. From July 2001 to July 2006, Mr. McWade served as a consultant to CA, assisting with, among other things, tax matters. As part of its investigation, the SLC interviewed Mr. McWade on August 16, 2006.

As described above, the SLC has reached a settlement with Mr. McWade, pursuant to which Mr. McWade will pay the Company $1 million, and the Company will seek dismissal of all claims against him.

*Peter Schwartz.* After graduating from Yale University in 1965, Mr. Schwartz served as a fighter pilot in the Marine Corps from 1965 to 1974. From 1974 to 1976, Mr. Schwartz worked at the National Institute for the Deaf, following which he worked in the Internal Audit department of the Xerox Corporation from 1976 to 1983. In 1983, Tony Wang, whom Mr. Schwartz knew from Yale, offered Mr. Schwartz a position in the Finance

75

Exhibit 10

department at CA. Mr. Schwartz accepted the offer and served as a Vice President of Finance from 1983 to 1985, at which time he was appointed CFO, a position he held until his resignation on June 22, 1998.[29] As part of its investigation, the SLC interviewed Mr. Schwartz on August 1, 2006.

As described further below, the SLC has determined that Mr. Schwartz was aware of, and participated in, the 35-Day Month practice while a senior officer at CA, and is therefore liable to CA for the losses it sustained on account of his actions. As such, the SLC has directed the Company to pursue claims against Mr. Schwartz for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); fraud (count six); and indemnification (count nine).

3.    **Oversight Director Defendants**

The following director defendants served on the CA Board during the period in which the 35-Day Month practice occurred. As described above, the 2005 Derivative Complaint and the Kaufman Complaint allege that Oversight Director Defendants breached their fiduciary duties to CA by failing to properly oversee CA (i) during the period of fraudulent conduct, and (ii) during the government investigation into the Company's accounting practices.

*Russell Artzt.* Mr. Artzt co-founded CA in 1976 with Charles Wang, whom he met in a math class at Queens College, and Mr. Artzt remains employed by the Company in a senior development position to this day. From 1976 to 1987, Mr. Artzt was CA's Senior Development Officer. From 1987 to 2002, Mr. Artzt was Executive Vice President of Research and Development. From 2002 to 2005, Mr. Artzt was Executive Vice President of Alliances

---

[29]    The SLC has concluded that after his resignation as CFO, Mr. Schwartz continued at CA in an executive officer position through the summer of 1998; Mr. Schwartz also served as a consultant to CA through March 31, 2003.

and eTrust Solutions.  Mr. Artzt is currently Executive Vice President in charge of products at CA.

Mr. Artzt was a member of the CA Board from November 1980 to August 24, 2005, when the CA Board determined to limit the number of management directors.  Mr. Artzt served on the Corporate Operations Committee (formerly known as the Executive Committee) from 1987 to August 24, 2005.  Mr. Artzt, along with Messrs. Wang and Kumar, were recipients under the KESOP, with Mr. Artzt receiving ten percent (10%) of the shares issued.

Mr. Artzt was interviewed by the SLC on June 28, 2006 and March 8, 2007.  As a result of these interviews and its investigation, the SLC concluded that Mr. Artzt was unjustly enriched by the KESOP.  As a result, the SLC has reached an agreement in principle to settle all claims against Mr. Artzt in exchange for the payment to CA of $9 million (the cash equivalent of 354,890 CA shares).  This settlement agreement will be presented to the Court for approval as part of an omnibus motion.  The SLC notes that during its investigation, it did not uncover evidence that Mr. Artzt directed or participated in the 35 Day-Month practice or was involved in the preparation or dissemination of the financial statements that led to the KESOP's accelerated vesting.

*Alfonse D'Amato*.  Mr. D'Amato has been a member of the CA Board since June 29, 1999.  Mr. D'Amato was invited to join the Board by Charles Wang, CA's then-Chairman and CEO.  He has served on the Audit Committee and Corporate Governance Committee (formerly known as the Nominating Committee) since joining the CA Board.  Mr. D'Amato was a member of the Compensation and Human Resource Committee (formerly known as the Stock Option and Compensation Committee) from August 25, 1999 to August 29,

77

2001. In August 2003, Mr. D'Amato served as chair of the committee that considered the settlement of the Class Actions.

Prior to joining the Board, Mr. D'Amato served three (3) terms in the United States Senate, from 1981 to 1999, as a Senator from the state of New York. While in the Senate, Mr. D'Amato served as Chair of the Senate Committee on Banking, Housing and Urban Affairs and the Commission on Security and Cooperation in Europe. After leaving the Senate, Mr. D'Amato was a director of Avis Rent-a-Car, Inc., later Avis Group Holdings, Inc., from 1999 to 2001, and an advisor director for Newtek Capital in 2002. He has served as a director of Signature Bank since 2005. Since 1999, Mr. D'Amato has been Managing Director of Park Strategies LLC, a consultancy and lobbying firm he founded with Wayne Berman, former assistant Secretary of Commerce for policy under President George H.W. Bush.

As part of its investigation, the SLC interviewed Mr. D'Amato on July 21, 2005, September 27, 2006, and March 8, 2007. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. D'Amato.

*Willem de Vogel.* Mr. de Vogel served as a member of the CA Board from August 1981 until August 1990, and then again from October 22, 1991 to August 28, 2002, when his term as a director expired and the Board imposed an eight-year limit for service as a director. Mr. de Vogel first became involved with CA when an affiliated entity invested in the Company in 1977. After CA became a public company in 1981, Tony Wang, Charles Wang's brother, asked Mr. de Vogel to join the CA Board. Mr. de Vogel served as a member of the Compensation and Human Resource Committee (formerly known as the Stock Option and Compensation Committee) from 1982 to August 1990, and from 1991 to August 28, 2002. Mr.

de Vogel was a member of the Audit Committee from March 1986 to August 8, 1990, and from October 1991 to August 28, 2002.

Mr. de Vogel has also served as a director of Morton Industrial Group, Inc. (formerly MLX Corp.) from 1986 to 2002 and as a director of Pameco Corp. from 1999 to 2001. Mr. de Vogel has served, and continues to serve, as a director of Factory 2-U Stores Inc. (since 2000) and Classic Vacation Group Inc. (since 2001). Mr. de Vogel has been President of Three Cities Research, Inc., a private equity firm, since 1982.

As part of its investigation, the SLC interviewed Mr. de Vogel on August 15, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. de Vogel.

*Richard Grasso.* Mr. Grasso served as a member of the CA Board from January 20, 1994 until August 28, 2002, when his term as a director expired and the Board imposed an eight-year limit for service as a director. Mr. Grasso became acquainted with CA in 1986 when CA was first listed on the NYSE, where he was employed. In late 1993, Charles Wang, who knew Mr. Grasso from the Company's affiliation with the NYSE, approached Mr. Grasso and asked him to join the CA Board. Mr. Grasso served as a member of the Compensation and Human Resource Committee (formerly known as the Stock Option and Compensation Committee) from 1994 to August 28, 2002 and the Corporate Governance Committee (formerly known as the Nominating Committee) from May 1996 to July 11, 2002.

Prior to joining the Board, Mr. Grasso was a floor clerk at the NYSE beginning in 1968, and spent the next thirty-five (35) years at the NYSE, where he rose through the ranks of the organization. Mr. Grasso served as President and COO of the NYSE from 1988 to 1995,

as Executive Vice Chairman from 1991 to 1995, and as Chairman and CEO from 1995 to 2003.
Mr. Grasso resigned from his position at the NYSE on September 17, 2003.

As part of its investigation, the SLC interviewed Mr. Grasso on September 25,
2006. Based on its investigation, for reasons described in detail below, the SLC has determined
to seek dismissal of the claims asserted against Mr. Grasso.

*Shirley Strum Kenny*. Dr. Kenny served as a member of the CA Board from
July 1994 to August 28, 2002, when her term as a director expired and the Board imposed an
eight-year limit for service as a director. Dr. Kenny joined the Board in 1994 at the request of
Mr. Wang and Irving Goldstein, both of whom she knew as graduates of Queens College of the
city of New York, where she was then serving as President. Dr. Kenny served as a member of
the Audit Committee from 1995 to August 28, 2002, and as the Audit Committee's Chair from
June 6, 2000 to May 14, 2002, at which time Walter Schuetze, who had recently joined the
Board, was appointed as Chair. Dr. Kenny also served as a member of the Corporate
Governance Committee (formerly known as the Nominating Committee) from May 1996 to
August 28, 2002.

Prior to joining the CA Board, from 1989 to August 1994, Dr. Kenny served as
President of Queens College. At that time, Dr. Kenny resigned that position to become
President of the State University of New York at Stony Brook ("SUNY Stony Brook"), in
which capacity she has served since September 1994. Dr. Kenny served as a director of Toys
R' Us Inc. from 1990 to 2002.

As part of its investigation, the SLC interviewed Dr. Kenny on June 30, 2006
and November 17, 2006. Based on its investigation, for reasons described in detail below, the
SLC has determined to seek dismissal of the claims asserted against Dr. Kenny.

80

Exhibit 10

*Roel Pieper*.[30]  Mr. Pieper served as a member of the CA Board from March 1,

1999 to August 28, 2002, when he resigned following Mr. Wang's retirement.  Mr. Pieper was

invited to join the Board by Mr. Wang, whom Mr. Pieper knew personally, and Mr. de Vogel.

Mr. Pieper served as a member of the Compensation and Human Resource Committee

(formerly known as the Stock Option and Compensation Committee) from August 25, 1999 to

August 28, 2002.

Prior to joining the Board, Mr. Pieper worked in various managerial positions at

Software AG from 1981 to 1988.  From 1988 to 1989, he served as a Senior Vice President in

the Technology Division of Software AG, and from 1989 to 1990, he served as its Chief

Technology Officer.  From 1991 to 1993, he served as the Chief Executive Officer of AT&T's

Unix System Laboratories.  From 1993 to 1995, he served as the Chairman and CEO of UB

Networks, Inc. and from 1995 to 1997 he served as the CEO of Tandem Computers.  From

1997 to 1998, Mr. Pieper served as a Senior Vice President and General Manager of Worldwide

Sales and Marketing at Compaq Computer Corp.  From 1998 to 1999, Mr. Pieper was a

member of the Board of Management and an Executive Vice President of Technology, Strategy

and Planning at Royal Philips Electronics, N.V.  Mr. Pieper has been a General Partner of

Insight Capital Partners since 1999, and Managing Director at Favonius Insight Ventures since

2001.

Mr. Pieper has also served as a director of numerous public companies,

including General Magic, Inc. from 1996 to 2000; Quokka Sports Inc. from 1997 to 2000;

Unify Corp. from 1997 to 1998; Nextlevel Systems Inc. from 1997 to 1998; General Instrument

Corp. from 1997 to 1998 (Chairman); Lernout & Hauspie Speech Products from 1999 to 2001

---

[30]     Mr. Pieper was named as a defendant in the 2005 Derivative Complaint, but was not named in the
Kaufman Complaint.

81

(Chairman); New Media Industries PLC from 2000 to 2002; and Nutri Pharma ASA from 2001 to 2002 (Chairman). Mr. Pieper has also served, and continues to serve, as a director of Viewsoft, Inc. (since 1995); Kaspia Systems, Inc. (since 1995); Smart Valley Inc. (since 1995); Stonehenge Telecom N.V. (since 1999); as Chairman of Ring! N.V. (since 2001); Oblicore Inc. (since 2004); and as Chairman of LB Icon AB (since 2004).

As part of its investigation, the SLC interviewed Mr. Pieper on August 27, 2006 and March 20, 2007. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Pieper.

*Charles Wang*. Mr. Wang co-founded CA in 1976 with Russell Artzt, and served as CA's CEO from 1976 to August 4, 2000, and as its Chairman from April 1980 to November 15, 2002. Prior to founding CA in 1976, Mr. Wang was the Vice President of Sales for Standard Data Corp. Mr. Wang currently owns the New York Islanders hockey team and is the co-owner of the New York Dragons arena football team. Mr. Wang is also involved in several real-estate ventures on Long Island, New York, including plans to develop the area surrounding the Nassau Coliseum in Uniondale.

As noted above, Mr. Wang was Chairman and CEO during much of the period when CA was engaging in a widespread revenue recognition fraud. The SLC has uncovered credible and corroborated evidence that Mr. Wang was aware of, and was an active participant in, the 35-Day Month practice, during which he, among other things (i) directed his subordinates to obtain additional revenue after the close of quarters to be counted in the prior quarter, and (ii) negotiated and participated in the negotiation of deals that he knew to be backdated. In addition, Mr. Wang is the only former member of CA's Board that has refused to

Exhibit 10

unconditionally and fully cooperate with the SLC's investigation, despite having been offered numerous opportunities to do so.

Based on the foregoing, the SLC has directed that the Company pursue claims against Mr. Wang for breach of fiduciary duty (count three); restitution and unjust enrichment (count four); corporate waste (count five); fraud (count six); violation of Section 14(a) of the Exchange Act (count seven); and indemnification (count nine).

### 4. Settlement Director Defendants

In August 2003, the following directors served on the committee that considered the settlement of the Class Actions and/or the committee that considered the settlement of the 2003 Derivative Action.[31] As described above, the 2005 Derivative Complaint and the Kaufman Complaint allege that the Settlement Director Defendants breached their fiduciary duties to CA by (i) failing to properly oversee CA during the government investigation into the Company's accounting practices, and (ii) improperly approving the 2003 Settlement. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against the Settlement Director Defendants.

*Kenneth Cron.* Mr. Cron served as a member of the CA Board from June 15, 2002 to September 18, 2006, when the Board determined to limit the number of management directors. Mr. Cron served as CA's interim CEO from April 26, 2004 to February 9, 2005, following Mr. Kumar's resignation. Mr. Cron also served on the Compensation and Human Resource Committee from August 28, 2002 to April 23, 2004. In August 2003, Mr. Cron served on the committee that considered the settlement of the 2003 Derivative Action.

---

[31] As mentioned above in the section detailing the Oversight Director Defendants, Alfonse D'Amato served as Chair of the Committee that considered the settlement of the Class Actions. Hereinafter, Mr. D'Amato is included in references to both the Oversight Director Defendants and the Settlement Director Defendants, unless otherwise noted.

83

Prior to joining the Board, Mr. Cron worked as a Division President at CMP Media Inc. from 1978 to 1999.  He has also served as Chairman and CEO of Uproar Inc. from September 1999 to March 2001 (Chairman and CEO).  From March 2001 to April 2004, he served as Chairman and CEO of Vivendi Universal Games, Inc., and has served as the Chairman of Midway Games, Inc. since June 2004.

As part of its investigation, the SLC interviewed Mr. Cron on June 22, 2005 and July 14, 2006.  Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Cron.

*Gary Fernandes*.  Mr. Fernandes has been a member of the CA Board since May 16, 2003.[32]  Mr. Fernandes was first asked to join the CA Board by Mr. Kumar in 2002, but Mr. Fernandes declined the offer because of non-competition arrangements with his former employer, Electronic Data Systems, Inc. ("EDS").  In 2003, EDS consented to Mr. Fernandes joining the CA Board.  Mr. Fernandes has served as a member of the Compensation and Human Resource Committee since August 27, 2003, and has been Chair of the Strategy Committee since August 9, 2006.  In August 2003, Mr. Fernandes served on the committee that considered the settlement of the 2003 Derivative Action.

Prior to joining the Board, Mr. Fernandes worked at EDS, and, over the course of a twenty-nine (29) year career starting in 1969, rose from the position of systems engineer to Vice Chairman.  Mr. Fernandes has also served as a director of numerous public companies, including John Wiley & Sons Inc. from 1989 to 2000; Southland Corp. from 1991 to 1995; Groceryworks.com from 2000 to 2002 (Chairman); Anacomp Inc. from 2003 to 2005; and webMethods, Inc. from 2002 to 2005.  Mr. Fernandes has served, and continues to serve, as a

---

[32]  Mr. Fernandes attended the May 13, 2003 CA Board meeting as a "guest of the Board."  Minutes of a Meeting of the CA Board at 1 (May 13, 2003).  At that meeting, it was resolved that he would be elected a director of the Company effective May 16, 2003.