1  Thomas N. FitzGibbon (SBN: 169194)
   TNF@ptflaw.com
2  **PFEIFFER THIGPEN & FITZGIBBON LLP**
   233 Wilshire Boulevard, Ste. 220
3  Santa Monica, CA  90401
   Telephone: (310) 451-5800
4  Facsimile: (310) 451-1599
5
6  Luke A. McGrath (*Pro Hac Vice Pending*)
   LZM@bickelbrewer.com
7  James S. Renard (*Pro Hac Vice Pending*)
   JSR@bickelbrewer.com
8  **BICKEL & BREWER**
9  767 Fifth Avenue, 50th Floor
   New York, New York 10153
10 Telephone: 212-489-1400
11 Facsimile: 212-489-2384
12
   Attorneys for Intervenor
13 *Sam Wyly*

14

15                 **UNITED STATES DISTRICT COURT**

16                 **CENTRAL DISTRICT OF CALIFORNIA**

17

| 18 | UNITED STATES OF AMERICA, | Case No. 2:05-CR-587-JFW-3 [Assigned to Hon. John F. Walter] |
|---|---|---|
| 19 | Plaintiff, | |
| 20 | - against - | **PART 2 OF EXHIBIT 10 TO DECLARATION OF LUKE A. MCGRATH IN SUPPORT OF INTERVENOR SAM WYLY'S MOTION TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER** |
| 21 | | |
| 22 | MILBERG WEISS BERSHAD & SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. SCHULMAN, SEYMOUR M. LAZAR, and PAUL T. SELZER, | |
| 23 | | |
| 24 | | |
| 25 | Defendants. | Date:    February 9, 2009 Time:    9:00 a.m. Room:    16 |
| 26 | | |

27

28

director of 7-Eleven Inc. (since 1999); Blockbuster Inc. (since 2004); and BancTec Inc. (since 2006).

As part of its investigation, the SLC interviewed Mr. Fernandes on July 27, 2005 and July 11, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Fernandes.

*Robert La Blanc.* Mr. La Blanc has been a member of the CA Board since July 15, 2002. Mr. La Blanc was invited to join the Board after meeting with Mr. Kumar, Mr. Wang, and CA director Lewis Ranieri, whom Mr. La Blanc knew as a fellow former executive of Salomon Brothers Inc. Mr. La Blanc served on the Compensation and Human Resource Committee from August 28, 2002 to August 27, 2003. Mr. La Blanc has served on the Corporate Governance Committee since August 28, 2002 and the Audit Committee since May 26, 2004. In August 2003, Mr. La Blanc served on the committee that considered the settlement of the 2003 Derivative Action.

Prior to joining the Board, from 1969 to 1979, Mr. La Blanc was a general partner of Salomon Brothers. Mr. La Blanc then founded Robert E. La Blanc Associates, Inc., where he has held the position of President since 1981. Mr. La Blanc has served as a director of numerous public companies, including Storage Technology Corp. from 1979 to 2004; Gilbert Associates Inc. in 1997; Salient 3 Communications, Inc. from 1997 to 2003; Tribune Co. from 2000 to 2001; and Avatech Solutions, Inc. from 2004 to 2005. Mr. La Blanc has served, and continues to serve, as a director of the Titan Corporation (since 1996); Chartered Semiconductor Manufacturing Ltd. (since 1998); and FiberNet Telecom Group, Inc. (since 2003). Mr. La Blanc is also currently a director of a family of Prudential Mutual Funds.

85

Exhibit 10

As part of its investigation, the SLC interviewed Mr. La Blanc on July 27, 2005 and July 13, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. La Blanc.

*Jay Lorsch.* Mr. Lorsch has been a member of the CA Board since April 1, 2002. Mr. Lorsch was invited to join the Board as part of Mr. Kumar's claimed effort to promote CA as the "gold standard" in corporate governance. Mr. Lorsch has served as (i) Chair of the Corporate Governance Committee since July 11, 2002, (ii) a member of the Corporate Operations Committee since August 28, 2002, and (iii) a member of the Compensation and Human Resource Committee since May 11, 2004. In August 2003, Mr. Lorsch served as (i) a member of the committee that considered the settlement of the Class Actions, and (ii) Chair of the committee that considered the settlement of the 2003 Derivative Action.

Mr. Lorsch has been on the faculty at the Harvard Business School since 1978, during which time he has served as the Louis Kirstein Professor of Human Relations. Mr. Lorsch has also served as a consultant to numerous Fortune 500 companies, and has served as a director of Brunswick Corp. from 1983 to 2003; Sandy Corp. from 1987 to 1996; and Benckiser N.V. from 1998 to 1999.

As part of its investigation, the SLC interviewed Mr. Lorsch on July 15, 2005 and July 20, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Lorsch.

*Lewis Ranieri.* Mr. Ranieri has been a member of the CA Board since June 26, 2001. Mr. Ranieri joined the CA Board at the request of directors Alfonse D'Amato and Richard Grasso, both of whom Mr. Ranieri knew personally. Mr. Ranieri has served as (i) Chairman of the Board since April 21, 2004, following Mr. Kumar's resignation, (ii) Chair of

the Compensation and Human Resource Committee (formerly known as the Stock Option and Compensation Committee) since August 29, 2001, and (iii) a member of the Strategy Committee since August 25, 2004. Mr. Ranieri served as lead independent director of the Board from May 14, 2002 to April 20, 2004, and as a member of the Audit Committee from January 21, 2003 to April 20, 2004. In August 2003, Mr. Ranieri served on the committee that considered the settlement of the Class Actions.

Prior to joining the Board, Mr. Ranieri was employed at Salomon Brothers Inc. from 1968 to 1987, where he rose to the position of Vice Chairman. Mr. Ranieri has served as a director of numerous public companies, including Bank United Corp. from 1988 to 2001 (Chairman); Delphi Financial Group Inc. from 1992 to 2003; Transworld Healthcare Inc. from 1997 to 2002; and Delphi International Ltd. from 1997 to 2002. Mr. Ranieri has served, and continues to serve, as Chairman of Franklin Bank Corp. (since 2001); as Chairman of American Financial Realty Trust (since 2002); as Chairman of Capital Lease Funding, Inc. (since 2003); and as a Director of Reckson Associates Realty Corp (since 1998). Mr. Ranieri has also served as Chairman, President and CEO of Ranieri & Co., Inc. since 1988, is the founder of Hyperion Partners L.P. and Hyperion Partners II L.P., and is Chairman or a director of various other Hyperion entities.

As part of its investigation, the SLC interviewed Mr. Ranieri on July 10, 2006 and March 1, 2007. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Ranieri.

*Walter Schuetze.* Mr. Schuetze has been a member of the CA Board since April 1, 2002. Mr. Schuetze was asked to join the Board by Mr. Kumar in early 2002 as part of Mr. Kumar's claimed effort to promote CA as the "gold standard" in corporate governance. Mr.

Schuetze had previously performed consulting work for CA, at Mr. Kumar's request, by serving on a "blue-ribbon panel" to review CA's accounting practices in response to the April 29, 2001 New York Times article.

Mr. Schuetze has chaired CA's Audit Committee since May 14, 2002. As Chair of the Audit Committee, Mr. Schuetze was responsible for managing the internal investigation of the Company's accounting practices, which began in July 2003. In August 2003, Mr. Schuetze served as (i) a member of the committee that considered the settlement of the Class Actions, and (ii) a member of the committee that considered the settlement of the 2003 Derivative Action.

Prior to joining the Board, Mr. Schuetze joined Eaton & Huddle in 1957, which subsequently merged with Peat Marwick Mitchell & Co., the accounting firm that later became KPMG, where he was a partner. Mr. Schuetze left KPMG in 1973 to serve as a charter member of the Financial Accounting Standards Board ("FASB") until 1976, and then returned to work for KPMG from 1976 to 1992. Mr. Schuetze was also a member, and Chairman, of the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants ("AICPA"). Mr. Schuetze served as the SEC's Chief Accountant from January 1992 to March 1995. From 1995 to 1997, Mr. Schuetze worked as an independent consultant. From November 1997 to February 2000, he served as the Chief Accountant at the SEC's Division of Enforcement. Mr. Schuetze has served as a director of Transmontaigne Inc. since 2002 and a director of NES Rentals Holdings Inc. since 2004. Mr. Schuetze has also served as an independent consultant since 2000.

Exhibit 10

As part of its investigation, the SLC interviewed Mr. Schuetze on July 6, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Schuetze.

*Alex Vieux*.  Mr. Vieux served as a member of the CA Board from July 15, 2002 to August 25, 2004.  Mr. Vieux was asked to join the Board in 2002 at the request of Mr. Pieper, whom Mr. Vieux knew generally from the European software industry.  Mr. Vieux served as a member of the Corporate Operations Committee from August 28, 2002 to August 25, 2004.  In August 2003, Mr. Vieux served on the committee that considered the settlement of the 2003 Derivative Action.

Prior to joining the Board, Mr. Vieux worked at Andersen Consulting from 1981 to 1985.  In 1985, Mr. Vieux took a position as the U.S. business correspondent for the French daily Le Monde.  In 1988, Mr. Vieux was named Visiting Professor at the University of Paris Dauphine.  Mr. Vieux is currently Chairman and CEO of Red Herring Magazine.  In addition, Mr. Vieux has served, and continues to serve, as a director of numerous public companies, including as Chairman of Dasar Inc. (since 1990); Korea Thrunet Co., Ltd. (since 1999); Madge Networks N.V. (since 2000); XRT SA (since 2000); Commerce One, Inc. (since 2002); Qualys Inc. (since 2002); Daum Communications Corp. (since 2003); and Avanquest Software (since 2005).  Mr. Vieux served as a director of Cibox LCI SA from 1998 to 2001.

As part of its investigation, the SLC interviewed Mr. Vieux on June 14, 2006. Based on its investigation, for reasons described in detail below, the SLC has determined to seek dismissal of the claims asserted against Mr. Vieux.

Exhibit 10

IV.   FORMATION OF THE SLC

A.   *Board Resolutions*

Following the filing of the 2005 Derivative Complaint, the CA Board, on

February 1, 2005, adopted a resolution (the "2005 Resolution") that established the SLC. *See*

Resolution of the CA Board (Feb. 1, 2005). The 2005 Resolution delegated to the SLC the

authority and power to:

> control and determine the Corporation's response to the [2005
> Derivative] Action and [the Rule 60(b)] Motions and the claims
> and arguments asserted in the Action and Motions.   The
> Committee may, in its discretion, conduct an investigation into
> such claims and Motions and shall have full and sole authority to
> determine the appropriate actions to be taken on behalf of and in
> the name of the Corporation with respect to those claims and
> Motions, including whether to pursue the claims in the Action,
> whether to seek an extrajudicial resolution of such claims, or
> whether to seek an order from the Court to dismiss the Action.

*Id.* The 2005 Resolution also gave the SLC the authority to retain such outside counsel and

other advisors it deemed necessary to perform its duties. Pursuant to the 2005 Resolution, the

SLC was initially comprised of independent CA directors William E. McCracken and Laura S.

Unger. The composition of the SLC was subsequently modified as described below.

Following the filing of the Kaufman Complaint, the CA Board, on October 31,

2006, adopted a resolution that authorized the SLC to control and determine CA's response to

that litigation (the "2006 Resolution"). *See* Minutes of a Meeting of the CA Board (Oct. 31,

2006). Specifically, the 2006 Resolution delegated to the SLC the authority and power to:

> control and determine the Corporation's response to the Delaware
> Derivative Action and the claims and arguments asserted in the
> Delaware Derivative Action.   The SLC may, in its discretion,
> conduct an investigation into such claims and shall have full and
> sole authority to determine the appropriate actions to be taken on
> behalf of and in the name of the Corporation with respect to those
> claims, including whether to pursue the claims, whether to seek

90

Exhibit 10

> extrajudicial resolution of such claims, or whether to seek an
> order from the Court to dismiss those claims.

*Id.* This resolution likewise gave the SLC the authority to retain such outside counsel and other

advisors it deemed necessary to perform its duties.

     B.     ***The Members of the Special Litigation Committee***
              ***of the Board of Directors of CA, Inc.***

           1.    **Current SLC Members**

                  (a)    *William McCracken*

Mr. McCracken joined the CA Board on February 1, 2005 as an independent

director, and was appointed to the SLC on that date. Mr. McCracken also serves on the

Compensation and Human Resource Committee and the Strategy Committee of the CA Board.

Mr. McCracken graduated from Shippensburg University of Pennsylvania in

1964 with a B.A. in Physics and Mathematics. Mr. McCracken worked at International

Business Machines Corp. ("IBM") for thirty-six (36) years, from 1965 until he retired in August

of 2001, and served in numerous positions at IBM as he worked his way up the ranks of the

organization. Some of the highlights are: from 1988 to 1990, he was a Vice President in

Channel Management within IBM's PC Division; from 1991 to 1993, he was a General

Manager (President) of IBM's PC Division overseeing Europe, the Middle East, and Africa

("EMEA"); from 1993 to 1994, he was the Division President in the EMEA and Asia Pacific

PC divisions; from 1994 to 1998, he served as General Manager (President) of Worldwide

Marketing and Sales for the PC company; from 1998 to 2000, he served as the General

Manager (President) of the Printing Systems Division; and from 1994 to 2001, Mr. McCracken

was a member of the Chairman's Worldwide Management Council.

In 2003, Mr. McCracken formed Executive Consulting Group LLC, a general

business and management strategy consulting company, and is currently its President. He has

<div align="center">91</div>

done general management and board consulting for companies such as Texas Pacific Group, Loral Space & Communications, and IBM. In addition, since July 31, 2003, Mr. McCracken has been a member of the board of IKON Office Solutions, Inc., a publicly-traded distributor of copier and printer technologies.

Mr. McCracken is also involved with several charitable institutions. For example, Mr. McCracken is currently Chairman of the Lutheran Social Ministries of New Jersey, a provider of community outreach services, affordable housing for special needs, low income, and elderly residents, and elder care; President of the Plainfield, New Jersey chapter of Habitat for Humanity; and a member of the New Jersey State Anti-Poverty Network.

(b)     *Renato Zambonini*

Mr. Zambonini joined the CA Board on April 11, 2005 as an independent director, and was appointed to the SLC on that date. Mr. Zambonini also serves on the Strategy Committee of the CA Board.

Mr. Zambonini attended the University of Glasgow from 1964 to 1966, when he left to work as a COBOL programmer. He began working as a computer operator at Honeywell Information Systems in Newhome, Scotland in 1969. In 1974, after he immigrated to Canada, Mr. Zambonini worked as a programmer for Comtech Group International in Toronto. During his six-year tenure at Comtech, Mr. Zambonini spent two years in Cork, Ireland from 1977 to 1979 establishing a research and development center. From 1980 to 1985, Mr. Zambonini worked for Warrington Inc., a distributor of retail products, where he helped establish an early version of enterprise management software. In 1986, Mr. Zambonini joined Boston-based Cullinet Software Inc.

In 1989, while Mr. Zambonini was still working at Cullinet Software, it was acquired by CA. Rather than staying with the combined entity, Mr. Zambonini left to join

Exhibit 10

Cognos Inc., a business software provider, after he was referred there by a former co-worker of Cognos's founder and then-CEO Michael Potter. Mr. Zambonini joined Cognos in September 1989 as a Vice President of Research and Development. From 1990 to December 1992, he worked as a Senior Vice President in Research and Development, and from 1992 to 1993 he worked as a Senior Vice President in Product Development and Business Development. In January 1993, Mr. Zambonini was appointed President and COO of Cognos, at which time he joined the Cognos Board. In September 1995, Mr. Zambonini was named CEO. In April 2002, he resigned as President, while maintaining the post of CEO. In 2002, the Ottawa Business Journal named Mr. Zambonini as its CEO of the Year. In June 2004, Mr. Zambonini resigned as CEO, and was appointed Chairman of the Board, a position that he continues to hold.

In addition, Mr. Zambonini has been a director of (i) BCE Emergis Inc., a publicly-traded company that provides ebusiness solutions to the North American financial services and Canadian healthcare industries, since June 2004, and (ii) Reynolds & Reynolds Company, a publicly-traded company that provides integrated business solutions to automotive retailers, since 2003. Mr. Zambonini has been chair of the Ottawa Hospital Foundation's Legacy Campaign since December 2001.

### 2.   Former SLC Member Laura Unger

Ms. Unger, a former Commissioner of the SEC, joined the CA Board on August 25, 2004 as an independent director,[33] after initially declining to join the CA Board in 2002

---

[33]   The DPA entered into by CA confirmed Ms. Unger's appointment to the CA Board, and provides that: "CA agrees to add new independent directors to its Board of Directors and to undertake corporate governance reforms such that, by December 31, 2005, CA will have: in addition to former SEC Commissioner Laura Unger, added a minimum of two independent directors to CA's board of Directors." DPA, ¶ 12(a).

because of other commitments. As noted above, Ms. Unger was appointed to the SLC on February 1, 2005, and resigned from the SLC on April 7, 2005, as described further below, to be replaced by Mr. Zambonini.

Ms. Unger graduated from the University of California at Berkeley in 1983 with a degree in rhetoric. She then graduated from New York Law School in 1987, and was subsequently licensed to practice law in Connecticut and New York. After graduating law school, Ms. Unger joined the New York Regional Office of the SEC, working in the SEC's Enforcement Division. In 1990, she moved to the SEC's Washington D.C. office, while continuing to serve in the Enforcement Division. For several months in 1990, Ms. Unger served as a Congressional Fellow in then-Senator Alfonse D'Amato's office, and from October 1990 to November 1997, she worked as counsel to the Senate Committee on Banking, Housing and Urban Affairs, which, at the time, was chaired by Mr. D'Amato.

On September 18, 1997, President William Clinton nominated Ms. Unger for a position as Commissioner of the SEC, and Ms. Unger was sworn in as Commissioner on November 5, 1997. Ms. Unger served as a Commissioner of the SEC from November 5, 1997 until she was named acting chair of the SEC on February 12, 2001. Ms. Unger served as acting chair of the SEC until she left the Commission on August 3, 2001.

Since leaving the SEC, Ms. Unger has served in a variety of positions. From June 2002 to June 2003, Ms. Unger served as a regulatory expert for CNBC. In May 2003, Ms. Unger became an independent consultant for JP Morgan Chase in connection with the Global Research Analyst Settlement, and continues to work in that capacity. From April 2002 to August 2004, Ms. Unger served on the Board of Borland Software Corp., a publicly traded

94

Exhibit 10

software company. In October 2002, she joined the Board of Ambac Financial Group, Inc., and continues to serve in that capacity.

Ms. Unger also serves on the Board of the Children's National Medical Center, a nationally recognized leader in pediatric medicine. She also serves on (i) the Non-Member Advisory Board of the U.S. Institute, (ii) the Wall Street Lawyer Advisory Board, and (iii) the SEC Historical Society Advisory Council.

C.     **SLC Independence Review**

Prior to conducting any substantive investigatory work, the SLC and its counsel, Fried Frank, engaged in a thorough review of the independence of each member with respect to the defendants named in the 2005 Derivative Action. In conducting the independence review, the SLC was guided by principles of Delaware law regarding the independence of special litigation committees. As such, the SLC and its counsel sought to determine whether its members were, "*for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind." *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003) (emphasis in original); *see also Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del. 1985) ("a director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences").

The factors that the SLC considered in its independence review included: (i) the SLC's involvement, if any, in the actions at issue in the 2005 Derivative Action; (ii) the SLC's financial interest, if any, in the actions at issue in the 2005 Derivative Action; (iii) the SLC's professional and personal relationships, if any, with the defendants in the 2005 Derivative Action; (iv) the SLC's mutual connections with the defendants in the 2005 Derivative Action, if any, to institutions, businesses, charitable organizations, or other entities; and (v) any pre-

95

Exhibit 10

judgments made by the SLC members, if any, about the veracity of the claims alleged in the 2005 Derivative Action.

The SLC and its counsel also considered any other factors that would "weigh on the mind of a reasonable special litigation committee member . . . in a way that generates an unacceptable risk of bias." *Oracle,* 824 A.2d at 938-39 ("a director may be compromised if he is beholden to an interested person. Beholden in this sense does not mean just owing in the financial sense, it can also flow out of personal or other relationships to the interested party") (citations omitted); *see also Beam v. Martha Stewart,* 845 A.2d 1040, 1051 (Del. 2004) (doubts about a director's independence may arise "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity"); *Biondi v. Scrushy,* 820 A.2d 1148, 1166 (Del. Ch. 2003) (finding that an SLC lacked independence where the SLC Chairman "publicly and prematurely issued statements exculpating one of the key company insiders whose conduct [was] supposed to be impartially investigated by the SLC"); *Katell v. Morgan Stanley Group, Inc.,* 1995 WL 376952, at *8 (Del. Ch. June 15, 1995) ("When a special committee's members have no personal interest in the disputed transactions, this Court scrutinizes the members' relationship with the interested directors") (citation omitted).

To that end, Mr. McCracken and Ms. Unger met with Fried Frank on March 15 and March 23, 2005, respectively, to review each of their respective backgrounds, and to discuss their relationships with current and former Company officers, directors, and employees in the context of the factors enumerated above. Further, Mr. McCracken and Ms. Unger met with Fried Frank on March 30, 2005 and April 7, 2005 to further discuss the issue of independence.

Based upon Fried Frank's review of Ms. Unger's background, Fried Frank and Ms. Unger jointly concluded that she was independent and financially disinterested from the defendants in the 2005 Derivative Action. However, Fried Frank and Ms. Unger jointly determined that it would be in the best interests of the Company for Ms. Unger to discontinue her participation on the SLC due to her past professional association with defendant Alfonse D'Amato, as noted above. While Ms. Unger did not believe that her past association with Mr. D'Amato compromised her ability to act independently, she nonetheless wanted to avoid even the appearance of a conflict. In Ms. Unger's letter announcing her resignation from the SLC, dated April 7, 2005, she stated:

> I am absolutely confident in my ability to render impartial and objective judgment in performing my duties as a member of the Committee and would make a valuable contribution to the Committee's efforts. To render a credible decision about the shareholder litigation, however, the Committee must meet rigorous independence criteria in both appearance and fact. After discussions with counsel regarding recent judicial interpretations on independence, I do not wish for any question about the appearance of my independence to compromise the Committee's important work.

Letter from Laura Unger to the CA Board (Apr. 7, 2005). No substantive investigative work was conducted while Ms. Unger served on the SLC.

Based upon Fried Frank's review of Mr. McCracken's background, Fried Frank and Mr. McCracken jointly concluded that he was independent and financially disinterested from the defendants in the 2005 Derivative Action. Specifically, Mr. McCracken: (i) had no involvement in any of the actions at issue in the 2005 Derivative Action; (ii) had no financial interest in the actions at issue in the 2005 Derivative Action; (iii) had no professional or personal relationship with any of the defendants; (iv) was not aware of any mutual connections to any institutions, businesses, charitable organizations, or other entities with any of the

97

Exhibit 10

defendants; and (v) had made no pre-judgments about any of the claims alleged in the 2005 Derivative Action.

On April 11, 2005, the CA Board elected Mr. Zambonini to serve as an independent director. That same day, he was appointed to the SLC. On May 9, 2005, Mr. Zambonini met with Fried Frank to review his background, and to discuss his relationships, if any, with current and former Company officers, directors, and employees in the context of the factors enumerated above. Based upon Fried Frank's review of Mr. Zambonini's background, Fried Frank and Mr. Zambonini jointly concluded that he was independent and financially disinterested from the defendants in the 2005 Derivative Action. Specifically, Mr. Zambonini: (i) had no involvement in any of the actions at issue in the 2005 Derivative Action; (ii) had no financial interest in the actions at issue in the 2005 Derivative Action; (iii) had no professional or personal relationship with any of the defendants (except as noted below); (iv) was not aware of any mutual connections to any institutions, businesses, charitable organizations, or other entities with any of the defendants; and (v) had made no pre-judgments about any of the claims alleged in the 2005 Derivative Action.

Based upon Fried Frank's interviews of Messrs. McCracken and Zambonini, and its independent research of the public record, Fried Frank found that:

- The SLC members were appointed to the Board after: (i) the alleged wrongdoing; (ii) the resignation from CA of all of the defendants who were charged with criminal conduct; (iii) the settlement of the 2003 Derivative Action and the Class Actions; (iv) the signing of the DPA; and (v) the commencement of the 2005 Derivative Action.

- Neither of the SLC members has worked for or with any of the individual defendants in the past.

- Neither of the SLC members are dependent upon any of the defendants for employment or other pecuniary gain.

- Neither of the SLC members has served on corporate, charitable, or other boards of directors (except for CA) with any of the defendants.

98

Exhibit 10

- Neither of the SLC members has been involved with charitable or educational institutions to which any of the defendants contribute funds of which they are aware.

- Neither of the SLC members has a prior personal or social relationship with any of the defendants.

- Neither of the SLC members made any prior judgments regarding the merits of the 2005 Derivative Action or the Rule 60(b) Motions.

The only mutual relations to the defendants that the SLC and Fried Frank uncovered during its independence review were the following.  First, E&Y serves as Cognos's independent audit firm, and as such, Mr. Zambonini has had contact with E&Y in a professional capacity during his tenure as Chairman and CEO of Cognos (although he has never interacted with the E&Y accountants who rendered services to CA).  Second, both members of the SLC have attended technology industry events also attended by Mr. Wang and/or Mr. Kumar in the past; however, neither of the SLC members interacted personally with them at these events.  For example, Mr. Zambonini was a member of the Enterprise Software CEO round table, which met every six months, along with Mr. Kumar and approximately thirty other CEOs.  However, Mr. Zambonini never had a one-on-one conversation with Mr. Kumar at these meetings.  Third, Mr. Zambonini met Charles Wang when his former employer, Cullinet, was acquired by CA in 1989.  However, as noted above, Mr. Zambonini declined to work for CA after the merger of Cullinet and CA, and Mr. Zambonini has not been in contact with Mr. Wang since that time.  Thus, the SLC members and Fried Frank jointly concluded that none of the above-described connections would in any way impair their independence with respect to E&Y, Mr. Kumar, and Mr. Wang.

For these reasons, both Messrs. McCracken and Zambonini, in consultation with Fried Frank, have concluded that they are independent and financially disinterested from the

Exhibit 10

defendants named in the 2005 Derivative Action, and their conclusions are the product of an

unbiased review of the facts and circumstances alleged in the 2005 Derivative Complaint.[34]

D.    *Retention of Counsel*

After interviewing multiple law firms, on March 8, 2005, the SLC, then

composed of Mr. McCracken and Ms. Unger, retained Fried Frank as counsel to assist the SLC

with its investigation of the claims alleged in the 2005 Derivative Complaint. Fried Frank had

no prior attorney-client relationship with CA, nor any of the individual defendants, nor the

members of the SLC. However, because Fried Frank had at the time, and currently has, an

attorney-client relationship with E&Y, the SLC retained separate counsel to advise it with

respect to the claims alleged in the 2005 Derivative Complaint against both KPMG and E&Y.

Fried Frank had no attorney-client relationship with KPMG at any point prior to or during the

SLC investigation, and does not now.

After interviewing several additional law firms, the SLC retained Cohen &

Gresser LLP as counsel in connection with its investigation of the claims alleged against E&Y

and KPMG. Cohen & Gresser had no prior attorney-client relationship with CA, KPMG, E&Y,

the individual defendants, or the members of the SLC. As a result of this division of the SLC

investigation, Fried Frank did not participate in the investigation of the claims against E&Y and

KPMG, while Cohen & Gresser did not participate in the investigation of the claims against the

individual defendants. Both firms consulted from time to time on strategic considerations

---

34    These same conclusions apply to the Kaufman Complaint, which was filed in September 2006, and is
virtually identical to the 2005 Derivative Action. As noted above, the only additional defendants named
in the Kaufman Complaint not named in the 2005 Derivative Complaint are Shirley Strum Kenny and
Alex Vieux, with whom the SLC members had no prior personal or professional relationship, and from
whom the SLC members are independent and financially disinterested.

related to the investigation, and coordinated their activities to proceed in the most efficient and cost-effective manner.

V.     SLC WORK PLAN

     *Overview.*  With the assistance of counsel, the SLC conducted a detailed and thorough factual and legal investigation in order to determine whether it is in the best interests of the Company and its shareholders to pursue, settle, or dismiss any or all of the claims asserted in the 2005 Derivative Action and the Kaufman Complaint.  The SLC members have been intimately involved in every aspect of the investigation.  Counsel to the SLC conducted approximately ninety (90) interviews[35] – at least thirty (30) of which were attended by one or both of the SLC members.  Among those individuals interviewed personally by the SLC members were (i) the Criminal Defendants (with the exception of Lloyd Silverstein), (ii) the Former Officer Defendants (with the exception of Charles McWade), (iii) the Oversight Director Defendants (with the exception of Willem de Vogel), (iv) the Settlement Director Defendants (with the exception of Alex Vieux), and (v) other former CA officers, employees, and advisors, including counsel from WLRK and S&C.  Several of these individuals were interviewed multiple times.

     In addition, SLC counsel reviewed millions of pages of documents, and the SLC members themselves have reviewed scores of pertinent documents, including interview memos, legal memos, minutes, notes, and e-mails.  SLC counsel performed a substantial amount of legal research and analysis, the results of which were considered by the SLC at various stages of the investigation.  The SLC held twenty (20) formal meetings during the course of its investigation, and held dozens of additional conference calls and informal meetings at which

---

[35]    This includes interviews conducted with the assistance of the SLC's counsel in connection with the claims alleged against the audit firms in the 2005 Derivative Litigation.

Exhibit 10

the issues raised during the investigation were discussed.  Indeed, Mr. Zambonini traveled from his home in Ottawa, Canada on more than twenty occasions.  The investigation was directed by the SLC members in all respects.

As described further below, the SLC's investigation was necessarily divided into two (2) distinct phases as a result of the simultaneous criminal prosecution of Sanjay Kumar and Stephen Richards.  At the outset of the SLC's investigation, the USAO requested that the SLC refrain from conducting interviews that in any way touched upon the underlying accounting fraud.[36]  As such, during the first phase of its investigation, the SLC limited its investigation to narrowly-tailored interviews while conducting substantial document review. Following the guilty pleas of Messrs. Kumar and Richards on April 24, 2006, the SLC was able to conduct and finish its investigation unrestricted.

A.    *Phase 1: The SLC's Limited Investigation*

During this phase of its investigation, the SLC attempted to conduct and complete its investigation into the CA Board's decision to authorize the 2003 Settlement without (as per the direction of the USAO) conducting any interviews that discussed or touched upon the underlying accounting fraud.  However, the SLC ultimately concluded that the two issues could not be divorced, and that obtaining a full understanding of the CA Board's knowledge with respect to the underlying accounting fraud was critical to understanding its decision to enter into the 2003 Settlement.  Thus, the SLC concluded that this portion of the

---

[36]   On June 24, 2005, the USAO filed a motion with this Court seeking a stay of all deposition discovery sought by the plaintiffs in connection with the Rule 60(b) Motions.  The USAO filed briefs supporting this motion on June 30 and November 7, 2005.  By order dated November 30, 2005, this Court granted the relief sought by the USAO and stayed all deposition discovery.  *See* Memorandum and Order, dated Nov. 30, 2005, *In re Computer Assoc. 2002 Class Action Sec. Litig.*, 02 Civ. 1226 (TCP).  Out of deference to the USAO's prosecution, the SLC voluntarily limited its investigation pursuant to the USAO's request.

Exhibit 10

investigation could not be (and was not) completed until after the resolution of the criminal cases against Messrs. Kumar and Richards.

1.    **Interviews**

In this first phase, the SLC conducted the following interviews during the spring and summer of 2005. Where not already articulated above, a brief description of that individual's role in the events at issue is provided:

| | THE SETTLEMENT DIRECTOR DEFENDANTS |
|---|---|
| 1. | *Kenneth Cron* |
| 2. | *Alfonse D'Amato* |
| 3. | *Gary Fernandes* |
| 4. | *Robert La Blanc* |
| 5. | *Jay Lorsch* |
| | OUTSIDE COUNSEL |
| 6. | *Peter Fleming.* Mr. Fleming, of Curtis, Mallet-Prevost, Colt & Mosle LLP, was counsel to the committee created by the Board to assess the merits of a settlement of the Class Actions. |
| 7. | *James McGuire.* Mr. McGuire, formerly of White & Case LLP, was counsel to the committee created by the Board to assess the merits of a settlement of the 2003 Derivative Action. Mr. McGuire is now a New York State Supreme Court Judge, Appellate Division. |
| 8. | *David Nachman.* Mr. Nachman of DLA Piper Rudnick Gray Cary US LLP (the Piper Rudnick), was counsel to the Company and the individual defendants in the Class Actions. |

The SLC also requested, received, and reviewed documents from each of these individuals. *See* Letters from Douglas H. Flaum to Peter Fleming and David Nachman (Apr. 11, 2005); Letter from Douglas H. Flaum to James McGuire (Apr. 14, 2005); Letter from David Hennes to Lewis Liman (May 24, 2005). The SLC also requested, received, and reviewed documents from Russell Artzt, Sanjay Kumar, and Charles Wang. *See* Letters from David Hennes to Stephen E. Kesselman, Vincent A. Sama, and Eric Halper (May 20, 2005).

2.    **Documents Reviewed**

The SLC also began (and substantially completed) reviewing millions of pages of documentary evidence during the first phase of its investigation, including:

103

| | DOCUMENTS |
|---|---|
| 1. | The so-called "23 boxes" of documents produced to the government by the Company in September 2003. |
| 2. | The 150 boxes of documents produced by the Company in the Class Actions. |
| 3. | Interview memoranda from 176 interviews of CA employees conducted by WLRK and S&C between April 2002 and November 2004. |
| 4. | Transcripts of the depositions given by CA employees in connection with the Class Actions. |
| 5. | Minutes, and where available, notes of the meetings of CA's Board, Audit Committee, Compensation Committee, Executive Committee, and Corporate Governance Committee from 1997 to 2004. |
| 6. | Board and Audit Committee packages from 2001 to 2005 (and earlier, to the extent available). |
| 7. | Counsels' talking points for meetings of CA's Board and Audit Committee, and meetings with the USAO and SEC, where available. |
| 8. | Exhibits to the Audit Committee's oral reports to the USAO and SEC in October and November 2004. |
| 9. | E&Y reports, presentations, memoranda and management letters. |
| 10. | KPMG reports, presentations, memoranda and management letters. |
| 11. | Certain reports prepared by PwC for the CA Board, WLRK, and S&C in connection with the government and Audit Committee investigations. |
| 12. | WLRK's correspondence with the USAO and the SEC regarding the investigation from 2002 to the present. |
| 13. | Documents produced by current and former directors, including notes taken at Board and Audit Committee meetings. |
| 14. | Certain publicly-available information, including SEC filings and news media reports, CA Press Releases, SEC Complaints, civil complaints filed against CA, and documents related to the criminal investigation of former CA officers and employees including informations, indictments, and plea agreements. |
| 15. | Significant portions of the PwC forensic database, containing the contents of the computers of eighty-nine CA employees, including e-mails. |

3.      **Experts**

The SLC retained several experts to assist it with its investigation, primarily to provide expert accounting and financial advice. The SLC also retained a private investigatory firm in an attempt to discover, and in some cases verify, the assets possessed by the Criminal Defendants. Those experts are as follows:

*PricewaterhouseCoopers.* PwC is the largest of the "Big Four" accounting firms, providing assurance, tax, and advisory services to companies around the world. PwC's clients

include at least four of the ten largest public companies in the United States. CA and WLRK first retained PwC in connection with the government investigation in February 2002.

Given its familiarity with CA and its financial reports, the SLC retained PwC in April 2006 to analyze the impact of the 35-Day Month practice on the periods leading up to the accelerated vesting of the KESOP, primarily the quarters ending December 31, 1997 and March 31, 1998, and through CA's fiscal year 2001. PwC calculated the adjusted revenue, income, and earnings per share ("EPS") numbers for each of the quarters examined after accounting for revenue that was deemed to be improperly recorded.

*Ray Ball, Ph.D.* Dr. Ball is the Sidney Davidson Professor of Accounting at the University of Chicago Graduate School of Business. The SLC retained Dr. Ball to conduct an analysis on the impact of the 35-Day Month practice on CA's share price in order to determine if, had the fraud and CA's true financial results been disclosed earlier, CA's share price would have met the targets required for the accelerated vesting of the KESOP shares. Dr. Ball is one of the world's leading experts on the effect of earnings announcements on stock prices and currently teaches masters and doctoral courses on Financial Accounting and International Accounting. Dr. Ball has received numerous teaching awards, including being named the American Accounting Association's Distinguished International Lecturer for 1999 and its Educator of the Year in 2003 and is the author or co-author of four (4) books and over sixty (60) papers. His research focuses on financial reporting and disclosure; earnings and stock prices; international accounting and finance; market efficiency; and the institutions of a market economy. Dr. Ball also received the American Accounting Association's inaugural award for Seminal Contribution to the Accounting Literature.

Dr. Ball has served as a professor at numerous educational institutions in addition to the University of Chicago, including the University of Queensland, Australia, from 1972 to 1976 (Professor of Accounting & Business Finance); the Australian Graduate School of Management from 1976 to 1986 (Foundation Professor); the William E. Simon Graduate School of Business Administration at the University of Rochester from 1986 to 2000 (Wesray Professor of Business Administration); and the London Business School from 1996 to 2002 (Professor and Visiting Professor of Accounting).  Dr. Ball has served, and continues to serve, as a Professor at the European Institute for Advanced Studies in Management (since 1998); as a Distinguished Fellow at the Centre for Independent Studies in Sydney, Australia (since 1996); and as an Academic Affiliate of Analysis Group Inc. (since 2000).[37]

*Analysis Group, Inc.*  Analysis Group is a national consulting firm that provides economic, financial, and business strategy consulting to law firms, corporations, and government agencies.  Analysis Group has provided research, analysis, and expert testimony in many complex litigations involving accounting and financial issues.  Analysis Group's professional staff, which includes Ph.D.s in accounting, as well as CPAs, CMAs, and CFAs, works closely with a network of academic experts who are leaders in these disciplines.  The SLC retained Analysis Group to support Professor Ball's analysis of the impact of the 35-Day Month practice on CA's share price in order to determine if, had the fraud and CA's true financial results been

---

[37]   Dr. Ball has served on numerous academic journals, including the *Journal of Accounting Research* from 1972 to 1987 (Associate Editor); the *Australian Journal of Management* from 1976 to 1979 (Foundation Editor); the *Journal of Accounting and Economics* from 1979 to 2000 (Associate Editor and Editor); the *Journal of Banking and Finance* from 1983 to 1988 (Associate Editor); and the *Journal of Business Finance and Accounting* from 1985 to 1988 (Editorial Board).  Dr. Ball has served, and continues to serve, on the Advisory Board of *Accounting Research Network* (since 1996); as Associate Editor of the *Asia and Pacific Journal of Accounting and Economics* (since 1999); as Editor of the *Journal of Accounting Research* (since 2000); on the Editorial Board of the *European Accounting Review* (since 2002); and as Advisory Editor of *Global Management Research* (since 2003).

106

Exhibit 10

disclosed earlier, CA's, CA's share price would have met the targets required for the accelerated vesting of the KESOP shares.

*Alvarez & Marsal.* Alvarez & Marsal, a leading professional services firm, was retained by the SLC to provide forensic accounting advice.

*SafirRosetti.* The SLC retained SafirRosetti, a private investigatory firm, in an attempt to discover, and in some cases verify, the assets possessed by the Criminal Defendants. SafirRosetti provided the SLC with information regarding the Criminal Defendants' stock holdings, ownership of real property, motor vehicles, and other valuable assets both in the names of the defendants and their spouses.

### 4. The SLC's Good Faith Attempts to Cooperate with the Plaintiffs and the Plaintiffs' Response

The SLC also made a good-faith effort to cooperate with all plaintiffs in the 2005 Derivative Action. For example, on May 6, 2005, counsel for the SLC met with counsel for Irving Rosenzweig and Bert Vladimir, plaintiffs in the 2005 Derivative Action. At this meeting, the SLC requested that the plaintiffs share any information that they believed would be helpful to the SLC's evaluation of the claims made in the 2005 Derivative Action. However, counsel for Messrs. Rosenzweig and Vladimir were unable to provide any basis for the claims they alleged in the 2005 Derivative Action, other than the guilty pleas of (at that time) five (5) of CA's former officers and employees.

On June 15, 2005, counsel for the SLC, and the members of the SLC, met with counsel for the Wyly entities. At this meeting, the SLC also requested that the Wyly entities share any information they believed would be helpful to the SLC's evaluation of the claims made in the 2005 Derivative Action. However, counsel for the Wyly entities declined to provide any substantive information to the SLC.

107

Exhibit 10

During its investigation, counsel for the SLC has periodically met with and updated counsel for the various plaintiffs, including counsel for Ms. Kaufman, on the status of its investigation and requested that they share any relevant information in their possession with the SLC. To date, no factual information has been shared with the SLC.

B.     *Phase II: After the Guilty Pleas of Messrs. Kumar and Richards*

On April 24, 2006, Messrs. Kumar and Richards pled guilty to all counts in the superseding indictment filed by the USAO. Shortly thereafter, counsel to the SLC contacted the USAO regarding its investigation, and, several weeks later, the USAO advised the SLC that it no longer objected to the SLC pursuing its investigation (but asked to be kept apprised of developments and retained the right to object to specific interviews if it believed it prudent to do so). *See* Letter from Eric Komittee, Assistant United States Attorney, United States Attorney's Office, to the Honorable Thomas C. Platt, United States District Judge, Eastern District of New York (Apr. 26, 2006). Accordingly, the SLC immediately began its investigation without restriction.

1.     **Interviews Conducted**

During this phase of its investigation, the SLC and its counsel conducted an additional eighty-two (82) interviews, some of which extended multiple days. These interviews included (i) all of the named individual defendants, except for Mr. Wang; (ii) certain current and former employees in various CA departments, including Sales, Finance, Sales Accounting, Legal, and GSO; and (iii) certain of CA's outside advisors during the relevant period. As noted above, the SLC members personally participated in many of these interviews.

Through these interviews, the SLC was able to gain a full understanding of the conduct at issue in the 2005 Derivative Action and the Kaufman Complaint. Below is a

108

Exhibit 10

complete list of the individuals interviewed by the SLC, with descriptions where not already

provided:

| | THE SETTLEMENT DIRECTOR DEFENDANTS |
|---|---|
| 1. | Kenneth Cron |
| 2. | Alfonse D'Amato |
| 3. | Robert La Blanc |
| 4. | Lewis Ranieri |
| 5. | Walter Schuetze |
| 6. | Alex Serge Vieux |
| | THE OVERSIGHT DIRECTOR DEFENDANTS |
| 7. | Russell Artzt |
| 8. | Alfonse D'Amato |
| 9. | Willem de Vogel |
| 10. | Richard Grasso |
| 11. | Shirley Strum Kenny |
| 12. | Roel Pieper |
| | NON-DEFENDANT DIRECTORS |
| 13. | Linus Cheung.  Mr. Cheung served on the CA Board from June 26, 2001 to March 27, 2002, and has not been named a defendant in any suit. |
| | CRIMINAL DEFENDANTS |
| 14. | David Kaplan |
| 15. | Sanjay Kumar |
| 16. | Stephen Richards |
| 17. | David Rivard |
| 18. | Lloyd Silverstein |
| 19. | Steven Woghin |
| 20. | Ira Zar |
| | FORMER OFFICER DEFENDANTS |
| 21. | Michael McElroy |
| 22. | Charles McWade |
| 23. | Peter Schwartz |
| | FORMER SENIOR MANAGEMENT |
| 24. | Gary Quinn.  Mr. Quinn joined CA as a programmer in the IT department in 1985.  From 1986 to 1987, he worked in product development; in 1988 he worked in the Sales department, and from 1988 to 1991 he worked in Pre-Sales, providing technical support for sales personnel; from 1991 to 1998, he was head of the Technology and Education Groups; from 1993 to 1995 he worked in Global Marketing; from 1996 to 2001, he worked in the IT and facilities areas; from April 2001 to 2003, he returned to Sales; Mr. Quinn was then the Executive Vice President of Partner Advocacy, until his resignation in September 2006. |

109

| 25. | *Douglas Robinson.* Mr. Robinson joined CA when CA acquired his then-employer Cullinet in 1989. From 1989 to 1991, he was the head of the Internal Audit department; from 1991 to 1993, he was the head of Sales Accounting; from 1993 to 1995, and again from 2002 to 2006, he was a Senior Vice President in the Finance department; from 1995 to 2000 he was the head of Investor Relations; and from October 2003 to April 2004, he served as CA's interim CFO. Mr. Robinson resigned from CA in August 2005. |
|---|---|
| | **INTERNAL AUDIT EMPLOYEES** |
| 26. | *Grace Caden.* Ms. Caden, a CPA, joined CA's Sales Accounting department in 1987. From 1993 to 1996, she worked in the Microproducts division, and in July 1996 she joined CA's Internal Audit department. Ms. Caden served as the head of the Internal Audit department from 2000 to 2004. Ms. Caden is currently employed by the Company as Vice President of Internal Audit. |
| 27. | *Anthony Valenzano.* Mr. Valenzano joined CA's Internal Audit department in 1999, and is currently employed in that department. |
| | **SALES EMPLOYEES** |
| 28. | *Paul Balzano.* Mr. Balzano joined CA as a systems engineer in 1984. From 1986 to 1989, he worked as a database specialist; in 1989, he joined the Sales department as an account manager; in the early 1990s, he began working in the global accounts division of the Sales department; in 1998, Mr. Balzano was transferred to the Global Sales Organization; Mr. Balzano has worked in various capacities in the Strategic Accounts Group within Sales since early 2000. Mr. Balzano is currently employed by the Company as a manager in the Sales department. |
| 29. | *Christina Savino Costanza.* Ms. Costanza joined Sales Accounting in 1994. |
| 30. | *Alex Fourney.* Mr. Fourney joined CA in August 1985. In fiscal year 2000, Mr. Fourney worked as a Vice President in the Global Accounts Group within Sales; in fiscal year 2001 Mr. Fourney worked as a Senior Vice President in the Strategic Business Alliances Division; in fiscal year 2002 Mr. Fourney became a Vice President and manager in Sales. |
| 31. | *Sam Greenblatt.* Mr. Greenblatt joined CA's Advance Sales department in 1994. Mr. Greenblatt is currently employed by the Company as Senior Vice President of Technology. |
| 32. | *Karen Kikel.* Ms. Kikel joined CA in June 1989. In 1994 she served as an assistant to Mr. Kumar; in 1995 she began working as a sales manager in global sales; from 1998 to February 2003 she served in the Global Sales Organization, after which she served as a paralegal in the Legal department. |
| 33. | *Hayley Tabor.* Ms. Tabor worked as a CA sales executive from 1991 to 2001. From 2001 to 2006, Ms. Tabor was responsible for sales, marketing, customer relations, and technical services for CA's operations in Europe, the Middle East, and Africa. Ms. Tabor left CA in 2006. |
| 34. | *Mark Wagasky.* Mr. Wagasky worked as a CA sales executive from 1995 to 2004, and resigned from CA in July 2004. |

| 35. | *James Christopher Wagner.* Mr. Wagner was the Senior Vice President for commercial sales at CA from 1995 through 1998. In 1998, he became Senior Vice President for CA professional services. From 1998 through 2000, Mr. Wagner reported directly to Sanjay Kumar. Mr. Wagner left CA in April 2000. |
|---|---|
| | **SALES ACCOUNTING EMPLOYEES** |
| 36. | *Peter Bordonaro.* Mr. Bordonaro joined CA as a contract administrator in the Sales Accounting department in May 1995. Mr. Bordonaro worked in the Global Sales Organization from 1998 to February 2003, at which time he returned to Sales Accounting as a business manager. |
| 37. | *Carmella Bythrow.* Ms. Bythrow joined CA in January 1988 in the Sales Accounting department. Ms. Bythrow was promoted to the position of Assistant Vice President in Sales Accounting in late 1999. |
| 38. | *Christina Savino Costanza.* Ms. Costanza joined the Sales Accounting department at CA in January 1994. She began working as a contract manager in Sales Accounting in the late 1990s. |
| 39. | *John Gallo.* Mr. Gallo worked as a contract supervisor in the Sales Accounting department in fiscal year 2000. |
| 40. | *Scott Hughes.* Mr. Hughes joined CA in August 1999 as a contract administrator in the Sales Accounting department. In April 2001 he was promoted to the position of contract supervisor in Sales Accounting. |
| 41. | *Tina Ratcliff.* Ms. Ratcliff joined CA in the Sales Accounting department in July 1991. |
| 42. | *Kurt Sprenger.* Mr. Sprenger joined CA in March 1990. In 1992 he began working as a contract supervisor in the Sales Accounting department. |
| | **FINANCE EMPLOYEES** |
| 43. | *Paul Goncalves.* Mr. Goncalves joined the Sales Accounting department in mid-1994. In 1996 Mr. Goncalves began working as an international controller; in 1999 Mr. Goncalves began working as an assistant controller for CA's operations in the U.S., and by 2004 he worked as controller for those operations. |
| | **DEVELOPMENT EXECUTIVES** |
| 44. | *Sam Greenblatt.* Mr. Greenblatt joined CA's Advance Sales department in 1994. Mr. Greenblatt is currently employed by the Company as Senior Vice President of Technology. |
| 45. | *Bill Merrow.* Mr. Merrow joined CA's Advance Sales department in 1995. Mr. Merrow is currently employed by the Company as Senior Vice President of Development. |
| 46. | *Gary Starkey.* Mr. Starkey joined the Advance Sales department in 1986. Mr. Starkey is currently employed by the Company as Senior Vice President of the Executive Technology Advisors. |
| 47. | *Nigel Turner.* Mr. Turner worked in the Advance Sales department from 1995 to 2002. Mr. Turner resigned from CA in October 2006. |
| | **CURRENT AND FORMER LEGAL EMPLOYEES** |
| 48. | *James Black.* Mr. Black joined CA's Legal department in 1997. Mr. Black resigned from CA in April 2006. |
| 49. | *Joshua DeRienzis.* Mr. DeRienzis worked in CA's Legal department from 1999 to 2005, and resigned from CA in July 2005. |

111

Exhibit 10

| 50. | *Bonnie Yeomans.* Ms. Yeomans has worked CA's Legal department since 1991. Ms. Yeoman's is currently an assistant General Counsel at CA. |
|---|---|
| | **ASSISTANTS** |
| 51. | *Lucy Neubauer.* Ms. Neubauer was an administrative assistant to Charles Wang from 1999 to 2002. Ms. Neubauer resigned from CA in April 2004. |
| 52. | *Joanne Passaretti.* Ms. Passaretti was an administrative assistant to Charles Wang in 1999. Ms. Passaretti is currently employed by the Company in CA's Italy office. |
| | **KPMG EMPLOYEES** |
| 53. | *Margaret Gonzales.* Ms. Gonzales is a senior manager of KPMG. |
| 54. | *Larry Smith.* Mr. Smith served as an engagement partner of KPMG from 2000 to 2002. |
| | **OUTSIDE COUNSEL** |
| 55. | *Robert Giuffra.* Mr. Giuffra, of Sullivan & Cromwell LLP, was counsel to the Audit Committee in connection with its investigation of the Company's accounting practices. |
| 56. | *Richard Urowsky.* Mr. Urowsky, of Sullivan & Cromwell LLP, was counsel to the Audit Committee in connection with its investigation of the Company's accounting practices. |
| 57. | *Scott Smith.* Mr. Smith, of Covington & Burling LLP, was corporate counsel to CA from 1999. |
| 58. | *John Savarese.* Mr. Savarese, of Wachtell, Lipton, Rosen & Katz, was counsel to CA in connection with the government investigation. |

The following former CA employees have refused to be interviewed by the SLC:

(i) Thomas Bennett, a former Senior Vice President of business development (2000-2004) who

pled guilty to obstruction of justice for his part in covering up the 35-Day Month practice;

(ii) Jim Berryhill, former Senior Vice President and General Manager of Sales; (iii) Richard

Chiarello, former head of worldwide Sales (1989-1998); (iv) Richard Finegan, former

divisional vice president of Financial Accounting (1998-2004); (v) Gayle Kemper, former

Senior Vice President and general manager of Sales (1987-2003); (vi) Michael Miller, former

general manager in the Sales department (1987-2001); (vii) Abraham Poznanski, former CFO

and Senior Vice President of Internal Audit (1979-2001); (viii) Bryan Shepherd, former head of

worldwide Sales; (ix) Chris Telano, former member of the Internal Audit department (1998-

2000); and (x) Donald Watnick, former head of litigation in the Legal department (2000-2004).

While the SLC has reason to believe these individuals may have information relevant to its investigation, the SLC believes this information would be largely corroborative of information provided by other witnesses, and thus does not believe that its inability to interview these individuals has materially impeded its ability to perform its mandate or reach its conclusions.

### 2. Additional Information

In addition to continuing to review the documents listed above during the first phase of its investigation, the SLC reviewed (i) e-mails, notes, and other documentation provided by Mr. Kumar; (ii) the materials produced by the USAO to Mr. Kumar pursuant to 18 U.S.C. § 3500; and (iii) and counsel's notes from Board and Audit Committee meetings. The SLC met with members of CA management on three occasions (once personally and twice telephonically) to receive their views of the impact of continued litigation on the Company

### 3. SLC Meetings

As noted above, in total, during the course of its investigation, the SLC met formally twenty (20) times. At these meetings, the SLC, with the aid of counsel, reviewed the results of its investigation, planned additional steps needed, and deliberated as to what course of action was in the best interests of the Company with respect to the claims made in the 2005 Derivative Action and the Kaufman Complaint. At least five (5) of the SLC's formal meetings were dedicated, in whole or in part, to deliberations of the various claims; and during these meeting the SLC members deliberated for over thirty (30) hours. The SLC members deliberated informally, both together and with counsel, for dozens of additional hours. The results of its factual findings and deliberations are detailed below.

In addition, the SLC members personally negotiated and reached settlements with certain of the defendants and their counsel, including Sanjay Kumar, Russell Artzt, and Charles McWade.

113

4.    **Preparation of this Report**

The SLC played a significant role in the drafting of its report. The SLC members spent innumerable hours drafting and reviewing this report and met with counsel on more than twenty-five (25) occasions to draft and discuss its substance. In addition, following an independence review conducted by Fried Frank, Christopher Lofgren, an independent CA Board member who joined the Board on November 11, 2005, reviewed two (2) drafts of the executive summary of this report, and then met with the SLC members to discuss his views.

VI.    THE 35-DAY MONTH PRACTICE

The following section details the 35-Day Month practice – and the involvement therein, if any, of the individual defendants. These facts are taken primarily from the record established during the government investigation, supplemented by information learned during the course of the SLC's investigation. Although the participants in the wrongdoing engaged in widespread deception – both in terms of their revenue recognition practices and their conspiracy to conceal those practices – the SLC has used, and relied on, documents, interview memoranda, and other data from previous investigations that could be substantiated and that it determined were reliable. Together, these sources tell the story of the fraud and obstruction perpetrated at CA.

A.    *Origins of the Fraud: Wall Street's Estimates and the Hockey Stick Effect*

1.    **The Pressure to Meet Analysts' Expectations**

The 35-Day Month practice grew over time, but always started with the same motivation: to ensure, regardless of its actual performance, that CA met or exceeded Wall Street's expectations. *See* DPA, Stipulation of Facts ¶ 8. Every fiscal quarter, when Wall

Street analysts "estimated what they believed would be CA's total revenue" for the quarter,[38] the market judged CA's stock based on its ability to meet these analysts' estimates. *Id.* ¶ 6. If CA met or exceeded the estimates, the Company's stock price would generally rise (all other things being equal); if CA failed to meet expectations, CA's stock price would generally be negatively affected. *See id.* CA's statements about its future growth prospects also played a role in the market's reaction (as is true with all stocks).

When the sales efforts to close business by the quarter end did not bear fruit, CA's senior management simply gave itself more time, and shifted the end of the quarter (and the beginning of the new quarter) until CA had enough business to meet the "Street's" expectations, and then lied about when that business was finalized. *See id.* ¶¶ 9-11. Indeed, three (3) of the Company's senior-most executives, Messrs. Kumar, Zar, and Richards, met informally each day for several days after the end of each quarter to size up the numbers and determine whether CA had, by that time, met or exceeded estimates (or if they needed to continue to extend the quarter and book additional business in this deferred "window").[39] *See id.* ¶ 9. Charles Wang also participated in certain of these meetings, and it was under his leadership that it became unacceptable for CA to miss Wall Street's expectations. In addition, those below Messrs. Wang, Kumar, Zar, and Richards, including Messrs. Rivard, Kaplan, and Silverstein, also played a role in these meetings, and routinely reported on the status of CA's numbers both before and after the quarter end.

---

[38]    These estimates were broken down so that analysts "predicted the earnings per share" of CA stock. DPA, Stipulation of Facts ¶ 6.

[39]    Mr. Richards, who became the head of the North American division of Sales in 1999 and the head of Worldwide Sales in 2000, joined these discussions in 1999.

115

2.      **Closing Back-End Loaded Quarters**

Compounding the problem – and very much related to it – was the fact that CA, like most software companies, struggled with "back-end loaded" quarters, a phenomenon commonly referred to as the "hockey stick effect."[40] That is, the overwhelming majority of CA's contract revenue generally did not arrive before the last week of the quarter, making the end of the quarter "a mad dash" to bring in revenue. Thus, at CA the quarter end was always chaotic and extraordinarily busy.

There were many factors that contributed to this "mad dash" around the quarter close:

*First*, as permitted under the applicable accounting rules, the Company booked the entire contract revenue from its license fees (even for multi-year contracts) upon execution of a contract -- or "up front" – and generally derived its revenue from a relatively small number of large contracts. *See id.* ¶ 5.[41] Therefore, in order to make its numbers for the quarter, CA

---

[40]     The term "hockey stick effect" was known throughout the software industry. Courts have described the phenomenon as follows:

> [L]icense revenues tend to come in within the last month of each quarter, a so-called "hockey stick effect." . . . The reason for the effect is well-understood. Purchasers of software harbor a belief, perhaps borne of experience or superstition, that sellers will cut the best deal near the end of a quarter because they are counting on the sale to make their quarterly projections. As a result, purchasers hold out until the end, trying to extract the last concessions before signing a binding deal. This leads to the last-minute booking of many sales when times are good, and the potential that many deals might fall through right before quarter's end or slip into later quarters if buyers are experiencing budget pressure. To the extent that the negative scenario is the one that pans out, there is the obvious risk that [a software company] will fail to meet its quarterly earnings projection.

*In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 910 (Del. Ch. 2004).

[41]     [W]hen a software license agreement was finalized, for accounting purposes CA allocated its revenue among the license fee and the usage and maintenance fees, with 80 percent or more normally allocated to the license fee. CA then calculated the present value of the license fee, which was normally collected incrementally over the term of the agreement. The present value of the license

needed to negotiate and finalize many of the large contracts in its pipeline, even if it meant racing to do so at the end of the quarter.

*Second*, because CA sold computer software licenses, its products required almost no time or manpower to produce and ship (which was done by e-mail or overnight mail) to multiple customers once the original "code" was created, as required under the accounting rules.[42] Thus, even when the end of the quarter was fast approaching, CA always had the ability to deliver its product by the quarter end – or in CA's case close enough to quarter end to plausibly (albeit wrongly) account for transactions as though delivery on the contracts had occurred before the quarter-end cut-off.

*Third*, because the software cost little, if anything, to produce incrementally, a large portion of the revenue from a contract dropped directly to the Company's bottom line. Incremental costs arising from a new licensing deal were generally limited to sales commissions and other relatively insignificant costs. As such, finalizing one large additional contract could substantially aid CA in meeting estimates.

*Finally*, CA's customers exploited both CA's need for large contracts and its ability to deliver on those contracts quickly by waiting until the end of the quarter – when CA was perceived as "highly motivated" to obtain the contract revenue necessary to make its numbers – to negotiate with the Company. Indeed, customers found that when they delayed

---

fee, which was referred to within CA as the "GAAP Value," was then recognized as revenue in the quarter in which the agreement was purportedly finalized and signed.

DPA, Stipulation of Facts ¶ 5. This changed when the Company moved to the new business model, described below.

[42]   CA often "shipped" trial versions of its software out to clients before the end of a quarter so that they would have it in case a transaction was ultimately closed.

negotiations to the very last minute, they were able to "hold CA's feet to the fire" and extract concessions, such as large discounts or free products.

Yet, even with – or possibly because of – the negative impact the hockey stick effect had on CA's negotiating strength, the phenomenon only increased over time. Ultimately, CA's fiscal quarters grew to be so back-end loaded that the Company faced the prospect of closing nearly *all* of its contracts in the last few days of the quarter. For example, a June 29, 1999 e-mail from a vice president in Sales Accounting to David Rivard, less than two days before the close of the first quarter of fiscal year 2000, states: "% still missing is frightening!" *See* E-mail CA Sales Executive to David Rivard (June 29, 1999). An attachment to that e-mail reflects that, with two (2) days remaining in the quarter, ninety-eight percent (98%) of the contracts the Company expected to close in the quarter had not yet reached the Sales Accounting department. *Id.* In explaining the reason for the e-mail, Mr. Rivard remarked that Sales Accounting was preparing to "get slammed" with an enormous amount of work because of the number of contracts that had not yet been received. The increasing impact of the hockey stick effect resulted in a corresponding increase in the magnitude of the 35-Day Month practice.

B.   *The Scope and Impact of the Fraud*

In this environment, multiple former CA officers, executives and employees knowingly decided to break the law, booking extra contract revenue and reporting the inflated revenue totals to the public in order to meet expectations. DPA, Stipulation of Facts ¶ 7. While CA employees did not, in general, create fictitious contract revenue, they did artificially extend the Company's fiscal quarters, "keeping the books open" after the quarter close in order to prematurely recognize revenue on contracts negotiated and finalized in the early days of the subsequent quarter. *Id.* ¶ 9. This illegal practice, known as the 35-Day Month, was a long and systemic effort, requiring the knowledge and at least tacit cooperation and approval of many

118

Exhibit 10

CA executives and employees, from the junior to mid-level to senior employees. *Id.* ¶ 7. The SLC has concluded that the 35-Day Month was a direct result of the corporate culture created by Charles Wang, the Company's co-founder and driving force.

1. **The Scope of the Fraud**

(a) *The "Eternal" Nature of the Practice*

As far as the SLC can determine, CA employees engaged in the 35-Day Month practice at least as far back as 1984, and possibly before. *See* Kumar Fatico Hr'g Tr. 45-46, *U.S. v. Kumar*, 04 Cr. 846 (ILG) (E.D.N.Y. Oct. 23, 2006). Mr. Kumar told the SLC that the 35-Day Month practice existed at CA before he arrived in 1987. Mr. McElroy, who joined CA in 1988, told the SLC that the 35-Day Month practice existed as far back as he could remember. Messrs. Silverstein and Kaplan told the SLC that the 35-Day Month practice existed when each joined Sales Accounting in 1992 and 1993, respectively. Indeed, although he joined CA in 1998, Mr. Rivard told the SLC that the 35-Day Month practice "existed for as long as CA had been keeping records." Other witnesses conveyed the same sentiment, asserting that the practice "went on for years" prior to their joining the Company, or that it had simply gone on "forever."

(b) *The Pervasiveness of the Practice*

Given its long history, it was inevitable that the 35-Day Month practice would become part of CA's culture.[43] While this was evidenced by the guilty pleas of Messrs. Richards, Woghin, Zar, Kaplan, Rivard, and Silverstein – who, in total, headed every major non-development department at CA – an equally important indicator of the "systemic,

---

[43]    The SLC was told that the 35-Day Month was also practiced at software companies that CA acquired. CA executives apparently asked about it as part of their diligence review during acquisitions and used its existence to negotiate a better purchase price. However, some witnesses have said that the practice at CA went so far "beyond" that which occurred at other companies that backdating contracts became known as the "CA way of doing business." *See U.S. v. Kumar*, Fatico Hr'g Tr., Oct. 23, 2006 at 46.

119

company-wide" nature of the practice was the fact that even lower-level employees perpetuated and took part in it. *See* DPA, Stipulation of Facts ¶ 7. For instance, both senior executives and lower-level staff were forced to work overtime to close deals that were negotiated post-quarter and were to be recognized in the prior quarter. According to Mr. Kumar, it was simply understood by everyone at CA that CA's quarters ran "from the 5th to the 5th." There were no "extra days," but, instead, the quarters themselves were shifted.

The practice permeated CA to such an extent that several employees told the SLC that "everybody" at the Company knew about it; no one bothered to hide it. Employees in the Sales, Sales Accounting, Legal, and Finance departments were overheard joking about contracts being executed on the "32nd of September" or the "33rd of March," and other fictional dates.[44] *See* E-mail from CA Controller to Steven Woghin (July 29, 1998). Long before investigators discovered it, CA employees themselves dubbed the practice the "35-Day Month." DPA, Stipulation of Facts ¶ 7. Moreover, this "dark" humor was not limited to employees that worked after the close of the quarter to book premature contract revenue. Employees in departments that were not involved in late contracting activity were also well aware of the practice, although not its illegality.

---

[44]     In fact, an e-mail was circulated among CA employees on October 2, 2000 containing a fake press release entitled, "CA's Q3 Cut-short by late identification of calendar error." The press release announces that:

> an anomaly had been identified in respect to the Gregorian Calendar (that was introduced by Pope Gregory XIII in 1582) which is now used by most countries in the world. . . . [C]urrent research indicates that Chronologists at this time did not forsee [sic] the impending quarter-end pressures that would face companies like CA, and therefore no correction was made. There was also evidence of rampant embolism, the practice of inserting one or more days into a calendar in an attempt to keep it in phase with seasons. Over time this has had the effect of sales people believing that there is in fact more time to close business before the quarter-end, then there actually is.

Due to the open way in which the 35-Day Month practice was effectuated, practiced, and discussed, many CA employees simply assumed the practice was permissible, because it was "too obvious" and too pervasive to be unlawful.[45]  Compounding this problem was the fact that, for most of its existence, CA did not provide any formal training or have any formal procedures with respect to revenue recognition, or other accounting practices, leaving employees to learn on the job.[46]  According to these employees, they relied primarily upon their co-workers and occasional memoranda and e-mail reminders distributed by senior management regarding GAAP.  *See, e.g.,* Memorandum from Charles McWade to CA's Financial Controllers (Aug. 13, 1997).  This lack of training at CA, and the open manner in which quarter-ends were extended, allowed the 35-Day Month practice to be passed on from one generation of CA employees to the next without question.

      (c)    *"Blessing" the Practice*

Junior, mid-level, and senior-level employees also assumed that the 35-Day Month practice had been "blessed" by senior management and was otherwise proper.  Senior executives sent out regular e-mails that helped their subordinates stay aware of the date to which quarters were to be artificially extended.  For instance, on December 29, 1998, Mr. Rivard, in his first full quarter at CA, sent an e-mail to Messrs. Zar, Kaplan, and Silverstein

---

[45]    For instance, a manager in Sales Accounting backdated a letter to reflect the date of a backdated contract, which the letter was amending.  *See* November 3, 2003 Preliminary [Oral] Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the Fiscal Year Ended March 31, 2000, Exhibits Volume II, Exhibit 68.  The letter, dated December 31, 1999, matter-of-factly refers to a phone conversation that occurred on January 12, 2000, thirteen days after the letter itself was supposedly sent: "I am enclosing for your records a revised counter-signed copy of your December 31, 1999 agreement . . . .  The Order Form has been revised . . . in accordance with your phone conversation with [a regional vice president in CA's sales department] on January 12, 2000 . . . ."  *Id.*  The contract at issue was backdated and improperly recorded as revenue in the third quarter of fiscal year 2000.

[46]    For example, CA's sales accounting employees did not receive a desk set of procedures with respect to CA's accounting practices, or revenue recognition.

121

stating that "January 5 will be the last day of business for December." E-mail from David
Rivard to Ira Zar, David Kaplan, and Lloyd Silverstein (Dec. 29, 1998).[47] Mr. Rivard then sent
the message to an assistant vice president in Sales Accounting who disseminated it to numerous
other employees involved in the contracting process. Likewise, senior executives sent word
down the ladder when they wished to book contracts after what they had already deemed the
"last day of business." These e-mails advised lower-level employees that certain late contracts
"may be commissioned and/or booked" in the prior month. *See* E-mail from CA Sales
Accounting Executive to David Rivard and CA Sales Accounting employees (Oct. 6, 1998).

      E-mail was not the only method of communicating the practice. Employees
merely had to reference the Finance department calendar to find out how long the Company's
books would remain open in a given quarter. *See* E-mail from CA Finance employee to
Finance and Financial Reporting employees (Sept. 28, 1998) ("Re: October 1998 World
Calendar"). As Mr. Silverstein told the SLC, the quarter generally remained open until the third
business day of a new fiscal quarter,[48] but the Finance department distributed a calendar that
contained the dates on which the quarters were expected to close, because the exact dates would
vary. The calendar also listed "every job that would run" during the year, including when
"maintenance would run," when the "final invoice would run," and when the "cut-off would
be" for contracts to be accepted in the quarter.

      The casual discussion of the last day of business in e-mails and the Finance
department calendar stood in stark contradistinction to e-mails sent during the period in which

---

[47]    Another oft-used phrase was "projected close date." *See* E-mail from Lloyd Silverstein to a CA Sales
executive (Aug. 23, 1999). Thus, on August 23, 1999, when a manager in the Sales department asked Mr.
Silverstein for the "projected close date" for the second quarter of fiscal year 2000 (ending September 30,
1999), Mr. Silverstein replied "October 5th." *Id.*

[48]    This is consistent with Mr. Kumar's view that the quarters were not "extended" as much as "shifted."

CA executives attempted to implement a "hard close" at the end of the quarter. Those e-mails, which started to be circulated once CA began to countersign contracts prior to the quarter close in compliance with the two-signature requirement of SOP 97-2,[49] indicated that senior executives were enforcing a "hard close" in which "all agreements" were required to be "signed" and "products shipped" by "the last day of the calendar month." *See, e.g.,* E-mail from David Kaplan to multiple recipients (June 28, 2001). While in concept the "hard close" should have ended the 35-Day Month practice, in practice, it was for some period of time subject to the same manipulation as the regular quarter-end.

Moreover, the practice of backdating received widespread management approval. In an e-mail titled "Contract Signing Prep," Mr. Rivard announced that "dates typed in" to the "CA signature block [were] the same date as typed/written in [to the] Licensee signature block." E-mail from David Rivard to multiple recipients (Feb. 8, 2000). Mr. Rivard added parenthetically that the pre-printed signature block date was to be the "last day of [the] month/quarter," without regard for the actual date on which the contract was signed. *Id.* The use of "pre-printed" dates was another way that CA executives circumvented the true end of the quarter, and was simply backdating by another name since the effect was the same – misrepresenting the actual date on which a contract was completed.

As is discussed above, senior managers also actively "blessed" the 35-Day Month practice by specifically encouraging their subordinates to close and backdate individual deals after the quarter-end. For example, in an early April 2000 e-mail, CA employees

---

[49]     Another issue identified in the DPA was CA's practice of not affixing its own signature to contracts within a given quarter, which was also a violation of GAAP. *See* DPA, Stipulation of Facts ¶¶ 13-16. This practice was identified by KPMG when it began to audit CA; KPMG told CA management that it had until the end of fiscal year 2000 to come into compliance, which KPMG thought CA then did. The SLC has found no evidence that the CA Board was made aware of this practice at the time.

123

referenced Mr. Richards as the senior executive who "pushed to get" a late contract executed and backdated for the quarter that closed on March 31, 2000. E-mail from former CA Sales Accounting executive to David Kaplan (Apr. 6, 2000) ("Re: Futuristic Deal – Late Entry!"). Because CA was "placed under pressure for revenue," lower-level employees were told that Mr. Richards had "cleared" the deal to be booked in the prior quarter. *Id.*

   CA senior executives also provided justifications for the 35-Day Month practice. For instance, when Mr. Kaplan raised concerns about the practice early in his career, Mr. Zar, among others, gave him several reasons why it was "okay" for CA to engage in the 35-Day Month practice such as: (i) the vast majority of CA's revenue would be generated by contracts arriving at the end of a month and, because of this, CA needed several days to book contracts arriving at the end of the month; (ii) the true effective date of the contracts was in the prior quarter; (iii) the contract appeared to be signed by the customer within the prior quarter; (iv) the product was shipped in the prior quarter; and (v) the quarter was still ninety (90) days long, but it would simply shift five (5) days later, an immaterial fact.

   Mr. Rivard also raised concerns when he joined CA from E&Y, but Mr. Zar gave him "numerous reasons" as to why the 35-Day Month practice was acceptable, including: (i) recognition of late revenue was justified because the contracts were multi-million dollar contracts with real value; (ii) the contract process did not start and end in two (2) days and therefore it made no sense to recognize a contract in the next quarter when the work on it had mostly been performed in the prior quarter; and (iii) deals were essentially done by the end of a quarter and the remaining work was merely "dotting i's and crossing t's." Mr. Zar sought to reassure Mr. Rivard by telling him that CA was working towards ending the 35-Day Month

practice, and that CA was "a big ship and could not be turned around too quickly," particularly in a sales-driven culture.[50]

Indeed, Mr. Zar himself "bought into" the justifications provided by his superiors. Since he had no experience outside CA, Mr. Zar told the SLC that he was "indoctrinated" to view the 35-Day Month practice as normal, watching his superiors extend quarters in the same manner for many years before he became CFO. He was taught that the few extra days after the quarter end were not actually "post-quarter." Mr. Zar also saw the practical problems associated with letting deals "slip" in the days following the quarter-end, knowing that if a deal did not close, CA would have to wait until the end of the next quarter for it to close. In the intervening months, there was a risk the client might be acquired, reduce their budget, or any other number of scenarios that would cause CA to lose the business.

(d)     *The CEOs' Encouragement of the Practice*

As noted above, the "tone at the top" encouraged this practice and allowed it to flourish. Under Mr. Wang, CA was known as a "one-headed" dragon, and no significant decisions were made without his participation and approval. Indeed, it was clear at the highest levels of management that even Mr. Kumar worked for Mr. Wang, and that Mr. Kumar was executing Mr. Wang's directives. Based upon statements made by nearly all witnesses that the SLC interviewed, the SLC determined that the 35-Day Month practice began on Mr. Wang's watch. As discussed above, the SLC found that the 35-Day Month pre-dated Mr. Kumar's arrival to CA in 1987, and existed and expanded throughout Mr. Wang's tenure as CEO. The SLC found further that Mr. Wang encouraged and participated in the practice.

Mr. Kumar, who was the Company's public face, and, from 1994 to August

---

[50]     Mr. Zar told the SLC that he does not recall such conversations.

125

2000, President and COO under Mr. Wang, executed the 35-Day Month practice, often at the explicit direction of Mr. Wang (and at other times to avoid Mr. Wang's anger). Mr. Kumar's own criminal conduct is clear, undisputed, and admitted: (i) he personally directed CA salespersons to backdate contracts to make it appear as if they had been signed in the prior quarter (Kumar/Richards Superseding Indictment ¶¶ 24, 34, 42, 47-49); (ii) he directed other CA senior executives to issue the same instructions (Kumar/Richards Superseding Indictment ¶¶ 42-43); (iii) he negotiated and signed agreements on behalf of CA after the quarter end that were backdated to appear as if they were completed in the prior quarter or left them intentionally undated (Kumar/Richards Superseding Indictment ¶¶ 29, 41); and (iv) he directed the meetings with CA executives at which it was determined how long fiscal quarters would be extended (Kumar/Richards Superseding Indictment ¶¶ 22-23).

Indeed, after the end of the first quarter of fiscal year 2000, in the first week of July 1999, Mr. Kumar, at the direction of Mr. Wang, flew to France to close a deal worth approximately $32 million to CA. The contract, which Mr. Kumar signed, was backdated and recognized in the first quarter. The next quarter, Mr. Kumar let it be known to CA's senior sales managers that he was not happy that he had to "save" the prior quarter for CA. As such, at the end of the second quarter, Mr. Kumar insisted that CA's regional sales managers travel to corporate headquarters in Islandia to close the quarter. As a result, the regional sales managers, then under the direct supervision of Mr. Kumar, continued to close business for the second quarter from Islandia during the first week of October 1999.

Mr. Kumar also pulled his senior executives, including Mr. Woghin, the Company's former General Counsel, who was not routinely involved in sales transactions, into the backdating scheme. For example, in early January 2000 after the end of a particularly

difficult quarter, Mr. Kumar told Mr. Woghin that CA was in the process of negotiating a $300 million contract, and instructed him to work with a senior CA Sales executive to "get the deal done." Mr. Woghin complied, and after he had resolved all of the outstanding legal issues in the proposed contract, Mr. Kumar told Mr. Woghin to send the final draft of the contract directly to him. Ultimately, the customer and Mr. Kumar, on behalf of CA, executed the agreement, which intentionally omitted the date block beneath each signature, leaving in the recital that the contract had an effective date of December 31, 1999. This allowed CA to improperly book $180 million of GAAP revenue in the third quarter of fiscal year 2000, which ended on December 31, 1999. *See* Kumar/Richards Superseding Indictment ¶ 41.

These are but three (3) vivid examples of Mr. Kumar's participation in, and encouragement of, the 35-Day Month practice, and how he co-opted other members of senior management along the way.

2.    **The Financial Impact of the Practice**

The scope of the 35-Day Month practice at CA was truly enormous, as was its impact on CA's publicly reported financial statements. For example, in fiscal year 2000 alone, which ran from April 1, 1999 to March 31, 2000, CA improperly recognized revenue from approximately 165 license agreements with an aggregate GAAP value of approximately $1.75 billion. *See* DPA, Stipulation of Facts ¶¶ 13-16. For fiscal year 2000, CA reported $6.103 billion in revenue, meaning that 28.7% of its revenue came from the improperly booked contracts. *Id.* In addition, the 35-Day Month practice allowed CA to report continuous growth, another closely watched indicator of CA's success, when in fact, CA's growth was unsteady.

C.    *The Criminal Defendants and Departmental Roles*

To appreciate how the 35-Day Month practice operated in practice at CA, the SLC sought to understand the role played by each of the CA executives who has pled guilty.

127

Exhibit 10

Because each of the seven (7) Criminal Defendants led a different department at CA -- Sales, Sales Accounting, Finance, Financial Reporting, Global Sales Organization, and Legal -- the story of how those defendants participated in the 35-Day Month practice is best told within the structural framework of CA itself.

### 1.    CA's Sales Department

Sales was the foundation of the CA empire, with Mr. Kumar -- by all accounts a superb salesman -- at the helm, and Mr. Richards ranking as his top aide and right hand man.[51] Sales, which was responsible for identifying potential contract opportunities, meeting with CA customers, negotiating the terms and conditions of contracts, and then obtaining the customer's signature, was the first link in the chain that effectuated the 35-Day Month.[52]

Until April 2000, Sales was organized geographically,[53] with general managers taking responsibility for assigned continental divisions and reporting to senior management, while regional managers and Sales representatives in the field reported to the general managers. At the beginning of each quarter, CA Sales managers attended quarterly Sales meetings, led by Mr. Wang and later Mr. Kumar, at which the Sales managers discussed the deals they had closed for the prior quarter, and their sales forecasts for the current quarter.  According to Mr.

---

[51]   As noted above, from December 1998 to April 2000, Mr. Richards was the head of North American Sales, reporting directly to Mr. Kumar.  In April 2000, Mr. Richards became the Executive Vice President of Worldwide Sales, a position that had been vacant since Richard Chiarello left the Company in December 1998.

[52]   Assisting the Sales force was the Pre-Sales group.  Its members, including defendant Russell Artzt, worked as "talking heads" and "evangelists" for CA technology.  The group members also functioned as "hammers," in that they would go to clients late in the negotiation process to attempt to convince them that they needed CA's products.  However, the group was not typically involved in the negotiations over particular terms and conditions that preceded the execution of the contract.

[53]   At the start of fiscal year 2001, Sales was restructured along product lines (e.g., Enterprise, Information, Management, Mainframe, and Services), with geographical distinctions existing only within each product group.

Exhibit 10

Kumar, at these meetings it was not unusual for there to be discussion about deals that had closed after the quarter end, but were nonetheless recognized in the prior quarter. CA Sales managers then communicated sales quotas to their subordinates, and Sales personnel worked through the quarter, and beyond, to meet those goals.

CA's Sales managers later attended a second quarterly meeting at the beginning of the third and final month of the quarter, again led Mr. Wang and then Mr. Kumar, at which the Sales managers discussed the deals they still needed to close in order to achieve the numbers they had forecasted and committed to. According to Sales employees, they worked on deals for a particular quarter until they were told that the quarter had "closed," which, as discussed above, was often three (3) to five (5) days after the calendar date on which the quarter should have closed. *See* DPA, Stipulation of Facts ¶ 9.

At CA, this three (3) to five (5) day period was often referred to as the "flash period." *Id.* At most companies, a flash period is typically the period in which preliminary quarterly results are calculated. Not so at CA, where the flash period – which was really viewed as a continuation of the quarter – was used to negotiate and close new deals to be booked in the prior period.[54] *Id.* ¶¶ 7, 9-10.

Notwithstanding the fact that CA's quarters were shifted by several days, Sales employees also knew that, to be counted as revenue in a quarter, a contract closed within the flash period had to bear a customer signature date within the prior quarter. *See* Memorandum from Lloyd Silverstein to CA Sales employees at 2 (Oct. 15, 2002). Accordingly, Sales personnel used different tactics to ensure that contracts were "properly" backdated. First, Sales

---

[54]     As discussed above, senior-level managers often sent out e-mails to communicate "the last day of business" for an artificially extended quarter indicating when negotiations truly had to conclude for the quarter.

personnel asked customers to re-sign an agreement completed during the flash period, with a new date indicating that it was signed by the customer prior to the quarter end. Second, and more often, CA Sales personnel gave contracts to customers for signature post-quarter with pre-printed date blocks bearing the date of the last day of the prior quarter. This use of pre-printed dates to backdate contracts became the dominant method of backdating in late 1998 or early 1999.

At times, customers recognized that CA was engaged in wrongful conduct, and resisted CA's backdating efforts. For example, on April 7, 2000, Messrs. Richards and Kumar told a CA salesperson to ask a customer to execute an agreement worth $16 million with an execution date of March 31, 2000. *See* Kumar/Richards Superseding Indictment ¶ 28. The customer refused to sign the backdated contract, but agreed to sign the agreement without an execution date. *Id.* After the customer signed the agreement, Mr. Richards instructed the CA salesperson to write in an execution date of March 31, 2000. *Id.; see also* April 6, 2000 E-mail from CA Sales Executive to Messrs. Kumar and Richards (Apr. 6, 2000).

In a sales-driven culture, the Sales department, at the direction of senior management, was the driving force behind the 35-Day Month practice, which then required the participation of the Company's other non-revenue generating departments.

### 2.   CA's Finance Department

The Finance department was responsible for "closing" the quarter, including tabulating CA's quarterly revenues on a contract-by-contract basis (Kaplan Information ¶ 7) and therefore its participation was essential to effectuate the 35-Day Month practice. The role of the Finance department is best explained by discussing the individuals who ran it during the period of the 35-Day Month, and the tools that they used to track CA's financial performance on a daily basis.

*Peter Schwartz.* From 1985 to June 22, 1998, the Finance department was led by Peter Schwartz, CA's then-CFO, who, as discussed below, resigned following the vesting of the KESOP (although he stayed on for several months in an operating capacity). Mr. Schwartz fiercely adhered to the hierarchical nature of CA, keeping the employees that worked below him shielded from contact with any senior-level decision-making and decision-makers. For instance, Mr. Kaplan, who reported directly to Mr. Schwartz, told the SLC that he never communicated with anyone above Mr. Schwartz; and, indeed, similarly, Mr. Kaplan commented that he rarely communicated with Mr. Schwartz. Mr. Kaplan explained that decision-making at CA was reserved to a very small cadre of executives.

According to witnesses, including those that reported directly to him, Mr. Schwartz not only "clearly knew" about the 35-Day Month practice, but also helped to implement it.[55] During his tenure as CFO, Mr. Schwartz is reported to have been part of the "foundation" of the 35-Day Month practice, determining when to close the quarter for accounting purposes. Witnesses told the SLC that Mr. Schwartz also advised Finance personnel that holding quarters open was a legitimate accounting technique, and in some instances explicitly encouraged backdating. For instance, Mr. Schwartz told a Sales employee that he could not be commissioned unless the date on a contract was changed to make it appear as though the contract was executed in the prior quarter. According to Mr. Kumar, he questioned Mr. Schwartz about the quarter-end shift, and Mr. Schwartz told Mr. Kumar that accounting for such things was "his problem" and not Mr. Kumar's. Mr. Silverstein told the SLC that CA employees would routinely go into Mr. Schwartz's office in the first days of the new quarter and discuss the status of deals listed on the Status Reports (discussed below) that

---

[55]   It should be noted that Mr. Zar, Mr. Schwartz's successor, did not have any information regarding Mr. Schwartz's knowledge of, or participation in, the 35-Day Month practice.

were then recognized in the prior quarter even though they had not been consummated by the quarter end.

During his interview with the SLC, Mr. Schwartz denied any knowledge of the 35-Day Month practice. Mr. Schwartz professed surprise to learn that contracts were backdated when he was CFO, and stated that he personally took steps to ensure that contracts were signed in the proper quarter before they could be recognized as revenue. Although he admitted to the existence of a "flash period," he defined it only as a period in which CA "counted everything," not a period in which contracts continued to be executed and booked as revenue.

However, given the weight of the evidence described in this report, understanding Mr. Schwartz's role at the Company and his hands-on management style, and having had the opportunity to observe him in person, the SLC does not find Mr. Schwartz's account credible.

*Ira Zar.* Mr. Zar joined CA immediately after graduating from college, and was appointed CFO in June 1998 at age thirty-six (36) with no experience outside of CA. Mr. Zar's appointment is viewed by the SLC as an attempt by Mr. Wang to ensure that he was surrounded by smart, but less than savvy and seasoned, executives beholden to him, who were therefore unable to exercise independent judgment. Mr. Zar, by all accounts Mr. Schwartz's protégé, plainly admitted – both in connection with his guilty plea and in his interviews with the SLC – the existence of the 35-Day Month practice during his tenure as CFO. *See* Zar Plea Tr. at 37-38. In post-quarter meetings with Messrs. Wang, Kumar, and Richards on the "flash date" (the last day of the flash period), Mr. Zar printed the "flash report" and discussed with Messrs. Kumar and Richards the "preliminary" results for the quarter. *See* Kumar/Richards Superseding Indictment ¶ 23; Zar Plea Tr. at 11-14. If CA had not yet generated enough

revenue to meet estimates by this time, Messrs. Wang and Kumar instructed Mr. Zar to continue to keep CA's books open after the flash period, which he did, while they attempted to finalize additional deals that were supposedly in the pipeline. *See* Kumar/Richards Superseding Indictment ¶ 222; DPA, Stipulation of Facts ¶ 10.  Mr. Zar knew this was wrong at the time, yet remained complicit. *See* Zar Plea Tr. at 38.

### 3.    CA's Sales Accounting Department

The Sales Accounting department, headed by Mr. Rivard beginning in August 1998,[56] was responsible for (i) ensuring contracts met revenue recognition requirements prior to execution and booking, (ii) executing contracts on behalf of CA, and (iii) entering contract information into CA's databases for booking. *See* Rivard Information ¶ 7.  While Sales brought in the backdated deals, and Finance prematurely recognized the revenue from those deals, the Sales Accounting department functioned as a middleman, assisting Sales with terms and conditions during contract negotiations to facilitate revenue recognition, executing backdated contracts on CA's behalf, concealing evidence of the fraud, and providing backdated deals to Finance for booking.

As one of his early acts as CFO, Mr. Zar recruited Mr. Rivard to CA from E&Y to head Sales Accounting.  Because of his outside perspective, Mr. Rivard quickly recognized that the 35-Day Month was improper, but did nothing to stop it. *See* Rivard Plea Tr. at 32-34. Swayed by the assurances he received from Messrs. Zar and Kaplan that this was how companies operated in the "real world," and that he would find the same thing at any other software company he went to work for, he chose to stay at CA and, according to Mr. Rivard, help to gradually improve CA's practices.

---

[56]    Before Mr. Rivard, Mr. Zar headed Sales Accounting.  Mr. McWade was the head of Sales Accounting in the mid-1980s.

Notwithstanding his intentions, Mr. Rivard assisted Sales employees in negotiating contracts beyond the quarter end, knowing that those contracts, once executed, would be recognized in the prior quarter. For example, Mr. Rivard was involved in the negotiation of a license agreement that continued past September 30, 1999 and into the first week of October. October 14, 2003 [Oral] Preliminary Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the Fiscal Year Ended March 31, 2000, Exhibits Volume I, at Exhibits 7-16. The deal was finally executed by the customer on October 5, 1999, but bore a date of September 30, 1999 in both signature blocks. Mr. Rivard signed the contract on behalf of CA, knowing that the dates accompanying the customer's signature and his own were false. *See* October 14, 2003 Preliminary [Oral] Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the Fiscal Year Ended March 31, 2000, Exhibits Volume II, at Exhibit 70, 81; Rivard Plea Tr. at 32.

Finally, the Sales Accounting department took charge of "cleaning up" completed contracts for presentation to CA's outside auditors – which was significant since CA's auditors only reviewed final contracts for revenue recognition purposes. *See* DPA, Stipulation of Facts ¶ 12. Following the close of the quarter, Mr. Rivard instructed Sales Accounting personnel "to remove all processing notations" – that is, to use White-Out to conceal the "fax lines," which would have otherwise showed the true time and date that the contract was received by Sales Accounting from Sales personnel in the field. *See id.*; Rivard Plea Tr. at 32. Although Mr. Rivard first "pushed back" against this procedure, Mr. Zar convinced him that it was "easier" than waiting for the original contracts to arrive (which would not contain incriminating fax lines), and Mr. Kaplan suggested that the action was par for the course.

134

Exhibit 10

4.    **CA's Global Sales Organization**

The GSO, which was established in 1998, worked as a "liaison" between the Finance, Legal, and Sales departments by assisting with the approval of contractual terms and conditions. The ostensible purpose for the GSO was to implement tighter controls on the discounts Sales employees offered customers, typically at quarter end. In this role, the GSO reviewed business proposals submitted by Sales personnel, and assisted in negotiating business-related issues. Mr. Silverstein, as head of the GSO, assisted Sales personnel in the negotiation of the contracts. *See* Silverstein Plea Tr. at 19.

Prior to commencing contract negotiations with a customer, Sales personnel were required to prepare a Business Analysis and Review Form ("BARF") that outlined the proposed transaction, including the discounts and concessions the Sales employee was considering offering to the customer. *see also* Preliminary [Oral] Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the FY Ended March 31, 2000, Exhibits Volume II, at Tab 85. This form was then submitted to the GSO for approval, and then modified as the business terms changed during the course of negotiations.

While checking the level of discounts authorized to customers was the GSO's primary responsibility, it also dealt with discreet licensing issues and other issues brought to its attention by the Legal department. Once a deal was executed, the Sales employee responsible for the deal created a final version of the BARF, which was then approved by the GSO. Generally, CA would not recognize revenue from a contract until the BARF received all necessary approvals, including from the GSO, Legal, and Sales Accounting. In addition, contracts valued over a threshold amount had to be approved by the GSO before revenue could be recognized. *See* Silverstein Compl. ¶ 20. In many cases, the BARFs indicated that business terms were being negotiated past the quarter end, and, likewise, final GSO approval came after

135

Exhibit 10

the end of the quarter in which the contract was booked.  (*See* November 3, 2003 Preliminary [Oral] Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the Fiscal Year Ended March 31, 2000, Exhibits Volume I, at Exhibit 8; *id.*, Exhibits Volume II, at Exhibits 57, 58).

      To further the 35-Day Month practice, Mr. Silverstein, and others in the GSO, communicated to CA Sales personnel that "it was okay to backdate contracts and make it look as though the deals had been signed in the [prior] quarter." Silverstein Plea Tr. at 20.  Much of the GSO staff either assumed or knew that backdated contracts were booked in the quarter prior to that in which they were actually signed.  For his part, Mr. Silverstein became aware that backdated contracts were being prematurely recognized shortly after he joined the Sales Accounting department in 1992, and brought the issue to the attention of Mr. Zar, among others.  Mr. Zar told Mr. Silverstein that he should not concern himself with when revenue was recognized, and Mr. Silverstein was told by others that even though the practice was wrong, it was immaterial.  *See id.* at 19-20.  After receiving these assurances, Mr. Silverstein continued to participate in the 35-Day Month practice.  *See id.* at 20.

      5.    **CA's Legal Department**

      In the context of the contract licensing process, the Legal department was responsible for providing approvals for non-standard contractual language, without which Sales executives could not execute a non-standard license agreement.  Likewise, the Finance department would not recognize revenue from non-standard contracts until the Legal department approved them.  Since most CA deals were large and complex, they frequently contained non-standard contractual language, thereby requiring the input of, and approval from, the Legal department.

While in some instances the Legal department participated in the 35-Day Month practice by actively covering up fraud and misrepresenting signature dates, its most persistent failure was in turning a blind eye to the improper activities of others, thereby allowing the practice to flourish. CA lawyers worked in tandem with Sales personnel and others in the negotiation of contracts after the quarter end, oftentimes with the understanding that the revenue from those contracts would be recognized in the prior quarter. *See* Woghin Plea Tr. at 28. Nonetheless, CA's lawyers chose to believe that somehow CA's Finance department ensured that CA stayed within the applicable accounting rules. In this way, CA's lawyers facilitated the 35-Day Month practice, and failed in their roles as gatekeepers to protect CA.

Mr. Woghin, CA's General Counsel, pled guilty to participating in the 35-Day Month practice, and allowing others in the Legal department to do the same. Mr. Woghin allowed the Legal department personnel "to routinely participate in the negotiation and drafting of software license agreements on behalf of CA during the week following the calendar end of fiscal quarters." *Id.* Mr. Woghin understood that this post-quarter activity was meant to "generate revenue for CA which could be improperly recognized in the prior fiscal quarter." *Id.* Attorneys in the Legal department were available at the quarter end and thereafter, and often worked around the clock to assist in closing deals. CA's in-house counsel did not stop working until an announcement had been made that the quarter had closed.

Mr. Woghin and Mr. McElroy, who were both senior CA lawyers, did more than allow the junior lawyers to facilitate the practice; they were, at times, active participants. As discussed above, Mr. Woghin finalized a contract for Mr. Kumar during the first week of January 2000 with a date of December 31, and revenue from this contract was recognized in the December quarter. *See id.* While Mr. Kumar did not explicitly tell Mr. Woghin that the

contract would be prematurely recognized for revenue recognition purposes, Mr. Woghin understood as much. Mr. Woghin took no steps to find out how the revenue from the contract was recognized; rather, he admittedly "stuck his head in the sand" when he knew that Mr. Kumar was "scrambling for revenue" after the quarter had already closed.

Mr. McElroy, CA's most senior licensing attorney – responsible for international transactions – also participated in the 35-Day Month practice. Indeed, Mr. McElroy admitted his involvement in the 35-Day Month practice to the SLC, stating that he participated in the modification of contracts after the close of a quarter, and that he had "assumed" that, if the contract bore a signature date from the prior quarter, revenue from that contract would be recognized in that quarter. Mr. McElroy told the SLC that he also assumed that CA's Finance department ensured that CA stayed within applicable accounting guidelines, and that while his participation in the 35-Day Month practice "may have been wrongful," he did not know – or want to know – this at the time.[57]

## VII.   ADDITIONAL ACCOUNTING ISSUES

The 2005 Derivative Action alleges that certain CA executives manipulated CA's accounting through other means in addition to the 35-Day Month practice. The complaint alleges four (4) additional improper practices, that (i) CA double-booked revenue upon the extension or renewal of contracts (2005 Derivative Compl. ¶ 52), (ii) CA improperly allocated revenue from maintenance fees to license fees (*id.* ¶ 49), (iii) CA improperly allocated revenue to products such as Unicenter that were given to customers for free (*id.* ¶ 51), and (iv) CA

---

[57]   Moreover, CA's attorneys casually discussed participating in the practice over lunch, "griping" about how the intense post-quarter negotiations caused them to work late hours and "ruined" their New Years celebrations. And, as noted above, CA attorneys regularly joked about the 35-Day Month practice, with one CA lawyer making his way around the office wishing his colleagues a "Happy March 33rd." These lawyers assumed or recognized that they were assisting in the improper booking of revenue, yet none took any steps to stop it.

improperly recognized license revenue from contracts with extended payment terms (*id.* ¶ 53). Plaintiffs allege no particularized facts, and provide no detail, to support these allegations. Rather, these allegations appear to be reprinted from the 1998 and 2002 Class Actions. *See* Am. and Consolidated Compl. For Violations of the Securities Exchange Act of 1934, *In re Computer Associates 2002 Class Action Sec. Litig.* ¶¶ 5, 34-38, 41-50, 64-69, 02 Civ. 1226 (TCP) (Oct. 22, 2002); Class Action Compl. for Violations of Federal Securities Laws, *Barroway v. Computer Associates Int'l, Inc.*, 98 Civ. 4839 (TCP) (July 21, 1998).

These additional issues are dealt with in a separate report by the SLC and are not addressed here for two (2) primary reasons: (i) the additional accounting issues were the primary subject of both the Class Actions, and the four-year-long government investigation, and there is no evidence that the Board was ever informed that CA's practices were improper, with the exception of CA's cancel/convert accounting for which CA issued a reclassification, which was publicly disclosed on May 15, 2000, that did not adversely impact CA's stock price and was later determined by PwC to be immaterial; and (ii) given the harm caused to the Company by the 35-Day Month practice, it alone provides a more than sufficient basis on which to evaluate the merits of each of the claims in the 2005 Derivative Action. As such, those issues will not be addressed herein.

## VIII. BOARD OVERSIGHT DURING THE PERIOD OF FRAUDULENT CONDUCT

The SLC has uncovered no facts to support any claim or argument that CA's non-management outside directors were aware of the 35-Day Month practice while it was occurring. Indeed, those directly involved in the fraud have told the SLC that, in their view, the outside directors could not have known, given the active concealment of the fraud, the role of the Board, and lack of software experience on the Board. Thus, the SLC set out to determine

whether, in light of the applicable legal standards, there were "red flags" that the outside

directors were aware of, or should have been aware of, but nonetheless ignored. As noted

above, the 2005 Derivative Complaint identifies no red flags that would have alerted the outside

directors to the existence of the 35-Day Month practice, so the SLC began its analysis by

identifying what it believed were key events at CA, analyzing whether those events were red

flags, and examining the Board's response to those events.

A.   *The Key Employee Stock Ownership Plan*

On May 25, 1995, CA's Board approved the KESOP in an effort to "enhance

shareholder value by encourag[ing], recogniz[ing] and reward[ing] sustained outstanding

individual performance by certain key employees who are largely responsible for the

management, growth and protection of [CA's] business." *See* Computer Assocs. Int'l, Inc.,

Proxy Statement (Form DEF 14A) (July 6, 1995) ("1995 Proxy"); KESOP § 1.1. Those "key

employees" were CA's three (3) most senior executives – Charles Wang (CA's then-Chairman

and CEO), Sanjay Kumar (CA's then-President and COO), and Russell Artzt (CA's then-

Executive Vice President of Research and Development). KESOP § 2.1.9. CA shareholders

approved the KESOP on August 19, 1995, retroactive to May 25, 1995.

1.   **The Origination of the KESOP**

The idea for the KESOP dated from late 1994, when Charles Wang raised the

notion of an executive compensation package with Willem de Vogel, who was then the chair of

CA's Compensation Committee. Mr. Wang initially proposed the idea to Mr. de Vogel

specifically as a means to incentivize Mr. Kumar, who was second in command to Mr. Wang,

to remain with CA. By that time, Mr. Kumar's meteoric rise through the management ranks at

CA was noteworthy, and he had been identified as the heir apparent to Mr. Wang. Messrs.

Exhibit 10

Wang and Kumar were, at that time, very close, as exemplified by the fact that in the early 1990s, Mr. Kumar supplanted Tony Wang, Charles Wang's brother, as the CA executive responsible for running the day-to-day operations at CA. Mr. Wang told Mr. de Vogel that he was concerned that Mr. Kumar would be recruited away from CA, and he wanted to ensure that Mr. Kumar's financial stake in CA was substantial enough to prevent him from leaving.

It appears that this view was shared by the CA Board as a whole, which was concerned about retaining CA's senior management during the beginning of the software industry boom that occurred in the mid-1990s. The highly regarded Mr. Kumar was viewed by the Board as a whole as a "plumb target for any technology types," and thus particularly vulnerable.[58]

What later became the KESOP took shape over a series of informal meetings between Mr. Wang and Mr. de Vogel. These conversations, and the resulting outline of a concept, ultimately precipitated a meeting at CA headquarters, at which Mr. de Vogel, Mr. Grasso, and Irving Goldstein,[59] the members of the Board's Compensation Committee, with the assistance of Pearl Meyer, then of the well-known executive compensation consulting firm, Frederic W. Cook & Co, created the KESOP.

As the KESOP began to take shape, Mr. Wang made clear his view that, as co-founder and CEO of the Company, the Compensation Committee should not only include him in the KESOP, but make him its largest beneficiary. Mr. de Vogel acquiesced to this demand,

---

[58]   Mr. de Vogel reported to the SLC that Mr. Schwartz, CA's CFO, was angry about the decision to exclude him and believed that it was unfair. Mr. Kumar told the SLC that Mr. Wang did not want Mr. Schwartz included in the plan, and sought to exclude him from a similar plan following the KESOP.

[59]   At this time, the CA Board consisted of Directors Artzt, de Vogel, Goldstein, Grasso, Kenny, Kumar, Wang, and Edward C. Lord. Mr. Goldstein, who was a graduate of Queens college with Mr. Wang, was a member of the CA Board and Chair of the Audit Committee from 1990 until his death in May 2000. Mr. Lord was a member of the CA Board from 1988 to March 1996. 1995 Proxy.

141

since in his view, at the time the KESOP was being considered, Mr. Wang did not have a sufficiently large ownership stake in CA, and the stock he did own was not tied to his remaining at CA.[60] Directors Grasso and Kenny also believed that Mr. Wang should be included in the KESOP both as a retention tool (they viewed him as the founder, driving force, and public face of CA) and to reward him for his continued service to CA. One final consideration that drove Mr. Wang's inclusion in the KESOP was that it persuaded him to sign a non-competition agreement with CA, something he had refused to do in the past.

The Compensation Committee included Mr. Artzt in the KESOP because he was a co-founder of the Company, along with Mr. Wang, and because it viewed his technological expertise as important to CA's future success. The Compensation Committee also believed that Mr. Artzt (i) knew the Company very well, (ii) served as an important intermediary between Messrs. Wang and Kumar, and (iii) was important to developing "a successor generation of leadership" at CA.

2.     **The Structure of the KESOP:  The Connection Between the KESOP and CA's Share Price**

The Compensation Committee tied the KESOP's vesting provisions to the Company's share price – as opposed to revenue or earnings targets – because it believed this was the best way to increase "shareholder value." That is, the Compensation Committee believed that if it set a "very high" target price for the KESOP's vesting provisions, and these provisions were met or exceeded, both the shareholders and the CA executives would benefit.

The notion of increasing shareholder value also led the Compensation Committee to design the KESOP as a restricted stock grant, as opposed to an award of stock

---

[60]     As of the filing of CA's July 6, 1995 Proxy Statement in which the KESOP was proposed to CA's shareholders, Mr. Wang owned 7,966,614 shares, or approximately five percent (5%), of CA's outstanding common stock.  *See* 1995 Proxy.

142

Exhibit 10

options. Mr. de Vogel favored a restricted stock grant over stock options, believing that restricted stock put the CA executives in the same shoes as CA's shareholders, and would make the plan more transparent. Mr. Grasso told the SLC that, in his view, according to the Black-Scholes pricing model and the prevailing market view on valuation, it made more sense to the Compensation Committee to use restricted stock rather than options.

As for the size of the KESOP, the Compensation Committee intended to compensate the KESOP Defendants in a manner that was commensurate with CA's peer companies. *See* Grasso Dep. 16:9-16, Oct. 17, 2001. The Compensation Committee, with assistance from its outside consultants, looked at what they believed was "reasonable" compensation when compared with other top executives in its industry, and found that the industry standard at the time was to provide top management with the opportunity to earn a three-to-five-percent (3-5%) ownership interest in the company over a three-to-five-year period. *See* de Vogel Dep. 34-35:22-25, 1-4, Sept. 24, 2001. Accordingly, the KESOP was designed with these targets in mind.

    3.    **The Mechanics of the KESOP**

        (a)    *The Grant Provisions*

As initially drafted, the KESOP authorized the Compensation Committee to grant up to 6,000,000 shares of CA common stock to be divided among the beneficiaries in certain percentages, that is:  Mr. Wang would receive sixty percent (60%) of any grant, Mr. Kumar would receive thirty percent (30%), and Mr. Artzt would receive ten percent (10%). *See* KESOP §§ 3.1, 3.2. The KESOP authorized an immediate grant of 2,000,000 shares (the "Initial Grant") that would vest on March 31, 2000 (the "Normal Vesting Date") in certain percentages, depending on the performance of CA's common stock (the "Normal Vesting Conditions"). *See* KESOP §§ 2.1.6, 2.1.7, 3.2, 4.3. Further, the KESOP authorized the

143

Compensation Committee to grant up to an additional 4,000,000 shares (the "Additional Grant") if CA's stock price met or exceeded certain targets in a given year (the "Grant Provisions"). *See* KESOP § 3.3; *see* Appendix A. Any Additional Grants made by the Compensation Committee were subject to the same Normal Vesting Date and Normal Vesting Conditions as the Initial Grant. See KESOP §§ 2.1.6, 2.1.7, 3.2, 4.3.

Following the creation of the KESOP, CA declared three (3) separate three-for-two stock splits, which became effective on September 6, 1995, July 16, 1996, November 28, 1997, respectively. The KESOP provided that the target prices for both the Grant Provisions and the Normal Vesting Conditions be adjusted to account for these stock splits. *See* KESOP § 3.3. In addition, the Compensation Committee proportionally increased the number of shares granted pursuant to each three-for-two split. As a result, the Initial Grant increased to 6,750,000 shares, and the Additional Grant increased to 13,500,000 shares. Thus, in sum, following the CA stock splits, the KESOP Defendants were eligible to earn 20,250,000 CA shares.

(b)     *The Vesting Provisions*

Because the KESOP was intended as a retention tool, the Initial Grant and any Additional Grants required the beneficiaries to remain employed at CA until the Normal Vesting Date (March 31, 2000) or all shares granted to them under the KESOP (both the Initial Grant and the Additional Grants) would be forfeited, unless the shares had already vested pursuant to the accelerated vesting schedule, as described below. *See* KESOP § 4.1. Section 4.3 of the KESOP provided the Normal Vesting Conditions for the KESOP shares:

(i)     Under § 4.3.1, if CA's closing stock price were to exceed $38.81[61] for any sixty trading days during CA's fiscal year 2000, then all shares in the Initial Grant and any Additional Shares would vest in their entirety.

---

[61]     All share prices are adjusted for the three three-for-two stock splits.

(ii)     Under § 4.3.2, if CA's closing stock price were to exceed $31.11 for any sixty trading days during CA's fiscal year 2000, but were not to exceed $38.81 for sixty trading days, then forty percent (40%) of the shares in the Initial Grant would vest and all other shares would be forfeited.

(iii)    Under § 4.3.3, if CA's closing stock price were to exceed $22.22 for any sixty trading days during CA's fiscal year 2000, but were not to exceed $31.10 for sixty trading days, then twenty percent (20%) of the shares in the Initial Grant would vest and all other shares would be forfeited.

(iv)     Also under § 4.3.3, if CA's closing price were to exceed $22.22 for any sixty trading days prior to the Normal Vesting Date, then twenty percent (20%) of the shares in the Initial Grant would vest (although they would remain subject to forfeiture under § 4.1 if the employee left the Company prior to March 31, 2000).

(c)     *The KESOP's Accelerated Vesting Provisions*

The KESOP also contained an "accelerated" vesting provision, which enumerated the conditions pursuant to which *all* shares granted under the KESOP would vest immediately and no longer be subject to forfeiture (the "Accelerated Vesting Provision"). *See* KESOP § 4.4. Under the Accelerated Vesting Provision, if CA's stock price closed at or above $53.33 on any sixty (60) trading days during any twelve-month period prior to the Normal Vesting Date of March 31, 2000, all shares granted in the Initial Grant and any Additional Grants would vest immediately. *See* KESOP § 4.4. Once vested, the shares were no longer subject to forfeiture, although they were subject to limitations on transfer for up to seven years following the vesting.[62] *See* KESOP § 5.1. As described below, the KESOP Defendants were awarded the majority of their shares pursuant to the accelerated vesting clause.

---

[62]     However, the Compensation Committee lifted all transfer restrictions on Mr. Wang's KESOP shares upon his retirement from CA. *See* Minutes of a Meeting of the CA Board at 2 (Feb. 28, 2003). The Compensation Committee also lifted the transfer restrictions on a large portion of Mr. Kumar's KESOP shares to allow him to use the shares as collateral for a loan. On May 20, 2005, the SLC sent letters to counsel for Messrs. Wang, Kumar, and Artzt, apprising them of the SLC's investigation and requesting that their clients refrain from pledging, disposing, gifting, or otherwise transferring any stock issued to them pursuant to the KESOP. *See* Letter from David Hennes to Vincent Sama, counsel for Mr. Wang,

145

B.   *The KESOP Shares Vest*

On May 21, 1998, two days after a joint Audit Committee and Board Meeting,

CA's share price closed above the $53.33 target for sixty (60) days in a twelve-month period,

thereby triggering the KESOP's Accelerated Vesting Provision. *See* KESOP § 4.4.  As a result,

the remainder of the Initial Grant (5,400,000 shares) and all Additional Grants (13,500,000

shares) vested;[63] in addition, the total award, including shares granted earlier under another

provision of the KESOP, was no longer subject to forfeiture.[64]  *See* KESOP §§ 3.2, 3.3, 4.1, 4.4.

On the date of vesting, the 18,900,000 CA shares were worth $1.04 billion.[65]  It is undisputed

that, at the time, the KESOP resulted in one of the largest payouts in U.S. Corporate history.[66]

On June 12, 1998, after an adjustment for taxes, CA transferred the shares to the beneficiaries.

Computer Assocs. Int'l, Inc., Proxy Statement (Form DEF 14A) (July 2, 1998) ("1998

Proxy").[67]  Subsequently, in March 2000, as part of a settlement of derivative litigation relating

to the grant provisions of the KESOP – unrelated to any allegations of accounting fraud – the

---

(May 20, 2005); Letter from David Hennes to Stephen Kesselman, counsel for Mr. Artzt, (May 20, 2005); Letter from David Hennes to Eric Halper, counsel for Mr. Kumar, (May 20, 2005).

[63]  In total, Mr. Wang received 11,340,000 shares, Mr. Kumar received 5,670,000 shares, and Mr. Artzt received 1,890,000 shares pursuant to the KESOP.

[64]  On January 11, 1996, CA's share price met the Normal Vesting Condition enumerated in § 4.3.3 and twenty percent (20%) of the Initial Grant, 1,350,000 CA shares, vested: 810,000 shares for Mr. Wang, 405,000 for Mr. Kumar, and 135,000 for Mr. Artzt. *See* Computer Associates Int'l, Inc., Definitive Proxy Statement (Form Def 14A) at 12 (July 10, 1996).  However, because they vested under the Normal Vesting Conditions, the shares of each executive were still subject to forfeiture if that executive left the Company before March 31, 2000. *See* KESOP § 4.3.3.  Nonetheless, when the Accelerated Vesting Condition was satisfied, as discussed above, these shares were no longer subject to forfeiture. *See* KESOP §§ 4.1, 4.4.

[65]  At the time of the award, CA had a market capitalization of $30 billion, and its stock traded at $54.95. *See* Computer Associates Int'l, Inc., Annual Report (Form 10-K) at 3 (May 22, 1998).

[66]  *See supra* note 11.

[67]  CA issued Mr. Wang 9,334,205 shares, Mr. Kumar 4,088,130 shares, and Mr. Artzt 1,320,931 shares. 1998 Proxy at 18.

KESOP Defendants agreed to return a total of 4,500,000 KESOP shares to the Company. Stipulation of Settlement at ¶ 1, *Sanders v. Wang*, 98 Civ. 4961 (TCP).[68]

Because the KESOP was tied to CA's share price, the SLC sought to determine to what degree, if any, the 35-Day Month practice affected the vesting of the KESOP. The SLC also examined whether the accelerated vesting of the KESOP was a red flag, and, if it was, whether the Board took any steps to investigate CA's financial health at a time when this historic transfer of shareholder wealth occurred.

As discussed above, the SLC has concluded that the origins of the 35-Day Month practice predated the vesting of the KESOP by many years. Thus, the SLC retained PwC to determine whether CA's reported financial results were overstated due to the practice during 1997 and 1998.[69] The SLC has concluded, based on PwC's work and its investigation, that CA's financial statements and publicly reported growth rate were materially overstated in fiscal year 1998 (April 1, 1997 through March 31, 1998), and the first quarter of fiscal year 1999 (April 1 through June 30, 1998), the quarter in which the KESOP vested.

The SLC also retained Professor Ray Ball, the Sidney Davidson Professor of Accounting at the University of Chicago Graduate School of Business, to determine what impact disclosure of the fraud and CA's true financial results would have had on CA's stock price. Professor Ball concluded that had the 35-Day Month practice been disclosed to the market in mid-1998, CA's stock price would have declined thirty-seven percent (37%). To put

---

68    As noted above, the plaintiffs in that case alleged that the Board improperly adjusted the KESOP grant to account for three separate three-for-two CA stock splits, and the Delaware Court of Chancery agreed. *See Sanders v. Wang*, 1999 WL 1044880, at *6 (Del. Ch. Nov. 10, 1999). As part of the settlement, Mr. Wang returned 2,700,000 shares to the Company, Mr. Kumar returned 1,350,000 shares, and Mr. Artzt returned 450,000 shares. Stipulation of Settlement at ¶ 1, *Sanders v. Wang*, 98 Civ 4961 (TCP).

69    CA's restatement, issued on April 26, 2004, did not cover this period. Computer Associates Int'l, Inc., Unscheduled Material Events (Form 8-K) at 5-7 (April 26, 2004).

147

it simply, had the real facts been known, the KESOP shares would not have vested on May 21, 1998, and Messrs. Wang, Kumar, and Artzt would not have received over $1 billion in CA stock.

At the Board level, prior to the KESOP vesting, the CA Board, as a whole, did not specifically monitor CA's share price in connection with the vesting of the KESOP, nor did it take any extra, incremental steps to ensure that CA's financials were accurate. Indeed, other than several directors loosely monitoring the number of days that CA's share price traded above $53.33, none of the Board members can recall doing anything special or different related to the impending vesting. Likewise, the Board took no additional steps, formal or informal, to verify CA's financials before or after the KESOP vested.

The directors interviewed by the SLC uniformly expressed the view that since they generally and regularly took appropriate steps to ensure the accuracy of CA's financial results, there was no need to take additional steps before or after the KESOP vested. Indeed, on May 19, 1998, two days before the KESOP vested, CA's Audit Committee met and received E&Y's "clean" audit opinion for fiscal year 1998, which ended on March 31, 1998. *See* Minutes of a Meeting of the CA Board at 1-2 (May 19, 1998). Shortly thereafter, the Audit Committee reviewed E&Y's management letter, which reported no material weaknesses. *See* Minutes of a Meeting of the CA Audit Comm. at 1-2 (Aug. 12, 1998). Finally, there is no evidence that any of the Board or Audit Committee's advisors, legal or accounting, recommended that the Company perform any additional work or testing in light of the vesting.

C.     *The Promulgation of SOP 97-2*

During the vesting period for the KESOP, and prior to the actual vesting, the accounting rules governing software revenue recognition changed materially. On December 15, 1997, AICPA promulgated Statement of Position ("SOP") 97-2, which became effective for

148

Exhibit 10

CA on April 1, 1998, the start of CA's fiscal year 1999.[70]  *See* SOP 97-2 c.92.  SOP 97-2

required that a software vendor, such as CA, meet four criteria before revenue may be

recognized: (i) persuasive evidence that an arrangement exists; (ii) delivery of the product has

occurred; (iii) the vendor fee is fixed or determinable; and (iv) collectability of the vendor fee is

probable.  SOP 97-2 c.08.  SOP 97-2 makes clear that for a software vendor that "has a

customary business practice of utilizing written contracts," such as CA, "evidence of the

arrangement," pursuant to (i) above, "is provided only by a contract signed by *both* parties."

SOP 97-2 c.16 (emphasis added).[71]

       The promulgation of SOP 97-2, which drew substantial industry attention,

provided a clear opportunity for the Board to examine CA's revenue recognition practices in

closer detail.  CA's outside auditor at the time, E&Y, provided repeated assurances to the Audit

Committee that CA's accounting practices were sound with respect to SOP 97-2:

- At a January 27, 1997 Audit Committee meeting, Jerry Reynolds and Mark Wovsaniker of E&Y "reviewed a number of existing and proposed FASB and ACSEC pronouncements.  With the possible exception of FAS 123 and the forthcoming revision of SOP 91-1, none of these standards would have any material impact on the Company. They felt comfortable that the prior year's work with FAS 123 and on-going liaison on SOP 91-1 would minimize the effect of these pronouncements."  Minutes of a Meeting of the CA Audit Comm. at 1 (Jan. 27, 1997).

- At an August 13, 1997 Audit Committee meeting, Mr. Wovsaniker "advised the Committee that the release of an updated SOP on revenue recognition (a clarification of SOP 91-1) was imminent, but that he did not anticipate a major impact on CA.  He also stated that he felt that *the Company had good financial controls and was conservative in its accounting approach generally.*"  Minutes of a Meeting of the CA Audit Comm. at 1

---

[70]   Prior to the enactment of SOP 97-2, software companies, including CA, had to meet the revenue recognition requirements of SOP 91-1.  SOP 97-2 c.01.

[71]   Before the enactment of SOP 97-2, SOP 91-1 had required that "even if all other requirements set forth in this SOP for recognition of revenue are met, revenue should not be recognized on those licenses until persuasive evidence of the agreement exists.  Such evidence is usually provided by the signed contract."  Douglas Carmichael, "Is it Time to Record the Sale?  Software Revenue Recognition Under SOP 97-2," *The CPA Journal*, July 1998, available at *www.nysscpa.org/cpajournal/1998/0798/features/f440798.htm* (citing SOP 91-1).

149

(Aug. 13, 1997) (emphasis added). At that time, E&Y presented its March 31, 1997 management letter to the Audit Committee, which states that although E&Y did not "anticipate that the revisions to the SOP [would] significantly impact the Company financially, certain administrative and sales accounting internal controls could be impacted." Letter from E&Y to the CA Audit Comm. at 1 (May 23, 1997). The management letter recommended that CA implement certain controls regarding revenue recognition issues. *Id.* At the August 13 meeting, management reported that most of the recommendations had been implemented or were intended to be implemented. *See* Minutes of a Meeting of the CA Audit Comm. at 1 (Aug. 13, 1997).

- At a February 23, 1998 Audit Committee meeting, Mr. Wovsaniker briefed the Audit Committee on the implications of SOP 97-2, which at that time did not yet apply to CA, and told the Audit Committee that it "would have *almost no impact on the Company's operations or financial results*" (with the exception of several paragraphs unrelated to the requirement that a signed contract exist before revenue can be recognized). Minutes of a Meeting of the CA Audit Comm. at 1 (Feb. 23, 1998) (emphasis added).

- At a May 19, 1998 joint Board and Audit Committee meeting, Mr. Wovsaniker stated that SOP 97-2 was "*not expected to have a material impact on [CA's] revenue recognition.*" Minutes of a Meeting of the CA Board and Audit Comm. at 2 (May 19, 1998) (emphasis added).

- At an August 12, 1998 Audit Committee meeting, Mr. Wovsaniker, in discussing SOP 97-2, told the Audit Committee that he "believed *the Company was in compliance with the provision[]*." Minutes of a Meeting of the CA Audit Comm. at 2 (Aug. 12, 1998) (emphasis added). At that time, Mr. Wovsaniker suggested that CA continue to monitor its business to ensure that CA remained in compliance. *Id.*

D.     *The July 21, 1998 Press Release*

The vesting of the KESOP had at least one unintended consequence, as it reportedly caused CA's then-CFO, Peter Schwartz, to resign. It was the common belief at CA that Mr. Schwartz was unhappy both at the size of the KESOP and the fact that he was not included as a beneficiary. Although Mr. Schwartz denied both motivations as a basis for his departure, he agreed that it was his view that the KESOP was far richer than he thought

appropriate. According to Mr. Kumar, Mr. Schwartz had a falling out with Mr. Wang over his exclusion from a subsequent compensation plan, which prompted his resignation.[72]

To replace Mr. Schwartz, Mr. Wang recommended to the Board, with Mr. Kumar's support, that it appoint thirty-six year-old Ira Zar as CA's new CFO. At the time that Mr. Zar was recommended to succeed Mr. Schwartz, the Board was presented with no alternative candidates, either external or internal. Indeed, Mr. Kumar told the SLC that Mr. Wang chose Mr. Zar precisely because he was "in the CA family," and that Mr. Wang only considered Charles McWade and Abraham Poznanski,[73] who were also members of the "CA family," as alternative candidates for the position.[74] At a June 22, 1998 Board meeting, "[a]fter discussion of Mr. Zar's background and experience gained during his sixteen years of employment by the Corporation," the Board appointed Mr. Zar to be CA's next CFO. Minutes of a Meeting of the CA Board at 2 (June 22, 1998).

On July 20, 1998 – less than sixty (60) days after the KESOP vested – the CA Board held its regularly scheduled quarterly meeting. *See* Minutes of a Meeting of the CA Board at 1 (July 20, 1998). Mr. Zar, who was making his first presentation to the Board as CFO, reviewed CA's financial performance for the first quarter of fiscal year 1999 and

---

[72]   Although Mr. Schwartz's resignation was technically dated June 22, 1998, he continued to function as an executive officer of the Company through the summer of 1998. For example, he played a substantial role at the Company's July 20, 1998 Board meeting and participated in the analyst calls that occurred on July 21, 1998.

[73]   Mr. Poznanski had previously served as CA CFO from 1981 to 1985, and in 1998 was Senior Vice President of the Internal Audit department, .

[74]   According to Mr. Kumar, Mr. Wang's CFO search was not limited to insiders because he feared that an outsider would expose the 35-Day Month practice, and reiterated a theme that the SLC heard time and again – that no one thought about the 35-Day Month practice as "wrong" while it was being perpetrated, and therefore fear of its discovery did not generally factor into senior management's decisions.

151


provided a projected outlook for the second quarter. *Id.*[75] When Mr. Zar completed giving his presentation, according to the minutes of the meeting, Mr. Kumar told his fellow Board members that "some large customers of the Corporation that are doing business in Asia have been reducing their spending and appear to be deferring purchase decisions in light of the current economic uncertainty in Asia." *Id.* at 2. Mr. Kumar explained to the Board that he had just come back from a conference in Australia where he had met with CA's top salespeople from around the world, and they had reported to him the impact the Asian economic crisis was having on CA's multi-national business. Sanjay Kumar Dep. 237-239, Aug. 7, 2001. Mr. Wang added that he also had recently visited Asia, and that he had observed that business there "had slowed to a halt." *See id.* During its investigation, the SLC has found no indication or evidence that CA management presented any financial analysis or extrinsic data to support their concerns, or a quantification of the expected decline in growth, and the CA Board did not ask them to do so.

Nonetheless, the Board members, led by Mr. Grasso, determined that this information was material, and that CA needed to promptly disclose the information to the market. The CA Board, which had been presented with a draft press release for approval, recommended that it be revised to reflect the stated concerns. *See* Minutes of a Meeting of the CA Board at 2 (July 20, 1998). It was the view of Mr. Woghin, confirmed by Mr. Kumar, that management did not intend to create a disclosable event, but rather to simply condition the Board for possible reduced performance in the coming months.

---

[75]     As noted above, Mr. Zar was appointed CFO on June 22, 1998, and this was the first Board meeting that he had ever attended. Mr. Zar said that he was very scared that he would be asked a question to which he would not know the answer, given his inexperience as CFO, and therefore did not speak at the meeting, except to present his report to the Board. Mr. Schwartz, whom Mr. Zar had been chosen to replace, participated at this meeting on a substantive level.

Interestingly, Mr. Kumar's recollection of these events differs from the recollections of all other attendees at the meeting. According to Mr. Kumar, it was Mr. Schwartz who raised concerns about the impact of the Asian economic crisis. Indeed, Mr. Kumar recalled being shocked that Mr. Schwartz had raised the issue to the Board without first discussing it with management, and trying, in vain, to persuade the Board to take additional time to understand the situation before issuing a public statement. Mr. Kumar's recollection is consistent with the testimony he gave in his August 7, 2001 deposition in the 1998 Class Action Litigation. *See* Kumar Dep. 237-39. Mr. Schwartz had no recollection of the details of this meeting, either in his August 16, 2001 deposition in the Class Actions or his August 1, 2006 interview with the SLC. *See* Schwartz Dep. 97-101, dated Aug. 14, 2001. In any event, the issue of who raised this issue is not material to the SLC's consideration of the issue.

On July 21, 1998, after the close of trading on the NYSE, CA announced its quarterly results. CA announced that it had met Wall Street EPS estimates of $0.34 (excluding the charge taken for the KESOP vesting). Press Release, Computer Assocs. Int'l, Inc., Computer Associates Reports Record First Quarter, Operating Earnings Up 25% (July 21, 1998). However, in that press release, CA cautioned the market that "the ripple effect of the Asian economic turmoil on our multinational clients . . . coupled with deferred software purchasing decisions as customers deal with their 'Y2K' projects and mainframe hardware transition issues, leads us to believe that our revenue and earnings growth will slow over the next several quarters." *Id.*[76] The next day, CA's share price fell thirty-one percent (31%).

---

[76]     Notably, while the press release mentions Y2K concerns, there is no mention of Y2K concerns in the July 20, 1998 Board minutes and none of the directors interviewed by the SLC recall it being discussed. *See* Minutes of a Meeting of the CA Board at 2 (July 20, 1998). Recollections vary, but some at the meeting recall discussing the mainframe transition issue, but none recall discussing Y2K, although that was an issue of constant discussion in the period leading up to January 1, 2000.

The share price decline resulting from the July 21 press release did not prompt action by the Board. At no point following the July 20 Board meeting, or following the stock market response to the July 21 press release, did the Board take any steps to determine when CA management learned of the information concerning the expected slowing of CA's growth rate. In particular, the Board took no steps to determine if Messrs. Kumar or Wang were aware of this issue before the KESOP vested, or whether there was a link between the timing of when they "learned" of this information and the vesting of the KESOP. Indeed, no director appears to have ever raised the question of whether – had the issue been known and disclosed two (2) months earlier – the $1 billion in KESOP shares would have vested.

E.   *Derivative and Class Action Litigation Filed in Response to the KESOP and the July 21 Press Release*

1.   **The 1998 Class Actions**

The linkage, however, was not lost on the securities plaintiffs' bar, and others at CA. As described above, between July 1998 and October 1998, eleven (11) putative class action complaints were filed against CA and Messrs. Wang, Kumar, and Artzt in the Eastern District, which were later consolidated into a single litigation, the 1998 Class Action. The 1998 Class Action alleged that CA began to experience serious financial problems prior to the vesting of the KESOP, and that the financial slide led CA to begin artificially inflating its revenues, in part, to protect the KESOP beneficiaries' interests in the accelerated vesting. The plaintiffs claimed, among other things, that CA was (i) inflating revenue by recognizing revenue on long-term contracts upfront, purportedly in violation of GAAP, (ii) offering excessive discounts to make revenue appear larger on certain products, and (iii) otherwise engaging in improper revenue recognition practices that artificially inflated CA's operating

revenue.  However, *none of these lawsuits allege that CA was using a "35-Day Month" or backdating contracts.*

### 2.    The 1998 Derivative Actions

In addition, in July and August 1998, derivative lawsuits were also filed in both the Eastern District and the Delaware Court of Chancery.  Plaintiffs in those derivative actions argued that the KESOP authorized the Compensation Committee to grant the KESOP Defendants six million shares in total, and did not permit any adjustments for stock splits or dividends on any shares, which adjustment the Compensation Committee had made, as described above.  The derivative action filed in the Eastern District also contained allegations of fraud, similar to those made in the 1998 Class Action, but likewise included no allegations of a "35-Day Month" or backdating.

The Board received an update about these lawsuits at an August 12, 1998 Board meeting.  *See* Minutes of a Meeting of the CA Board (Aug. 12, 1998); Woghin Talking Points at 1 (Aug. 12, 2998).[77]  At that time, Mr. Woghin told the Board that the class action lawsuits had no merit, but rather "are based solely on a theory that there 'must have been' fraud because Charles, Sanjay and Russ had a motive to keep the stock price high until their shares vested under [the KESOP], and, for that reason, wrongfully delayed in issuing the cautionary warning eventually included in the July earnings release."  Woghin Talking Points at 1 (Aug. 12, 1998).

With regard to the derivative lawsuits, Mr. Woghin told the Board that the plaintiffs claimed that "Charles, Sanjay and Russ defrauded CA by maintaining the share price artificially high for their own financial gain, thereby committing fraud, and that all the directors breached their duty of care by allowing this to happen."  *Id.*  Mr. Woghin told the Board that the

---

[77]    At that time the Board was comprised of Directors Artzt, de Vogel, Goldstein, Grasso, Kenny, Kumar, and Wang, and retained this composition until May 2001.

155

"allegations of all the complaints are extremely thin," and that the Company had "a reasonably good shot" at achieving dismissal of the derivative lawsuit due to the shareholders' failure to make a demand. *Id.* at 1-2.

The final comment in Mr. Woghin's talking points states: "Bottom line is that we have been through this before. We know what to expect and how to deal with it through very effective counsel." *Id.* at 2. This was the message that the Board received – that these were strike suits that would be dealt with in the ordinary course of business. As new directors joined the Board through the course of the litigation, they were similarly assured that there was no merit to the litigation.

The SLC viewed the filing of these lawsuits as the end of a series of events starting with the vesting of the KESOP, which could have prompted the Board to more closely examine the Company's financial health. However, not even the filing of the lawsuits, which explicitly linked the KESOP and the July 21 press release, caused the Board to take steps, formal or informal, to examine these events and their linkage, if any. With regard to the lawsuits, the Board universally believed, based on Mr. Woghin's advice, and its own experiences with class action litigation, that the lawsuits were without merit.

F.    *CA Changes Outside Auditors from E&Y to KPMG*

The vesting of the KESOP required the Company to take a $675 million charge against earnings in the first quarter of fiscal year 1999 (the "KESOP charge"), ending June 30, 1998. This caused CA to report a $481 million loss for the quarter. *Id.* When the KESOP was created, E&Y advised the Compensation Committee that when it vested, the charge would be a "one-time" charge -- meaning that it would happen only in one (1) fiscal quarter -- that would be

taken in the quarter with the majority of the days in which CA's share price closed at or over $53.33. *See* de Vogel Dep. 37-38.

Under this scenario, the charge would have been taken in the fourth quarter of fiscal year 1998, ending March 31, 1998. When the vesting of the KESOP became likely, E&Y changed its advice, advising CA to take the charge over two (2) quarters, divided by the percentage of days that CA's stock traded over the required price. Finally, right before the KESOP actually vested, E&Y changed its advice again, advising CA to take a one-time charge in the quarter that the KESOP actually vested, which CA did. E&Y's constantly changing advice caused great unhappiness at CA. *See* Minutes of a Meeting of the CA Board and Audit Comm. at 2 (May 19, 1998).

This issue came to a head at the May 19 joint Board and Audit Committee Meeting. Mr. Wovsaniker, the lead E&Y partner for the CA audit, told the Board that because E&Y could not predict with certainty when the KESOP would vest, it would be most appropriate to recognize the KESOP charge as of the day the target is actually reached. *See id.* This had the effect of pushing the charge into the first quarter of fiscal year 1999 – the then-current period – rather than the already-closed fourth quarter of fiscal year 1998. More importantly, from the Board's perspective, this would focus even more attention on the KESOP, because the KESOP charge would affect CA's current earnings. The Board ultimately acquiesced to Mr. Wovsaniker's position, but not without a considerable amount of frustration and dissatisfaction with E&Y. *See* Minutes of a Meeting of the CA Audit Comm. at 1-2 (Aug. 12, 1998).

The Board's unhappiness with E&Y's change in position led the Board to seek to replace E&Y. *See* Minutes of a Meeting of the CA Board at 2 (May 26, 1999). At an August

157

12, 1998 Audit Committee meeting, Mr. Goldstein, then-Chair of the Audit Committee –
speaking on behalf of the Board – "expressed dissatisfaction with the untimely nature of Ernst
& Young's guidance respecting the timing of the charge for the" KESOP. *See* Minutes of a
Meeting of the CA Audit Comm. at 1-2 (Aug. 12, 1998). The E&Y representatives present,
Thomas Hudgins, Mark Wovsaniker, and Martin Shannon, told the Audit Committee that E&Y
would provide more timely advice in the future. *See id.* at 2. CA's dissatisfaction with E&Y
continued into 1999. At a May 26, 1999 Board meeting, Mr. Kumar reported to the Board on a
meeting he had with the then-Chairman of E&Y to discuss the inconsistency of E&Y's advice
with respect to the KESOP charge. *See* Minutes of a Meeting of the CA Board at 2 (May 26,
1999).[78] The minutes of that Board meeting reflect that the directors "expressed displeasure
with the quality and consistency of the advice given by Ernst & Young," and directed
management to consider retaining the services of another of the major auditing firms to replace
E&Y. *Id.* at 2.

      At a June 18, 1999 Audit Committee meeting, Mr. Zar presented his
recommendation for a possible replacement for E&Y, in the event that the Board decided to
make a switch. *See* Minutes of a Meeting of the CA Audit Comm. at 1-2 (June 18, 1999). Mr.
Zar told the Audit Committee that throughout his search for a potential replacement, he had
considered the factors that had contributed to the Board's dissatisfaction with E&Y, "including
lack of decisiveness, inconsistency in advice, and less than effective advocacy in professional
associations." *Id.* at 2. Mr. Zar then proposed KPMG and PwC as the best candidates, and
advised the Committee that, in his view, KPMG would be the best choice due to its prior

---

[78]    The May 26 meeting was Roel Pieper's first meeting as a director. At this time the Board was comprised
of directors Artzt, de Vogel, Goldstein, Grasso, Kenny, Kumar, Pieper, and Wang.

Exhibit 10

experience with the Company.[79]  *Id.*  Ultimately, at a June 29, 1999 Board meeting, after considering the proposals of, and meeting with representatives from KPMG, PwC, and E&Y, the Board selected KPMG to replace E&Y.  *See* Minutes of a Meeting of the CA Board at 2 (June 29, 1999).[80]

At an August 25, 1999 Audit Committee meeting, Mark Goodburn of KPMG, the new lead partner for the CA audit, reported that KPMG had successfully transitioned onto the CA account and, in the course of that transition, had, among other things, reviewed E&Y's workpapers for the fiscal year 1999 audit.  *See* Minutes of a Meeting of the CA Audit Comm. at 1-2 (Aug. 25, 1999).  At a follow-up Audit Committee meeting on August 31, 1999, KPMG representatives presented their plan for CA's fiscal year 2000 audit.  *See* Minutes of a Meeting of the CA Audit Comm. at 1-2 (Aug. 31, 1999).  As part of that plan, Mr. Goodburn told the Audit Committee that KPMG "intended to take a 'fresh look' at the Corporation's accounting practices."  *Id.* at 2.

In the fall of 1999, KPMG raised with CA management the issue of CA's compliance with the two-signature requirement of SOP 97-2.  Prior to this time, CA had, as a matter of practice (and in contravention of the plain language of SOP 97-2), failed to countersign agreements prior to the quarter-end.  This is because CA considered a contract binding upon receiving the customer's signature, and considered its own signature to be

---

[79]   KPMG audited the books of four of CA's European subsidiaries and Platinum Technology International, Inc., which was acquired by CA in April 1999.

[80]   The Board elected Alfonse D'Amato to the Board at this meeting, effective immediately.  *See* Minutes of a Meeting of the CA Board at 2 (June 29, 1999).  Mr. D'Amato's first meeting as a director was the July 15, 1999 meeting.  *See* Minutes of a Meeting of the CA Board at 2 (July 15, 1999).  Once Mr. D'Amato joined the Board, it was comprised of directors Wang, Artzt, Kumar, Grasso, Kenny, de Vogel, Pieper, and Goldstein.

irrelevant. *Id.* E&Y had not raised this as an issue with CA.[81]  When KPMG reviewed CA's

practices, it told CA that under SOP 97-2 all contracts had to be fully executed by *both* parties

by the quarter-end, and gave CA until the fourth quarter of fiscal year 2000 (ending March 31,

2000) to come into compliance. *Id.* at 15-16.

CA management resisted this approach, arguing that it would be physically

impossible for CA to timely countersign all of its license agreements, because only a few

executives had the authority to sign contracts on behalf of CA, and the majority of CA's

contracts came in on the final night of the quarter. *Id.* at 15.  CA management ultimately

agreed to bring the Company into compliance, and purportedly did so, by implementing a "hard

close," discussed above, whereby all paperwork for contracts had to be processed before the

quarter end. *See, e.g.* E-mail from Sanjay Kumar to CA Sales executive (Jan. 13, 2000).

At a January 25, 2000 Audit Committee meeting, KPMG representatives

reported on the first six (6) months of their audit work. *See* Minutes of a Meeting of the CA

Audit Comm. at 2 (Jan. 25, 2000). Mr. Goodburn reported that he anticipated that KPMG

would audit transactions accounting for at least eighty-five percent (85%) of the Company's

revenue worldwide. *Id.* Mr. Goodburn also described "the efforts that KPMG would devote to

reviewing the quality of the Corporation's internal communications and accounting policies,

with particular attention to its policies regarding execution of contracts." *Id.*

---

[81]    In its March 31, 1998 management letter, E&Y suggested that there were "sales contracts for which the
Company did not countersign a contract due to a dispute with the customer over contract terms and/or
acceptance signatures were not dated." Letter from E&Y to the CA Audit Comm. at 1 (May 26, 1999).
However, E&Y did not associate these sales contracts with a general practice of failing to sign or date
CA's own signature on contracts, along with when there was no dispute over contract terms. In addition,
E&Y told CA that this issue, among several others noted in the same section of the letter, was not
"material to consolidated results," either "individually or in the aggregate." *Id.*

160

Exhibit 10

By the end of fiscal year 2000, KPMG believed that the Company had moved into compliance on the counter-signature issue, and KPMG's management letter, dated September 27, 2000, does not identify the countersignature issue as a problem. With respect to CA's internal controls, KPMG's management letter states that it:

- "would generally characterize the Company's accounting systems and related processes as being less integrated and requiring more manual intervention than is typical for enterprises of similar size and breadth." Letter from KPMG to the CA Audit Comm. at 1 (Sept. 27, 2000).

- "[t]he Company's finance staff requires an understanding of off-line processes or familiarity with a generally oral history of transactions. This dependency contributes to the risk of errors in the accounting and financial reporting process." *Id.* at 2.

- KPMG concluded that "[t]he Company does not have a comprehensive set of written accounting policies and procedures." *Id.*

Finally, KPMG recommended that CA, "at a minimum," develop a set of desk procedures summarizing key accounting policies and procedures. *Id.* The Audit Committee – then comprised of directors de Vogel, Goldstein, and Kenny – reviewed the September 27 management letter with KPMG at an October 24, 2000 Audit Committee meeting. At that time, Mr. Zar advised the Audit Committee that the Company was in the process of preparing such desk procedures. *See* Minutes of a Meeting of the CA Audit Comm. at 2 (Oct. 24, 2000).

G.   *CA's "New Business Model"*

In May 2000, CA's senior management approached the Board with the idea of changing CA's then-existing up-front revenue recognition system to a "new business model," whereby, among other things, revenue would be recognized ratably over the life of the agreement. *See* Minutes of a Meeting of the CA Board at 2 (May 11, 2000). While this change had many legitimate reasons – indeed, it was considered a "best practice" by some -- certain members of CA's management (not Mr. Kumar) also saw the change as a way to end the 35-

161

Exhibit 10

Day Month practice, since the end of the quarter push to find new business (the hockey stick effect) would no longer be needed. As such, the SLC sought to determine whether the Board expressed any skepticism about the need for the switch, or whether it suspected that the switch might be a cover for improper revenue recognition practices.

At a May 11, 2000 Board Meeting, Messrs. Kumar and Wang (with Mr. Kumar taking the lead) presented the new business model to the Board. *See* Minutes of a Meeting of the CA Board at 2 (May 11, 2000). Mr. Kumar told the Board that CA had "to get out of this mode" – booking nearly all of CA's revenue at the end of a quarter. Mr. Kumar also warned the Board that it would be impossible for CA to continue growing under the old model, because approximately seventy-five percent (75%) or more of CA's sales were completed in the last few days of the quarter. The Board was told that switching to the new business model would significantly reduce the bargaining power held by the Company's customers to negotiate discounts at the end of the quarter. In short, Mr. Kumar, who was the driving force behind the new business model, believed that the primary benefit of the new model was that it would allow CA to sell software in a different way and with more flexibility than its competitors.

The Board was aware of the issues surrounding the race at the quarter close, both at CA and in the industry as a whole, and the Board discussed how a new model could alleviate the quarter-end pressures and reduce the Company's vulnerabilities with respect to discounts. For example, Mr. Pieper, who also sat on the Board of Veritas Software, which he claimed pioneered the ratable revenue recognition model in the software industry, attested to the benefits of such a model. Further, management's suggestion that CA switch to the new business model was not the first time the idea of ratable revenue recognition had been raised at the Board level, as the idea was periodically raised by Mr. Kumar and discussed at Audit

162

Exhibit 10

Committee meetings. The Board universally believed that the switch was requested to end "the hockey stick effect," and it had no reason to suspect that management had other, unstated, reasons for changing to the new business model. Likewise, the SLC found no evidence to suggest that the Board suspected that ending the 35-Day Month practice was a motive for management's proposal to switch to the new business model.

The Board was generally supportive of the switch and thought Mr. Kumar had presented powerful arguments to support the change. However, the Board did not approve the new business model at the May 11 Board meeting since the directors were concerned about Wall Street's reaction and felt that management's "execution plan" would not be effective, i.e., that the Company was not prepared to effectively communicate the model to Wall Street. The Board feared that if not communicated properly, switching to the new business model would make it appear to the investing community as though the Company's revenue numbers had dramatically decreased. Accordingly, the Board asked management to prepare a pro forma model of CA's financial statements demonstrating what the previous five (5) years would have looked like under the new business model, and a comprehensive plan for educating Wall Street. CA management promptly began working to provide the Board with the requested information.[82]

Management next proposed the new business model in July 2000, but again the Board rejected the idea. Finally, in October 2000, having gathered enough data to provide the Board with sufficient financial comparisons to previous years, management "re-pitched" the new business model. Mr. Kumar "requested that the Directors consider adopting a new business model for the Corporation that he believed would have several material benefits for the

---

[82]   Indeed, Mr. Kumar told the SLC that Mr. Wang was extremely concerned about Wall Street's reaction to the presentation of CA's financials under the new business model, and asked how he was going to explain to his mother how CA went from a $6 billion company to a $3 billion company seemingly overnight.

163

Exhibit 10

Corporation including relieving pressure on the Corporation's negotiations with customers concerning discounts; providing greater visibility into future revenue streams; and adding greater flexibility to the terms of the Corporation's licensing transactions." Minutes of a Meeting of the CA Board at 2 (Oct. 24, 2000). After further debate, the Board decided to adopt the model. On October 25, 2000, CA issued a press release announcing this "dramatic shift in its business model." Computer Assocs. Int'l, Inc., Unscheduled Material Events (Form 8-K) at 12 (October 25, 2000).

H.    *April 29, 2001 New York Times Article*

In late March 2001, CA's senior management discovered, through internet postings and information from former CA employees, that Alex Berenson, a reporter from the New York Times who had written several articles critical of CA in the past, was researching a new article regarding CA's accounting practices. *See* E-mail from Sanjay Kumar to Steven Woghin, Ira Zar, and CA Public Relations employees (Mar. 21, 2001). Beginning in mid-April, Mr. Berenson began sending questions via e-mail to CA's public relations department, which then forwarded those questions to CA's senior executives, including Messrs. Kumar, Woghin, and Zar. *See, e.g.,* E-mail from Alex Berenson to CA Public Relations employee (Apr. 25, 2001). While Mr. Berenson's questions dealt with various accounting issues, such as CA's transition to the new business model and its license/maintenance accounting, none of his questions raised the 35-Day Month or the timing of revenue recognition more generally. *See, e.g.,* E-mail from Alex Berenson to CA Public Relations employee (Apr. 27, 2001). CA's executives declined to be interviewed by Mr. Berenson, since they were of the opinion that the article would be negative, and no amount of cooperation from CA would change that result. *See, e.g.* E-mail from Sanjay Kumar to CA Public Relations employee (Apr. 26, 2001).

164

Exhibit 10

However, there is no evidence that the CA Board was consulted about the Company's response (or lack thereof) to Mr. Berenson's questions, or that the Board was forewarned that an article would be forthcoming.

On April 29, 2001, Mr. Berenson's article, entitled "A Software Company Runs Out of Tricks; The Past May Haunt Computer Associates," was featured prominently on the front page of the business section of the Sunday edition of The New York Times. *See* Alex Berenson, *A Software Company Runs Out of Tricks; The Past May Haunt Computer Associates*, N.Y. Times, Apr. 29, 2001, at C1. The lengthy article focused on claims that CA: (i) implemented the new business model as a means to cover up its shrinking earnings; (ii) recognized fees associated with maintenance up front as opposed to ratably, which is required by GAAP; (iii) classified most of the fees from extended or renewed agreements as new license revenue; (iv) falsely represented its Unicenter program as a successful product when it, in fact, struggled; and (v) gave Unicenter to customers for free to enhance its appearance to Wall Street. *See id.* While several paragraphs of the article dealt with each of these four allegations, a single paragraph raised the 35-Day Month.

That paragraph, which was the fifth paragraph of the article, provides in full:[83]

> Computer Associates, they say, has used accounting tricks to systematically overstate its revenue and profits for years. The practices were so widespread that employees joked that C.A. stood for 'Creative Accounting,' and that March, June, September and December, when fiscal quarters end, had 35 days, giving the company extra time to close sales and book revenue.

*Id.*

---

[83] The Company's senior executives received a preview of the article on Saturday evening, April 28, and immediately began planning the Company's response. Because several of the issues raised by Mr. Berenson were the subject of the then-pending Class Actions, the consensus of CA's management was that the article was an attempt by Milberg Weiss to "stir the pot" in order to promote the plaintiffs' interests in that litigation. The Company's response, drafted primarily by Messrs. Woghin and Zar, was posted on CA's website on April 30.

165

Exhibit 10

Certain senior CA managers reported that the 35-Day Month allegation "jumped off the page" at them, given their knowledge of the practice, while others paid little attention to it due to its lack of prominence in the article and the fact that the practice had ended. Regardless of their personal reaction to the 35-Day Month allegation, no senior CA executive raised the practice or discussed it, either amongst themselves or with the Board. Further, the Company's written response to the article presented a rebuttal to each of the allegations contained in the article, *except* for the 35-Day Month allegation. According to those interviewed by the SLC, senior management did not make an affirmative decision not to discuss the issue or not to address it in the Company's response, but rather, no one raised the issue, apparently in the hope that, since it was purely "historical," if ignored it would just go away.

The Board members' initial reactions to the article were varied.[84] However, the directors universally felt that the article was sensationalized journalism that resulted from the media's perpetual inability to understand CA's business. For example, CA's switch to the new business model, considered a forward thinking and conservative business move by the directors (and those in the industry), had nonetheless been the subject of extensive criticism in the media, and the Board viewed the allegations in the article as further evidence of the media's continued inability to appreciate the model.[85]

---

[84] At this time the Board was comprised of directors Wang, Kumar, Artzt, D'Amato, de Vogel, Grasso, Kenny, and Pieper.

[85] It should be noted that Wall Street analysts also viewed the new business model as a positive. For example, a report issued by Deutsche Bank on April 30, 2001 in response to the publication of the article states:

> We continue to view CA's new business model (which combines a new, more flexible term licensing approach with more conservative pro rata revenue recognition) as a major positive. Our field work indicates that customers like it as do investors. Moreover, it addresses a number of the issues raised by the article.

Deutsche Bank, CA: New York Times Publishes Negative Article – Strong Buy (Apr. 30, 2001).

166

Exhibit 10

The Board also knew that several of the allegations contained in the article were, in fact, demonstrably false. For example, the Board knew that Unicenter was a real and valuable CA product used by many large corporations, and as such, the article's allegation that Unicenter was "shelfware" was untrue.[86] In the Board's view, some allegations were scurrilous, such as the allegation that CA hired "young, cute girls" to sell multi-million dollar software packages to "geeky-type" technology specialists, and this too diminished the impact of the article as a whole.

The Board was also wary of Mr. Berenson as a journalist, because he had already written several articles portraying CA in a negative light, and appeared to the directors to both lack objectivity and to be on a sort of "crusade" against CA. Indeed, this was Mr. Berenson's third negative piece on CA in just over a month (*see* Alex Berenson, *Computer Associates Considers Severance for Some it Fired*, N.Y. Times, Mar. 28, 2001, at C5; Alex Berenson, *Questions on Firings and Severance at Computer Associates*, N.Y. Times, Mar. 20, 2001, at C1) and the article was being criticized outside the company as being "irresponsible."

---

[86]    The AberdeenGroup, a leading provider of fact-based research focused on the global technology-driven value chain, issued a response to the article. *See* AberdeenGroup, Aberdeen Field Experience at Odds with NY Times' View of Computer Associates' Viability (May 1, 2001):

> Aberdeen typically doesn't respond publicly to stories published in the mainstream press. However, the April 29, 2001, *New York Times'* piece on Computer Associates (CA) rates an exception to this rule. The story contains substantive inaccuracies to which Aberdeen can speak from direct field experience. Additionally, the story is laced with innuendoes that undermine its credibility. . . . The *Times'* implication that Unicenter TNG's success is primarily a CA-fabricated myth is just not true. Though shelfware incidents certainly do occur — for CA as well as for most software suppliers — Unicenter TNG remains a market powerhouse at work in enterprises that are household names . . . . *[O]ne would think that objective investigative journalism could dig up more impressive Unicenter exemplars than Bradlees and New Pig.*

*Id.* (emphasis added).

167

For example, a Prudential Securities release issued on April 30, 2001 states, "[w]e would also point out, however, that the article has a number of inconsistencies that suggest this third, Sunday Business Section headline article, is clearly an attack that does not look at any of the positive aspects of the company – and more importantly the stock." Prudential Securities, New York Times Newsflash: Mainframe Software Has Been a Difficult Business Fraught With Accounting Issues – Does Anyone Not Know That? (April 30, 2001). The report went on to state that it believed that certain of Mr. Berenson's analyses were "irresponsible and sensational." *Id.* Likewise, with respect to the new business model, Deutsche Bank stated:

> [w]e believe that, regardless of past issues and stories, CA is now a very customer friendly company that, with the advent of its new business model back in 10/2000, is gaining increased business momentum. Our field work shows that customers and prospects like CA's new flexible licensing approach and CA's previewed F4Q (March) results, which included GAAP revenue of $732 million along with a gross increase in residual value of $1.3 billion (based on the GAAP balance sheet) are evidence of that.

Deutsche Bank, CA: New York Times Publishes Negative Article – Strong Buy (April 30, 2001).

None of the directors focused on the paragraph mentioning the 35-Day Month when they read the article, and no member of management, including Mr. Kumar, drew their attention to it. There is no evidence that the directors, either as a whole or in small groups, discussed this allegation, or the article as a whole, immediately following the article's publication. Indeed, it appears that the analyst community failed to focus on the 35-Day Month allegation as well, as none of the analyst reports issued in response to the article and reviewed by the SLC mention the 35-Day Month allegation. To the extent that Wall Street questioned

Mr. Kumar about the allegation, he replied that the Company used a ratable revenue recognition model under which there is no need for a 35-day month.

To aid the Company with its response to the article, CA retained a public relations firm and a crisis management consultant. *See* Minutes of a Meeting of the CA Board at 1 (May 7, 2001). According to Mr. Woghin, this was the first time, to his knowledge, that CA had sought outside help for the Company. Further, Mr. Kumar suggested that Dr. Kenny, Chair of CA's Audit Committee, meet with CA's auditors to discuss the article and satisfy herself that the Company's current accounting practices were sound.[87] On the morning of May 7, prior to a telephonic Board meeting scheduled for later that day, Dr. Kenny sent a memo, drafted by Mr. Woghin, to KPMG, E&Y, and certain members of CA management, requesting that they attend a meeting the next day "to get a clearer picture of the issues that were raised . . . in the recent New York Times article." *See* E-mail from Priscilla Smith, Dr. Kenny's Assistant, to E&Y, KPMG, Scott Smith, Ira Zar, Steven Woghin, David Kaplan, and Grace Caden (May 7, 2001). Dr. Kenny also sent a memo to CA's independent directors, in which she proposed a meeting for May 8, so that she could report to them on the outcome of her meeting with the auditors and management. Memorandum from Shirley Strum Kenny to Willem de Vogel, Alfonse D'Amato, Roel Pieper, Richard A. Grasso (May 7, 2001). Mr. Zar then made follow-up calls to the audit firms to ensure that they would attend. Although they were given only one (1) day's notice, neither of the audit firms raised any objections regarding the timing of the meeting, or requested additional time to prepare.

Later on May 7, the Board met telephonically, at which time Mr. Kumar updated the Board on events that had occurred following the article's publication. *See* Minutes of a

---

[87]   Dr. Kenny was appointed Chair of the Audit Committee on June 6, 2000 after the death of director and Audit Committee Chair Irving Goldstein.

169

Meeting of the CA Board at 1 (May 7, 2001). The article was presented to the Board by Mr.

Kumar as (i) part of the class action plaintiffs' attack on CA and (ii) the result of comments by

disgruntled former CA employees. The minutes of that meeting reflect that Mr. Kumar

reported that CA "had received substantial support from noted financial analysts who regularly

follow and report on the Corporation and its stock." *Id.*[88] Mr. Kumar also told the Board that

the Company had been receiving counsel from public relations experts and crisis management

advisors with respect to the Company's response. *Id.*

At the conclusion of the meeting, Mr. Kumar told the Board that the Audit

Committee would meet the next day, May 8, "to consider, independent of the Corporation's

management, whether it is advisable for the Corporation to take any additional steps respecting

its review of the Corporation's financial reporting practices." *Id.* at 2. Mr. Kumar also told the

Board that CA management was in the process of forming a blue ribbon panel of independent

experts to review its financial reporting practices and confirm that CA followed "best

practices." *Id.* The substance of the article was not discussed at this meeting.

---

[88]     This report was accurate. *See, e.g.,* CIBC World Markets Corp., *NYT Article Should be Taken with Both a
Grain of Reality As Well As Salt* (Apr. 30, 2001); Deutsche Banc Alex. Brown Inc., *CA: New York Times
Publishes Negative Article-Strong Buy* (Apr. 30, 2001) ("*In our opinion, New York Times article on 4/29
was filled with errors, half-truths, and old and out-of-date information*") (emphasis added); Prudential
Securities, *CA: New York Times Article on Computer Associates Misrepresentative, In Our View* (Apr.
30, 2001); Dain Rauscher Wessels, *CA: The New York Times: Taking A Few Kernels Of Truth To The
Extreme* (Apr. 30, 2001) ("While we think CA's business is under some pressure and maintain our
Neutral stance, *we found most of the article exaggerated and one-sided*") (emphasis added); Morgan
Stanley Dean Witter, *No New News – CA Responds* (May 1, 2001) ("*Overall, we believe the article had
no material new news and contained inaccuracies and misleading statements*") (emphasis added); Jim
Murphy, *Capital Markets Report Mark to Market: If You Won't Identify Yourself, Shut Up,* Dow Jones
Newswire (May 2, 2001) ("*In the aftermath of the Times' trashing of CA, one of the surprising things
was the strong defense of the company – 'on the record,' mind you - by prominent analysts at prominent
firms, none of whom, apparently, was contacted by the New York Times for its story Sunday*") (emphasis
added); *See* E-mail from Chuck Phillips (Software/B2B Industry Analyst, Managing Director at Morgan
Stanley) to Alex Berenson, forwarded to Sanjay Kumar (Apr. 29, 2001) (noting *"inaccuracies"* contained
in the article and generally defending CA).

Exhibit 10

The Board felt reassured by Mr. Kumar at this meeting because they were told that there was nothing to support the allegations in the article. The directors took further comfort from the fact that Mr. Kumar (i) had personally requested that the Chair of the Audit Committee look into the allegations raised in the article, and (ii) had, on his own initiative, begun assembling the blue ribbon panel. These actions, the directors felt, were not the sort of thing a CEO with something to hide would undertake. That said, the Board nonetheless realized it was its responsibility to "disprove these sorts of allegations" and to make sure there were no "irregularities or tricks going on" with respect to the Company's accounting practices.

1.      **Preparation for the May 8 Meeting**

According to those interviewed by the SLC, very little, if anything, was done in preparation for the meeting called by Dr. Kenny. Dr. Kenny did not request that management or the auditors provide her with any materials to prepare. Prior to the meeting, Mr. Woghin recalled sending Dr. Kenny only the article itself and the Company's written response. CA management slated to attend – Messrs. Zar, Woghin, Kaplan and Grace Caden (head of CA Internal Audit) – did not meet to prepare for the meeting, or discuss in advance what would be said. While this appeared to the SLC to be unusual considering the circumstances, the SLC was told that it was "not the CA way" to have formal meetings to discuss such things. Likewise, there is little evidence that KPMG, which was in the middle of completing CA's annual audit for fiscal year 2002, did any additional work in preparation for the meeting. As noted above, neither management nor the audit firms objected to the timing of the meeting, and did not request any additional time in order to prepare.

171

2.     **The May 8 Meeting**

At 8:00 a.m. on May 8, Dr. Kenny met with (i) Larry Smith of KPMG, (ii) Martin Shannon of E&Y, (iii) Ira Zar, Steven Woghin, David Kaplan and Grace Caden of CA, and (iv) Scott Smith of Covington & Burling LLP, CA's outside corporate counsel, at Dr. Kenny's office at SUNY Stony Brook.  According to Dr. Kenny, the other members of the Audit Committee, Messrs. de Vogel and D'Amato, did not attend this meeting because it was preliminary, and was held simply to determine if further action was required.  If that turned out to be the case, according to Dr. Kenny, she would have called in the other members of the Audit Committee for any follow-up meetings.  Several attendees commented that, in hindsight, it was unusual for her to hold such a meeting without the other members of the Audit Committee present, but at the time, no one thought of, or raised, this as an issue.

Given the passage of time, the record is scant as to what actually transpired at this meeting, and the attendees, in particular Dr. Kenny (whom the SLC interviewed twice on this issue)[89] generally had trouble recalling detailed information about the substance of the discussions.  The meeting itself is reported to have lasted between forty-five (45) minutes to an hour.  Nonetheless, the SLC was able to glean certain facts from the collective recollections of the attendees, and the limited documentary record.

According to those who attended, Dr. Kenny opened the meeting with general comments regarding its purpose.  The tone at the meeting was not adversarial, and while the attendees appreciated the seriousness of the meeting, they did not feel that they were under attack.  Without asking specific questions, Dr. Kenny then asked Mr. Zar to address the allegations contained in the article, and turned the meeting over to him.  Mr. Zar reviewed the

---

[89]     As noted above, given that the SLC closely examined the Board's response to the New York Times article, it interviewed the key participants – Dr. Kenny, Ira Zar, David Kaplan, and Steven Woghin – twice regarding this issue.

172

Exhibit 10

Company's response to most of the allegations in the article, and Dr. Kenny interjected questions during his presentation. Mr. Zar did not use any materials in his presentation other than the response posted on CA's website.

A memo generated after the meeting indicates that Mr. Zar addressed (i) CA's shift to the new business model and use of pro forma accounting, (ii) allegations that CA had engaged in "accounting tricks" to inflate its revenues, (iii) CA's allocation of revenue as maintenance, (iv) Unicenter, and (v) CA's use of reserves in connection with acquisitions. *See* Kenny Talking Points (drafted by Steven Woghin) at 1-2 (May 7, 2001). However, Mr. Zar did not address the 35-Day Month allegation and, to his relief, no one asked him to do so during or after his presentation. It was reported that Ms. Caden and Mr. Woghin also spoke briefly at the meeting, but that Mr. Zar was the primary presenter on behalf of management.

Following Mr. Zar's presentation, with all attendees still present, Dr. Kenny questioned the representatives from the accounting firms. Those who attended recall that Dr. Kenny asked the auditors general, high-level questions such as: "have you ever seen anything that would lend credence to the allegations in the article?" or "is there anything in the article to be concerned about?" The attendees universally recall that both audit firms responded that there was not. Dr. Kenny did not "cross examine" the auditors, or ask detailed questions about the accounting issues on a more granular level.

There appears to be a disconnect between the assurances given by the auditors at this meeting, which have been described as "general," and Dr. Kenny's takeaway that, in essence, the auditors gave CA a "clean bill of health." Generally, the audit firms told Dr. Kenny that their prior audits were performed in conformance with generally accepted accounting standards ("GAAS"), and that CA's accounting practices were in conformity with

173

Exhibit 10

GAAP. The attendees also recall the auditors addressing CA's license/maintenance and cancel/convert accounting, and CA's transition to the new business model. In addressing the new business model and CA's pro forma accounting, Mr. Smith of KPMG cited an attestation report that KPMG had recently completed. *See* Minutes of a Meeting of the CA Audit Comm. at 2 (May 8, 2001). To create this report, KPMG had examined CA's pro forma accounting, and confirmed that its assumptions were reasonable. *See id.* Dr. Kenny did not ask the auditors to address the 35-Day Month allegations at any point during the meeting, and they did not do so on their own initiative.

Next, Dr. Kenny asked Mr. Zar to leave the meeting, and then asked the auditors if there were any issues they wished to bring to her attention. Dr. Kenny was told that there were none. *See id.* at 3; Kenny Talking Points (drafted by Steven Woghin) at 2 (May 7, 2001). Next, all of CA management was asked to leave the meeting, and Dr. Kenny asked the auditors again if there was anything they wished to discuss without management present. The auditors again told Dr. Kenny that there were no issues to discuss. *See* Minutes of a Meeting of the CA Audit Comm. at 3 (May 8, 2001); Kenny Talking Points at 2 (May 7, 2001). According to Dr. Kenny, although she does not specifically recall what was said, she recalled that the auditors raised no concerns during the executive session, and in her view, she would have expected them to do so if they had any concerns about CA's financial statements or the allegations raised in the article.

The SLC believes that Dr. Kenny rightfully took comfort, although in the SLC's view possibly somewhat excessive comfort, from those assurances. Dr. Kenny honestly expected that the auditors, or management, would have raised any accounting issues if they existed, or if the auditors had any doubt as to their existence, and their failure to do so was

Exhibit 10

interpreted by Dr. Kenny as an affirmation that there were none.  Accordingly, Dr. Kenny did not request that the auditors perform any follow-up work after the meeting, and the audit firms did not on their own accord recommend that any further action be taken.

As noted above, the 35-Day Month allegation was never specifically raised or discussed by anyone at any time during this meeting.  CA management purposely avoided raising the issue, and recalled feeling relieved that no one else at the meeting did.  The SLC asked members of management present at the meeting as to what would have transpired had Dr. Kenny asked about the 35-Day Month practice.  The SLC was told that, while each of them would have liked to believe that they would have answered any question about the 35-Day Month practice truthfully, they believe that they would have sought to avoid the issue or -- if pushed -- been dishonest, much in the way they responded during the first year and a half of the government investigation.  Mr. Zar candidly observed to the SLC that it took over a year and half for the Company, represented by WLRK, who in turn was assisted by PwC, to get to the bottom of the issue once the government investigation began, and surmised that a similar result would have occurred had Dr. Kenny began questioning the practice at this meeting.

3.    The May 8 Audit Committee Meeting

Following Dr. Kenny's morning meeting, at 4:30 p.m., she telephonically reported her findings to the Audit Committee and the Board's other independent directors, who participated by invitation.  *See* Minutes of a Meeting of the CA Audit Comm. at 1 (May 8, 2001).  The minutes from the meeting reflect that, Dr. Kenny reported "in some detail the responses supplied by Mr. Zar and the members of the accounting firms." *Id.* at 2.  Prior to the meeting, and at her request, Mr. Woghin had prepared a set of talking points for Dr. Kenny to use as a basis for her report.  These talking points noted each of the allegations raised in the article – except for the 35-Day Month – and the response given by Mr. Zar. *See* Kenny Talking

175

Points (May 8, 2001) (drafted by Steven Woghin).  Dr. Kenny told the directors present that
Mr. Zar had assured her that the Company's accounting practices were appropriate.  Mr. de
Vogel questioned Dr. Kenny at various points throughout her report.

According to the minutes, Dr. Kenny reported further "that both KPMG . . . and
Ernst & Young . . . denied the Corporation had used any 'accounting tricks' as alleged in the
Times article."  Minutes of a Meeting of the CA Audit Comm. at 2-3 (May 8, 2001).  As
described above, those who were present at the morning meeting did not recall the auditors
making such a broad statement and believed that this conclusion overstated the assurances
given by the audit firms, although it reflects what Dr. Kenny honestly believed she had been
told.  Here, again, the SLC found a disconnect between what CA's outside auditors had done,
and what the directors understood the auditors to have done.  As noted above, the auditors
provided Dr. Kenny with general assurances regarding their prior audit work, but the SLC has
uncovered no evidence to support the conclusion that the auditors told Dr. Kenny that the
allegations made in the article were "false."  Mr. Woghin and Mr. Smith, who were present at
the meeting, however, did not correct or qualify Dr. Kenny's statement to the directors on the
call.

As a result, the directors understood from Dr. Kenny's report that the outside
auditors had examined CA's accounting, and determined that no problems existed.  Further, the
directors on the call reported that they assumed from Dr. Kenny's report that all of the
allegations in the article had been individually addressed by the auditors, including the 35-Day
Month allegation.  Based on Dr. Kenny's report, the directors believed that there was no
substance to the allegations in the article.

Exhibit 10

At the conclusion of the meeting, which is reported to have lasted approximately fifteen (15) minutes, the directors thanked Dr. Kenny for undertaking this task on behalf of the Board. *See* Minutes of a Meeting of the CA Audit Comm. at 3 (May 8, 2001). The Audit Committee took no further action in response to the article following this meeting. According to Mr. de Vogel, "the temperature came down" after Dr. Kenny gave a report of her inquiry.

### 4.   Dr. Kenny's Independence

While Dr. Kenny may have appeared to be the obvious choice to conduct this inquiry on behalf of the Board given her role as Audit Committee Chair, the SLC was concerned about the possibility that her relationship with Mr. Wang, who was Executive Chairman at this time, impaired her ability to view the allegations in the article objectively. Dr. Kenny, as noted above, became Chair of the Audit Committee on June 6, 2000, and Mr. Wang had a long and well-documented professional relationship and personal friendship dating back to the period when Dr. Kenny served as President of Queens College, where Mr. Wang was a prominent and successful alumnus.[90]

In 1996, after Dr. Kenny had left Queens College to become President of SUNY Stony Brook, and two (2) years after she joined the CA Board, Mr. Wang pledged a $20 to $25 million donation for the purpose of constructing the Charles B. Wang Center for Asian and Asian American Culture (the "Wang Center") at SUNY Stony Brook.[91] The donation is Mr. Wang's largest known charitable contribution to date, and it represented the largest single

---

[90]   *See* Alex Berenson, *A Gift Raises Questions On Computer Associates*, N.Y. Times, Dec. 3, 2002, at C1; John Giuffo, *SUNY, Inc.: The Decline of Higher Education Under Pataki*, The Village Voice, Sept. 18-24, 2002.

[91]   Bruce Lambert, *Computer Chief to Give SUNY an Asian-American Center*, N.Y. Times, Dec. 8, 1996, at 49.

donation in the history of the State University of New York at that time.[92]  Ultimately, Mr.

Wang's Foundation has reportedly spent more than $52 million on the construction of the Wang

Center, which opened on October 22, 2002.[93]  The details of the donation and the building

process were the subject of extensive media coverage from the initial announcement in

December 1996 to its opening, and Mr. Wang often commented on his donation at CA Board

meetings.[94]

   The SLC believes that this is another example of a situation where things could

have been done better.  The SLC was troubled by the fact that it appears that no meaningful

evaluation of Dr. Kenny's independence was conducted when Dr. Kenny became Chair of the

Audit Committee, at which time Mr. Wang was CEO and Chairman, and his substantial

donation to SUNY Stony Brook was known to the Board.  Nor was any evaluation performed at

the time of the initial donation, which occurred in December 1996, after Dr. Kenny joined the

CA Board.  The only evaluation ever performed occurred when Dr. Kenny became President of

SUNY Stony Brook.  Dr. Kenny went before the University's ethics commission, because

Stony Brook had existing contracts with CA, and it was determined that it would not be a

problem, *from the University's perspective*, for Dr. Kenny to sit on CA's Board.

   Ultimately, given the actions taken by Dr. Kenny and the Audit Committee, and

the information provided to Dr. Kenny by management and CA's outside auditors, the SLC

---

92  SUNY Stony Brook, "Charles B. Wang Center," https://www.stonybrook.edu/sb/wang/about.shtml (last visited Feb. 2, 2007).

93  Suraj Rambhia, *An Interview with Charles B. Wang*, The Stony Brook Statesman, Oct. 30, 2006 (available at http://www.sbstatesman.com/media/storage/paper955/news/2006/10/30/news/2006/10/20/News/An.Interv iew.With.Charles.B.Wang-2407766.shtml) (last visited Feb. 2, 2007).

94  *See, e.g.,* Lambert, *supra* note 93; Berenson, *supra* note 92; Press Release, SUNY Stony Brook, "Governor Pataki, Charles Wang Open New Center at Stony Brook," (http://www.state.ny.us/governor/press/02/oct22_5_02.htm) (last visited Nov. 2, 2006).

      Exhibit 10

concludes, based on all available evidence, that her relationship with Mr. Wang did not impair her ability to independently evaluate the allegations made in the article.[95]  Likewise, under NYSE independence rules in place at the time,[96] Dr. Kenny was considered an "independent" director and permitted to serve as Chair of the Audit Committee.

### 5.   Mr. Kumar's May 8, 2001 E-mail

At the same time, on May 8, 2001, Mr. Kumar sent an e-mail to CA's senior executives, including Messrs. Richards, Zar, and Woghin, regarding the 35-Day Month issue. Mr. Kumar states in the e-mail that "[t]wice in 10 days I have been asked by a newspaper reporter about CA booking business after the 30/31 of a month at the end of a quarter."  Mr.

---

[95]   Interestingly, the SLC learned that when conflict arose between Messrs. Wang and Kumar and the Board was faced with a decision as to who should remain at the Company, Dr. Kenny did not throw her support behind Mr. Wang as certain other directors had.  Instead, the SLC learned that Dr. Kenny attempted to mediate between the two sides and remain neutral.

[96]   The NYSE listing standards in effect at the time stated that a director will not be considered "independent" if, among other things, he or she has:

> been employed by the corporation or its affiliates in the current or past three years;

> an immediate family member who is, or has been in the past three years, employed by the corporation or its affiliates as an executive officer;

> been (i) a partner, controlling shareholder, or executive officer of an organization that has a business relationship with the corporation or (ii) has had a direct business relationship with the corporation (e.g., a consultant), unless the corporation's board determines in its business judgment that the relationship does not interfere with the director's exercise of independent judgment. Business relationships can include commercial, industrial, banking, consulting, legal, accounting and other relationships. A director can have this relationship directly with the company, or the director can be a partner, officer or employee of an organization that has the business relationship; or

> been employed as an executive of another entity where any of the corporation's executives serve on that entity's compensation committee.

The NYSE listing standards in effect now require that the board make an affirmative determination that a director has no "material relationship" with the listed company.  Material relationships can include commercial, industrial, banking, consulting, legal, accounting, charitable, and familial relationships, among others.  The June 6, 2000 CA Board resolution appointing Dr. Kenny as Chairperson of the Audit Committee, states that the CA Board made a determination that Dr. Kenny was independent within the meaning of the NYSE rules.  Statement of Action taken on the Unanimous Consent of the CA Board (June 6, 2000).

179

Exhibit 10

Kumar stated further that he knew:

- "that there are many many instances that we pay commissions to sales people that bring in business right after the end of a quarter at the previous quarter's rate as a means of motivating the sales organization."

- "that we push very hard to get as much business in at the end of a quarter as possible, and that we keep pushing to keep the momentum to get all the business that we can to start the next quarter off to a hot start."

- "that if a deal slips at the end of a quarter that it is going to slip to the end of the next quarter and that is the reason that we push sales staff to get the deals even after the close of the quarter to book it in the new quarter."

- "that sales managers often tell their sales staff that we need more and more to make sure that we start the next quarter off well."

- "that sales managers promise the previous quarter's commission rates for the first week or ten days of the new quarter to keep the momentum going."

Mr. Kumar stated that he could see "how an outsider, who does not understand the facts, can get the wrong impression" about CA's quarter end practices.

Mr. Kumar concluded the e-mail by asking CA's senior executives to ensure that they "are vigilant and comply with quarter end cutoffs," and to ensure that their subordinates "are doing the right thing to make sure that [CA] adhere[s] to the applicable revenue recognition rules as well as our internal policies and procedures." According to Mr. Zar, this was Mr. Kumar's attempt to convey to management "the party line," and that rather than actively coordinating their stories, management viewed an e-mail such as this as the "official commentary," and would then repeat that story. Likewise, Mr. Kaplan, who believed that someone had shown him this e-mail, viewed this as Mr. Kumar's attempt to create a record. Mr. Kumar denied that this e-mail constituted an attempt to coordinate management's "story," however, regardless of Mr. Kumar's intent, that is how the e-mail was interpreted by those who received it. Indeed, several of the points Mr. Kumar made in the e-mail were later repeated by

Exhibit 10

CA employees to CA's counsel and the government when the government began its
investigation of the issues raised in the New York Times article in February 2002.[97]

## IX. THE GOVERNMENT INVESTIGATION AND THE SETTLEMENT OF THE CLASS ACTION AND DERIVATIVE LITIGATION

### A. *2002 – Commencement of the Government Investigation*

*January-March 2002.* In January 2002, the Company began to receive reports
from various former CA employees that the USAO had contacted them to discuss their
employment at CA. On February 20, 2002, several newspapers reported that the government
had launched an investigation into CA's accounting practices. *See, e.g.,* Mark Harrington &
Robert Kessler, *CA Faces FBI Probe; Feds looking at possible accounting fraud,* Newsday,
Feb. 20, 2002; Alex Berenson, *Inquiry Into Computer Associates,* N.Y. Times, Feb. 20, 2002, at
C7. That same day, Mr. Woghin sent a memo to the Board informing the directors that the
Company had retained WLRK,[98] specifically partners Martin Lipton and John Savarese, to
handle the government investigation; and that WLRK had in turn reached out to the government
"in order to understand their concerns and answer their questions before this matter proceeds
too far." Memorandum from Steven Woghin to the Members of the CA Board at 1 (Feb. 20,
2002). In the Board's view, CA had brought in the "strongest" law firm that it knew of to
represent the Company in, and if possible to quickly resolve, the investigation.[99]

---

[97] For example, as discussed below, Mr. Silverstein met with the government on September 6, 2002, at which time he imparted the "party line" that sales people thought that contracts were prematurely booked due to the timing of the commissions they received, but that those sales people would not be in a position to know how CA accounted for any particular contract. *See supra* at 213-215.

[98] According to Messrs. Woghin and Kumar, WLRK was retained at the request of Mr. Grasso.

[99] WLRK had previously represented CA in an attempt by the Wylys to take control of the CA Board through a proxy contest. Several of the directors, including Lewis Ranieri and Richard Grasso, had previous experience with WLRK outside of their membership on the CA Board.

The following day, at a February 21, 2002 Board meeting, Mr. Wang advised the Board that the Company learned that the USAO had "commenced a preliminary inquiry into certain matters originally published in The New York Times in April of 2001." Minutes of a Meeting of the CA Board at 1 (Feb. 21, 2001). Mr. Savarese reported to the Board that he had made initial contact with the USAO, and predicted that he would meet with the USAO within the week to discuss the situation. *Id.* at 1-2. Mr. Lipton advised the Board that he had spoken with representatives from KPMG about the allegations in the New York Times article, and that KPMG remained "thoroughly satisfied" with its prior audits of CA's financial statements. *Id.* at 2.

According to Mr. Savarese, at the outset of the investigation, the Board was eager to "get comfortable" with the matters under investigation, understand what the government's concerns were, and what the Company's strategy would be going forward. Both Mr. Savarese and Mr. Kumar told the Board that the Company was committed to cooperating with the government and responding to the government's requests for information.

One (1) week later, on February 27, 2002, the Board met again to receive an update from counsel. WLRK reported, based on teleconferences with the USAO and the SEC, that the government was looking into four (4) issues: (i) whether the Corporation's product, Unicenter TNG ("Unicenter"), had achieved market acceptance or was, as first asserted in the New York Times article, "shelfware"; (ii) whether CA's accounting for cancel/convert transactions was appropriate; (iii) whether CA properly booked revenue on contracts that had been executed and delivered upon, but which had not been fully executed *by the Company* in the period the revenue was recognized; and (iv) whether there was a relationship between the vesting of the KESOP and the timing of the July 21, 1998 press release. *See* Minutes of a

Meeting of the CA Board at 2-3 (Feb. 27, 2002). Mr. Savarese reported that he had met with CA management and KPMG to discuss these four (4) issues, and had learned "significant information" regarding each area.

The Board was told by WLRK that: (i) there were "strong facts to refute" the allegations regarding Unicenter sales; (ii) CA had issued a reclassification of its revenue when KPMG reviewed CA's cancel/convert accounting in May 2000, and the change did not draw investor or SEC attention at that time, and that the cancel/convert accounting issue was "ancient history"; (iii) KPMG had informed Mr. Savarese that CA's practice of not countersigning contracts was "proper, just not [the] best practice," and was "not used to shift revenue from one quarter to [an]other"; therefore the issue "should not be a problem"; and (iv) David Nachman, who represented the Company in the Class Actions, "ha[d] well developed facts" regarding the vesting of the KESOP and the timing of the July 21 press release and that this area should likewise not prove problematic. Notes of Scott Smith LLP at 1-3 (Feb. 27, 2002). WLRK told the Board that it was meeting with the SEC later that day and that it planned to (i) share with the SEC what it had learned, (ii) confirm that there were no additional areas of inquiry to those listed above, and (iii) confirm that CA would move as quickly as possible to respond to the government's concerns.

While no one present at the meeting questioned whether WLRK, which had only been retained a week earlier, had adequate time to come to the preliminary assessments reported to the Board at this meeting, most of these issues were well known to the Board prior to WLRK's involvement. As noted above, all the issues that the government was investigating were raised in the April 29, 2001 New York Times article, and in part in the Class Actions, and the Board viewed the government investigation as an extension of those events.

Exhibit 10

For example, CA's cancel/convert accounting practice had been a long running focus of the 1998 Class Action. Mr. Savarese was therefore able to discuss this issue with Mr. Nachman, who, he believed, already had a "firm grasp" of the accounting material. The Unicenter issue had been raised in the New York Times article, and had been addressed by the Audit Committee in May 2001.[100]

Further, the Board, in part based on statements made by WLRK and management, continued to believe that the plaintiffs in the then-ongoing Class Actions (along with certain disgruntled former CA employees) were feeding the press and the government "bogus" information in an effort to pressure the Company in the litigation. Indeed, it was reported to the Board that Melvyn Weiss, lead counsel in the Class Actions, had called Mr. Nachman the day after the news of the investigation broke and asked him, "now do you want to settle?" CA had steadfastly refused to discuss settlement in the past. Many of the directors recall being assured personally at the time (and on numerous other occasions as the investigation progressed) – either by WLRK or management, or both – that there had been no wrongdoing.[101]

The Board met again two (2) days later on March 1, 2002. At this Board meeting, Mr. Savarese told the Board that he had met with the government and conveyed three (3) points: (i) he "stressed the Board's great concern that CA shareholders have been badly injured by what appeared to be a campaign of leaks coordinated with short selling activity that

---

100  Mr. Woghin told the SLC that CA had "a lot of meetings" with WLRK "right out of the box," and that WLRK ultimately "produced a list of clients who used Unicenter." Mr. Savarese and Mr. Woghin therefore concluded that the "anecdotal and statistical information" suggested that "Unicenter was a real product," contrary to the government's allegation.

101  Prior to joining the Board on March 25, 2002, Mr. Lorsch said that he spoke to Mr. Lipton "at length," and that Mr. Lipton told him that there was "no substance" to the government's allegations.

Exhibit 10

has hammered the stock price"; (ii) he "conveyed the Board's and the Company's pledge that [the government] will receive prompt and complete cooperation from the Company"; and (iii) he "provided a detailed account of what [WLRK had] been able to learn about the underlying historical facts relating to the '4 areas of concerns' [the government] had described." Savarese Talking Points at 1-2 (Mar. 1, 2002).[102]  In addition, Mr. Savarese told the Board that the revenue recognition aspect of the government's investigation not only included, as had been previously reported, contracts that had not been timely executed by the Company, but also "backdated [contracts]," i.e., contracts backdated by CA *customers* to appear as if they were signed by the quarter end, but were not.

However, Mr. Savarese also made it clear to the Board that the government appeared to be "most interested in two (2) issues," both unrelated to backdating:  (i) CA's cancel/convert practice, and (ii) whether the Company "used 'pro forma' reporting in an appropriate way to present its transition to the [new business model] adopted in Oct. 2000," which the government had added as a new, fifth area of concern. *Id.*  Again, because the New York Times article had focused on (and was even thought to be the result of) the Company's switch to the new business model, the Board and management had already devoted a considerable amount of time to addressing the public's concerns on the subject.[103]

Mr. Savarese reported that the government had an "open mind" on all these points, but had "clearly devoted more time and energy to this than previously thought – the

---

[102]   Throughout this section, the SLC has relied upon "talking points" prepared by Mr. Savarese for use at meetings with the Board and the government.  Mr. Savarese told the SLC that it was generally his practice to follow very closely, if not verbatim, his talking points when giving a presentation to the CA Board. Members of the Board reported that Mr. Savarese typically read from prepared remarks, and that he typically delivered them in an uninterrupted fashion.

[103]   Some on the Board believed that the government investigation, in its entirety, was – like the New York Times article – the result of a continued misunderstanding of the new business model.

USAO asked sophisticated, intelligent questions." *Id.* In response to this report, Mr. Savarese recalls that the Board acted in a way that demonstrated it was "generally concerned," and wanted to make sure that the Company "devoted appropriate resources" to cooperating fully in order to resolve the situation.

At the conclusion of the meeting, Mr. Woghin addressed the question of legal representation for the non-management directors in connection with the government investigation. Mr. Woghin told the directors that "Messrs. Lipton and Savarese had been directed to determine, during their meetings with government representatives, whether any conflict of interest appeared among the Directors or between any of the Directors and the Corporation." Minutes of a Meeting of the CA Board at 3 (Mar. 1, 2002). Mr. Savarese confirmed for the Board that he and Mr. Lipton had conferred with the government, KPMG, and Mr. Woghin, and that WLRK was satisfied that no conflict existed at that time. Mr. Savarese also confirmed that WLRK had reached its conclusions "independent of any contact with the Corporation's management." *Id.* at 4. Both Mr. Woghin and WLRK told the Board that WLRK would "immediately advise the Directors if they believe that separate counsel is needed." *Id.*[104]

At this point, it is important to note that the SLC's investigation has uncovered a disconnect between what CA management and WLRK believed WLRK's role was to be, and what at least some directors believed WLRK was doing. Specifically, WLRK was retained to interact with the government, respond to government inquiries and requests, and to generally

---

[104] Mr. de Vogel was initially uncomfortable with this arrangement, notwithstanding the fact that both Mr. Lipton and Scott Smith of Covington & Burling, CA's corporate counsel, assured him that it was appropriate. Mr. de Vogel then spoke with his regular litigation counsel from another prominent law firm, who advised him that by obtaining opinions from both WLRK and Covington & Burling, Mr. de Vogel had satisfied himself that it was appropriate to proceed in this fashion.

"defend" the Company and its officers and directors in connection with the government investigation. This is confirmed by WLRK's engagement letter with CA, which states as follows: "Our firm has been engaged to represent Computer Associates in connection with an inquiry by the Northeast Regional Office of the Securities & Exchange Commission and the United States Attorney's Office for the Southern District of New York in respect of certain accounting matters." Letter from John Savarese to Steven Woghin (June 11, 2002). WLRK was not retained or instructed to conduct an "independent investigation or inquiry" into the areas of concern raised by the government.[105]

In contrast, the CA Board members generally believed that WLRK had undertaken a broader mandate. Several directors expressed the view that they believed that WLRK was conducting an internal investigation designed to "get to the bottom of" of the areas raised by the government, uncover the "true facts," and independently determine whether there had been any wrongdoing by CA or its officers. The directors' belief about the scope of WLRK's engagement was based upon their view as to what a top-notch law firm would do when representing *both* the Company *and* its independent directors in connection with a governmental investigation.[106] No one from management or WLRK explained or made clear to the directors, none of whom were lawyers, the more limited scope of WLRK's actual engagement. This misunderstanding, the SLC believes, caused members of the CA Board to

---

[105]    That said, WLRK did attempt to discover whether there was any basis to the government's allegations. WLRK told the SLC that he told the Board that the Company had to develop credible answers to the government's allegations. Indeed, we are aware of no instance where Mr. Savarese told the Board that there were investigative steps WLRK could, or should, have taken, but did not because of the nature of WLRK's investigation.

[106]    While Roel Pieper's recollection was that Mr. Lipton told the Board that WLRK would perform an internal investigation, the SLC believes that it is more likely that Mr. Pieper misunderstood Mr. Lipton, who like Mr. Savarese, told the Board that WLRK needed to understand the facts before it could respond to the government's allegations.

take excessive comfort from the fact that WLRK repeatedly informed the Board that it was unaware of any wrongdoing and that CA was developing credible defenses to the government's allegations.

     *April-May 2002.* In April 2002, WLRK began interviewing CA employees regarding the government's areas of concern, one of which was late-signed and backdated contracts. At this time, WLRK conducted five (5) interviews. Initially, on April 26, 2002, WLRK interviewed Peter Schwartz, the Company's former CFO, who had headed the Finance department until June 1998 (but stayed on for several months in an executive capacity), and other high level finance and internal audit employees. With respect to the issue of CA's signature, the employees interviewed were forthcoming about the fact that, prior to KPMG becoming CA's auditor, CA had routinely failed (for, in their view, good-faith business reasons) to countersign license agreements prior to the quarter end, in violation of GAAP. WLRK believed that these witnesses appeared credible in part because of their candor in revealing this information.

     At the same time, CA management was adamant that its customers (as opposed to CA) signed CA license agreements on time. The employees interviewed at this time, including Messrs. Schwartz and Kaplan and other senior executives, gave false or misleading answers to WLRK in order to assure them that CA did not backdate contracts. For example, a senior Finance executive told WLRK that there was a mechanism in place at CA that effectively prevented any late executed contracts from being recognized; in particular, that Financial Reporting would generate a list of contracts to be "backed out" of revenue because they were signed after the end of the quarter. In his interview, Mr. Schwartz told WLRK that there were quarter-end reviews of contracts to confirm that they were recognized in the same

Exhibit 10

quarter in which they were signed. Mr. Kaplan, likewise, falsely told WLRK that any mistakes in revenue recognition – for example, late signature dates or late shipping dates – would have been caught at the end of the month or quarter.

In addition, CA executives gave WLRK plausible, but false, reasons for why it appeared that contracts may have been booked late. These executives told WLRK that while contracts were consistently recognized in the quarter in which customers signed them, there was a period of five (5) days after the month end in which contracts were "administratively processed," making it seem as though late contracts were booked in the prior quarter.

Mr. Kaplan also told WLRK that there was no relationship between the timing of sales commissions and the timing of revenue recognition. In this way, Mr. Kaplan confirmed what Mr. Schwartz and other senior executives had already told WLRK: that former CA employees, and Sales personnel in particular, might think there was a 35-Day Month practice because CA sometimes paid sales commissions in the month prior to the month in which a contract was actually signed. This made sense, WLRK was told, because Sales employees were being rewarded for their hard work in a timely fashion and did not have to wait until the next quarterly period to get paid.[107]

While the SLC uncovered no explicit agreement to lie to WLRK, the SLC has learned that certain CA senior executives, including Messrs. Zar, Kaplan, and Rivard informally coordinated the responses they would give to questions about the 35-Day Month. On several occasions, for instance, Mr. Rivard met with the other executives to "get the gist" of what people were saying, and to establish false but believable and consistent answers to questions

---

[107]   In a February 2003 telephonic interview, Stephen Richards added that Sales employees would sometimes receive this commission out of a sense of fairness, as they had done most of the work on the deal in the prior quarter and most of the negotiations for the deal took place in the prior quarter.

189

Exhibit 10

about CA's revenue recognition practices. These "stories" were consistent with Mr. Kumar's May 8, 2001 e-mail, which was viewed as a defense to the 35-Day Month allegations when they were first raised in the New York Times article. Ultimately, these falsehoods and half-truths provided to WLRK were then passed on to the government and the CA Board.

1.    **May 14, 2002 Board Meeting**

At a May 14, 2002 Board meeting, Mr. Savarese reported that, based on WLRK's most recent meeting with the government, it was clear that the USAO was hearing "decidedly negative (though perhaps misinformed) accounts about" the issues it was investigating, including a "laxity in the q[uarter]-end controls, which effectively permitted [contracts] signed after the q[uarter]-end to be counted." Savarese Talking Points at 1 (May 14, 2002). Mr. Savarese's notes of the meeting indicate that he told the directors: "yes there will be mistakes, but no evidence they were made purposefully." Notes of John Savarese at 2 (May, 14, 2002) (emphasis in original). Further, Mr. Savarese reported that he had effectively addressed the government's concerns regarding the new business model and CA's pro forma accounting – something the Board was very appreciative of – but that all of the other allegations were still "live issues." So by this time, (i) at least one of the original five (5) issues had been resolved in a manner satisfactory to the government and (ii) the Board had not been told of evidence of intentional misconduct.

Mr. Savarese also reported to the Board that, on the other issues, the government "has not reached any conclusions yet," and that the investigation was ongoing so the Company was "not out of the woods yet." *Id.* To that end, the Board was told that the government had issued subpoenas to certain of CA's customers and its auditors. According to several Board members, the fact that the Company was able to successfully address certain of the government's allegations was encouraging, and lent credence to management's claims that

<center>190</center>

Exhibit 10