1   Thomas N. FitzGibbon (SBN: 169194)
    TNF@ptflaw.com
2   **PFEIFFER THIGPEN & FITZGIBBON LLP**
    233 Wilshire Boulevard, Ste. 220
3   Santa Monica, CA  90401
    Telephone: (310) 451-5800
4   Facsimile: (310) 451-1599
5
6   Luke A. McGrath *(Pro Hac Vice Pending)*
    LZM@bickelbrewer.com
7   James S. Renard *(Pro Hac Vice Pending)*
    JSR@bickelbrewer.com
8   **BICKEL & BREWER**
9   767 Fifth Avenue, 50th Floor
    New York, New York 10153
10  Telephone: 212-489-1400
    Facsimile: 212-489-2384
11
12
    Attorneys for Intervenor
13  *Sam Wyly*
14
15          **UNITED STATES DISTRICT COURT**
16          **CENTRAL DISTRICT OF CALIFORNIA**
17
18  UNITED STATES OF AMERICA,        Case No. 2:05-CR-587-JFW-3
                                     [Assigned to Hon. John F. Walter]
19          Plaintiff,
                                     **PART 3 OF EXHIBIT 10 TO**
20     - against -                   **DECLARATION OF LUKE A.**
                                     **MCGRATH IN SUPPORT OF**
21  MILBERG WEISS BERSHAD &          **INTERVENOR SAM WYLY'S**
22  SCHULMAN LLP, DAVID J.           **MOTION TO INTERVENE AND**
    BERSHAD, STEVEN G.               **FOR RELIEF FROM PROTECTIVE**
23  SCHULMAN, SEYMOUR M.             **ORDER**
    LAZAR, and PAUL T. SELZER
24                                   Date:    February 9, 2009
25          Defendants.             Time:    9:00 a.m.
                                     Room:    16
26
27
28

DECLARATION OF LUKE A MCGRATH IN SUPPORT OF MOTION OF SAM
WYLY TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER

Pfeiffer Thigpen & FitzGibbon LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

there was no substance to the remaining allegations, and that the government simply needed to better understand CA's business. Given the areas of investigation that remained – (i) Unicenter, (ii) the cancel/convert practice, (iii) the timing of the KESOP, and (iv) backdating – the Board and its counsel took certain proactive steps in an attempt to understand, and to ultimately resolve, them.

In contrast, CA's executive management team, including Messrs. Wang and Kumar, knew that the backdating allegations were, in fact, quite substantive and, following this meeting, met to discuss what to do about the government's now-intensifying focus on this issue. According to Mr. Kumar, Mr. Wang instructed Mr. Kumar to "stonewall" the government, and believed, based on a similar tactic that he employed in a prior investigation by the USAO on a personal matter, that the investigation would eventually "go away." Mr. Wang felt that the backdating issue was an "old issue" and therefore "his issue" – since it occurred before the new business model – and that the investigation was therefore a renewed attack on him. Accordingly, at Mr. Wang's instruction, CA's senior management remained silent about the 35-day month issue.

2.      **PwC's Work**

(a)      *The "KESOP Study"*

In the early summer of 2002, Mr. Schuetze, who, like Mr. Lorsch, was elected to the Board on March 25, 2002, sketched out his preliminary thoughts to WLRK on a study of CA's accounting practices around the time the KESOP vested (the "KESOP Study").[108] The study originated from a conversation between Messrs. de Vogel and Schuetze, in which Mr. de Vogel expressed concern about ensuring the accuracy of CA's financial reports for the quarters

---

[108]    Prior to joining the Board, Mr. Schuetze was assured by Messrs. Kumar, Zar, and Woghin that the allegations in the April 29, 2001 New York Times article were without basis.

in which the KESOP vested.  Mr. Schuetze and Mr. de Vogel reasoned that a study of those

quarters would be a "good test" to see if CA's senior management had improperly inflated

CA's revenue, because that was the time when they had the greatest incentive to do so.  At Mr.

Schuetze's request, PwC conducted a study of the two (2) fiscal quarters immediately preceding

the vesting of the KESOP shares (the third and fourth quarters of fiscal year 1998, October 1,

1997 to March 31, 1998).

The scope of PwC's work, as designed by Mr. Schuetze, was to determine

whether: (i) there was persuasive evidence that license agreements recognized in the relevant

periods properly contained customer signatures and dates; (ii) reserves, loss accruals and

allowance accounts did not reflect large or unusual movements and were consistent with prior

and subsequent periods; (iii) capital expenditures did not reflect large or unusual items and were

consistent with the trend and amounts in prior and subsequent periods; (iv) provisions, accruals

(and releases of accruals), and payments relating to income tax accounts did not reflect any

large or unusual fluctuations and were reasonable; and (v) there were no large or unusual

"unrecorded liabilities" that were accrued or paid subsequent to the relevant period.  Woghin

Talking Points at 1 (Aug. 23, 2002).  In connection with the study, PwC looked at 126 CA

North American contracts with a GAAP value of $1 million or more (totaling $1.26 billion),

and a selection of 54 North American contracts with a GAAP value of less than $1 million

(totaling $27.85 million).

However, PwC did not perform a forensic audit – one in which all relevant

documents and e-mails were examined – of the two quarters at issue, but followed a set of

agreed-upon revenue and expense procedures.  Rather than doing a full scale audit, it was

agreed that PwC would initially focus on CA's central files and only look at other

documentation when it thought it necessary to do so.  In an August 27, 2002 memo, PwC explained that its "agreed-upon procedures" included examining "[s]elected contracts . . . for appropriate customers' signatures and dates."  Memorandum from PwC (Aug. 27, 2002).  PwC only engaged in further investigation when it spotted "[p]otential exceptions," and then it reviewed "other, related, contract and sales arrangement documentation; and . . . other indicia of persuasive evidence of the arrangement."  *Id.*[109]

At the conclusion of the KESOP Study, at a meeting held on August 23, 2002, the Board was told by Mr. Woghin that PwC found that "only 5̲ contracts of the 180 reviewed for the period either lacked evidence of a customer signature [x], or of a date [y], or reflected an untimely customer signature and date [z]."  Woghin Talking Points at 1 (Aug. 23, 2002) (emphasis in original).  Further, "PwC concluded that the compliance rate of properly signed and dated customer contracts is *inconsistent with an assertion of manipulation of revenue recognition* practices and that there were adequate reserves that CA maintained for any exceptions to its revenue recognition policies."  *Id.* (emphasis added).  Mr. Woghin also reported to the Board, "[o]n the basis of PwC's findings, and on the prior Ernst & Young audit actually performed at the time for the fiscal year in question, Mr. de Vogel and Mr. Schuetze are satisfied that CA fairly presented its financial results for the third and fourth [fiscal] quarters of 1998."  *Id.* at 2.

Mr. Schuetze, who retained a written copy of the study after the investigation had concluded, was satisfied with PwC's work upon its completion.  He took comfort in PwC's work because he believed that the PwC partner leading the study, was "thorough" and had

---

[109]     The only reports that PwC reviewed were "TOPS reports," which were printouts of contract files from the TOPS database.  These reports were reviewed "for completeness" and "for any large or unusual items."  Memorandum from PwC (Aug. 27, 2002).

193

confidence that PwC had followed the established procedures. *See, e.g.,* E-mail from Steven

Woghin to Sanjay Kumar and Ira Zar (Aug. 26, 2002). While certain directors mistakenly

believed that PwC had conducted a forensic audit, all the directors appropriately took comfort

from the results of this study and the fact that it had been designed by Mr. Schuetze, former

Chief Accountant to the SEC, and implemented by PwC, one of the "big four" accounting

firms.

        (b)    *The Customer Signature Review and Analysis*

In addition to the KESOP Study, in the early summer of 2002, WLRK retained

PwC to conduct several additional studies, including a study to address the 35-Day Month

allegation, entitled "Customer Signature Review and Analysis," which was referred to as the

"532 Contract Study." For the 532 Contract Study, as established with WLRK, PWC examined

the contracts produced by CA to the government, which included all contracts from (i) CA's top

six customers, and (ii) the "top 25" contracts, for each quarter of fiscal years 1998 through

2001. Memorandum from PwC at 1 (Sept. 4, 2002). The total revenue associated with the

contracts reviewed by PwC was $13 billion. *Id.*

        PwC's review process was as follows:

> For each contract selected for review, the contract effective date
> was compared to the customer signature date in order to identify
> instances where the contract's effective date preceded the quarter
> in which the customer's signature was dated. For each instance
> identified, the actual date of revenue recognition was researched
> to determine that revenues were recognized after customer
> signatures were obtained and not on the basis of the effective
> contract date.

*Id.* at 2. In addition, PwC examined CA's procedures for establishing revenue reserves. *Id.*

However, at WLRK's direction, PwC again did not conduct a forensic audit and therefore did

not examine documentation other than the actual contracts themselves – i.e., the same

information that had been produced to the government. *See, e.g.* E-mail from PwC to WLRK (May 18, 2002).

In September 2002, PwC issued the final results of its Customer Signature Review and Analysis study. PwC found that "a review of 532 contracts [total value of $13 billion] produced in response to the [SEC's] February 26, 2002 informal document request disclosed *no evidence to indicate that CA routinely or intentionally recognized contract revenues before customer signatures were obtained.*" Memorandum from PwC at 1 (Sept. 4, 2002) (emphasis added). According to Mr. de Vogel, Dan Dooley of PwC told him that PwC had uncovered "all kinds of reserves" supporting the fact that CA actually "undercounted" revenue and that Mr. Dooley gave the impression that he believed he could strongly defend CA's accounting practices in court. This report, in conjunction with the KESOP Study, gave the Board considerable comfort with respect to the revenue recognition aspects of the government investigation.

However, as with the precise parameters of the role being undertaken by WLRK, many directors seemed to not fully appreciate the precise scope of PwC's work on both the 532 Contract Study and the KESOP Study. Here again, at least some directors believed a forensic audit was being conducted, and were surprised to learn during their interviews with the SLC that this was not the case. The failure of the Board to fully understand the precise scope of PwC's work again gave the Board a greater degree of comfort about that investigation than was warranted under the circumstances.

CA management encouraged this misunderstanding by using the results of PwC's work as further cover for the 35-Day Month practice, and its position that the Company had done nothing wrong. For example, on November 25, 2002, the Wall Street Journal

published an article reporting that the government was investigating whether the Company had

prematurely recognized revenue from licensing agreements.[110]  That same day, Mr. Woghin

sent a memo to the Board concerning the article, in which he stated that:

> [i]t is important to note that this allegation was investigated
> thoroughly by PwC and reported upon by them to the government
> previously.   In its analysis and report, PwC found nothing to
> support such an allegation. The government has not asked the
> company for additional information since the PwC report was
> delivered.

Memorandum from Steven Woghin to the Members of the CA Board at 1 (Nov. 25, 2002).

### 3.    Mr. de Vogel's Meeting with the Government

While PwC was in the middle of its work, the Board determined that director

Willem de Vogel should meet with representatives of the USAO and the SEC in order to

respond to the government's concerns regarding the KESOP and, hopefully, move the

investigation towards a conclusion. *See* Memorandum from Warren Stern and John Savarese to

Steven Woghin at 1 (July 19, 2002) ("Stern Memo"). At a July 2, 2002 Board meeting, WLRK

told the Board that the goal of this meeting was to "to lay out in very forceful terms that we

have asked PwC to analyze in detail the documents we've already produced to the government,

to focus on the issues the government has expressed concern about in the past, and to assess

whether there are any problems." Savarese Talking Points at 1 (July 2, 2002).  According to

WLRK, this was a good time to take this step since WLRK told the Board that "the government

has not been all that active.  Reviewing documents/meeting with some W[itnesses]/but clearly

---

[110]   The article stated: "Federal investigators have been gathering information from some former Computer
Associates International Inc. employees who claim that the software maker often back-dated and forward-
dated customer contracts to shift revenue between fiscal quarters in an effort to meet earnings targets,
according to the former employees and lawyers with knowledge of the matter." Jerry Guidera, *Computer
Associates' Deals Probed – Investigators Study Dates Of Contracts to Determine Effects on Quarterly
Results*, WALL ST. J., Nov. 25, 2002, at A3.

some of the wind has come out of their sails already and we expect that this upcoming meeting will help to spill some more air out." *Id.*

Mr. de Vogel, accompanied by WLRK, met with the government on July 18, 2002 and made a presentation about the creation of the KESOP, telling the government that the KESOP had been his idea, and providing an explanation of the plan. *See* Stern Memo at 4. Mr. de Vogel explained the technical aspects of the KESOP, the grant and vesting provisions, the seven-year transfer restrictions, and why the targets in the KESOP were "hurdles that were hard to clear." Mr. de Vogel added that, in his view, the fact that Messrs. Wang and Kumar paid portions of the taxes on the KESOP in cash "implied that they had not schemed to inflate the price" because they were increasing their long-term risk, which would not be rational if they knew that CA's financials were improperly inflated. *Id.*

According to WLRK's summary of the meeting, a representative of the SEC expressed some measure of agreement with Mr. de Vogel's argument regarding the KESOP, and a representative from the USAO said that "while he might disagree with this argument, he thought the logic behind the formulation of the KESOP that [Mr. de Vogel] had previously explained was in some respects persuasive." *Id.*

At this meeting, WLRK also addressed CA's cancel/convert accounting, and then gave a "Contract Signature Presentation" in which it presented the preliminary results of the 532 Contract Study, which, as noted above, was ultimately completed in early September. WLRK reported that PwC had reviewed 532 contracts for customer signature issues and had identified twenty-nine (29) contracts with potential issues. *Id.* at 1-3. Mr. de Vogel added that the twenty-nine (29) contracts appeared to have been randomly distributed over the seven-year period reviewed (from fiscal years 1994-2000), and that none of the twenty-nine (29) contracts

Exhibit 10

occurred in the two (2) quarters preceding the vesting of the KESOP.  WLRK noted that PwC had concluded that the twenty-nine (29) contracts with issues "might well be" the result of "simple human error."  *See id.* at 3.

Finally, WLRK explained to the government, for the first time, the operation of CA's "late executed contract" reserve.  According to WLRK, the late executed contract reserve was established to account for contracts signed after the quarter end but nonetheless recognized in the prior quarter, and he presented the reserve as evidence of the Company's good faith and conservatism with respect to revenue recognition.  Mr. de Vogel "volunteered that CA recognized that sales people might 'cheat' by backdating contracts, so it established a reserve.  This led to discussion that made clear that reserves were established for a number of reasons relating to mistaken revenue recognition." *Id.*[111]

According to WLRK's summary, at the conclusion of the meeting, the government representatives told Mr. de Vogel and WLRK that their presentations were "extremely helpful." *Id.* at 5.  The government remarked that the retention of PwC was an "impressive step," and that the government appreciated CA's cooperation. *Id.*

At a July 22, 2002 Board meeting, Mr. de Vogel reported on his meeting with the government.  Mr. de Vogel said that he felt good about the meeting, that it had gone well, and that he felt that he had made it clear to the government that the KESOP was a good plan. WLRK reported to the Board that Mr. de Vogel "put an engaging, appealing and astute face on

---

[111]   Recollections vary as to when each director learned about the late executed contract reserve, with most directors believing they did not learn of the practice until July 2003, and some asserting they learned of it as late as January 2004.  However, the written documentation reflects that this information was imparted to the directors no later than February 2003, and probably earlier, since Mr. de Vogel discussed it with the government in July 2002.  Memorandum from Steven Woghin to the Members of the CA Board at 2 (Feb. 21, 2003).  With the exception of Mr. Fernandes, who joined the Board in May 2003, all of the directors interviewed believed the late executed contract reserve was a good business practice because it allowed the "machinery to keep going" while accounting for some mistakes along the way.

a [company] that they otherwise tend to hear bad things about from former disgruntled employees." WLRK told the Board that the government said it was "v[ery] impressed by [the] degree of [the] Co[mpany]'s cooperation to date," with Mr. de Vogel's presentation, and with the retention of PwC.  Savarese Talking Points at 1 (July 22, 2002).  However, WLRK reported that the scope of the government's investigation had remained unchanged, and that it would continue to interview and to issue grand jury subpoenas to former employees, particularly sales employees.  *Id.* at 2.

Also at this meeting, David Nachman, counsel to the Company in the Class Actions, reported to the CA Board on the status of the Class Actions.  Mr. Nachman "expressed the view that although the plaintiffs had a weak case, it was unlikely that the Corporation would succeed in obtaining summary judgment and that a trial likely would be required."  Minutes of a Meeting of the CA Board at 5-6 (July 22, 2002).  Mr. Nachman also reported that additional class action and derivative litigation had been filed in February 2002 following the announcement that the government had initiated an investigation into CA's accounting practices.  *Id.* at 6.

4.     **WLRK Interviews**

During July and August 2002, WLRK continued to interview CA employees regarding CA's revenue recognition practices, including Messrs. Kaplan, Rivard, and Silverstein.  Prior to their interviews, several of these executives discussed their impending interview with Mr. Woghin who, at a minimum, encouraged them not to offer any information WLRK did not specifically request.[112]  Each of these individuals provided WLRK misleading

---

[112]     For example, according to Mr. Rivard, Messrs. Zar and Woghin came to Mr. Rivard's office to alert him to the fact that WLRK wanted to meet with him.  When they told Mr. Rivard that WLRK had questions about CA's revenue recognition practices, the three sat for a while and "ran through the various things Mr. Rivard should tell the lawyers in his interview."  For example, Mr. Rivard might say that there was a

information concerning the Company's revenue recognition practices, this time with more detail. Many of the interviewees incorrectly discussed the concept of an "administrative window," explaining that while contracts had to be signed by the end of the quarter, at one point in time Sales executives had until the flash date to physically deliver and process the finalized contracts to CA.

Mr. Silverstein told WLRK that contracts were supposed to arrive at CA before quarter end, but that Sales Accounting needed time to review paperwork related to contracts that had been completed. He then said that any contracts that arrived after the end of the quarter *might* be recognized as revenue, depending on whether all the circumstances indicated that the contract was signed in the field before quarter end. Mr. Silverstein told WLRK that "[t]here had to be something more than the contract just appearing out of thin air with the date on it" in order to book it, including a pre-quarter-end postmark on a mailed-in contract or a pre-quarter-end phone call from the Sales employee telling CA headquarters that the contract was signed. Moreover, Mr. Silverstein purported to explain why employees might think that revenue was recognized early, telling WLRK that CA might have commissioned a transaction as if it was "done" in the prior month, even if the revenue was recognized later. Mr. Silverstein then falsely claimed that, because CA did not want to impede the sales process, it continued to process deals for commission purposes if they arrived during the flash period.

Mr. Savarese reported to Mr. Kumar the results of these interviews.

---

policy in place regarding revenue recognition to which sales accounting adhered, although this was not true. Mr. Kaplan stated that Mr. Woghin gave him bad advice, namely that "the less you say [in interviews with WLRK and S&C] the better you are." Mr. Woghin denies that he ever instructed any CA employee as to how to answer questions about the 35-Day Month practice.

5.    **CA Annual Meeting**

On July 11, 2002, CA's Board resolved to limit directorships to eight (8) years. *See* Minutes of a Meeting of the CA Board at 2 (July 11, 2002). Also on that day, Kenneth Cron, Robert La Blanc, Alex Vieux, and Thomas Wyman were elected to the CA Board,[113] and directors de Vogel, Grasso, Pieper, and Kenny, who collectively had served almost forty (40) years on the CA Board, resigned, effective August 28. As a result, following CA's August 28, 2002 annual meeting, the Board was comprised of outside directors Cron, D'Amato, La Blanc, Lorsch, Ranieri, Schuetze, Vieux, and Wyman, along with Messrs. Kumar, Wang, and Artzt. Computer Assocs. Int'l, Inc., Proxy Statement (Form DEF 14A) (July 26, 2002). With the exception of directors D'Amato and Ranieri, no outside director had been with the Company since the beginning of the government investigation.

6.    **September 6, 2002 Meeting with the Government**

According to Mr. Silverstein, after the August interviews, WLRK told Mr. Silverstein that it believed that he did a very good job of explaining why a salesperson might believe that CA had backdated contracts (when it actually had not) and that they had therefore chosen him to answer questions from the government on behalf of CA. Mr. Silverstein recounted to the SLC that he was reluctant to do so, but did not share this reluctance with the WLRK attorneys at the time. Notwithstanding his hesitance, according to Mr. Silverstein, he was convinced to meet with the government by Messrs. Woghin and Zar, who told him that (i) the government was not really asking about the 35-Day Month practice, but rather about how

---

[113]    Mr. Wyman, who was formerly the Chairman and CEO of CBS Inc., served only until January 8, 2003, when he passed away.

the Company paid commissions to its salespeople, (ii) he did not have to volunteer information, and (iii) to keep his knowledge of the 35-Day Month in his "back pocket."[114]

Following these instructions, on September 6, 2002, Mr. Silverstein conveyed CA's "party line" to the government. *See* Silverstein Plea Tr. at 20. By all accounts, Mr. Silverstein did a "fine job" of persuading the government that disgruntled employees, and not a widespread practice of prematurely recognizing revenue, were responsible for the 35-Day Month allegations. When the government asked him about the 35-Day Month practice, and whether he was aware of any contracts that were recognized in quarters prior to those in which they were signed, Mr. Silverstein told the government that he was not aware of any such contracts. Mr. Silverstein explained that due to the timing of sales commissions, it appeared to Sales personnel that contracts were being recognized early, but that, because CA reserved against late contracts – a practice which Sales representatives would not be privy to – no contract revenue would be prematurely recognized.[115]

Following the September 6 meeting with the government, Messrs. Wang and Kumar again discussed CA's strategy with respect to the government investigation and again determined to remain silent about the 35-Day Month issue. According to Mr. Kumar, Mr. Wang again told him that the 35-Day Month was a "historical problem," and that there was no reason to "destroy" CA's current business by disclosing the practice now. Mr. Wang again told

---

[114]   Mr. Woghin denies that he ever instructed any CA employees as to how to answer questions about the 35-Day Month practice.

[115]   Representatives of the USAO, SEC, and FBI were all in attendance for these statements. *See* Silverstein Plea Tr. at 19. From CA, Charles McWade and Rick Finegan also attended the meeting, along with Mr. Savarese. Mr. McWade presented on the Company's cancel/convert practice; however, according to Mr. Savarese, Mr. Finegan did not participate. Thus, on both July 18 and September 6, representatives of CA made false statements to the government, some knowing and intentional, concerning CA's revenue recognition practices

Exhibit 10

Mr. Kumar that the government would eventually "go away" if the Company continued to "stonewall" on the issue.

Consistent with that conversation, at an October 22, 2002 Board meeting, according to Mr. Kumar, Mr. Wang told the Board that CA had good quarter-end cut off procedures in place, which were sometimes difficult to enforce, but nonetheless adequate. At no time before his resignation from the Board on November 15, 2002, did Mr. Wang advise the Board that he was aware of any evidence to the contrary.

### 7.    2002 Summary

Based on the SLC's investigation, it is clear that throughout 2002, both CA management and WLRK (who had been misled by CA management) told the Board that there was no substance to the issues being examined as part of the government investigation, and that CA had developed credible answers to the government's questions. Indeed, the Board was consistently told that the April 2001 New York Times article and the government investigation were the result of (i) disgruntled former employees with little actual knowledge who fed the government inaccurate information, and (ii) cooperation between the plaintiffs' lawyers at the Milberg Weiss law firm and the government. This view was confirmed, in their minds, by (i) the fact that at least one of the issues being investigated by the government had been resolved in CA's favor, (ii) the results of PwC's work, which addressed the 35-Day Month allegations and the allegations regarding the KESOP, and (iii) the positive reports they had received concerning the presentations to the government made by Messrs. de Vogel and Silverstein. This is the view that the Board took into 2003, when the government investigation took a material turn for the worse.

B.    *January 2003 – June 2003:  The Government Investigation Escalates*

1.    **WLRK Interviews**

During the week leading up to a January 21 Board meeting, WLRK conducted additional interviews of CA employees, interviewing four (4) CA Sales and Legal department employees regarding certain documents the Company had produced in response to a grand jury subpoena issued to CA on December 19, 2002 (the "December Subpoena").[116]  Those interviews were prompted by, among other things, the fact that the Company produced an e-mail which stated "remember no backdating on this one" with respect to a particular transaction.  Each of the employees interviewed presented explanations for any documents that raised issues and asserted that they believed each particular transaction at issue was signed by the quarter end.

2.    **January 21, 2003 Board Meeting**

At the January 21, 2003 Board meeting, attended by Messrs. Savarese and Lipton, WLRK reported to the Board that there had been material negative developments in the investigation:  (i) in December 2002 the government had issued "7 or 8 [grand jury] subpoenas to various customers requesting e-mails, faxes, memos, etc. re: when contracts with CA were signed"; and (ii) the government claimed it had "[f]ound some disturbing documents suggesting backdating," but that the claims "need[ed] to [be] analyze[d] in detail."  Savarese Talking Points at 1 (Jan. 21, 2003).  Mr. Savarese's talking points indicate that he reviewed with the Board several of the documents that he believed were troubling the government and discussed the additional work WLRK did to analyze the situation.  *Id.*  Mr. Savarese did not raise an

---

116    The December Subpoena called for sixteen (16) contracts and documents related to those contracts, including drafts, internal and external correspondence (including e-mail), a list of all persons who worked on the transactions, and other documents.

204
Exhibit 10

alarm at this meeting, and the message that he conveyed was that the Company and WLRK would keep working at the outstanding issues and would keep the Board posted.[117]

WLRK also told the Board that the Company had consistently cooperated fully with the government and was in the process of responding to the December Subpoena. The directors interviewed reported that the tone of WLRK's report indicated that the Company was making good progress with the government, and it would only be a matter of time before this issue was taken care of and the whole investigation would be over. The directors stated that the report they received at this meeting was "not alarming," and that while there were clearly issues to be addressed, they did not have the sense that the Company was in any danger at this point because of these developments.

As it had in the past, WLRK advised the Board to be patient, and that the investigation would take time to resolve. WLRK also listed five (5) impediments to a resolution of the government investigation, including: (i) the Milberg Weiss Class Actions; (ii) a "[s]teady stream of former disgruntled [e]mployees being located by Milberg Weiss investigators and turned over to FBI"; (iii) "KESOP Plan = huge jury appeal"; (iv) "[s]ome troubling documents/facts"; and (v) "[c]ancel/convert activity." *Id.* at 2. These impediments were presented to the directors because, according to counsel, the Board was anxious to resolve the investigation and needed to understand why it was continuing to take time.

As to the relationship between the Class Actions and the government investigation, both Mr. Savarese and Mr. Lipton told the Board that the Class Actions were a serious impediment to resolving the government investigation since, in their view, the USAO would be reluctant to end its investigation while the Class Actions were pending in the same

---

[117]    According to Mr. Kumar, Messrs. Lipton and Savarese knew that there were isolated instances of problem contracts, but neither was told during this time that a systemic practice of shifting CA's quarters existed.

205

district. The directors unanimously recall being told that resolving the Class Actions was a necessary, but not sufficient, precondition to resolving the government investigation. This meeting was the last time the Board would receive a direct, firsthand update from outside counsel for nearly six (6) months.

Shortly after the January 21 meeting, on January 29, 2003, WLRK submitted a letter to the USAO setting forth the preliminary results of their review of the materials collected in response to the December Subpoena. Letter from John Savarese to Eric Corngold and David Pitofsky, U.S. Attorney's Office for the Eastern District of New York, at 2 (Jan. 29, 2003). With respect to the scope of the review, the letter states:

> [i]n the course of responding to the Subpoena, we have carefully analyzed the available documentary materials (including contracts, correspondence, faxes, emails and related revenue recognition entries), and in some cases have interviewed CA personnel involved in the transactions, to assess whether the revenues associated with the sixteen agreements identified in the Subpoena were recognized by CA in the appropriate financial reporting period.

*Id.* Despite this representation, there were additional documents at CA that had not been collected. As discussed below, these documents were later produced in the fall of 2003. The letter then states that "of the sixteen agreements [the USAO] identified, there is only one relatively small agreement which appears, given the currently available information, likely to have been recognized prematurely." *Id.* at 3.

The January 29 WLRK letter also provides explanations, including those given to the Board, for documents related to each contract that appeared to evidence premature revenue recognition, based upon a review of additional documents and interviews of CA employees. For example, with respect to a contract dated September 30, 1999, but for which there was a copy with a fax date of October 5, 1999, WLRK reported that the CA Sales

Exhibit 10

employee who negotiated the deal clearly recalled standing at the fax machine on September 30 waiting for the fax, and then personally delivering the fax to Mr. Kumar when it arrived that day. *Id.* at 4. WLRK then added that the same CA Sales employee recalled that certain pages of an exhibit had been omitted from the original signed contract, and offered this as an explanation as to why the customer faxed another copy on October 5. *Id.* at 5. WLRK offered similar explanations for documents related to the other contracts identified in the subpoena. *Id.*

The WLRK letter concluded as follows:

> In closing, we want to emphasize that *CA continues to deny vigorously that it has intentionally recognized revenue in a period other than the one in which the contract was signed.* We have carefully reviewed the files relating to contracts enumerated in your Subpoena, and – aside from the few potential issues affecting nominal amounts of revenues discussed above – see nothing that would establish the contrary. *In our discussions with senior managers and sales people, we have been impressed by the force of their assurances that CA did not engage in this practice.* Moreover, as we and PwC explained and documented during our July 18 and September 6 meetings with you, *CA took pains through its reserve process to assure that revenue associated with any contract that was received during the quarter would not be recognized until it was proper to do so.*
>
> We also recognize that you may have information and documents that we do not have and that may bear upon the revenue-recognition questions addressed in this letter. If that is the case, we would like the opportunity to discuss any further questions or concerns you may have. In short, CA is prepared to do everything within its power to meet your concerns and put any questions about this to rest.

*Id.* (emphasis added). This communication to the government was fully consistent with the views WLRK was expressing to CA's Board.

### 3.    WLRK Telephone Interview with Stephen Richards

On February 19, 2003, WLRK interviewed Stephen Richards, CA's then-head of Sales, by telephone for the first time. According to WLRK's summary of the interview, "Mr.

207

Richards emphatically denied ('absolutely not') that CA encouraged its sales representatives to

backdate contracts." Mr. Richards' testimony was consistent with that of other senior CA

executives, who told WLRK that Sales employees were often confused about revenue

recognition because: (i) the effective date and the execution date on contracts was sometimes

different; (ii) they were pushed to continue to close deals after the quarter end in order to

prevent the deals from slipping; and (iii) on occasion, they were commissioned in the quarter

prior to the quarter in which a contract was executed as a reward for their efforts. Mr. Richards

also told WLRK that Sales employees had no reason or way to know how revenue from a

contract was recognized as an accounting matter, and that even he did not know how or when

CA recognized revenue from contracts. Mr. Richards further stated that he did not believe that

Sales managers encouraged their teams to backdate deals, and he "emphatically denied that Mr.

Kumar has ever encouraged or suggested backdating." The theme conveyed by Mr. Richards –

that there was no 35-Day Month – was knowingly false.

4.    **February 21, 2003 Memo to the Board**

On February 12, 2003, the USAO sent a letter to WLRK which enclosed a

second grand jury subpoena. In the letter, the USAO stated its view that "CA *has not complied*

*fully with an [outstanding] subpoena . . . has not responded fully to questions we have raised,"*

and was of the view that *"CA's production has been incomplete."* Letter from David Pitofsky

to John Savarese at 1 (Feb. 12, 2003) (emphasis added). The letter stated that, in particular:

> [g]iven the complex nature of CA's licensing agreements and our
> understanding as to the vigorous negotiations commonly
> preceding the execution of such agreements, we expected to
> receive a significant volume of documents in addition to the final,
> executed agreements; however, CA has produced very few drafts
> and limited correspondence (either internal or external).

208
Exhibit 10

*Id.* at 1-2. The USAO then requested that CA "provide a complete production of documents responsive to the December 19th Subpoena forthwith." *Id.* at 2. In addition, the USAO provided an example of a document it had received from a CA customer, but not from CA. Specifically, the letter enclosed a copy of a CA Order Form on which it appeared that the signature date had been altered. The USAO stated that, regardless of the significance of the document with respect to backdating, this document "raises the obvious question of why it was not produced by CA." *Id.* at 3.

The next week, on February 21, 2003, Mr. Woghin sent a memo to the Board, in which he reviewed the Company's response to the December Subpoena. Memorandum from Steven Woghin to the Members of the CA Board at 1 (Feb. 21, 2003). Mr. Woghin reported that CA had been able to find anecdotal or documentary evidence to support the timing of the revenue recognized on all but two (2) of the contracts identified in the subpoena. *Id.* With regard to one of those contracts, the memo states: "[a]s PricewaterhouseCoopers had previously reported to the government, CA maintained adequate reserves for such an item." *Id.* at 2. The memo noted that the other contract at issue was for only $440,636, and stated that CA was continuing to look for evidence to support the timing of the revenue recognized for both contracts. *Id.* The Board took comfort in the fact that management vigorously denied that they had engaged in wrongdoing and was able to refute a vast majority of the government's concerns.

After addressing the documentation that CA provided to the government for each of the contracts at issue, Mr. Woghin, for the first time, told the Board that the *"government questions whether we have fully and completely responded to their subpoena since they apparently have received some materials from CA customers that we have not been able to*

209

Exhibit 10

*locate and produce." Id.* (emphasis added). The memo informed the Board that the government might be "concern[ed]" that "what they continue to 'hear' about backdating of agreements from their informants is inconsistent with the information we have produced." *Id.* However, Mr. Woghin did not share with the Board the text of the February 12 letter from the USAO. Likely as a result, Mr. Woghin believed that the memo depicted a rosier view of reality at the time.

While the directors generally did not specifically recall receiving this memo, the directors recalled learning at or around the first half of 2003 that the government expressed concern with the adequacy of CA's document productions. The directors also recalled that they told Mr. Woghin to make sure CA devoted sufficient resources to complying with the government's document requests and that Mr. Woghin said he would do so.[118]

5.   **CA's Last Chance to "Come Clean"**

During the early part of 2003, WLRK continued to meet with the government to discuss the 35-Day Month issue. By this time, the government was no longer showing interest in any of the other issues it had originally identified, which Mr. Woghin told the Board "after 15 months" had "all . . . seemingly dropped off the table." Woghin Talking Points at 3 (May 13, 2003).[119]   The sole "[q]uestion," at this point, as Mr. Woghin put it, was "how to deal with

---

[118]   The Board next met on February 28, 2003, to consider the retirement package Charles Wang was to receive, who as noted above, announced his retirement on November 15, 2002. The Board, and particularly the Compensation Committee, then comprised of Directors Cron, La Blanc, and Ranieri, devoted a substantial amount of time to this issue during this period.

[119]   The government told CA it had stopped pursuing the issues it originally had raised with respect to the new business model during a meeting in April 2002. It is not clear precisely when the government stopped pursuing the other issues, including cancel/convert, the timing of the KESOP, and Unicenter. Mr. Savarese told the SLC that the government was satisfied on the Unicenter issue and the cancel/convert practice by late October or early November 2002, although a memo from Mr. Woghin to the Board says that the government was still actively involved in this issue through the middle of November 2002. Memorandum from Steven Woghin to the Members of the CA Board at 1 (Nov. 14, 2002). Moreover, in February 2003, Mr. Savarese told the government by letter that he was responding to the government's

Exhibit 10

this remaining issue [of the 35-Day Month practice] with the government." *Id.* Thus, the Board was aware that the government was no longer investigating four of the five issues it had identified early in 2002. This fact was very significant to most of the directors, who, as noted above, universally believed that it was only a matter of time before the 35-Day Month issue likewise would be resolved.

In early April 2003, WLRK had a conversation with the USAO, in which the government again expressed the view that the Company had not been forthcoming with regard to the 35-Day Month issue. The USAO explained that the government had developed evidence that there was a 35-Day Month practice at CA, and that the government wanted to give CA one last chance to "come clean." In the words of the Assistant U.S. Attorney ("AUSA") leading the investigation, CA could only prevent a ratcheting up of the investigation by making a "shoestring catch."[120]

WLRK reported this alarming discussion directly to Messrs. Kumar, Woghin, and Zar, but not to any outside CA Board member. At this meeting, Mr. Kumar continued to deny the existence of a 35-Day Month practice, and for the first time instructed WLRK to conduct a "full investigation," using any and all of the Company's resources, to disprove the government's claim. Messrs. Kumar and Woghin told Mr. Savarese that they would promptly relate this development to the Board, but that was not done.

---

"request for information regarding the events leading up to the reclassification in CA's fiscal year 2000 financial statements, and for the two (2) prior years, of the accounts associated with CA's 'cancel/convert' activity." Letter from John Savarese to Eric Corngold, David Pitofsky, and Alexander Vasilescu, Senior Trial Counsel, U.S. Sec. and Exch. Comm'n (Feb. 6, 2003).

120   A "shoestring catch" is a baseball term for a running catch made near the ground; in other words, a last-minute save.

Thus, in late April 2003, WLRK re-interviewed Messrs. Richards and Rivard, and also interviewed, for the first time, several other CA employees, including Mr. Zar.  During his May 19, 2003 telephonic interview, Mr. Zar told WLRK that, generally speaking, "sales accounting people knew that a deal had to be signed by the end of the quarter in which it was booked."  Mr. Zar also said that he was not aware that Sales personnel might encourage customers to sign contracts with incorrect pre-printed signature dates without changing the date.  During his April 22, 2003 interview, Mr. Rivard told WLRK that the "flash date" was "never purposefully extended to book more revenue."  Mr. Rivard said that abuses of the booking system might have occurred, but that he was not personally aware of any.  Mr. Richards and a general manager of Sales during fiscal year 2000 both told WLRK that CA Sales personnel used pre-printed customer signature dates on contracts, and that "the sales organization would continue to keep the printed date . . . of 3/31/2000" even if the quarter had already ended.  Both Mr. Richards and the general manager told WLRK that they did not worry about revenue recognition issues, and assumed that the Sales Accounting and Finance departments ensured that revenue was accounted for properly "on the back end," although the general manager explained that others believed this was done to allow CA to book revenue in an earlier quarter.

Mr. Savarese told the SLC that Mr. Richards and the general manager were "adamant" that any abuses that had occurred were isolated, and "not uniformly done."  Based on these explanations, Mr. Savarese believed that the real issue was a disconnect between Sales and Sales Accounting/Finance – and made plans to present the issue to the government at a scheduled May 20 meeting.

Exhibit 10

6. **May 13, 2003 Board Meeting**

   (a) *The Class Action Litigation and Mediation*

At a May 13, 2003 CA Board Meeting, Messrs. Kumar and Woghin reported to the Board on the status of the Class Actions and the government investigation. Minutes of a Meeting of the CA Board at 8 (May 13, 2003).

According to Mr. Kumar, the Board was very interested in settling the civil litigation at this point. Present in their minds was WLRK's advice to the Board that a settlement would reduce the number of constituencies agitating the government, and would therefore help bring a conclusion to the investigation. With respect to the Class Actions, Mr. Woghin reported that U.S. District Judge Platt had recommended that the parties attempt to mediate a settlement of all outstanding shareholder litigation, and had appointed retired U.S. District Judge Frederick B. Lacey to serve as mediator. *See* Woghin Talking Points at 1 (May 13, 2003). Mr. Woghin told the Board that the plaintiffs would be willing to accept a combination of stock and cash in a settlement, but would not be willing to accept less than $150 million. *Id.* Mr. Woghin reported that, after two (2) sessions with Judge Lacey, and numerous telephone conferences both with Judge Lacey and between the parties, the parties had been unable to reach a settlement. *See id.* at 2.

Mr. Woghin also told the Board that the Company's motion for summary judgment, which had been filed on September 5, 2002, would be placed back on the Court's docket, but that it was "likely the Court will deny our motion and will set a trial date for the fall of 2003." *Id.* at 2. Mr. Woghin did not explain to the Board, and the Board did not ask, why the Court was likely to deny the Company's motion, and there was no discussion of whether there were "bad facts" for CA in the civil litigation.

213

Exhibit 10

(b)     *The Government Investigation*

With respect to the government investigation, Mr. Woghin reported to the Board that the government had issued additional subpoenas to CA in March and April asking for information covering transactions executed in fiscal year 2000.[121] Mr. Woghin explained that the government was "focused on the timing of revenue recognized at the end of each quarter," but did *not* convey to the Board the substance of Mr. Savarese's April 2003 call or the severity of the government's position. *Id.* Mr. Woghin did, however, tell the Board that the Company had identified certain issues in the process of responding to the subpoenas, including: (i) cases where contracts with pre-printed signature dates were completed in the first few days after the close of a quarter, but booked in the prior quarter; and (ii) contracts completed after the quarter close that were caught by Sales Accounting and "a reserve was taken backing the revenue out from the prior quarter." *Id.* at 3. Mr. Woghin explained that WLRK had recently met with several CA Sales, Sales Accounting, and Finance personnel in order to understand the flow of paperwork from Sales to Finance through the contracting process.

Mr. Woghin then presented to the Board an outline of how CA could propose to resolve the government investigation: "[c]an acknowledge there were some mistakes" but: (i) "nothing was intentional"; (ii) CA "tried to catch errors when they did occur"; (iii) even if errors occurred, they were "not criminal – these were real contracts with . . . real revenues"; (iv) the "problem is historical and has been addressed"; and (v) "all remedial action was taken by the Company *before* the government investigation and on our own initiative." *Id.* (emphasis in original). Mr. Woghin recommended to the Board that the Company attempt to convince the USAO that the problem was neither material nor criminal, and try to negotiate a non-criminal,

---

[121] The subpoenas issued by the government in April, June, and July of 2003 are discussed in detail below.

civil settlement with the SEC. The Board unanimously agreed with this approach, and that set the stage for WLRK to present these arguments to the government.

At this meeting, Gary Fernandes was elected to the Board, which, in the SLC's view, was a significant event due to his extensive experience in the software industry and the perspective he brought to the Board. The directors universally recall Mr. Fernandes being more skeptical than others on the Board of the positions taken by management in general, and Mr. Kumar in particular. According to Mr. Kumar, early in Mr. Fernandes' tenure on the Board, Mr. Fernandes asked Mr. Kumar pointedly whether there had been a systemic practice of extending quarters at CA, and, in response he had told him there was not.

### 7.    May 20, 2003 Meeting with the Government

On May 20, Mr. Savarese met with the government prepared to seek a civil settlement and, during the meeting, acknowledged to the government that CA could have had better controls in place. However, while attempting to explain the circumstances underlying certain contracts identified by the government as suspect, the AUSA interrupted him, saying that the meeting should end if Mr. Savarese planned on presenting a series of "excuses" to the government.

Recognizing that his planned approach was ineffective, if not counter-productive, instead Mr. Savarese focused on discussing the inculpatory evidence that the government had asked him to provide. Mr. Savarese told the government that while there were several weaknesses in CA's contracting process, including that Sales employees sometimes left incorrect pre-printed dates on contracts in order to assure themselves of early commissions, CA management "adamantly" insisted that this was not a widespread practice. Mr. Savarese told the government that the situation at CA – as between Sales and Sales Accounting – was analogous to the "right hand not knowing what the left hand was doing," as Sales personnel

assumed that Finance and Sales Accounting would know how to properly recognize revenue from contracts with pre-printed dates, while the Finance and Sales Accounting departments relied on the pre-printed dates when determining how to recognize revenue, assuming the Sales employees dated contracts correctly. Mr. Savarese's talking points reflect that he reported to the government that "the weaknesses [in sales accounting] resulted by chance, not by design," and "it is not clear that errors that may have resulted from the system materially distorted CA's business." Savarese Talking Points at 18 (May 20, 2003).

The government was, to say the least, not persuaded. The AUSA asked Mr. Savarese if he was saying that he was not in a position at that time to represent to the government that he knew the full scope of the problem. Mr. Savarese said that he was not, but that from what he had been told and from the documents he had seen, the issue appeared to be confined to isolated instances of human error. When Mr. Savarese raised the idea of a civil settlement, the government representatives rejected this concept and suggested that he ask the Board to have an independent committee – with its own separate counsel – conduct an independent investigation (so that the Company's representatives could be in a position to speak to the government with full knowledge of the situation).

8.    **June 9, 2003 Phone Conference with the Government**

In a follow-up call with WLRK on June 9, the government maintained the position that it had staked out in May. The USAO and SEC told WLRK that: (i) they wanted to know the Board's decision regarding the government's suggestion that they initiate an independent investigation; and (ii) to tell him that the government now considered three (3) CA senior executives – Messrs. Zar, Rivard, and Silverstein – "subjects" of the USAO

investigation.[122]  While Mr. Savarese promptly reported what he had been told to Mr. Woghin, he did not tell any members of the Board.  In fact, no one reported the substance of the May 20 meeting or the June 9 telephone call to CA's outside directors until a July 2, 2003 Board meeting, discussed below.  Importantly, CA's directors did not receive a first-hand briefing from outside counsel for the nearly six-month period of January 21, 2003 through July 2, 2003.[123]

C.   *June 2003 – A Settlement Framework is Reached*

During this same time frame, settlement negotiations in the Class Actions were progressing.  On June 8, 2003, Mr. Kumar provided the Board with an update on the Class Actions by e-mail: "regarding the topic that I called each of you on about 10 days ago. . . .  We continue to haggle with [the] other side and are making progress."  E-mail from Sanjay Kumar to Alfonse D'Amato, Alex Vieux, Robert La Blanc, Gary Fernandes, Jay Lorsch, Kenneth Cron, Lewis Ranieri, Walter Schuetze, Russell Artzt, Steven Woghin, and Ira Zar (June 8, 2001).  Shortly thereafter, Mr. Woghin advised the Board by memo that a tentative global settlement had been reached to settle a number of litigations then pending against CA.  These litigations included: (i) the 1998 Class Action; (ii) the 2002 Class Action; (iii) the 2002 ERISA class action lawsuit; (iv) two "greenmail" derivative lawsuits pending in the Delaware

---

122   According to the U.S. Attorney's Manual, "[a] 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation," while a "target" of an investigation "is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."  9 U.S. Attorney's Manual § 11.151 (2006), *available at* http://ww.usdoj.gov/usao/eousa/foia-reading-room/usam/title9/11mcrm.htm#9-11.151.

123   Mr. Savarese claims that he asked to meet with the Board following his discussions with the government but that Mr. Woghin told him that he himself would keep the Board informed and did not schedule a Board meeting for Mr. Savarese to attend until early July.  In contrast, Mr. Woghin recollects only that Mr. Savarese was busy on other matters during this timeframe.  Either way, the most salient fact remains – CA's directors did not receive a timely, direct, firsthand account of the government meetings that occurred in May and June.

217

Exhibit 10

Chancery Court;[124] and (v) the 2003 Derivative Litigation.  Mr. Woghin described the settlement to the Board as follows: "In consideration for a global settlement of all litigation, it is proposed that CA would create a fund to be distributed to the class members of 5.7 million shares of common stock.  This represents slightly less than 1% of the outstanding stock of the company and thus would have limited dilutive effect."  Memorandum from Steven Woghin to the Members of the CA Board at 1 (undated).  At CA's then-current stock price, the settlement was valued at approximately $133.2 million.

At a June 18, 2003 telephonic Board meeting,[125] Mr. Kumar outlined the terms of the proposed settlement.  *See* Minutes of a Meeting of the CA Board at 1 (June 18, 2003). Mr. Kumar repeated that the lawsuits "would involve the issuance of 5.7 million shares of the Corporation's Common Stock" and also that the settlement "was tentative and remained subject to the resolution of various issues."  *Id.*  David Nachman, counsel to the Company in the Class Actions, then discussed the history of the litigation, and the risks and benefits of the settlement. *Id.*  Mr. Nachman addressed two (2) main concerns of the Board with respect to the settlement – the amount ($133 million) and the form (all stock, no cash).  *Id.*  Mr. Nachman expressed his view that the settlement was very much in CA's interest, and further pointed out that while the

---

[124]    The Company described the "greenmail" derivative suits in its public filings as follows:

> In July 2002, two derivative lawsuits were filed against the then directors of the Company in the Delaware Chancery Court. These lawsuits alleged waste and breach of fiduciary duties in connection with the Company's payment to and standstill agreement with Sam Wyly and Ranger Governance Ltd., pursuant to which they agreed, among other things, not to engage in a proxy contest with the Company for five years and to extend Mr. Wyly's noncompete agreement with the Company. By stipulation of the parties to the litigation, the Chancery Court dismissed these lawsuits, with prejudice, in April 2004.

Computer Assocs. Int'l Inc., Annual Report (Form 10-K) at 10 (June 14, 2004).

[125]    This was Gary Fernandes' first CA Board meeting as a director.  At this time, the Board was comprised of Messrs. Artzt, Cron, D'Amato, Fernandes, Kumar, La Blanc, Lorsch, Ranieri, Schuetze, and Vieux.

Exhibit 10

settlement would be expensive, "proceeding to trial could result in substantially greater costs, as well as potential liability for the Corporation's directors." *Id.* The Board discussed the details of the proposed settlement with an emphasis on the amount of stock involved, and the potentially dilutive effect of the settlement. The Board did not discuss the releases that would be given by CA as part of the settlement at this meeting, but instead focused on the financial aspects of the settlement.

Mr. Nachman also discussed certain factors that he believed would cause the settlement to enhance the likelihood of resolving the government investigation, although he told the Board that resolving the civil cases in "no way assure[s] a speedy or favorable outcome in the investigation." *Id.* at 1-2. It was explained to, and understood by, the Board at this meeting that the government would view a settlement of the Class Actions favorably. In addition, the Board discussed and continued to believe that Milberg Weiss was providing the government negative and inaccurate information about the Company, and that a settlement would put an end to that cooperation.[126]

At the conclusion of the meeting, the directors unanimously felt that settling the civil litigation would be a positive step for the Company, and resolved that the Company should continue to move forward towards a settlement along the lines that had been outlined. The Board reasoned that the market would view the settlement favorably, and that this would have a positive impact on CA's stock price, which would act to offset any dilution caused by the stock issuance.

---

[126] This was consistent with the advice the Board had received from Mr. Lipton and Mr. Savarese of WLRK at the January 21, 2003 Board meeting, when WLRK identified the Class Actions as an impediment to resolving the government investigation.

Mr. Nachman also recommended that the Board form an independent committee to assess the merits of the settlement. *Id.* Mr. Nachman recognized that he could not advise the Board regarding the settlement because he represented the individual defendants (some of whom were Board members), who would benefit from any releases granted by the Company, and recommended that independent counsel be retained to assist the committee. As discussed further below, the Board subsequently created two (2) separate committees, one (1) to review the class action settlement, and one (1) to review the derivative settlement. *Id.*

Also at this meeting, Mr. Kumar "discussed recent developments in the SEC/Justice Department investigation of the corporation and stated that the Board would meet in the near future to discuss those developments and related matters." *Id.* at 3. This update was, to say the least, very cursory and non-specific as Mr. Kumar did not inform the Board about the most salient facts relating to recent discussions with the government: (i) that the government had identified numerous contracts it believed had been backdated; (ii) that the government was suggesting an Audit Committee investigation; and (iii) that Messrs. Zar, Rivard and Silverstein were "subjects" of the government's investigation. The Board would not learn these facts until July 2, several weeks later.

D.    *July 2003 – The Audit Committee Investigation is Authorized*

At a July 2, 2003 telephonic CA Board Meeting, Mr. Savarese (in his first presentation to the Board since January 2003) provided the Board with a report of his May 20 meeting and June 9 call with the government. *See* Minutes of a Meeting of the CA Board at 1-2 (July 2, 2002).

The Board was told that the government had rejected WLRK's attempts to persuade the government that any improperly-booked contracts were the result of "isolated" mistakes, and "refused to discuss a settlement." Instead, Mr. Savarese reported, among other

220

Exhibit 10

things, that: (i) in rejecting his settlement offer, both the USAO and SEC "*assert[ed] that they believed that senior management of the company had intentionally held quarters open and used backdated contracts to meet earnings estimates*" (emphasis added); (ii) there were nine (9) transactions with signature dates at issue for fiscal year 2000, and the second quarter contracts alone amounted to $200 million, or one-third of North American license revenue for that quarter; (iii) WLRK had concluded that CA's record keeping made it "difficult" to establish when contracts were actually signed, but that there were "certain transactions in which circumstances suggest that the contract was signed after quarter-end and back dated"; and (iv) the government identified Messrs. Zar, Rivard, and Silverstein as "subjects" of the government's investigation.  Savarese Talking Points at 10-11, 3-4 (July 2, 2003).[127]  Mr. Savarese proceeded to review certain of the transactions mentioned above, and the circumstances that suggested that the revenue from these contracts might have been prematurely recognized.  Mr. Savarese added that:

> We are aware of other contracts, however, which were not booked in revenues because of timing concerns, and, as noted previously, periods in which reserves against contracts received late were taken.  It is possible that some contracts were recognized as a result of a mistake in Sales Accounting.

*Id.* at 9-10. Mr. Savarese also told the Board, twice, as follows:

> As we said at the outset, we want to *emphasize that the senior managers have all denied any knowledge that revenue was intentionally recognized in the wrong period*, but acknowledge that mistakes may have occurred.  We *also want to emphasize that we have not conducted an intensive analysis of the facts from the standpoint of GAAP as understood in the 2000 fiscal year.* There is an argument that it would not necessarily have violated

---

[127]  Each of the directors understood that being named a "subject" of the government investigation was serious, and meant that the government was examining that person's conduct.  To the extent it was unclear, Mr. Savarese read to the Board the relevant section of the U.S. Attorney's Manual that explained the distinction between a "subject" and a "target."

221

Exhibit 10

> GAAP at that time to book a contract signed after the end of the
> quarter if all material terms had been agreed prior to the end of
> the quarter. *This would entail an in-depth inquiry into the facts
> and circumstances of each contract, including forensic searches
> of computer systems and, possibly, inquiries to customers.* _In
> sum, we have not reached the conclusion that the company's
> financial statements were materially deficient or that any person
> acted wrongfully._

*Id.* The Board was also told that the USAO believed that an independent committee of the

Board should "conduct a full internal inquiry and report its results to the Government."

Minutes of a Meeting of the CA Board at 1 (July 2, 2003).

To the Board, this report was "qualitatively different" from all other reports it

had received from Mr. Savarese and management regarding the investigation to date. Indeed,

the directors interviewed variously described this report as a "thunderbolt" and a "sucker

punch" which precipitated a "deafening" silence on the call.[128]  Notwithstanding Mr. Woghin's

February 21, 2003 memo,[129] to most, if not all, of the directors, this was the first clear

indication that the government was dissatisfied with CA's cooperation, and that reality did not

match with what had previously been reported to the Board.  Nonetheless, the Board reacted to

the news with a measured expression of concern.  Although it was clear to the Board that the

government investigation had taken a turn for the worse, the directors did not panic.

As a whole, the Board generally continued to believe that the problem was far

more limited than it ultimately turned out to be, since it had not seen any evidence, from the

government or WLRK (which had developed none), implicating CA's senior managers.  At this

---

[128]   In contrast, one director, Mr. Lorsch, told the SLC that from Mr. Savarese's tone, he took away from the
meeting that the Board should not "worry" and that the government's accusations lacked merit.

[129]   As noted above, this memo suggested that the government was receiving information from CA customers
that seemed to be at odds with what CA itself was producing, causing the government to question whether
CA was responding fully to the government's document requests.  Memorandum from Steven Woghin to
the Members of the CA Board at 2 (Feb. 21, 2003).

point, simply because Messrs. Zar, Silverstein and Rivard had been identified as "subjects," the Board did not, in general, presume that they were, in fact, complicit in any wrongdoing, and believed that the newly-authorized Audit Committee investigation would shed light on that issue.

At the conclusion of the meeting and its deliberations, the Board unanimously resolved to authorize the Audit Committee to conduct an investigation into CA's accounting practices. *See* Minutes of a Meeting of the CA Board at 2 (July 2, 2003). The Board members believed the investigation was the best way to test the government's allegations and move the investigation to a conclusion. There is no record that the settlement of the civil litigation was discussed at this meeting.

By no later than July 11, 2003, the Audit Committee – which consisted of directors D'Amato, Ranieri, and Schuetze – had retained S&C as its counsel.[130] S&C promptly began the process of understanding the situation, primarily through a series of discussions with WLRK.[131] On July 22, 2003, the Audit Committee had a conference call with two (2) S&C partners, Robert Giuffra and Richard Urowsky, to discuss "the process by which Sullivan & Cromwell intended to assist the Committee in conducting an investigation of the timing of the Corporation's recognition of certain license revenue." Minutes of a Meeting of the CA Audit Comm. at 4 (July 22, 2003).

---

[130]    S&C was selected on the recommendation of Mr. D'Amato, who had worked with S&C partner Robert Giuffra when he was counsel to the Senate Committee on Banking, Housing and Urban Affairs, a committee that Mr. D'Amato chaired.

[131]    Plaintiffs in the 2005 Derivative Complaint allege that "CA hired [S&C] to replace Wachtell." 2005 Compl. ¶ 247. That is not true. S&C was retained by and represented CA's Audit Committee in connection with its internal investigation, and WLRK continued to represent CA in responding to the government investigation.

223

Following the Audit Committee meeting, the Board held a meeting at which Mr. Woghin reported on the status of the civil litigation and the government investigation. *See* Minutes of a Meeting of the CA Board at 3 (July 22, 2003). Mr. Woghin provided the Board with more detail regarding the financial terms of the proposed civil settlement, which now included a potential cash component if CA's stock price dropped below a certain level. This cash component was incorporated in the settlement at the request of the plaintiffs and resulted from the uncertainty of the government investigation. *See* Memorandum from David Nachman to Files/CA at 2 (July 28, 2003). Mr. Woghin advised the Board that the Audit Committee had retained S&C to assist with its investigation, and "reviewed the actions expected to be taken in the Committee's investigation, the anticipated timing of each, and certain issues to be considered in carrying out the investigation." Minutes of a Meeting of the CA Board at 3 (July 22, 2003); *see also* Minutes of a Meeting of the CA Audit Comm. at 4 (July 22, 2003).

Around noon on July 24, 2003, Mr. Nachman spoke by phone with Melvyn Weiss, lead counsel to the plaintiffs in the Class Actions, and advised him that the government investigation of CA's accounting practices was continuing. Mr. Nachman told Mr. Weiss that it appeared that the government was no longer interested in the four (4) issues that had formed the basis of the 1998 Class Actions – the KESOP, CA's cancel/convert accounting, Unicenter, and the new business model – but that the government was now focused on the timing of CA's revenue recognition during CA's fiscal year 2000. Mr. Nachman told Mr. Weiss that the Board had authorized the Audit Committee to investigate this issue with the assistance of independent counsel and auditors. *See* Memorandum from David Nachman to Files/CA at 2 (July 28, 2003).

The next day, on July 25, 2003, Judge Platt held a status conference. At that conference, the parties told Judge Platt that they had agreed, subject to CA Board approval, to a

Exhibit 10

global settlement. Further, Mr. Nachman told the Court that he "had *not* ventured any predictions regarding the outcome [of the government investigation]; the company had been successful, apparently, in addressing many of the government's concerns, but *there were certain issues – not even those initially raised, and not those specifically raised in this litigation – that remained subject of intense government scrutiny.*" *Id.* at 2-3 (emphasis added). Mr. Nachman also reported that the Audit Committee was investigating the issues that were still the subject of government scrutiny. Finally, Mr. Nachman reported that there was no way to predict the outcome of the government investigation with certainty, which is why the plaintiffs had requested "down-side protection" (the cash component) in the initially all-stock settlement. *Id.*

That same day, Mr. Woghin sent a memo to the Board reporting that the parties to the civil litigation had met with Judge Platt and agreed, subject to Board approval, to settle the litigation on substantially the same terms presented to the Board by Mr. Nachman at the June 18 Board meeting. The memo summarized the proposed settlement for the Board, which now:  (i) created a fund of 5.7 million shares from which all claims and attorneys' fees would be satisfied; (ii) included a provision whereby 2.2 million of the 5.7 million shares would be converted to cash if, at the time the settlement became final, CA's shares traded at $23.43 or less; and (iii) provided that CA would contribute a maximum of $1.75 million towards the costs of administering disbursement of the settlement fund. Memorandum from Steven Woghin to the Members of the CA Board at 1 (July 25, 2003).

E.    *August 2003 – The Settlement is Approved*

1.    **The August 4, 2003 S&C Meeting with the Government**

On August 4, 2003, Messrs. Giuffra and Urowsky of S&C met with representatives of the USAO and the SEC for the first time to introduce themselves, and to get

225

an understanding of the status of the investigation. At the meeting, the government told S&C

that (i) it was dissatisfied with the Company's and counsel's cooperation (particularly the pace

and volume of e-mail production), and (ii) it had evidence demonstrating that the Company and

its senior managers had engaged in the 35-Day Month practice to falsely represent the

Company's quarterly financial reports. The S&C lawyers were surprised with the

government's "chilly" tone, which conveyed the impression that the situation was "quite

serious," and that the Audit Committee investigation had to "get moving." The USAO and the

SEC, however, declined to provide specifics to S&C concerning the evidence that the

government had and, specifically, which executives at CA were involved.

On August 7, 2003, at the request of Walter Schuetze, Mr. Woghin sent a memo

to the Board reporting on the August 4 meeting. The one-page memo states:

> In addition to expressing dissatisfaction with both Wachtell
> Lipton and the company's cooperation to date, *the government
> explained that it believed that the company had engaged in a
> systematic practice of backdating license agreements.* This is
> what the government refers to as the "35 day month." *It believed*
> (but without offering any proof) *that senior managers of the
> company (both current and former) had directed this practice and
> that it was done with the specific intent to represent falsely the
> company's quarterly revenues.*

Memorandum from Steven Woghin to the Members of the CA Board (Aug. 7, 2003). The

memo also states that the government expected the Audit Committee to complete its

investigation by October 15, 2003. *Id.*[132]

Despite the stark nature of the memo, the directors for the most part viewed the

information as largely reflecting what they had heard at the July 2 Board meeting.[133] All the

---

[132] Although S&C did not draft or comment on the memo – it was written by Messrs. Woghin and Schuetze –
Messrs. Giuffra and Urowsky confirmed that the memo accurately reflected what transpired at the
meeting.

Exhibit 10

directors expressed the belief that the Audit Committee, led by Mr. Schuetze (who was the former Chief Accountant of the SEC), would get to the bottom of these issues, including whether there was any wrongdoing. Further, most of the directors continued to take some degree of comfort from the fact that the government had not offered the Company or the Audit Committee any specific evidence or factual detail to support its claims. At this time, in Mr. Giuffra's view – which was formed in large part by his discussions with Mr. Savarese and which he shared with the Audit Committee – there was still a possibility that the government was only posturing or "saber-rattling" in an attempt to extract a favorable settlement.

### 2. Retention of Counsel for the Settlement Committees

On August 11, 2003, Mr. Woghin retained counsel for the two (2) committees that were to consider the proposed civil settlements. Mr. Woghin selected Peter Fleming, a partner at Curtis, Mallet-Prevost, Colt & Mosle LLP, and James M. McGuire, counsel at White & Case LLP, to represent the class action and derivative settlement committees, respectively. Mr. Nachman recommended Mr. Fleming to Mr. Woghin, and Mr. D'Amato had suggested Mr. McGuire to Mr. Woghin several months earlier (as an attorney CA might consider retaining to assist WLRK in dealing with the government investigation; Mr. Woghin and Mr. D'Amato did not discuss Mr. McGuire in this context, or at this time).[134]

On August 14, 2003, Mr. Woghin sent a memo to the Board outlining the process for the settlements, and attaching the biographies of Messrs. Fleming and McGuire.[135]

---

[133]   Given what they had been told at the July 2 Board meeting, this memo was "not news" to the Board, and Mr. Woghin was not contacted by any Board members to discuss this memo.

[134]   According to Mr. Woghin, the delay in retaining counsel for the committees, from June 18 to August 11, was attributed to several procedural and mechanical issues that CA needed to resolve prior to retaining counsel, such as conflict checks.

[135]   The SLC discovered that the biography for James M. McGuire distributed to the Board was not, in fact, Mr. McGuire's biography. Rather, it was the biography of a White & Case ("W&C") partner named James J. McGuire. James J. McGuire is a former Assistant U.S. Attorney for the Southern District of

227

In the memo, Mr. Woghin explained that the original settlement committee, which was established on June 18 and was comprised of directors D'Amato, Lorsch, Ranieri, and Schuetze, would review the class action settlement.  A separate committee comprised of the independent non-interested directors who were not defendants in the derivative suit – directors Cron, Fernandes, La Blanc, Lorsch, Schuetze, and Vieux – would review the derivative settlement.  *See* Memorandum from Steven Woghin to the Members of the CA Board (Aug. 14, 2003).

From August 11 to 18, 2003, Messrs. Fleming and McGuire each took steps to review the respective settlements in preparation for meetings with each committee, which were scheduled to occur telephonically on August 19.

Mr. Fleming received a preliminary briefing on the class action litigation from Mr. Nachman, and then reviewed the relevant pleadings, including the complaint and summary judgment papers.  Mr. Fleming billed the Company a flat fee of $25,000 for his evaluation of, and advice regarding, the settlement.

Mr. McGuire reviewed the papers in the class action and derivative litigations, and had numerous conversations with Messrs. Nachman and Savarese regarding issues related to the derivative settlement.  According to his billing records, Mr. McGuire devoted a total of

---

New York, and had significantly more experience with white collar and complex commercial litigation than James M. McGuire.  Given his lack of experience in these areas, James M. McGuire (who had most recently served as counsel to then-New York Governor George Pataki) enlisted the help of then-W&C partners, Richard Holwell, now a U.S. District Judge, who had more experience in securities and fiduciary duty matters, and Lawrence Byrne, a former Assistant U.S. Attorney.  Mr. Holwell was also present for the telephonic meeting held by the derivative settlement committee on August 19, discussed in detail below, but no one involved in the call recalls him participating substantively.  Mr. Holwell, who spent a total of 8.4 hours on the matter, declined to be interviewed by the SLC, informing the SLC through a representative of White & Case that he had no recollection of the events.

Exhibit 10

sixty-five (65) hours to the assignment.[136]  In total, Mr. McGuire listed eight (8) calls with Mr. Nachman on his billing records prior to the August 19 committee meeting.  Among the issues discussed on these calls – and particularly relevant to the SLC – was whether the class action plaintiffs would agree to a settlement if the derivative case was left unsettled, or if the releases in the derivative case were narrowed or limited.  Mr. Nachman was emphatic with Mr. McGuire that he believed the settlement of the class action and derivative litigations was a "global" deal, and that it was probable that the settlement would collapse if the releases, which would run from the Company to its officers and directors, were limited or altered in any respect.

On August 18, Mr. McGuire spoke with William Federman, the attorney representing the derivative plaintiffs, in part to determine whether the proposed settlement was, and had to be, part of a "global" deal.  Mr. McGuire concluded, based on his conversations with counsel, including Messrs. Federman and Nachman, that the Board could not approach the settlement of the derivative and Class Action litigations in any way other than as a "global" deal.

Mr. McGuire also spoke several times with Mr. Savarese to educate himself about the internal and government investigations, and discussed the potential impact of the releases contained in the derivative settlement on the government investigation.[137]  In addition to providing factual background on the government investigation, Mr. Savarese expressed concern to Mr. McGuire about whether the Board's credibility with the government would be negatively affected if the Board released CA's management from liability prior to the resolution

---

[136]  In addition to Mr. McGuire, other W&C lawyers, including Messrs. Holwell and Byrne, devoted about forty-seven (47) hours to the matter.

[137]  Mr. McGuire also spoke briefly to Mr. Giuffra, who told Mr. McGuire about S&C's August 4 meeting with the government, and advised him that he was "too new" to the situation to give a proper assessment as to how the investigation would turn out.

Exhibit 10

of the Audit Committee and government investigations. Mr. Savarese told the SLC that he did not take a position on this issue, but merely raised it as one to be considered by the derivative settlement committee. Mr. Savarese discussed this issue with Messrs. McGuire, Woghin and Nachman, but did not raise it with the Board. In fact, none of the directors were ever made aware, by any counsel, internal or external, that Mr. Savarese (or anyone else) had raised this as an issue to be considered.

That said, and as noted above, Messrs. Lipton and Savarese had, during the course of the investigation, repeatedly told the Board that it was unlikely that CA could resolve the government investigation unless the civil litigation was first settled. As such, Mr. Ranieri recalled that, from his perspective, the entire Board understood a civil settlement to be positively related to the resolution of the government investigation. Mr. Fernandes believed that the one factor that "got [the Board] over the hurdle" in order to settle the civil litigation was that the settlement was thought to be "the key" to resolving the government investigation.

Mr. McGuire also spoke with Messrs. Savarese and Nachman, among others, about the possibility of limiting the scope of the releases in the derivative settlement. Mr. Nachman told Mr. McGuire that, in his opinion, it would be within the Board's business judgment to grant full global releases notwithstanding the Audit Committee investigation. Ultimately, the idea of limited releases was apparently raised among counsel as a potentially viable alternative, since it provoked a response from counsel for Charles Wang.

On August 18, 2003, Messrs. McGuire and Savarese received a memo from Mr. Wang's attorneys, which advocated and exhorted that Mr. Wang should be given a full release in connection with the settlement. The memo, which contained several obvious misstatements of fact and law, advocated a position that a global settlement (including a full release for all

individual defendants) is "consistent with the position CA has taken in its public disclosures" and "anything less than a global settlement unnecessarily jeopardizes court approval." Memorandum from Daniel Murdock and Robert Bostrom, Winston & Strawn LLP, to James McGuire at 1-2 (Aug. 18, 2003). The memo also stated that it would be an "irrational exercise" of the directors' business judgment to block a global settlement in order to preserve claims against the individual defendants due to market risks and the risk of additional exposure. *Id.* at 1-3. Finally, the memo stated that "a partial settlement . . . would also create the impression that CA's independent directors have suspicions (which they presumably do not have)." *Id.* at 2.

Mr. McGuire stated that the memo was "not very persuasive" since it was "aggressive" and its claims were "pretty preposterous." Mr. Savarese responded by memo dated August 19 (with a copy to Mr. McGuire), in order to "correct certain of the material errors" made by Mr. Wang's counsel, including that: (i) Mr. Wang's attorneys had implied that CA and the individual defendants were "jointly represented" by WLRK when this was clearly not true; (ii) CA had not, as Mr. Wang's attorneys had alleged, publicly stated that the government's allegations were "unsupportable"; and (iii) Mr. Wang's attorneys incorrectly claimed that the Audit Committee's investigation was "commenced . . . simply to convince skeptical prosecutors of what CA's own investigation has revealed." Memorandum from John Savarese to Daniel Murdock and Robert Bostrom at 1-2 (Aug. 19, 2003).[138] Neither Mr.

---

[138]  In a further response, dated August 20, Mr. Wang's counsel asserted that its August 18 memo referred only to the allegations of wrongdoing alleged in the civil actions, not the allegations made by the government. Letter from Daniel Murdock to John Savarese and Warren Stern at 1 (Aug. 20, 2003). They also acknowledged that their "observation" on the Audit Committee investigation was "hyperbolic" and "not intended to denigrate the investigation's integrity or CA's good faith in initiating it." *Id.* at 2.

Exhibit 10

Wang's memo nor Mr. Savarese's response was distributed to the members of the derivative settlement committee or to any other Board member.

### 3.   The Settlement Committees Meetings

On August 19, 2003, the class action and derivative settlement committees each participated in a telephonic meeting with their respective counsel. Recollections vary, but those involved recall that each call lasted between thirty (30) minutes and one (1) hour. The members of both committees participated in the class action call, which occurred first.[139] The members of the class action settlement committee then dropped off the call when the derivative settlement committee heard from its counsel and deliberated. Mr. McGuire listened in on the class action settlement call, and Mr. Woghin, who participated in both calls, was the only member of CA management present on either of the calls. None of the committee members recall consulting with their counsel, requesting or receiving additional materials, or consulting informally with each other, prior to the calls.

#### (a)   The Class Action Settlement Committee Meeting

This call began at 7:00 a.m. Eastern Standard Time on August 19. Mr. Fleming told the committee that he had reviewed the complaint and the summary judgment papers in the class actions, and that he estimated the Company's exposure in the class action litigation at between two (2) and five (5) billion dollars. Mr. Fleming reviewed the history of the mediation with Judge Lacey, who he said was "willing to call fools fools," and told the directors that Judge Lacey had recommended a settlement "substantial[ly in] excess" of the amount ultimately agreed upon. Fleming Talking Points at 1 (Aug. 19, 2003).

---

[139]   Mr. La Blanc, who was a member of the derivative settlement committee, did not participate in the class action settlement committee call.

Mr. Fleming told the committee that the risks of not going forward with the settlement were: (i) the two to five billion dollar exposure; (ii) if a trial were lost, a successful appeal would be unlikely in the current environment (post-Enron/WorldCom); (iii) the continued distraction of management and costs to the Company; and (iv) continued pressure on CA's stock. *Id.* at 2. While Mr. Fleming told the committee that he "was a trial lawyer at heart," and thus did not generally like to settle a case, he advised the committee that he would strongly counsel against trying this case. Further, Mr. Fleming told the committee that this case was especially risky since the Company would not only have to win the first trial, but would have to "win them all." Finally, Mr. Fleming's notes state that he recommended the class action settlement "in [the] strongest possible way." *Id.*

Most, if not all, of the directors interviewed recalled the two-to-five-billion-dollar figure, and that Mr. Fleming strongly advocated settling the class action. For example, Mr. Cron stated that the number was "etched in his mind"; Mr. D'Amato noted that CA "could have lost billions of dollars" if the case went to trial; and Messrs. Lorsch, Ranieri, and Schuetze told the SLC substantially the same thing.

These recollections are consistent with the one set of handwritten notes from the settlement calls that were produced by the directors. Mr. Schuetze's notes from the class action committee call state, "'Exercise of Business Judgment Rule;' Possible loss $2 – 5 billion; Trial likely; Proposed settlement – Issuance 5.7 million shares CA stock plus possible $52 million cash if price declines; Believes settlement is good for CA – in CA's best interest – recommend settlement." Notes of Walter Schuetze (Aug. 19, 2003). Mr. Schuetze recalled that there was a lengthy discussion about the background of the litigation and the benefits of settling, and, following Mr. Fleming's presentation, the committee concluded that the settlement was in CA's

Exhibit 10

best interests.  The class action settlement committee voted unanimously to recommend the settlement to the full Board.

               (b)     *The Derivative Settlement Committee Meeting*

Following the class action settlement committee call, the members of that committee dropped off the call, and the derivative settlement committee had its call with Mr. McGuire (and Mr. Holwell, who as noted above, had listened in on Mr. Fleming's presentation).  Mr. McGuire provided the committee with an overview of his credentials, and an overview of the allegations contained in the derivative action.  Mr. McGuire explained to the derivative settlement committee that he had reviewed the settlement and studied the summary judgment papers filed in the class action, but had *not* conducted an independent factual investigation of the allegations contained in the derivative complaint.  *See* Memorandum from James McGuire and Richard Holwell to Files at 2 (Aug. 19, 2003).

None of the committee members questioned Mr. McGuire about the specifics of what he had done to prepare for the call, but rather relied upon the reputation of the White & Case firm in concluding that they could rely on his advice.  That said, Mr. McGuire did not advise the committee that he needed any additional time in order to adequately advise the committee or that he was in any way uncomfortable about the advice he was giving, and the committee members assumed that he would have done so if it was necessary.

Mr. McGuire told the committee that he believed it likely that Judge Platt would deny the Company's motion for summary judgment because, although "the motion appeared strong . . . it was unusual for such motions to be granted."  *Id.*  Mr. McGuire said that absent a settlement, both the class action and derivative litigation would go to trial.  Mr. McGuire then outlined the terms of the derivative settlement for the committee, noting that although the Company would not receive a cash payment, "certain existing and new corporate governance

234

Exhibit 10

measures would be maintained for a period of some years." *Id.* Mr. Woghin then outlined for the committee what those specific measures were. *Id.*

According to those who participated on the call, Mr. Fernandes asked what the potential ramifications would be of granting the releases if it turned out that CA management was found to have engaged in wrongdoing, and whether it was possible for CA to settle without giving releases (in whole or in part) to its officers and directors. According to Mr. McGuire's summary of the meeting (drafted that day), in response to Mr. Fernandes' question, he said that:

> while he was not aware of any evidence that any of the director defendants had engaged in wrongdoing, if the U.S. Attorney's Office reached the conclusion that a director had engaged in criminal misconduct, they would then have to decide whether to pursue charges against the corporation. In making that decision, one of the factors that the prosecutors would consider was how the Company had responded to evidence of misconduct, including whether the Company had improvidently released potential claims against the director defendants in the derivative litigation.

*Id.* at 3-4.

In considering Mr. McGuire's advice, the derivative settlement committee also discussed the possibility of (i) deferring the settlement until after the conclusion of the Audit Committee and government investigations, or (ii) "narrowing or tailoring" the releases to preserve the Company's ability to pursue future action against certain individuals. Recollections vary as to the extent that these issues were discussed. One director recalled that the issues were discussed "fairly exhaustively" and another director told the SLC that it was "very hard to get to yes" on the releases. On the other hand, other directors recalled a much shorter discussion, and Mr. Vieux does not recall the issue being discussed at all. The SLC concludes that the Board discussed the issue to some extent and generally relied on the advice of Mr. McGuire, who told the committee that the settlement was an "all or nothing" deal.

Exhibit 10

This is consistent with the contemporaneous documentary evidence. Mr.

Schuetze's notes from the call state in their entirety:

> "Exercise of Business Judgment Rule"; trial likely; In settlement, institute therapies – maintain for three years certain therapies; Cost of trial – 30 to 40 million plus distraction; Query – what about partial releases to individual directors?   Group B concluded, based on its judgment, given all of the facts, that the Board should go forward with a global settlement with full releases to directors.

Notes of Walter Schuetze (Aug. 19, 2003).  According to Mr. McGuire's summary memo

concerning the meeting:

> Counsel pointed out that deferring settlement of the derivative actions could threaten to upset the global resolution of both the class actions and derivative actions and, further, that an attempt to limit the release of claims against the director defendants could also endanger a global resolution of all the litigation.

Memorandum from James McGuire and Richard Holwell to Files at 4 (Aug. 19, 2003).

Mr. McGuire's memo describes the conclusion of the meeting as follows:

"Further discussion ensued and the directors concluded that the avoidance of this risk, together

with the other benefits of settlement outlined by Mr. McGuire, outweighed whatever theoretical

benefits might result from a continuation of the derivative actions." *Id.*  Ultimately, the

committee concluded that the derivative settlement was in the best interests of CA because it

was (i) a necessary and advisable part of the global settlement of the civil litigation, and (ii) an

important step in laying the groundwork for an ultimate resolution of the government

investigation, as counsel had explained to them earlier in 2003.

Immediately following the derivative settlement committee conference call, Mr.

McGuire sent an e-mail to Mr. Woghin, which stated:

> I think the spirited, exceptionally thorough discussion among a highly informed group of independent directors will itself go a

> long way at preventing any of the harm that conceivably could
> ensue in the event that the possibility we discussed ever arose.
> The company is very fortunate to have directors of their caliber.

E-mail from James McGuire to Steven Woghin (Aug. 19, 2003).[140] Mr. Woghin told Mr.

Kumar via e-mail:

> Had a VERY thorough discussion with Committee B, including
> *what if we don't settle the derivative suit, what if we give limited
> releases.*   Lots of probing of the possible effect on the
> government, exposure of this board, etc.  Committee ultimately
> unanimously agreed to recommend to the board settlement of the
> derivative action with the standard form of releases.

E-mail from Steven Woghin to Sanjay Kumar (Aug. 19, 2003) (capitalization in original)

(italics added).  Mr. Woghin told the SLC that this e-mail was not intended to be self-serving,

but rather was designed to keep Mr. Kumar apprised of what had actually occurred.

At an August 21, 2003 CA Board Meeting, at which all of the outside directors

participated telephonically, Mr. Kumar reported on the actions taken by the committees in

connection with the settlements.  He then summarized again the terms of the proposed

settlement and reviewed the creation of the settlement committees.  The minutes reflect that the

respective committee chairs – Mr. D'Amato with regard to the class action litigation and Mr.

Lorsch with regard to the derivative litigation – noted that each respective committee had

undertaken a thorough review of the financial terms and the risks, and both committees had

unanimously recommended that the Board approve the settlements.  *See* Minutes of a Meeting

of the CA Board at 1-2 (Aug. 21, 2003).

---

[140]   The "possibility" discussed on the August 19 call – and likely referred to here – was the possibility that
the government would find that representatives of the Company had "engaged in criminal misconduct."
Memorandum from James McGuire and Richard Holwell to Files (Aug. 19, 2003).  Mr. McGuire said
that, if this were to occur, the government "would then have to decide whether to pursue charges against
the corporation." *Id.*

237

Certain directors at the meeting raised the possibility of deferring the decision on the settlement to August 27, 2003, the date of the Board's annual meeting. However, the minutes state that CA management explained to the Board that it would be "desirable" to announce the settlement prior to the annual meeting. *Id.* at 2. Indeed, the "desire" to make an announcement at CA's annual meeting was, in part, a driving force behind the timing of when the Board met to decide to authorize the settlement. The Board then approved the committee recommendations: "Following discussion, the Board approved the settlement, with Messrs. Artzt and Kumar abstaining." *Id.*

    F.    *Post-Settlement Approval; the Audit Committee Investigation Continues*

At the August 27, 2003 annual CA Board Meeting, Mr. Giuffra made his first presentation to the full Board. Mr. Fernandes' notes of Mr. Giuffra's presentation at this meeting reflect that he gave a decidedly negative report: "Government's Attitudes: Evidence of tens of millions of post quarter transaction bookings; Backdated contracts [included in revenue and] earnings; Inadequate response to discovery requests; No Question on Mis-Booking – only on [how] high up the management chain; they are more aggressive & emphatic." Notes of Gary Fernandes (Aug. 27, 2003). The Board felt that this report echoed what they had been hearing for the last two (2) months: that the government had information that the Board did not, but that still no evidence had been provided about any specific acts of wrongdoing by any CA executive.

Despite this report and, as discussed further below, the many other events that would occur, and facts that would be uncovered during the Audit Committee investigation before the settlement was finally approved on December 8, 2003, no director ever questioned, or reconsidered, whether it remained in the Company's best interest to grant releases to all of CA's officers and directors. When asked about this, the directors responded in one of three

        Exhibit 10

ways:  (i) despite having many top law firms advising them (WLRK, S&C, White & Case, Curtis-Mallet, Covington & Burling, and Piper Rudnick), no counsel ever suggested they revisit the issue and the directors assumed counsel would have advised them if they should – or even could – re-evaluate the settlement;[141] (ii) through December 2003, the directors had no information that led them to believe that *very* top management (Messrs. Wang or Kumar) had been involved in any wrongdoing; and (iii) as additional negative facts arose, the benefit to shareholders of the global settlement became even more apparent and thus the risk of upsetting the global deal even greater.

On August 29, 2003, Judge Platt preliminarily approved the settlement.  The commentary from financial analysts that covered CA's stock was overwhelmingly positive.  For example, Banc of America, which rated CA as a "buy," reported that the settlement "*could lead to some resolution with the SEC and DOJ.*"  Banc of Am. Sec., Company Settles All Accounting-Related Shareholder Lawsuits; Could Pave Way for Progress with SEC and DOJ (Aug. 25, 2003) (emphasis added).  Similarly, Friedman, Billings, Ramsey & Co. ("FBR") upgraded CA to "Outperform," noting that "[i]t appears that CA has been able to settle these lawsuits for *a very small amount.*"  Friedman, Billings, Ramsey, CA: Computer Associates Litigation Overhang Removed – Upgrading to Outperform (Aug. 25, 2003) (emphasis added)).  FBR added that the settlement was "*extremely positive for the company* . . . as it removes . . . a much greater unknown" than the government investigation.  *Id.* (emphasis added).  Consistent with Wall Street's reaction, CA's stock price rose from $24.82 on August 25, when the settlement was announced, to $27.00 by the close of business on September 3.

---

[141]    Some directors believed that once approved, the decision to settle could not be reversed, while others recognized that the settlement was still subject to Court approval.

1.     **The September and October 2003 CA Document Productions**

It is at this point in the chronology of the government investigation that the documents which have come to be known as the "23 Boxes" were collected and analyzed. Given the importance attached to these documents by the plaintiffs in connection with the Rule 60(b) motions and the press reporting on this issue, the SLC was determined to understand their origin.

The origin of these documents is the subject of great debate due to a September 24, 2004 Wall Street Journal article entitled "In CA Probe: Recovered Emails, Surprise Cache of Documents."[142] The press account of the origin of the documents, in the view of the SLC, is largely inaccurate. This press account, including its title, created the myth of a "surprise cache of documents" that Mr. Woghin and CA had collected, and then concealed, in order to prevent their discovery. The article references a "surprise delivery" of twenty-three (23) boxes of documents by Mr. Woghin, implying that, for whatever unexplained reason, he had ended his document-withholding scheme and unexpectedly produced the documents that he had purportedly collected and hidden.[143] The SLC has concluded that the facts do not support this version of the events. The SLC found instead that the evidence supports the view that the Company failed to produce certain of these documents earlier in the government investigation

---

[142]   This article seems to be largely the source of the declarations by plaintiffs' counsel in the Class Action cases, who allege that Mr. Woghin "withheld" and "intentionally concealed" these documents. Declaration of Alexander Widell at 4, *In re Computer Assocs. Class Action Sec. Litig.*, No. 98 Civ. 4839 (TCP) (E.D.N.Y. Sept. 12, 2006); Joint Declaration of Samuel K. Rosen and Lee Squitieri, *Computer Assocs. Int'l, Inc. Derivative Litig.*, No. 04 Civ. 2697 (TCP) (E.D.N.Y. Sept. 12, 2006). As explained further below, as a factual matter there is no evidence to support such a claim. The two declarations cited above were not, and could not have been, based on actual knowledge of the facts.

[143]   For instance, the Wyly movants read the Wall Street Journal article to indicate that in September or October 2003, after the settlement had been finalized, "CA's lawyers became aware that Woghin . . . brought 23 boxes of documents he had been withholding to the[ir] attention . . . ." Memorandum of Law in Support of Motion for Relief Pursuant to Rule 60(B) of the Federal Rules of Civil Procedure at 6-7, *In re Computer Assocs . Class Action Sec. Litig.*, No. 98 Civ. 4839 (TCP) (E.D.N.Y. June 14, 2005). As discussed below, this account is not accurate.

Exhibit 10

due to markedly deficient and delayed document collection efforts during the early part of 2003, and that, once remedied, the documents were collected and produced in due course.

(a)     *The 2002 Document Requests and Grand Jury Subpoena*

Beginning in late February 2002, the SEC began issuing voluntary document requests to CA relating to each of the areas of investigation identified by the government at the outset of its investigation (which are described above). Specifically, on February 26, 2002, the SEC issued a voluntary document request to CA seeking seventeen (17) broad categories of documents (the "SEC Document Request"). On February 27, 2002, WLRK, the SEC, and the USAO met to discuss CA's response to the SEC Document Request, including certain limitations on the request proposed by WLRK and the timing of CA's production. Initially, according to WLRK, the SEC agreed to permit CA to narrow the scope of its document productions in various respects. For example, the government permitted CA to limit the scope of certain of its collection efforts to documents maintained in the "Company's Finance Department license files" in order to expedite its response, but reserved the right to broaden its request at a later point. *See* Letter from John Savarese to Alexander Vasilescu, U.S. Sec. and Exch. Comm'n, and David Pitofsky at 2 (Mar. 12, 2002); Letter from John Savarese to David Pitofsky and Alexander Vasilescu at 2 (Apr. 24, 2002); Memorandum from John Savarese to File (Nov. 11, 2003). As such, at this time, the Company did not attempt to collect documents from outside CA's central files. Memorandum from John Savarese to File (Nov. 11, 2003).

The document collection process established by the Company in 2002, and followed through the fall of 2003, was that CA would collect and review documents internally, and then provide the potentially responsive documents to WLRK, who would then produce the documents to the government on behalf of the Company. The Company refused WLRK's offer to manage the documents collection and production, and established this protocol purportedly

241

because (i) CA had substantial experience in producing documents, and (ii) CA was seeking to reduce its costs. Even with the benefit of hindsight, it is unclear whether the 35-Day Month practice would have been uncovered earlier had WLRK handled the document collection at CA. Nonetheless, that same hindsight makes plain that it certainly would have been a better practice than the one employed by CA and WLRK.

WLRK, on behalf of the Company, began producing documents from the Finance department's North American license files in response to the SEC Document Request on March 7, 2002, and continued to do so on a rolling basis. By April 19, 2002, CA, through WLRK, had produced sixty-eight (68) boxes of documents to the SEC, and indicated that "a very substantial amount of additional documents" would be forthcoming. Letter from John Savarese to Alex Vasilescu at 2 (Apr. 19, 2002). By May 1, 2002, WLRK informed the government that CA had completed its response to the SEC Document Request "as limited" by various agreements with the government, with the exception of the Company's response to Request No. 8 of the SEC Document Request, which called for, among other things, "all documents concerning contracts or licenses that were backdated." Letter from John Savarese to David Pitofsky and Alexander Vasilescu at 2 (May 1, 2002); *see* Letter from Alexander Vasilescu to John Savarese (voluntary request attached) (Feb. 26, 2002).

With respect to Request No. 8, WLRK informed the government that the Company's response required "further review that remains ongoing." Letter from John Savarese to David Pitofsky and Alexander Vasilescu at 2 (May 1, 2002). Indeed, at this time the Company had not made any efforts to specifically search for backdated license agreements. Memorandum from Donald Watnick to File at 1 (Mar. 29, 2002). Instead, at the recommendation of Mr. Woghin and Donald Watnick, CA's then-head of litigation, PwC

reviewed the contracts produced to the government in response to Request Nos. 1, 2, and 3 of the SEC Document Request[144] to determine whether "either the customer's signature or the Company's counter-signature on a contract took place after the period in which the revenue associated with such contracts was recorded."[145]  Letter from John Savarese to Alex Vasilescu at A-2 (Apr. 19, 2002).

Throughout the summer of 2002, the Company continued to produce documents in response to additional informal requests from the SEC, including the documents reviewed by PwC in connection with the 532 Contract Study.  Then, as noted above, on December 19, 2002, the USAO issued the December Subpoena, which was the first grand jury subpoena issued to CA.  As described above, the December Subpoena called for sixteen (16) contracts and all documents related to those contracts, including drafts, internal and external correspondence (including e-mail), a list of all persons who worked on the transactions, and other documents. In addition, the government increased its efforts to subpoena third parties, the majority of whom

---

[144]    Specifically, Request Nos. 1, 2, and 3 of the SEC Document Request called for:

   1.   All contracts and licenses, correspondence and communications, concerning the sale or license of software to CA customers whose accounts reflect the top sources of revenue for CA during FY 1995-2001.

   2.   All contracts and licenses, correspondence and communications, concerning the sale or license of software to the following CA customers: Merrill Lynch and Co., NASDAQ, Electronic Data Systems Corp., Citibank, N.A., Time Warner and/or AOL Time Warner, CS First Boston, J.P. Morgan, and any of their independent divisions, subsidiaries or other related entities.

   3.   All contracts and licenses, correspondence and communications, concerning the sale or license of software to CA customers whose accounts reflect the top sources of revenue for the sale or licensing of Unicenter TNG during FY 1995-2001.

   Letter from Alexander Vasilescu to John Savarese (voluntary request attached) (Feb. 26, 2002).

[145]    This review took several weeks and was separate from the 532 Contract Study, which PwC subsequently conducted at WLRK's request. Memorandum from John Savarese to File at 3 (Dec. 2, 2003). Like the 532 Contract Study, PwC did not review documents other than the contracts themselves to determine whether they were signed in a timely manner.

were CA customers, to obtain additional documents.  On January 10, 2003, the Company began

producing documents responsive to the December Subpoena from CA's central licensing files,

and indicated that it would continue to produce responsive documents on a rolling basis.

According to WLRK, the Company then endeavored to collect documents from areas outside of

the Finance department, including from the GSO, Legal and Sales Accounting departments, all

in response to the December Subpoena.[146]  Memorandum from John Savarese to File (Nov. 11,

2003).

It was at this time that CA began to collect, and produce, certain documents that

WLRK surmised that the government had received from CA's customers and found troubling.

For example, as discussed above, on January 29, 2003, in connection with a larger production,

CA produced to the government an e-mail relating to a license agreement with a large CA

customer, which said, "remember, no backdating on this one."  At the time, with explanations

provided by CA management and others, the Company was able to offer, in WLRK's view,

seemingly innocent and plausible explanations for such documents both to the government and

to the Board.[147]  As such, as described above, in a letter to the USAO accompanying the

January 29 document production, WLRK "emphasized" that CA continued to "deny vigorously

that it has intentionally recognized revenue in a period other than the one in which the contract

---

[146]   The Legal department, with the help of the Finance department, sought to identify the CA employees
involved in the negotiation, drafting, or approval of the identified transactions, and then personally
contacted them and requested that they provide all documents related to the transactions contained in the
employees' personal files.  *See* E-mails between Steven Woghin and Donald Watnick (Jan. 2, 2003).  CA
did not send out document collection memos or e-mails to broad groups of employees, nor did it image
the computers of employees involved in the transactions or otherwise attempt to independently obtain
electronic documents related to the transactions off of CA's back-up servers.

[147]   As discussed above, this document, and others collected around this time, were discussed at CA's January
21, 2003 Board meeting.  At that meeting, WLRK presented the explanations provided by CA employees
– including the Criminal Defendants, whom the Board did not suspect of wrongdoing at the time – for the
documents that CA believed were troubling the government.

was signed." Letter from John Savarese to David Pitofsky and Eric Corngold at 7 (Jan. 29, 2003).

Then, as discussed above, in a February 12, 2003 letter from the USAO to WLRK enclosing a new grand jury subpoena requesting the "originals" of all documents produced in response to the December Subpoena, the USAO expressed dissatisfaction with the level of CA's document production efforts. In that letter, the government specifically cited the Company's failure to produce a significant number of drafts, correspondence, and other documents relating to license agreements identified in the December Subpoena. The letter states the government's belief that:

> CA has not complied fully with the subpoena served on CA dated December 19, 2002. . . . Given the complex nature of CA's licensing agreements and our understanding as to the vigorous negotiations commonly preceding the execution of such agreements, we expected to receive a significant volume of documents in addition to the final, executed agreements; however CA has produced very few drafts and limited correspondence (either internal or external).

Letter from David Pitofsky to John Savarese at 1-2 (Feb. 12, 2003). In addition, the USAO called Mr. Savarese to express its dissatisfaction with the number of e-mails produced by the Company.[148]

---

[148]    The government's frustration regarding CA's document collection and production efforts was, as discussed above, in part relayed to the Board in a February 21, 2003 memo from Mr. Woghin. The memo states that the "government questions whether we have fully and completely responded to their subpoena since they apparently have received some materials from CA customers that we have not been able to locate and produce." Memorandum from Steven Woghin to the Members of the CA Board at 2 (Feb. 21, 2003). Mr. Woghin stated further that, "to satisfy themselves that the documents [CA] produced were complete, they have now requested that we produce the 'originals' of all documents previously produced." *Id.* at 3. Mr. Woghin told the Board that CA would produce those documents to the government by the end of the week. *Id.* Mr. Woghin told the SLC that this memo painted a "rosier" picture than that which actually existed. The Board was not provided with the USAO's February 12 letter to WLRK at the time.

Exhibit 10

As a result, WLRK questioned Mr. Woghin regarding CA's failure to produce significant amounts of e-mail, and Mr. Woghin explained that the Company's policy was not to retain e-mail on its servers, keep back-up tapes, or have archive servers, and that all e-mail was deleted after thirty (30) days pursuant to CA's document retention policy.[149]  According to Mr. Savarese, Mr. Woghin was adamant that there was no e-mail to be found due to CA's failure to retain e-mail on its servers, and its stringent document retention policy.[150] According to Mr. Woghin, due to this failure, he advised WLRK that it would have to search individual employees' computers for e-mail.  However, the Company did not make any efforts to obtain e-mail from CA employees' computers, other than to request that employees search for and produce their own e-mail, because, in Mr. Woghin's view, WLRK did not suggest that they do so.

Despite the government's concern regarding CA's document collection and production efforts, particularly with respect to e-mail (and the representation made to the Board that all necessary steps would be taken), no immediate changes were made to the process by which documents were collected at CA.  Into the spring of 2003, CA continued to collect and produce documents responsive to the SEC Document Request, the December Subpoena, and various additional requests.[151]

---

[149]   According to several individuals interviewed by the SLC, Mr. Wang disliked e-mail, because he felt it hampered direct communication between sales people and clients.

[150]   Mr. Woghin gave the same explanations to S&C when it was first retained in the summer of 2003.

[151]   In a March 6, 2003 letter, the SEC requested that CA provide an update on the status of production with respect to Request No. 8 of the SEC Document Request, asking if CA had completed its production in response to this request, and if not, what documents were currently outstanding. *See* Letter from Danielle Friedman to John Savarese (Mar. 6, 2003).  In a March 13 response, Mr. Savarese summarized his view of how CA had attempted to comply with the request and noted that additional documents relating to backdating had been discovered in an effort to comply with the USAO's December Subpoena. *See* Letter from John Savarese to Danielle Friedman (Mar. 13, 2003).  Mr. Savarese explained that if, in the process

246

Exhibit 10

(b)     *The April, June, and July 2003 Subpoenas*

In the spring of 2003, the government issued additional subpoenas to CA requesting all of CA's license agreements (some of which were covered by earlier requests) and related documents for particular fiscal quarters, which, when analyzed in their entirety, enabled the Audit Committee to conclude that the 35-Day Month practice existed at CA.

On April 14, 2003, the SEC issued a subpoena to CA (the "April 14 Subpoena") requesting, for the second, third, and fourth quarters of CA's fiscal year 2000 (July 1, 1999 to March 31, 2000), a spreadsheet "of contracts that composed the reported revenue for each requested quarter." SEC Subpoena, *In re Computer Assocs. Int'l, Inc.* (NY-7008) (Apr. 14, 2003). The SEC requested that the spreadsheet contain the following information for each contract listed: (i) the parties to the contract; (ii) the date the contract was signed by CA; (iii) the date the contract was signed by the customer; (iv) the sales agents involved in the contract negotiations; (v) the total amount of the contract; and (vi) the amount included as revenue in that quarter from the contract. This subpoena also requested that CA produce, among other things, the following documents for those quarters: (i) all contracts entered into by CA in the amount of $5,000,000 and above; and (ii) all correspondence and memoranda, including e-mail, faxes, and handwritten notes, concerning *all* contracts reported as revenue.

In a letter accompanying the April 14 Subpoena, the SEC requested "that before any documents are produced in response to [(i) and (ii) above], Computer Associates first produce all contract signature pages for each contract that was reported as revenue in each quarter." Letter from Danielle Friedman, Staff Attorney, U.S. Sec. and Exch. Comm'n, to John Savarese (Apr. 14, 2003) (emphasis in original). To respond to this subpoena, WLRK, as

---

of complying with more recent document requests, CA uncovered any additional documents responsive to Request No. 8, those documents would be promptly produced.

247

Exhibit 10

specifically requested by the government, worked first on collecting and producing the contract signature pages, and then on creating the requested spreadsheet, before seeking the underlying documents from CA.

On May 28, 2003, WLRK produced to the SEC, on behalf of CA, the contract signature pages requested in the SEC's April 14 letter. Then, on June 17, 2003, WLRK produced the spreadsheet requested in the April 14 Subpoena, identifying the contracts recognized by CA in the second, third, and fourth quarters of fiscal year 2000. In a letter accompanying the June 17 production, WLRK stated, "CA has assumed the authenticity of documents maintained in the ordinary course of its business and the accuracy of the information in those business records." Letter from Warren Stern to Alexander Vasilescu (June 17, 2003). For example, WLRK told the government that it relied on the signature dates that appear on the faces of the contracts that exist in the Finance department's files, "[a]ccordingly, the information with respect to signature dates set forth in the spreadsheet should not be interpreted as a representation that the contract was actually signed on the dates indicated in the documents." Further, during this time, the Company continued to produce documents responsive to the December Subpoena, which were "recently located in the course of ongoing efforts to respond to government inquiries." Letter from John Savarese to David Pitofsky (June 13, 2003).

On June 27, 2003, the SEC issued another subpoena to CA, this time requesting the following documents for the second, third, and fourth quarters of CA's fiscal year 2000 and the first fiscal quarter of CA's fiscal year 2001 (April 1, 2001 to June 30, 2001) (the "June 27 Subpoena"): (i) all "forecast reports" issued by the GSO; (ii) all reports used by CA management and/or CA's sales force to track contract negotiations, and all documents related to

those reports; (iii) documents that identify the departments and persons who created, distributed, and received the above-described reports; and (iv) organizational charts for various departments at CA. SEC Subpoena, *In re Computer Assocs. Int'l, Inc.* (NY-7008) (June 27, 2003). Following the issuance of this subpoena, Mr. Woghin, for the first time, began sending document collection memos to broad groups of CA employees, requesting that employees search their files for all documents related to the licensing agreements requested in the April and June Subpoenas and requiring them to respond in writing regarding the results of their efforts.

On July 17, 2003, the SEC issued a subpoena requesting documents related to all contracts, and related documents, recognized in the first quarter of CA's fiscal year 2000 (April 1, 2000 to June 30, 2000). *See* SEC Subpoena, *In re Computer Assocs. Int'l, Inc.* (NY-7008) (July 17, 2003) (the "July 17 Subpoena").[152] The SEC also requested that CA now "produce those documents previously identified in the subpoena dated April 14, 2003" – which, as indicated above, were the contracts for $5,000,000 or more and related correspondence (including e-mails and faxes). These documents, the SEC stated, "by agreement, ha[d] not yet been produced." Letter from Danielle Friedman to Warren Stern at 1 (July 17, 2003).

In connection with this production, the SEC specifically requested that CA "undertake a thorough search for responsive documents, particularly faxes, cover letters and e-mails that attach or reference partially executed contracts tendered by customers in responsive quarters." *Id.* Indeed, the SEC cited to the Company the recent decision in *Zubulake v. U.B.S. Warburg*, 217 F.R.D. 309 (S.D.N.Y. 2003), which outlined the efforts that broker-dealers must undertake with respect to producing e-mails and the possibility of recovering deleted e-mail,

---

[152]     The documents requested in this subpoena had not been requested in the April 14 Subpoena.

and stated that "the staff would appreciate a search being undertaken that is consistent with the persistence of the parties in *Zubulake*." *Id.* In addition, the SEC specifically instructed the Company to search its field offices, in addition to CA's Islandia headquarters, for responsive documents. *Id.*

As a result, CA searched sales files, work papers, and employees' files, and a team of CA employees was assigned to review the documents collected from CA's worldwide offices. This team included Finance and Sales Accounting department employees, and occurred primarily during July and August 2003. The team reportedly reviewed and organized the documents into boxes by fiscal quarter based on the review criteria, and "flagged," or specifically identified, any documents that raised potential revenue recognition issues to bring to the Legal department's attention. Mr. Kaplan, who was involved in this review process, kept a running list of the contracts for which there were documents suggesting issues, which was later produced to the government.

All former CA executives involved in the document collection and review process, including those that have pled guilty, emphatically denied that documents were ever intentionally destroyed, altered, or withheld from WLRK or the government.[153] Messrs. Kaplan and Rivard, who were involved in responding to the government's document requests early in the process and were in part responsible for the document review that occurred in the summer of 2003, candidly admitted their role in the 35-Day Month practice to the SLC, and credibly denied that any documents were withheld from counsel. This account was corroborated by Doug Robinson, the former head of CA's Internal Audit, Sales Accounting, and Investor

---

153    Mr. Kaplan specifically recalled being shown by the FBI documents that he had flagged during the review process, and he assumed that all flagged documents were turned over to the government as long as they were not privileged.

Relations departments, who was heavily involved in the document collection and offered the same account. These accounts are likewise corroborated by substantial contemporaneous e-mail traffic concerning the review. Ultimately, once the Company undertook to collect the relevant documents, they were turned over to WLRK, and when reviewed and analyzed, they evidenced the 35-Day Month.

Throughout July 2003, CA produced documents to the government responsive to the April, June, and July subpoenas, including Status Reports and Missing Reports for fiscal year 2000 and the first quarter of fiscal year 2001.[154] At the same time, the Audit Committee investigation was getting underway. Due to the concern expressed by the government regarding CA's document productions, as evidenced in the SEC's July 17 letter and expressed at the August 4 meeting, one of the Audit Committee's initial priorities was to understand the scope of CA's prior document collection and production efforts, and to remedy any deficiencies in those efforts going forward. *See* E-mails between Tracy High and Donald Watnick (Aug. 8, 2003); Memorandum from Tracy High to Donald Watnick (Aug. 12, 2003). During August and early September 2003, S&C began requesting information from the Company regarding its document collection efforts, interviewing CA employees regarding the document collection process, and gathering information regarding CA's back-up systems.

Beginning in mid-September, at S&C's insistence (and over the objection of Mr. Woghin), PwC began the process of imaging the hard drives of numerous CA employees and

---

[154]     WLRK was first made aware of the Status Reports in April 2003 during its interviews of CA employees. The WLRK letter accompanying the production of the reports explains that, (i) Status Reports "were used by the CA sales force, finance department, and others to, among other things, track contracts," and (ii) Missing Reports "were prepared by the Financial Reporting department based upon information contained in the status reports." Letter from Louis Barash, WLRK, to Alexander Vasilescu at 2 (July 23, 2003).

251

Exhibit 10

examining CA's back-up tapes.[155]  This was a multi-step process, in which PwC (i) interviewed legal and technical employees to better understand the structure of CA's information systems, (ii) assessed various computer systems utilized by CA to determine the location of relevant data; (iii) captured and recovered information from the computers and Blackberry devices of relevant CA employees, (iv) analyzed the recovered information, and (v) reported the results of this analysis to both WLRK and S&C.  In total, at the direction of S&C, PwC examined 101 computers and Blackberry devices belonging to eighty-seven (89) CA employees.

In the end, the SLC found that the documents produced during the summer and fall of 2003 were not a "secret cache" hidden at the Company.  Instead, the SLC found a document collection process that was flawed in many respects, which resulted in serious delays.[156]  In retrospect, the SLC believes that the Company's document collection and production efforts could have been improved if the Company had acted earlier to (i) send document collection requests to broad groups of employees; (ii) search CA's worldwide sales offices; (iii) hire forensic specialists to locate and preserve electronic documents, particularly e-mail; and (iv) have its outside counsel coordinate and participate in the document collection efforts.  This is particularly true after it became clear that the government believed that the Company's productions were deficient.  Nonetheless, the myth that the 23 Boxes constituted a "hidden cache" that then became a "surprise delivery," is simply that, just a myth.

---

[155]   At the outset of its investigation, S&C perceived resistance from Mr. Woghin to some of its suggestions, including the imaging of the computers of CA employees, and he also told S&C that he wanted to sit in on interviews of CA employees.  Ultimately, S&C asked the Audit Committee to direct Mr. Woghin not to interfere with its investigation.  This was done.

[156]   The question of whether the Company's document collection efforts were intentionally deficient has not been definitively answered.  All of the CA executives involved in the document collection process interviewed by the SLC stated that it was not.

Exhibit 10

(c)     *The Compilation of Documents Responsive*
*to the April, June, and July 2003 Subpoenas*

During late August and early September 2003, after documents that had been collected by CA had been turned over to WLRK in several batches, WLRK reviewed and organized the documents. WLRK attorneys, at the request of the government, created color-coded folders and chronologies using the documents for each contract from fiscal year 2000, incorporating the Status and Missing Reports (produced to the government in July), e-mails, fax cover sheets, and cover letters. By mid-September 2003, WLRK attorneys had concluded that the chronologies, in conjunction with the spreadsheets produced in response to the April Subpoena, indicated that numerous contracts were executed by CA's customers after the quarter end in fiscal year 2000, but had been backdated and recognized as revenue by CA in the prior quarter.

Mr. Savarese then called Mr. Giuffra, and asked him to come to WLRK's offices, where the contract chronologies were reviewed with him.[157] Messrs. Savarese and Giuffra then called Mr. Schuetze and informed him that documents that the Company had recently provided to WLRK evidenced possible premature revenue recognition. Mr. Schuetze instructed the lawyers to "get to the bottom" of these issues, and immediately flew from Texas to New York to meet with counsel, spending a substantial amount of time in New York as the Audit Committee's investigation became more intense.

On September 19, 2003, CA continued to produce to the SEC and USAO documents responsive to the April 14, June 27, and July 17 Subpoenas, and made subsequent

---

[157]     As noted above, the September 24 Wall Street Journal article contained many inaccuracies. Most tellingly, there was no "surprise delivery" of "23 boxes" of "paperwork." As described above, the SLC believes that the documents at issue were collected from various CA offices and delivered over several months. After they were reviewed and organized, Mr. Savarese called Mr. Giuffra and presented him with the contract chronologies that WLRK had assembled.

productions on October 7 and 10, and November 3, 7, and 14, 2003.[158] WLRK's letter to the

SEC, accompanying the October 7, 2003 production, referenced what the review had revealed,

and states, "we want to call your attention to the fact that these productions contain a number of

documents suggesting that certain license agreements were signed by customers *after* the

quarter end, although the agreements themselves bear a quarter end signature date." Letter

from John Savarese to Alexander Vasilescu at 2 (Oct. 7, 2003).

    (d)  *The SLC's Review of the Documents*

    The SLC reviewed these documents as well, which include, among other things,

e-mails regarding contract negotiations, various contract status reports, and copies of signed

contracts. Following its review of these documents, the SLC came to the same conclusion that

WLRK and S&C did -- that the documents evidenced possible premature revenue recognition.

The SLC did not find any "smoking gun" documents pointing to misconduct by CA's officers,

such as Mr. Kumar, and found no documents discussing "backdating" or other criminal acts. In

fact, Mr. Kumar's name was noticeably absent from these documents, and his name appeared

primarily on innocuous e-mails in which he approved certain discounts or other contract terms

proposed by sales personnel.

    Instead, the SLC found that the documents, when analyzed together with

(i) information regarding when CA recorded the revenue from certain contracts (which is not in

the documents), and (ii) its prior knowledge about the fraud, implicated numerous lower level

employees, and bore the fingerprints of executives actively involved in revenue recognition

decisions at the quarter end, such as Messrs. Rivard and Silverstein. As a result, and as is

discussed further below, the SLC believes that the Audit Committee took the most effective

---

158  As noted above, the documents that constitute the so-called "23 Boxes" were produced on September 19
   and October 7, 2003.

           Exhibit 10

action that it could given the knowledge that it had -- it promptly requested and received the resignations of Messrs. Rivard and Silverstein, in addition to Mr. Zar, to whom they, and the entire Finance organization, reported.  The next day, as discussed below, it then publicly disclosed the findings of the review, and the employment decisions it had made.  Thus, the information contained in the "23 Boxes" was all publicly-available and known to the plaintiffs and their counsel, who, as discussed below, acknowledged the government investigation, but nonetheless determined to proceed with the settlement at the fairness hearing in early December.[159]

Indeed, the USAO reached a similar conclusion with respect to the contents of the 23 Boxes.  In connection with its motion seeking a stay of discovery, the USAO observed that the "23 boxes . . . rendered <u>no</u> additional evidence of fraud beyond that which [the Wyly Movants] already had."  Government's Reply in Support of Motion to Intervene and Stay Discovery at 7, *In re Computer Assocs. Class Action Sec. Litig.*, 02 Civ. 1226 (TCP) (E.D.N.Y. Nov. 7, 2005) (emphasis in original).  The USAO based this observation on the fact that the "23 boxes' contents were in the public record far in advance of the settlement fairness hearing before this court."  *Id.*  The USAO then went on to compare the words of the Wyly Movants' brief to the words in the CA press release from August 8, 2003 to show that, almost three months before the settlement hearing, the Wyly Movants (and everyone) were in possession of the very information that the Wyly Movants now claim to be "newly discovered."  *Id.* at 7-8. The USAO concluded, therefore, that "the notions that the Wyly Movants were 'ignorant' of the facts proved by the 23 boxes' contents, and that the boxes contents now evidence a 'fraud on the Court,' are simply preposterous."  *Id.* at 8.

---

[159]   Following the October 8 press release, discussed below, no plaintiff requested confirmatory discovery or to see any of the information that the Audit Committee developed in its investigation.

2.    **October-November 2003 – The Results of the Audit Committee Investigation**

After CA's initial productions in response to the April, June, and July Subpoenas, the Audit Committee took a number of steps to understand the scope of the problem evidenced by the documents. *First*, as noted above, the Audit Committee accelerated its on-going investigation by imaging CA employees' computers in order to recover additional documentary evidence relating to the timing of customer signatures and by conducting additional interviews of CA employees.  By November 21, 2003, PwC had imaged the computers and hand-held devices of fifty-five (55) CA employees, including Messrs. Kumar, Zar, and Richards.[160]  This effort produced voluminous amounts of e-mail that was previously thought not to exist. *Second*, during the first week of October, the Audit Committee – along with S&C attorneys and representatives from PwC – interviewed sixteen (16) CA employees, including Messrs. Kumar (for the first time) and Zar.

As the Audit Committee "ratcheted up" its investigation, CA's senior managers met and discussed what their response to the investigation should be.  Sometime in late September or early October 2003, Messrs. Kumar, Richards, Woghin, and Zar met in a conference room at a Manhattan law firm at which time they discussed how to coordinate their response to the Audit Committee investigation.  At the meeting, which purportedly lasted approximately forty-five (45) minutes, the assembled group laid out the explanations they should give to the Audit Committee when questioned about the practice.  According to Mr. Kumar, the group discussed "carefully chosen" words for the executives to use and agreed to

---

160    Ultimately, PwC imaged the computers and personal electronic devices of eighty-nine (89) CA employees.

256

Exhibit 10

rely on documents such as the "McWade Memo"[161] and the idea of an "administrative window." Mr. Woghin recalled this meeting, and that the executives engaged in general conversation about the government investigation, but denied that any specifics as to how to respond to the Audit Committee or the government were discussed.

Accordingly, at their interviews, which occurred on October 3 and 6 respectively, Messrs. Zar and Kumar[162] both denied the existence of the 35-Day Month practice. Mr. Zar gave several excuses in an attempt to explain away documents evidencing the 35-Day Month practice. Mr. Zar told the Audit Committee that CA followed the revenue recognition policies outlined in the McWade Memo. He asserted that some contracts may have been improperly accounted for in fiscal year 2000 because new employees from CA's then-recent acquisition of Platinum Technologies Inc. were unfamiliar with CA's policies or SOP 97-2, and that many of the problems resulted from "minor modifications" to contract paperwork post-signing. However, in the view of the Audit Committee and its counsel, Mr. Zar's answers raised questions and caused the Audit Committee to lose confidence in him. As a result, the Audit Committee determined to seek Mr. Zar's resignation, although the directors did not believe that they had evidence that he had personally engaged in fraud.

In his interview, Mr. Kumar – as he had in the past – denied any involvement in the Company's quarter-end activity and revenue recognition practices. He said that he generally avoided making "relationship calls" to clients late in the quarter, for fear that it would

---

[161] That memo, written by Mr. McWade and dated August 13, 1997, properly states that a "client must sign the license agreement . . . no later than the last date of the month in which revenue is being recognized, and it must be received by the controller no later than the FLASH date corresponding to the month in which revenue is being recognized." Memorandum from Charles McWade to Financial Controllers at 1 (Aug. 13, 1997) (bold and capitalization in original).

[162] Messrs. Schuetze, Ranieri and D'Amato attended the interview of Mr. Kumar, and Mr. Schuetze attended the interview of Mr. Zar.

Exhibit 10

"tip off" the client that CA was desperate for the contract.  Similarly, he told the Audit Committee that he did not supervise or participate in revenue recognition decisions, relying instead on Mr. Zar.  When Mr. Schuetze asked Mr. Kumar directly whether he had been involved in, or had knowledge of, any backdating, Mr. Kumar denied any such involvement or knowledge.  To the Audit Committee and its counsel, Mr. Kumar appeared to be credible.

In contrast, during S&C's interviews of various Sales Accounting and Finance department employees, the Audit Committee learned that mid- and lower-level employees had significant experience with backdating contracts and booking late contract revenue.  The picture of the 35-Day Month that began to emerge from those interviews was that of a widespread, common knowledge practice that was embedded in the way CA did business.

Following the interviews (and a review of the evidence), at an October 7, 2003 CA Board Meeting, Mr. Schuetze reported to the Board that the Audit Committee had determined that CA had prematurely recognized revenue from "a number of software contracts" during fiscal year 2000.  Minutes of a Meeting of the CA Board at 1 (Oct. 7, 2003).  Mr. Schuetze told the Board that while the contracts were "genuine," it was "still [a] serious issue" which might require a restatement for fiscal year 2000.  Notes of Scott Smith at 1 (Oct. 7, 2003).  Mr. Kumar followed Mr. Schuetze's report by telling the Board that he had, pursuant to the Audit Committee's recommendation, sought, and expected to receive, the resignations of Messrs. Zar, Rivard, and Silverstein, all of whom had overseen sales accounting during the relevant period.  Minutes of a Meeting of the CA Board at 1-2 (Oct. 7, 2003).[163]  While the Board expressed dismay at this revelation, the directors also expressed a sense of relief that,

---

163    These were the same three (3) individuals that the USAO had identified to WLRK as "subjects" of the government's investigation in June.

although revenue had been prematurely recognized, the revenue itself was real.[164] Nevertheless, the Board was "very quiet" after Mr. Schuetze spoke. "[T]here were ten seconds when no one knew what to say." As one Board member told the SLC, he was in a "state of shock" over the revelation.

At this point, neither S&C nor WLRK knew of, or presented, evidence of criminality by Messrs. Zar, Rivard, or Silverstein to the Audit Committee or the Board. Rather, the majority of directors interviewed understood that the executives were asked to resign because the accounting improprieties happened "on their watch," and because these individuals did not have credible explanations for what had occurred or for their conduct relating to revenue recognition. According to notes taken at this meeting, the directors asked several questions, including (i) whether the problem was limited to fiscal year 2000, and (ii) whether there were other members of management involved. Mr. Schuetze commented that, as of then, the Audit Committee had not uncovered a "pattern of activity," but that the Audit Committee's investigation was continuing and "they may find more." Notes of Scott Smith at 2 (Oct. 7, 2003).[165]

The next day, on October 8, 2003, the Company issued a press release announcing the preliminary results of the Audit Committee's investigation, and the resignations of Messrs. Zar, Rivard, and Silverstein. *See* Press Release, Computer Assocs. Int'l, Inc., Computer Associates Announces Preliminary Results of Board Inquiry (Oct. 8, 2003). The press release stated that:

---

[164]   Mr. Cron told the SLC that the problem "was terrible," but that he was consoled somewhat by the fact that "it was not what the government said *plus more*; it was just what the government said."

[165]   No CA counsel, inside or outside, raised the issue of the settlement or the releases at this meeting, and the settlement was not discussed.

259

Exhibit 10

> The Audit Committee's investigation is continuing, but we have determined that CA recognized certain revenue prematurely in the fiscal year ending March 31, 2000. The committee found that a number of software contracts in that fiscal year appear to have been signed after the end of the quarter in which revenues associated with such contracts had been recognized. Those revenues should have been recognized in the quarter in which the contract was signed.

*Id.* The press release stated further that the Audit Committee "found no evidence that the revenues and cash flows associated with these contracts were not genuine." *Id.* As noted above, the SLC found that this press release accurately conveyed what the documents that had been collected demonstrated. The press release also reported that Mr. Kumar had asked for, and received, the resignations of "those who oversaw sales accounting during the relevant time," Messrs. Zar, Rivard, and Silverstein. *Id.*

The night before the press release was issued, Mr. Nachman, at the request of Mr. Woghin, called Richard Schiffrin, co-lead counsel for the plaintiffs in the Class Actions, to advise him of the impending release, and what the Audit Committee had uncovered, in an attempt to determine whether it would upset the settlement. Mr. Schiffrin told Mr. Nachman that the plaintiffs would proceed with the settlement notwithstanding what the Audit Committee had discovered and announced. Mr. Nachman did not report any of those discussions to the Board. Plaintiffs had until November 11, 2003 to opt out of the settlement, and on December 5, 2003, a fairness hearing was held in front of Judge Platt. As is discussed further below, plaintiffs took no steps to upset the settlement, but instead continued to advocate for it.

(a)     *The October 14 Meeting with the Government*

On October 14, Messrs. Giuffra, Urowsky, Savarese, and Schuetze met with the government, in their first meeting since the October 8 announcement. Mr. Giuffra's talking points reflect that he expressed to the government that the Audit Committee, S&C, and WLRK

had been working hard to cooperate in the government's investigation. Mr. Giuffra noted that he had spoken with Mr. Schuetze "almost daily," particularly in the previous three (3) weeks. He explained that, with the help of PwC, the Audit Committee and its counsel had reviewed more than three hundred (300) contracts, mostly from fiscal year 2000, and identified twenty-six (26) contracts that appeared to have been recognized in the wrong quarter. Mr. Giuffra provided the government with four volumes of contract chronologies, which included documents related to these twenty-six (26) contracts. *See* October 14, 2003 [Oral] Preliminary Report of the Audit Committee of CA on Certain Revenue Recognition Questions in the Fiscal Year Ended March 31, 2000, Volumes I-IV. In addition, Mr. Savarese reported to the government that the recent productions of documents were made to the government promptly after CA discovered them.

At the same time, Mr. Giuffra also "stress[ed]" that the Audit Committee's conclusions were still "preliminary" and that the Audit Committee was "not yet in [a] position to draw conclusion[s] as to how or why this happened." Giuffra Talking Points at 1, 7 (Oct. 14, 2003). He noted that while the Audit Committee had "determined that it had 'lost confidence'" in Messrs. Zar, Rivard, and Silverstein as a result of a combination of four factors:

> (1) the number of contracts appearing to have late customer signatures in F[iscal] Y[ear] 2000; (2) the lack of controls over decisions made by lower level sales accounting personnel relating to the period when contracts were booked; (3) the handling of post-quarter-end modifications to contracts w[ithout] establishment of clear, bright line rules; and (4) the need to maintain adequate documentation.

*Id.* at 3. Mr. Giuffra reported that the Audit Committee had not yet developed evidence that any of the three (3) were involved in intentional wrongdoing. Indeed, the Audit Committee had

not determined that Messrs. Zar, Rivard,[166] and Silverstein "knew or should have known [that] contracts were signed by customers after q[uarter]-end," much less that any of the three had "violated securities laws . . . [or] knowingly violated GAAP." *Id.* at 10.

At this point in the fall of 2003, the scope of the fraud itself was also still unclear. As is indicated in a highlighted portion of Mr. Giuffra's talking points, at the time of the October 14 meeting, a "majority of contracts w[ith] customer signature issues appear[ed] to be in [the second quarter of fiscal year 2000, dated] September 30, 1999." *Id.* at 6 (emphasis in original). This evidence led the Audit Committee to consider (and to suggest to the government) a "possible explanation" that these contracts were incorrectly accounted for because of the "large Platinum acquisition" that had occurred several months earlier. *Id.*[167] Likewise, there was at least some evidence supporting Mr. Zar's rationale of allowing "minor modifications" to contracts that required only "ministerial changes" after the quarter close, although Mr. Giuffra recognized that "CA did not document [the] 'minor modification' process," casting doubt on the validity of the practice. *Id.* at 7.

In addition, Mr. Giuffra discussed two (2) memoranda regarding contract revenue recognition at CA distributed to CA employees in the late 1990s, the McWade Memo, which Mr. Giuffra used as an example of CA "policy," and a memo by Mr. Silverstein. In contrast to the McWade Memo, the Silverstein Memo, dated October 15, 1998, could be seen as counseling backdating. It stated that:

> [t]he effective date, signature dates and initial payment dates must
> all be in the month the business is to be recognized. If an error is
> made (i.e., the client dates his signature October 1, 1998 when the

---

[166]   Mr. Rivard declined to be interviewed by the Audit Committee.

[167]   The acquisition of Platinum caused "additional pressures on [the] CA Sales Accounting staff," because "a substantial number of Platinum employees did not remain for a transition period." *Id.*

transaction is effective September 30, 1998), clean paperwork must be executed to correct this error. Cross outs and white out are not acceptable.

Memorandum from Lloyd Silverstein to CA Sales Employees at 2 (Oct. 15, 1998). Although Mr. Giuffra noted that the Silverstein memo "raises questions," he also explained that the Audit Committee was not able to question Mr. Silverstein after his resignation and thus could not obtain information regarding what Mr. Silverstein intended to convey. Giuffra Talking Points at 9 (Oct. 14, 2003).

Finally, Mr. Giuffra emphasized that there was "no evidence to suggest that revenues and cash flows associated with those contracts were not genuine." *Id.* at 3. According to Mr. Giuffra, this was part of an effort to lay the groundwork for a settlement and to distinguish the 35-Day Month practice from the frauds that had recently occurred at Enron and WorldCom.

        (b)    *The October 20 Board Dinner*

The evening before an October 21, 2003 Board meeting, the Board held a dinner, which several members of CA's senior management, including Stephen Richards, attended. According to Mr. Richards, he spoke with Mr. Kumar prior to the dinner and asked him to arrange an opportunity for him to speak with director Ranieri about his upcoming SEC testimony, and that Mr. Kumar did so. At the dinner, Mr. Richards recalls that he spoke privately with Mr. Ranieri and asserts that he told him that (i) he felt "uncomfortable" testifying before the SEC, and (ii) based on his counsel's advice, he was considering asserting his Fifth Amendment rights at the deposition. According to Messrs. Richards and Kumar (who joined the second half of the conversation) Mr. Ranieri told him that if Mr. Richards did not testify he would have to leave CA and that he, Mr. Ranieri, could not "protect" Mr. Richards if he was

263

        Exhibit 10

"outside the Company." According to Mr. Richards, Mr. Ranieri told him that the Company would continue to fight the government's allegations, and that CA would prevail in the end.

Mr. Ranieri did not specifically recall this conversation; however, Mr. Ranieri told the SLC that his "script" for such conversations was to tell CA employees that they should talk to the government and tell the truth. Mr. Ranieri told the SLC that he would assure such employees that if they cooperated with the government and had not done anything wrong, then the Company would support them and would not "leave them out to dry." With respect to the individuals who asserted their Fifth Amendment rights with the government and would not cooperate with the Audit Committee, the Audit Committee's position was that they had to leave the Company. Mr. Ranieri explained to the SLC that the Audit Committee's policy was enforced without exception. While Mr. Ranieri did not specifically recall his response to Mr. Richards, he believed that any conversation with Mr. Richards was consistent with other conversations he had with CA employees concerning the need to testify and cooperate.

While the record is unclear as to exactly what was said during this particular conversation, it appears that Mr. Richards conveyed to Mr. Ranieri that he felt uncomfortable testifying in front of the SEC. Under these circumstances, while the SLC does not believe that Mr. Richards' statements to Mr. Ranieri constituted a "red flag," it analyzed these statements as such for purposes of its investigation. The relevant facts are as follows: on the next day, October 21, the Audit Committee's counsel advised the Board that it intended to interview Mr. Richards. On October 22, 2003, S&C interviewed Mr. Richards in order to ascertain what, if anything, Mr. Richards knew about the 35-Day Month practice at CA. During his interview, Mr. Richards stated, among other things, that he understood CA's revenue recognition policy to require that customers sign contracts in the quarter in which the contract was booked. Mr.

Exhibit 10

Richards said that he had no reason to believe that CA improperly recognized revenue during fiscal years 1999 and 2000, and that he was not aware of any effort at CA to inflate revenue through backdating contracts. While it is now obvious that Mr. Richards was not telling the truth, the Audit Committee then had no facts to lead them to conclude that Mr. Richards was untruthful. Further, the next day, October 23, as discussed below, Mr. Richards testified before the SEC and did not assert his Fifth Amendment rights. Thus, the Audit Committee had no factual basis to believe that he testified falsely, and even if the earlier discussion with Mr. Ranieri was a red flag, he, and the other members of the Audit Committee, satisfied their duties to investigate.

(c)    *The October 21, 2003 Board Meeting*

The Board, like the government, also questioned why the evidence of the 35-Day Month practice found in the documents had not been discovered earlier. In advance of an October 21 Board meeting, Mr. Woghin raised the issue with Mr. Savarese, who stated the question and answer as:

> why we didn't locate the "bad" email and fax traffic documents earlier. Simple answer is that they turned up in the course of collecting [documents] in response to the July 17, 2003 S.E.C. subpoena, and that we have brought these "bad" [documents] to the government's attention promptly after discovering them ourselves. There may well be more to this but I think that is a fair, preliminary answer.

E-mail from John Savarese to Steven Woghin (Oct. 14, 2003). Mr. Savarese also conveyed this view to the Board at the October 21 Board meeting. Mr. Savarese informed the Board that the documents were "produced in mid-September 2003 in response to an SEC request in mid-July 2003." Savarese Talking Points at 2 (Oct. 21, 2003).

According to his talking points, Mr. Savarese informed the Board further that possible elements of a resolution with the government could include, among other things, a

265

deferred prosecution agreement, an SEC consent decree, "disgorgement" by the CEO and CFO under Sarbanes-Oxley § 304, and "civil lawsuits."

The Board also received an update on the Audit Committee investigation. According to Mr. Giuffra's talking points, he updated the Board regarding: (i) the interviews conducted and documents reviewed by the Audit Committee; (ii) the Audit Committee's meeting with the SEC and USAO on October 14; and (iii) the next steps in the investigation. Mr. Giuffra reported that the Audit Committee had identified twenty-six (26) contracts to the government that appeared to have been signed after the end of a fiscal quarter, but were recognized in the prior quarter. Mr. Giuffra also stated that there were likely a "large number" of additional contracts signed after the quarter end.[168] The Audit Committee reported that its immediate focus was to determine the impact of the fraud on CA's prior financial statements, and whether CA needed to issue a restatement, and then to determine who was responsible.

With respect to document production, Mr. Giuffra told the Board that the government "wanted to know about production of doc[uments] and subpoena compliance," but that Mr. Savarese had provided the government with a "factual report" that "did [an] effective job" of explaining that the Company had complied with all of the SEC's subpoenas. Giuffra Talking Points at 6 (Oct. 21, 2003); Notes of Scott Smith at 5 (Oct. 21, 2003). Counsel did not raise the issue of the settlement and the releases at this meeting and the Board did not discuss it.

The independent directors met separately after the October 21 Board meeting, with Mr. Schuetze reporting on the Audit Committee investigation. Mr. Schuetze told the other

---

[168]   Mr. Giuffra stressed in his talking points that he did not "want to suggest that all contracts w[ith] typed-in quarter-end date[s] were signed after quarter-end," and explained that the review had "confirmed extensive use of typed-in quarter end dates," but that "on some occasions," the evidence indicated that "sales representatives would go back to customers and obtain contracts w[ith] signatures as of quarter-end." *See* Giuffra Talking Points at 2-3 (Oct. 21, 2003).

266
Exhibit 10

directors that he had informed the government about the Audit Committee's preliminary findings, the resignations of the three (3) CA executives, and that a restatement was a real possibility. The directors discussed how a restatement might affect senior management bonuses, as notes from the meeting indicate: "only year end effects it, SOX 304 to be considered, other board action for management generally." Notes of Scott Smith from Independent Director Meeting at 2 (Oct. 21, 2003). Mr. Fernandes (who joined the Board in May 2003) raised the question of how it could be that the Board did not know about the revenue recognition issues earlier, given the involvement of WLRK since February 2002. *Id.* Mr. Schuetze responded that the Board and WLRK had consistently been assured by management that CA had properly accounted for contract revenue, and the problem had not been found until they collected documents in response to the July 2003 subpoena, and analyzed them in September 2003. *See id.*[169]

(d)   *Mr. Kumar's Compensation Review*

On October 10, 2003, The New York Times published an article by Floyd Norris entitled, "His Bonus was Based on Inflated Profits: Will He Give it Back?" The article questioned whether Mr. Kumar should return the incentive-based compensation that he received during the time CA had improperly recognized revenue. *See* Floyd Norris, *His Bonus was*

---

[169]   The Company and its counsel were contemplating the civil settlement in late October. At the time, CA developed public relations materials to be used upon the approval of the settlement. On October 21, 2003, the same day that the Board met, WLRK provided comments to Mr. Woghin on a "Q&A" regarding the settlement. Warren Stern, a WLRK partner assisting Mr. Savarese, wrote:

> You should anticipate a question as to whether the settlement, if approved, would preclude claims against directors and officers arising from the matters under investigation by the A[udit] C[ommittee] and the government. Answer, "we are not prepared to speculate as to all of the effects of the settlement on claims that have not been asserted, but it could."

E-mail from Warren Stern to Steven Woghin (Oct. 21, 2003). There is no indication that the Board reviewed this e-mail or the Q&A, or that anyone raised the issue of the impact of the releases to the Board at this time.

267

Exhibit 10

*Based on Inflated Profits: Will He Give it Back?*, N.Y. Times, October 10, 2003, at C1.  That day, Mr. Schuetze requested, by e-mail, that Mr. Kumar provide the Audit Committee with a detailed analysis of his compensation for fiscal years 1999 through 2002.  E-mail from Sanjay Kumar to Walter Schuetze (Oct. 10, 2003).  Mr. Kumar provided the Audit Committee with the proxy statements for each year at issue, and retained Towers Perrin, an employee-benefits consultant, (i) to provide an additional analysis of his compensation under CA's 1994 Annual Incentive Compensation Plan, and (ii) to explain the possible effects inter-quarter movements of revenue might have had on his compensation under that plan.  *See* Report by Towers Perrin at 1 (Oct. 17, 2003).

At the October 21 CA Board Meeting, Mr. Kumar "presented an analysis, requested by Mr. Schuetze, concerning the incentive compensation paid to" him in fiscal years 1999 and 2000.  *See* Minutes of a Meeting of the CA Board at 4 (Oct. 21, 2003).  The Towers Perrin report concluded that inter-quarter movement of revenue likely did not have an impact on Mr. Kumar's compensation under CA's 1994 Compensation Plan.  Report by Towers Perrin (Oct. 17, 2003).  The report reasoned that, because "the Compensation Committee exercised its discretion to reduce the plan awards by forty-six percent (46%) in FY99 and twenty-five percent (25%) in FY00," the issue was almost a "moot point." *Id.*  "[R]evenues would had to have been $741.9 million lower in FY00 before Mr. Kumar's calculated award would have been lower than his actual award." *Id.*

(e)     *The Continuation of the Audit Committee's Investigation*

At the same time, the Audit Committee's investigation continued, as it conducted eleven (11) new interviews in the last twelve (12) days of October, including an interview with Mr. Richards the evening before his SEC testimony, as noted above.  While

Exhibit 10

acknowledging that he did not give S&C the "full picture," Mr. Richards believes he answered S&C's questions literally and truthfully.

On October 23, 2003 Mr. Richards testified in front of the SEC and perjured himself in three (3) material ways. First, Mr. Richards denied knowing that revenue from contracts finalized after the close of a quarter was improperly recognized in the prior quarter, and stated that he assumed CA's Finance and Sales departments would ensure compliance with revenue recognition requirements. *See* Kumar/Richards Superseding Indictment ¶ 70. Although he admitted to pressuring Sales managers to finalize license agreements after the ends of quarters, he claimed that he did so only because these sales managers had not reached their sales quotas, and not so as to allow revenue from these contracts to be recognized in the prior quarters. *Id.* ¶ 69. As discussed above, these statements were unquestionably false, as Mr. Richards subsequently admitted to knowingly participating in the 35-Day Month practice. *See* Kumar/Richards Plea at 79-80. Second, when he was asked to explain the use of pre-printed signature dates on contracts, Mr. Richards asserted that the practice was "[f]rankly, a very, very subtle sales tool," used to "remind" a client of its "commitment to complete a transaction in a certain time frame." *See* Kumar/Richards Superseding Indictment ¶ 89. In truth, as discussed above, the practice was used to allow late-arriving contract revenue to be booked in the prior quarter, and Mr. Richards admitted this in his guilty plea. Third, Mr. Richards told the SEC that he was never involved in discussions with anyone at CA, including Mr. Kumar, regarding whether CA was going to be able to reach Wall Street's estimates, and that in fact, he was unaware of CA's performance until such information was made public in a press release. *See id.* Again, as discussed above, this was also false; Messrs. Wang, Kumar, Richards, and Zar often met at the end of a quarter to discuss CA's prospects for meeting Wall Street's estimates

269

and how many backdated contracts would be needed to do so.  *See* Kumar/Richards Plea at 80-82.

(f)   *The November Meetings with the Government*

On November 3, 2003, S&C met with the government to present an update on the Audit Committee's investigation.  S&C provided additional documentary evidence of backdated contracts to the government, and discussed the continuing nature of the investigation.  With respect to Mr. Kumar, S&C reported to the government that the Audit Committee was interested to know if the government was aware of any evidence of wrongdoing by Mr. Kumar, and stated that it stood ready to meet with the government with or without counsel to receive such evidence.  The government declined this request for information.

S&C met with the government again on November 24, 2003.  Mr. Giuffra (i) told the government that the Audit Committee was working with PwC to determine the necessity and/or size of any required restatement of CA's financials (and whether to restate for both backdated contracts and untimely or non-existent CA countersignatures), and (ii) discussed the status of two (2) CA employees: Messrs. Kumar and McElroy.  S&C told the government that the Audit Committee had no information implicating Mr. Kumar in any wrongdoing, and repeated his statements that either Messrs. Schuetze or Ranieri would like to meet with the government, with or without counsel, to hear the government's evidence against Mr. Kumar.  However, the government declined to have such a meeting.  Indeed, despite this (and other) requests, at no point did the government ever share its evidence against Mr. Kumar with the Audit Committee.  With respect to Mr. McElroy, Mr. Giuffra added that the Audit Committee appreciated the government's decision to inform it that Mr. McElroy had asserted his Fifth Amendment rights, and had scheduled a second interview with him based on this information.

270

G.     *December 2003 – The Settlement is Finalized*

The Board met again on December 3, 2003.  At that time, WLRK reported to the Board that: (i) David Kaplan and Gayle Kemper had been terminated from CA because they refused to be interviewed by the Audit Committee; (ii) Mr. McElroy had asserted his Fifth Amendment rights during an interview with the SEC; (iii) the Audit Committee was still not aware of any evidence implicating Mr. Kumar; (iv) the Audit Committee was now investigating charges of obstruction; and (v) the government wanted to interview Mr. Woghin.

With respect to Mr. Kumar, Mr. Savarese reported to the Board that he was not aware of any evidence linking Mr. Kumar to the 35-Day Month practice.  Mr. Giuffra also reported that he had explained to the government that the Audit Committee had no evidence of Mr. Kumar's involvement, and that he had asked the government to share any evidence that the government had.  Mr. Giuffra told the Board that the government did not respond to this request, but also "did not say, for example, [the Audit Committee] should look harder for evidence of wrongdoing."  Giuffra Talking Points at 4 (Dec. 3, 2003).  Mr. Giuffra also told the Board that the Audit Committee would "look into" the questions the government had "raised . . . about CA doc[ument] production, including regarding e-mail production," but pointed out that "WLRK ha[d] provided good explanations" for why the documents were not produced earlier. *Id.* at 7; *see* Notes of Scott Smith at 2 (Dec. 3, 2003).

On December 5, 2003, a fairness hearing was held regarding the settlement,[170] at which Melvyn Weiss, lead counsel for the plaintiffs in the Class Actions stated:

> As we are all aware, *there is a criminal investigation that is ongoing, and I just wanted the Court to understand, as we have*

---

[170]     November 10, 2003 was the deadline for shareholders to opt out, and November 18, 2003 was the deadline to file written objections.  There were 644,000 notices sent to class members, with less than 500 opt-outs and two objections, which were ultimately withdrawn. *Id.*

271

Exhibit 10

> *stated in our papers, that we've took all of that into account in coming to the conclusions we did as to what would be a fair, reasonable and adequate settlement for the class members.*

Transcript of Record at 3, *In re Computer Assocs. Class Action Sec. Litig.*, No. 98 Civ. 4839 (TCP) (E.D.N.Y. Dec. 5, 2003) (emphasis added).

Mr. Nachman appeared on behalf of the Company in the Class Actions and stated:

> I think it . . . bears repeating, this settlement does not resolve or affect any potential regulatory criminal or other action that may arise from the previously announced investigations by the SEC and Department of Justice into the company's past financial statements and accounting practices. . . . I wanted to add in connection with this settlement, as the Court knows, no assurances have been provided concerning the possible outcomes of the SEC and Justice Department investigations, nor have any assurances been provided that the audit committee will not recommend additional actions beyond the ones already taken.

*Id.* at 20-21.[171]

Further, with regard to the Board's approval of the settlement, Mr. Nachman stated:

> the non-defendant directors currently on the board of CA who had to consider the settlement and particularly the settlement of the derivative suit were in turn advised by yet another independent counsel in connection with their deliberations . . . so that one of the things especially in this day and age that we all wanted to ensure, and I think all parties were sensitive to, is that the entry into the settlements was not only appropriate on the substance in terms of amounts and so on, but the process by which we got here was appropriate, transparent and a proper one, and I think we're all very comfortable with that and feel that that's been done.

---

[171]    Mr. Weiss also acknowledged the government investigation in his declaration, filed on December 1, 2003 supporting the final approval of the class action settlement: "In February 2002, the SEC and Department of Justice announced separate investigations of CA and its accounting practices. The government is still pursuing these investigations and has not provided information or assistance to plaintiffs." *In re Computer Assocs. Class Action Sec. Litig.*, No. 98-CV-4839 (TCP), *In re Computer Assocs. 2002 Class Action Sec. Litig.*, No. 02-CV-1226 (TCP) at 37, n. 9.

*Id.* at 23. Mr. Woghin attended the hearing as counsel to the Company in the 2003 Derivative Action, but did not make any statements on the record. The Court issued orders approving the settlement on December 8, 2003, and entered those Orders on December 10 and 11. Order and Final Judgment With Respect to CA Defendants, *In re Computer Assocs. Class Action Sec. Litig.*, No. 98 Civ. 4839 (TCP) (E.D.N.Y. Dec. 8, 2003); Order and Final Judgment With Respect to CA Defendants, *Federman v. Artzt*, No. 03 Civ. 4199 (TCP) (E.D.N.Y. Dec. 8, 2003).

Following the approval of the settlement, during the late December 2003 and January 2004 timeframe, as discussed at the December 3, 2003 Board meeting, the Audit Committee took additional steps to investigate the obstruction of the government investigation. The Audit Committee conducted more than fifteen (15) additional interviews in which, among other things, it questioned CA employees about the Company's response to the government investigation. Specifically, the Audit Committee asked detailed questions about (i) CA's document collection and review processes, and whether CA employees had destroyed or altered documents in order to conceal the 35-Day Month practice from the government; (ii) the interviews previously conducted by WLRK, and whether CA employees had deliberately misled WLRK; and (iii) whether CA employees discussed the government investigation and the interviews conducted by WLRK and S&C with CA senior managers.

H.   *2004 – The Guilty Pleas*

*January-February.* Throughout 2003, the Board had not been provided with any evidence directly implicating the Company's most senior executives in revenue recognition fraud. However, that changed beginning with Lloyd Silverstein's guilty plea on January 22, 2004. Mr. Silverstein pled guilty to one count of obstruction of justice, and told the Court during his allocution that he participated in the 35-Day Month practice and then covered it up.

273

Exhibit 10

*See* Silverstein Plea Tr. at 20. Mr. Silverstein admitted that, in 2002, he "was told by a CA

executive" – Mr. Kaplan – "not to discuss the Company's end-of-quarter practice with the

outside lawyers. When I met with the outside lawyers, I did not do so." *Id.*. Mr. Silverstein

also told the Court that, when he was asked to speak to the government directly, "[s]everal CA

executives" – later identified to the SLC as Messrs. Zar and Woghin – told him "not to disclose

the practice. When I was interviewed by the government in September, 2002, I did not do so."

Silverstein Plea Tr. at 20.

After Mr. Silverstein pled guilty, the Board again considered whether Mr.

Kumar had been involved in the 35-Day Month practice or the cover up. One week earlier, on

January 14, 2004, the Audit Committee interviewed Mr. Kumar, and, during that interview, Mr.

Kumar again denied all knowledge of the 35-Day Month practice. On the day of Mr.

Silverstein's guilty plea, the Audit Committee conducted a telephonic interview of Mr. Kumar,

who explained that he had little contact with Mr. Silverstein, and had no knowledge of the

conspiracy to obstruct justice. When the Audit Committee relayed Mr. Kumar's account to the

government during a January 28, 2004 meeting, the government responded by stating that the

Audit Committee should continue looking for evidence against Mr. Kumar. The government

also told Mr. Schuetze that he had his "head in the sand" with regard to Mr. Kumar, and that the

government would not settle with the Company while Mr. Kumar remained CEO, but

nonetheless continued to refuse to share any evidence that it might have had that implicated Mr.

Kumar in the 35-Day Month practice. Mr. Giuffra then presented to the government the

evidence that the Audit Committee had uncovered concerning the widespread wrongdoing at

CA, and the involvement of many of its employees.

Later that day, the Board met without counsel in a meeting called by Mr. Kumar. At this meeting, Mr. Fernandes engaged Mr. Kumar in a "one-on-one . . . interrogation," while the rest of the Board observed. After the session, Mr. Fernandes was convinced that Mr. Kumar should leave the Company. However, a majority of the Board disagreed, as even Mr. Fernandes felt that, at this time, there was no "smoking gun" that implicated Mr. Kumar in wrongdoing. Mr. Kumar told the SLC that he also met privately with Mr. Fernandes around this time in Mr. Fernandes' office in Dallas, Texas. At this meeting, Mr. Kumar tried to convince Mr. Fernandes that (i) he did not implement the new business model to conceal the fraud, (ii) the fraud was allowed to occur because CA's controls were weak, not because he condoned or participated in it, and (iii) once CA's revenue numbers were "put back" in the proper quarters and calculated with the reserves, the effect of the fraud on the Company's numbers would be immaterial.

On February 1, 2004, "Super Bowl Sunday," the Board met at CA headquarters for eight (8) hours to consider the evidence of Mr. Kumar's knowledge of, and involvement in, the 35-Day Month practice and the obstruction of justice. First, Walter Schuetze provided the Board with an update on the status of the Audit Committee's investigation, including the work being done to determine whether CA needed to issue a restatement. Second, Mr. Schuetze reported that, with respect to Mr. Kumar, the Audit Committee had interviewed him three (3) times and found that he had credible answers as to why he did not know about the 35-Day Month practice. Third, Mr. Schuetze related the "head in the sand" comment made to him at the January 28 meeting with the government, and stated that the government continued to decline to provide him with any evidence of wrongdoing by Mr. Kumar. Finally, Mr. Schuetze

Exhibit 10

reported that the government took the position that it would not settle with the Company until Mr. Kumar was removed from the CEO position.

The Board then heard a twenty to thirty-minute presentation from Messrs. Giuffra and Savarese, who made the government's case against Mr. Kumar. According to WLRK, much of the evidence presented by counsel – which related to several contracts in which Mr. Kumar played a role that were ultimately found to have been backdated, and other comments reportedly made by Mr. Kumar about "needing" more contracts to close in the early days of a quarter – was discovered by the Audit Committee in the days between the January 20 and February 1 Board meetings. Messrs. Giuffra and Savarese also raised several mitigating factors including that (i) there was no direct evidence linking Mr. Kumar to the fraud, (ii) Mr. Kumar's e-mails generally indicated that he was cooperative during the government investigation, (iii) Mr. Kumar took several steps to implement the gold standard of corporate governance at CA, and (iv) one of the primary sales executives who had implicated Mr. Kumar was terminated by CA and had "an axe to grind."

After the presentations, the lawyers from WLRK and S&C left the room and Mr. Kumar answered questions from several different directors, including Messrs. D'Amato, Cron, Lorsch, Fernandes, and Schuetze. The Board questioned Mr. Kumar as to how he could have been the "hands on" COO, and then CEO, he was reported to have been and not have known about the 35-Day Month practice. Mr. Kumar responded that (i) he had only worked in research and development before becoming COO, and had no experience in sales or finance, and (ii) he was told directly by Messrs. Wang and Schwartz that contracts signed after the quarter end were reserved for, and that he did not know that the reserve had ended until May 2003. The directors then asked several pointed questions of Mr. Kumar, including, among

276

Exhibit 10

others, (i) "were you ever aware of backdating contracts," (ii) "did you direct anyone to book [a contract] one way or another," and (iii) "who will come forward and say that Sanjay Kumar did direct [the practice]." Notes of Scott Smith at 15-20 (Feb. 1, 2004). Mr. Kumar maintained that he did not participate in, or have knowledge of, the 35-Day Month practice.

Following the directors' questioning, the lawyers from WLRK and S&C rejoined the meeting. The directors asked further questions of the lawyers regarding both the evidence against Mr. Kumar and their fiduciary duties as directors. After extended debate, the Board took no action against Mr. Kumar, pointing to the facts that: (i) there was no evidence directly pointing to Mr. Kumar; (ii) Mr. Kumar was a valuable asset to the Company, (iii) Mr. Kumar had been responsible for the new business model and other positive corporate governance actions, and (iv) it was "inconceivable" to some that he had taken part in any wrongdoing. Moreover, none of the senior executives who had left the Company, such as Mr. Zar, had pointed a finger at Mr. Kumar, which the Board viewed as supporting Mr. Kumar's position.

The Audit Committee investigation continued throughout February, with counsel interviewing fourteen (14) additional CA executives and employees, including Charles Wang, who denied any knowledge of the 35-Day Month practice and indicated that Mr. Kumar ran the business side of CA.

*March-June.* On March 10, 2004, Mr. Kumar met with Mr. Schuetze in San Antonio, Texas. According to Mr. Kumar, Mr. Schuetze asked him directly about the 35-Day Month practice. Mr. Kumar said that he explained to Mr. Schuetze why, in his view, the 35-Day Month practice was "not a problem." Mr. Kumar said that, during the discussion with Mr. Schuetze, he "minimized the number of late deals" that had been completed by CA. Mr. Kumar

told Mr. Schuetze that if he were to recalculate CA's numbers properly, taking into account CA's reserves, it would show that the impact of the practice was not material. At no time did Mr. Kumar disclose his knowledge of or participation in the 35-Day Month practice.

At a March 12, 2004 CA Board meeting, the Board discussed succession planning for CA's senior management, including the CEO, CFO, COO, General Counsel, and Chief Compliance Officer positions. During the executive session, CA's independent directors again discussed the evidence that had been presented to them at the February 1 meeting, and debated the best course of action to take with respect to Mr. Kumar. The directors discussed the difficulty the Company would have putting a new management team in place without Mr. Kumar's assistance, and determined that the Company must act quickly to fill vacant positions.

As a cooperating witness, Mr. Silverstein's guilty plea precipitated further guilty pleas by senior CA executives. As described above, on April 8, 2004, Messrs. Kaplan, Rivard, and Zar all pled guilty to charges relating to their involvement in the 35-Day Month practice, and the resulting obstruction of justice. That same day, Mr. Woghin, whose name was disclosed in public documents related to Mr. Zar's criminal proceeding, was fired at the direction of the Audit Committee.

At the same time, documentary evidence was discovered which began to directly implicate Mr. Kumar in the 35-Day Month practice. The Audit Committee recovered a laptop computer used by a former CA Sales executive that contained multiple post-quarter-close congratulatory e-mails from Mr. Kumar regarding deals finalized shortly after the quarter close. For example, on April 6, 2000, several days after the quarter close, the Sales executive sent an e-mail to Messrs. Kumar and Richards stating that he was having trouble closing a deal and stating:

Exhibit 10

> If we could get someone to ask [the customer] to "do us a favor" and sign the contract, leaving the date block blank (they technically can't backdate the signature block, even though the contract says an effective date of 3/31/00 . . . the new company wasn't technically formed until 4/1/00). I'll take care of fixing any mistakes that [the customer] inadvertently leave[s] off the fax contract.

E-mail from CA Sales executive to Stephen Richards and Sanjay Kumar (Apr. 6, 2000). The Sales executive then sent an e-mail the next day to Messrs. Kumar and Richards saying that "[t]he Eagle has landed . . . $11.9M GAAP . . . $19.7M lifecycle . . . contract addendum and P.O. . . . I'm taking my kids shopping tomorrow – on you!" E-mail from CA Sales Executive to Stephen Richards and Sanjay Kumar (Apr. 7, 2000). Mr. Kumar responded that "[s]hopping is on me." E-mail from Sanjay Kumar to CA Sales Executive and Stephen Richards (Apr. 8, 2000). In an April 6, 2004 interview with the Audit Committee, Mr. Kumar once again reaffirmed his prior false statements that he had no knowledge of the 35-Day Month practice, and added that he had believed that the late executed contract reserve prevented any premature recognition of revenue.[172]

On April 14, 2004, Mr. Schuetze, along with S&C, again met with the government. At this meeting, Mr. Schuetze informed the government that CA was prepared to restate its financial statements for fiscal year 2000 and the first two quarters of fiscal year 2001. Mr. Schuetze described for the government the work that went into preparing the restatement, and the involvement of counsel, PwC, and KPMG in those efforts. Mr. Schuetze also told the government that the Company was in the process of determining what additional personnel decisions needed to be made.

---

[172]   On April 16, 2004, at Mr. Schuetze's request, Mr. Giuffra circulated these e-mails and S&C's summary of Mr. Kumar's interview to the entire Board.

279

Exhibit 10

In mid-April 2004, approximately one week before an April 20 Board meeting, Mr. Kumar again met with Mr. Schuetze, this time in New York, in order to make a pitch on his own behalf. According to Mr. Kumar, he met with Mr. Schuetze because he knew Mr. Schuetze's support was critical to his continued employment at CA and he had heard that Mr. Schuetze had begun to advocate for Mr. Kumar to leave the Company. At this meeting, Mr. Kumar again lied to Mr. Schuetze by denying all involvement in the 35-Day Month Practice.

On April 20, the Board met again to discuss Mr. Kumar. At this meeting, S&C gave an extensive presentation regarding the evidence that had been compiled against Mr. Kumar. *First*, Mr. Zar's criminal information and guilty plea was reviewed with the Board, and the Board was told that the individual referred to as "Executive One" in the Information had been identified as Mr. Kumar, and that "Executive One" was described as having directed and participated in the 35-Day Month practice. The Board was told that, based on Mr. Zar's plea, the government's case against Mr. Kumar was "no longer circumstantial," and that the USAO had used the terms "Executive One" and "Executive Two" intentionally in order to assist the Board with making personnel decisions.

*Second*, the Board reviewed the e-mails, described above, that explicitly referenced backdating and a backdated deal. The Board was told that the AUSA leading the investigation had said that he "could not imagine a stronger smoking gun," than these e-mails. In his defense, Mr. Kumar told the Board, as he had told the Audit Committee in his April 6 interview, that he did not recall receiving the e-mails, and that it was likely he never read them.

*Third*, the Board reviewed the evidence regarding Mr. Kumar's involvement with the $180 million undated EDS license agreement finalized in January 2000, which was recognized in the December 1999 quarter.

*Fourth*, the Board heard a presentation on the legal obligations of directors with respect to selecting a CEO, reviewed the steps the Audit Committee had taken to date and the results of its investigation, and heard the pros and cons of keeping or removing Mr. Kumar from his position.

Mr. Kumar's counsel then gave a presentation on behalf of Mr. Kumar.  Mr. Kumar's counsel: (i) reiterated Mr. Kumar's position that he believed that a reserve was in place to account for late signed contracts; (ii) pointed out that there was nothing in the criminal informations filed against Messrs. Kaplan and Rivard implicating Mr. Kumar, leaving Mr. Zar as the only witness against Mr. Kumar (discussed below); (iii) presented defenses for the e-mails described above that explicitly referenced backdating and a backdated deal; and (iv) concluded that the government does not have enough evidence to make a criminal case against Mr. Kumar.

By this time, certain members of the Board, including Messrs. Schuetze and Lorsch had become "fed up" with Mr. Kumar, joining Mr. Fernandes in believing that Mr. Kumar had to be removed as CEO.  Mr. D'Amato felt that the Board no longer had the "luxury of more time" to obtain definitive proof and had to act on the facts before it.  Yet, certain members of the Board, particularly Alex Vieux, vehemently maintained that it was in the shareholders' best interest to have Mr. Kumar lead the Company unless and until there was more solid proof that Mr. Kumar was involved in the improprieties and a highly qualified executive was immediately available to replace him.[173]

---

[173]    Mr. Vieux told the SLC that CA had a two-day business meeting in Washington D.C. sometime in March 2004, during which Mr. D'Amato met with Mr. Vieux and told him that the Board wanted to oust Mr. Kumar.  Mr. Vieux said that the Board still needed Mr. Kumar to run the Company, and that to get rid of Mr. Kumar would be "precipitous."

281

Exhibit 10

Ultimately, the Board determined to demote Mr. Kumar from CEO to the position of "Chief Software Architect," and remove him from the Board.  As Mr. Ranieri explained to the government the following day, Mr. Kumar would play an "advisory role" and Mr. Kumar was "simply to be a resource during the transition" while the Board conducted a search for a new CEO.  Ranieri Talking Points (drafted by S&C) (April 20, 2004).  Mr. Kumar was not to exercise any executive control, and play no role in accounting, financial reporting, revenue recognition, or sales.  *Id.*  At this point, the Board was reluctant to let Mr. Kumar go completely, since the CA World sales conference was upcoming, and, in their view, no one else "spoke the CA language with customers."  Indeed, the Board feared that without Mr. Kumar, the Company would appear to be in a state of disarray in front of its entire customer base.[174]

On June 4, 2004, after CA World, the Board requested and received Mr. Kumar's resignation.

## X.   APPLICABLE LAW AND ANALYSIS OF THE CLAIMS

### A.   Count One: *Violation of The Public Company Accounting Reform and Investor Protection Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C. § 7243*

Count one of the 2005 Derivative Complaint seeks disgorgement, under § 304 of Sarbanes-Oxley, of any bonuses, incentive compensation and/or profits from stock sales received by Messrs. Kumar, Schwartz, Wang, and Zar – all former CA CEOs and CFOs – from March 31, 1998 through March 31, 2002.[175]  As described above, the SLC has determined that

---

[174]   According to Mr. Kumar, he met with certain members of the Board, including Messrs. Artzt, Ranieri, D'Amato, and Vieux, at S&C's midtown offices following the Board meeting.  Mr. Kumar recalls being told he was being demoted, but assured that the Company would settle the government investigation and then bring him back as CEO in six months time.  The directors identified by Mr. Kumar dispute his recollection of these events, and recall a more general conversation, such as "if you are cleared," we may bring you back.

[175]   *See* 2005 Compl. ¶¶ 251-62.  As discussed above, Mr. Wang was CEO from June 1976 until August 4, 2000; Mr. Kumar was CEO from August 4, 2000 until April 20, 2004; Mr. Schwartz was CFO from 1985

the Company has valid claims, under different theories, against all four (4) of these former CA CEOs and CFOs (and has determined to settle with Messrs. Kumar and Zar).  However, for the reasons stated below, the SLC concludes that there is no legal merit to this particular claim, and that this claim should be dismissed.

> Section 304 provides:
>
> if an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –
>
> (1)    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2)    any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243.  To obtain reimbursement from a CEO or CFO under § 304, it must be shown that (1) the issuer has restated its financial statements; (2) the restatements were required because of a "material noncompliance . . . with any financial reporting requirement under the securities laws"; and (3) the material noncompliance was the "result of misconduct." *Id.; see also* Harold S. Bloomenthal, Sarbanes-Oxley Act in Perspective § 10.5 (2006-2007 ed.).  All three elements are plainly evident in this case.

However, while the plain language of § 304 appears to support a disgorgement claim in this case, "[e]very court that has considered the issue directly has concluded that § 304 contains no implied private right of action." *In re Digimarc Corp. Derivative Litig.*, 2006 WL

---

until June 22, 1998 (and continued to play an executive role after that); and Mr. Zar was CFO from June 22, 1998 until October 7, 2003.

2345497, at * 2 (D. Or. Aug. 11, 2006); *see also In re Bisys Group, Inc. Derivative Action,* 396 F. Supp. 2d 463, 464 (S.D.N.Y. 2005) ("This Court holds that there is no private right of action under § 304 of Sarbanes-Oxley").[176] Thus, neither the derivative plaintiffs nor CA have standing to assert this claim.

       For example, in *Neer v. Pelino,* 389 F. Supp. 2d at 657, the U.S. District Court for the Eastern District of Pennsylvania held that shareholders lacked standing to seek reimbursement under § 304, finding that it did not create an express or implied private right of action. Reviewing the text of the statute, the Court observed that Sarbanes-Oxley explicitly created a private right of action to enforce the pension fund trading blackout restrictions under § 306, but failed to include a similar provision in § 304, suggesting that Congress did not intend to create a private right of action under § 304. *Id.* at 655. The Court then looked to the legislative history of the Act, finding that "neither supporters nor opponents of the House draft wanted to give private parties the right to seek disgorgement under this provision," and that nothing in the Senate Report suggested a different intent. *Id.* at 657. Rather, the Court found that Congress intended that the SEC, and not private parties, have the power to enforce § 304 and to seek disgorgement of profits on behalf of the issuer. *See id.* As a result, the Court

---

176    *See also Neer v. Pelino,* 389 F. Supp. 2d 648, 657 (E.D. Pa. 2005) ("In light of the text and structure of the [Sarbanes-Oxley] Act and its legislative history, we find that Congress did not intend to create an implied cause of action in Section 304"); *In re Goodyear Tire & Rubber Co. Derivative Litig.,* 2007 WL 43557, at *7 (N.D. Ohio Jan. 5, 2007) ("The Court holds that no private right of action exists under Section 304 of the Sarbanes-Oxley Act of 2002."); *Kogan v. Robinson,* 432 F. Supp. 2d 1075, 1082 (S.D. Cal. 2006) (the court "joins all other courts that have considered this issue" and "[i]n light of the text and structure of Section 304 and the Sarbanes-Oxley Act, this Court declines to imply a private right of action"); *In re Whitehall Jewelers, Inc. S'holder Derivative Litig.,* 2006 WL 468012, at * 8 (N.D. Ill. Feb. 27, 2006) ("this court is inclined to concur with its colleagues in *Neer* and *Bisys Group* that no private right of action is available under § 304"); Harold S. Bloomenthal, Sarbanes-Oxley Act in Perspective § 10.4 ("All of the district courts that have reached the issue in derivative actions based on Section 304 have concluded that it does not create a private action that can be brought by a shareholder in a derivative action seeking to compel the chief executive and financial officer to reimburse the issuer").

dismissed the shareholders' § 304 claim for lack of standing. This same analysis undoubtedly bars plaintiffs' § 304 claim here as well.

There is also a question as to whether § 304, enacted by Congress on July 30, 2002, can be retroactively applied to require disgorgement as a result of misconduct that occurred prior to the date of enactment. As alleged by plaintiffs in the 2005 Derivative Complaint, "in April of 2004, CA was required to restate more than $2 billion as a result of material noncompliance with the financial reporting requirements of the federal securities laws." 2005 Compl. ¶ 258. This restatement covered CA's publicly-disclosed financials for fiscal years 1998, 1999, 2000, and 2001, which ended on March 31, 2002. *See id* ¶ 260. Thus, although CA's restatement was announced in April 2004, after the effective date of § 304, the restatement was a result of misconduct that had occurred before § 304 was enacted.

The federal courts have not yet definitively determined whether § 304 can be applied retroactively to reach financial statements that are restated due to misconduct that occurred prior to the effective date of the statute. However, in *In re AFC Enterprises, Inc. Derivative Litigation*, 224 F.R.D. 515, 521 (N.D. Ga. 2004), the U.S. District Court for the Northern District of Georgia considered this question and concluded, in dicta, that "[a]bsent a clear indication from Congress to the contrary, the presumption is that legislation does not apply retroactively" (citation omitted). The Court found no such clear indication of congressional intent in § 304. *See id.* ("There is no 'clear indication' from Congress that this forfeiture provision of the Sarbanes-Oxley Act was intended to have retroactive application to misconduct which occurred before its effective date"). However, the Court expressly declined to rule on this issue "at this early stage of the litigation without a developed factual record." *Id.*

Exhibit 10

The SLC believes that this is the correct analysis.[177]  Regardless of the ultimate outcome of the retroactivity analysis in this case, the uncertainty surrounding retroactive application of § 304 is an additional factor that undermines a § 304 claim, and further counsels against pursing this claim.

Given the clear legal impediments to bringing a successful § 304 claim, the SLC concludes that it is not in CA's best interests to bring this claim, as the likely costs attendant to litigating a resolution of the legal issues outweigh any possible recovery for the Company.  The SLC reaches this conclusion based on this legal analysis, as well as the fact that it has other valid and viable claims against Messrs. Wang and Schwartz, and that those claims provide a more than sufficient basis for recovery for the Company.

B.   *Count Two:  Statutory Contribution Against the Individual Defendants and Auditor Defendants*

Count two of the 2005 Derivative Action seeks contribution from all individual defendants and Auditor Defendants[178] pursuant to the PSLRA, 15 U.S.C. § 78u-4(f)(8), which states that "[a] covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages."  On CA's behalf, plaintiffs seek to recover from the individual defendants and Auditor Defendants the 5.7 million shares of CA

---

177   Some commentators have noted that this remains an open question.  *See* Harold S. Bloomenthal & Samuel Wolff, Securities and Federal Corporate Law § 20:14.12 (2d ed. 2001); Paul H. Dawes, *The Disgorgement Mandates of Sarbanes-Oxley Section 304: Do They Reach Innocent CEOs and CFOs?*, in Securities Litigation & Enforcement Institute 2006, PLI Corp. Law & Practice Course, Handbook Series No. 8805, at 111 (2006).

178   The Individual Defendants named in this claim are as follows:  Russell Artzt, Sanjay Kumar, Stephen Richards, Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein, Charles Wang, Willem de Vogel, David Grasso, Roel Pieper, Michael McElroy, Charles McWade, and Peter Schwartz.  For reasons previously discussed, the analysis in this section will not address plaintiffs' statutory contribution claim against the Auditor Defendants.

common stock that CA paid to settle the Class Actions and the 2003 Derivative Action. *See* 2005 Compl. ¶ 264.

For the reasons stated below, the SLC has determined that a statutory contribution claim is unlikely to succeed on the merits because (i) it is barred by statute and the judicially-approved settlement agreement to which CA was a party; and (ii) it may be barred by the applicable statute of limitations. Further, in the exercise of its business judgment, the SLC has concluded that strategic considerations counsel against pursuit of this claim. As previously discussed, CA has other viable claims against the individual defendants whom the SLC believes are culpable that are more likely to succeed and are less susceptible to costly legal challenge. Against the remaining individual defendants, CA does not believe that such claims are factually viable or in the best interests of the Company. As such, there is no need to upset the existing Class Action settlement and expose CA to the costs associated with relitigating the Class Action claims where other valid and viable claims already exist. Therefore, the SLC has determined that this claim should be dismissed.

1.      **A Claim for Statutory Contribution is Barred by the 2003 Settlement and Final Judgment**

First, the Order and Final Judgment entered by Judge Platt on December 10, 2003, provides that:

> Pursuant to time [sic] PSLRA and 15 U.S.C. § 78u-4(f)(7), the Released Parties are hereby discharged from all claims for contribution by any person or entity, whether arising under state, federal or common law, based upon, arising out of, relating to, or in connection with the Settled Claims of the Settlement Class or any Settlement Class Member. Accordingly, to the full extent provided by the PSLRA, the Court *hereby bars any action by any person or entity, for contribution against the Released Parties arising out of the Securities Class Actions.*

287

Final Judgment ¶ 9 (emphasis added). Thus, the Final Judgment makes clear that all claims for contribution arising out of the settlement against "released parties," by any person or entity, are barred.

> The Final Judgment defines "Released Parties" as:
>
> The *CA Defendants* and each of their *past or present* subsidiaries, parents, successors, predecessors, insurers, reinsurers, *officers, directors,* shareholders, members, *employees,* agents, fiduciaries, partners, principals, registered representatives, analysts, advisors, investment advisors, independent contractors, underwriters, issuers, insurers, co-insurers, reinsurers, investment bankers, consultants, personal representatives, divisions, assigns, attorneys, accountants ... heirs, beneficiaries, members of their immediate families and any person, firm, trust, corporation, or other individual or entity in which any CA Defendant has a controlling interest or which is related to or affiliated with any of the CA Defendants and the legal representatives, heirs, successors in interest or assigns of the CA Defendants (the "Released Parties").

Final Judgment ¶ 7 (emphasis added, repetitions in original). The "CA Defendants" are defined to include CA, Inc., Charles Wang, Sanjay Kumar, Russell Artzt, Ira Zar, Willem de Vogel, Richard Grasso, Shirley Strum Kenny and Irving Goldstein. *Id.* at p. 1. As a result of that definition, and the use of the terms "past or present ... officers, directors, ... [and] employees," all defendants named in the 2005 Derivative Action are "released parties." *Id.* ¶ 7.[179] As a result, CA's statutory contribution claim against all individual defendants is barred by the Final Judgment.

---

[179]   The following defendants in the 2005 Derivative Action who were not parties to the Class Action settlement are released by paragraph 7 of the Final Judgment: "past or present directors," including Kenneth Cron, Alfonse D'Amato, Lewis Ranieri, Gary Fernandes, Robert La Blanc, Jay Lorsch, Roel Pieper, and Walter Schuetze; "past or present officers," including Stephen Richards, Steven Woghin, Michael McElroy, Charles McWade, and Peter Schwartz; and "past or present employees," including David Kaplan, David Rivard, and Lloyd Silverstein. The remaining defendants to the 2005 Derivative Action – including Charles Wang, Sanjay Kumar, Russell Artzt, Ira Zar, Willem de Vogel, and Richard Grasso – were parties to the Class Action settlement and are released as "CA defendants." Shirley Strum Kenny and Alex Vieux were also released from liability as "CA defendants," but were not named as defendants in the 2005 Derivative Compliant.

Exhibit 10