Thomas N. FitzGibbon (SBN: 169194)
TNF@ptflaw.com
**PFEIFFER THIGPEN & FITZGIBBON LLP**
233 Wilshire Boulevard, Ste. 220
Santa Monica, CA 90401
Telephone: (310) 451-5800
Facsimile: (310) 451-1599

Luke A. McGrath (*Pro Hac Vice Pending*)
LZM@bickelbrewer.com
James S. Renard (*Pro Hac Vice Pending*)
JSR@bickelbrewer.com
**BICKEL & BREWER**
767 Fifth Avenue, 50th Floor
New York, New York 10153
Telephone: 212-489-1400
Facsimile: 212-489-2384

Attorneys for Intervenor
*Sam Wyly*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>- against -<br><br>MILBERG WEISS BERSHAD & SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. SCHULMAN, SEYMOUR M. LAZAR, and PAUL T. SELZER<br><br>Defendants. | Case No. 2:05-CR-587-JFW-3<br>[Assigned to Hon. John F. Walter]<br><br>**PART 4 OF EXHIBIT 10 TO DECLARATION OF LUKE A. McGRATH IN SUPPORT OF INTERVENOR SAM WYLY'S MOTION TO INTERVENE AND FOR RELIEF FROM PROTECTIVE ORDER**<br><br>Date:      February 9, 2009<br>Time:      9:00 a.m.<br>Room:    16 |

2.    **The Statute Bars CA From Pursuing a Claim for Statutory Contribution Against Certain Defendants**

Under the PSLRA, contribution cannot be sought "by any person against [a] settling covered person." 15 U.S.C. § 78u-4(f)(7). Thus, all "settling covered persons" are protected against a claim for contribution by CA. A "covered person" is defined, in relevant part, as "a defendant in any private action arising under this chapter." 15 U.S.C. § 78u-4(f)(10)(C)(i). Those defendants who were parties to the settlement of the Class Actions, as approved in the Final Judgment, are therefore "settling covered persons," against whom CA cannot seek contribution. Thus, statutory contribution claims against Russell Artzt, Richard Grasso, Sanjay Kumar, Willem de Vogel, Charles Wang, and Ira Zar, all of whom were named as defendants in the Class Actions and were parties to the settlement, and are therefore "settling covered persons," are barred by the PSLRA.

Further, 15 U.S.C. § 78u-4(f)(7)(A)(ii) bars claims for contribution arising out of a settled class action "by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person." CA is a "settling covered person," as it was a defendant in the Class Actions, and a party to the settlement. Thus, CA's claim for contribution is barred, except as to a person "whose liability has been extinguished by the settlement of the settling covered person." 15 U.S.C. § 78u-4(f)(7)(A)(ii). Taken alone, the text of the PSLRA suggests that it may be possible for CA to seek contribution from those individuals who have been released from potential liability for the actions at issue in the Class Action complaint, but who were not named as defendants to that

---

289

action or parties to the settlement thereof – i.e., persons whose "liability has been extinguished"

by CA's settlement. *See id.*[180]

However, as previously discussed, the bar order entered as part of the Final

Judgment more broadly defines the class of released parties than does the PSLRA, and

therefore more broadly restricts the availability of contribution by discharging the "Released

Parties . . . from *all claims for contribution by any person or entity.*" Final Judgment ¶ 9

(emphasis added).

> The PSLRA requires that:
>
> > [u]pon entry of the settlement by the court, the court shall enter a
> > bar order constituting the final discharge of all obligations to the
> > plaintiff of the settling covered person arising out of the action.
> > The order shall bar all future claims for contribution arising out of
> > the action–
> > (i) by any person against the settling covered person; and
> > (ii) by the settling covered person against any person, other than a
> > person whose liability has been extinguished by the settlement of
> > the settling covered person.

15 U.S.C. § 78u-4(f)(7)(A).

In contrast, the bar order in the Final Judgment does not carve out an exception

for contribution actions against "a person whose liability has been extinguished by the

settlement of the settling covered person," where such a person otherwise falls within the

definition of "Released Parties." *See* Final Judgment ¶ 7.   While the PSLRA mandates entry of

such a bar order, it does not prohibit the entry of an order barring contribution from a more

broadly-defined class of individuals.[181]   The bar order contained in the Final Judgment was

---

[180]   This includes Kenneth Cron, Alfonse D'Amato, Gary Fernandes, David Kaplan, Robert La Blanc, Jay
Lorsch, Michael McElroy, Charles McWade, Roel Pieper, Lewis Ranieri, Stephen Richards, David
Rivard, Walter Schuetze, Peter Schwartz, Lloyd Silverstein, and Steven Woghin.

[181]   *See, e.g., In re Consol. Pinnacle West Sec. Litig.,* 51 F.3d 194, 197 (9th Cir. 1995) (upholding bar order
prohibiting contribution claims against non-party insurers); *In re PNC Fin. Serv. Group, Inc. Sec. Litig.,*

negotiated and agreed to by the parties, and approved by the Court. The fact that the Final

Judgment prohibits contribution claims against non-party individuals not explicitly referenced

in the PSLRA does not affect its validity or enforceability, and it is controlling here.

### 3.   A Statutory Contribution Claim May be Barred by the Statute of Limitations

In addition to being barred by the Final Judgment, plaintiffs' statutory

contribution claim may be barred by the short six-month statute of limitations for such actions.

*See* 15 U.S.C. § 78u-4(f)(9). The relevant statute of limitations provides:

> In any private action determining liability, an action for
> contribution shall be brought not later than 6 months after the
> entry of a final, nonappealable judgment in the action, except that
> an action for contribution brought by a covered person who was
> required to make an additional payment pursuant to paragraph (4)
> may be brought not later than 6 months after the date on which
> such payment was made.

15 U.S.C. § 78u-4(f)(9). After two amendments, the Final Judgment was entered January 5,

2004. *See* Compl. ¶ 265.[182]

Plaintiffs contend that this was the "final, nonappealable judgment," entry of

which began the six-month statutory limitations period. Plaintiff's initial complaint, captioned

*Ranger Governance, LTD. v. Computer Associates International, Inc. et al.* (the "Initial

Complaint"), was dated and received by the Court on June 29, 2004 – within the six-month

---

440 F. Supp. 2d 421, 442-43 (W.D. Pa. 2006) ("The overwhelming weight of authority addressing the issue of whether the PSLRA was intended to provide the exclusive approach to a court barring claims upon the entry of a partial settlement has soundly rejected the proposition. . . . No aspect or provision of the PSLRA addresses or suggests that it is the only bar order that may be sanctioned by the courts"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 731-32 (E.D. Pa. 2001) (upholding bar order prohibiting contribution claims against "released parties" defined broadly to include "Settling Defendants and their respective [non-party] predecessors, successors, affiliates, officers, attorneys, agents, insurers, and assigns" except as it categorically applied to "attorneys").

[182]   The judgment to which plaintiffs presumably refer is actually dated January 5, 2004, and not January 6, 2004, as plaintiffs allege.

291

limitations period. However, the Initial Complaint did not allege a claim for contribution under 15 U.S.C. § 78u-4(f)(8) against the individual defendants, or enumerate specific facts relating to the Class Action settlement for which CA would seek contribution. Plaintiffs' statutory contribution claim was detailed for the first time in the 2005 Derivative Complaint, filed January 7, 2005 – more than six months after the Final Judgment was entered, and therefore untimely under § 78u-4(f)(9).[183] Thus, the question is whether this claim "relates back" to the Initial Complaint, filed on June 29, 2004 – if so, the statutory contribution claim will be considered timely. If not, it will be barred by the statute of limitations.

Federal Rule of Civil Procedure 15(c) states, in relevant part, that for the purpose of determining whether an amended complaint has been filed within the applicable limitations period,

> [a]n amendment of a pleading relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

Federal Rule of Civil Procedure 15(c)(1) does not apply, since nothing in the PSLRA explicitly provides for the relation back of an amended complaint. However, Federal Rule of Civil Procedure 15(c)(2) may allow plaintiffs' statutory contribution claim to "relate back" to the original derivative complaint if it arises "out of the [same] conduct, transaction, or occurrence set forth . . . in the original pleading."

As a preliminary matter, the relation back doctrine of Fed. R. Civ. P. 15(c) "is to be liberally construed," *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 411 F. Supp.

---

[183]   A First Amended Complaint was filed on July 28, 2004. However, like the initial complaint, this First Amended complaint did not seek contribution for payments made by CA to settle the class action or derivative litigation, and it was outside the six-month period in any event.

2d 377, 385 (S.D.N.Y. 2006), in accord with the purpose of the Rule, which "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (quotation omitted). However, "[f]or a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading." *Id.*; *see also Mayle v. Felix*, 545 U.S. 644, 659 (2005) ("relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims").

More specifically, "[t]he inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading." *Flag Telecom*, 411 F. Supp. 2d at 385 (quotation omitted); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1140 (S.D.N.Y. 1996) ("[T]he principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party by the general fact situation alleged in the original pleading") (quotation omitted). As such, "[w]here the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." *Slayton*, 460 F.3d at 228. Analysis of this issue is, not surprisingly, fact and case specific, but prior case law provides some, although not dispositive, guidance.

For example, in *Slayton*, a securities fraud case, the Second Circuit held that an allegation that American Express improperly inflated its revenue and failed to follow GAAP, asserted for the first time in the amended complaint, related back to a claim in the initial complaint that the company had inadequate internal controls, which led to the overstatement of accounts receivable. *Id.* at 228-29. The allegations in the original and amended complaint all related to the plaintiffs' causes of action for securities and common law fraud, and the amended

complaint's allegations merely "amplified, or stated in a slightly different way," the claims made in the original complaint. *Id.*

In contrast, in *In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513, 528-29 (S.D.N.Y. 2005), the Court held that plaintiffs' securities fraud claims arising from the company's acquisitions did not relate back to the original complaint, which alleged misstatements in the prospectus in connection with the company's initial public offering ("IPO"). Whereas the initial complaint centered on the IPO and the allegedly misleading statements made in the prospectus, it did not allege that these misstatements were part of an overall fraudulent scheme to misstate earnings and hide unfavorable business developments, which was the focus of the amended complaint. The Court therefore rejected plaintiffs' argument that the amended complaint alleged the "same basic wrongs," and held that the original complaint failed to provide defendants with adequate notice of their intent to bring suit for fraudulent conduct in connection with the company's acquisitions prior to its IPO. *Id.* at 528. Thus, the Court found that relation back was improper, and rejected the allegations made in the amended complaint as time-barred. *Id.* at 529.

In this case, the Initial Complaint alleged violations of 15 U.S.C. § 7243 (Sarbanes-Oxley) (count one), Breach of Duty Under Faithless Servant Doctrine and the Doctrine of Unjust Enrichment (count two), Breach of Fiduciary Duty (count three), Gross Negligence (count four), Corporate Waste (count five), Fraud (count six), and Conspiracy (count seven), arising from CA's fraudulent accounting practices, the compensation paid to those involved in such practices, and the expenses incurred to conduct internal audits and investigations into the company's financial statements. *See* Initial Compl. ¶¶ 44-65. These claims arose generally out of the "widespread conspiracy at CA to artificially inflate earnings

figures in order to increase the price of CA stock going back to at least 1998." Initial Compl. ¶ 27. In contrast, the Initial Complaint did not assert any wrongdoing in connection with the Class Action settlement and, indeed, mentioned the Class Action settlement just once in its recitation of background facts, noting that "[i]n December 2003, to settle class actions alleging fraud and securities violations in connection with the provision of false financial reports, CA agreed to issue and deliver to class members and attorneys approximately $100 million worth of CA stock." Initial Compl. ¶ 26. The Initial Complaint contained no allegations that this settlement was improper, and did not seek contribution for amounts paid by CA as a result.

Viewed broadly, it could be argued that the Initial Complaint very generally alleged the same set of circumstances that give rise to the claim for contribution under the securities laws. Specifically, the accounting fraud detailed in the Initial Complaint was the basis for the Class Actions and resulted in the settlement, for which the 2005 Derivative Complaint seeks contribution.

However, there is nothing in the Initial Complaint evidencing plaintiffs' intent to pursue a claim for contribution under 15 U.S.C. § 78u-4, and there is no allegation attacking the class action settlement as improper or unfair. Likewise, there is no factual nexus between the underlying accounting fraud and the decision to settle the Class Actions. Thus, in the SLC's view, the far better argument is that this is not a case in which the later complaint simply restated in greater detail an initial cause of action, but rather one in which an entirely new cause of action has been asserted based on a statutory provision that was not mentioned in the original complaint.

In sum, in the SLC's view, a claim for statutory contribution is not timely under the PSLRA, and it is likely that any such claim will be contested on that basis, adding

additional expense and delay to this litigation.  Thus, given this uncertainty and, as discussed above, because a claim for statutory contribution under 15 U.S.C. § 78u-4(f)(8) is unlikely to succeed due to the releases granted in the Final Judgment and the statutory bar against contribution claims against "settling covered persons," the SLC has determined that it is not in the Company's best interests to pursue this claim and that it should be dismissed.

C.   *Count Three: Breach of Fiduciary Duty*

Count three of the 2005 Derivative Complaint alleges that each of the individual defendants breached their fiduciary duties owed to the Company.  2005 Compl. ¶¶ 271-72; *see also* Kaufman Compl. ¶¶ 103-04.  As described above, this cause of action can be divided into four distinct claims.  First, it is alleged that CA's directors and officers breached their fiduciary duties to the Company by failing to properly oversee CA's business practices during the years in which the 35-Day Month practice and improper revenue recognition was taking place.  *See* 2005 Compl. ¶ 272; *see also* Kaufman Compl. ¶¶ 37, 44.  Second, it is alleged that CA's Board of Directors failed to properly oversee CA's business practices through the course of the government investigation.  *See* Kaufman Compl. ¶ 104.  Third, it is alleged that CA's Board of Directors breached its fiduciary duties by approving the 2003 Settlement, pursuant to which CA released all then-current and former directors and officers from liability, and by authorizing and approving the DPA, both without seeking contribution from known wrongdoers.  *See* Kaufman Compl. ¶¶ 104, 112; 2005 Compl. ¶¶ 265, 273, 276, 285.  Finally, it is alleged that CA's Board of Directors breached its fiduciary duties by failing to take action against Mr. Kumar immediately after Lloyd Silverstein pled guilty to federal criminal charges in late January 2004. Kaufman Compl. ¶¶ 93-97.

1.     The *Caremark* Claim

The *Caremark* claim alleged in the 2005 Derivative Complaint and the Kaufman Complaint challenges the CA Board's oversight during two (2) distinct periods in time: (i) the period during which the 35-Day Month practice occurred, and (ii) the period during which the government investigation occurred.  Both periods are analyzed separately herein.

*First*, as stated above, the 2005 Derivative Complaint alleges that during the period of fraudulent conduct the Oversight Director Defendants – Russell Artzt, Alfonse D'Amato, Willem de Vogel, Richard Grasso, Sanjay Kumar, Roel Pieper, and Charles Wang[184] – breached their duty of oversight by failing to take steps to prevent and uncover the 35-Day Month practice.  *See* 2005 Compl. ¶¶ 271-277.[185]

In support of this claim, the 2005 Derivative Complaint alleges that the Oversight Director Defendants ignored "numerous red flags that indicated the lack of oversight at CA" and that this failure caused "serious, if not irreparable, damage to the Company, its reputation and its business prospects." 2005 Compl. ¶ 272(a).  However, plaintiffs do not identify *any* of these "red flags" of which they claim the Board was, or should have been, aware.  Plaintiffs further assert – again without any supporting factual allegations – that the Oversight Director Defendants (i) failed "to have in place sufficient controls and procedure to monitor CA's practices" (*id.* ¶ 272(b)), (ii) "knowingly or recklessly disseminat[ed] and

---

[184]   Shirley Strum Kenny is not named as a defendant in the 2005 Derivative Complaint, notwithstanding the fact that she served on the CA Board during the period in which the fraud occurred.  She was named as a defendant in the Kaufman Complaint.

[185]   Likewise, the Kaufman Complaint alleges that directors Willem de Vogel, Richard Grasso, and Shirley Strum Kenny breached their duty of oversight by "failing to detect the accounting fraud and the subsequent efforts by [management] to cover it up."  *See* Kaufman Compl. ¶ 44.  However, the Kaufman Complaint is devoid of *any* factual allegations relating to the time period in which the fraud occurred.  Indeed, this unsupported allegation contained in the "Parties" section of the complaint is the only mention of the claim in the entire complaint.  *See id.*

297

permit[ed] to be disseminated, misleading information to shareholders, the investing public and the public at large" (*id.* ¶ 272(c)), and (iii) allowed "the Company to engage in wholesale improper accounting practices which subjected the Company to fines, penalties, lawsuits and further investigation." (*Id.* ¶ 272(d)).

*Second*, the Kaufman Complaint alleges that the Criminal Defendants, the Oversight Director Defendants,[186] and the Settlement Director Defendants – Russell Artzt, Kenneth Cron, Alfonse D'Amato, Gary Fernandes, Sanjay Kumar, Robert La Blanc, Jay Lorsch, Lewis Ranieri, Walter Schuetze, and Alex Vieux – "directed, participated in and/or obstructed the government's investigation into the accounting fraud and/or permitted or failed to take action against others who obstructed the investigation thereby subjecting the Company to criminal indictment, heavy monetary fines, debarment from all government business, and other severe sanctions." Kaufman Compl. ¶ 104(a).[187]

*Conclusion.* As is discussed below, the SLC has determined that the non-management Oversight Director Defendants and the Settlement Director Defendants exercised legally sufficient oversight at CA, and as such, did not breach their duty under Delaware law during the periods in question. In addition, as discussed above, the SLC has concluded, in exercising its business judgment under Delaware law, that it is in the best interests of the

---

[186] The only exception is Roel Pieper, who is not named as a defendant in the Kaufman Complaint, notwithstanding the fact that he served on the CA Board during the period in which the fraud occurred.

[187] Part of this allegation is plainly and demonstrably wrong. In actuality, CA has not been debarred from "all government business" as alleged by Ms. Kaufman. Quite to the contrary, as the Board of Directors was informed, CA risked debarment had it *not* entered into the DPA, and CA's customer list continues to include several government entities. (*See e.g.,* Deborah Solomon & Anne Marie Squeo, *Crackdown Puts Corporations, Executives in New Legal Peril – More Than Ever, Businesses Face Risk of Prosecution; Post-Enron, a Changed View – Companies Rush to Cooperate,* WALL ST. J., June 20, 2005, at A1 ("In April 2004, the government threatened to indict the company if it didn't replace top management, attorneys on both sides say. An indictment would have been devastating to the company's already-tarnished reputation, and a finding of guilt would have precluded CA sales to the federal government, a major customer")).

Exhibit 10

Company to seek dismissal of this claim with respect to Mr. McElroy. As also discussed above, with respect to Messrs. Wang and Schwartz, the SLC has concluded that the Company has valid and viable claims for breach of fiduciary duty based on, among other things, their knowledge of, and participation in, the 35-Day Month practice, and that it is in the best interests of the Company to pursue those claims. Finally, as noted above, the SLC has reached settlements with Messrs. Artzt, Kumar, and McWade pursuant to which it will seek dismissal of all claims against them.

        (a)     Director Decision Making: The Duty of Care[188]

Directors and officers owe a duty of care to the Company (*see Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)) that requires them to "'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions." *In re the Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) ("*Disney IV*"), *aff'd*, 906 A.2d 27 (Del. 2006); *see also Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) ("in making business decisions, directors must consider all material information reasonably available"); *Aronson*, 473 A.2d at 812 ("directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them"). As such, the business judgment rule is a judicial presumption that directors and officers acted "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."

---

[188]    CA is incorporated in the state of Delaware. As a result, under New York law, the fiduciary obligations owed by CA's officers and directors are analyzed under Delaware substantive law. *See BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000) ("Consistent with the internal affairs doctrine, a claim of breach of fiduciary duty owed to a corporation is governed by the law of the state of incorporation").

*Aronson,* 473 A.2d at 812; *see also Disney IV,* 907 A.2d at 755 ("[t]he presumption of the business judgment rule creates a presumption that a director acted in good faith").

(b)    Director Oversight: The Duty of Loyalty

Nonetheless, director liability may be premised on a director either (i) *intentionally* failing to act where action is required, or (ii) *intentionally* failing to cause the company to have adequate information and reporting systems in place. In either case, such conduct by a director constitutes a failure to discharge his/her fiduciary duties in good faith, and, therefore, violates the duty of loyalty. *See Stone v. Ritter,* 911 A.2d 362, 370 (Del. 2006) ("*Stone II*") ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith"); *Guttman v. Huang,* 823 A.2d 492, 506 (Del. Ch. 2003) (the "standard for liability for failures of oversight . . . requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith"). Indeed, a lack of good faith is a "necessary condition to liability" in the oversight context and "a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Stone II,* 911 A.2d at 369.

Accordingly, directors alleged to have violated their duty of oversight do not receive the protection of the business judgment rule, as there is no "business judgment" to which the courts can defer. *See, e.g., Rattner v. Bidzos,* 2003 WL 22284323, at *8 (Del. Ch. Oct. 7, 2003) (refusing to apply the business judgment rule when making a demand futility decision). However, liability under this theory is extremely rare, and courts have noted that an oversight claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark,* 698 A.2d at 959, 967; *see also Halpert Enter., Inc.*

*v. Harrison,* 2007 WL 486561, at *5 (S.D.N.Y. Feb. 14, 2007) (citation omitted); *Stone II,* 911
A.2d at 372 (same); *Rattner,* 2003 WL 22284323, at *8 ("a claim for failure to exercise proper
oversight is one of, if not the, most difficult theories upon which to prevail").

To establish a failure of oversight, a plaintiff must show "either (1) that the
directors knew or (2) should have known that violations of law were occurring *and*, in either
event, (3) that the directors took *no steps* in a good faith effort to prevent or remedy that
situation, *and* (4) that such failure proximately resulted in the losses complained of."
*Caremark,* 698 A.2d at 971 (emphasis added); *see also Saito v. McCall,* 2004 WL 3029876, at
*6 (Del. Ch. Dec. 20, 2004). This test can be satisfied by showing either that: (i) "the directors
*utterly failed* to implement *any* reporting or information system or controls," or "having
implemented such a system or controls, *consciously* failed to monitor or oversee its operations
thus disabling themselves from being informed of risks or problems requiring their attention";
or (ii) that the directors "had notice of serious misconduct and simply failed to investigate," i.e.,
intentionally ignored "red flags." *Stone II,* 911 A.2d at 370 (emphasis added); *Shaev,* 2006 WL
391931, at *5 ("a *Caremark* plaintiff can plead that 'the directors were conscious of the fact
that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in
defiance of their duties").

The "failure to exercise oversight" claim and the "failure to investigate" claim
are "closely related," but distinct. *Shaev,* 2006 WL 391931, at *5. For both claims, however,
"imposition of liability requires a showing that the directors *knew* that they were not
discharging their fiduciary obligations." *Stone II,* 911 A.2d at 370 (emphasis added); *Guttman,*
823 A.2d at 505 (director liability is premised on "a showing that the directors were conscious
of the fact that they were not doing their jobs"); *In re the Walt Disney Co. Derivative Litig.,* 906

A.2d 27, 67 (Del. 2006) ("*Disney V*") ("A failure to act in good faith may be shown . . . where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties").

          (i)        Failure to Exercise Oversight

             (1)      Legal Standard

       The duty of oversight does not require directors to possess detailed information about all operational aspects of a business. *See Caremark*, 698 A.2d at 971. Rather, directors must "attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards." *Id.* at 970; *see also Shaev*, 2006 WL 391931, at *5. However, "only a *sustained or systematic failure* of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." *Caremark*, 698 A.2d at 971 (emphasis added); *see Halpert*, 2007 WL 486561, at *5 (citation omitted); *Stone II*, 911 A.2d at 369 (affirming the standard for oversight liability articulated in Caremark).

       As noted above, to render directors liable for a failure to implement adequate information systems and controls, the directors' failure must amount to bad faith, meaning that the failure to act was intentional. *See Stone II*, 911 A.2d at 370 ("a showing of bad faith conduct, in the sense described in *Disney* and *Caremark*, is essential to establish director oversight liability"); *Disney IV*, 907 A.2d at 755 ("Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty, a conscious disregard for one's responsibilities*, is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith") (emphasis in original).

There is no legal formula prescribing the steps directors must take to ensure that a company has in place reasonable information and reporting systems. Delaware courts, however, have provided some guidance as to the types of controls a board can implement in order to satisfy their duty of oversight.  For example, a duly-constituted audit committee that meets regularly, and the retention of an independent audit firm, are the types of reporting systems that a Board can implement to satisfy its duty of oversight. *See Shaev*, 2006 WL 391931, at *5 (a failure of oversight can be shown by demonstrating that a board "entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet"); *Ash v. McCall*, 2000 WL 1370341, at *15 n.57 (Del. Ch. Sept. 15, 2000) ("the existence of an audit committee, together with [the] retention of Arthur Anderson as . . . outside auditor to conduct annual audits of the Company's financial reporting, is some evidence that a monitoring and compliance system was in place").

Whether the reporting systems actually worked is not the test.  Indeed, in a recent decision, the Delaware Supreme Court explicitly rejected an attempt to "equate a bad outcome with bad faith" in the oversight context. *Stone II*, 911 A.2d at 373.  In that case, certain employees of AmSouth Bancorporation failed to file Suspicious Activity Reports ("SARs"), as required under federal law, in connection with a customer's establishment of custodial accounts that were then used by the customer in a criminal scheme. *See id.* at 365. AmSouth ultimately became the subject of a federal criminal investigation because of the failure of its employees to file SARs. *See id.* at 366.

In order to resolve the criminal investigation, AmSouth, like CA, entered into a deferred prosecution agreement in which it admitted that "at least one" employee knowingly failed to file SARs in a timely manner, and, like CA, agreed to pay a substantial fine. *Id.* In

303

Exhibit 10

addition, the Federal Reserve and Alabama Banking Department issued an order requiring
AmSouth to, among other things, engage an independent consultant to review its compliance
programs and make recommendations "for new policies and procedures to be implemented by
the Bank," much like the independent examiner required under CA's DPA. *Id.* at 366; *see* DPA
¶¶ 19-22.

Plaintiffs brought a claim against the AmSouth Board of Directors alleging
solely that the directors "had utterly failed to implement any sort of statutorily required
monitoring, reporting or information controls that would have enabled them to learn of
problems requiring their attention." *Stone II*, 911 A.2d at 370. The Supreme Court affirmed
the Court of Chancery's dismissal for failure to make a demand on the AmSouth Board, as
there were no particularized facts that "created reason to doubt whether the directors had acted
in good faith in exercising their oversight responsibilities." *Id.* at 373. Based on findings made
by AmSouth's independent consultant (which were incorporated into the complaint), the
Supreme Court concluded that "the Board received and approved relevant policies and
procedures, delegated to certain employees and departments the responsibility for filing SARs
and monitoring compliance, and exercised oversight by relying on periodic reports from them."
*Id.*

The Supreme Court added that "the directors' good faith exercise of oversight
responsibility may not invariably prevent employees from violating criminal laws, or from
causing the corporation to incur significant financial liability, or both." *Id.* at 373; *see also
Shaev*, 2006 WL 391931, at *5 ("one thing that is emphatically not a *Caremark* claim is the
bald allegation that directors bear liability where a concededly well-constituted oversight
mechanism, having received no specific indications of misconduct, failed to discover fraud").

Exhibit 10

Thus, a claim that a board must have violated its duty of oversight simply because fraud – even criminal fraud – occurred lacks merit. *See Shaev*, 2006 WL 391931, at *5 (rejecting a claim that "only a board violating its fiduciary duties could possibly have remained ignorant" of alleged accounting improprieties);[189] *Stone v. Ritter*, 2006 WL 302558, at *2 (Del. Ch. Jan. 26, 2006) ("*Stone I*"), *aff'd*, 911 A.2d 362 (Del. Nov. 6, 2006) ("Neither party disputes that the lack of internal controls resulted in a huge fine – $50 million, alleged to be the largest ever of its kind. The fact of those losses, however, is not alone enough").

In sum, "[i]n the absence of red flags, good faith in the context of oversight must be measured by the directors' actions 'to assure a reasonable information and reporting system exists' and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome." *Stone II*, 911 A.2d at 373 (citation omitted). Thus, with this legal framework in mind, the SLC sought to determine whether the non-management Oversight Director Defendants "breached their duty of oversight," by "utter[ly] fail[ing] to attempt to assure a reasonable information and reporting system exist[ed]." *Caremark*, 698 A.2d at 971.

(2)     Analysis

In considering plaintiffs' claim that the directors failed to ensure that CA had sufficient information and reporting systems in place during the period of the fraud, the SLC looked first to the allegations in the 2005 Derivative Complaint. However, other than the bald allegation that the directors "fail[ed] to have in place sufficient controls" (*see* 2005 Compl. ¶ 272(b)), plaintiffs provided no facts on this issue (except to acknowledge that CA had a duly constituted Audit Committee that met regularly during each of the fiscal years at issue). *See id.*

---

[189]   As noted above, the claim rejected in *Shaev* is the exact claim alleged by plaintiffs in the 2005 Derivative Complaint. Rather than identifying *any* red flags, plaintiffs allege that "it is impossible to imagine how this fraud could have been perpetrated under the very noses of CA's purportedly sophisticated directors absent a complete failure of oversight or their knowing participation." 2005 Compl. ¶ 216.

305

¶ 217 ("The Audit Committee met only three times during each of fiscal years 1998 and 1999"). Thus, as part of its investigation, the SLC considered, using Delaware law as its guide, the sufficiency of CA's information and reporting systems. As described below, the SLC has concluded that the information and reporting systems during the fraud were designed to ensure that appropriate information reached the Board, and were therefore legally sufficient under Delaware law. As such, the SLC will seek dismissal of this claim.

As an initial matter, the CA Board established a duly-constituted Audit Committee, which met at regular intervals throughout the fiscal year. In preparation for such meetings, CA management typically provided the Audit Committee members with written materials regarding CA's financial results. Specifically, the CA Audit Committee held the following meetings:

- In fiscal year 1998 (April 1, 1997 to March 31, 1998), the Audit Committee held three (3) formal meetings.
- In fiscal year 1999 (April 1, 1998 to March 31, 1999), the Audit Committee held two (2) formal meetings.
- In fiscal year 2000 (April 1, 1999 to March 31, 2000), the Audit Committee held four (4) formal meetings.[190]
- In fiscal year 2001 (April 1, 2000 to March 31, 2001), the Audit Committee held four (4) formal meetings.

Further, CA's Audit Committee retained E&Y, and then KPMG – both "Big 4" accounting firms – as CA's independent outside accounting firm to audit CA's consolidated financial statements.[191] At its meetings, the Audit Committee met independently with CA's

---

[190]     Plaintiffs allege incorrectly that the Audit Committee met twice during fiscal year 2000. *See* 2005 Compl. ¶ 217.

[191]     For fiscal years 1997, 1998 and 1999, E&Y planned and performed annual audits of the consolidated financial statements of CA and its subsidiaries, and considered the Company's internal control structure in order to determine auditing procedures for the purpose of expressing an opinion on the consolidated financial statements and not to provide assurance on the internal control structure. *See* Letter from E&Y

outside auditors, without the presence of management.  The Audit Committee also received and reviewed annual management letters from CA's outside auditors presenting the results of their audit for each fiscal year.  CA maintained an Internal Audit department, which performed primarily international work and non-critical domestic work.  The head of Internal Audit attended each Audit Committee meeting and reported to the Audit Committee on the scope and results of its work.  In connection with its receipt of management letters from its auditors, the Audit Committee received the credentials of, and a description of audit responsibilities for, each of the employees who worked in the Internal Audit department.  At no time was the Audit Committee told that the outside auditors or the Internal Audit department needed additional resources.

Indeed, the information the Board received regarding the implementation of SOP 97-2, which governed revenue recognition at CA, provides an example of how those systems worked to ensure that the Board received relevant information.  In the year leading up to, and shortly after the implementation of SOP 97-2 at CA (see section VIII.C., *supra*), the Audit Committee received five (5) reports from E&Y regarding the new accounting rules and their impact on CA's business.  For example, prior to SOP 97-2 becoming effective, the Audit Committee was told by the E&Y partner on the CA account that SOP 97-2 would "not have a major impact on CA" and "would have almost no impact on the Company's operations or financial results."  Shortly after SOP 97-2 became effective, E&Y told the Audit Committee that it "believed the Company was in compliance with the provision."  The message from the

---

to the CA Audit Comm. at 1 (May 26, 1999).  For fiscal year 2000, KPMG planned and performed an audit of the financial statements of CA, and considered internal controls in order to determine auditing procedures for the purpose of expressing an opinion on the Company's financial statements. This did not include examining the effectiveness of internal controls or providing assurances on internal controls. *See* Letter from KPMG to the CA Audit Comm. at 1 (Sept. 27, 2000).

three (3) other reports by E&Y was similar.  Thus, given the numerous reports the Audit Committee received regarding SOP 97-2, the Board reasonably believed that it was receiving relevant information regarding CA's accounting practices, and that reporting advised it that CA was in compliance with the governing accounting guidelines.

        The changeover to KPMG – which was precipitated by the Audit Committee when it became dissatisfied with the quality and timeliness of E&Y's work (itself evidencing a level of involvement and oversight) – further highlights the fact that the Board was receiving adequate information.  When KPMG was hired, it reviewed CA's internal accounting and finance controls.  KPMG then reported in its first management letter, dated September 27, 2000, that it "would generally characterize the Company's accounting systems and related processes as being less integrated and requiring more manual intervention than is typical for enterprises of similar size and breadth."  The management letter continues: "[t]he Company's finance staff requires an understanding of off-line processes or familiarity with a generally oral history of transactions.  This dependency contributes to the risk of errors in the accounting and financial reporting process."  Contributing to this problem was the fact that "[t]he Company does not have a comprehensive set of written accounting policies and procedures."  KPMG then recommended that CA develop a set of desk procedures summarizing key accounting policies and procedures.  The Audit Committee was subsequently assured by Mr. Zar that the Company was working on such procedures.  KPMG raised no issues to the Audit Committee concerning the Company's implementation of, or compliance with, SOP 97-2.  Thus, given the identification of these issues by KPMG to the Audit Committee, and the corrective action taken by CA's CFO, the Board reasonably believed that it was receiving information regarding CA's accounting practices sufficient to conduct the appropriate degree of oversight.

Exhibit 10

In addition, there were information and reporting systems in place to ensure that the entire Board received an appropriate level of information.  Specifically, the Board held the following meetings:

- In fiscal year 1998 (January 1, 1998 to March 31, 1998), the Board held eight (8) formal meetings.

- In fiscal year 1999 (April 1, 1998 to March 31, 1999), the Board held fourteen (14) formal meetings.

- In fiscal year 2000 (April 1, 1999 to March 31, 2000), the Board held thirteen (13) formal meetings.

- In fiscal year 2001 (April 1, 2000 to March 31, 2001), the Board held six (6) formal meetings.

In preparation for such meetings, CA management typically provided Board members with written materials, on a monthly and quarterly basis, regarding CA's financial results.  The Board also received memoranda from Mr. Woghin, CA's General Counsel, informing the Board of, or updating the Board on, certain material legal events at the Company.  The Board often reviewed additional materials, such as PowerPoint presentations regarding CA's quarterly results and draft press releases announcing those results.  Generally, CA's CFO, General Counsel, and outside corporate counsel attended these meetings in order to present to the Board and answer any questions that arose.[192]  The SLC also found that several members of the Board were in contact with Messrs. Wang, Kumar, Zar, and Woghin outside of meetings when issues arose.

Because CA's Board had these reporting mechanisms in place, to both the Audit Committee and full Board, the SLC concludes that the non-management Oversight Director Defendants exercised legally sufficient oversight at CA, and, as such, did not breach their duty

---

[192]    CA's outside securities counsel, Scott Smith of Covington & Burling LLP, was present at Board meetings in order to respond to director questions as appropriate.

of oversight under Delaware law. *See Shaev*, 2006 WL 391931, at *5 (dismissing a *Caremark* claim where there is merely a "bald allegation that directors bear liability where a concededly well constituted oversight mechanism, having received no specific indications of misconduct, failed to discover fraud"); *Guttman*, 823 A.2d at 498 (dismissing complaint where it failed to address "whether the company had an audit committee during [the contested period], how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices"). An "unintended adverse outcome" is not a sufficient basis for a claim (*Shaev*, 2006 WL 391931, at *5), and the SLC will seek to dismiss this claim.[193]

   (ii) Failure to Investigate

     (1) Legal standard

  For a "failure to investigate" claim to succeed, there must be "specific red-or even yellow-flags" that put the Board on notice of potential misconduct. *See Guttman*, 823 A.2d at 507. As the Delaware courts have observed, such flags "are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer." *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003); *see also Guttman*, 823 A.2d at 507 ("the complaint does not plead a single fact suggesting specific red or even yellow flags were waved at the outside directors"); *Rattner*, 2003 WL 22284323 at *13 (same).

  Under Delaware law, "absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *Caremark*, 698 A.2d at

---

[193] That being said, as described above, several layers below the Audit Committee and Board, the SLC found that CA's internal reporting structure was deficient in many respects.

969. Further, once a red flag is "waved" to the Board, for the Board to be liable, the Board must *willfully* and *intentionally* ignore that flag. *See Stone I*, 2006 WL 302558 at *2 ("[n]or do plaintiffs point to facts suggesting a conscious decision to take no action in response to red flags. Without these well-pled allegations, there is no possibility the defendants faced a substantial likelihood of liability").

For example, in *Stone II*, described at length above, the Delaware Supreme Court defined "red flags" as "facts showing that the board *was aware* that AmSouth's internal controls were inadequate, [and] that these inadequacies would result in illegal activity." 911 A.2d at 370 (emphasis added). In that case, the Court of Chancery found that:

> Plaintiffs' complaint is devoid of the particularized allegations of fact needed to tie the defendants to any of the alleged wrongdoing. Plaintiffs fail to point to any facts either showing how the [criminal] scheme, or any other problems at AmSouth, waved a 'red flag' in the face of the board. Nor do plaintiffs point to facts suggesting a conscious decision to take no action in response to red flags. Without these well-pled allegations, there is no possibility the defendants faced a substantial likelihood of liability.

*Stone I*, 2006 WL 302558 at *2. Thus, in the absence of specific facts that waved a red flag "in the face" of the directors, and evidence of a conscious decision to ignore those facts, directors will not be found liable for a breach of their duty of oversight. *Id.*

The District Court's decision in *In re Veeco Instruments Inc.*, 434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2006) provides an example of what constitutes a "red flag" under Delaware law. In that case, an employee reported to management that Veeco had violated federal export laws. The company then conducted an internal audit, and found that several violations of law had actually occurred. *See id.* at 273. The initial report of the employee, and the result of the Company's audit, were reported to the board. Because Veeco derived seventy percent (70%) of its revenue from export sales, and a single violation of federal export laws

311

Exhibit 10

could have led to the suspension of its export privileges, "the reported violations threatened to jeopardize the future viability of Veeco." *Id.* at 278. Seven (7) months later, the same employee reported another set of export law violations.

The plaintiffs, while failing to plead specific facts regarding the Board's response to the first reported violation, claimed that, in light of the second reported infraction, "the Audit Committee permitted additional violations to occur, either by completely disregarding the first report, or by establishing procedures that were wholly inadequate and ineffective and that failed to protect the Company from potentially enormous liability." *Id.* at 278. In denying the Board's motion to dismiss, the Court held that "[t]his is not a case where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability.'" *Id.* at 279 (quoting *Caremark*, 698 A.2d at 969). The Court added that "[t]his is precisely the type of case the Delaware Chancery Court was contemplating when it recently held, 'A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning.'" *Id.* at 278 (citations omitted).

In light of this well developed legal framework, the SLC first examined the 2005 Derivative Complaint and the Kaufman Complaint for any alleged "red flags" identified to the Board, but found that they alleged no warnings that the Board was aware of but intentionally ignored. Despite this pleading failure,[194] the SLC sought independently to identify facts or circumstances that should have alerted the Board to the revenue recognition fraud, but were intentionally ignored. At the outset, it is important to note that certain of the Criminal

---

[194]   As discussed above, this pleading failure alone is grounds for dismissal. *See Guttman*, 823 A.2d at 507.

Defendants who had access to the Board told the SLC that CA's independent directors had no knowledge of the 35-Day Month practice. Nonetheless, based upon its own independent investigation, the SLC identified three potential "red" or "yellow" flags. The SLC's analysis of these is discussed below.

(2)    Analysis

a.    The Vesting of the KESOP, the July 20 Board Meeting, and the Class Action and Derivative Litigation[195]

*The KESOP Vesting.* The SLC examined the May 21, 1998 accelerated vesting of the KESOP as a potential "yellow flag." As discussed above, pursuant to the accelerated vesting provisions of the KESOP, which was tied to the Company's stock price, Messrs. Wang, Kumar, and Artzt received CA stock then-valued at $1.1 billion. While the KESOP provided a general motive to artificially inflate CA's stock price, thereby potentially creating a risk of fraud, the SLC found no evidence pointing to specific, or even general, misconduct that was intentionally ignored by the Board in the time period leading up to the accelerated vesting. *See Shaev,* 2006 WL 391931, at *5 ("in order to show that the board violated some fiduciary duty by inaction, a complaint must do much more than simply say that an employee perceived the company to face risk, even a large risk").

Although the accelerated vesting itself was not a "red flag" that a revenue recognition fraud was taking place, the SLC nonetheless sought to determine whether the Board took any steps to ensure the propriety of CA's financial statements, given the motive that the KESOP created. As a result of its investigation, which included interviews with every non-management director at the time (except Irving Goldstein, who passed away in May 2000), the

---

[195]    At this time, the Board was comprised of directors Artzt, de Vogel, Goldstein, Grasso, Kenny, Kumar, and Wang.

313

SLC has determined that the Board took no special steps in that regard. Indeed, it is undisputed that the only KESOP-specific action taken by the Board during the period prior to the accelerated vesting was to ensure that the vesting trigger actually occurred, that is, that CA's stock in fact traded at or above $53.33 for sixty (60) days in a twelve-month period. The Board repeatedly questioned E&Y about the details associated with the charge resulting from the KESOP, but not about the Company's underlying financial statements. It is the SLC's view that, given the enormity of the award, it would have been "better practice" for the outside directors to have taken additional steps to ensure the accuracy of CA's financials during the vesting period; however, their failure to do so did not constitute a breach of their duty of oversight, as there was no indication of a problem with those financials.

This determination is buttressed by the fact that the Board had *very* current information from CA's outside auditors at the time the KESOP vested. Indeed, just *two* (2) *days* before the KESOP vested, at a May 19 joint Board and Audit Committee meeting, the Board received E&Y's audit report for fiscal year 1998, which encompassed the two completed quarters (the third and fourth quarters of fiscal year 1998) preceding the vesting of the KESOP. Representatives from E&Y informed the Board that it had provided an unqualified, or clean, opinion on the Company's financial statements.[196] There is no evidence that E&Y, management, or CA internal audit raised any issue with respect to CA's financial statements for fiscal year 1998 (which ended March 31, 1998), or recommended that the Board or the Audit Committee take any additional action with respect to those financial statements.

---

[196]   As noted above, an "unqualified opinion" is defined as an "independent auditor's opinion that a Company's financial statements are fairly presented, in all material respects, in conformity with generally accepted accounting principles." John Downes and Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 765 (6th ed. 2003).

As discussed further below, the Board was entitled to, and did, rely upon its outside auditors to ensure that CA employed proper accounting practices during the periods in which the KESOP vested. *See Cantor v. Perelman*, 235 F. Supp. 2d 377, 388 (D. Del. 2002) ("the Marvel board delegated the corporate accounting duties to E&Y. Further, the board relied upon Ernst & Young expertise in accounting matters . . . Lastly, Ernst & Young provided a clean accounting report to Marvel. As a result, the court finds that the Marvel board met its fiduciary duties with regard to accounting"), *aff'd in part, rev'd in part*, 414 F.3d 430 (3d Cir. 2005).

*The July 21, 1998 Press Release.* The SLC similarly concluded that the events that transpired at the July 20, 1998 CA Board meeting do not constitute a "red" or "yellow" flag pointing to false financial statements or revenue recognition fraud. As described above, on July 20, 1998, within sixty (60) days of the vesting of the KESOP, CA held its regular quarterly Board meeting. At that meeting, CA management told the Board that it expected CA's growth to slow in the coming months due to various factors,[197] including the Asian economic crisis and the imminent release of new mainframe hardware by IBM. This view was purportedly based upon anecdotal reports from top sales executives, with whom Mr. Kumar had just met at a CA sales conference. Mr. Wang, who had recently returned from a trip to Asia, supported this view.

It is undisputed that no member of management presented any quantitative analysis regarding CA's projected growth at this meeting. Indeed, this view conflicted with that of Mr. Zar, CA's new CFO, who had just given the Board his more positive view of CA's

---

[197] As noted above, the majority of the participants at the Board meeting recall that it was Mr. Kumar that identified this issue to the Board, as reflected in the minutes. Mr. Kumar recalls that Peter Schwartz raised the issue, and that he was surprised at the time. The issue of who first raised the issue is immaterial to the analysis here, as it is undisputed that it was raised by either Mr. Kumar or Mr. Schwartz and supported by Mr. Wang.

315

projected growth. At the urging of Mr. Grasso, and with the approval of the Board, on July 21,

CA issued a press release in which it cautioned the market that "the ripple effect of the Asian

economic turmoil on our multinational clients . . . coupled with deferred software purchasing

decisions as customers deal with their Y2K projects and mainframe hardware transition issues,

leads us to believe that our revenue and earnings growth will slow over the next several

quarters." Press Release, Computer Assocs. Int'l Inc., Computer Associates Reports Record

First Quarter, Operating Earnings Up 25% (July 21, 1998). On the following day, the price of

CA's stock dropped by thirty-one percent (31%).

        The SLC has concluded that CA management's announcement that it expected

growth to slow, despite its proximity to the KESOP award, did not signal to the non-

management directors that management had previously engaged, and was then engaging, in

fraudulent revenue recognition practices. Even if the directors had taken a cynical view and

assumed the worst of Messrs. Kumar, Schwartz, and Wang, it might have led the Board to

question the timing of when they learned of the information relating to the Asian economy,

which would not have led to the discovery of improper revenue recognition practices, much less

a carefully concealed backdating conspiracy.

        Moreover, as noted above, the CA Board was not automatically required to

assume the worst of the Company's senior managers, with no grounds causing it to do so. *See*

*Caremark*, 698 A.2d at 969 ("absent grounds to suspect deception, neither corporate boards nor

senior officers can be charged with wrongdoing simply for assuming the integrity of employees

and the honesty of their dealings on the company's behalf"). In the Board's view, at the time,

Messrs. Kumar, Schwartz, and Wang were highly valued executives who had greatly increased

shareholder value and whom the Board trusted. As such, the Board was entitled, in good faith,

Exhibit 10

to believe and credit management's statements that CA's growth would slow in the future, and the timing of when management learned this information. Therefore, the SLC concludes that CA management's comments did not constitute a "red" or "yellow" flag that gave the Board notice of actual or potential revenue recognition misconduct.

*The Class Action and Derivative Litigation.* The plaintiffs' securities bar, however, did assume the worst of CA's management. Shortly after the July 21 press release and the resultant stock price drop, shareholders filed a series of class action lawsuits. The Board was advised, as early as August 1998, that the lawsuits claimed, among other things, that Messrs. Artzt, Kumar, and Wang knew the information disclosed in the July 21 press release at an earlier date, but did not disclose that information in order to allow the KESOP shares to vest. Nonetheless, even with the filing of these lawsuits (which did *not* allege the premature booking of revenue), there was still no "red flag" waving in the face of the Board, which they intentionally ignored.

Shortly after the suits were filed, Mr. Woghin told the Board that there was no substance to them. He specifically advised the Board that the plaintiffs in those lawsuits had alleged, in sum, that "a fraud must have occurred" because "Charles [Wang], Sanjay [Kumar] and Russ [Artzt] had a motive to keep the stock price high until their shares vested under the '95 Comp Plan, and, for that reason, wrongfully delayed in issuing the cautionary warning eventually included in the July earnings release." Mr. Woghin also reported that these "strike suits" were "garden-variety shareholder class action types," containing allegations that were "extremely thin." Mr. Woghin's notes indicate that he concluded his report by saying, "[b]ottom line is that we have been through this before. We know what to expect and how to deal with it through very effective counsel." Further, a review of the derivative complaints

317

 Exhibit 10

filed in August 1998, which directors de Vogel, Goldstein, Grasso, and Kenny would have received from Mr. Woghin because they were named as defendants, confirms Mr. Woghin's characterization of the lawsuits. The complaints, which contain no particularized factual allegations, were objectively quite "thin."

The SLC concludes that allegations in the shareholder suits, taken alone or together with the KESOP vesting and July 21 press release, did not constitute a "red" or "yellow" flag putting the Board on notice of actual or potential revenue recognition fraud. Indeed, had the Board ordered a full investigation of each of the allegations in the litigation, absent would have been an inquiry into the propriety of CA's revenue recognition practices, since no such allegation was made. As such, had the Board ordered an investigation, the harm that ultimately befell CA would not have been prevented.

b.    The New Business Model[198]

CA management's proposal that CA adopt a "new business model" in May 2000, while alleged to have been a "cover-up" for financial fraud (2005 Compl. ¶¶ 52, 211), is not alleged in the 2005 Derivative Complaint to be a "red flag" to the Board that signaled revenue recognition misconduct. Nonetheless, the SLC analyzed the events surrounding its proposal and adoption to see if it was, and to gauge the Board's reaction.

As described above, Mr. Kumar presented the Board with several legitimate business reasons for moving to the new business model, including (i) providing greater visibility into CA's future revenue streams, (ii) adding greater flexibility to the terms of the Company's licensing transactions; (iii) putting an end to the hockey stick effect, whereby CA booked the vast majority of its quarterly revenue in the last few days of the quarter; and (iv)

---

[198]    At this time, the Board was comprised of directors Artzt, D'Amato, de Vogel, Grasso, Kenny, Kumar, Pieper, and Wang.

Exhibit 10

curbing the ability of CA's clients to wait until the last minute at the quarter end to execute deals in order to extract large discounts. The ratable recognition of revenue under the new business model was, in all respects, a more conservative accounting approach than the "up-front" revenue recognition model CA had historically used, as recognized by the Board. Rather than suggest misconduct, the proposal of the new business model enhanced management's credibility with the Board.

Although certain of the Criminal Defendants (Messrs. Kaplan and Rivard) have stated that the end of the 35-Day Month practice was one motive to move to the new business model, it was not the only or primary motive (and Mr. Kumar – who was the driving force behind the new business model – has told the SLC that it was not even a factor in his mind). Given the benefits to the model and the Board's undisputed lack of knowledge concerning the 35-Day Month practice, it cannot reasonably be concluded that a request to move to the new business model, standing alone, should have been viewed as a cover for a nefarious motive on the part of management. As such, the SLC concluded that the proposal of the new business model did not constitute a red or yellow flag.

Moreover, and importantly, the Board did not simply rubber-stamp management's proposal and agree to adopt the new model. The Board, recognizing that the change could result in confusion in the marketplace as to CA's financial reporting and financial performance, requested that management perform additional work to understand the presentation of CA's financials in order to ensure that the switch to the new model would be transparent to the market. It is undisputed that CA's Finance department performed a substantial amount of work for the Board to justify the switch, and that the switch was approved

319

in October 2000 only after the Board received and considered this data, almost six (6) months later. There is simply no evidence that the Board willfully and intentionally ignored this event.

        c.      The April 29, 2001 New York Times Article

The SLC also examined the April 29, 2001 New York Times article as a potential red flag. As described above, the article alleged that CA: (i) implemented the new business model as a means to cover up its shrinking earnings; (ii) recognized fees associated with maintenance up front as opposed to ratably, which is required by GAAP; (iii) classified most of the fees from extended or renewed agreements as new license revenue; (iv) falsely represented its Unicenter program as a successful product when it, in fact, struggled; and (v) gave Unicenter to customers for free to enhance its appearance to Wall Street. In addition, the article also claimed that CA stood for "Creative Accounting" and that "March, June, September and December, when fiscal quarters end[ed], had thirty-five (35) days, giving the Company extra time to close sales and book revenue." Alex Berenson, *A Software Runs Out of Tricks; The Past May Haunt Computer Associates*, N.Y. Times, Apr. 29, 2001. This was the only reference to the 35-Day Month practice in the article, and it appeared in the fifth paragraph of the article.

At the outset, the SLC questioned whether the article constituted a red flag to the CA Board. On the one hand, the article articulates (albeit without specificity or attribution) allegations of accounting fraud at CA; on the other hand, the article was presented to the Board by CA management as an unfounded and unsubstantiated attack on CA instigated by the class action plaintiffs. Indeed, many of the issues raised in the article, and discussed at far greater length, were the subject of the then-pending Class Actions, and, as such, the Board had familiarity with the allegations. For example, CA's cancel/convert accounting practices were a

focus of both the article and the Class Actions, and the Board was familiar with the Company's historical practices. CA's switch to the new business model and pro forma accounting was another primary focus of the article, and the Board had similarly, and recently, spent a great deal of time evaluating the model both before and after its implementation. In addition, certain members of the Board questioned Mr. Berenson's journalistic integrity, and believed that he demonstrated considerable bias, given his use of anonymous sources and that he had written several unfavorable, and in the Board's view inaccurate, articles about CA prior to the April 29 article.

As such, the Board viewed the article with a skeptical eye, and, given the context and its use of anonymous sources, it is doubtful, at most, whether this article was a "red flag" for purposes of a *Caremark* claim. Indeed, the only decision the SLC found in which press reports (there, also New York Times articles) were determined to have been a potential "red flag" to a board of directors concluded that the press reports were a "red flag" only when "taken as a whole" with other facts, including, (i) alleged internal audit reports of fraud, (ii) the director defendants' alleged personal knowledge of improper practices, (iii) a pending *qui tam* action in which particularized allegations of fraud were alleged, and (iv) an investigation by the federal government. *See McCall v. Scott*, 239 F.3d 808, 819-20 (6th Cir. 2001) (applying Delaware law). Therefore, it is unlikely that the April 29, 2001 New York Times article, without similar surrounding circumstances (which are absent here), is sufficient to constitute a "red flag" under the law.

Even so, for the sake of completeness of analysis, the SLC treated the article as a "red flag" to the Board, putting it on notice of potential revenue recognition misconduct such that it had a duty to act. Following an extended investigation of this issue, in which the SLC

321

interviewed most of the key participants twice, the SLC concludes that in the unlikely event the article was a "red flag," the Board nonetheless addressed the article adequately under the law.

*First*, as noted above, on May 7, 2001, shortly after the article was published, the Board held a special meeting to discuss the article and the Company's response. The Board was advised by Mr. Kumar (who, at the time, the Board had no reason to distrust) that (i) CA had posted a written response to the allegations in the article on CA's website, (ii) the Company had received substantial support from financial analysts who regularly follow and report on the Company; (iii) CA had retained the services of a public relations consultant and a crisis management firm to aid the Company in its response to the article; (iv) management had begun efforts to form a blue ribbon panel of independent experts to review the Company's financial reporting practices; and (v) the Audit Committee would meet on May 8, 2001, to consider, independent of management, whether further action was necessary.

*Second*, on May 8, 2001, Dr. Kenny, then-Chair of the Audit Committee, met with representatives from CA's current and former outside auditors, KPMG and E&Y, and CA's senior management, including the CFO (Mr. Zar), head of Internal Audit (Ms. Caden), head of Financial Reporting (Mr. Kaplan), and the General Counsel (Mr. Woghin), and Scott Smith, CA's outside counsel. At this meeting, Mr. Zar addressed CA's (i) switch to the new business model and pro forma accounting, (ii) cancel/convert accounting, (iii) license/maintenance accounting and related issues related to maintenance revenue, (iv) use of reserves in connection with acquisitions, and (v) Unicenter. Mr. Zar provided support for the Company's position that the allegations made with respect to each of these issues were without basis. Further, the representatives from the accounting firms provided Dr. Kenny with assurances that they stood by their prior audit work, and that their prior audits had been

Exhibit 10

performed in conformity with GAAS.  While the SLC found that Dr. Kenny did not "cross-examine" Mr. Zar or the auditors, the general consensus of the attendees was that she honestly and competently investigated the issues.

In addition, according to Dr. Kenny, it was her belief that either management or the auditors would have informed her if there was anything at all to be concerned about. Instead, Messrs. Zar and Kaplan intentionally failed to raise the 35-Day Month as an issue, despite their knowledge of the practice.  Near the conclusion of the meeting, Dr. Kenny first asked Mr. Zar to step out of the meeting, and asked the auditors and remaining members of management if there was anything they wanted to raise outside of Mr. Zar's presence.  Both groups assured her that there were no such issues.  Then, Dr. Kenny asked all of the CA employees to leave the meeting, and again asked the auditors if there was anything they wanted to raise.  Again, the auditors assured her that there were no such issues.

*Third*, later on May 8, 2001, the Audit Committee, and remaining non-management directors, held a telephonic meeting to receive a report from Dr. Kenny on her meeting earlier in the day.  Dr. Kenny made a presentation to the directors, based on notes prepared by Mr. Woghin, of the explanations and assurances that she had been given by both management and the audit firms.  By all accounts, Mr. de Vogel was the most active participant on the call, asking probing questions throughout Dr. Kenny's presentation.  Significantly, as reported in the minutes, Dr. Kenny reported to the directors that the "audit firms had assured her that CA had not employed any of the accounting tricks alleged in the article."  While this may have overstated the assurances actually given by the auditors, neither Mr. Woghin nor Mr. Smith, who participated on this call and in the earlier meeting, corrected or qualified this

statement, and the directors hearing this report took considerable comfort from this representation.

Based upon these events, the SLC concluded that the non-management Oversight Director Defendants satisfied their duty of oversight to the Company. The directors did not intentionally ignore or disregard the article.[199] Rather, the full Board met about the article, the Chair of the Audit Committee met with the outside auditors and management to address the points raised in the article, and the Audit Committee and independent directors met to decide what further action, if any, should be taken. Thus, the directors did not "utterly fail" to take action in breach of their duty of good faith.

That said, during the course of its investigation, the SLC identified an issue that was not raised in either the 2005 Derivative Complaint or the Kaufman Complaint. The SLC examined whether, as a result of Dr. Kenny's personal and professional relationship with Mr. Wang, detailed above, the steps she took in response to the article were marked by a conflict of interest such that that they amounted to a sham. Several factors led the SLC to conclude that they were not.

First, every attendee at the May 8 meeting with the accounting firms that was interviewed by the SLC stated that they believed that Dr. Kenny made a good faith attempt to understand the implications of the article. Second, Mr. Kumar had replaced Mr. Wang as CEO by this time (although he was still Executive Chairman).[200] Third, Mr. Wang was not the subject of the article, the Company and its accounting practices were. Fourth, the SLC

---

[199]   As set forth earlier in this Report, numerous financial analysts and independent research groups published responses to the New York Times article which disagreed with the positions taken by Mr. Berenson.

[200]   It was reported to the SLC that, subsequently, in November 2002 when a conflict arose between Messrs. Kumar and Wang over whether Mr. Kumar should remain as CEO, Dr. Kenny adopted a neutral position instead of putting her support behind Mr. Wang.

Exhibit 10

uncovered no evidence suggesting that Dr. Kenny conducted her investigation in bad faith. Fifth, the SLC found Dr. Kenny's assertions that her relationship with Mr. Wang did not impair her ability to evaluate the allegations in the article to be honestly held and credible. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005) (finding that plaintiffs failed to demonstrate that a JPMC director who was also the president of a museum was not independent where "the plaintiffs state that JPMC is a significant benefactor [of the museum], but they never state how JPMC's contributions could, or did, affect the decision-making process of the president of one of the largest museums in the nation"); *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins*, 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004) ("Our cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment").

Thus, the SLC has concluded that Dr. Kenny's relationship with Mr. Wang did not render her efforts a sham. The SLC found that, despite her relationship with Mr. Wang, Dr. Kenny made a "genuine, good faith effort-to do her job as a director." *See ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *19 (Del. Ch. Dec. 21, 2006) ("Under Delaware law, it is fundamental that a director cannot act loyally towards the corporation unless she tries-i.e., makes a genuine, good faith effort-to do her job as a director").

Thus, in sum, the SLC's investigation failed to uncover any instances in which "red flags" of revenue recognition fraud were identified to the Board, but were nonetheless ignored. Instead, the SLC found that there were few, if any, clear notices of revenue recognition problems, and the Board adequately responded in instances where there was any

indication of misconduct.  It bears repeating that "Delaware law requires only diligence, not heroism." *Shaev*, 2006 WL 391931, at *6.  Here, the SLC has concluded that the Oversight Director Defendants engaged in legally sufficient oversight, and will seek dismissal of this claim.

d.      Reliance on Expert Advice:  Accountants

In considering whether the non-management Oversight Director Defendants could be held liable for breach of their fiduciary duties of oversight during the period of fraudulent conduct, the SLC also considered the extent to which they justifiably relied on the opinions and reports of experts – here, CA's independent auditors, E&Y and then KPMG.

Under Delaware General Corporation Law § 141(e), board members are relieved from liability for damages resulting from their actions if they "rel[ied] in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by . . . any other person[s] as to matters the [board] member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." *See, e.g., Disney V*, 906 A.2d at 60 (the purpose of § 141(e) "is to protect directors who rely in good faith upon information presented to them from various sources, including 'any other person as to matters the member reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care by and on behalf of the corporation'").

For example, in *Cantor*, 235 F. Supp. 2d at 388-89, the district court, applying Delaware law, rejected a claim alleging a breach of the duty of oversight where employees of the corporation were alleged to have prematurely booked licensing revenue, because the board relied upon its outside auditors to ensure that the company was properly recognizing revenue. The district court found that:

> Here, the Marvel board delegated the corporate accounting duties
> to Ernst & Young. Further, the board relied upon Ernst & Young
> expertise in accounting matters, such as the best method of
> accounting for Marvel's business. Lastly, Ernst & Young provided
> a clean accounting report to Marvel. As a result, the court finds
> that the Marvel board met its fiduciary duties with regard to
> accounting.

*Id.* at 388; *see Ash,* 2000 WL 1370341, at *9 (board's reliance on the due diligence opinions of expert accounting and financial advisors Deloitte & Touche and Bear Stearns in deciding whether to approve a merger was in good faith).

Here, the 2005 Derivative Complaint pleads no particularized facts to show that the Board's reliance on E&Y and KPMG was unreasonable or not in good faith, and is thus subject to dismissal on that ground alone. Again, notwithstanding this pleading failure, the SLC independently undertook to see if such facts nonetheless existed. They do not. The SLC has concluded that the Board's reliance on E&Y and KPMG was appropriate. The SLC found that the CA Board relied upon its independent outside auditors – two (2) highly qualified, "Big 4" accounting firms – to ensure that CA was in compliance with applicable accounting standards and that its revenue recognition practices were appropriate. At no time, either before or after SOP 97-2 came into effect, did E&Y raise the timing of CA's revenue recognition as an issue, and, to the contrary, E&Y assured the Audit Committee on five (5) occasions that it believed that CA was in compliance with its requirements. Further, both E&Y and KPMG consistently provided CA with a "clean" or "unqualified" audit report for the fiscal years during which the fraudulent conduct occurred. Likewise, there is no evidence that the Board was, or should have been, aware of the 35-Day Month practice such that the directors' reliance on the audit firms was unreasonable or in bad faith.

In short, the SLC uncovered no evidence to rebut the presumption that the Board properly relied on its outside auditors concerning the Company's accounting practice. Rather, the SLC found that the Board actually, and in good faith, relied upon nationally-recognized accounting firms that it reasonably considered were qualified to audit CA. Thus, the SLC concludes that § 141(e) provides additional support for its decision to seek dismissal of claims related to the Board's oversight of CA's revenue recognition practices.

e.   Oversight and the Government Investigation

Finally, the SLC examined the CA Board's oversight through the course of the government investigation, from when the Board was first notified of its existence in February 2002 through 2003. Ms. Kaufman alleges that the Oversight Director Defendants exercised "poor or non-existent oversight" during 2002 and through the first six months of 2003 (Kaufman Compl. ¶ 64).[201]

*Commencement of the Investigation in 2002.* Ms. Kaufman fails to plead the existence of *any* facts regarding the government investigation or the CA Board's oversight during 2002. The Kaufman Complaint is devoid of *any* factual allegations regarding the CA Board's information and reporting systems, or "red flags" that alerted, or should have alerted, the CA Board to the obstruction of the government investigation, but were ignored during 2002. This, of course, is grounds for dismissal. *See Canadian Commercial Workers Indust. Pension Plan v. Alden*, 2006 WL 456786, at *7 (Del. Ch. Feb. 22, 2006) ("The *Caremark* section of the Amended Complaint then conclusorily avers that Defendants 'ignored their duties to the Company.' Absent supporting facts, such bald conclusions need not and will not be accepted as sufficient to survive a motion to dismiss").

---

[201]   This claim is found only in the Kaufman Complaint. *See* Kaufman Compl. ¶¶ 102-104.

328

      Exhibit 10

Despite this pleading failure, the SLC, during its investigation, sought to identify any potential "red flags" that could have alerted the Board to the obstruction during 2002, but found none. Further, as detailed below, the SLC found that the Board took legally adequate steps to address the government investigation throughout 2002.

The SLC found that, in February 2002, upon learning that the USAO and SEC had commenced a preliminary investigation into CA's accounting practices, the Board retained highly-qualified counsel, WLRK, to represent the Company in connection with those investigations. Within the first week after learning of the investigation, the Board received two reports from WLRK, and thereafter in 2002 received numerous additional reports from WLRK (as well as from the Company's General Counsel, Mr. Woghin). During that time, WLRK and management consistently assured the Board that the Company was cooperating fully with the investigation, that WLRK could represent both management and the Board as there was no known conflict between the two groups, and that certain issues initially raised by the USAO had been resolved in the Company's favor. The SLC found no evidence that the Board was presented with any contrary information during 2002 to suggest otherwise, and none appears in the Kaufman Complaint.

Following WLRK's retention, the firm retained PwC, another nationally-recognized accounting firm, to conduct the 532 Contract Study, among others, to address the government's revenue recognition allegations. As described above, PwC reported to the Board that "a review of 532 contracts (total value of $13 billion) produced in response to the SEC's February 26, 2002 informal document request disclosed *no evidence to indicate that CA routinely or intentionally recognized contract revenues before customer signatures were obtained.*" (emphasis added). At the same time, the Board itself retained PwC to conduct the

329

Exhibit 10

KESOP Study. As described above, the KESOP Study was a study of the two quarters that preceded the vesting of the KESOP, which addressed five separate accounting issues for those quarters, and was designed by directors Schuetze and de Vogel to determine whether any wrongdoing had occurred during the time when CA management had the greatest motive to commit fraud. Likewise, the results of the KESOP Study provided no indication of revenue recognition fraud. The results of these studies were conveyed to the Board, and no limitation qualified their results.

In July 2002, Mr. de Vogel, a member of the Audit Committee (and a creator of the KESOP), met personally with the government in order to address its concerns with regard to the KESOP, and to hear its view with respect to the investigation. At this meeting, the government appeared to have an open mind, and the SLC has uncovered no evidence to suggest that the government provided Mr. de Vogel with any evidence of either accounting fraud or obstruction.

In sum, in response to the commencement of the government investigation, the CA Board retained highly-regarded outside counsel and an independent "Big 4" accounting firm to assist it, and certain Board members became personally involved in the Company's response to the government. The Board received numerous updates from counsel and management during 2002. There is simply no evidence that the CA Board failed to act where action was required, and the SLC concludes that the CA Board satisfied its duty of oversight during this period. *See Stone I*, 2006 WL 302558, at *2 (plaintiffs failed to "point to facts suggesting a conscious decision to take no action in response to red flags. Without these well-

pled allegations, there is no possibility the defendants faced a substantial likelihood of liability").[202]

*The Investigation in 2003.* The Kaufman Complaint pleads the existence of events in 2003 and 2004 that could constitute "red flags" and that did alert, or should have alerted, the Board to the obstruction of the government's investigation or the underlying fraud.[203] However, prior to the filing of the Kaufman Complaint (and after), the SLC independently identified and examined these, and other events, and the Board's response.

Specifically, the SLC examined the Board's response to (i) a July 2, 2003 CA Board meeting at which the Board was told, among other things, that (a) the government had suggested that the Audit Committee conduct its own investigation and (b) that the government believed that CA's senior managers had intentionally held fiscal quarters open in order to prematurely recognize revenue from licensing agreements and (c) that three CA executives were "subjects" of the government investigation; (ii) an August 7, 2003 memo from Mr. Woghin, which, among other things, alerted the Board that the government had expressed dissatisfaction with the Company's cooperation to date; (iii) the production of the so-called "23 Boxes" in September 2003; (iv) a December 3, 2003 CA Board meeting at which the Board was

---

[202] On July 2, 2002, Kenneth Cron, Robert La Blanc, Alex Vieux, and Thomas Wyman were elected to the CA Board, and directors de Vogel, Grasso, Pieper, and Kenny resigned effective August 25, 2002. As such, directors de Vogel, Grasso, Pieper, and Kenny cannot be held liable for any action, or failure to act, after August 25, 2002. Directors Cron, La Blanc, and Vieux cannot be held liable for any action, or failure to act, before August 25, 2002. Mr. Wyman died on January 8, 2003, shortly after being elected to the CA Board.

[203] These events included (i) a July 2, 2003 CA Board meeting, at which Mr. Savarese recommended that the Board direct the Audit Committee to conduct an independent investigation into the Company's accounting practices, and informed the Board that Messrs. Zar, Rivard, and Silverstein were "subjects" of the government investigation; (ii) the disclosure of the "23 boxes" of documents in September 2003; (iii) the October 7, 2003 employment terminations of Messrs. Zar, Rivard, and Silverstein, and the evidence indicating accounting fraud that had been uncovered at that time; (iv) a December 3, 2003 Board meeting, at which the Board was advised that the government was investigating whether CA employees had obstructed the investigation; and (v) the guilty pleas of Messrs. Silverstein, Zar, Kaplan, and Rivard during January and April 2004. *See* Kaufman Compl. ¶¶ 6-10, 66, 75, 77-78, 81, 89-90.

told that the government was investigating possible obstruction charges; and (v) the guilty pleas of Messrs. Silverstein, Zar, Kaplan, and Rivard during January and April 2004. The SLC's analysis of these issues is discussed below.

*The July 2, 2003 Board Meeting.* At this meeting, as described above, Mr. Savarese reported, among other things, that: (i) in rejecting his settlement offer on behalf of CA, both the USAO and SEC "assert[ed] that they believed that senior management of the company had intentionally held quarters open and used backdated contracts to meet earnings estimates;" and (ii) the government had identified Messrs. Zar, Rivard, and Silverstein as "subjects" of the government's investigation. The Board was also told that the government had suggested that the Board begin its own investigation. However, at this time, there were no concrete allegations that any member of CA senior management was involved in revenue recognition fraud or had obstructed the government's investigation. Nonetheless, the SLC assumed, for purposes of analysis, that Mr. Savarese's report constituted a "red flag."

The non-management directors universally reported to the SLC that this meeting was the first at which there was a strong indication that the government was dissatisfied with CA's cooperation. Mr. Savarese also informed the Board that while senior management had denied any intentional wrongdoing, they acknowledged that mistakes had been made with respect to revenue recognition. No evidence was presented to the Board that senior managers had lied to, or otherwise deceived, WLRK or the government. In response to the information presented to it, the Board, at the government's suggestion, authorized the Audit Committee to conduct an independent internal investigation with respect to the government's revenue recognition allegations. The Board authorized the Audit Committee to retain independent counsel, and other independent advisors, as it saw fit, to assist with its investigation.

332

Exhibit 10

Thus, when presented with government allegations that were in conflict with what senior management told WLRK and the Board -- with no hard evidence to support either position – the Board determined to authorize an independent investigation, conducted with the assistance of independent counsel and independent accountants, that would resolve the issue. Within three weeks of the July 2 meeting, the Audit Committee had retained, and met with, S&C in order to initiate its investigation. Two weeks after that, S&C had its first meeting with the government. This is not a case in which directors simply sat idle in the face of a "red flag"; rather, the Board took decisive steps to address the issue. As such, the SLC concludes that the Board satisfied its duty of oversight with respect to what it learned at the July 2 meeting.

*The August 7, 2003 Memo.* As described above, on August 7, 2003, at Mr. Schuetze's request, Mr. Woghin sent the CA Board a memo informing it that S&C had met with government representatives, and that: (i) the government "expressed dissatisfaction with both Wachtell Lipton and the company's cooperation to date," and (ii) the government "believed that the company had engaged in a systematic practice of backdating license agreements;" and (iii) the government "believed (but without offering any proof) that senior managers of the company (both current and former) had directed this practice and that it was done with the specific intent to represent falsely the company's quarterly revenues." Memorandum from Steven Woghin to the Members of the CA Board (Aug. 7, 2003).

The SLC found that the directors properly viewed this memo as "more of the same" information it had heard from Mr. Savarese at the July 2 meeting. As such, they generally believed that they had already acted with respect to this information by authorizing the Audit Committee to conduct its investigation, and believed that the investigation would address the issues raised in the memo. With respect to the issue of the Company's cooperation,

the Board likewise believed that the Audit Committee investigation would address any issues that existed. While the SLC was struck by the stark nature of the memo, which plainly states the government's position, it nonetheless found that, at this time, the directors were not legally required to take further action beyond having already authorized an independent investigation, which was now beginning, only one month earlier.

   *The September 2003 Document Productions.*  Much has been made of the so-called "23 Boxes" that were produced by the Company to WLRK, and then to the government by WLRK, in September and October of 2003.  Following a review and analysis of these documents, the Audit Committee concluded that contracts were, in fact, backdated.  With respect to the production of the documents, neither the Board, nor the Audit Committee, was told that the documents had been compiled and concealed by Mr. Woghin, as (incorrectly) alleged by plaintiffs.  To the contrary, the Board was repeatedly informed that the documents were collected in the normal course of the Company's response to government subpoenas.  Nonetheless, when reviewed and analyzed, the documents evidenced a revenue recognition fraud, and, as such, were clearly a "red flag" to the Board.

   The SLC found that the Audit Committee's response to these documents was timely and effective.  *First*, S&C, on behalf of the Audit Committee, engaged PwC to, among other things, image the computers of numerous current and former CA employees to obtain further documentation.  *Second,* in the first week of October 2003, counsel to the Audit Committee interviewed sixteen (16) employees regarding the information contained in the documents, including Messrs. Kumar, Zar, Kaplan, McWade, and Ms. Caden (then-head of Internal Audit).  Members of the Audit Committee personally attended the interviews of Messrs. Zar and Kumar.  *Third*, the Board held a meeting on October 7, 2003 to discuss the

Exhibit 10

Audit Committee's findings. *Fourth*, the Audit Committee recommended that Mr. Kumar

terminate the employment of Messrs. Zar, Rivard, and Silverstein, the executives in charge of

the Finance, Sales Accounting, and GSO departments, respectively, who were responsible for

implementing and overseeing CA's revenue recognition policies. *Fifth*, the Audit Committee

disclosed its findings to the public in a press release on October 8, 2003, announcing that CA

had improperly recognized revenue from numerous licensing agreements during fiscal year

2000.[204] *Sixth*, the Audit Committee caused its counsel to promptly advise the USAO and SEC

of all facts and developments resulting from its investigation, which it did on October 14, 2003.

Given that the Board took these steps once it had learned that there was documentary evidence

demonstrating that there was a practice of backdating at CA, any claim that the Board failed to

take any steps to investigate the "red flag" are without basis.

    *The October 20 Board Dinner.* At a dinner preceding the October 21 Board

meeting, Mr. Richards had a conversation with Mr. Ranieri during which he expressed

apprehension to Mr. Ranieri about testifying before the SEC, and told him that his lawyers had

recommended that he assert his Fifth Amendment rights. It is unclear exactly how Mr. Ranieri

responded within the context of the conversation; however, Mr. Richards claims that Mr.

---

[204]   The Kaufman Complaint states that, after being informed of the contents of the "23 Boxes," the Board
members "failed to disclose any of their knowledge or information about the fraud or the ongoing
conspiracy either to the Court or to the Company shareholders." Kaufman Compl. ¶72. This is plainly
false. As discussed above, the October 8 press release, which is not mentioned in the Kaufman
Complaint, disclosed that:

> The Audit Committee's investigation is continuing, but we have determined
> that CA recognized certain revenue prematurely in the fiscal year ending
> March 31, 2000. The committee found that a number of software contracts in
> that fiscal year appear to have been signed after the end of the quarter in which
> revenues associated with such contracts had been recognized. Those revenues
> should have been recognized in the quarter in which the contract was signed.

The press release also disclosed that the Company had terminated Messrs. Zar, Rivard, and
Silverstein. *See* Press Release, Computer Associates Announces Preliminary Results of Board
Inquiry (Oct. 8, 2003).

335

          Exhibit 10

Ranieri said that he could not "protect" Mr. Richards if he was outside the Company, but that he could "protect him" if Mr. Richards remained "on the inside." Mr. Ranieri does not recall the conversation, but recalls that his general practice at the time was to advise CA employees of the Audit Committee's policy, which was that all employees should provide full and honest testimony and that any employee who asserted his Fifth Amendment rights and consequently failed to cooperate with the Audit Committee's investigation would be terminated.

Regardless of the precise words used, it is clear that two days later, on October 22, the Audit Committee interviewed Mr. Richards. On October 23, Mr. Richards testified before the SEC. In both his Audit Committee interview, and his testimony before the SEC, Mr. Richards provided misleading answers that implied that he did not participate in and was not aware of the 35-Day Month practice. Given that the Audit Committee interviewed Mr. Richards promptly after Mr. Ranieri's conversation with him, and that Mr. Richards ultimately testified before the SEC and did not assert his Fifth Amendment rights, the SLC concludes that the Audit Committee responded appropriately to the situation at the time. Six months later, once actual evidence was uncovered implicating Mr. Richards, the Board terminated his employment.

*The December 3, 2003 Board Meeting.* At a December 3, 2003 CA Board meeting, the Board was advised, for the first time, that the government had expressly questioned whether any CA employees had obstructed the government investigation. Mr. Kumar reported to the Board that, upon learning that the government was looking into possible obstruction charges, the Audit Committee, with assistance from S&C, had expanded the purview of its investigation and undertaken to investigate whether "there was any basis for concern that the Corporation had obstructed the government's investigation." Minutes if a

Exhibit 10

Meeting of the CA Board at 2 (Dec. 3, 2003). Accordingly, the Audit Committee began investigating possible instances of obstruction. The SLC concludes that, by expanding the mandate of the Audit Committee to investigate the allegation of obstruction raised by the government, the Board satisfied its duty of oversight at this time.

Thus, here again, the Board, when faced with clear red flags, took steps to fully investigate and develop the facts, and ultimately took action to address the situation. The Board did not willfully ignore events as they occurred. As such, the SLC concludes that the director defendants therefore engaged in legally sufficient oversight throughout 2003.

f.      Reliance on Expert Advice: Counsel

As noted above, under § 141(e) of the Delaware General Corporation Law, directors are relieved from liability for damages resulting from their actions if they relied in good faith on experts that had been selected with reasonable care. *See, e.g., In re Cheyenne Software Inc. S'holder Litig.*, 1996 WL 652765, at *2 (De. Ch. Nov. 7, 1996); *Disney V,* 906 A.2d at 59 (declining to hold compensation committee liable where they relied on opinion of expert selected with reasonable care, the issue was within expert's professional competence, and opinion was "not so deficient" as to give committee reason to question his opinion).

With respect to the government investigation, the CA Board retained, in good faith, WLRK – a nationally-recognized law firm with whom the directors had prior experience – to advise the Company in connection with the government investigation. Later, the Audit Committee independently retained, in good faith, S&C, another nationally-recognized law firm to advise it in connection with its investigation. The SLC found that the CA Board and Audit Committee actually, and in good faith, relied upon the advice given by both WLRK and S&C at

337

Exhibit 10

each step throughout the government and the Audit Committee investigation.[205] As such, the

SLC concludes that § 141(e) provides additional support for its decision to seek dismissal of

claims related to the CA Board's oversight during the government investigation.

g.   Exculpatory Clause Under Del. Gen. Corp. Law § 102(b)(7)

Finally, CA's Certificate of Incorporation ("Certificate") protects its directors

from monetary damages in the event of a breach of the duty of care, as permitted by § 102(b)(7)

of the Delaware General Corporation Law.[206]  Under § 102(b)(7) and CA's Certificate, no

director shall be personally liable to CA or to CA shareholders for monetary damages unless

they, among other things:  (i) breach their duty of loyalty, or (ii) engage in intentional

misconduct, knowing violation of the law, or acts or omissions not in good faith.  *See* CA

Certificate ¶ Tenth.  Because this claim is for a breach of the duty of loyalty, the exculpatory

clause does not bar this claim on its face.  *See Stone II*, 911 A.2d at 367.  However, as described

above, the SLC has concluded that the directors at issue did not breach their duty of loyalty in

---

[205]   The Board also often relied upon advice from CA's in-house counsel, Steven Woghin, throughout this period.  While Mr. Woghin later pled guilty to fraud and obstruction, the Board was unaware of this and thus properly relied upon Mr. Woghin, a former Department of Justice attorney.

[206]   CA's exculpatory clause during the period at issue is found in Paragraph Tenth of the CA Certificate.  The clause closely mirrors the language of § 102(b)(7) and reads as follows:

> No director shall be personally liable to the corporation or its shareholders for monetary damages for any breach of fiduciary duty by such director as a director, except (i) for breach of the director's duty of loyalty to the corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the General Corporation Law of Delaware is amended after approval by the shareholders of this article to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director or the corporation shall be eliminated or limited to the full extent permitted by the General Corporation Law of Delaware, as so amended.

CA Certificate ¶ Tenth.

Exhibit 10