

1  Thomas N. FitzGibbon (SBN: 169194)
   TNF@ptflaw.com
2  **PFEIFFER THIGPEN & FITZGIBBON LLP**
3  233 Wilshire Boulevard, Ste. 220
   Santa Monica, CA  90401
4  Telephone: (310) 451-5800
   Facsimile: (310) 451-1599
5

6  Luke A. McGrath (*Pro Hac Vice Pending*)
   LZM@bickelbrewer.com
7  James S. Renard (*Pro Hac Vice Pending*)
   JSR@bickelbrewer.com
8  **BICKEL & BREWER**
9  767 Fifth Avenue, 50th Floor
   New York, New York 10153
10 Telephone: 212-489-1400
   Facsimile: 212-489-2384
11

12
   Attorneys for Intervenor
13 *Sam Wyly*

14

15             **UNITED STATES DISTRICT COURT**

16             **CENTRAL DISTRICT OF CALIFORNIA**

17

18 UNITED STATES OF AMERICA,        Case No. 2:05-CR-587-JFW-3
                                    [Assigned to Hon. John F. Walter]
19          Plaintiff,

20       - against -               **PART 5 OF EXHIBIT 10 TO
                                   DECLARATION OF LUKE A.**
21                                 **MCGRATH IN SUPPORT OF
                                   INTERVENOR SAM WYLY'S**
22 MILBERG WEISS BERSHAD &         **MOTION TO INTERVENE AND**
   SCHULMAN LLP, DAVID J.          **FOR RELIEF FROM PROTECTIVE**
23 BERSHAD, STEVEN G.              **ORDER**
   SCHULMAN, SEYMOUR M.
24 LAZAR, and PAUL T. SELZER       Date:   February 9, 2009
                                   Time:   9:00 a.m.
25      Defendants.                Room:   16

26

27

28

the oversight context, and did not act in bad faith.  As such, the SLC concludes that the CA Board is protected by CA's exculpatory clause, and that this provides additional support for its decision to seek dismissal of this claim.

### 2.   The Decision to Settle

The 2005 Derivative Complaint also alleges that, in authorizing the settlement of the Class and Derivative Actions, the Settlement Director Defendants breached their duty of care by (i) issuing 5.7 million shares of CA common stock, then-valued at $133 million, and (ii) granting releases to CA's officers and directors.  This breach allegedly occurred because those directors approved the settlement without seeking contribution from the Criminal Defendants, "[n]otwithstanding their knowledge of the wrongdoing committed by the Individual [director and officer] Defendants."  2005 Compl. ¶ 86.[207]  Plaintiffs allege that by the time the Court approved the settlement in December 2003, CA's Board: "(1) knew that [Ira] Zar and [David] Kaplan had lied to CA's current and former outside lawyers; (2) knew that [Steven] Woghin had engineered a cover-up by withholding key documents until after the settlement; and (3) knew that [Sanjay] Kumar was involved."  2005 Compl. ¶ 223.

Ms. Kaufman alleges further that the directors were then in possession of documents (the 23 Boxes) that "indicated that Company executives, including at least Zar, Woghin, and Kumar, systematically had violated proper accounting procedures."  Kaufman Compl. ¶ 71.  Plaintiffs allege that, despite this knowledge, "the current director defendants did nothing to disclose those activities . . . to prevent a fraud on the Court and the consummation of an unfair agreement to the Company."  2005 Compl. ¶ 87.

---

[207]    Ms. Kaufman similarly alleges that the Settlement Director Defendants breached their duty of care to the Company by "caus[ing] the Company to enter into unfair and improper Settlements whereby the wrongdoers were released from any liability for their harm to the Company." Kaufman Compl. ¶ 104(b).

339

Exhibit 10

For the reasons discussed below, the SLC has concluded that this claim should be dismissed. Primarily, this claim is infirm because its factual underpinnings are wholly erroneous. The SLC's lengthy investigation on this issue has revealed that the outside directors – at the time the settlement was authorized and approved – did not know any of the items set forth above that form the basis of plaintiffs' claim. While all these issues were actively being investigated by the Audit Committee and its counsel, these were not yet known to be true. Further, what was known by the directors – that CA had prematurely recognized revenue from numerous contracts during fiscal year 2000 – was disclosed to the public in the October 8, 2003 press release. Under the applicable legal standards, this claim should be dismissed.

(a)     The Business Judgment Rule

As described above, the business judgment rule is a judicial presumption that directors and officers acted in a manner consistent with the duty of care – that is, "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson,* 473 A.2d at 812; *see also Disney IV,* 907 A.2d at 755 ("[t]he presumption of the business judgment rule creates a presumption that a director acted in good faith"). The deference afforded to corporate decision-making by the business judgment rule "serves to protect and promote the role of the board as the ultimate manager of the corporation," and "'operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation.'" *Disney IV,* 907 A.2d at 746 (quoting *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del. 1993)).

Thus, courts are typically precluded from second-guessing the substantive decisions of corporate directors, as such second-guessing would ultimately prove injurious to shareholders. *See Caremark,* 698 A.2d at 967 ("To employ a different rule – one that permitted

Exhibit 10

an 'objective' evaluation of the decision – would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests"). "Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment*, he or she should be deemed to satisfy fully the duty of attention." *Id.* at 968 (emphasis in original).

The business judgment rule's presumption of due care " applies when there is no evidence of 'fraud, bad faith, or self-dealing.'" *Disney IV*, 907 A.2d at 747 (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)). In order to overcome the presumption created by the business judgment rule, a plaintiff must prove that the defendants acted with (i) fraud, (ii) illegality, (iii) a conflict of interest, or (iv) gross negligence. *See Kahn ex rel. DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 465 (Del. 1996); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000) ("To overcome the presumption of the business judgment rule, plaintiffs bear the burden to show that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis").

Typically, the actions of directors will not subject them to liability for breach of the duty of care unless the plaintiff can show "gross negligence." *Growe v. Bedard*, 2004 WL 2677216, at *7 (D. Me. Nov. 23, 2004) (applying Delaware law and stating "[t]o establish a breach of the duty of due care, a plaintiff must ordinarily establish gross negligence on the part of directors") (citing *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001)); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005) ("Director liability for breaching the duty of care is predicated upon concepts of gross negligence"). Absent any of these conditions, the board's decision "will be upheld unless it cannot be 'attributed to any

341

rational business purpose.'" *Disney IV*, 907 A.2d at 747 (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

             (i)       There Was No Fraud, Illegality, or Conflict of Interest

        The SLC has found no evidence to suggest that the decision to authorize the settlement was tainted by fraud, illegality, or a conflict of interest, and none is alleged in the 2005 Derivative Complaint.[208]  As is described above, there is no evidence that any non-management members of CA's Board were aware of, or participated in, the 35-Day Month practice at any time.

        The only potential conflict of interest identified by the SLC in connection with the Board's decision to authorize the settlement comes from the fact that the releases granted as part of the negotiated settlement covered the Board.  However, under Delaware law, such allegations clearly do not rise to the level of a breach of the duty of loyalty.  As the Delaware Court of Chancery held in *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149 (Del. Ch. 2003), the argument that "the releases Board members received constituted a material benefit to the directors that made the settlement a self-interested transaction" does not "come up to the mark."  In that case, "[t]he complaint fail[ed] to allege that anyone had sued, or even threatened suit against, the directors at the time they authorized either settlement proposal." *Id.*  As such, "[b]ecause the threat of personal liability was so insubstantial, there is no force to Wexford's

---

[208]    The 2005 Derivative Complaint does not allege this conflict.  However, the Kaufman Complaint alleges that directors Artzt, D'Amato, and Ranieri were defendants "in the class action and derivative lawsuits, and, as such, faced significant personal liability under securities laws," and thus "approv[ed] unfair settlements for personal interests, to the detriment of the Company." Kaufman Compl. ¶ 35 (a) & (b). This is not accurate.  Directors D'Amato and Ranieri, who sat on the class action settlement committee were not named as defendants in the Class Actions and, as such, did not face any potential liability in those lawsuits.  Further, as is noted in the August 21, 2003 Board meeting minutes, which the Company provided to Ms. Kaufman, Mr. Artzt abstained from the decision to authorize the settlement and, as such, played no role in approving the settlements.

contention that, because the Settlement Agreement includes releases running in favor of the directors, those directors were 'interested' in that transaction." *Id.*[209]

In an analogous situation, the Delaware courts have also found that a Board's decision to amend a company's certificate of incorporation to include a §102(b)(7) provision, which, as discussed above, protects directors (i.e., themselves) from monetary liability arising from due care violations, is insufficient to establish director interest for the purpose of excusing pre-suit demand. In *Orloff v. Shulman*, 2005 WL 3272355, at *13 (Del. Ch. Nov. 23, 2005), the Court of Chancery stated that it "has at least twice before rejected claims of this kind, noting that they are 'but variations on the "directors suing themselves" and "participating in the wrongs" refrain.'" *Id.* at *13 (quoting *Decker v. Clausen*, Civ. 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989)); *see also Caruana v. Saligman*, 1990 WL 212304, at *4 (Del. Ch. 1990)). The Court of Chancery expressly held that the directors' approval of the § 102(b)(7) provision, in and of itself, was insufficient to demonstrate that directors lacked the independence necessary to make a business decision as to whether to proceed with a suit challenging their actions. *See id.*

This makes perfect sense: "it is more or less universally the case that when a corporation pays value to settle a claim, it demands and receives releases in favor of its

---

[209]   The Delaware courts have also addressed the issue of director independence in the context of pre-suit demand. In this analogous situation, the courts have repeatedly held that "[i]n order to rebut the presumption of director disinterestedness and independence, a stockholder must show that the directors' self-interest materially affected their independence." *McGowan v. Ferro*, 859 A.2d 1012, 1029 (Del. Ch. 2004). "In other words, to be disqualifying, the nature of the director interest must be substantial, not merely incidental." *Id.* (quotation omitted). To adequately allege director interest sufficient to excuse pre-suit demand under Delaware law, "the complaint must allege 'specific facts establishing that the potential for liability is not a mere threat but instead may rise to a substantial likelihood." *Kohls v. Duthie*, 791 A.2d 772, 779 (Del. Ch. 2000) (citations omitted). Under this rationale, "a mere threat of personal liability resulting from one's participation as a director in approving a transaction should not suffice to sterilize a director's discretion." *Id.* at 780; *see also Guttman*, 823 A.2d at 500 (requiring a showing that "the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality" before a court will excuse pre-suit demand).

directors, officers and other agents, in order to preclude the possibility of having to defend against any additional claims arising out of the matters at issue in the settlement." *H-M Wexford*, 832 A.2d at 149. From a policy and practical standpoint, "[t]here would be little sense in a rule providing that the presence of such prophylactic measures in a settlement agreement results in that agreement being treated as an interested party transaction." *Id.* at 149-50. Thus, the mere fact that the CA Board received a release in connection with the settlement does not create a conflict.

In addition, as discussed above, the class action and derivative litigation settlements were evaluated and approved by two (2) separate committees of independent directors, established for this purpose by the Board. The class action settlement committee consisted of directors D'Amato, Lorsch, Ranieri, and Schuetze, none of whom were named as defendants in the class action litigation. The derivative settlement committee consisted of directors Lorsch, Cron, Fernandes, La Blanc, Schuetze, and Vieux, none of whom were named as defendants in the derivative litigation. Each committee was represented by separate, independent outside counsel.

Because the settlements were negotiated and approved by separate committees of independent directors, their decision to enter into a settlement on CA's behalf was not compromised by a conflict of interest, and is entitled to business judgment protection. *See In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1187 (N.D. Cal. 1993) (applying Delaware law and holding independent committees of disinterested directors' decision to settle protected by the business judgment rule, but finding that committee lacked independence because it was not advised by outside counsel); *Abramowitz v. Posner*, 513 F. Supp. 120, 127 (S.D.N.Y. 1981) (applying Delaware law and holding that "the business judgment rule may properly be invoked

by disinterested directors, acting independently, even when some board members, because of their interest in the transaction, are disqualified from participating in the board's decisions"), *aff'd*, 672 F.2d 1025 (2d Cir. 1982).

Therefore, the business judgment rule will protect the Current Director Defendants from liability for their decision to authorize the settlement unless that decision was (i) the result of gross negligence, or (ii) the decision wholly lacked a rational business purpose. As described above, the SLC, in reviewing the facts and circumstances of this decision, has concluded that the Board did not commit gross negligence, and the decision was based on valid, objective business considerations. As such, the SLC will seek to have this claim dismissed.

(ii)     Gross Negligence

With respect to actions of corporate fiduciaries, gross negligence has been defined as "reckless indifference to or deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Disney IV*, 907 A.2d at 750 (citation omitted); *see also Benihana*, 891 A.2d at 192. To show gross negligence, a plaintiff must articulate facts suggesting a "wide disparity" between the decision-making process employed by the board, and a process that would be rational. *See Guttman*, 823 A.2d at 507 n.39 ("If gross negligence means something other than negligence, pleading it successfully in a case like this requires the articulation of facts that suggest a *wide* disparity between the process the directors used to ensure the integrity of the company's financial statements and that which would have been rational") (emphasis in original). As a result, "duty of care violations are rarely found." *Disney IV*, 907 A.2d at 750.

The SLC has concluded that the facts surrounding the Board's decision to authorize the 2003 Settlement do not "suggest a *wide* disparity between the process the

345

directors used . . . and that which would have been rational," amounting to gross negligence.

*Id.* (emphasis in original).  As discussed above, through its investigation, the SLC found that:

- The civil litigation began in 1998, at which time Mr. Woghin advised the Board that the claims made by the plaintiffs were "extremely thin." The civil litigation continued for five years, and the Board received periodic updates regarding the litigation throughout.

- WLRK, and other outside counsel, repeatedly advised the Board that the existence of the Class Actions was an impediment to resolving the government investigation.

- At a May 13, 2003 Board meeting, Mr. Woghin advised the Board that the Company had participated in mediation with the plaintiffs with the assistance of a retired U.S. District Judge, and that the parties were unable to reach a settlement. Mr. Woghin informed the Board that he believed the Court would deny the Company's then-pending motion for summary judgment, and that the case would go to trial in the fall of 2003.

- The directors remained informed about the status of the settlement negotiations through management e-mails on the subject.

- Prior to a June 18, 2003 Board meeting, the Board received a memo from Mr. Woghin outlining the terms of a proposed settlement, and had been in e-mail contact with Mr. Kumar about the negotiations.

- At a June 18, 2003 Board meeting, David Nachman, CA's outside counsel, and Sanjay Kumar presented the proposed "global" settlement to the Board. Mr. Nachman strongly advocated that the directors agree to the settlement and provided his opinion that the settlement was a preliminary step toward resolving the government investigation. The Board formed an independent committee to evaluate the settlement.

- At a July 22, 2002 Board meeting, Mr. Nachman reported to the Board on the status of the Class Actions and the 2003 Derivative Action, and the proposed settlement. Mr. Nachman reported that while the plaintiffs had a weak case, the case would likely go to trial.

- On July 25, 2003, Mr. Woghin sent the Board a memo updating it on the status of the settlement discussions. Mr. Woghin reported that the parties to the Class Actions and 2003 Derivative Action had met with the Court, and agreed to a settlement on substantially the same terms outlined by Mr. Nachman at the June 18 Board meeting, pending Board approval.

Exhibit 10

- On August 11, 2003, James McGuire (then counsel at the law firm White & Case, and now an appellate judge) and Peter Fleming (one of New York's leading trial lawyers) were retained as counsel for the derivative and class action settlement committees, respectively.

- On August 14, 2003, Mr. Woghin sent the Board a memo announcing the members of two (2) settlement committees – one for the Class Actions and one for the 2003 Derivative Litigation – providing the resumes of counsel for the committees, and outlining the settlement process.

- On August 19, 2003, both settlement committees participated in a conference call with their respective counsel, during which the committees raised and considered the relevant issues associated with the settlements, including the necessity of the settlements being "global" and the propriety of granting releases to CA's officers and directors prior to the conclusion of the government and Audit Committee investigations.

- On August 21, 2003, the Board met again to consider, and decide upon, the settlement. Mr. Kumar again reviewed for the Board the terms of the proposed settlement, and then reviewed the actions taken by the Board with respect to the settlement to date. Directors D'Amato and Lorsch, Chairs of the class action settlement committee and the derivative settlement committee, respectively, reported to the Board regarding the review conducted by each committee and the recommendation of each committee that the Board approve the respective settlements. After a discussion, and with Messrs. Kumar and Artzt abstaining, the Board approved the settlements.[210]

- The majority of the Board understood that the settlement was final when they authorized it in August 2003. None of the Company's lawyers advised the Board to the contrary, and no lawyers raised the issue of the releases to the Board after August 2003.

The SLC has concluded that these facts do not suggest gross negligence on the part of the director defendants, but rather, demonstrates that they used a rational process designed to ensure that the Board acted on an informed and adequate basis in making its

---

[210]   Despite the fact that the Company provided Ms. Kaufman with the August 14 memo, the June 18 and August 21 Board meeting minutes, and other documents outlining the settlement process employed by the Board (pursuant to her § 220 request), Ms. Kaufman omits the following facts from her complaint: (i) the creation of the independent class action and derivative settlement committees, (ii) the committees' retention of independent counsel, and (iii) the August 19 committee meetings. Instead, Ms. Kaufman alleges that the Board approved the settlements at a "hastily called" Board meeting, at the urging of Messrs. Kumar and Woghin, without the benefit of outside counsel. Kaufman Compl. ¶¶ 7, 66. This allegation is, of course, wrong, and directly contrary to documents in the possession of Ms. Kaufman.

decision. The directors did not act with "reckless indifference to or a deliberate disregard of the whole body of stockholders." *Id.* (quotations omitted); *see also Albert v. Alex Brown Mgmt. Serv., Inc.*, 2005 WL 2130607, at * 4 (Del. Ch. Aug. 26, 2005) ("Gross negligence . . . involves a devil-may-care attitude or indifference to duty amounting to recklessness") (citation omitted).

Nor was the Board wholly uninformed of the facts. *See Van Gorkom*, 488 A.2d at 874-875 (finding breach of fiduciary duty where Board authorized sale of company after a twenty-minute presentation and two-hour deliberation, without any supporting documentation, prior notice, or input from counsel or management). The SLC believes that, when considering the entirety of the factual record, the "board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives," and therefore deserves the protection of the business judgment rule. *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989).[211]

As noted above, plaintiffs allege that by December 2003, when the 2003 Settlement was finalized, the directors *knew* that (i) Messrs. Zar and Kaplan had lied to CA's current and former outside lawyers, (ii) Mr. Woghin had engineered a cover-up by withholding documents, and (iii) Mr. Kumar was involved in wrongdoing. Likewise, Ms. Kaufman alleged that the "23 Boxes" "indicated that Company executives, including at least Zar, Woghin and Kumar, systematically had violated proper accounting procedures." Kaufman Compl. ¶ 71. These allegations are factually incorrect.

*First*, as discussed above, the Board did not know if Mr. Zar had lied, but decided that he should be terminated because the accounting fraud occurred on his watch as

---

[211]    As noted above, the SLC believes that there were several aspects of the process that could have been improved. None of these, however, render the Board's decision to approve the settlement "grossly negligent" or the result of "bad faith." *See Disney III*, 907 A.2d at 745, n.399.

CFO.  Further, Mr. Kaplan resigned from CA on December 3, 2003, after refusing to be interviewed by the Audit Committee, but this did not mean that the directors "knew" that Mr. Kaplan had obstructed the government's investigation or that he had "lied" to counsel.  *Second*, the Board was never told that Mr. Woghin had withheld documents.  To the contrary, the Board was told explicitly by Mr. Savarese on October 21, 2003 that the documents had been collected in the ordinary course of responding to the government's subpoenas and by S&C that WLRK had provided "good explanations" about the document collection issues.  *Third*, as is quite clear from the extensive investigation into Mr. Kumar's involvement in the fraud conducted through 2003 and 2004, and the information garnered by that investigation, the Board did not "know" that Mr. Kumar was involved in the fraud until well after the settlement was approved and finalized by the Court.  As a review of the "23 Boxes" demonstrates, those documents did not implicate Mr. Kumar in the 35-Day Month.  Nor did they implicate Messrs. Zar and Woghin, as alleged by Ms. Kaufman.

Thus, the only "new" information the Board had by December 2003 when the settlement was finalized was that which was announced in the October 8 press release – that there had been some form of an accounting fraud at CA.  However, this was something that had been explicitly contemplated by the derivative settlement committee at the August 19 meeting.  The derivative settlement committee also contemplated the possibility that evidence of wrongdoing on the part of CA's management might arise in the Audit Committee and government investigation, and nonetheless determined that it was in the best interests of the Company to go forward with the settlement.[212]

---

[212]   As discussed above, and as reflected in contemporaneous documents, the derivative settlement committee discussed the possibility of (i) deferring the settlement until after the conclusion of the Audit Committee and government investigations, or (ii) "narrowing or tailoring" the releases to

In other words, the scenario which the derivative settlement committee considered in making its decision in August 2003 had now arisen. At that time, it determined that the Company's interest in a global settlement of the civil litigation outweighed any potential benefit to pursuing claims against potential wrongdoers. That is a decision that is protected by the business judgment rule. *See Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702-704 (2d Cir. 1980) (business judgment rule protects directors' failure to "reconsider" a merger agreement in light of a subsequent tender offer); *John Hancock Capital Growth Mgmt., Inc. v. Aris Corp.*, 1990 WL 126656, at *2 (Del. Ch. 1990) (business judgment rule protects the implicit rejection by the board of a bond repurchase, as a result of an earlier transaction that precluded the purchase).

Further, the reasons given by the directors as to why they did not reconsider the settlement were that: (i) despite having many top law firms advising them, no counsel ever suggested they revisit the issue and the directors assumed counsel would have advised them if they should – or ever could – re-evaluate the settlement; (ii) through December 2003, the directors had no information that led them to believe that top management (Messrs. Wang or Kumar) had been involved in any wrongdoing; and (iii) as additional negative facts arose, the benefit to shareholders of the global settlement became even greater and more apparent. Thus, the SLC found that the directors did not violate their fiduciary duties by refusing to reconsider and seeking to upset the 2003 Settlement, but rather, found the reasons given by the directors as to why they did not reconsider the settlement to be credible, reasonable, and given in good faith.

---

preserve the Company's ability to pursue future action against certain individuals in the event that evidence of wrongdoing emerged.

Indeed, it is difficult to see how CA could have benefited by upsetting the global settlement to pursue claims of *de minimis* value, relative to the risk and exposure that the Company faced. Under plaintiffs' theory, one plausible outcome was that CA would abandon the global settlement, lose a multi-billion dollar jury verdict in a case scheduled for trial, but preserve claims against former executives who have, collectively, under $3 million in assets.[213] This is why the business judgment rule protects directors from ill-considered, hindsight second guessing such as that engaged in by Ms. Kaufman.

(iii)     Rational Business Purpose

The SLC has also concluded that the decision to authorize the settlement was not "unintelligent" and can certainly be "attributed to a rational business purpose." *Disney IV*, 907 A.2d at 747-48; *see Khanna v. McMinn*, 2006 WL 1388744, at *23 (Del. Ch. May 9, 2006) ("'[t]his Court will not second-guess the judgment of a board of directors if it bases its decision on a rational business purpose'"). The SLC found the following with respect to the purpose underlying the Board's decision:

- Counsel advised the Board that the Class Actions and 2003 Derivative Action would go to trial, at an estimated cost of $30 to $40 million, not including the distraction to management that would result.

- The settlement extinguished liability for the Company in the Class Actions, which was estimated by counsel to be between $2 and $5 billion, in exchange for 5.7 million shares of CA stock (then-valued at $140 million) and no cash payment.

- The Board believed, based on the advice of counsel, that resolving the Civil Litigation would help resolve the government investigation by ending the cooperation between the plaintiffs' lawyers and the government.

---

[213]     This represents the collective assets of Messrs. Zar, Rivard, and Silverstein, the only members of CA management determined to bear any amount of responsibility for the 35-Day Month practice at CA through December 2003 when the settlement was approved. As discussed above, the Board had not been presented with any evidence at that time that Messrs. Kumar or Wang were involved in the fraud, or the cover-up of the fraud.

351

- The derivative settlement committee considered the benefits of and the risks associated with granting the releases. Counsel advised the settlement committees that deferring the settlement or attempting to limit the releases could upset a "global" settlement of the Class Actions and 2003 Derivative Action.

Therefore, it is clear to the SLC that these were valid business considerations that the Board reasonably and honestly believed, and these considerations drove and supported the decision to authorize the settlement in 2003. These business considerations were equally compelling in December 2003 when the settlement was approved. Indeed, as noted above, if anything, the motivation to extinguish CA's civil liability as a step towards resolving the government investigation had increased. As such, the SLC has concluded that the Company has no basis to rebut the presumptions afforded by the business judgment rule, and the SLC will seek dismissal of this claim.

(iv)    Reliance on Expert Advice

As discussed above, § 141(e) of the Delaware General Corporation Law relieves directors from liability if they relied in good faith upon experts who have been selected with reasonable care by or on behalf of the corporation. *See Cheyenne Software*, 1996 WL 652765, at *2 ("[D]irectors are protected from a breach of the duty of due care when the directors reasonably believe the information upon which they rely has been presented by an expert 'selected with reasonable care' and is within that person's 'professional or expert competence'"). Two qualified lawyers, Peter Fleming of Curtis Mallet and James McGuire of White & Case, advised the settlement committees. Both attorneys recommended that the committees authorize their respective settlements. In addition, at the time the "global" settlement was initially presented to the Board, Mr. Nachman advised the Board that he believed the global settlement was in the best interests of the Company and might help lead to

352

Exhibit 10

resolution of the government investigation.  This was consistent with earlier advice from WLRK that settlement of the Class Actions would be a positive step towards resolving the government investigation.[214]  In sum, the Board received advice from no fewer than four separate law firms, and each of those firms advised the Board that the settlement was in the best interests of the Company.  At no point in time did any counsel advise the Board that its opinion had changed.

Further, the presumption that the Board exercised proper business judgment includes the presumption that it appropriately relied on experts.  *See Ash*, 2000 WL 1370341, at * 9 ("The McKesson board is entitled to the presumption that it exercised proper business judgment, including proper reliance on experts"); *Brehm*, 746 A.2d at 261 (executive compensation consultant "is presumed to be an expert on whom the Board was entitled to rely in good faith under Section 141(e) in order to be 'fully protected,'" and plaintiffs must rebut this presumption to establish director liability).

To rebut such a presumption, plaintiffs must plead "particularized facts" showing gross negligence, which includes one of the following: (i) that the directors actually did not rely on expert advice; (ii) that the reliance was not in good faith; (iii) that the directors did not reasonably believe the expert was qualified; (iv) that the directors failed to act with reasonable care in selecting the expert; (v) that the issue of the case was so obvious to the directors that regardless of expert advice, they themselves should have picked up on it, or (vi) that the decision was so unconscionable as to be wasteful or fraudulent.  *See Ash*, 2000 WL 1370341, at * 9 ("Plaintiffs have not rebutted the presumption with particularized facts creating

---

214  To be clear, WLRK was "not asked to opine on whether the Board of Directors should approve the proposed derivative settlement" and did not do so, but did opine about the effect of a settlement on the government investigation. *See* Letter from John Savarese to Dan Murdock and Robert Bostrom (Aug. 20, 2003).

353

reason to believe that the McKesson board's conduct was grossly negligent"); *Brehm*, 746 A.2d at 262 (plaintiff must set "forth particularized facts creating reason to believe that the Old Board's conduct was grossly negligent" to rebut the presumption of proper reliance on an expert); *Crescent/Mach I Partners*, 846 A.2d 963 at 985 ("to overcome the presumption that the director defendants acted on an informed basis plaintiffs must show gross negligence").

Here, there are no facts to rebut the presumption afforded by the business judgment rule. *See supra* at 239-251; *Brehm*, 746 A.2d at 262. The SLC has found that the directors actually and reasonably relied in good faith on the advice of counsel in making their decision, and that the directors reasonably believed that counsel were qualified based upon the recommendation of Mr. Woghin, the attorneys' resumes,[215] the professional reputations of their respective firms, and the presentations made by the attorneys themselves.

While Mr. McGuire was originally recommended to CA by Mr. D'Amato, an interested director, the SLC found that these facts – that Mr. D'Amato recommended him for a separate matter months prior to his retention and Mr. Woghin independently contacted Mr. McGuire for this representation – do not indicate that the Board relied on Mr. McGuire in bad faith or that they failed to exercise due care in the selection of counsel. Further, Messrs. Fleming and McGuire provided the Board with a reasonably adequate basis for their conclusions, following their review of the litigation papers, information gathered from various sources knowledgeable about the litigation, consultation with other counsel, and their professional experience.

---

[215] The fact that, as noted above, the biography of Mr. McGuire attached to the August 14 memo was not, in fact, his biography, but the biography of a White & Case partner also named James McGuire, does not render their reliance on him unreasonable since they had no reason to suspect or believe that it was not the "correct" James McGuire. Further, the Board was comfortable with his presentation, and another White & Case partner, now U.S. District Judge Richard Holwell, also participated on the call.

Likewise, the fact that Mr. Woghin, and not the committee members themselves, selected these lawyers does not change this conclusion. *See In re Western Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at * 22 (Del. Ch. May 22, 2000) (holding that in approving merger, special committee of independent directors could reasonably rely on advice of outside counsel recommended by corporation's general counsel, where outside counsel "appeared qualified" and did not have any conflicts of interest with parties to transaction). The SLC has uncovered no evidence that Mr. Woghin tried to interfere with the Board's decision-making process, or to select lawyers that would reach a certain result. Given the Board's state of knowledge at the time – there is no evidence to support any claim that it knew of wrongdoing by Mr. Woghin at this time – the SLC believes that it was not unreasonable to allow Mr. Woghin to coordinate the retention of counsel.[216]

Finally, as noted above, the decision to authorize the settlement was not so unconscionable as to be considered wasteful or fraudulent, thereby making the Board's reliance on counsel's advice unreasonable. To the contrary, as evidenced by the extensive discussions among counsel and the Board regarding the benefits and potential risks of settling, the decision required the Board to weigh multiple factors, including the substantial benefits a settlement would provide to the Company. Ultimately, the settlement did, in fact, provide substantial benefit to the Company: (i) CA's stock price rose consistently following the announcement of

---

[216]   This conclusion is in accord with the recent Chancery Court decision in *Valeant Pharm. Int'l v. Jerney*, 2007 WL 704935 (Del. Ch. Mar. 1, 2007), which discusses reliance on expert advice in the context of evaluating a decision to pay large cash bonuses to company executives for entire fairness under Delaware law. In that case, the court held that it was unreasonable for the defendant, a former director and president of a corporation, to rely on the advice given by a compensation expert for several reasons, including (i) that the expert performed earlier work for management on the same matter; (ii) that the expert provided advice on the payment of an option bonus, not a cash bonus; (iii) that the advice given by the expert was based on inflated values related to an IPO pricing and spinoff; and (iv) that the expert was chosen by an interested party – one of the company executives receiving the bonus. *Id.* While Mr. Woghin, who chose the lawyers representing the committee members in the instant case, was similarly interested, no other indicia exist to question the committee's reliance on those lawyers.

the settlement until the Audit Committee announced its preliminary findings in October 2003;

(ii) the Company settled for substantially less than it would have had the Board delayed settling,

and avoided a jury verdict that was potentially in the billions of dollars; (iii) the Company

avoided the significant distraction to management that would have resulted from a trial; and (iv)

CA has not been wholly precluded from seeking restitution from the wrongdoers (as evidenced

by the Kumar settlement).  Thus, the SLC concludes that the Settlement Director Defendants

are entitled to the protection of § 141(e) of the Delaware Code, and that this provides a further

basis for dismissal.

(1)     CA's Exculpatory Clause

As discussed above, CA's Certificate protects directors from monetary damages

in the event of a breach of the duty of care, as permitted by § 102(b)(7).  *See supra* note 204.

The SLC found no evidence that the Settlement Director Defendants breached their duty of

loyalty in approving the settlement, and no such allegation was made in the 2005 Derivative

Complaint.  Likewise, there is no evidence that the Settlement Director Defendants engaged in

intentional misconduct or knowingly violated the law.

Finally, the SLC found no evidence suggesting that the Board consciously

disregarded its responsibility to the Company, or that it knew that it was making a decision

based on inadequate information and deliberation, but did not care.  *See Disney V,* 906 A.2d at

66 ("intentional dereliction of duty, [and] a conscious disregard for one's responsibilities" is

misconduct that is "properly treated as a non-exculpable, nonindemnifiable violation of the

fiduciary duty to act in good faith"); *The Litig. Trust of MDIP, Inc. v. Rapoport,* 2004 WL

3101575, at *4 (D. Del. Nov. 29, 2004) ("the underlying alleged facts must tend to show that

the defendants *knew* that they were making material decisions without adequate information

Exhibit 10

and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (citation omitted) (emphasis in original).

Rather, as described at length above, the Board took steps in good faith to ensure that it was adequately informed with respect to the settlement, and is therefore entitled to the protections of CA's Certificate and § 102(b)(7). This further supports the SLC's decision to seek dismissal of this claim.

### 3.    The Kumar Decision

The Settlement Director Defendants are also alleged to have breached their duty of care for failing to remove Mr. Kumar as CEO before it did on April 20, 2004, as a result of his then-alleged role in the accounting fraud and cover-up. Specifically, the Kaufman Complaint alleges that in early 2004, "[d]espite a wealth of evidence that the cover up was directed from the very top, the Director Defendants continued in their by now familiar – and increasingly inexplicable – blind faith in their CEO, failing to move against Kumar." Kaufman Compl. ¶ 94. For the reasons discussed below, the SLC has concluded that there is no basis for this claims.

As described in detail above, the decision as to how the Board should treat Mr. Kumar once evidence of general wrongdoing had surfaced was far from "blind" – to the contrary, it was carefully considered on several occasions. In the period of slightly more than five months – once Mr. Silverstein pled guilty on January 22 – the Board met four times concerning Mr. Kumar. Within three months after Mr. Silverstein's plea, the Board demoted him to a non-management position (on April 20, 2004), and then secured his resignation in early June, the exact action Ms. Kaufman alleges should have been taken. All of these actions were taken months prior to any action by the SEC or USAO against Mr. Kumar, which

357

                              Exhibit 10

occurred in September 2004. Finally, the record is clear that the Board kept Mr. Kumar for as long as it did, and deliberated as extensively as it did, because it believed that his continued leadership was in the best interests of CA's shareholders. These deliberations, and the resulting decisions – both to refrain from taking action against Mr. Kumar and ultimately removing him – are classic business judgments.

(a)    The Business Judgment Rule

The decision of the directors not to take action against Mr. Kumar in early 2004 was carefully considered and is therefore protected by the business judgment rule. *See Aronson*, 473 A.2d at 813 ("a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule"); *Rattner*, 2003 WL 22284323 at *7 ("the business judgment rule [] operates in instances of . . . a conscious decision to refrain from acting"). As a result, and as discussed above, plaintiffs must prove that the defendants acted with (i) fraud, (ii) illegality, (iii) a conflict of interest, or (iv) gross negligence in order to overcome the presumption that they acted with due care in deciding not to take action against Kumar in early 2004. *See Crescent/Mach I Partners*, 846 A.2d at 984.

In the end, this analysis is guided by concepts of gross negligence, since the SLC found no evidence that the Board's decision was tainted with fraud, illegality, or a conflict of interest. To the contrary, the decision was made by the Board's independent directors who had no interest, other than their interest in doing what was best for CA and its shareholders, in the outcome of the decision that was made with respect to Mr. Kumar's employment.

As noted above, with respect to actions of corporate fiduciaries, gross negligence has been defined as "reckless indifference to or deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Disney IV*, 907 A.2d at 750 (citation omitted); *see also Benihana*, 891 A.2d at 192. To show gross negligence, there must

358

Exhibit 10

be a "wide disparity" between the decision-making process employed by the board, and a process that would be rational. *See Guttman*, 823 A.2d at 507 n. 39. The SLC has concluded that the facts surrounding the Board's decision to not take action against Mr. Kumar at the February 1, 2004 Board meeting do not "suggest a *wide* disparity between the process the directors used . . . and that which would have been rational." *Disney IV*, 907 A.2d at 750 (emphasis in original).

Following the discovery in October 2003 that there had been some form of wrongdoing at CA, the Board began gathering information regarding Mr. Kumar's possible involvement in both the accounting fraud and any effort to cover up that fraud. Among other things, (i) the Audit Committee requested a meeting with the government specifically for the purpose of obtaining information regarding Mr. Kumar's culpability, if any (which occurred on November 3, 2003), (ii) the Board inquired and received reports about the evidence against Mr. Kumar at each subsequent Board meeting (and each time counsel (both WLRK and S&C) reported that they had uncovered no evidence linking Mr. Kumar to the fraud), (iii) Mr. Schuetze requested, and Mr. Kumar provided to the Board, a report prepared by outside consultants regarding the compensation Mr. Kumar received during the period of fraudulent conduct, and (iv) the Audit Committee's investigation was "ratcheted up" in order to gain as much documentary evidence and witness testimony possible. These steps were taken prior to any action by the government against Mr. Kumar, or any CA executive.

Then, following the guilty plea of Mr. Silverstein on January 22, 2004, at which time it became clear that there had been some form of a coordinated effort to obstruct the government's investigation, the Board took several additional steps to understand what, if any, role Mr. Kumar had played in either the fraud or the cover up.

*First,* the same day as Mr. Silverstein's plea, the Audit Committee's counsel interviewed Mr. Kumar by telephone, who was traveling, to question him about his contacts with Mr. Silverstein. Mr. Schuetze participated in the interview personally. Mr. Kumar told the Audit Committee that he had little contact with Mr. Silverstein, and had no knowledge of the conspiracy to obstruct justice.

*Second,* six days later, on January 28, 2004, CA's independent directors met with Mr. Kumar to question him further regarding his involvement in the accounting fraud, and the alleged obstruction. Also on January 28, 2004, Mr. Schuetze attended a meeting with the government at which he asked the government to provide the Company with any evidence it had implicating Mr. Kumar. The government refused to provide any such evidence, but instead told Mr. Schuetze that he had "his head in the sand," with respect to Mr. Kumar, and that he should continue to investigate.

*Third,* Mr. Fernandes met with Mr. Kumar privately and questioned him about the 35-Day Month practice. Mr. Kumar admitted to the SLC that he lied to Mr. Fernandes and attempted to convince him that the 35-Day Month occurred because CA's controls were weak, but that ultimately, the impact of the practice was not material and thus would not be a "problem" for CA in the end.

*Fourth,* on February 1, 2004, the Board held a lengthy meeting at which it, (i) received a report from Mr. Schuetze regarding what the Audit Committee had learned about Mr. Kumar to date; (ii) received updates and advice from WLRK and S&C regarding what they had learned about Mr. Kumar, and the government's view with respect to Mr. Kumar (particularly that the government would not settle with CA while Mr. Kumar remained CEO), (iii) met with Mr. Kumar (without WLRK or S&C) to give him the opportunity to address the

evidence against him, and answer questions from the directors, (iv) received advice from WLRK, S&C, and Covington & Burling regarding the directors' duty with respect to their decision; (v) held an executive session during which the directors outlined a plan for making their decision with respect to Mr. Kumar, and (vi) decided to take no immediate action with respect to Mr. Kumar, but to continue to monitor the situation. The record is abundantly clear that the Board questioned WLRK, S&C, and Mr. Kumar extensively concerning any evidence of Mr. Kumar's knowledge of, or participation in, the fraud. The Board also fully explored what the impact of any decision would have on the government investigation and CA as a whole. Having gathered all the relevant facts, and acting with the advice of three separate law firms, the directors decided not to take any action against Mr. Kumar at that time.

   The SLC has concluded that these facts in no way suggest gross negligence on the part of the directors, but rather, demonstrates that the Board "acted in a deliberate and knowledgeable way." *Citron*, 569 A.2d at 66. The Board did not display the "devil-may-care attitude or indifference" required to show gross negligence, but instead took numerous steps to fully inform itself with respect to the facts and their duties as directors. As such, the decision not to take action against Mr. Kumar deserves the protection of the business judgment rule.

   Further, the SLC found that the decision not to take action against Mr. Kumar can be attributed to a rational business purpose. *See Disney IV*, 907 A.2d at 747-8. The directors universally believed that Mr. Kumar added substantial value to CA as CEO, and were concerned that his departure would cause a major disruption to CA's business during an already turbulent time for the Company. The directors also considered the fact that CA's business had improved by that time, as reflected in CA's share price. As such, the directors approached any change to the business very cautiously. The question before the Board was whether they would

361

do more harm by taking action than not, and it chose to wait until it had more definitive information before making such a decision. As such, the SLC found that the Board based its decisions on valid business considerations, and the decision to wait was not "unintelligent" or "irrational." *Id.*

The Board revisited the question of what to do about Mr. Kumar following the April 8 guilty pleas of Messrs. Kaplan, Rivard, and Zar. *First,* on April 14, 2004, Mr. Schuetze again met with the government in order to (i) report on the results of the Audit Committee's investigation to date, including that CA planned to issue a restatement, and (ii) to report on personnel issues then being addressed by the Board. *Second,* on April 16, 2004, Mr. Schuetze requested that S&C circulate to the Board certain documentary evidence that the Audit Committee uncovered and believed potentially implicated Mr. Kumar in the backdating conspiracy. In addition, at Mr. Vieux's request, S&C circulated to the CA Board a summary of Mr. Kumar's interview in which he addressed the documents then at issue. *Third,* during the week prior to an April 20, 2004 Board meeting, Mr. Schuetze met with Mr. Kumar to allow him to plead his case and question him privately regarding his knowledge of, and participation in, the 35-Day Month practice. Mr. Kumar again lied to Mr. Schuetze.

*Finally,* on April 20, 2004, the Board held another lengthy meeting at which (i) S&C gave a presentation updating the Board on the information the Audit Committee had gathered regarding Mr. Kumar to date, including the materials distributed to the CA Board prior to the meeting, and counseled the Board regarding its options with respect to Mr. Kumar, (ii) Mr. Kumar's attorney gave the Board a presentation on his behalf, and (iii) the Board ultimately decided to strip Mr. Kumar of executive level status and demote him from CEO to the position of "Chief Software Architect" and removed him from the Board. As discussed above, the

Exhibit 10

Board did not totally sever Mr. Kumar from the Company at this time because CA's annual customer conference, CA World, was approaching and the Board believed that it would be extremely difficult to find someone to take Mr. Kumar's place at this important customer event on such short notice.

Then, on June 4, 2004, following CA World, the Board requested and received Mr. Kumar's resignation.

Thus, ultimately, after carefully considering the newly discovered evidence and balancing several competing considerations, including the weight of the evidence and how best to transition the Company to new leadership, the Board acted against Mr. Kumar. The Settlement Director Defendants satisfied their duty of care both when they decided not to take action on February 1 and when they finally did, both in April and June. Both decisions were the product of an informed decision-making process and were grounded in a rational business purpose. These decisions are the classic business decisions – the hard calls that must be made even if they turn out different than anticipated – that are protected by the business judgment rule.

(i)     CA's Exculpatory Clause

Finally, as discussed above, CA's Certificate protects the Board from monetary damages in the event of a breach of the duty of care, as permitted by § 102(b)(7). The SLC found no evidence that the Settlement Director Defendants breached their duty of loyalty – engaged in intentional misconduct or knowingly violated the law – in deciding not to take action against Mr. Kumar in February. Likewise, the SLC found no evidence suggesting that the Board consciously disregarded its responsibility to the Company, or that it knew that it was making a decision based on inadequate information and deliberation, but did not care. *See Disney V,* 906 A.2d at 66 ("intentional dereliction of duty, [and] a conscious disregard for one's

363

responsibilities" is misconduct that is "properly treated as a non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith"); *Rapoport*, 2004 WL 3101575, at *4 ("the underlying alleged facts must tend to show that the defendants *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (citation omitted) (emphasis in original).

Rather, as described at length above, the Board took steps in good faith to ensure that it was adequately informed with respect to the evidence against Mr. Kumar and his culpability, and is therefore entitled to the protections of CA's Certificate and § 102(b)(7). This further supports the SLC's decision to seek dismissal of this claim.

D.   *Count Four: Restitution and Unjust Enrichment*

Count four of the 2005 Derivative Complaint alleges that Messrs. Artzt, Kaplan, Kumar, McElroy, McWade, Richards, Rivard, Schwartz, Silverstein, Wang, Woghin, and Zar improperly received compensation from CA under the Company's 1991, 1995 (the KESOP) and 2000 executive compensation and incentive plans (collectively, the "Incentive Plans" or "Plans"). *See* 2005 Compl. ¶ 280. Plaintiffs allege that these defendants earned bonuses and other incentive payments by inflating the Company's earnings, revenues, and share price by issuing financial reports that they knew to be false. Plaintiffs claim that these defendants should not, in equity and good conscience, be allowed to keep the bonus and incentive compensation they received, and therefore seek restitution for the amounts paid under these Incentive Plans. *See id.* ¶¶ 281-82.

Under Delaware law, unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the

fundamental principles of equity and justice." *Schock,* 732 A.2d at 232 (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del. 1988)); *see also HealthSouth,* 845 A.2d at 1105 (unjust enrichment violates "the fundamental principles of justice or equity and good conscience").

Restitution is the remedy for unjust enrichment, as it "serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance." *Schock,* 732 A.2d at 232-33 (quoting *Fleer,* 539 A.2d at 1062). To obtain restitution, it must be shown that (i) the defendant was unjustly enriched; (ii) the defendant secured a benefit; and (iii) it would be unconscionable to allow the defendant to retain that benefit. *See Schock,* 732 A.2d at 232; *HealthSouth,* 845 A.2d at 1105. It need not be shown that the defendant engaged in, or had knowledge of, wrongdoing. *See Schock,* 732 A.2d at 233; *HealthSouth,* 845 A.2d at 1105 ("restitution is permitted even when the defendant retaining the benefit is not a wrongdoer"); *Tucker v. Scrushy,* 2006 WL 37028, at *5 (Ala. Cir. Ct. Jan. 3, 2006) ("knowledge is immaterial under the law of unjust enrichment") (applying Delaware law).

For the reasons discussed herein and below, the SLC has determined that CA has a valid and viable claim for unjust enrichment against Mr. Wang for most of the shares of CA common stock awarded to him under the KESOP, which the SLC intends to pursue.[217] Further, the SLC has also determined that it has valid and viable unjust enrichment claims for incentive compensation paid to the Criminal Defendants and Mr. Schwartz under the 1991 and 2000 Plans, which the SLC also intends to pursue. As noted above, the SLC has reached settlements

---

[217] Under New York law, unjust enrichment claims are governed by a six-year statute of limitations. Thus, certain aspects of this claim are untimely and will not be pursued. *See AmBase Corp. v. City Investing Co. Liquidating Trust,* 2002 WL 59431, at *5 (S.D.N.Y. Jan 15, 2002) (applying New York law), *aff'd,* 326 F.3d 63 (2d Cir. 2003).

Exhibit 10

with Messrs. Artzt, Kumar, and McWade pursuant to which it will seek dismissal of all claims against them. Finally, as discussed above, the SLC has determined that it is not in the Company's best interests to pursue a claim for unjust enrichment against Mr. McElroy, as the cost of litigating such a claim far outweighs any possible return that the Company would obtain. As such, the SLC will seek dismissal of this claim against Mr. McElroy.

E.   *Count Five: Corporate Waste*

Count five of the 2005 Derivative Complaint alleges that the individual defendants and the Settlement Director Defendants are liable to CA for corporate waste for (i) paying undeserved compensation to the individual defendants, (ii) approving the settlement of the Class Actions without seeking contribution from the individual defendants, and (iii) entering into the DPA with the USAO, also without seeking contribution from the individual defendants. *See* 2005 Compl. ¶ 285. The Kaufman Complaint alleges a similar claim. *See* Kaufman Compl. ¶¶ 106-110. While the 2005 Derivative Complaint generally alleges liability on the part of all Settlement Director and individual defendants, this claim can only properly be interpreted as applying to those director defendants who had the authority to, and did (i) make compensation decisions, and (ii) settle the civil and criminal litigation arising out of CA's fraudulent accounting practices.

The test for waste under Delaware law is "severe," and gives officers and directors wide latitude to exercise business judgment without facing liability for unwise decisions. *See, e.g., Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993) (finding that plaintiff is unlikely to prove waste under "severe" test, and denying injunction for failure to show probability of success on the merits). As the Delaware Supreme Court recently reiterated, "[t]o recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving

that the exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *Disney V*, 906 A.2d at 74 (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).

Thus, "a claim for waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets." *Id.*; *see also White v. Panic*, 783 A.2d 543, 554 (Del. 2001) ("As a practical matter, a stockholder plaintiff must generally show that the board irrationally squander[ed] corporate assets – for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all") (citations omitted). In contrast, "[i]f reasonable, informed minds might disagree on the question, then in order to preserve the wide domain over which knowledgeable business judgment may safely act, a reviewing court will not attempt to itself evaluate the wisdom of the bargain or the adequacy of the consideration." *Zapata*, 658 A.2d at 183 (citation omitted). Simply stated, "[i]f under the circumstances any reasonable person *might* conclude that the deal made sense, then the judicial inquiry ends." *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995) (emphasis added).

In the *Disney* case, the Delaware Supreme Court recently addressed the issue of waste in connection with a board's compensation decision. According to the complaint, Disney's board committed waste by permitting a lucrative severance payout to its then-president, Michael Ovitz, under the no-fault termination provision of his employment contract, when it allegedly could have contested that issue. Rather, the plaintiffs claimed, the Disney board had grounds to terminate Ovitz for cause, thereby avoiding the large payments to which Ovitz was entitled under the no-fault provision. *See Brehm*, 746 A.D.2d at 265.

367

Exhibit 10

In rejecting this claim, the Court of Chancery found that the plaintiffs had failed to "allege with particularity facts tending to show that *no reasonable business person* would have made the decision that the New Board made under these circumstances." *Id.* at 266 (emphasis added).  The Delaware Supreme Court then upheld the dismissal, stating:

> One can understand why Disney stockholders would be upset with such an extraordinarily lucrative compensation agreement and termination payout awarded a company president who served for only a little over a year and who underperformed to the extent alleged.    That said, there is a very large – though not insurmountable – burden on stockholders who believe they should pursue the remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from office.

*Id.* at 267.  Despite expressing concerns about "lavish executive compensation," the Court held that such decisions are left to the business judgment of directors, and though we may have "aspirations that boards of directors . . . live up to the highest standards of good corporate practices," failure to do so is not grounds for liability under Delaware law.  *Id.* at 249.

This is the legal framework under which the waste claims alleged in the 2005 Derivative Complaint were analyzed by the SLC.  For the reasons discussed below, including (i) the broad discretion afforded directors in making business decisions, (ii) the undisputed lack of knowledge of the non-management directors concerning the 35-Day Month practice, and (iii) the lack of evidence suggesting that those directors acted contrary to CA's best interests, the SLC will seek dismissal of this claim (except as to Mr. Wang).

1.    **Payment of Undeserved Compensation**

Plaintiffs first allege that "the payment of the Underserved Compensation and Other Ill-Gotten Gains to the individual defendants . . . provided no benefit to the Company" and amounted to "a waste of corporate assets." 2005 Compl. ¶ 285; *see also* Kaufman Compl. ¶ 109. Although plaintiffs seek to hold all Current Director Defendants and individual

defendants liable, this claim can only be reasonably interpreted to apply to those directors who had responsibility for the challenged employee compensation decisions.[218]  However, plaintiffs identify no particular compensation decision that they challenge, apparently claiming that all compensation paid at all times amounted to waste.

Under Delaware law, "[t]o be sure, directors have the power, authority and wide discretion to make decisions on executive compensation." *Brehm*, 746 A.2d at 262 n.56 (citing 8 Del. Code § 122(5)).[219]  Compensation decisions made by an independent and informed board, acting in good faith, are entitled to the protection of the business judgment rule and will not be second-guessed by courts. *See Prod. Res. Group L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del. Ch. 2004) ("Informed decisions regarding employee compensation by independent boards are usually entitled to business judgment rule protection"); *Litt v. Wycoff*, 2003 WL 1794724, at *6 (Del. Ch. Mar. 28, 2003) ("employee compensation decisions made by a fully informed, disinterested, and independent board of directors are usually entitled to the protection of the business judgment rule").

As discussed above, the requirement that a board be informed means only that a board's decision must be based on "all material information *reasonably available*." *Van Gorkom*, 488 A.2d at 872 (emphasis added) (citation omitted); *see also Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 797 (Del. Ch. 2006) ("to invoke the [business judgment] rule's protection, directors have a duty to inform themselves, prior to

---

218   Thus, the claim in the 2005 Derivative Complaint against the non-director Individual Defendants – Messrs. Kaplan, McElroy, McWade, Richards, Rivard, Schwartz, Silverstein, Woghin, and Zar – who were not authorized to make such compensation decisions, is without basis, and should be dismissed.

219   Section 122(5) of the Delaware General Corporation Law provides that "[e]very corporation . . . shall have the power to . . . [a]ppoint such officers and agents as the business of the corporation requires and to pay or otherwise provide for them suitable compensation."

369

making a business decision, of all material information reasonably available to them")
(quotation omitted).

      Here, unfortunately, the material information reasonably available to the directors did *not* include the most critical data: that numerous officers were engaged in a wide-ranging fraud and obstruction. In light of this reality, the SLC has found no evidence to suggest that any of the non-management directors acted in bad faith in setting the compensation of any CA employee, or that the Board was, or should have been, aware of the 35-Day Month practice when it approved any form of compensation. To the contrary, the SLC believes that had the directors known that CA employees were involved in a fraudulent accounting scheme, the individuals involved would have had their employment terminated, and would not have received any incentive compensation. As such, the SLC believes that the non-management directors are protected by the business judgment rule, and that this claim should be dismissed. For the reasons noted above, however, the SLC will pursue this claim against Mr. Wang. As noted above, the SLC has reached settlements with Messrs. Artzt and Kumar, pursuant to which it will seek dismissal of all claims against them.

      2.    **Civil Litigation Settlement**

      Plaintiffs next contend that the August 2003 settlement of the Class Actions and Derivative Litigation without seeking contribution amounted to corporate waste, and thereby seek to hold the Current Director Defendants and individual defendants liable. *See* 2005 Compl. ¶¶ 285-86; *see also* Kaufman Compl. ¶ 108. Again, although the 2005 Complaint generally alleges waste against all individual defendants, the decision to settle the pending litigation was the sole responsibility of the Settlement Director Defendants – Messrs. Cron,

Exhibit 10

D'Amato, Fernandes, Kumar, La Blanc, Lorsch, Ranieri, Schuetze, and Vieux.[220]  As such,

there is no basis for a claim arising out of the decision to settle the civil litigation as against the

other non-director individual defendants who did not authorize the settlement.[221]

        As discussed at length above (*see* supra 378-358), the SLC has determined that

CA's directors acted in a manner consistent with their duties of loyalty and due care in

approving the settlement of the Class Actions and Derivative Litigation in August 2003.  In

connection with the settlement, the Company extinguished several billion dollars of potential

liability.  The approval of the settlements by the Board was supported by valid business

considerations, and was the result of a deliberative process in which the Board appropriately

relied on the advice of counsel.  Because the SLC has concluded that the decision is protected

by the business judgment rule, the SLC has likewise concluded that the decision to settle did

not amount to corporate waste.  Under no circumstances was this a decision that was "so one

sided that no person of ordinary, sound judgment could conclude that the corporation has

received adequate consideration."  *Disney V*, 906 A.2d at 74 (quotation omitted).  The SLC will

seek dismissal of this claim as well.

3.      **Decision to Enter Into the DPA**

        Finally, the 2005 Complaint alleges that the Current Director Defendants and

individual defendants wasted corporate assets when they agreed to settle the criminal charges

against CA by entering into the DPA, which was executed on September 22, 2004, without

seeking contribution.  *See* 2005 Compl. ¶ 285.  Although this claim again names both the

---

220     Mr. Vieux was not named as a defendant in the 2005 Derivative Complaint, but is named as a defendant in the Kaufman Complaint.

221     Accordingly, this claim should be dismissed against Messrs. Artzt, de Vogel, Grasso, Kaplan, Kumar, McElroy, McWade, Pieper, Richards, Rivard, Schwartz, Silverstein, Wang, Woghin, and Zar, who did not authorize the settlement.

371

Exhibit 10

individual defendants and the Current Director Defendants, it can only apply to those directors who authorized CA's entry into the DPA on September 21, 2004.[222] With respect to those directors who authorized CA to enter into the DPA, the SLC has concluded that the decision to enter into the DPA without seeking contribution was motivated by rational business considerations, and cannot be considered to have been one of those "rare, unconscionable case[s] where directors irrationally squander or give away corporate assets." *Disney V*, 906 A.2d at 74. As a result, the SLC has determined that this claim should be dismissed.

As discussed above, CA itself was charged with securities fraud and obstruction of justice in connection with the 35-Day Month practice. *See* DPA ¶ 1. Under the terms of the DPA, CA, among other things, (i) accepted full responsibility for the fraudulent conduct of its officers and employees, (ii) instituted certain corporate reforms, (iii) agreed to fully cooperate with the USAO and the SEC, and (iv) paid $225 million in restitution to CA shareholders who suffered losses because of this conduct. *See* DPA ¶¶ 8, 23. In return, the USAO agreed to recommend that prosecution of CA be deferred for eighteen (18) months, after which the USAO would seek dismissal of all charges against the Company, with prejudice. *See* DPA ¶ 24. Further, the USAO agreed not to file any additional charges against CA relating to its fraudulent accounting practices. *See id.*[223]

---

222     Those directors include Messrs. Artzt, Cron, D'Amato, Fernandes, La Blanc, Lorsch, Ranieri, and Schuetze. Plaintiffs' claim against Messrs. de Vogel, Grasso, Kaplan, Kumar, McElroy, McWade, Pieper, Richards, Rivard, Schwartz, Silverstein, Wang, Woghin, and Zar should be dismissed since these defendants played no role in approving the DPA.

223     CA's compliance with the terms of the DPA was to be monitored by an Independent Examiner. *See* DPA ¶ 19. On September 14, 2006, the USAO extended the term of the Independent Examiner, which would otherwise have expired on September 16, 2006, until May 1, 2007, due to outstanding issues with CA's internal accounting controls and the reorganization of its Accounting department. *See* Letter from the USAO to the Honorable I. Leo Glasser (Sept. 14, 2006).

The SLC has concluded that the Board's decision to enter into the DPA spared CA from the tremendous costs and negative publicity that would have likely resulted from a criminal prosecution and trial, regardless of the outcome. As commentators have recently noted, "[t]he reality is that few public or regulated companies can withstand the uncertainties and consequences that flow from an unresolved federal criminal indictment, much less conviction." Scott A. Resnik & Keir N. Dougall, *The Rise of Deferred Prosecution Agreements*, N.Y.L.J. Dec. 18, 2006, at 9. The decision to enter into the DPA resolved the federal criminal charges against CA without risking a criminal conviction or a prolonged, public criminal trial. Most importantly, it allowed the Company to move on, and to allow new management to focus on building a profitable software business on behalf of CA's shareholders.

Had CA been indicted, much less convicted at trial, it is possible that CA would have ceased to exist as a going-concern, given the negative publicity and business consequences resulting from such an outcome. Even in the early stages of the criminal investigation, the Board was acutely aware of the potential negative impact that a continuing government investigation and criminal litigation could have on CA's business.

The SLC has therefore concluded that the decision to enter into the DPA was not "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *See Disney V*, 906 A.2d at 74. Rather, the SLC has determined that the decision to enter into the DPA was a rational and well-advised decision, which has allowed the Company to reform its management and to emerge from the government investigation as a healthy and competitive business organization.

373

The decision not to seek contribution from the Criminal Defendants does not change this analysis. By this time – September 22, 2004 – five (5) CA senior executives had already pled guilty, and Messrs. Kumar and Richards had been fired from CA, criminally indicted, and were awaiting trial. Given the stakes for CA, and the posture of Mr. Kumar, the only one of the Criminal Defendants with any substantial assets – he was publicly fighting the criminal charges lodged against him at the time – it was not unreasonable to go forward with the DPA without seeking contribution. Indeed, since Mr. Kumar had been fired, CA had no leverage to compel him to contribute to a settlement, and delay in entering into the DPA could have been catastrophic for CA.

Indeed, the likely negative consequences of a continued criminal prosecution, regardless of the outcome, counseled strongly in favor of a negotiated resolution, even if such a resolution did not involve seeking contribution from the wrongdoers. In any event, the DPA preserved CA's ability to seek restitution in connection with the sentencing of the Criminal Defendants, which it is pursuing. *See* DPA ¶ 6(g) ("CA may be entitled to apply as a victim, on behalf of itself and/or its present or former shareholders, for an award of some or all of the amount of any such disgorged compensation obtained from such present and former CA officers or employees").[224] As part of a settlement with the government, Mr. Kumar has agreed to pay restitution of $52 million, which will be distributed to former CA shareholders.

The SLC is also pursuing monetary settlements from the Criminal Defendants. For example, it has already settled with Mr. Kumar and will receive a partially secured $15.25 million judgment. As such, even if the decision did constitute corporate waste (it did not), this

---

[224]    On October 20, 2006, in connection with the sentencing of Mr. Kumar, CA submitted a Victim Impact Statement to the U.S. Department of Probation, in which it sought restitution for the costs incurred by CA as a result of Mr. Kumar's crimes. The SLC joined in this application.

Exhibit 10

claim is not yet ripe, given the avenues for recovery that the SLC is currently pursuing. *See Saito*, 2004 WL 3029876 at *5 (claim that directors breached their fiduciary duties by "failing to pursue claims for monetary redress against the former HBOC directors . . . is premature and fails to allege any harm" because "plaintiffs fail to allege that . . . Director Defendants have made a definitive decision whether to sue" these individuals); *Laties v. Wise*, 2005 WL 3501709, at *2 (Del. Ch. Dec. 14, 2005) (waste claim not ripe where "there are no allegations . . . that the directors made a definitive decision not to seek restitution").

In sum, the SLC has concluded that the waste claims alleged in the 2005 Derivative Complaint and Kaufman Complaint lack merit, and should be dismissed in all respects, except with respect to waste claims alleged against Mr. Wang in the 2005 Derivative Complaint.

### F.   *Count Six: Fraud*

Count six of the 2005 Derivative Complaint alleges that the individual defendants "owed a duty of full disclosure to CA," but failed to disclose to the Company known facts regarding their misconduct and that of other CA officers, directors, and employees. 2005 Compl. ¶ 288. Plaintiffs further allege that the individual defendants intentionally, knowingly, and recklessly misrepresented CA's financial results, "thereby inducing CA's other directors to vote for, pay and incur the expense of transferring Undeserved Compensation to CA executives on the basis of false representations in amounts greater than those to which those employees were entitled." 2005 Compl. ¶¶ 289-90. For these alleged fraudulent acts, plaintiffs seek compensatory, consequential, and exemplary damages on CA's behalf. *See* 2005 Compl. ¶ 291.

Under New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party

making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (quotation omitted); *see also Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damages to the plaintiff").[225]

Where a fraud claim is based not on an affirmative misrepresentation but on concealment of material information, a plaintiff must also demonstrate that the defendant, as here, had a duty to disclose such information. *See Lerner*, 459 F.3d at 291-92 (citation omitted); *see also Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) (officers, directors, and "key managerial employees" have a "duty to disclose information that is relevant to the affairs of the agency entrusted to [them]"); *Potter v. Pholad*, 560 N.W.2d 389, 394 (Minn. Ct. App. 1997) (applying Delaware law and holding that "officers, as agents of the corporation, have an obligation to disclose information material to the board's ability to make an informed decision"). Regardless of whether the case is predicated on an affirmative misrepresentation or on acts of concealment, the scienter element requires proof of an "attempt to deceive," which can be demonstrated by showing "knowledge of falsity or reckless pretense

---

[225] New York law governs plaintiffs' common law fraud claim. While the law of the state of incorporation generally governs actions arising from corporate relationships and obligations (the "internal affairs doctrine"), "[t]he tort of fraud is considered to be committed where the misrepresentation is uttered." *Aquilio v. Manaker*, Nos. 90-CV-45, 91-CV-93, 1991 WL 207473, at *6 (N.D.N.Y. Oct. 10, 1991). The conduct on which plaintiffs base their fraud claim occurred in New York, thereby requiring the application of New York law. However, the elements of a fraud claim under Delaware law mirror those under New York law, so the outcome would be the same. *See, e.g., DCV Holdings v. ConAgra, Inc.*, 2005 WL 698133, at *7 (Del. Mar. 24, 2005).

Exhibit 10

of knowledge." *Board of Educ. of Hudson City Sch. Dist. v. Sargent*, 146 A.D.2d 190, 199 (3d Dep't 1989).

Because CA has, among other things, restated its financial statements from fiscal years 2000 and 2001, and admitted as part of the DPA that it improperly recognized revenue from at least 1998 through 2001, there is no question that CA's financial statements contained misrepresentations of CA's revenue and earnings. Given the scope of the restatement and the size of the fraud, those misrepresentations are unquestionably material. Further, it is clear that the CA Board reasonably relied on the Company's publicly-reported financial statements in awarding incentive compensation to CA's officers and employees. Finally, the SLC has concluded that certain of the defendants acted with the requisite knowledge of falsity and an intent to deceive.

As such, the SLC has concluded that the Company has valid and viable fraud claims against Messrs. Kumar, Richards, Zar, Woghin, Kaplan, Rivard, and Silverstein, all of whom have admitted, in connection with their guilty pleas, that they intentionally participated in and facilitated the 35-Day Month practice, and subsequently conspired to conceal the existence of this practice from the Audit Committee and the government. Likewise, for the reasons discussed in this Report, the SLC has also determined that the Company has valid and viable claims for fraud against Messrs. Wang, Schwartz, and McWade. The SLC intends to pursue claims against all of these defendants except for Messrs. Kumar, Artzt, and McWade with whom the SLC has reached settlements, pursuant to which it will seek dismissal of all claims against them.

With respect to the CA Board members named as defendants in count six – Messrs. Artzt, de Vogel, and Grasso – as discussed above at length, the SLC has found no

Exhibit 10

evidence demonstrating that the Board members knew, or were reckless in not knowing, about the 35-Day Month practice or obstruction of justice at CA. Indeed, these directors were amongst the many people misled by those at CA who had knowledge of the fraudulent activity. As such, the SLC has concluded that the Company does not have a viable claim for fraud against these individuals, and that this claim should be dismissed.

Finally, with respect to Mr. McElroy (and as discussed above), the SLC has concluded that although there may exist a facially viable claim for fraud, it is not in the Company's best interest to pursue such a claim. In addition to the considerations discussed above, for this claim to succeed, the SLC will need to demonstrate, at a minimum, that Mr. McElroy was reckless in not knowing that CA's financial statements, for which he had no responsibility, were misstated. As a result, the SLC will seek dismissal of this claim against Mr. McElroy.

G.    *Count Seven: Violations of Section 14(a) of the Exchange Act*

Count seven of the 2005 Derivative Action alleges that Messrs. Artzt, Cron, D'Amato, de Vogel, Fernandes, Kaplan, Kumar, La Blanc, Lorsch, McElroy, McWade, Ranieri, Richards, Rivard, Schuetze, Silverstein, Wang, Woghin, and Zar caused CA to file false and materially misleading proxy statements relating to (i) CA's 2002 Incentive Plan (the "2002 Plan"), issued on July 26, 2002, and (ii) CA's 2003 Compensation Plan for Non-Employee Directors (the "2003 Plan"), issued on July 21, 2003, in violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n. *See* 2005 Compl. ¶¶ 293-96. The 2002 Plan "was intended to replace future awards under the Company's 1994 Annual Incentive Compensation Plan," while the 2003 Plan "increase[d] director compensation to approximately $150,000" and provided for fifty percent (50%) of this to be paid in deferred stock, rather than options. *See id.* ¶¶ 293-94.

Exhibit 10

Plaintiffs claim that the challenged proxy statements failed to disclose (i) violations of federal securities laws; (ii) the participation of the individual defendants in these violations and the accounting manipulations; and (iii) the failure of certain individual defendants to cooperate with government authorities investigating accounting improprieties and the involvement of certain directors in the obstruction of justice. *See id.* ¶ 296. Plaintiffs further allege that the 2002 and 2003 Plans were approved by shareholders as a result of the false and misleading proxy statements, and would not have been approved if material information had been properly disclosed. *See id.* ¶¶ 295, 297.

Section 14(a) prohibits the solicitation of proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). SEC Rule 14a-9 prohibits proxy solicitation "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a); *see also Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999).

To assert a viable claim under Rule 14a-9, a plaintiff must show that (i) the proxy materials contained a false or misleading statement of a material fact; (ii) that was the result of knowing, reckless or negligent conduct; and (iii) the proxy solicitation was an essential link in effecting the proposed corporate action. *See Bond Opportunity Fund v. Unilab Corp.*, 87 Fed. Appx. 772, 773 (2d Cir. 2004); *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir. 1991); *Vides v. Amelio*, 265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003). Likewise, "the omission of information from a proxy statement will violate [section 14(a) and Rule 14a-9] if either the SEC

requirements specifically require disclosure of the omitted information in a proxy statement, *or* the omission makes statements in the proxy statement materially false or misleading." *Vides*, 265 F. Supp. at 276-77 (quotation omitted).

Under § 14(a), it must only be shown that the misstatement or omission in the proxy statement was made on the basis of negligence. *See Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive" and "[l]iability can be imposed for negligently drafting a proxy statement"); *see also In re Elan Corp.*, 2004 WL 1305845, at *16 (S.D.N.Y. May 18, 2004) ("pursuant to the PSLRA, Count V of the Complaint must be dismissed for failing to set forth any facts giving rise to a strong inference that the defendants acted at least negligently in misrepresenting or failing to set forth the material facts in the . . . proxy materials").

With respect to the first element of a § 14(a) claim – that the proxy statements contain a false or misleading statement of a material fact, or omit to state a material fact necessary in order to make the statement not false or misleading – the SLC concludes that the challenged proxy statements failed to disclose CA's fraudulent accounting practices and the obstruction of the government investigation by certain CA executives. *See* Computer Assocs. Int'l, Inc., Proxy Statement (Form DEF 14A) (July 26, 2002); Computer Assocs. Int'l, Inc., Proxy Statement (Form DEF 14A) (July 21, 2003). Therefore, this element of plaintiffs' § 14(a) claim is satisfied.

The next issue is whether those facts were material so as to require their disclosure. To show the materiality of the omitted facts, there must be a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC*

*Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976). In other words, "[i]f a reasonable shareholder would have viewed disclosure of an omitted fact as having 'significantly altered the total mix of information made available' then that fact is material." *Mendell*, 927 F.2d at 673 (quotation omitted); *see also Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005). The SLC believes that the failure to disclose information regarding its fraudulent accounting practices and the obstruction of the government investigation "significantly altered the total mix of knowledge," thereby making the omitted facts material under section 14(a). *Seinfeld*, 404 F.3d at 650 (quotation omitted).

The next issue is whether the defendants acted with the requisite culpable mental state. As noted above, the standard is negligence. *See Wilson*, 855 F.2d at 995 ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive. Liability can be imposed for negligently drafting a proxy statement") (citation omitted). For those Criminal Defendants who have pled guilty – Messrs. Kumar, Richards, Zar, Rivard, Silverstein, Kaplan, and Woghin – the SLC can demonstrate that they knowingly and intentionally failed to disclose their fraudulent conduct in CA's proxy materials, and can, therefore, prove negligence (and more). As a result, the SLC has concluded that it has valid and viable claims against the Criminal Defendants for violation of § 14(a). With respect to Mr. Wang, as noted above, the SLC has concluded that he knew of, and participated in, the 35-Day Month practice. Therefore, the SLC will pursue a claim against Mr. Wang for failing to disclose his fraudulent conduct in CA's 2002 proxy statement, issued in July of that year, because he served as executive chairman through November 2002. However, because Mr. Wang left CA on November 15, 2002 and therefore was not involved in the 2003 proxy solicitation, filed with the SEC on July

381

21, 2003, this aspect of the claim will be dismissed.  Finally, the SLC has determined that it is not in CA's best interests to pursue a claim against Mr. McElroy, as discussed previously.

As discussed at length above (*see* supra at 313-384), with respect to the directors named in count seven – Messrs. Cron, D'Amato, de Vogel, Fernandes, La Blanc, Lorsch Ranieri, and Schuetze – the SLC has uncovered no evidence that they acted knowingly, recklessly, or negligently in failing to disclose information regarding CA's fraudulent accounting practices, information which they did not have at the time these proxy statements were filed and could not have reasonably obtained.  As such, the SLC has concluded that the Company does not have a viable claim for violation of § 14(a) against these Board members, and that this claim should be dismissed.

As noted above, the SLC has reached settlements with Messrs. Artzt, Kumar, and McWade pursuant to which it will seek dismissal of all claims against them.

H.    *Count Nine:  Common Law Contribution and Indemnity*

Count nine of the 2005 Derivative Action seeks common law contribution and indemnification from all defendants "for the damages caused by their acts and omissions which gave rise to the claims which CA was required to pay hundreds of millions of dollars to settle." 2005 Compl. ¶ 306; *see also* Kaufman Compl. ¶¶ 111-13.  The SLC has determined that claims for common law contribution against the defendants are precluded by the bar order contained in the Final Judgment, as discussed above in connection with plaintiffs' statutory contribution claim, and should be dismissed.  Under New York law, however, CA is entitled to indemnification from the actual wrongdoers.[226]  The SLC will pursue a claim for

---

[226]    As discussed above, New York substantive law will apply to plaintiffs' contribution and indemnity claim. However, Delaware law regarding contribution, as codified at 10 Del. Code § 6302(a), does not differ substantially from New York law and its application would yield the same result, as described herein.

Exhibit 10

indemnification against the Criminal Defendants (except Mr. Kumar), and Messrs. Wang and Schwartz.  As noted above, the SLC has reached settlements with Messrs. Artzt, Kumar, and McWade pursuant to which it will seek dismissal of all claims against them.

### 1.    Contribution

Under New York law, common law "[c]ontribution may be available among joint tortfeasors who are liable for the same injuries to a third party." *In re Global Serv. Group LLC*, 316 B.R. 451, 464 (Bankr. S.D.N.Y. 2004); *see also Trump Village Section 3, Inc. v. N.Y. State Hous. Fin. Agency*, 307 A.D.2d 891, 896 (1st Dep't 2003) ("Contribution is generally available as a remedy when two or more tort-feasors share in responsibility for an injury, in violation of duties they respectively owe to the injured person") (citations omitted); *Matthews v. U.S.*, 150 F. Supp. 2d 406, 419 (E.D.N.Y. 2001).  Moreover, a claim for contribution does not require that the party from whom contribution is sought to be liable under the same theory of liability, or for the same conduct.  *See In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 528 (Bankr. S.D.N.Y. 2005); *Raquet v. Braun*, 90 N.Y.2d 177, 183 (1997) ("contribution is available 'whether or not the culpable parties are allegedly liable for the injury under the same or different theories'") (citations omitted).  However, "the source of a state law contribution claim must be an obligation imposed by state, rather than federal, law." *W.R. Grace & Co. v. Zotos Int'l*, 2005 WL 1076117, at *9 (W.D.N.Y. May 3, 2005); *see LNC Inves. V. First Fidelity Bank*, 935 F. Supp. 1333, 1340 (S.D.N.Y. 1996) ("many courts have held that the existence, scope and limitations of a right of contribution under a federal statute are governed by federal law").  Therefore, CA cannot assert a claim for contribution under state law to recover the amounts it paid to settle the federal securities laws claims contained in the Class Actions.

Further, as discussed above, the Final Judgment entered on January 5, 2004, precludes CA from seeking contribution from the "released parties":

383

Exhibit 10

> *whether arising under state, federal or common law*, based upon,
> arising out of, relating to, or in connection with the Settled Claims
> of the Settlement Class or any Settlement Class Member.
> Accordingly, to the full extent provided by the PSLRA, *the Court
> hereby bars any action by any person or entity, for contribution*
> against the Release Parties arising out of the Securities Class
> Actions.

Final Judgment ¶ 9 (emphasis added). This bar order specifically applies to all claims for

contribution – "whether arising under state, federal or common law" – and not just those arising

under the PSLRA. As described above, the "released parties" include not only the Individual

defendants named in the Class Actions, but also "[t]he CA Defendants and each of their past or

present subsidiaries, parents, successors, predecessors, insurers, reinsurers, officers, directors,

shareholders, members, employees, agents, fiduciaries, partners, principals." *Id.* ¶ 7. Thus, it is

clear that all of the individual defendants named in the 2005 Derivative Complaint are

"Released Parties" under the Final Judgment in the Class Action, and therefore cannot be held

liable for contribution under New York common law. The SLC will seek dismissal of this

claim.

### 2.   Indemnification

Unlike a claim for contribution, a claim for indemnification is not precluded by

the terms of the bar order in the Final Judgment, discussed above.[227] Thus, the SLC has

determined that there exists a valid and viable claim for indemnification against the Criminal

Defendants, as well as against Messrs. Wang and Schwartz, all of whom the SLC believes

knowingly and intentionally participated in the 35-Day Month practice, thereby causing injury

to the Company. The SLC will pursue this claim.

---

[227]   This is consistent with the PSLRA, which requires the entry of a bar order barring contribution claims "by
the settling covered person against any person, other than a person whose liability has been extinguished
by the settlement of the settling covered person," but does not purport to bar claims for indemnification.
*See* 15 U.S.C. 78u-4(f)(7).

384

Exhibit 10

Under New York law, "[i]ndemnity involves an attempt to shift the entire loss from one who is compelled to pay for a loss, without regard to his own fault, to another party who should more properly bear responsibility for that loss because it was the actual wrongdoer." *Trump*, 307 A.D.2d at 895 (quotation omitted).   However, in contrast to a claim for common law contribution, "a party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the common law indemnity doctrine." *Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.*, 992 F. Supp. 657, 660 (S.D.N.Y. 1998) (citation omitted).

On its face, CA's admission of guilt and acceptance of responsibility in the DPA appear to implicate CA in the wrongdoing and preclude a claim for indemnification by the Company. *See* DPA ¶ 2.   However, as a corporate entity, CA can act only through its agents and employees. *See Braswell v. U.S.*, 487 U.S. 99, 109-10 (1988) ("Artificial entities such as corporations may act only through their agents").   Thus, CA's participation in the 35-Day Month practice occurred only by virtue of the fraudulent conduct of its former officers and employees, and it would turn the law on its head if CA itself could not seek indemnity because their wrongful conduct is imputed to the Company.   Without minimizing the Company's acceptance of responsibility under the DPA, the CA officers and employees identified above were indeed the "actual wrongdoer[s]," who "should more properly bear responsibility for" the losses suffered by CA as a result of their fraud. *Trump*, 307 A.D.2d at 895.   Equitable considerations require that CA be entitled to recoup its losses from those who caused its injury. Thus, for these reasons, the SLC has concluded that there exist valid and viable common law indemnity claims against the Criminal Defendants (except Mr. Kumar with whom the SLC has reached a settlement), as well as against Messrs. Wang and Schwartz which the SLC will

pursue.  As noted, the SLC has reached a settlement with Mr. McWade pursuant to which it will seek dismissal of all claims against him.

XI.    CONCLUSION

Throughout its exhaustive and independent investigation of the allegations in the 2005 Derivative Action and the Kaufman Complaint, the SLC was mindful that its mandate was to determine what courses of action are in the best interests of the Company.  The SLC believes, after weighing all the available information, that it has reached conclusions that are truly in the best interests of CA and its shareholders.  The SLC hopes that with this Report, and by taking the actions recommended herein, CA can finally put the past behind it and move on to a successful future for the benefit of all who have put their faith in CA.

Exhibit 10